**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| ASHLEY DIAMOND, | |
|       Plaintiff, | |
| v. | CASE NO. 5:20-CV-00453-MTT |
| TIMOTHY WARD, et al., | |
|       Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

    Background on Ms. Diamond and Her Prior Incarceration in GDC ......................... 2

    GDC Officials Have Once Again Placed Ms. Diamond in Men's Prisons Where She Is
        Suffering Repeated Sexual Assault and Unrelenting Sexual Victimization ..................... 3

    Defendants Are Once Again Denying Ms. Diamond Medically Necessary Gender
        Dysphoria Care Despite the Medical Consensus on Her Need for Treatment .................. 6

    Plaintiff's Attempts to Negotiate with Defendants for Interim Relief Have Failed ................. 8

ARGUMENT .............................................................................................................. 9

    I.  Legal Standard ................................................................................................. 9

    II.  Plaintiff Is Substantially Likely to Succeed on Her Eighth and Fourteenth Amendment
        Claims ......................................................................................................... 10

      A.  Defendants Have Violated Plaintiff's Right to Be Protected From Sexual Abuse ........ 10

      B.  Defendants Have Violated Plaintiff's Right to Equal Protection ................................... 16

      C.  Defendants Have Violated Plaintiff's Right to Adequate Medical Care. ..................... 23

    III. Plaintiff Will Suffer Irreparable Injury Without Relief ................................................. 26

    IV. The Balance of Equities Support a Preliminary Injunction ......................................... 28

CONCLUSION ........................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
  968 F.3d 1286 (11th Cir. 2020) ...................................................... 16, 19, 20, 21, 22

*Anderson v. Whaley*,
  No. 2:06-cv-620-WKW, 2009 WL 2870062 (M.D. Ala. Sept. 3, 2009) ................................ 16

*Alexander v. Weiner*,
  841 F. Supp. 2d 486 (D. Mass. 2012) ...................................................................... 24

*Asseo v. Pan Am. Grain Co.*,
  805 F.2d 23 (1st Cir. 1986) ................................................................................. 10

*Booher v. Marion Cnty.*,
  No. 5:07-cv-00282-WTH-GRJ, 2007 WL 9684182 (M.D. Fla. Sept. 21, 2007) ..................... 30

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ....................................................................................... 20

*Braggs v. Dunn*,
  257 F. Supp. 3d 1171 (M.D. Ala. 2017) ................................................................... 25

*Brooks v. Berg*,
  270 F. Supp. 2d 302 (N.D.N.Y. 2003) .................................................................... 25

*Brown v. Johnson*,
  387 F.3d 1344 (11th Cir. 2004) ........................................................................... 24

*Caldwell v. Warden, FCI Talladega*,
  748 F.3d 1090 (11th Cir. 2014) ........................................................................... 11

*Campbell v. Bruce*,
  No. 17-CV-775-JDP, 2019 WL 4758367 (W.D. Wis. Sept. 30, 2019) .................................. 17

*Cassady v. Dozier*,
  No. 5:17-CV-495 (MTT), 2018 WL 1370602 (M.D. Ga. Mar. 16, 2018) (Treadwell, J.) ....... 26

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ..................................................................................... 17, 20

*Colwell v. Bannister*,
  763 F.3d 1060 (9th Cir. 2014) ............................................................................. 25

i

*Corbett v. Kelly,*
   No. 97-CV-0682 E, 2000 WL 1335749 (W.D.N.Y. Sept. 13, 2000)........................................ 12

*De'lonta v. Johnson,*
   708 F.3d 520 (4th Cir. 2013) ........................................................................................ 26

*De Veloz v. Miami-Dade Cnty.,*
   756 F. App'x 869 (11th Cir. 2018) ................................................................. 17, 18, 19, 27, 29

*Diamond v. Owens,*
   131 F. Supp. 3d 1346 (M.D. Ga. 2015) (Treadwell, J)...................................... 3, 11, 12, 23, 25

*Doe v. Mass. Dep't of Corr.,*
   No. 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018)......................................... 21

*Edmo v. Corizon, Inc.,*
   935 F.3d 757 (9th Cir. 2019) .................................................................................... 28, 29

*Farmer v. Brennan,*
   511 U.S. 825 (1994).................................................................................... 2, 11, 12, 15

*Farrow v. West,*
   320 F.3d 1235 (11th Cir. 2003) ..................................................................................... 23

*Figueroa v. Dinitto,*
   52 F. App'x 522 (1st Cir. 2002)..................................................................................... 13

*Fields v. Smith,*
   712 F. Supp. 2d 830 (E.D. Wis. 2010)............................................................................. 28

*Gammett v. Idaho State Bd. of Corrs.,*
   2007 WL 2186896 (D. Idaho July 27, 2007) ..................................................................... 29

*Glenn v. Brumby,*
   663 F.3d 1312 (11th Cir. 2011) ............................................................................. 20, 21, 22

*Gonzalez v. Governor of Georgia,*
   978 F.3d 1266 (11th Cir. 2020) ................................................................................ 10, 28

*Greeno v. Daley,*
   414 F.3d 645 (7th Cir. 2005) ....................................................................................... 26

*Hale v. Tallapoosa Cnty.,*
   50 F.3d 1579 (11th Cir. 1995) ...................................................................................... 15

*Hampton v. Baldwin,*
   No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) . 13, 19, 21, 22, 23, 27

*Harris v. Bd. of Supervisors,*
  366 F.3d 754 (9th Cir. 2004) ................................................................. 28

*Hicklin v. Precynthe,*
  No. 4:16-CV-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ............... 24, 27

*Hoffer v. Jones,*
  290 F. Supp. 3d 1292 (N.D. Fla. 2017) .............................................. 28, 29

*Kastl v. Maricopa Cnty. Cmty. Coll. Dist.,*
  No. Civ. 02–1531PHX–SRB, 2004 WL 2008954 (D. Ariz. June 3, 2004) ............ 22

*Keohane v. Fla. Dep't of Corrs. Sec'y,*
  952 F.3d 1257 (11th Cir. 2020) ............................................................. 25

*Konitzer v. Frank,*
  711 F. Supp. 2d 874 (E.D. Wis. 2010) ............................................... 24, 25

*Kosilek v. Spencer,*
  774 F.3d 63 (1st Cir. 2014) ................................................................... 25

*LaMarca v. Turner,*
  995 F.2d 1526 (11th Cir. 1993) ............................................................. 26

*Laube v. Haley,*
  234 F. Supp. 2d 1227 (M.D. Ala. 2002) .................................................. 28

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,*
  51 F.3d 982 (11th Cir. 1995) ................................................................ 10

*Monroe v. Baldwin,*
  424 F. Supp. 3d 526 (S.D. Ill. 2020) ...................................................... 26

*Monroe v. Meeks,*
  No. 18-CV-00156-NJR, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020) .............. 24, 25

*Nguyen v. Immigration & Naturalization Serv.,*
  533 U.S. 53 (2001) .............................................................................. 21

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................ 10

*Norsworthy v. Beard,*
  87 F. Supp. 3d 1164 (N.D. Cal. 2015) .................................................... 28

*Planned Parenthood Se., Inc. v. Bentley,*

951 F. Supp. 2d 1280 (M.D. Ala. 2013) .................................................................. 28

*Reed v. Long,*
420 F. Supp. 3d 1365 (M.D. Ga. 2019) (Treadwell, J.) .................................... 28, 30

*Rodriguez-Garcia v. De Veloz,*
140 S. Ct. 127 (2019) .......................................................................................... 17

*Rodriguez v. Sec'y for Dep't of Corrs.,*
508 F.3d 611 (11th Cir. 2007) ................................................................ 12, 13, 16

*Roe v. Elyea,*
631 F.3d 843 (7th Cir. 2011) .............................................................................. 25

*Scott v. Roberts,*
612 F.3d 1279 (11th Cir. 2010) ...................................................................... 27, 29

*Smith v. Reg'l Dir. of Fla. Dep't of Corrs.,*
368 F. App'x 9 (11th Cir. 2010) .......................................................................... 16

*Soneeya v. Spencer,*
851 F. Supp. 2d 228 (D. Mass. 2012) .............................................................. 24, 25

*Tay v. Dennison,*
457 F. Supp. 3d 657 (S.D. Ill. 2020) ............................... 12, 13, 15, 21, 22, 27

*Thomas v. Bryant,*
614 F.3d 1288 (11th Cir. 2010) .......................................................................... 27

*Washington v. Albright,*
No. 2:11-cv-618-TMH, 2011 WL 4345687 (M.D. Ala. Aug. 22, 2011) ................................ 16

*White v. Baker,*
696 F. Supp. 2d 1289 (N.D. Ga. 2010) .............................................................. 28

*United States v. Virginia,*
518 U.S. 515 (1996) .................................................................... 16, 20, 21

*Univ. of Tex. v. Camenisch,*
451 U.S. 390, 395 (1981) .................................................................... 10, 16

## Statutes, Rules, & Regulations

28 C.F.R. § 115.42 .............................................................................................. 4

Fed. R. Civ. P. 65 ................................................................................................ 30

## INTRODUCTION

Plaintiff, Ashley Diamond, a Black transgender woman in the custody of the Georgia Department of Corrections ("GDC"), files this petition for emergency relief to avert the imminent risk of harm she faces due to the GDC Defendants' recurrent failure to provide her reasonable protection from sexual assault and medically necessary gender dysphoria care—failures made even more egregious because Ms. Diamond sued GDC officials for similar constitutional violations before.

Even though Ms. Diamond is similarly situated to cisgender women in terms of the risk of sexual assault she faces in men's prisons, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison have denied Ms. Diamond a placement in a women's facility pursuant to a "De Facto Placement Ban" that disregards the safety needs of transgender people and assigns them to facilities based on their birth-assigned sex, regardless of whether such placements are safe and appropriate. As a result, Defendants have placed Ms. Diamond in a series of men's prisons where she once again faces unrelenting sexual abuse and attacks, contrary to the recommendations of GDC's own medical providers. Ms. Diamond also faces severe healthcare deprivations—including denials of medically-necessary forms of hormone therapy, hair removal products, and accommodations for her gender expression—that have wreaked havoc on her physically and psychologically and led to depression, anxiety, and repeated suicide and self-castration attempts.

Defendants' continued refusal to provide Ms. Diamond adequate medical care or protection from assault—the very refusals which formed the basis of her prior lawsuit—have pushed Ms. Diamond to her breaking point and stripped her of the will to live. Although Ms. Diamond contacted Defendants, through counsel, to request that they begin voluntarily complying with their constitutional obligations, they have doubled down on their refusal while also taking actions to block her early release, leaving this emergency motion as her only remaining recourse.

Accordingly, Ms. Diamond files this Motion for Preliminary Injunction because, "having stripped [Ms. Diamond] of virtually every means of self-protection and foreclosed [her] access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

## STATEMENT OF FACTS
### Background on Ms. Diamond and Her Prior Incarceration in GDC

Ms. Diamond is a woman. She is also transgender. Decl. of Ashley Diamond ("Diamond Decl.") ¶ 1. She was diagnosed with gender dysphoria at age 15. *Id*. Because gender identity is immutable, Ms. Diamond's medical treatment includes living openly as a woman and receiving hormone therapy to more closely align her body with her brain. *Id*. ¶¶ 4, 51. Decl. of Dr. Randi Ettner ("Ettner Decl.") ¶ 64. Ms. Diamond began hormone therapy to feminize her body at age 17. Diamond Decl. ¶ 50. She has received feminizing hormones for more than 25 years, with the exception of the times that GDC refused to provide them to her. Diamond Decl. ¶¶ 63, 65. As a result of her long-term usage of hormones, Ms. Diamond has been hormonally reassigned. Ettner Decl. ¶ 66. That is, she has circulating sex steroid hormones—estrogen and testosterone—comparable to her female peers. *Id.*; Decl. of A. Chinyere Ezie ("Ezie Decl."), Exhibit ("Ezie Ex.") 25 (showing Ms. Diamond's hormone levels in normal range for cisgender women). Consistent with her long-time hormone use, Ms. Diamond has the secondary sex characteristics of a woman. She has female breast development, softened skin, diminution of body hair, the absence of male pattern baldness, redistribution of body fat consistent with a female shaped body, loss of muscle mass, and genital changes. Ettner Decl. ¶¶ 68-70. Indeed, Ms. Diamond only developed male pattern facial hair after Defendant Lewis and others interrupted her medically necessary treatment hormone treatments for three years between 2012 and 2015. Diamond Decl. ¶¶ 3-4; Ettner Decl. ¶¶ 69, 74, 75.

Ms. Diamond sued GDC officials, including Defendant Sharon Lewis, in 2015 after they placed her in a series of men's prisons where she was sexually assaulted almost a dozen times, and diagnosed with PTSD. *Diamond v. Owens* ("*Diamond I*"), 131 F. Supp. 3d 1346 (M.D. Ga. 2015) (Treadwell, J). Defendant Lewis also denied Ms. Diamond medically necessary gender dysphoria care which devastated Ms. Diamond physically and emotionally and led her to repeated suicide and self-castration attempts. Diamond Decl. ¶¶ 4-5. Ms. Diamond's lawsuit concluded after she was released from custody and compensated for her injuries. *Id.* ¶¶ 6, 9.

**GDC Officials Have Once Again Placed Ms. Diamond in Men's Prisons Where She Is Suffering Repeated Sexual Assault and Unrelenting Sexual Victimization**

Ms. Diamond reentered GDC custody on October 29, 2019 in connection with a technical parole violation. During her October 2019 intake, Ms. Diamond completed GDC Prison Rape Elimination Act ("PREA") classification paperwork that confirmed her status as a transgender PREA victim with an exclusively non-violent criminal record and a history of being assaulted in GDC custody. Diamond Decl. ¶ 12; *see also* Ezie Ex. 4. During intake, Ms. Diamond spoke with Defendants Ford and Toole to discuss her history of sexual abuse in male GDC facilities and her ongoing risk of sexual assault. Diamond Decl. ¶11; GDC Defs.' Answer to Pl.'s Am. Compl. ECF No. 41 ("GDC Answer") ¶ 231. During intake, Ms. Diamond also met with Statewide PREA Coordinator Defendant Grace Atchison to discuss her housing needs and requested a female facility placement for safety reasons. *Id.* ¶ 232 (same); Diamond Decl. ¶ 11.

GDC's formal written policies allow transgender women to be placed in female facilities as a safety measure. *See* Ezie Ex. 19; Ezie Ex. 22. Ms. Diamond is eligible for a female facility placement under the criteria set forth in these policies. *See* Decl. of James Aiken ("Aiken Decl.") ¶¶ 33-43, 50-64, 85. GDC officials are also required by law to give "serious consideration" to Ms. Diamond's own views regarding housing placements and safety, and to reevaluate her placements

as safety issues arise. 28 C.F.R. § 115.42(e); *see also* Aiken Decl. ¶¶ 31, 34, 42, 59, 86; Ezie Ex. 22. However, despite receiving detailed information about Ms. Diamond's outsized risk of abuse and attacks in male prisons, Defendants Timothy Ward, Sharon Lewis, Javel Jackson, Robert Toole, Grace Atchison, Ahmed Holt, and Brooks Benton (collectively the "Housing Defendants"), who are the relevant decisionmakers with respect to Ms. Diamond's housing placements, denied Ms. Diamond's safety requests pursuant to an unwritten policy that denies transgender women housing placements in female facilities on a blanket basis, regardless of safety considerations, application of the criteria set out in GDC's policy, or any other consideration ("De Facto Placement Ban"). Ezie Decl. ¶¶ 5, 9, 10, 11; Diamond Decl. ¶ 15. The De Facto Placement Ban has superseded all other of GDC's written policies. Ezie Decl. ¶¶ 5, 9, 10, 11; Diamond Decl. ¶ 15; Aiken Decl. ¶¶ 60-64.

Because of the Placement Ban, Defendants placed Ms. Diamond in a series of men's prisons where she has endured sixteen sexual assaults since her October 29, 2019 return to custody—assaults that have involved groping, genital contact, sexual abuse by staff, and forced anal and oral penetration, among other violations. Diamond Decl. ¶¶ 16-18; Ezie Exs. 6-12; GDC Answer ¶¶ 83, 236. Ten of these assaults occurred at ***Ms. Diamond's current facility***—Coastal State Prison ("Coastal")—where Warden Benton and other officials stoked hostility toward Ms. Diamond upon her arrival by announcing that she was a "freak" and a "snitch" and leaking Ms. Diamond's confidential PREA reports. Diamond Decl. ¶¶ 21, 41, 47; Decl. of John Doe ("Doe Decl.") ¶¶ 4-5; Decl. of Blake Duckworth ("Duckworth Decl.") ¶¶ 3-4; Ezie Ex. 8-12. The remaining assaults occurred while she was inexplicably incarcerated at the Georgia Diagnostic Classification Prison ("GDCP"), a closed-security male prison where she was preyed upon by staff and other incarcerated people alike. Diamond Decl. ¶¶ 17-18; Ezie Exs. 6-8.

Even though Ms. Diamond has repeatedly notified the Housing Defendants of her abuse

and attacks through PREA complaints, a formal grievance, other verbal and written communications, and this *lawsuit*, they have refused to reevaluate Ms. Diamond's placement in male prisons or her urgent safety requests ***to this day***. Diamond Decl. ¶¶ 19, 36-38; Ezie Decl. ¶¶ 23-25; Ezie Exs. 6-12, 15-18; GDC Answer ¶ 7 (admitting that Ms. Diamond continues to be housed only in men's facilities).

The Housing Defendants have also refused to take meaningful steps to protect Ms. Diamond or safeguard her from continued assault in the male facilities where she continues to be housed. Diamond Decl. ¶¶ 13-16; Duckworth Decl. ¶¶ 15, 27-30, 41-42; Doe Decl. ¶¶ 8-9. For instance, two of the Housing Defendants—Defendant Benton and Defendant Toole—placed Ms. Diamond in a cell that did not lock, where she was attacked by intruders who entered her cell for months on end. Doe Decl. ¶ 11 (speaking to condition of cell door); Duckworth Decl. ¶ 11 (same); Diamond Decl. ¶¶ 22, 40 (noting repeated requests to get the lock repaired). The Housing Defendants refused to investigate Ms. Diamond's PREA complaints after she voiced concerns about retaliation and asked that her lawyers be present for interviews. Diamond Decl. ¶ 43. To date none of her attackers have been punished. *Id.* The Housing Defendants failed to review or preserve security camera footage documenting Ms. Diamond's sexual assaults or attacks, despite repeated requests from Plaintiff and her counsel to preserve and review. Ezie Exs. 6, 8-10; Diamond Decl. ¶ 19.

The sexual abuse Ms. Diamond has been, and continues to be, subjected to because of the Housing Defendants' failure to protect her and their enforcement of the De Facto Placement Ban is jeopardizing her physical and mental health. Diamond Decl. ¶¶ 13-15, 35-36, 37-44, 46-48; Ettner Decl. ¶¶ 93-94, 104-107, 111-130. As such, Ms. Diamond's mental health counselor has repeatedly recommended that Ms. Diamond be processed for a safety transfer, but to date all requests have been refused. Ezie Exs. 15-17. The Housing Defendants' insistence that Ms.

Diamond be housed with men in the same dormitory at Coastal where she has suffered abuse and attacks means that she still faces an endless torrent of sexual harassment, sexual abuse and sexual coercion; she is strip-searched by men, viewed naked by men, and forced to shower among men. Diamond Decl. ¶¶ 33-34, 45. Her survival ultimately depends on whether the men in her surroundings feel like raping or attacking her on a given day. *Id*. ¶¶ 44, 48; Doe Decl. ¶¶ 5-10; Duckworth Decl. ¶¶ 8-10, 13-14, 23-27, 30; Aiken Decl. ¶¶ 19-20, 22-24, 31, 35, 50-51, 54, 58.

As a result, Ms. Diamond continues to live in fear of the next inevitable assault, her mental health has deteriorated, and her risk of irreversible decomposition has now reached a critical level. Diamond Decl. ¶¶ 45, 114, 117; Ettner Decl. ¶¶ 93-94, 104-107, 111-130. Ms. Diamond has attempted suicide twice in recent months, she struggles every day to find the will to live. Diamond Decl. ¶¶ 112, 114; Duckworth Decl. ¶¶ 43-45, 49-51.

### Defendants Are Once Again Denying Ms. Diamond Medically Necessary Gender Dysphoria Care Despite the Medical Consensus on Her Need for Treatment

Despite having ample knowledge and notice about Ms. Diamond's gender dysphoria diagnosis and treatment needs, Statewide Medical Director Sharon Lewis, Statewide Mental Health Director Javel Jackson, and Assistant Commissioner of the Health Services Division Jack Sauls (collectively the "Healthcare Defendants") have also denied Ms. Diamond medically necessary gender dysphoria care since her October 2019 return to custody, despite Ms. Diamond's well-documented history of self-injury and suicide attempts in GDC custody. Diamond Decl. ¶¶ 10-15; Ezie Ex. 4.

As her 2015 case established, hormone therapy and accommodations related to her gender expression—including the ability to wear female clothing and a hairstyle and be referred to using gender-affirming pronouns—are medically necessary treatments under the Standards of Care that Ms. Diamond requires to manage her gender dysphoria. Verified Compl., *Diamond v. Owens*, No.

5:15-cv-00050-MTT, ECF No. 3, ¶¶ 31-32, 39-42, 73-76, 79-80, 112, 163; Diamond Decl. ¶¶ 51-53; Ettner Decl. ¶¶ 28-33, 34-39, 64, 71-74, 80-82, 86-87, 88-90; Ezie Ex. 23 (GDC provider confirming Ms. Diamond's need for hormone therapy and accommodations for gender expression). Ms. Diamond also requires medicated hair removal treatments to address facial and body hair Ms. Diamond developed after Defendant Lewis terminated her hormone therapy between 2012 and 2015, and a housing placement where she will be reasonably safe from assault. Diamond Decl. ¶¶ 3-4; Ettner Decl. ¶¶ 69, 74, 75, 81, 86-87, 125-131; Ezie Ex. 15-17, 23, 26, 40.

All of the GDC healthcare providers who have individually evaluated Ms. Diamond, including Dr. David Roth and Dr. Daniel Fass, have affirmed Ms. Diamond's need for this full complement of care and advocated that proper treatment—including transfer to an appropriate housing placement—be initiated. Diamond Decl. ¶¶ 51-54; Ettner Decl. ¶¶ 60, 62, 64, 71-74, 80-90, 110, 112, 119-121, 125-131; Ezie Ex. 15-17, 23, 26-27, 40. However, contrary to the recommendations of Ms. Diamond's GDC healthcare providers and the applicable Standards of Care, the Healthcare Defendants have refused to initiate these medically necessary treatments. The Healthcare Defendants have denied Ms. Diamond accommodations for her gender expression. Diamond Decl. ¶¶ 57-59. The Healthcare Defendants have blocked her requests for medicated hair removal treatment to address new hair growth brought about by Defendant Lewis's treatment denials—with Defendant Lewis personally denying the request—even though it is a source of tremendous pain. *Id.* ¶ 55; Ettner Decl. ¶¶ 69, 71-74, 81, 87, 125; Ezie Ex. 29.

The Healthcare Defendants have also refused to provide Ms. Diamond medically-necessary forms of hormone therapy. Diamond Decl. ¶ 57; Ettner Decl. ¶¶ 77, 88-90. The hormone therapy Ms. Diamond has received to date has been erratic—sometimes delayed for weeks at a time, or lowered without justification—and completely unmonitored, which has limited its efficacy at alleviating Ms. Diamond's gender dysphoria symptoms. Diamond Decl. ¶¶ 55-57; Ettner Decl. ¶¶

77, 88-90. Despite repeated requests, the last time Defendants conducted bloodwork to monitor Ms. Diamond's hormone levels to ensures her hormone therapy is working to treat and alleviate her gender dysphoria symptoms was November 2019, when she first entered GDC custody. Diamond Decl. ¶ 57; Ettner Decl. ¶ 89; Ezie Ex. 25. The Healthcare Defendants who have blocked Ms. Diamond's requests for medically necessary treatments have never conducted any individualized assessment of Ms. Diamond or her healthcare needs. GDC Answer ¶ 196. Instead, they've denied her requests on a blanket basis, without any medical judgement whatsoever contrary to the Standards of Care. *Id.*; Diamond Decl. ¶ 49; Ettner Decl. ¶¶ 75-79. When providers like Dr. Fass and Dr. Roth who have actually treated Ms. Diamond have tried to get Ms. Diamond approved for care, they have been summarily overruled by the Healthcare Defendants, *i.e.* "GDC's Central Office." Diamond Decl. ¶ 53.

Because of Defendants' failure to provide her adequate gender dysphoria care, Ms. Diamond's mental health has significantly deteriorated. She struggles with depression, anxiety, hopelessness, and suicidality, resulting in several attempts to end her life. Diamond Decl. ¶ 66; Ezie Ex. 24. She has also repeatedly attempted to castrate herself to stop her pain and damaged her organs in the process—causing severe infection, difficulty urinating, and putting her at risk of kidney failure and death. Diamond Decl. ¶¶ 61, 105; Ezie Ex. 28. Ms. Diamond's dysphoria symptoms—and in particular, her impulse to attempt suicide and self-castration—worsen each day she is denied treatment. Diamond Decl. ¶ 59-60; Ettner Decl. ¶ 24 (explaining that auto-castration is a form of self-surgery in dysphoric individuals). If the Healthcare Defendants' treatment denials continue, the consequences will be predictable and dire: putting Ms. Diamond at an imminent risk of psychological decompensation, physical injury, or death. Ettner Decl. ¶¶ 105, 111-131.

**Plaintiff's Attempts to Negotiate with Defendants for Interim Relief Have Failed**

Prior to filing her Complaint and again prior to filing an Amended Complaint, Ms.

Diamond was advised that her release date was imminent, mooting the need for this motion. Diamond Decl. ¶¶ 87-89; Ezie Decl. ¶¶ 28-30. Since the filing of her complaint, Ms. Diamond, through counsel, has attempted to negotiate with Defendants in an attempt to avert this motion. Ezie Decl. ¶ 23. Ms. Diamond held telephonic status conferences with Defendants on January 22, 2021, March 10, 2021, and March 24, 2021 to see if Defendants would initiate the medical treatment or safety transfers she needs for her health and physical safety. Ezie Decl. ¶¶ 23-24. Ms. Diamond notified Defendants that she would seek preliminary relief if the Parties were unable to reach a resolution, but as of March 25, 2021, the Parties remain at an impasse. *Id.* ¶¶ 24-26. During the pendency of these negotiations, Ms. Diamond learned that her release date, which had until recently been set for March 1, 2021, had been set back almost a year to April 2022—making her requests for healthcare and safekeeping even more urgent. Diamond Decl. ¶¶ 88-92; Ezie Decl. ¶¶ 27-29.[1] A medical assessment by an expert on gender dysphoria and trauma on March 12, 2021 revealed that Ms. Diamond's condition is deteriorating, dire and quickly moving towards irreversible. Ettner Decl. ¶¶ 91-131. Following significant delays in communicating with her attorneys, Ms. Diamond now comes to the Court to seek the relief she so desperately needs.

## ARGUMENT

### I.   Legal Standard

Preliminary injunctions are appropriate where a party can show "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause

---

[1] The changes to Ms. Diamond's release date are the result of a campaign of retaliation that is also threatening the integrity of these proceedings. This conduct is the subject of a separate motion Ms. Diamond has filed, which seeks a Protective Order to prevent further retaliation, witness intimidation, and document destruction and tampering on the part of Defendants and GDC personnel. *See* Pl.'s Mot. for Protective Order dated April 9, 2021, filed herewith.

the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020). But where, as here, "[t]he government is the opposing party," "[t]he third and fourth factors merge." *Id.* (internal quotations and citations omitted); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs do not need to "prove [their] case in full" at the preliminary injunction stage, *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), or show that the evidence "positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Courts may also grant a preliminary injunction based on declarations, affidavits, and evidence ordinarily considered inadmissible such as hearsay, so long as it is "appropriate given the character and objectives of the injunctive proceeding." *Id.* at 985 (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

## II. Plaintiff Is Substantially Likely to Succeed on Her Eighth and Fourteenth Amendment Claims

This Court should grant Ms. Diamond's Motion for a Preliminary Injunction because, as detailed below, she is substantially likely to prevail on the merits of her Eighth Amendment and Fourteenth Amendment Equal Protection claims.[2] The sexual abuse, healthcare denials, and physical and emotional injury that Ms. Diamond has suffered, and continues to suffer, are severe, irreparable, compounding and will continue unabated absent injunctive relief. The public interest and balance of harm also tip decidedly in favor of Ms. Diamond's request that Defendants provide her constitutionally adequate healthcare and protection from sexual violence.

### A. Defendants Have Violated Plaintiff's Right to Be Protected From Sexual Abuse

Prison officials have a duty to protect incarcerated people from physical and sexual

---

[2] Ms. Diamond's Motion seeks relief under Counts I, IV, V, VI, and VII of her Complaint, without prejudice to her ability to seek additional equitable relief following discovery or at trial.

violence pursuant to the Eighth Amendment. *See Farmer*, 511 U.S. at 833-34; *Diamond I*, 131 F. Supp. 3d at 1376. "A prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists, the official does not respond reasonably to the risk, and the official's actions or inaction causes the injury." *Diamond I*, 131 F. Supp. 3d at 1376 (citing *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (cleaned up)). Plaintiff is substantially likely to prevail on the merits of her Eighth Amendment claim because she demonstrates each of the necessary elements.

     *1. Defendants Knew Ms. Diamond Stood a Substantial Risk of Harm from Sexual Abuse*

     First, the Housing Defendants had subjective knowledge of Ms. Diamond's substantial risk of harm from sexual abuse based on, among others: a) their knowledge, as memorialized in GDC policy, that transgender people in prison face a "particularly high risk for [] sexual abuse or harassment," Ezie Ex. 19 (IV)(D)(1); b) their specific knowledge of Ms. Diamond's history of sexual assault in GDC custody, including through *Diamond I*, Diamond Decl. ¶¶ 2-6, 10-11; GDC Answer ¶¶ 1-3, 20; Ezie Exs. 1-2; c) the intake interviews and PREA screenings Ms. Diamond completed where she disclosed her ongoing assault risks and placement needs, including her interview with Defendants Toole, Ford, and Atchison, Diamond Decl. ¶¶ 11-12; GDC Answer ¶¶ 231-232 Ezie Ex. 3; d) Ms. Diamond's PREA classification and assessments, including the assessment she completed upon her arrival at Coastal, which identified her as a transgender PREA victim, Diamond Decl. ¶ 12; Ezie Ex. 5; e) Ms. Diamond's verbal and written complaints, formal grievance, and the six PREA Notices she submitted through counsel to notify the Housing Defendants of her ongoing abuse and attacks and pleas for a safety transfer to a female facility, Ezie Exs. 6-12, 15-18; and f) Ms. Diamond's broader medical, mental health, and institutional file, which Defendants Lewis, Jackson, and Atchison were required to review before making any placement decisions. Ezie Ex. 19.

Based on this record, Ms. Diamond can show the Housing Defendants had subjective knowledge of her substantial risk of assault in custody because the risk was "obvious," "long-standing, pervasive, well-documented," and Defendants were "exposed to information concerning the risk." *Farmer*, 511 U.S. at 842-43 (noting, in a failure to protect case brought by a transgender prisoner, subjective knowledge can be inferred "from the very fact that the risk was obvious."); *Corbett v. Kelly*, No. 97-CV-0682 E, 2000 WL 1335749, at *4 (W.D.N.Y. Sept. 13, 2000) ("An inmate's advance notification to prison officials of a risk of harm . . . may be a factor to show that the officials had knowledge of the risk."). *See also Diamond I*, 131 F. Supp. 3d at 1377-78 (finding that similar allegations "covered the waterfront" with respect to showing subjective knowledge); *Tay v. Dennison*, 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020) (finding actual knowledge based on the "Plaintiff's other lawsuits, her grievances and PREA complaints" and the fact that she is transgender).

### 2.  *Defendants Showed Deliberate Indifference to Ms. Diamond's Risk of Assault*

Ms. Diamond can also show that the Housing Defendants engaged in deliberate indifference by responding to her substantial risk of assault "in an objectively unreasonable manner," even as Ms. Diamond's sexual assaults continued and she begged for help. *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 620 (11th Cir. 2007) (internal citations omitted); *accord Farmer*, 511 U.S. at 842 (deliberate indifference can be shown by knowledge of a risk coupled with a failure to reasonably respond).

*First*, contrary to the Supreme Court's admonition that "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society," *Farmer*, 511 U.S. at 834 (internal quotations and citations omitted), the Housing Defendants placed Ms. Diamond in a series of men's prisons where she faced an undue risk of assault, despite being authorized under GDC policy and federal law to approve Ms. Diamond for

placement in a female facility as a safety alternative. Aiken Decl. ¶¶ 19-20, 22-25, 31, 33-43, 50-64, 84-86, 92, 95; Ezie Ex. 22 (same); Ezie Ex. 19 (confirming that female facility placements were authorized, and that Defendants Lewis, Jackson and Atchison were key decisionmakers). *See also* Ezie Ex. 31-32 (confirming that female facilities house cisgender women with criminal histories comparable to Ms. Diamond, along with those charged with rape and murder); Ettner Decl. ¶¶ 119-121 (noting nationwide practice of approving transgender facility placements).

In choosing to place Ms. Diamond exclusively in men's prisons where she suffered repeated abuse and attacks, the Housing Defendants applied GDC's De Facto Placement Ban to Ms. Diamond and denied her female facility placements based on a blanket policy instead of individualized considerations, in spite of the severe and obvious risks of sexual assault the policy ban exposed her to. *See* Ezie Decl. ¶¶ 5-7; Ezie Ex 19 (IV)(D)(1) (acknowledging that transgender people "***are at particularly high risk*** for physical or sexual abuse or harassment.") (emphasis added). Pursuant to GDC's De Facto Placement Ban, the Housing Defendants also refused to reassess Ms. Diamond's placements in male facilities or her eligibility for a safety transfer even when she became the victim of repeated and foreseeable attacks. These refusals constitute deliberate indifference under settled law. *See Rodriguez*, 508 F.3d at 623 (failing to authorize a safety transfer can constitute an Eighth Amendment violation); *Figueroa v. Dinitto*, 52 F. App'x 522, 524 (1st Cir. 2002) (same); *Tay*, 457 F. Supp. 3d at 685 (refusing to assess a transgender woman's eligibility for a safety transfer to a female facility likely violated the Eighth Amendment); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *17 (S.D. Ill. Nov. 7, 2018) (granting preliminary injunction that ordered prison officials to "consider [] all evidence for and against transferring [the transgender plaintiff] to a women's facility").

*Second*, the Housing Defendants showed deliberate indifference to Ms. Diamond's safety risks by failing to take reasonable steps to protect her from abuse at the men's facilities where she

was placed—leaving her to fend for herself and fight off attackers and predators from all sides. Diamond Decl. ¶¶ 13-16, 19, 22, 30-35, 38-40, 44, 47-48, 113, 115; Duckworth Decl. ¶¶ 25, 31-33; Doe Decl. ¶¶ 5, 8-9. Likewise, the Housing Defendants failed to take corrective action or adopt basic and obvious safeguards after assaults occurred. For example, Defendants Benton and Toole placed Ms. Diamond in a cell that does not lock, and unjustifiably refused to repair the lock for months even after Ms. Diamond was repeatedly attacked by intruders. Diamond Decl. ¶¶ 22-25, 27-29, 40. Defendant Benton failed to maintain the confidentiality of her PREA reports, which led to Ms. Diamond being harassed and labeled a snitch. *Id*. ¶¶ 36, 41-42. Defendants failed to conduct investigations into Ms. Diamond's PREA complaints after she asked for her lawyers to be present to minimize retaliation, Diamond Decl. ¶ 43; Aiken Decl. ¶¶ 44-48 (describing proper investigation procedure). They also failed to preserve or review video security footage in the wake of her assaults. Diamond Decl. ¶ 19. To date, none of the inmates who assaulted Ms. Diamond have been punished. *Id.* ¶ 43.

Defendants have even refused to transfer Ms. Diamond out of the dormitory where she has already been assaulted ten times despite having incontrovertible knowledge of the ongoing sexual assault risk she faces there. Diamond Decl. ¶¶ 3, 10-15, 22; Ezie Exs. 9-12; Ezie Decl. ¶ 7. They have also rejected repeated requests from Ms. Diamond's medical providers that she be processed for a transfer due to the ongoing abuse she was experiencing at Coastal, and the impacts on her mental and wellbeing. Ezie Ex. 15-17, 26 ("[A]lthough [Ms. Diamond] is making every effort to remain in population, she is chronically stressed, fearful, anxious and this setting activates triggers for PTSD"). One sexual assault is too many. Yet here, Ms. Diamond has endured sixteen instances of sexual assaults since her return to GDC custody and counting, along with sexual abuse, sexual harassment, sexual coercion and sexual victimization on a near-daily basis. All the while, the Housing Defendants refuse to make changes to improve her safety or alter her environment—even

though based on Ms. Diamond's "history of sexual harassment, assaults, and rapes while incarcerated in the men's division[], keeping her there may be tantamount to confining her in a cell with a cobra." *Tay,* 457 F. Supp. 3d at 685.

The Housing Defendants' actions have also put Ms. Diamond at a substantial risk of severe and life-threatening harm because her PTSD, emotional suffering, and risk of death by suicide are now extreme. Diamond Decl. ¶¶ 3, 13-14, 16, 20-22, 34-36, 44-48, 58, 59, 66, 91, 104-107, 109, 112-118; Ettner Decl. ¶¶ 91-131. Consequently, Ms. Diamond can show deliberate indifference on the part of each of the Housing Defendants because they "knew of ways to reduce the harm but knowingly . . . or . . . recklessly declined to act." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995). *See also Farmer*, 511 U.S. at 842 (for purposes of liability, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

### 3. *Defendants Caused Plaintiff's Injuries*

Ms. Diamond suffered, and continues to suffer, physical injuries and mental anguish as a result of the Housing Defendants' actions and inactions. It is beyond dispute that the Housing Defendants had the authority to modify Ms. Diamond's housing placements, approve her for placement in a female GDC facility, or adopt operational safeguards to protect her from ongoing risks. *See, e.g.*, Ezie Ex. 19 (authorizing GDC to place transgender women in female facilities); Ezie Ex. 22 (same); GDC Answer ¶¶ 21-23, 25, 29 (admitting that Lewis, Atchison, Toole, and Jackson sat on the GDC Committee responsible for transgender housing placements, and that Ward had final oversight authority); Aiken Decl. ¶¶ 39, 84-86, 92, 95 (discussing Defendants' authority). However, the Housing Defendants blocked and refused Ms. Diamond's repeated requests to be placed at a women's facility or approved for a safety transfer following the attacks at GDCP and Coastal, despite having the express authority to do so, leaving Ms. Diamond to languish and suffer continued victimization. Diamond Decl. ¶¶ 11-16, 21-22, 38 (describing current status). *See also*

*Rodriguez*, 508 F.3d at 625 (asking "whether [the defendant] was in a position to take steps that could have averted the [harm] . . . but, through deliberate indifference, failed to do so.") (citations omitted).

### A. Defendants Have Violated Plaintiff's Right to Equal Protection

Ms. Diamond also has a substantial likelihood of succeeding on the merits of her claim that Housing Defendants violated her right to equal protection by discriminating against her based on sex. *Camenisch*, 451 U.S. at 394 (noting that a "likelihood of success," not actual "success," is required for purposes of the standard). An imprisoned plaintiff states an equal protection claim by showing that similarly situated individuals received more favorable treatment and that the differential treatment was based on a constitutionally protected interest without the requisite countervailing governmental interest. *Smith v. Reg'l Dir. of Fla. Dep't of Corrs*., 368 F. App'x 9, 12 (11th Cir. 2010); *see also Washington v. Albright,* No. 2:11-cv-618-TMH, 2011 WL 4345687, at *2 (M.D. Ala. Aug. 22, 2011), *report adopted*, 2011 WL 4345681 (M.D. Ala. Sept. 16, 2011) (applying framework to placement claim); *Anderson v. Whaley*, No. 2:06-cv-620-WKW, 2009 WL 2870062, at *6 (M.D. Ala. Sept. 3, 2009) (same).

Here, Housing Defendants have discriminated against Ms. Diamond by placing her in men's prisons solely based on her transgender status without regard for her physical safety, and by exposing her to a severe risk of sexual assault and sexual victimization by incarcerated men, a risk not faced by similarly situated women in women's prisons. As set forth below, Defendants' actions fail to satisfy the heightened level of review required to justify this discrimination. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty*., 968 F.3d 1286, 1295–96 (11th Cir. 2020) (applying "heightened scrutiny" to bathroom policy that excluded transgender student from using bathroom in accordance with his gender identity); *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 533-34 (1996) (explaining that the Equal Protection Clause tolerates only "exceedingly persuasive"

classifications based on sex or gender); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,

440 (1985) (noting that sex or gender "generally provide[ ] no sensible ground for differential

treatment").

> 1. *Ms. Diamond is similarly situated to other women because she is equally vulnerable to sexual assault and victimization by cisgender men in men's prisons.*

Ms. Diamond, despite having been assigned male at birth, now shares many of the same

characteristics as other women who were assigned female at birth (*i.e.*, cisgender women). For

example, as is the case with most women, she has female breasts, feminine mannerisms, and a

female gender identity. Ettner Decl. ¶¶ 68-70. Ms. Diamond is similar in build, muscle mass and

bone density to an average non-transgender, or cisgender, woman that is her height and weight,

and is slight of build—weighing only 135 lbs. Ezie Ex. 30 (offender profile). Ms. Diamond's long-

term hormone usage has also caused changes to her genitals, including atrophy that prevents her

ability to have erections or engage in penetrative sex. Diamond Decl. ¶¶ 50-51, 61; Ettner Decl. ¶

70. Based on these, and other similarities, she is as vulnerable to sexual harassment, sexual assault,

sexual abuse and sexual victimization in men's prisons as any cisgender woman. *De Veloz v.*

*Miami-Dade Cnty.*, 756 F. App'x 869, 877 (11th Cir. 2018), *cert. denied sub nom. Rodriguez-*

*Garcia v. De Veloz*, 140 S. Ct. 127 (Mem.) (2019) (noting the "outrageous risk" of harassment,

assault, rape, or murder that cisgender women face in men's prisons); *Campbell v. Bruce*, No. 17-

CV-775-JDP, 2019 WL 4758367, at *1 (W.D. Wis. Sept. 30, 2019) (finding, as undisputed facts,

that transgender women in men's prisons who "have been taking hormones for years and have

developed female breasts" face a "heightened risk of sexual assault."). Aiken Decl. ¶¶ 19-20, 22-

24, 31, 35, 50-51, 54, 57-58.

The Housing Defendants' refusal to house Ms. Diamond in an environment where she

would be protected from cisgender male predation is based either on the sex she was assigned at

birth, or her external anatomy, despite the fact that science has shown that a person's sex is comprised of several components, including hormones, chromosomes, external genitalia, internal reproductive organs, gender identity, and sexual differentiation in brain development and structure, and that gender identity is ultimately determinative, many of which Ms. Diamond shares in common with similarly situated cisgender women. Ettner Decl. ¶ 21-22, 61 (explaining that transgender women are not "biologically male").

As noted by the Eleventh Circuit, it is beyond dispute that "placing a female in the general population of a male detention facility… pose[s] an unreasonable risk of serious harm to the female's future health or safety." *De Veloz*, 756 F. App'x at 877. Given Ms. Diamond's attributes, the risk that she will be harassed, assaulted, raped or even murdered is the same for her as for a cisgender woman in a men's prison—a peril casually discarded by the Housing Defendants that has come to fruition more than a dozen times. The abuse Ms. Diamond has suffered, and continues to suffer, is based on her transgender status and the fact that she is viewed by incarcerated cisgender men as female, a fact that, as would be the case with a cisgender woman housed in a men's prison, places her at an extremely high risk of sexual assault by cisgender men. Aiken Decl. ¶ 50. Yet, she remains in men's prisons and endures sexual harassment, sexual victimization, and sexual assaults, and avoids further injury or death, not based on any action by Defendants but, as would be the case with any woman in her position, at the discretion of violent cisgender male predators in her midst. Aiken Decl. ¶¶ 19-20, 22-25, 31, 35, 50-51, 54, 58.

*2. Ms. Diamond is similarly situated to cisgender women housed in women's prisons*

Ms. Diamond is also similarly situated to cisgender women currently housed in GDC's facilities for women. GDC's public "Find an Offender" database confirms that cisgender woman who are convicted of the same criminal offenses as Ms. Diamond are exclusively housed in women's prisons. Ezie Ex. 31. In addition, even a cursory search of GDC's "Find an Offender"

database reveals that numerous cisgender women who have committed far more serious offenses—including murder, sex offenses, and even sexual assaults against others in custody, are currently incarcerated in GDC's facilities for women. *See* Ezie Ex. 32 (showing profiles of women convicted of rape, murder, assault in custody, and aggravated sodomy). There can be no serious doubt that if Ms. Diamond were a cisgender woman with the exact same characteristics, including crime, sentence, and criminal history, the Housing Defendants would have housed her in a women's facility. *See De Veloz*, 756 F. App'x at 880 (stating "the unlawfulness of placing a female detainee within the male population [i]s readily apparent"); *Hampton*, 2018 WL 5830730, at *12 ("female inmates can be equally aggressive and violent, perhaps more so than [plaintiff]. Yet, no one would suggest those women should be housed in the men's division.").

By applying the De Facto Placement Ban to Ms. Diamond and blocking her requests for a safety transfer, the Housing Defendants discriminated against Ms. Diamond despite her similarity to incarcerated cisgender women by housing her exclusively in men's prisons even though the risks associated are "not only self-evident, but serious and real." *De Veloz*, 756 F. App'x at 877. Though *De Veloz* involved a cisgender woman, Ms. Diamond's history of repeated sexual victimization in GDC's men's facilities clearly establishes that the danger to women in men's prisons is not limited to cisgender women. Diamond Decl. ¶¶ 2-3, 13-18, 22-29, 30-34, 40, 43-48, 104-105, 112-114, 118; Aiken Decl. ¶¶ 19-20, 22-25, 31, 35, 50-51, 54, 57-58. Because "the Constitution does not tolerate any form of gender stereotyping on the basis of one's birth sex and sexual organs," it is impossible to discriminate more facially than this. *Adams ex rel. Kasper*, 968 F.3d at 1303.

### 3. *Defendants cannot satisfy heightened scrutiny for their differential treatment*

Notwithstanding Ms. Diamond's comparable risks of sexual harassment, sexual assault and sexual abuse at men's prison, the Housing Defendants have applied the De Facto Placement Ban

to Ms. Diamond while protecting similarly situated women by placing them in women's facilities where they do not face a constant threat of abuse from cisgender male predators. Defendants' differential treatment of Ms. Diamond is based on sex, regardless of whether they base their actions on her transgender status, birth-assigned sex, or anatomy. *Adams ex rel. Kasper*, 968 F.3d at 1296 (recognizing that special burden placed on "transgender students because their gender identity does not match their sex assigned at birth" was sex discrimination); *accord Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("discrimination against a transgender individual because of [their] gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender"); *Bostock v. Clayton Cnt*y., 140 S. Ct. 1731, 1741 (2020) (confirming that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"). Accordingly, heightened scrutiny applies to the De Facto Placement Ban and the Housing Defendants' placement decisions. *Johnson v. California*, 543 U.S. 499, 511–12 (2005) (confirming that heightened scrutiny still applies in the prison context); *Hernandez v. Fla. Dep't of Corrs.*, 281 F. App'x 862, 867 (11th Cir. 2008) (same).

Defendants cannot meet the required "exceedingly persuasive" justification for applying the De Facto Placement Ban to Ms. Diamond or housing her in a men's facility based on her transgender status because it is not "substantially related to a sufficiently important governmental interest." *Adams ex rel. Kasper*, 968 F.3d at 1296 (quoting *City of Cleburne*, 473 U.S. at 441). This burden is "demanding" and "rests entirely on" the Housing Defendants. *VMI*, 518 U.S. at 533. Although prison discipline and security are compelling governmental interests, housing Ms. Diamond in a men's facility was not substantially related to that interest for two reasons: The Housing Defendants rely on an impermissibly hypothesized rationale and they rely on gender stereotypes.

To satisfy heightened scrutiny, the Housing Defendants' justification for housing Ms.

Diamond differently than her cisgender counterparts must be "genuine, not hypothesized," *Adams ex rel. Kasper*, 968 F.3d at 1299 (quoting *VMI*, 518 U.S. at 533), meaning that it must be based in "demonstrable reality." *Id.* (quoting *Nguyen v. Immigration & Naturalization Serv.*, 533 U.S. 53, 77 (2001) (O'Connor, J., dissenting)). The Housing Defendants must therefore provide solid evidence that Ms. Diamond, as a transgender woman, is inherently more threatening to prison discipline and security if housed in a women's facility than a cisgender women. Not only is a security justification for their housing decisions unsupportable; it is contrary to proper prison order and discipline. Aiken Decl. ¶¶ 26-28, 33-43, 50-64, 85-86, 92, 95. Indeed, the risk of adverse outcomes in transferring a transgender woman like Ms. Diamond to a predominantly female facility "is minimal, if not nonexistent" so long as "basic security measures are operating at a basic and validated manner." Aiken Decl. ¶ 40.

Because no evidence, merely speculation and conjecture, exists to justify the Housing Defendants' refusal to house Ms. Diamond in an environment equally safe from cisgender male predation as is provided to similarly situated women, any justification must be purely hypothetical and therefore fails heightened scrutiny. *See, e.g.*, *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (citing *VMI*, 518 U.S. at 531) ("generalized concerns for prison security are insufficient to meet the 'demanding' burden placed on the State to justify sex-based classifications."); *Hampton,* 2018 WL 5830730, at *12 (rejecting the argument that "placing transgender inmates in the facility of their assigned sex at birth is substantially related to the achievement of prison security"); *Tay*, 457 F. Supp. 3d at 682 (same).

The Housing Defendants' justification also relies on gender stereotypes, which "presume that men and women's appearance and behavior will be determined by their sex." *Adams ex rel. Kasper*, 968 F.3d at 1302 (quoting *Glenn*, 663 F.3d at 1320). Such stereotypes cannot justify differential treatment because of sex or transgender status. *Id.* (quoting *inter alia Glenn*, 663 F.3d

at 1320 n.9 ("[G]overnmental reliance on gender-based stereotypes is dispositive in . . . equal protection analysis")). As explained by the Eleventh Circuit, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn*, 663 F.3d at 1316. The Housing Defendants labeled Ms. Diamond a man for purposes of placing her in a GDC facility based on either her sex assigned at birth or her anatomy. This labelling relies either on the stereotype that women are not assigned male at birth, or that women should possess a certain form of external genitalia, or both—either are unconstitutional. *See, e.g., Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*, No. Civ. 02–1531PHX–SRB, 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004) ("[N]either a woman with male genitalia nor a man with stereotypically female anatomy, such as breasts, may be deprived of a benefit or privilege [] by reason of that nonconforming trait.").

Moreover, the Housing Defendants placed Ms. Diamond in a men's facility based on gender stereotyping without regard to the facts—well known to GDC officials—that Ms. Diamond identifies and lives as a woman, that she possesses the hormonal makeup and physical characteristics of a woman, including female secondary sex characteristics, and that she faces the risks of physical and sexual assault that any woman would face if housed in men's prisons. *See Adams ex rel. Kasper*, 968 F.3d at 1302–03; *Tay*, 457 F. Supp. 3d at 681 (noting that where transgender plaintiffs are properly administered hormone therapy, concerns about functional male anatomy become non-issues). Because GDC officials discriminated against Ms. Diamond by placing her in a men's prison based on her transgender status, thereby exposing her to a severe risk of assault not faced by similarly situated cisgender women in women's facilities, without sufficient justification, Ms. Diamond has a substantial likelihood of succeeding on the merits of her equal protection claim. *See, e.g.*, *Tay*, 457 F. Supp. 3d at 682 (transgender plaintiff was likely to succeed on her claim that her placement at a men's prison violated the Equal Protection clause); *Hampton*,

22

2018 WL 5830730, at *12 (same).

**C.  Defendants Have Violated Plaintiff's Right to Adequate Medical Care.**

Ms. Diamond has a substantial likelihood of succeeding on the merits of Count VII of the Amended Complaint, ECF No. 36, which alleges that Defendants Lewis, J. Jackson, and Sauls violated the Eighth Amendment's prohibition on cruel and unusual punishment in failing to provide adequate medical care. Prison officials violate the Eighth Amendment when they act with deliberate indifference to the serious medical needs of an incarcerated person. *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). An incarcerated plaintiff must show that (1) there was a serious medical need (objective inquiry), (2) the prison official was deliberately indifferent to the serious medical need (subjective inquiry), and (3) the prison official's wrongful conduct caused injury. *Diamond I*, 131 F. Supp. 3d at 1371-72. All of these criteria have been met here.

*1.  Defendants Were Deliberately Indifferent to Ms. Diamond's Serious Medical Needs*

Defendants Lewis, J. Jackson, and Sauls ("Heathcare Defendants") acted with deliberate indifference by knowingly disregarding Ms. Diamond's gender dysphoria treatment needs, despite being aware that is a serious medical need that, if untreated, "can lead to psychological suffering and physical injury." *See* GDC Answer ¶ 39; *Diamond I*, 131 F. Supp. 3d at 1371 (same). The *Diamond I* lawsuit gave the Healthcare Defendants irrefutable notice of Ms. Diamond's need for hormone therapy and accommodations related to her gender expression. *Diamond I*, 131 F. Supp. 3d at 1356, 1372-75, 1382; GDC Answer ¶1-3 (admitting knowledge of prior lawsuit). Ms. Diamond's current healthcare providers within GDC also alerted the Healthcare Defendants to Ms. Diamond's unmet treatment needs, including her need for facial hair removal products. Diamond Decl. ¶¶ 52-53, 55. So did Ms. Diamond, through Notice letters and grievances, which Defendant Lewis personally received and reviewed. Diamond Decl. ¶¶ 49, 52-53, 55, 63-64 (discussing Lewis's denial of grievance); Ezie Exs. 6-14, 29. Yet, the Healthcare Defendants refused to provide

Ms. Diamond with any gender expression accommodations, despite knowing they were a critical component of her care; denied her requests for medicated hair removal treatments; and have failed to conduct blood work or monitoring to ensure that Ms. Diamond's hormone therapy is minimally therapeutic while also allowing erratic, weeks-long interruptions. Diamond Decl. ¶ 57; Ettner Decl. ¶¶ 75, 77, 79, 81-82, 87, 88-90; Ezie Ex. 27.

Defendants' failure to ensure that Ms. Diamond's hormone therapy is timely and therapeutic, despite repeated requests, violates the Eighth Amendment because is either "grossly inadequate care" or "so cursory as to amount to no treatment at all." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); *accord Monroe v. Meeks*, No. 18-CV-00156-NJR, 2020 WL 1048770, at *3 (S.D. Ill. Mar. 4, 2020) (granting an injunction that ordered prison officials to "ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels."). Courts have also recognized that "'gender-affirming' canteen items and permanent hair removal are not merely cosmetic treatments but, instead, medically necessary treatments to address a serious medical disease." *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018); *accord Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012) (transgender plaintiff who was denied laser hair removal stated Eighth Amendment claim); *Konitzer v. Frank*, 711 F. Supp. 2d 874, 909-11 (E.D. Wis. 2010) (same); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 246-48 (D. Mass. 2012) (enjoining ban on hair removal treatment as unconstitutional). Because Defendants Lewis, Jackson and Sauls are also Housing Defendants, the refusal to provide gender-affirming care or to transfer Ms. Diamond to a women's facility despite her acute symptoms highlights the inadequacy of her treatment where transfer to female facility in order for her to live in accordance with her female identity and be protected from male predation "is now medically necessary." Ettner Decl. ¶ 117.

Unlike in *Keohane v. Florida Department of Corrections Secretary*, where "medical professionals were—and remain—divided over whether social transitioning is medically necessary to [the plaintiff's] gender-dysphoria treatment," this case does not involve a purported battle of the experts. 952 F.3d 1257, 1274 (11th Cir. 2020), *reh'g denied*, 981 F.3d 994 (Mem.) (11th Cir. 2020). Defendants Lewis, J. Jackson, and Sauls have simply overridden the treatment recommendations of GDC healthcare providers without conducting any individualized assessment of Ms. Diamond's medical needs—the very same blanket denials this Court recognized as unconstitutional in Ms. Diamond's first case. *Diamond I*, 131 F. Supp. 3d 1346. *See also Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014); *Roe v. Elyea*, 631 F.3d 843, 862-63 (7th Cir. 2011); *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014); *Soneeya*, 851 F. Supp. 2d at 247; *Brooks v. Berg*, 270 F. Supp. 2d 302, 310 (N.D.N.Y. 2003), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003).

Individually and taken together, these failures constitute deliberate indifference to Ms. Diamond's serious medical needs arising from her gender dysphoria. *See*, e.g., *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 546 (S.D. Ill. 2020), *aff'd on reconsideration sub nom. Monroe v. Meeks*, No. 18-CV-00156-NJR, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020) (ordering officials to "cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition"); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1192 (M.D. Ala. 2017), *clarified*, No. 2:14-cv-601-MHT, 2018 WL 5410915 (M.D. Ala. 2018) ("multiple policies or practices that combine to deprive a prisoner of a 'single, identifiable human need,' such as mental-health care, can support a finding of Eighth Amendment liability.").

Defendant's refusal to provide Ms. Diamond anything beyond erratic and unmonitored hormone therapy is objectively unreasonable given the self-castration attempts and acute gender dysphoria symptoms Ms. Diamond has experienced since her return to custody. *See Frank*, 711 F.

Supp. 2d at 908 (treatment is "arguably inadequate" where an inmate "keeps exhibiting the behavior seen in [gender dysphoria] sufferers, repeated self-castration attempts"); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[J]ust because [the defendants] have provided [the plaintiff] with some treatment consistent with the [WPATH] Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment."); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (prison officials show deliberate indifference when they "doggedly persist[] in a course of treatment known to be ineffective."). *See also Cassady v. Dozier*, No. 5:17-CV-495 (MTT), 2018 WL 1370602, at *6 (M.D. Ga. Mar. 16, 2018) (Treadwell, J.) (acknowledging that plaintiff who sought surgery because her gender dysphoria did not improve simply with hormone therapy stated an Eighth Amendment claim at the PLRA screening stage).

### 2. *Defendants Caused Plaintiff's Injuries*

Ms. Diamond can also demonstrate causation because Defendants Lewis, J. Jackson, and Sauls are the GDC officials ultimately responsible for approving healthcare and treatment plans for transgender people in GDC custody. *See* Ezie Ex. 20 ("Each treatment plan or denial of treatment must be approved by the Statewide Medical Director and Statewide Mental Health Director"); GDC Answer ¶ 28 (admitting that Sauls also has a role in healthcare provision). Accordingly, Defendants Lewis, J. Jackson, and Sauls's decision to overrule the recommendations of Ms. Diamond's medical providers and block her urgent requests for treatment are the only reason that Ms. Diamond has gone without medically necessary care to this day. *See LaMarca*, 995 F.2d 1526, 1538 (11th Cir. 1993) (citation omitted) ("A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation.").

## III.   Plaintiff Will Suffer Irreparable Injury Without Relief

Ms. Diamond has demonstrated irreparable harm with respect to her claims because as a

result of Defendants' sex discrimination, failure to protect her, and failure to provide her adequate medical care, Ms. Diamond has suffered and will continue to suffer severe physical and emotional injury, including sexual abuse, sexual assaults, depression, anxiety, suicidal ideation, worsening PTSD, and suicide and self-castration attempts. Diamond Decl. ¶¶ 108-118; Ettner Decl. ¶¶ 91-131. *See, e.g.*, *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citations and quotation marks omitted) ("An injury is irreparable if it cannot be undone through monetary remedies."); *Tay*, 457 F. Supp. 3d at 687–88 (transgender plaintiff established irreparable harm in Eighth Amendment failure to protect case because "money will not make Plaintiff whole or protect her from physical and emotional abuse"); *Hicklin*, 2018 WL 806764, at *9 ("depression, anxiety, and intrusive thoughts of self-castration" caused by treatment denials are irreparable injuries).

The harm that Ms. Diamond has experienced and will continue to experience also relates to "unconstitutional condition[s] of confinement," which are themselves irreparable injuries that only injunctive remedies can protect against. *Thomas v. Bryant*, 614 F.3d 1288, 1322 (11th Cir. 2010). In *Tay v. Dennison*, a court held that a transgender plaintiff satisfied the irreparable harm requirement where she had "been forced to endure constant sexual abuse and harassment at various men's facilities." 457 F. Supp. 3d at 687. In *Hampton v. Baldwin*, a court ruled that a transgender prisoner demonstrated irreparable harm where "she was forced to endure constant sexual and physical abuse" in men's facilities and prison officials "refuse[d] to do anything to protect her." 2018 WL 5830730, at *15. Similarly, in *De Veloz*, the Eleventh Circuit acknowledged that being inappropriately housed in a men's facility for even a single day can create an Eighth Amendment injury because it "create[s] an extreme condition" and unreasonably threatens "the female's future health or safety." 756 F. App'x at 877.

Courts have also found that denying gender dysphoria treatment to people in custody or delaying medical care in a way that prolongs an individual's pain and suffering or heightens their

risk of medical complications is another source of irreparable harm. *See, e.g., Edmo v. Corizon, Inc.*, 935 F.3d 757, 797 (9th Cir. 2019), *cert. denied sub nom. Idaho Dep't of Corr. v. Edmo*, 141 S. Ct. 610 (2020) (finding irreparable harm based on transgender plaintiff's "high risk of self-castration and suicide"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015) (finding irreparable harm based on "[e]motional distress, anxiety, depression" and "significant worsening of her gender dysphoria"); *Fields v. Smith*, 712 F. Supp. 2d 830, 869 (E.D. Wis. 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011) (gender dysphoria care denials caused irreparable harm); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017) (denial of treatment "in an appropriate and timely manner" to people in custody was irreparable harm); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) (injunction was warranted to prevent complications from treatment delays); *Harris v. Bd. of Supervisors,* 366 F.3d 754, 766 (9th Cir. 2004) (same).

## IV.  The Balance of Equities Support a Preliminary Injunction

Ms. Diamond's request for an injunction also favors the public interest because "the public interest always is served when citizens' constitutional rights are protected, including [ ] offenders." *Reed v. Long,* 420 F. Supp. 3d 1365, 1379 (M.D. Ga. 2019) (Treadwell, J.) (citation omitted); *accord White v. Baker*, 696 F. Supp. 2d 1289, 1313 (N.D. Ga. 2010) (where "a constitutional right is at issue, the entry of an injunction would not be adverse to the public interest but would in fact *advance it*.") (emphasis added); *Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002) ("The public interest is in no way served by . . . incarcerating inmates in dangerous conditions.").

Ms. Diamond is also entitled to a preliminary injunction because the risk of harm she faces outweighs any harm to Defendants. *Gonzalez*, 978 F.3d at 1271 (articulating standard). The harm to Ms. Diamond is immeasurable. Every day that Ms. Diamond languishes in a demonstrably unsafe environment and goes without treatment, her mental health further

28

deteriorates, and she stands an overwhelming risk of serious injury or death from assault, homicide, suicide or self-harm. *See, e.g.*, *Gammett v. Idaho State Bd. of Corrs*., 2007 WL 2186896, at *15-16 (D. Idaho July 27, 2007) (balance of harms "sharply" favored plaintiff who stood a risk of psychological harm without gender dysphoria treatment); *Edmo*, 935 F.3d at 781 (equities favored transgender plaintiff denied gender dysphoria care because of "continuing emotional distress and self-castration attempts"). In contrast, Defendants cannot claim any harm at all because Ms. Diamond merely seeks to enjoin unconstitutional conduct. *Scott*, 612 F.3d at 1297. In contrast, the harm threatened to Ms. Diamond is the unspeakable horror of continued sexual abuse and assault as a woman in a men's prison. *De Veloz*, 756 F. App'x at 877 (noting the "outrageous risk" that women in men's prisons "will be harassed, assaulted, raped, or even murdered."). Any alleged harm based on cost or burden would be *de minimis*. *See Hoffer*, 290 F. Supp. 3d at 1304 ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants.") (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction that (1) orders Defendants to transfer Ms. Diamond to a female facility for safety purposes for the remainder of her time in custody in order for her to be protected from sexual victimization by male inmates; (2) directs Defendants to allow Ms. Diamond to shower privately; (3) enjoins Defendants from using male correctional officers to conduct strip searches of Ms. Diamond, absent exigent circumstances; (4) directs Defendants to provide Ms. Diamond with medically necessary treatment for gender dysphoria, including but not limited to consistent and therapeutic doses of hormone therapy, access to permanent body hair removal, and gender-affirming care including access to female canteen items, accommodations for a female hairstyle and grooming standards, or, alternatively, a transfer to a female facility; and (5) enjoins Defendants from enforcing the De Facto Placement Ban and

any other policies, customs, or practices that have served as a moving force behind their actions denying Ms. Diamond protection from sexual assault or adequate gender dysphoria treatment.

Ms. Diamond also requests that the bond requirement be waived given her indigent status and the important constitutional rights she seeks to vindicate. *See Booher v. Marion Cnty.*, No. 5:07-cv-00282-WTH-GRJ, 2007 WL 9684182, at *4 (M.D. Fla. Sept. 21, 2007) ("Public interest litigation [] is a recognized exception to the Rule 65(c) bond requirement."); *Reed*, 420 F. Supp. 3d at 1381 (declining to impose bond in case seeking to enforce the constitutional rights of felons).

Dated: April 9, 2021

Respectfully Submitted,

/s/ Elizabeth Littrell
Elizabeth Littrell, Ga. Bar No. 454949
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031
Phone: (404) 221-5876
Fax: (404) 221-5857
Email: beth.littrell@splcenter.org

Tyler Rose Clemons[*]
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Phone: (504) 526-1530
Fax: (504) 486-8947
Email: tyler.clemons@splcenter.org

Maya G. Rajaratnam[*]
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
Phone: (334) 956-8307
Fax: (334) 956-8481
Email: maya.rajaratnam@splcenter.org

A. Chinyere Ezie[*]
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Phone/Fax: (212) 614-6467
Email: cezie@ccrjustice.org

*Counsel for Plaintiff Ashley Diamond*
*\* Admitted Pro Hac Vice*