**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

ASHLEY DIAMOND,

      Plaintiff,

v.

TIMOTHY WARD, et al.,

      Defendants.

CASE NO. 5:20-CV-00453-MTT

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PROTECTIVE ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

    GDC Officials Have Inundated Ms. Diamond with Retaliatory Disciplinary Reports that
    Have Derailed Her Chances for Transfer or Release ........................................................ 2

    GDC Officials at Coastal Have Altered Ms. Diamond's Institutional Records and
    Intimidated a Witness to Provide False Testimony to Further Deter Her Advocacy ......... 6

    GDC's Ongoing Campaign of Retaliation Has Already Been Used to Deny Ms. Diamond
    Certain Transfers and Push Her Tentative Release Date Back by More than a Year......... 8

    Restrictions on Ms. Diamond Ability to Communicate With Her Lawyers Has Impeded
    Her Ability to Effectively Litigate Her Case .................................................................... 9

    Ms. Diamond's Attempts to Meet and Confer with Defendants Have Failed .......................... 9

ARGUMENT ......................................................................................................... 10

    I.  The Court Should Issue a Protective Order Under Its Inherent Equitable Powers or Its
      Authority Under the All Writs Act to Halt Retaliation, Witness Tampering, and the
      Falsification of Evidence .......................................................................................... 10

      A.  The Court Should Issue a Protective Order to Ms. Diamond Pursuant to its Inherent
         Equitable Authority ............................................................................................ 11

    II.  Alternatively, the Court Should Issue Ms. Diamond a Protective Order Pursuant to the
       All Writs Act to Safeguard the Proceedings and the Court's Jurisdiction ....................... 14

      A.  Courts Enjoy Broad Equitable Authority Under the All Writs Act .................................. 14

      B.  The Prerequisites for an All Writs Order Have Been Met ................................................. 15

CONCLUSION ..................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Al-Amin v. Smith,*
  511 F.3d 1317 (11th Cir. 2008) ............................................................... 14

*Aldrich v. Romo*,
  No. 5:20-cv-00974-MCS-KK, — F. Supp. 3d —, 2020 WL 6305646 (C.D. Cal.
  Oct. 9, 2020) ............................................................... 17

*Al Otro Lado, Inc. v. Nielsen*,
  No. 17-CV-2366-BAS (KSC), 2019 WL 1057387 (S.D. Cal. Mar. 6, 2019)......................... 17

*Ben David v. Travisono*,
  495 F.2d 562 (1st Cir. 1974)............................................................... 11, 12

*Burr & Forman v. Blair*,
  470 F.3d 1019 (11th Cir. 2006) ............................................................... 15, 16, 17

*Christopher v. Harbury*,
  536 U.S. 403 (2002)............................................................... 17

*Disability Rights N.J., Inc. v. Velez*,
  No. 10–03950 (DRD), 2011 WL 2937355 (D.N.J. July 19, 2011)............................. 11

*EEOC v. Int'l Union of Operating Eng'rs,*
  438 F. Supp. 876 (S.D.N.Y. 1977) ............................................................... 17

*Ekokotu v. Fed. Express Corp.*,
  408 F. App'x 331 (11th Cir. 2011) ............................................................... 12, 13

*Fed. Trade Comm'n v. Dean Food Co.*,
  384 U.S. 597 (1966)............................................................... 14, 16

*Goninan v. Wash. Dep't of Corrs.*,
  No. 3:17-cv-05714-BHS-JRC, 2018 WL 4630205 (W.D. Wash. Sept. 26, 2018)................... 13

*Goodyear Tire & Rubber Co. v. Haeger*,
  137 S. Ct. 1178 (2017)............................................................... 11

*Harvard v. Inch*,
  No. 4:19-cv-00212-MW-MAF (N.D. Fla. Jan. 28, 2020)................................... 11, 12

*Hudson v. Palmer*,
  468 U.S. 517 (1984)............................................................... 13, 14

*In re Se. Banking Corp. Sec. & Loan Loss Reserves Litig.*,
No. 95-2602-CIV DAVIS, 1996 WL 34491908 (S.D. Fla. July 8, 1996) ............................... 10

*ITT Cmty. Dev. Corp. v. Barton*,
569 F.2d 1351 (5th Cir. 1978) ................................................................... 18

*Klay v. United HealthGroup, Inc.*,
376 F.3d 1092 (11th Cir. 2004) ...................................................... 14, 15, 16

*Peer v. Lewis*,
606 F.3d 1306 (11th Cir. 2010) ................................................................ 11

*Pell v. Procunier*,
417 U.S. 817 (1974) .................................................................................. 14

*Procup v. Strickland*,
792 F.2d 1069 (11th Cir. 1986) (en banc) ................................................ 14

*Rissman, Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.*,
No. 11-10791-MLW, 2011 WL 5025206 (D. Mass. Oct. 20, 2011) ........................................ 12

*Rohe v. Wells Fargo Bank, N.A.*,
988 F.3d 1256 (11th Cir. 2021) .................................................. 15, 16, 18

*United States v. N.Y. Tel. Co.*,
434 U.S. 159 (1977) ........................................................................ 14, 15, 16

*United States v. Garrett*,
571 F.2d 1323 (5th Cir. 1978) ................................................................... 13

*Wright v. Newsome*,
795 F.2d 964 (11th Cir. 1986) ................................................................... 13

**Statutes**

28 U.S.C. § 1331 ....................................................................................... 15

28 U.S.C. § 1343 ....................................................................................... 15

All Writs Act, 28 U.S.C. § 1651 ................................................. 2, 10, 14, 15

**Rules**

Fed. R. Civ. P. 26 ................................................................................. 12, 17

## INTRODUCTION

Plaintiff Ashley Diamond, an incarcerated transgender woman who has been denied medically necessary gender dysphoria care and protection from sexual assault since her October 2019 return to the Georgia Department of Corrections ("GDC"), has also become the target of a retaliation campaign by Defendants and their agents designed to punish her for advocacy and to influence the outcome of this litigation.

The retaliation campaign includes falsification of her institutional file in a way that directly impacts her claims, witness tampering, and targeting Ms. Diamond in an effort to tarnish her otherwise unblemished disciplinary record through Defendants' unilateral and unrestrained ability to paper her with false and unjustified disciplinary reports. For example, Ms. Diamond, who had not received a single disciplinary report in custody prior to October 2020 when litigation became imminent, has received **fourteen** disciplinary reports since that time that have been upheld without true due process and derailed her eligibility for parole. Defendant Benton and other officials at Coastal have manipulated Ms. Diamond's institutional records to falsely label her a sexual predator and gang member, rather than a recurrent victim of sexual assault who is preyed upon by gang members. Coastal officials even pressured an incarcerated person who witnessed some of the constitutional violations underlying this case to provide false testimony against Ms. Diamond and falsely accuse her of rape to fit the narrative about her they have created—a narrative that, not coincidentally, benefits their litigation position. Fortunately, the person targeted refused to do so, but that has not prevented Ms. Diamond from experiencing various negative impacts from these false accusations.

The retaliation scheme orchestrated by Defendants was foreshadowed, if not admitted to, by Defendant Benton who threatened to keep Ms. Diamond in Coastal for "four more years" for suing him—a threat that came to fruition in March 2021 when her parole release date was pushed

1

back by more than a year. Accordingly, Ms. Diamond moves this Court to issue a Protective Order pursuant to its inherent equitable authority and its authority under the All Writs Act, 28 U.S.C. § 1651(a), that enjoins Defendants and their agents from retaliating against Ms. Diamond and third-parties, intimidating witnesses, and altering records or falsifying her institutional files in ways that serve to obstruct or impede this Court's ability to fairly adjudicate this case.

## FACTUAL BACKGROUND

On September 29, 2020 and October 23, 2020, after suffering a horrific series of sexual assaults in her dormitory at Coastal State Prison, Ms. Diamond, through counsel, submitted Prison Rape Elimination Act ("PREA") complaints that detailed the constitutional failures of Coastal staff with respect to Ms. Diamond's health and safety. Declaration of A. Chinyere Ezie ("Ezie Decl."), Exhibits ("Ezie Ex(s).") 11-12.[1] Collectively, the notices demanded that GDC officials and staff at Coastal take proactive steps to protect Ms. Diamond going forward if they wished to "avert litigation." Ezie Ex. 12.

Within days of receiving these notices, Defendant Benton and his subordinates at Coastal began a campaign of retaliation against Ms. Diamond that has taken numerous forms, and had the purpose or effect of punishing Ms. Diamond for her advocacy and speech and imperiling the chance of success of her threatened litigation. Declaration of Ashley Diamond ("Diamond Decl.") ¶¶ 67-103.

### GDC Officials Have Inundated Ms. Diamond with Retaliatory Disciplinary Reports that Have Derailed Her Chances for Transfer or Release

Since October 2020, when litigation concerning Ms. Diamond's mistreatment at Coastal became imminent, Ms. Diamond has received fourteen disciplinary reports.  Ezie Exs. 33-37; Ezie

---

[1] All declarations and exhibits referenced in Plaintiff's Motion are separately and concurrently filed herewith.

Decl. ¶¶ 16-20; Diamond Decl. ¶¶ 67-91; Declaration of James Aiken ("Aiken Decl.") ¶¶ 62, 78-83. Prior to this time, Ms. Diamond had not received *any* disciplinary reports since her return to custody. Diamond Decl. ¶ 68.

On October 7, 2020, just days after Ms. Diamond submitted her September 29 PREA complaint, Ms. Diamond was issued a disciplinary report for not providing a urine sample for a drug test, even though the reason she was unable to urinate was her castration attempts brought about by her gender dysphoria. Diamond Decl. ¶¶ 59-61, 66, 69; Ezie Ex. 28, 33. Ms. Diamond reminded GDC officials that there was a medical reason that she could not urinate on demand and offered to take a blood test, but she was issued a disciplinary report all the same. Diamond Decl. ¶ 69; Ezie Ex. 33.

On October 31, 2020, just days after Ms. Diamond filed a PREA Notice that alleged Coastal administrators had enabled two additional assaults by refusing to repair the lock on her cell door, Ms. Diamond was issued **five** retaliatory disciplinary reports in succession. Diamond Decl. ¶¶ 67-77; Ezie Exs. 34-36. One disciplinary report accused Ms. Diamond of tampering with her cell door to prevent it from locking, even though Ms. Diamond repeatedly complained to GDC officials that her cell door was broken and requested repairs—requests she even reiterated in her October 23 PREA Complaint. Diamond Decl. ¶¶ 22, 40, 75; Declaration of J. Blake Duckworth ("Duckworth Decl.") ¶¶ 10-11; Declaration of John Doe ("Doe Decl.") ¶ 11; Ezie Ex. 12, 36.

Another disciplinary report accused Ms. Diamond of indecent exposure, soliciting sex, and engaging in a consensual sexual act that is a medical and physical impossibility for Ms. Diamond due to her long-term hormone therapy and history of castration attempts. Decl. of Dr. Randi Ettner ("Ettner Decl.") ¶¶ 50, 61, 71-74; Diamond Decl. ¶¶ 50, 61, 73; Ezie Ex. 35. At the time of the report, Ms. Diamond was seated fully-clothed in her cell with John Doe, a platonic friend who

found Ms. Diamond semi-conscious following a suicide attempt, and who remained to make sure she was stable and that she did not try to kill herself again. Diamond Decl. ¶ 71; Doe Decl. ¶¶ 12-15; Ezie Decl. ¶ 18. When an officer noticed Mr. Doe seated in Ms. Diamond's cell, she exclaimed "Yes! We got him [Ms. Diamond] now!," and they were placed in solitary confinement without explanation. Doe Decl. ¶¶ 16-17; Diamond Decl. ¶ 71.

Hours later, when Ms. Diamond and Mr. Doe finally learned about the false charges against them, they attempted to dispute them but were blocked by Coastal staff. Diamond Decl. ¶¶ 74, 76; Doe Decl. ¶¶ 18-22. Defendant Benton and officials at Coastal refused to administer a rape kit or examine Ms. Diamond and Mr. Doe to confirm whether sexual contact actually took place. Diamond Decl. ¶ 74; Doe Decl. ¶ 21-22; Ezie Ex. 35. Defendant Benton also failed to retrieve the surveillance camera footage from outside Ms. Diamond's cell, despite her lawyers' express request. Diamond Decl. ¶ 74; Ezie Decl. ¶ 21. The fifth and final disciplinary report Ms. Diamond received on October 31, 2020 cited her for asking a staff member to return Mr. Doe's legal mail and personal items after he was thrown into solitary. Diamond Decl. ¶ 75; Ezie Ex. 34.

The disciplinary reports Ms. Diamond received on October 31 were rubberstamped by GDC officials without actual due process. Diamond Decl. ¶¶ 76, 85-87; Ezie Ex. 40, Att. 1 (describing the requirements of process); Aiken Decl. ¶¶ 80-83 (same). For example, in one of the only two he "hearings" she received, she witnessed that the disposition line on one of her discipline reports had been pre-marked "guilty" *before* the hearing began. Diamond Decl. ¶ 76. Ms. Diamond was not allowed to present evidence about the impossibility of the charges against her—including testimony and statements of GDC medical staff—that would have confirmed that Ms. Diamond's long-term hormone use and recurrent self-castration attempts have caused significant damage to her genitals and deprived her of basic function, including the ability to urinate with ease or have

erections. Diamond Decl. ¶¶ 50, 59-61, 66, 68-69, 73-74; Ettner Decl. ¶¶ 70, 76, 83, 126 (describing the "chemical castration" that results from long-term hormone use); Ezie Ex. 28 (describing challenges with castration and resulting injuries); Ezie Ex. 35 at 3-9 (speaking to medical impossibility). And although each of the reports contained a statement indicating that Ms. Diamond had been found guilty "due to supporting documentation," Ezie Exs. 34-36, no witnesses or evidence were proffered by GDC, including the officers whose unsworn allegation served as the basis of her disciplinary charges. Diamond Decl. ¶¶ 76, 86; Doe Decl. ¶ 22. When Ms. Diamond appealed the rulings, she never received a response. Diamond Decl. ¶¶ 76, 87.

Ms. Diamond has received even more disciplinary reports since her lawsuit officially began. Diamond Decl. ¶¶ 78-85; Ezie Ex. 37. In December 2020 and January 2021, Ms. Diamond received **four** new disciplinary reports: one for being unable to urinate due to her castration attempts for a second time; one for throwing away two broken pencils; and two reports for allowing prison maintenance workers, whose job it is to keep her dormitory clean, into her cell to do their jobs. Diamond Decl. ¶¶ 79-81. In February 2021, Ms. Diamond received three new disciplinary reports after engaging in self-advocacy and attempting to file a PREA report against a GDC officer who is biased against transgender people and subjected her to mistreatment. Diamond Decl. ¶ 83; Duckworth Decl. ¶¶ 28-29 (discussing bias). The reports falsely accused her of being "insubordinate," using illicit words, and having a contraband cell phone based on Facebook posts her family had made on her behalf, not actual possession of a cell phone. Diamond Decl. ¶ 83.

The disciplinary reports also continue to this day: in March 2021, Ms. Diamond received another disciplinary report charging her with unauthorized possession of "contraband" for having safety scissors during a staff-sanctioned arts and crafts project. Diamond Decl. ¶ 84. Ms. Diamond has not been afforded due process in connection with her disciplinary reports. Diamond Decl. ¶¶

85-87. Of her fourteen disciplinary reports, Ms. Diamond has only received two hearings to date, one of which was the sham hearing on her October 31 disciplinary reports. Diamond Decl. ¶ 86. Ms. Diamond has been blocked from presenting evidence or witnesses in her defense, and has never been offered a chance to view the evidence against her. Diamond Decl. ¶ 86. Ms. Diamond has even been blocked from having staff members of her choosing serve as her advocates as prison rules allow. Diamond Decl. ¶ 86; Ezie Ex. 40, Att. 1. Ms. Diamond's appeals have also gone unanswered, leaving her unclear on the final disposition of her disciplinary charges for months at a time. Diamond Decl. ¶ 87.

**GDC Officials at Coastal Have Altered Ms. Diamond's Institutional Records and Intimidated a Witness to Provide False Testimony to Further Deter Her Advocacy**

In addition to papering Ms. Diamond with disciplinary reports, GDC officials at Coastal have also falsified records and attempted to coerce false testimony that paints Ms. Diamond as a dangerous predator. Diamond Decl. ¶¶ 93-102; Doe Decl. ¶¶ 23-29. Beginning in November 2020, Defendant Benton and his subordinate, Carl Betterson, the Deputy Warden of Care and Treatment, placed Mr. Doe in prolonged solitary confinement and attempted to coerce him into providing false statements and testimony about Ms. Diamond, in exchange for his release from solitary. Doe Decl. ¶¶ 23-29; Diamond Decl. ¶¶ 97-99.

Specifically, Deputy Warden Betterson summoned Mr. Doe to his office on three separate occasions and pressured Mr. Doe to file a PREA Report that falsely accused Ms. Diamond of rape, even though John Doe had testified unequivocally that the two of them had **never** even been intimate. Doe Decl. ¶¶ 23-29; Diamond Decl. ¶¶ 97-99. When Mr. Doe reminded Betterson that he had never engaged in any sort of sexual activity with Ms. Diamond and that to say otherwise would be to lie, Betterson refused to take "no" for an answer and pressured Mr. Doe to make the statement anyway—instructing him to be a "team player." Doe Decl. ¶¶ 25-27. Betterson also

implied that he would transfer Mr. Doe out of solitary confinement and back into his dormitory if he agreed to cooperate. Doe Decl. ¶¶ 27.

The third time Mr. Doe refused Deputy Warden Betterson's request to lie and submit a false PREA report against Ms. Diamond, Betterson angrily threw Mr. Doe back into solitary where he remained for almost three months, even though the maximum sanction GDC allows for a sexual activity charge is of "isolation one to fourteen days." Ezie Ex. 40 (GDC discipline policy explaining use of segregation as punishment); Doe Decl. ¶¶ 28-29. When Betterson finally released Mr. Doe from solitary, Mr. Doe was intentionally placed in some of the most dangerous dormitories at Coastal. Doe Decl. ¶¶ 31-39. GDC staffers also spread rumors around the prison that Mr. Doe had been "fucked by a sissy" and "screwed by a transsexual," which made Mr. Doe a target for harassment and violence that endangered his life. Doe Decl. ¶¶ 30-34. On his first day in his new dormitory, Mr. Doe was threatened by gang members at knifepoint who called him anti-gay slurs and threatened to kill him unless he paid them protection money. Doe Decl. ¶¶ 33-34. When Mr. Doe challenged the placement, he was returned to solitary confinement for several more weeks before being transferred to another dormitory considered unsafe. Doe Decl. ¶ 35.

Ms. Diamond has also learned that Defendant Benton, by and through his subordinates, tampered with her GDC records and falsifying them to say that she is a PREA sexual aggressor with a history of victimizing others in prison, instead of a PREA sexual victim with a history of being assaulted. Diamond Decl. ¶¶ 93-95. A staff member showed Ms. Diamond GDC computer records containing false statements and reports. Diamond Decl. ¶¶ 94, 100-101. Even if Ms. Diamond had engaged in a consensual act as alleged, it would not have been a basis to designate her a PREA sexual aggressor under GDC Policy or the PREA standards. Aiken Decl. ¶¶ 62, 71-74.

The computer records also showed that Ms. Diamond's security classification had been updated to say that she was a member of GDC's Security Threat Group—a designation that is reserved for members of violent prison gangs, not to individuals like Ms. Diamond who are assaulted or extorted by them. Diamond Decl. ¶ 79; Ezie Ex. 38; Aiken Decl. ¶¶ 71-72, 75-77. These false statements and designations have a real and potentially deadly consequence because they can serve as a pretext to keep Ms. Diamond in her current dormitory, which is populated by sexual predators, or to transfer her to another housing situation where PREA aggressors and gang members predominate. Diamond Decl. ¶ 20, 95; Duckworth Decl. ¶ 26; Aiken Decl. ¶¶ 70, 74, 77.

### GDC's Ongoing Campaign of Retaliation Has Already Been Used to Deny Ms. Diamond Certain Transfers and Push Her Tentative Release Date Back by More than a Year

In a conversation Ms. Diamond had with Defendant Benton after filing her lawsuit, Benton openly acknowledged his intention to punish Ms. Diamond for her advocacy and block her chances for early release—stating "You're trying to sue me? Well, I'm keeping you here. You're going to be here for four more years." Diamond Decl. ¶ 77. On March 8, 2021, Ms. Diamond learned that Benton successfully carried out his promise when a GDC staff member informed her that her release date had been pushed back by more than a year—from March 1, 2021 to April 2022—because Benton and other officials had taken steps to falsify her institutional records and make her "look like a monster." Diamond Decl. ¶¶ 89-91, 100-102; Ezie Ex. 39 (confirming new release date). Ms. Diamond was issued a letter from the Parole Board that confirmed this factual recitation; it explained that the false allegations concerning Ms. Diamond's "institutional conduct" were the basis for denial. Diamond Decl. ¶ 102; Ezie Decl. ¶ 27.

In addition to extending Ms. Diamond's incarceration in a prison environment that has already proven to be imminently dangerous,[2] the disciplinary reports and falsifications to her institutional record are being used by GDC as a basis to deny Ms. Diamond transfers, including a

transfer to a Transition Center where, as a transgender woman, she would likely be safer. Ezie Decl. ¶ 22; Ezie Ex. 40.

### Restrictions on Ms. Diamond Ability to Communicate With Her Lawyers Has Impeded Her Ability to Effectively Litigate Her Case

Making matters even more critical, since she first lodged her complaints of retaliation, Defendants and their agents at Coastal have severely restricted Ms. Diamond's access to legal calls—the only means of reciprocal attorney-client communication available as a result of the COVID-19 pandemic. Declaration of Maya G. Rajaratnam ("Rajaratnam Decl.") ¶¶ 3-4. Prior to her January 2021 retaliation complaints, Ms. Diamond's counsel was able to schedule weekly legal calls through Coastal's legal call request process. *Id.* ¶ 6. However, since that time, Ms. Diamond's counsel's efforts to schedule weekly legal call have been exhaustive, and largely unavailing. *Id.* ¶¶ 7–14 (documenting counsel's repeated scheduling requests that were ignored). By the time Plaintiff's counsel raised the issue with the Court at a Status Conference on April 5, 2021, more than three weeks had passed in which Defendants refused to schedule a confidential attorney-client call, despite daily requests and the involvement of Defendants' counsel. *Id.* ¶ 13. As a result, despite Ms. Diamond's critical situation and deteriorating mental health condition, her ability to meet with her counsel, prosecute her case, and assist in the preparation of discovery and these motions have been severely impaired.[2] *Id.* ¶ 15-17; Diamond Decl. ¶ 103. Legal mail between plaintiff and her counsel has also become increasingly unreliable. *Id.* ¶ 16.

### Ms. Diamond's Attempts to Meet and Confer with Defendants Have Failed

Ms. Diamond's lawyers contacted counsel for GDC defendants on January 12, 2021, February 25, 2021, February 26, 2021, March 2, 2021, and March 16, 2021, to request an

---

[2] Following the status conference, Defendants' counsel successfully facilitated scheduling a legal call. Rajaratnam Decl. ¶ 13. Although they were unable to ensure scheduled weekly legal calls, counsel has represented that they do not anticipate impediments to attorney-client access in the future.

opportunity to speak about her current status, including the pattern of retaliation that Ms. Diamond and third parties were experiencing. Ezie Decl. ¶ 23. On January 22, 2021, March 10, 2021, March 24, 2021, Ms. Diamond's attorneys also held telephonic status conferences with counsel for the GDC defendants to discuss the retaliation and ask that it be brought to an immediate end, in an attempt to avert this motion. Ezie Decl. ¶¶ 24-25. However, Ms. Diamond's discussions with counsel for GDC defendants have stalled. Ezie Decl. ¶¶ 25-26. As a result, Ms. Diamond and Mr. Doe continue to experience retaliation and live in fear. Diamond Decl. ¶¶ 77-82, 116; Doe Decl. ¶¶ 39-41.

## ARGUMENT

**I.      The Court Should Issue a Protective Order Under Its Inherent Equitable Powers or Its Authority Under the All Writs Act to Halt Retaliation, Witness Tampering, and the Falsification of Evidence**

The Court should issue a Protective Order under its inherent equitable authority, or alternatively, the All Writs Act, 28 U.S.C. § 1651(a), because Defendants and their agents have engaged in a course of conduct designed to punish Ms. Diamond for her constitutionally-protected advocacy and impede her access to justice that has also jeopardized the safety of Ms. Diamond and at least one third-party witness. Where, as here, the Defendants' position of authority over the Plaintiff and her witnesses is inherently coercive and their ability to manufacture evidence is unrestrained, the Court has not only the power "to protect the integrity of its judicial proceedings" but the obligation to exercise that authority "to ensure a fair administration of justice." *In re Se. Banking Corp. Sec. & Loan Loss Reserves Litig.*, No. 95-2602-CIV DAVIS, 1996 WL 34491908, at *10 (S.D. Fla. July 8, 1996). As set out below, the conditions here necessitate the Court's issuance of the relief requested.

**A.  The Court Should Issue a Protective Order to Ms. Diamond Pursuant to its Inherent Equitable Authority**

This Court should issue a protective order to Ms. Diamond pursuant to "the inherent equitable powers of the court to prevent abuses, oppression, and injustices" outside the context of discovery protective orders. *Disability Rights N.J., Inc. v. Velez*, No. 10–03950 (DRD), 2011 WL 2937355, at \*3 (D.N.J. July 19, 2011); *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (affirming that "[f]ederal courts possess certain "inherent powers . . .to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.") (citations omitted); *Peer v. Lewis*, 606 F.3d 1306, 1315 (11th Cir. 2010) (quotations omitted) (noting that a "'court may safely rely on its inherent power' to sanction bad faith conduct in the course of litigation"). Exercise of the court's inherent equitable authority is particularly important where plaintiffs and witnesses are ***confined by*** the opposing party, who exercises near absolute control over their lives, and over documents and witnesses that could influence the outcome of the litigation. For instance, in *Harvard v. Inch*, a court found that serious allegations of retaliation against incarcerated plaintiffs by prison officials, coupled with reasonable fears of further retaliation for participating in ongoing litigation, warranted issuance of a protective order to "prohibit retaliation so that this Court may properly achieve the ends of justice entrusted to it." No. 4:19-cv-00212-MW-MAF, slip op. at 3 (N.D. Fla. Jan. 28, 2020).

Similarly, in *Ben David v. Travisono*, 495 F.2d 562 (1st Cir. 1974), the appellate court upheld a protective order prohibiting witness intimidation that was issued shortly after prisoners brought suit to challenge the conditions of their confinement. The *Travisono* court opined that "[t]he findings necessary to support such a protective order are simply that [1] the plaintiffs reasonably fear retaliation and [2] that the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order." *Id.* at 564. The Court held that

11

the plaintiffs in *Travisono* satisfied that standard because they were prisoners who feared retaliation by prison guards. *Id.*

The Court also noted that "in a prisoner setting, given the charges and counter charges revealed here, a court might well conclude that an inmate would be fearful of retaliation even without an entirely objective basis: rumor, suspicion, and the dependency of the inmate might parlay even a low objective probability of misconduct into a substantial subjective fear," and suggested that even subjective fear could be reasonable given the inherent dynamics of being incarcerated. *Travisono*, 495 F.2d at 564; *see also Rissman, Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.*, No. 11-10791-MLW, 2011 WL 5025206, at \*5 (D. Mass. Oct. 20, 2011) (agreeing "that '[w]hile some forms of witness intimidation or document destruction doubtlessly necessitate injunctive relief under Rule 65, protective orders are also an appropriate vehicle to prevent interference with potential witnesses'") (citing *Travisono*, 495 F.2d at 564).

Given that Ms. Diamond and her witnesses are individuals currently in the custody of Defendants who have already experienced significant retaliation and backlash from Defendants and their agents, the misconduct set out above more than warrants court intervention. *Travisono*, 495 F.2d at 564 (granting protective order); *Harvard*, slip op. at 3 (protective order warranted "[b]ased on the alleged retaliation [inmate] has already suffered, [and his] fears [of] further retaliation if he continues to participate in this case.").

Applying the principles in in Rule 26(c) of the Federal Rules of Civil Procedure also supports the relief requested, which protects a party or person in the context of discovery based on "good cause" shown through a "particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *Ekokotu v. Fed. Express Corp.*, 408 F. App'x 331, 335-36 (11th Cir. 2011) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978));

*see also Goninan v. Wash. Dep't of Corrs.*, No. 3:17-cv-05714-BHS-JRC, 2018 WL 4630205 (W.D. Wash. Sept. 26, 2018) (stating, in the context of a prison litigation, that prison officials cannot "conduct themselves in a manner that interferes with any party's access to justice," and reserving its "right to utilize its inherent powers against any party who fails to do so.").  Good cause for a protective order exists here.

Even though the Constitution prohibits prison officials from retaliating against Ms. Diamond for exercising her constitutional right to challenge the conditions of her confinement, *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986), that is precisely what Defendants have done. As summarized above, after litigation became imminent, and during the pendency of the litigation, Defendants have: a) brought demonstrably false charges against Ms. Diamond, and upheld the false charges before the pretense of a hearing even began, resulting in revocation of her eligibility for parole for more than a year and obstructing her ability to be moved to a Transition Center; b) threatened and intimidated another person in custody to coerce him into bringing false rape charges against her; c) falsified and otherwise altered evidence germane to this litigation to falsely claim she has a history of victimizing others and to paint her as a predator; and d) elevated her security classification and PREA designation without justification to solidify the narrative that Ms. Diamond is a dangerous predator, instead of a PREA victim. *See* Statement of Facts, *supra*, at 2-10.

Taken together, not only have these actions been retaliatory and punitive, they have had the purpose and effect of giving Defendants a tactical litigation advantage by providing a pretextual basis to deny her safety transfers and endangering Ms. Diamond and her witnesses while chilling their speech. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (noting that incarcerated people "retain [] First Amendment rights of speech 'not inconsistent with [their] status as ... prisoner[s]

or with the legitimate penological objectives of the correctional system.'") (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *Al-Amin v. Smith,* 511 F.3d 1317, 1333 (11th Cir. 2008) (same). Not only have these actions negatively impacted Ms. Diamond's ability to prosecute her case, they have created a situation where the court's fact-finding may also be materially impaired. For all these reasons, Ms. Diamond's Motion for a Protective Order should be granted.

## II.   Alternatively, the Court Should Issue Ms. Diamond a Protective Order Pursuant to the All Writs Act to Safeguard the Proceedings and the Court's Jurisdiction

The relief requested is also available pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which provides "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *See also Procup v. Strickland*, 792 F.2d 1069, 1074 (11th Cir.1986) (en banc) (noting that the Act is a codification of the federal courts' traditional, inherent powers).

### A.   Courts Enjoy Broad Equitable Authority Under the All Writs Act

Courts may issue orders under the All Writs Act to safeguard ongoing proceedings and "enjoin almost any conduct which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *Klay v. United HealthGroup, Inc*., 376 F.3d 1092, 1102 (11th Cir. 2004) (internal citations omitted); *United States v. N.Y. Tel. Co*., 434 U.S. 159, 172-73 (1977) (explaining the All Writs Act "aids [a court] in the performance of its duties"); *see also Fed. Trade Comm'n v. Dean Foods Co*., 384 U.S. 597, 603-04 (1966) (a court may use the All Writs Act to preserve the status quo as necessary to resolve the issues before it).

Courts have "broad power" and "significant flexibility in exercising their authority under the Act." Accordingly, injunctions and orders issued pursuant to the All Writs Act may be directed to (1) the immediate parties to a proceeding, (2) "persons who, though not parties to the original

action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice," and (3) "even those who have not taken any affirmative action to hinder justice." *Klay*, 376 F.3d at 1100 (citing *N.Y. Tel. Co.*, 434 U.S. at 174); *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1263-64 (11th Cir. 2021) (affirming application to non-parties).

The traditional requirements for an injunction "do not apply to injunctions under the All Writs Act." *Klay*, 376 F.3d at 1100; *accord Rohe*, 988 F. 3d at 1265; *see also N.Y. Tel. Co.,* 434 U.S. at 174 (affirming grant of injunction under the All Writs Act without regard to traditional four injunction factors). Nor must a party seeking an All Writs Order "state a claim" in the traditional sense. *Klay*, 376 F.3d at 1100. Rather, it is enough to "point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior," *Klay*, 376 F.3d at 1100, and show that: (1) the court already has an independent basis for its jurisdiction, *Burr & Forman v. Blair*, 470 F.3d 1019, 1027 (11th Cir. 2006); (2) the order sought "is in aid of the district court's jurisdiction and agreeable to the usages and principles of law," *Klay*, 376 F. 3d at 1112 (citing 28 U.S.C. § 1651(a)) (cleaned up); and (3) there are no alternative statutory remedies available. *Burr & Forman*, 470 F.3d at 1027. All of the prerequisites for relief have been satisfied here.

### B. The Prerequisites for an All Writs Order Have Been Met

It is undisputed that the Court already has an independent basis for jurisdiction in this case by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), which collectively confer jurisdiction to federal district courts in civil actions arising under the U.S. Constitution or that seek to redress the deprivation, under color of any State law, of any right secured by the U.S. Constitution. *See* Def. Arneika Smith's Answer to Am. Compl. ¶ 17, ECF No. 38 (admitting jurisdiction is proper); GDC Defs.' Answer to Am. Compl. ¶ 17, ECF No. 41 (same); *see also, e.g., Burr & Forman,* 470

F.3d at 1027 (asking whether the court already has jurisdiction over a case); *N.Y. Tel. Co*., 434 U.S. at 172 n.19 (same).

The All Writs order that Plaintiff seeks will aid the Court's jurisdiction and is also agreeable to the usages and principles of law for myriad reasons. The Eleventh Circuit has affirmed that All Writs injunctions may be properly issued where, as here, they will protect the integrity of a judicial proceeding that is at risk of being threatened by party and non-party conduct. *See, e.g.*, *Rohe*, 988 F.3d at 1266 (approving of orders that "serve to protect [a] proceeding . . . from some threat to its integrity."); *Klay*, 376 F.3d at 1099-1102 (same).

The threats articulated here are imminent and concrete: Ms. Diamond is facing ongoing retaliation at Coastal—including in the form of attempted witness tampering, falsification of institutional records, and altering her PREA victim status to obscure her history of victimization and imminent threat of harm she still faces—whose purpose or effect is to distort the evidentiary record, diminish Ms. Diamond's chances for release or transfer, and hinder this Court from reviewing Ms. Diamond's legal claims as thoroughly as justice requires. As such, the order sought here is agreeable to the usages and principles of law because it will permit the fair adjudication of Ms. Diamond's claims before this Court without undue obstruction and interference as the "rational ends of law" require. *See N.Y. Tel. Co.*, 434 U.S. at 172-73 (reciting standard); *Klay*, 376 F.3d at 1102 (approving of All Writs orders that "promote the resolution of issues in a case properly before it . . . [or] facilitat[e] . . . the court's effort to manage the case to judgment.") (citations omitted); *Dean Foods*, 384 U.S. at 608 (acknowledging the "express authority" of federal courts to orders that protect their own jurisdiction under the All Writs Act).

All Writs Act orders are also agreeable and appropriate where, as here, "prison officials [including non-defendants] allegedly have taken action that impedes a prisoner's ability to litigate

his case." *Aldrich v. Romo*, No. 5:20-cv-00974-MCS-KK, — F. Supp. 3d — , 2020 WL 6305646, at *2 (C.D. Cal. Oct. 9, 2020) (citations omitted). The retaliatory conduct alleged here—including witness intimidation and unreasonably delaying her ability to communicate with her attorneys—has impeded Ms. Diamonds ability to prosecute her case, and even delayed the filing of the motions now before this Court. Rajaratnam Decl. ¶¶ 16-17; Diamond Decl. ¶ 103. Ensuring that plaintiffs like Ms. Diamond are able to exercise their constitutional right to access the courts without fear of punishment or retaliation is agreeable to the usages and principles of the law because the right of access to the courts is constitutionally guaranteed. *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (noting origins in the Privileges and Immunities Clause of Article IV, the First Amendment right to petition, and the Due Process and Equal Protection rights accorded by the Fifth and Fourteenth Amendments). As such, courts may issue All Writs Act orders "to prevent or remedy actions designed to or having the effect of deterring the use of the courts, or punishing one for such use." *EEOC v. Int'l Union of Operating Eng'rs,* 438 F. Supp. 876, 880 (S.D.N.Y. 1977). This includes orders enjoining retaliation aimed at witnesses. *Id.* at 881; *accord Al Otro Lado, Inc. v. Nielsen*, No. 17-CV-2366-BAS (KSC), 2019 WL 1057387, at *3 (S.D. Cal. Mar. 6, 2019) (same).

Finally, Ms. Diamond is entitled to an All Writs Order because there is no alternative statutory remedy that she can avail to halt the retaliation she and other witnesses are experiencing while also protecting the integrity of this proceeding and the Court's ability to adjudicate this case without improper interference through trial.[3] *Burr & Forman*, 470 F.3d at 1027 (asking whether other statutory remedies are available); *Rohe*, 988 F.3d at 1268 (same). S*ee also ITT Cmty. Dev. Corp. v. Barton,* 569 F.2d 1351, 1359–60 (5th Cir. 1978) (noting the All Writs Act permits a

---

[3] Indeed, if the Court finds that a protective order is not available pursuant to Rule 26 or its inherent equitable powers, there are no alterative ***non***-statutory remedies available to Plaintiff either.

district court to issue orders that "enable the court to try the issues [in a pending case] to final judgment," and to "develop the material issues and to bring them to a complete resolution").

## CONCLUSION

For the reasons set forth above, this Court should grant Ms. Diamond a protective order (1) enjoining Defendants and their agents from retaliating against Ms. Diamond and John Doe, or any other witnesses, including GDC staff; and (2) enjoining Defendants and their agents from taking any adverse action against Ms. Diamond based on the altered designations of her as a PREA aggressor and security threat group member.

Dated: April 9, 2021

Respectfully submitted,

/s/ Elizabeth Littrell
Elizabeth Littrell, Ga. Bar No. 454949
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031
Phone: (404) 221-5876
Fax: (404) 221-5857
Email: beth.littrell@splcenter.org

Tyler Rose Clemons[*]
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Phone: (504) 526-1530
Fax: (504) 486-8947
Email: tyler.clemons@splcenter.org

Maya G. Rajaratnam[*]
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
Phone: (334) 956-8307
Fax: (334) 956-8481
Email: maya.rajaratnam@splcenter.org

A. Chinyere Ezie[*]
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Phone/Fax: (212) 614-6467
Email: cezie@ccrjustice.org

*Counsel for Plaintiff Ashley Diamond*
*\* Admitted Pro Hac Vice*