UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ASHLEY DIAMOND,

                Plaintiff,

    v.                                      CASE NO. 5:20-CV-00453-MTT

TIMOTHY WARD, et al.,

                Defendants.

## DECLARATION OF ASHLEY DIAMOND

I, Ashley Diamond, hereby declare and state as follows:

1. My name is Ashley Diamond. I am a 42-year-old Black woman. I am also transgender. I was diagnosed with gender dysphoria when I was fifteen years old and have lived as the woman I know I am ever since.

2. I was the plaintiff in *Diamond v. Owens* ("*Diamond I*"), 131 F. Supp. 3d 1346 (M.D. Ga. 2015), a lawsuit I filed after officials at the Georgia Department of Corrections ("GDC"), including Defendant Statewide Medical Director Lewis, placed me in a series of men's prisons where I was preyed on because I am a woman who has full breasts and a feminine appearance.

3. Between 2012 and 2015, I was sexually assaulted nearly a dozen times in GDC custody. Defendant Lewis and GDC officials ignored my pleas for protection. I was also diagnosed with Post-Traumatic Stress Disorder ("PTSD") because of the assaults and trauma I experienced.

4. My lawsuit also challenged Defendant Lewis's decision to terminate the medically necessary treatment for my gender dysphoria that I had been receiving since I was a teenager—hormone therapy and the ability to express my gender—which was physically and emotionally devastating.

5. Because of these healthcare denials, during my first incarceration I became depressed and suicidal, engaged in self-harm, and repeatedly attempted to end my life. I also attempted to

        castrate myself on multiple occasions to take the pain of my dysphoria away—something I have never done when my gender dysphoria is being properly treated.

6. On August 31, 2015, while my lawsuit was still pending, I was released from custody for the sake of the public interest subject to a nine-year term of parole supervision.

7. After my release, I returned to my hometown and resumed medically necessary treatments for my gender dysphoria, which now includes hair removal treatment since being denied hormone therapy by GDC for three years has led me to grow facial and body hair for the first time in my life. With treatment, my gender dysphoria improved and severe symptoms like my self-castration attempts went away.

8. I also received counseling and treatment for my PTSD and sought treatment at a medical center in Florida that specializes in treating transgender patients.

9. My lawsuit ended in February 2016 after Defendant Lewis and other officials agreed to a settlement that compensated me for my injuries.

### Experiences in GDC Custody Since October 29, 2019

10. On October 29, 2019, I was sent back to GDC custody in connection with a technical parole violation. As part of the intake process, I met with Defendants Atchison, Toole, and Ford—GDC officials who, together with Defendant Lewis and Defendant Statewide Mental Health Director Jackson, have special duties when it comes to transgender housing placements.

11. Defendants Atchison, Toole, and Ford were familiar with the facts of my first lawsuit, so we discussed my history of being assaulted in GDC. During the meetings, I voiced ongoing concern for my safety in men's prisons and specifically asked Statewide PREA Coordinator Atchison to be placed at a female GDC facility for safety reasons to avoid future assaults.

12. As part of the intake process, I also completed a Prison Rape Elimination Act ("PREA") assessment that identified me as a PREA Sexual Victim because of my status as a transgender woman and non-violent offender with a history of being sexually assaulted in GDC custody.

13. However, despite my known safety risks and requests, Defendants Atchison, Lewis, Toole, and Jackson rejected my request for placement in a female facility and placed me at a series of men's prisons where I have, again, faced constant and unrelenting sexual harassment, abuse, coercion, and assault.

14. Defendants Ward, Holt, Ford, and Benton, who also have authority over transgender housing placements, also refused my repeated requests to be rehoused even after they were

notified that I had been sexually assaulted and abused and as my substantial and ongoing risk of harm became even more apparent.

15. GDC's written policies allow transgender women to be placed in women's prisons and I meet all the written criteria. But in reality, GDC refuses to place transgender women in women's facilities regardless of their meeting the criteria set out—something GDC officials admitted when I asked why my transfer requests were being ignored.

## Abuse and Attacks at GDCP and Coastal State Prison

16. As a result of their housing decisions, I have been sexually assaulted sixteen times since my October 29, 2019 return to custody—horrific assaults and attacks that have included being anally and orally raped, groped, grabbed, and masturbated and ejaculated on.

17. Between October 29, 2019 and June 4, 2020, when I was housed at Georgia Classification and Diagnostic Prison ("GDCP"), a closed-security men's prison, I was sexually assaulted six times and preyed upon by staff and inmates alike.

18. While at GDCP, I was raped, attacked, propositioned, groped, rubbed up on, and taunted by male inmates who threatened to rape me, among other sexual abuses. For example, a GDC staffer grabbed my breasts and mocked me for being transgender in plain view of security cameras. An inmate hiding in a closet tried to sexually assault me. I was even locked in a room and abused over a two-day period by a GDC staff member whose job was to protect me.

19. When I reported these incidents to Defendants through my counsel and through GDC PREA Compliance Managers, they did not take meaningful steps to protect me. Defendants did not even keep surveillance video of my attacks like my lawyers requested.

20. On June 4, 2020, I was transferred to my current facility, Coastal State Prison ("Coastal"), another men's prison where, as a woman, I am constantly being targeted and fear for my safety each and every day. I was also placed in a dormitory that has a large number of convicted sex offenders.

21. GDC officials, including Unit Manager Rodney Jackson, have made a dangerous environment even worse by calling me a freak and making sexually explicit comments about my body that sent a message to my dorm mates that when it came to abusing transgender people, it was open season at Coastal.

22. Since my June 2020 arrival at Coastal, I have been sexually abused or assaulted **ten times** by cisgender men who have treated me like prey—including a chilling set of rapes and attacks that occurred because my cell door at Coastal did not lock for months on end. I

narrowly escaped being raped a handful of other times after being attacked only because I was able to get away from an attacker, or because other inmates intervened.

23. For instance, on or about July 3, 2020, I was sexually assaulted by a man who followed me into my unlocked cell, covered my mouth, ripped off some of my clothes, and attempted to rape me. I only escaped because two other people from my dormitory intervened and stopped the attack.

24. On or about July 16, 2020, I escaped another attack after a different man entered my cell without authorization.

25. In a terrifying incident that happened on or about September 13, 2020, a man entered my unlocked cell during the middle of the night and began masturbating at the foot of my bed.

26. On or about September 18, 2020, another man at the prison locked me in a room and tried to rape me. He ripped my shirt off, grabbed my breasts, and forced me onto a bed and sexually assaulted me until "count" began, and I was able to run away.

27. One day later, on or about September 19, 2020, I was again sexually assaulted by another incarcerated person who lives in my dormitory. The man entered my cell, physically grabbed my head, and forced me to give him oral sex.

28. Then, on or about September 20, 2020, I was assaulted by two other men who live in my dormitory. During the first attack, I was brutally attacked and sexually assaulted in my cell. Later that same day, I was attacked by a different individual who trapped me in their room and sexually assaulted me until I was able to escape.

29. On or about October 9, 2020, and October 29, 2020, I was sexually assaulted twice by men from my dormitory who entered my unlocked cell and fondled me while masturbating. I was also threatened by a gang member who threatened me with sexual assault and told me he wanted to "stuff [his] cock in [my] throat."

30. On or about March 8 and March 9, 2021, I suffered two more sexual assaults in my dormitory at Coastal. During the first assault, which took place on March 8, an inmate sat down next to me in a common area and whipped out his penis and began masturbating while trying to grope me.

31. During the second assault, which took place on March 9, 2021, I was approached by the same male inmate as the previous day when I entered the day room of my dormitory. The assailant unhinged his pants, exposed his genitals, and lunged at me. The assault only ended because I managed to escape.

32. The March 9 assault was witnessed by others in the dormitory who reported it on my behalf. However, nothing happened to my assailant in the aftermath of my attacks. He just remained in my dormitory, and when he learned about the PREA complaints against him, he used them to threaten me.

33. Instead of having access to a private shower like PREA requires, I also have to shower around men, who ogle my body. Just last week, on or about March 29, 2021, while I was in the shower, a male inmate moved an industrial fan in front of my shower stall so that the curtains flew open and my nude body was on display.

34. A group of male inmates gathered in front of me and began whooping and hollering about the "peep show" and making crude sexual comments about my body. I ran out of the shower and returned to my cell, humiliated and afraid. For the rest of the week, people approached me to make harassing comments and talk about my "peep show," making my dormitory environment even more unbearable.

35. I have notified Defendants about my ongoing victimization and risk of attack every way that I can. Through my attorneys, I submitted nine Notices of Violation that notified Defendants about the abuse and attacks I have been experiencing, and the way that the mistreatment is impacting me.

36. I've made verbal complaints about my safety and safety risks to Defendants Benton, Toole, Atchison, and Ford. I've spoken to mandatory reporters at GDCP and Coastal, including dormitory mentors, PREA compliance managers, and mental health personnel, who reported my assaults to various Defendants up the chain.

37. I even submitted a grievance about my sexual assaults and requested placement in a women's facility, only to be told it was a "non-grievable" issue and there was no administrative remedy available for me to pursue. I've also requested, more times than I've been able to count, safety transfers away from Coastal to a female facility where the abuse and attacks would finally stop.

38. Despite all of the brutal assaults I've endured at Coastal, my pleas for a safety transfer have all been ignored, so I am still living in the same male prison and dormitory where I've already been assaulted ten times, where I am enduring constant sexual harassment, and where threats still loom.

39. In addition to denying my requests for a safety transfer, Defendants have also dragged their feet on taking basic steps to protect me from further assaults and abuse at Coastal.

40. For instance, even though I repeatedly complained to Defendant Benton and other Coastal staff that my cell door did not lock beginning in June 2020, my requests to repair the lock were always refused. Once, I was told, "some cell doors work, and others do not." Another

     time, a prison maintenance worker told me that Defendants Benton and Toole had ordered staff to keep my cell door exactly the way it was. After that conversation, I suffered more abuse and attacks because my cell door did not block out intruders.

41. Defendants have also breached the confidentiality of my PREA complaints and circulated my notices around the prison, which has gotten me labeled as a snitch and led to further attacks.

42. For instance, on or about October 30, 2020, I was threatened in the pill call line by one of my assailants who was informed of my October 23 PREA report by Deputy Warden of Care and Treatment Carl Betterson. My assailant told me that he was going to "fuck me up." Since then, I've been afraid to go to pill call, and staff refuse to escort me, even though it makes it harder for me to get medication that I need.

43. When I asked Defendants and other GDC officials to let my lawyers be present to participate in my PREA interviews to minimize further retaliation and threats to my safety, they stopped investigating my PREA complaints entirely. As a result, I've never heard back about the status of my PREA complaints, and none of the inmates who have abused and attacked me have been punished to this day.

44. As a woman in a men's prison, every day I spend at Coastal is a living nightmare. I am sexually harassed on an almost daily basis. I am constantly groped and rubbed up on by men, pressured for sex, and threatened with rape or violence when I refuse.

45. I am also strip searched by male officers, which is traumatizing and humiliating. GDC officials walk in on me when I am nude or getting dressed and inmates peer through my window to catch a glimpse of me naked or semi-dressed.

46. As a result, my PTSD is worse than ever. I carry so much trauma that it is hard for me to get through the day. I have panic attacks that make it difficult to even breathe. The sound of doors opening and closing, keys clanking, or footsteps approaching makes my heart race and my palms sweat. I have trouble sleeping because of my anxiety and nightmares. I have even stopped eating meals and lost weight because I fear more attacks and am afraid to leave my cell.

47. In addition to the sexual violence and psychological torture I've experienced, there are physical threats. I've been called a snitch more and more because I decided to take a stand against my sexual abuse. The threats are also escalating. Recently, a knife was slid under my door with a note that said, "do everyone a favor and kill yourself."

48. Because Defendants will not take steps to protect me, my survival depends on whether people in my dormitory are willing to protect me instead.

## Challenges Related to Medical Care

49. Since returning to GDC custody, Defendants Lewis, Jackson, and Sauls have also denied me medically necessary gender dysphoria care in a manner that is eerily reminiscent of my first lawsuit. Defendants have denied me treatment without so much as evaluating me, and vetoed the treatment recommendations of GDC healthcare providers who have actually assessed my needs.

50. I have been taking feminizing hormones since I was 17 years old and have taken them consistently except for when I have been denied access by GDC. Hormones have allowed my body to align more closely with my female gender identity, allowing me to grow full breasts, have soft skin, and have a feminine physique. In addition, they have caused changes to my genitals that prevent me from having erections.

51. All of the GDC healthcare providers who have evaluated me since 2015—including Dr. Stephen Sloan, Dr. Daniel Roth, and Dr. Daniel Fass—agree that hormone therapy and gender expression accommodations are medically necessary treatments that I need to manage my gender dysphoria.

52. Dr. Roth also affirmed my need for medicated hair removal treatments because of the painful changes to my body that happened after Defendant Lewis denied me hormone therapy for three years during my first period of incarceration, which caused facial and body hair to grow. The emergence of male facial and body hair really exacerbates my gender dysphoria, as does shaving my face like a man.

53. Dr. Roth and Dr. Fass have advocated for me to receive a treatment plan that includes accommodations related to my gender expression and hair removal products, but GDC's "Central Office"—i.e., Defendants Lewis, Jackson, and Sauls—has blocked them at every turn.

54. As a result, I've been subjected to harmful restrictions on my gender expression, threatened with forced haircuts, and been denied accommodations like female clothing or hairstyle allowances and access to female commissary items. I've also had to fight tooth and nail even to get access to female undergarments like a bra or panties.

55. I've also been denied access to the medicated hair removal products I need to stop my dysphoria from worsening—a request that Defendant Lewis personally rejected, even though she's the reason I need hair removal treatment in the first place.  I can't use male depilatories like Magic Blue  on a regular basis because they are very painful and cause my face to burn, breakout, and form pustules since they are made for men's skin, unlike my skin which is softer because of my hormone therapy. I also need permanent facial hair removal by laser or medicated creams for my gender dysphoria, so that I don't have to engage in the male ritual of shaving or removing facial hair.

56. GDC staff at my facilities also demean and disregard my gender—referring to me as a man and using male pronouns to refer to me day in and day out, which is incredibly destabilizing and makes my gender dysphoria worse. Even being called by my last name, Diamond, would be less painful.

57. I have also had major issues when it comes to accessing hormone therapy. The hormone therapy I'm receiving is also erratic and unmonitored because no one is taking regular bloodwork to ensure my levels are actually therapeutic. It has been more than a year since I saw an endocrinologist, and the only bloodwork I have on file is from November 2019, right after I first entered GDC custody.

58. My hormone therapy has also been delayed for weeks at a time and the dosage lowered without explanation, which has wreaked havoc on my mind and body.

59. Being denied the necessary treatments for my dysphoria has taken a severe toll on my mental and physical health. My gender dysphoria has become overwhelming and unmanaged. Over the past few months, I have tried to castrate myself repeatedly because my dysphoria is crippling.

60. When my gender dysphoria is properly treated, I don't have the impulse to castrate myself in this way. But right now, I can't control these urges because my dysphoria is almost as bad as it was during my first incarceration—the only other time I've struggled with attempts at castration.

61. Because of my castration attempts, I have cuts and bruises on my genital area that have, at times, become severely infected. I've also sustained damage to my urethra that has made it difficult for me to urinate, sometimes for days at a time. When I was evaluated by GDC doctors, I was warned that my injuries could lead to kidney failure or death. The damage to my genitals makes it doubly impossible for me to have erections or engage in penetrative sexual contact.

62. My body is also physically changing because my hormone levels are not being monitored and I can't do anything to stop it.

63. I filed numerous grievances and appeals begging Defendants Lewis, Jackson, and Sauls to initiate the care I need, but they have been denied. My lawyers also wrote five Notice letters explaining how my health and safety are being jeopardized by Defendants' healthcare denials, but Defendants have refused to take any action whatsoever.

64. Dr. Fass also contacted Defendants Lewis and J. Jackson to notify them that my medical care was inadequate but got nowhere. He even apologized to me for not being able to do anything.

65. When I've tried to speak to mental health counselors about gender dysphoria and the pain that I feel, they have admitted they don't know anything about it. So instead of having a real counseling session, I've just received the occasional Sudoku puzzle or coloring sheets, which does not ease my dysphoria.

66. Being without the gender dysphoria care I need has left me depressed, anxious, hopeless, and suicidal. My castration attempts are more frequent than they've ever been. I have also attempted suicide multiple times and death is a looming thought because I want to end my pain.

### Retaliation in Response to Advocacy at Coastal

67. After filing PREA reports on September 29, 2020 and October 23, 2020 about sexual assaults I was experiencing at Coastal and the role that staff played, Coastal officials began retaliating against me by giving me disciplinary reports.

68. Before this retaliation campaign began in October 2020, I had a clean institutional record that was free of disciplinary reports. But ever since it began, I've faced an avalanche of disciplinary reports— fourteen disciplinary reports in all at last count, and six disciplinary reports in October 2020 alone.

69. For instance, on October 7, 2020, in the wake of a PREA report describing a series of sexual assaults I experienced at Coastal, I received a disciplinary report for not providing a urine sample for a drug test even though I was sent to medical *for being unable to urinate* due to my castration attempts. When I reminded GDC officials there was a medical reason I could not urinate on demand, I was issued a disciplinary report even though I offered to take a blood drug test instead.

70. Then on October 31, 2020, just days after I filed a PREA Notice that called attention to the role Defendant Benton and Coastal administrators had played in my sexual assaults and threatened litigation, I was issued five false and baseless disciplinary reports in one day.

71. For instance, on October 31, 2020, after a GDC officer noticed me sitting in my cell fully-clothed talking to ▮▮▮▮▮▮▮ a platonic friend who rescued me after a suicide attempt and stayed with me afterwards to make sure I wouldn't attempt again, the officer said, "Yes! We got him now!" (speaking about me as if I'm a man), and we were each handcuffed and sent into solitary confinement without any explanation.

72. Hours later, I received a disciplinary report that was actually three disciplinary reports/charges in one, that falsely alleged I had consensual sex with ▮▮▮▮▮▮▮ and penetrated him.

73. Not only was this disciplinary report completely untrue, but it accused me of an act that is medically impossible for me as a transgender woman with gender dysphoria who has been on feminizing hormones for decades beginning in my teens, with a history of self-castration and chronic PTSD—conditions which have destroyed my libido, changed my sex organs, and make it impossible for me to have erections or engage in penetrative sex.

74. As soon as I received the false report, I began compiling evidence and witnesses who could speak to the impossibility of the charges, including GDC nurses who were familiar with my castration attempts and the damage they caused to my organs. I also asked officials to review the security camera footage outside my cell and to examine me and to administer a rape kit to prove that I had not engaged in sexual conduct, but they refused to do so.

75. The other disciplinary reports that I received on October 31 following my PREA reports were just as nonsensical. For instance, I received a disciplinary report for allegedly tampering with my cell door to prevent it from locking, *after complaining to GDC officials that my cell door did not lock and requesting repairs*. I also received a disciplinary report for asking a staff member to give ▮▮▮▮▮▮ back his legal work and personal items, including habeas papers, after he was transferred out of our dorm.

76. In the end, even though the disciplinary reports were demonstrably false and absurd, I was never given the chance to challenge them like prison rules allow. GDC officials even sustained my consensual sex disciplinary report and found me guilty before I had a hearing or uttered a word in my defense. Even though the reports stated I had been found guilty based on "supporting documentation," to my knowledge, there was none. I was never given the chance to present evidence, or hear the evidence against me. No witnesses were ever called—not even the nurse who could speak to the impossibility of the allegations, or the officer whose unsworn allegation against me was the basis of the charge. My lawyers were even denied the opportunity to help me challenge the trumped-up report. And when I tried to appeal, I never got a response.

77. Defendant Benton has openly acknowledged that I am being punished for my legal advocacy, and that GDC officials are trying to block my eligibility for early release. After I filed my lawsuit, Benton and I had a conversation where he said in essence: "You're trying to sue me? Well, I'm keeping you here. You're going to be here for four more years."

78. True to Benton's promise, the retaliation has gotten even worse since my lawsuit was filed. One GDC staffer even admitted that Benton and other administrators have been working together to punish me for my advocacy. They even called a special strategy meeting on the subject after my lawsuit began.

79. As a result, the avalanche of disciplinary reports against me has also gotten larger. In or about December 2020, I received a **second** disciplinary report for being unable to urinate

on demand even though my difficulties stemmed from the same medical reason as before—castration attempts triggered by gaps in my gender dysphoria care.

80. On or about December 23, 2020, I received a disciplinary report for having "contraband' after an officer sifted through my trashcan and found two broken pencils.

81. In or about December 2020 and January 2021, I received two disciplinary reports in quick succession for allowing prison maintenance workers whose job it is to keep our dormitory clean to enter my cell and clean my floor.

82. To this day, GDC officials at Coastal continue to manufacture reasons to discipline me and are quick to punish me whenever I try and engage in self-advocacy at the prison for myself or others.

83. For instance, in February 2021, when I tried to file a PREA report against GDC Officer Mitchell for being openly hostile to me because I am transgender and flinging open my cell door while I was undressed, I was hit with three disciplinary reports in succession. One report falsely accused me of being "insubordinate," another falsely accused me of using illicit words, and another falsely accused me of having a contraband cell phone, even though I have no phone, because Mitchell went to my Facebook page and saw posts and updates my family made on my behalf.

84. Just last month, on March 17, 2021, I received another disciplinary report charging me with unauthorized possession for having plastic safety scissors as part of an arts and crafts project that had been sanctioned by staff. The staffer also loudly stated "Mr. Diamond, here's your DR" in an effort to humiliate me in front of others.

85. The disciplinary reports I've received have also been upheld without any sort of due process, even when I've tried to mount a challenge.

86. Of the fourteen disciplinary reports I've received since October 2020, I've only had two hearings to date. The hearings I've been given have also been a sham. I've been blocked from presenting evidence or witnesses in my defense. I've never been offered a chance to view the evidence against me. I've even been blocked from having staff members of my choosing serve as my advocates like prison rules allow. The decisionmakers' minds have also been made up no matter how ludicrous the facts—for instance, the total absence of any proof that I have a cell phone.

87. My appeals have all gone unanswered, so I've been uncertain about their disposition for months at a time. It was only on March 8, 2021 that I learned, through changes to my release date, that the appeals had been sustained, but to this day I still haven't received paperwork.

88. When I began this lawsuit, my lawyers planned to file a Motion for Preliminary Injunction, but GDC officials told me that I was scheduled for release on November 30, 2020, so we abandoned that plan. Then, as my lawyers were working to amend my complaint and evaluate my options for preliminary relief, I was told that I had a new release date of March 1, 2021.

89. But now as a result of Benton's retaliation scheme and the retaliation I've experienced from staff, my confirmed release date set for March 1, 2021 based on performance incentive credits **has now been pushed back to April 2022.**

90. I learned about the latest reset on March 8, 2021, after a staff member pulled me aside to explain why everyone else with my release date had already gone home, while I had been held back.

91. Being kept behind bars for another full year is terrifying, devastating, and dangerous because my health and safety are still in peril every day.

92. In addition to the abuse and attacks I face, COVID-19 is running rampant at Coastal, and I have chronic asthma, which increases my risk of succumbing to the virus. In March, there was a major outbreak at Coastal and people all around me started testing positive and dying. Even though I'm in a high-risk group, incarcerated people in Georgia are not eligible to receive COVID-19 vaccines, so I will remain at high risk until my release.

### Retaliation Directed at Witnesses and Falsifications to My Institutional File

93. As bad as it is that Benton has made good on his promise to keep me locked in prison longer because of my advocacy, the retaliation has not stopped there. After I filed this lawsuit, I learned that Benton and other officials had also begun tampering with my prison records and peppering them with false statements claiming that I am a gang member and sexually violent predator.

94. A GDC staffer also showed me a computer record that had been falsified to say that I am a PREA sexual aggressor who has a history of sexually victimizing and physically assaulting people in prison, which are both completely untrue.

95. Not only are both of these statements false, they are dangerous because they give GDC an excuse to house me with sexual predators and deny my requests for transfer. Prior to the falsification, my PREA records accurately stated that I was a PREA sexual victim with a history of suffering abuse and attacks, who required ongoing protection from assault.

96. The staffer also informed me that my security classification had suddenly been changed to say that I am a part of a security threat group, a designation that GDC reserves for members of violent prison gangs.

97. I also learned that Defendant Benton and Deputy Warden of Care and Treatment Carl Betterson had pressured ▮▮▮▮▮▮▮ to submit a false PREA report accusing me of being a rapist and a predator, and that Betterson urged him to be a "Team Player" by making false allegations against me.

98. When ▮▮▮▮▮▮▮ refused to join in on their lies, he was kept in solitary confinement for three months. Afterwards, he was transferred to some of the most dangerous dormitories at Coastal as another form of punishment directed at me and at him.

99. I learned about Benton and Betterson's campaign to make me out to be a predator, and to punish ▮▮▮▮▮▮▮ for not cooperating, when I received letters from ▮▮▮▮▮▮▮ in January 2021 describing their efforts to coerce him to lie about me. Afterwards, a GDC staffer confirmed that Benton and Betterson had hatched a plan to get criminal charges pressed against me.

100. On March 8, 2021, when I learned that my parole release date had been set back, a staff member also showed me a file that Warden Benton and others had sent to the Parole Board to block me from being released on March 1 as originally planned.

101. The file contained falsified statements and records that alleged that I am a gang member and dangerous predator. It also forwarded all of the retaliatory disciplinary reports I've received at Coastal since October 2020 as punishment for my advocacy and lawsuit. Put simply, the file Benton and others submitted to the Parole Board made me look like a monster.

102. I know these retaliatory reports are the reason my release date was pushed back because the Parole Board issued me a letter stating that I had been denied parole "due to [my] institutional conduct."

103. My attorneys can't even help me address the retaliation effectively because most of our call requests over the past few months have been blocked. It's been almost a month since I've been able to schedule a legal call to update them on my situation. Legal mail is also severely delayed, so I don't even know what's happening in my case day to day and have been unable to participate in discovery.

### The Abuse I'm Experiencing at Coastal Is Endangering My Life

104. As a woman in a men's prison who lives in fear of the next sexual assault and who is being sexually harassed, abused, and threatened day in and day out, I feel broken. My PTSD is crippling. I am plagued by nightmares where I relive my assaults. Because I live in fear of the next inevitable sexual assault, I have panic attacks that make it difficult to even breathe. I also have difficulty sleeping at night unless I take sedatives that leave me vulnerable to more attacks and abuse. These symptoms get worse every day and their intensity is increasing.

105. Being denied life-saving healthcare day in and day out is also excruciating. My mental health is disintegrating, and I am still overcome with the impulse to castrate myself, even though I know it carries a risk of serious injury or death.

106. I'm also struggling with suicidal feelings because of all the abuse and attacks I've lived through at GDC. In the past year, I've tried to kill myself six times to try and end the pain.

107. In May 2020, while I was still at GDCP, I attempted suicide by overdosing on medication after I was assaulted by Officer Arneika Smith, a second GDC staffer whose job was to protect me.

108. All of my other suicide attempts have happened since my transfer to Coastal because I've faced such relenting abuse and attacks. For instance, I've tried to overdose on medication, and I've tried to poison myself by drinking chemicals. I've tried to starve myself by refusing food, which is easy to do because there are already so few ways I can go to meals safely.

109. And on or about October 31, 2020, I attempted suicide by turning my belt into a noose after being assaulted and threatened three times in a few days.

110. My October 31 suicide attempt was almost successful. I even lost consciousness. The only reason I survived is because ██████ found me, took the noose off of my neck, and stayed with me long enough to make sure I would not attempt suicide again.

111. But ultimately that kind act led to the false disciplinary reports that got us both punished. I am deeply anguished that his good deed in saving my life and being my friend has caused him so much pain.

112. Since that time, I've attempted suicide again, and in recent weeks, my suicidal feelings have gotten stronger, because every day I spend as a woman in a men's prison is unbearable. The sexual coercion, harassment, abuse and assaults I face are unrelenting.

113. My physical safety constantly hangs in the balance, and every day I face new dangers and perils. In recent weeks, men in my dormitory have propositioned me, exposed themselves to me, lunged at me nude, groped me and masturbated in my presence, and exposed my nude body in the shower. I have only narrowly escaped more serious sexual assaults and attacks. It is like I'm trapped in a nightmare.

114. Even though I believe in my lawsuit, I am having more and more trouble finding the will to live. Most days, I would rather die than keep suffering abuse like this.

115. Living in constant fear that Defendant Benton and others will find new ways to punish me and prolong my sentence has made things even harder. The physical and mental toll is difficult to bear.

116. The news that Defendants' punitive and retaliatory actions against me have succeeded in delaying my eligibility for parole was like a door closing on the slight rays of hope I was holding onto to get through the torture of being a woman in a men's prison. Now, I am hopeless, fearful of ongoing retaliation, and at my wits end.

117. To say that my mental health is deteriorating is an understatement. I try to stay strong, but I am at the end of my rope and don't know how much more I can take.

118. Unless GDC processes me for a safety transfer and begins giving me the healthcare I need, I worry that I will not survive incarceration.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 7, 2021                                    Respectfully submitted,

                                                        /s/Ashley Diamond
                                                        Ashley Diamond