UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ASHLEY DIAMOND,

Plaintiff,

v.

TIMOTHY WARD, et al.,

Defendants.

CASE NO. 5:20-CV-00453-MTT

**DECLARATION OF CORECTIONAL FACILITIES EXPERT JAMES AIKEN**

**I.   QUALIFICATIONS**

1.   My name is James E. Aiken, and I am a former Commissioner on the National Prison Rape Elimination Commission where I served from 2004 to 2009, the body charged with developing the Prison Rape Elimination Act (PREA) standards for the prevention, detection, and elimination of prison rape and the management of transgender individuals that apply to corrections departments across the country.

2.   I also have over 49 years of experience in the administration, operation, and management of Departments of Correction and male and female correctional facilities, and have held positions ranging from Commissioner, to Director, to Warden.

3.   For example, I served as the Director of the Bureau of Corrections for the United States Virgin Islands, where I was given the specific mission to remedy overcrowding, gang problems, random and systemic violence, and general mismanagement. I served as the Commissioner of the Indiana Department of Correction, where I was responsible for the overall administration of the Indiana corrections system that consisted of 46 separate adult and juvenile facilities. I served as a Deputy Regional Administrator of the South Carolina Department of Corrections, where I supervised sixteen South Carolina institutions at all security levels. I served as Warden of the Central Correctional Institution, the largest correctional facility in South Carolina, housing medium-security, maximum-security, and death row inmates. I also served as the Warden of the South Carolina Women's Correctional Institution, where I was responsible for all aspects of female inmate welfare and rehabilitation.

4.   I was also offered the position of Commissioner of the Georgia Department of

Corrections by Governor Zell Miller in the early to mid-1990s following a prison crisis and major sex scandal involving female inmates being abused, but I declined the employment offer given my then-existing commitments.

5.  I have consulted with the United States Department of Justice, National Institute of Corrections, and federal, state, and local prisons on a variety of subjects, including, but not limited to: inmate classification, management of women offenders, management of youthful offenders in adult prisons, prison security systems, security operational performance, prison critical event avoidance, and riot/gang management. I have conducted thousands of inmate security evaluations in the spectrum ranging from the first time non-violent offender to an international terrorist that killed thousands. I have also conducted hundreds of disciplinary hearings regarding inmates while serving as a member and chairman. I have conducted hundreds of disciplinary hearing reviews as the authority to ensure the hearings and findings were conducted in accordance with policy and sound correctional practice.

6.  I am currently the President of James E. Aiken & Associates, Inc., serving as an expert witness and consultant on prison conditions and future inmate dangerousness. I have served as an expert witness or consultant in approximately 350 civil and criminal proceedings in at least 30 state and federal (United States) jurisdictions as well as Canada. I have also provided expert consultancy internationally, including in Costa Rica and the Dutch Kingdom. I have also taught courses in Corrections at the university and technical college levels.

7.  I received my Masters Degree in Criminal Justice from the University of South Carolina and my Bachelor of Arts from Benedict College, Columbia, South Carolina.

8.  A true and accurate copy of my *curriculum vitae* is attached as **Exhibit A**.

## II.  MATERIALS CONSIDERED

9.  In preparing this Declaration, in addition to my extensive professional experience, I reviewed materials concerning Ms. Diamond's background, criminal history, and confinement in the Georgia Department of Corrections (GDC) from 2012 to 2015 and from 2019-present at the Georgia Diagnostic & Classification Prison (GDCP) and Coastal State Prison (Coastal). These materials include the Amended Complaint in this case, *Diamond v. Ward, et. al.*, No. 5:20-CV-00453, ECF No. 36; Ms. Diamond's Declaration, the Declaration of Dr. Randi C. Ettner, and the Declaration of John Doe, filed herewith; the Verified Complaint filed in *Diamond v. Owens, et. al.*, No. 5:15-cv-00050 (M.D. Ga. Feb. 19, 2015), ECF No. 3; the September 14, 2015 court order denying Defendants' motion to dismiss; and GDC records detailing Ms. Diamond's criminal history and housing placement, and the housing placements of female inmates

convicted of similar offenses.

10. In addition, I reviewed GDC's Standard Operating Procedures on the Classification and Management of Transgender and Intersex Offenders, SOP 220.09, effective July 26, 2019; GDC's Standard Operating Procedures on the Prison Rape Elimination Act (PREA) Sexually Abusive Behavior Prevention and Intervention Program, SOP 208.06, effective December 1, 2014 and March 2, 2018; GDC's Standard Operating Procedure on the Management and Treatment of Offenders Diagnosed with Gender Dysphoria, SOP 507.04.68, effective April 7, 2015; and the Georgia Department of Corrections (GDC) organizational chart.

11. A complete list of the materials I considered is attached as **Exhibit B**.

### III. OVERVIEW AND GENERAL PURPOSE AND MISSION OF CONFINEMENT FACILITIES IN AN OPERATIONAL CONTEXT

12. Corrections staff throughout the chain of command are responsible for the safety and wellbeing of the inmates in their custody and control. Corrections staff are also responsible for protecting the fundamental legal rights, including the state and federal constitutional rights, of those in custody.

13. Ensuring the health, safety and security of the inmate population is critical to the mission of corrections systems, so the importance of these responsibilities cannot be overstated. Each decision, observation, behavior, measure, and policy that prison officials take has a direct causal relationship to the well-being, life, and death status of literally thousands of people. Therefore, the highest level of accountability and objective performance outcomes of various functions must be established and monitored.

14. A reasonably safe correctional setting must be able to perform the following functions in a seamless and accountable manner that is carefully monitored by prison officials to prevent operational deficiencies that can compromise the health, safety, or security of inmate populations, staff, or the public:

   a. **Classification:** The manner in which the inmate population is assigned to a security designation, level of supervision (audio, visual, structural, staff deployment, treatment, and technology), housing unit, and/or program is based upon factors exampled by nature of offense, length of sentence, type of sentence, recommendations of the court, medical condition, mental health status, legal status, gender identity, current behavior, previous behavior, potential behavior, gang affiliation, criminal history, escape history, overall confinement adjustment history, substance abuse history, and education. Factors used in the classification process are reassessed on a continual basis to ensure validation and objective effectiveness pertaining to the safety, treatment, and security of staff, inmates, and

the community. Appropriate classification of inmates is paramount and essential to the safe operations of a confinement setting. The misclassification of inmates is not merely uncomfortable or inconvenient; the effects are far more significant and include serious and/or permanent injury, chronic and/or debilitating conditions, and even death.

b. **Policy and Procedure Development & Implementation:** Written policy and procedures delineate and clarify behavioral expectations of staff throughout the chain of command by which prisons are expected to operate. They are also the foundation for measuring prison officials' behavioral compliance with applicable law, constitutional mandates, and sound correctional practice. Once adopted, policy effectiveness and institutional compliance must be assessed and reassessed on a regular (daily) basis to ensure validation and objective effectiveness. More specifically, prison officials must verify and continually monitor confinement operations daily in order to establish that the policies and practices are objective, empirical, and outcome-based, to directly prevent, detect, respond to, and contain security issues prior to the occurrence of a critical event involving life endangerment peril.

The process to achieve reasonable attainment of basic sound security, protection, and safety of inmates is exampled by prison officials' obligation to create and maintain a posture of professional trust and integrity among stakeholders, including confinement staff, inmates, the judiciary, and the general public through their decisions, directives, and interactions with staff/inmates. Inmate population and staff measure all aspects of governance, interaction and behaviors of prison officials in regard to their personal safety and security priorities to determine whether it comports with their level of life endangerment, harassment or general treatment. The impression gained by inmates and staff is normally defined as the "prison culture of the institution or agency".

- With respect to policy implementation, also provided are exampled approaches that should be taken in order for prison officials to achieve a reasonable safe and secure confinement security operation:

- Prison officials must develop, implement, and objectively measure validated and accurate performance outcomes that have a direct causal relationship to specific protection issues of stakeholders (staff, inmates, and the community).

- Prison officials must establish and objectively monitor protection and security systems (daily) that reasonably ensure the safety and security of stakeholders.

4

- Prison officials must take immediate actions, with the maximum level of accountability, that have a direct and objective causal relationship to the prevention, detection, response, and containment of life endangerment security issues prior to the advent of a life endangerment critical event.

- Prison officials must establish objective measurements of validated security and safety productivity within applicable law and sound correctional practice that reasonably protect staff, inmates, and the community.

- Also, the objective measurements must force prison officials to establish and implement "cause and effect" outcome measures and actions that will prevent, detect, respond to, and contain life endangerment issues prior to the occurrence of an actual life endangerment critical event.

- Additionally, these systems and objective measures must be designed, monitored as well as administered by the prison to interact, exchange validated information, and correspond with each other in a seamless and accountable manner.

The outcome product is a basic validated legally compliant, reasonably safe, and secure confinement setting.

c. **Information Management:** The collection, validation, formatting, and dissemination of information that has a positive and measurable impact upon the safety and protection of the community, inmates, and staff. This validated data and information must be designed to present to the prison official, at the correct time, to force factual decision making and protective behaviors of staff in the chain of command regarding the inmate.

d. **Planning:** The process of gathering, evaluating, validating, and documenting objective information regarding the safety and security needs of inmates, staff, and the public to minimize the advent of a critical event involving life endangerment and/or death. This information forces objective analysis and decision-making that compares performance goals to objective measures of validated productivity.

e. **Training and Staff Development:** The mechanism through which prison officials behaviorally operationalize the mandates of policy, procedure, applicable law, and sound confinement practice. Training and staff development transform written policy and procedure into actual behavior of staff and establish the agency which in turn promotes the institutional culture. It is also that mechanism prison officials use to ensure that the mission, goals, and objectives of the organization are

transformed into actual practice and behavior patterns of staff and inmates. This transformation also aids in the establishment of the agency and institutional culture and climate. Failure to use training and staff development as a behavioral transformation instrument usually causes the prison and agency to become inconsistent and arbitrary regarding the management of the inmate population as well as facilitates critical events involving intimidation, extortion, staff misconduct, injury, needless suffering, avoidable endangerment, and death.

f. **Chain of Command:** Prison officials have the responsibility and authority to ensure the confinement system is operating (daily) in a reasonably empirically safe and secure manner while complying with applicable law and sound confinement practice. Each person in the chain of command must act upon even minute information that will often be measured by life-or-death outcomes.

g. **Offender Management Audits and Inspections:** A tool prison officials use to establish, monitor, and empirically validate prison/agency security, safety, and protection performance. Prison officials must conduct formal and informal evaluations of various aspects of the confinement operation in order to further objectively ensure the security and operational status of the facility on a regular (daily) basis. These audits and inspections must not be "process based"; instead there must be a direct "cause and effect" productivity outcome to these activities. The objective interdiction of violent attacks, murders, excessive use of force, escapes, unfair/retribution oriented disciplinary processes, sexual misconduct, etc. must be the outcome product of management audits and inspections.

h. **Security Performance Evaluations:** A system to objectively assess the overall operation of prison security and safety as well as the institutional climate, status, and performance regarding safety, protection, and security-related measures.

i. **Staffing (Complement, Deployment, Supervision, Duties):** This function provides adequate sight and sound supervision of the inmate population through the use of staff members who are properly educated, trained, equipped, supervised, and deployed to ensure the appropriate level of protection, response to actual and/or potential life endangerment issues as well as the reasonable and obvious security and safety requirements of inmates and staff.

j. **Medical and Mental Health (Operational):** This system provides medical and mental health services necessary to reasonably ensure the safety and well-being of the inmate population. Medical and mental health must be seamlessly integrated with all other systems. The mental health and medical systems must undergo continuous empirical and operational assessment due to the reality that the inmate population cannot receive even elementary care without the permission and

facilitation of prison officials like Defendants. Furthermore, prison officials must adhere to treatment requirements of qualified health care professionals.

15. In addition, prison officials must adopt measures to proactively detect, prevent, and abate random and systemic violence and violence targeted to especially vulnerable populations (i.e. transgender inmates) before they deteriorate into critical events involving life endangerment such as sexual violence, intimidation, gang violence, extortion, or death.

16. Prison officials who allow dysfunction to develop and persist, as well as "wait" to react once a crisis or external inquiry occurs, operationally cause avoidable death, peril and extreme critical events. When prison officials do not meet minimally acceptable standards, tactics, and basic security measures, the results also promote operationally critical events, deaths, and other perils.

17. Based upon my preliminary operational assessment regarding this proceeding, I have found that these vital aspects of prison governance are not apparent here. Defendants have not taken the steps or adopted the operational measures necessary to achieve an objective, validated, measurable and basic level of security, safety, protection, and treatment for Ms. Diamond.

18. In particular, and as discussed further below, I have not seen objective validation that Defendants have objectively planned, established, implemented, empirically monitored and taken elementary necessary steps to ensure Ms. Diamond's medical needs regarding her medical diagnosis and treatment are met, ensure her mental health diagnosis and treatment are being accurately fulfilled, and establish an operational governance at facilities that proactively and measurably prevents, detects, responds to and contains endangerment and intimidation acts upon transgender inmates prior to critical events occurring.

## IV.  SAFETY ISSUES CONCERNING HOUSING TRANSGENDER WOMEN IN MEN'S PRISONS

19. There are inherent life endangerment risks that transgender women face in men's prisons—in particular, the enhanced risk of violence, extortion, and sexual assault—that are widely known and understood within the corrections profession.

20. For example, in a 2007 study commissioned by the California Department of Corrections and Rehabilitation, 4% of randomly sampled inmates in California state prisons reported being sexually assaulted, while 59% of transgender inmates reporting being sexually assaulted. Valerie Jenness et al., Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault 2 (Jun. 2007), https://cpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/BulletinVol2Issue2.pdf.

Similarly, a 2014 report from the United States Department of Justice Bureau of Justice Statistics found that between 2007-2012, 34% of transgender inmates in federal and state prisons and local jails experienced sexual victimization. Allen J. Beck, U.S. Department of Justice, Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates Tbl. 1 (Dec. 2014), https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

21.   In 2004, the United States Congress appointed me to be one of nine Commissioners of the National Prison Rape Elimination Commission (the "PREA Commission," or "Commission") established pursuant to 34 U.S.C. Sec. 30306 (detailing establishment and objectives of Commission). The Commission held hearings throughout the country and carefully considered the appropriate standard for the safe housing and placement of transgender inmates over a five-year period. The Commission was also responsible for the development of standards that would lead to the prevention, detection, and elimination of prison rape and issued the National Prison Rape Elimination Commission Report ("Report") in June 2009, attached as **Exhibit C**, that became the basis for the federal Prison Rape Elimination Act (PREA) Standards that were issued by the Department of Justice in 2012 at 28 C.F.R. Part 115.

22.   In addition to promulgating general standards and procedures for inmate safety, the PREA Commission's Report and resulting PREA Standards acknowledge and account for the ways that transgender inmates (as well as lesbian, gay and bisexual inmates) are especially vulnerable to the prison's specific perils of intimidation, harassment, and random and systemic violence to include sexual assault.

23.   PREA's training, screening, and data collection requirements, which have been incorporated into GDC's standard operating procedures since December 1, 2014, serve to make officials within GDC well-aware of the commonsense reality known across the corrections industry that transgender inmates belong to a particularly vulnerable group that is especially susceptible to attacks, extortion and forms of endangerment from other inmates.

24.   Prison officials are also informed of the vulnerability of transgender prisoners through their day-to-day work experiences since transgender women in male prison environments face a serious but operationally predictive risk of harassment and assault from predator male inmates (individual or collective) who perceive them as "weak," "passive," "misfits," and "non gang affiliated."

25.   Given these dynamics, a corrections professional with any level of job training or passing familiarity with corrections environments would know that a transgender woman in a male facility—particularly a woman with a prior history of sexual

victimization—stands a serious and operationally predictable risk of experiencing sexual assault.

26. Prison officials have the responsibility and authority to take precautions to protect prisoners who they know are, or who they know are perceived as, vulnerable to physical violence and/or sexual abuse, such as would be a transgender woman in a men's prison. Sound correctional practice requires prison officials to take threats of violence directed at particularly vulnerable prisoners seriously, to prevent and proactively investigate these threats, and to take appropriate objective measures to reasonably protect such prisoners from harm. As prison officials, protecting particularly vulnerable groups from sexual assault is not a matter of "best practices." Instead, it is a fundamental requirement of the job.

27. Protecting particularly vulnerable prisoners from sexual assault also yields broader penological benefits. When prison officials listen to the concerns of vulnerable groups and take precautions to protect them, such as monitoring their safety, they increase their legitimacy as authority figures as well as abate predator prisoners (individually and group) from establishing their command authority over the prison and prisoners. Additionally, these actions signal to other prisoners that abuse will not be tolerated and increase the safety of the facility for officers and prisoners alike. This has a positive prison cultural impact regarding safety and security.

28. The converse is also true. For example, where prison officials dismiss and ignore the safety needs of transgender women and otherwise reflect hostility or disrespect to transgender inmates, by, for example, belittling transgender women, insulting them, or bringing negative attention to their status as transgender, their actions place transgender women in that facility at a significantly higher risk of assault, abuse and victimization. Responsible Authorities, including Wardens or Commissioners, who become aware of any such behavior among staff would be expected to discipline and retrain staff to prevent operational life endangerment failures in the future. The practiced behaviors of Wardens or Commissioners must serve to create the expected norms and mores of the facility and agency.

## V.   THE PRISON RAPE ELIMINATION ACT AND REQUIREMENTS FOR TRANSGENDER OFFENDER MANAGEMENT

### A.  PREA Classification Requirements Generally

29. Serving in the capacity as a Commissioner with PREA, by appointment of the United States Congress, I established that one of the most important aspects regarding the safety and security of inmates from sexual transgressions pertained to the appropriate screening, supervision, treatment, protection, and security special population which equates to an objective proactive classification system. The classification system is a

key component to prison systems' assurance that inmates, staff, and the general public are reasonably protected.

30. The purpose of PREA screenings and assessments is to identify inmates who are especially vulnerable to sexual assault, and to account for these stated vulnerabilities in terms of "housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. Sec. 115.42(a).

31. PREA Standards explain that sexual assault risk factors include: "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;" "[w]hether the inmate has previously been incarcerated;" "[w]hether the inmate's criminal history is exclusively nonviolent;" "[w]hether the inmate has previously experienced sexual victimization;" the inmate's age and physical build, "whether the inmate has a mental, physical, or developmental disability," and the "inmate's own perception of vulnerability," among others. 28 C.F.R. Sec. 115.41(d).

32. PREA risk assessments must be performed for all inmates upon their initial arrival into custody; as a follow-up, not to exceed 30 days later; upon their transfer between facilities; and upon a "referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization[.]" 28 C.F.R. Sec. 115.41(f)-(g).

### B.     PREA Requirements for Transgender Housing Placements

33. The PREA Standards provide additional guidance concerning the placement of transgender people in prison. Specifically, the PREA Standards state: "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. Sec. 115.42 (c).

34. The PREA Standards also require that "[a] transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration" when determining housing placements, and that housing placements be reassessed twice a year or as threats emerge. 28 C.F.R. Sec. 115.42 (d)-(e).

35. Because the well-known endangerment risks that transgender women face in a male prison environment—including the enhanced risk of sexual violence, extortion, forced prostitution, threats, and restriction in movement—are largely absent when transgender women are housed in female facilities, the PREA Standards also acknowledge that the

transfer of a transgender woman into a predominantly female prison population can and must be achieved when health and safety considerations dictate, regardless of her genital status. 28 C.F.R. Sec. 115.42(c).

36. Prior to the formation of the Commission in 2004, prison systems historically determined transgender housing placements solely and categorically based on genital status. However, because a transgender person with a female gender identity or secondary sex characteristics will be subject to the same perils as any woman in a male prison environment, the PREA Commission rejected the use of "genital status" as the sole basis to determine housing placements for transgender inmates. *See* Report at 77 ("The facility makes individualized determinations about how to ensure the safety of each inmate").

37. The reference to "management and security problems" that appears in the PREA Standards is not a carve out or override to the ban on placements based solely on genital status. Rather, it is a requirement that prison officials provide transgender individuals placements that allow for the proper and reasonable abatement of management and security problems while also adhering to the medical and mental health requirements of the transgender inmate and reasonably ensuring the inmate's safety and well-being.

38. GDC's written policies, specifically its PREA Policy and Standard Operating Procedure on the Classification and Management of Transgender and Intersex Offenders, SOP 220.09 (Transgender Classification and Management Policy) and Standard Operating Procedure on the Prison Rape Elimination Act Sexually Abusive Behavior Prevention and Intervention Program, SOP 208.06 (PREA Policy), acknowledge and adopt these corrections industry norms.

39. GDC's PREA Policy purports to adopt and implement the PREA Standards systemwide, SOP 208.06, while GDC's Policy on the Classification and Management of Transgender and Intersex Offenders affirms that transgender people in prison "are at particularly high risk for physical or sexual abuse or harassment," SOP 220.09(IV)(D)(1), and tasks the Statewide Classification Committee with the responsibility "for making case-by-case decisions about whether a transgender or intersex offender will be housed in a male or female facility," SOP 220.09(III)(J).

## C.   Operational Feasibility of Placing Transgender Women in Female Facilities

40. Operationally, placing a transgender woman in a women's facility does not create a safety concern for non-transgender women in the facility – especially where the transgender woman has no history of violence and no criminal history involving sexual aggression. The security and safety concerns of transgender women do not create unmanageable situations if basic security delivery is performing at an elementary

seamless manner. For example, chain of command, classification, security technology, sight and sound supervision, physical structure, education, medical care, psychological services, contraband control, inmate movement, gang management, preparation, and pastoral care systems are fully integrated with each other to promote the safety and security of all concerned. If a transgender woman is transferred to a predominantly female facility and these above example systems are operating at a basic and validated manner, the risk of adverse outcomes is minimal if not nonexistent.

41.     The transfer of a transgender woman into a predominantly female prison population can and must be achieved, especially if medical/mental health diagnosis and course of treatment require such placement. The purpose of a fully integrated operational medical/mental health/classification/maintenance/security/chain of command/training and program services task force is to discover, evaluate, plan, and monitor potential issues necessary to be mitigated in order to ensure proper blending of transgender women into this predominantly female prison environment.

42.     The pre-requisite for placement in a women's prison should always be predicated on medical and psychological determinations, the transgender inmate's input, and the need for the transgender woman to have necessary programming, safety, and security.

43.     A blanket ban on placing a transgender woman in a women's facility based on security concerns unrelated to the transgender woman's individual circumstances would be an admission that the agency is failing to operationally manage its facilities. Moreover, based on the information set out above, such a blanket ban would be contrary to PREA standards, sound correctional practice, and the position of the Department of Justice standards, and in reliance on prejudice and/or gender stereotyping reflecting pre-conceived unvalidated notions about men and women in confinement.

## VI.   OVERVIEW OF CORRECTIONS PRACTICES FOR RESPONDING TO AND INVESTIGATING SEXUAL ASSAULT

### A.  Requirements for PREA Investigations

44.     The purpose of PREA is to prevent, detect, and respond to sexual abuse in confinement facilities by establishing national standards. Pursuant to that objective, it is imperative that every allegation of sexual abuse in a correctional facility be thoroughly and appropriately investigated by a qualified investigator who has been trained to investigate sexual abuse allegations in confinement settings and that the investigations are conducted in a thorough, fair and impartial manner.

45.     Corrections agencies should have policies and procedures in place that ensure PREA investigations are conducted promptly, thoroughly, and objectively. Investigations should proceed in accordance with standard protocols and procedures regardless of the

level of cooperation received from the victim.

46.   Prisons are highly controlled environments and officials are given a relatively high level of control and regimentation compared to members of the community. Therefore, prison officials have numerous avenues to obtain pertinent information and evidence when a victim is unwilling to be interviewed without the involvement of their legal counsel. The degree to which a person "cooperates" with investigators should not equate to the degree of how the investigation is conducted, especially since inmates may naturally be wary of retaliation or the "snitch" label. In other words, whether a victim is deemed uncooperative is of no significance regarding the integrity of the investigation and/or whether the investigation should be advanced or concluded.

47.   The operational foundation for this requirement is exampled: (1) it is not the victim's responsibility to assist in a prison investigation. The victim does not have the authority and/or responsibility to provide information to staff unless such victim wishes to provide the information; (2) the prison setting is a "contained" environment where prison officials have total control over movement, associations, housing configurations, materials an inmate may retain, and communications, and authority to conduct searches without warrants and conduct video surveillance without the inmate's permission; (3) inmate population, inclusive of victims, consider and measure their level of protection from random or systemic violence, inappropriate measures by prison officials in almost every aspect of their existence in a prison setting. This survival instinct is very pronounced in prison environments in which the victim has been subjected to various aspects of intimidation and violence as well as understands that these critical events have occurred previously with other inmates. It becomes more acute and life threatening when prison officials do not demonstrate the appropriate behaviors, which personifies that inmate safety is not a priority. This survival instinct permeates the inmate population.

48.   In my corrections experience and experience as a PREA Commissioner, there is no legitimate penological or administrative reason to deny to an alleged victim of a sexual assault, as part of the PREA investigation, participation of their attorney when that attorney is requested and available. There are a variety of means to facilitate the involvement of an attorney's participation in interviews with the alleged victim to avoid any adverse impact on the pace or substance of the investigation. The involvement of professionally trusted legal advisors should be viewed as helpful to a proper investigation where the objective of the investigation is a proper, thorough and impartial investigation, as opposed to an administrative formality, because it can assuage the inmate and provide the reassurance necessary for the victim who fears retaliation and whose professional trust of prison officials has been violated.

### B. Corrective Action by Corrections Personnel

49. My correctional experience also establishes that if investigations are not thoroughly investigated based on factual information and the longer investigative process is extended, it promotes professional mistrust among inmate population and deteriorates meaningful credibility between staff and inmate population. Critical events are evaluated by inmate population based on their overwhelming need for safety and protection. They know that this level of safety and protection has a direct relationship upon the timely manner critical events, rule violations as well as criminal matters taken in the investigative stages. Inmates assess this on a continual basis. Untimely and non-objective investigative processes equate to a higher level of discord within the institution as well as increase the intensity of negative perception that basic rights and protections are neither promoted nor guaranteed to the victim. There is the loss of professional trust.

## VII.   ASSESSMENT OF MS. DIAMOND'S CURRENT STATUS

### A. Ms. Diamond's Housing Placements

50. I understand that Ms. Diamond has lived and presented as a woman since she was a teenager and has female secondary sex characteristics, including breasts. Therefore, prison officials must develop and implement a classification plan that addresses the reality of her situation, which is that male inmates in GDC custody regard Ms. Diamond as a woman and react to her as a female. This misclassification of Ms. Diamond into a male prison setting unnecessarily creates a life-threatening situation for her and compromises the safe and orderly operation of the prison.

51. According to the materials I've reviewed as part of this proceeding, these perils have already manifested as male inmates and corrections staff sexually assaulting Ms. Diamond sixteen times since her return to custody, and men attempting to view her showering, hiding in closets to molest her, entering her room at night to arouse themselves and to sexually assault her, masturbating in her presence, rubbing up against her sexually, grabbing her, groping her, using sexualized taunts about her breasts and body, and attempting to coerce and otherwise force her into performing sexual acts at the risk of violent retaliation.

52. The frequency and intensity of these predator assaults and transgressions are validated indicators that prison officials abdicated their duties related to the safeguarding of Ms. Diamond, and her safety and wellbeing, or lack thereof, were instead left to life endangerment discretion of inmates in her facility environment.

53. The fact that brief periods have gone by where Ms. Diamond has not been sexually harassed or assaulted is of no operational significance. The sexual brutalization, abuse

and attacks, as well as the sexualized taunts and threats Ms. Diamond has already experienced, as referenced above, give sufficient notice that she is at high risk for random/systemic chronic violence, including sexual violence. Basic preventative outcome based objective actions must be taken to address this obvious peril to her wellbeing. It is simply not sound correctional practice to allow a known potential endangerment to remain and not take appropriate and validated steps to mitigate the issue that reasonably ensures objective productivity.

54. Given Ms. Diamond's history of attacks and these operational dynamics, if prison officials do not remove her from this environment and place her in a setting where risk factors are substantially alleviated, these ongoing perils are likely to occur including Ms. Diamond being, yet again, the victim of violence, the risk of her being forced into prison prostitution by predator inmates in exchange for her protection, and her becoming the catalyst for rival predator inmates attacking each other to reap the benefits from Ms. Diamond's prostitution activity.

55. According to Ms. Diamond's Declaration, she is repeatedly forced to shower in areas that men can access or where they can see her body. The PREA Standards require that transgender inmates "be given the opportunity to shower separately from other inmates." 28 C.F.R. Sec. 115.42 (f). There is no reasonable operational justification for failing to follow this straightforward requirement as separate showers pose no threat to security or the normal operations of the facility.

56. Ms. Diamond's placement in a male facility has facilitated the systemic sexual violence, taunting, intimidation, harassment and violence that case materials indicate she has experienced, and it has needlessly subjected her to a very high risk of a critical event escalating into a life and death situation.

57. The inherent endangerment risks that transgender women face in a male prison environment—notable here, the risk of sexual violence and victimization—are virtually nonexistent when transgender women are housed in female facilities.

58. In contrast, based on Ms. Diamond's background and profile, continuing to house Ms. Diamond in a male correctional facility creates an overwhelming and unnecessary peril of endangerment that is equally manifest in a medium security prison as in a maximum security prison.

59. Based on my corrections experience and the materials I reviewed as part of this proceeding, Ms. Diamond's safety requires that she be transferred to a women's correctional facility to abate the clear, present and known endangerment issue presented by her risk of sexual assaults and victimization in medium and maximum security men's prisons after providing her input regarding such placement.

60.   At the time of Ms. Diamond's placement at GDCP and Coastal, Ms. Diamond met all of GDC's stated criteria for housing transgender women in female facilities as set forth in GDC's Standard Operating Procedure on the Classification and Management of Transgender and Intersex Offenders, SOP 220.09.

    a.   Ms. Diamond's medical profile indicated that she is transgender, and has gender dysphoria.

    b.   Ms. Diamond's PREA risk assessment indicated that she is a PREA Sexual Victim with a history of abuse and attacks;

    c.   Ms. Diamond is receiving hormone treatments;

    d.   Ms. Diamond has never been convicted of a sex offense (though the policy indicates placements may still proceed if an appropriate explanation is given; it is operationally conceivable that women's prisons have confined persons convicted of sex offenses);

    e.   Ms. Diamond did not have a disciplinary history "of a sexual nature" (though the policy indicates placements may still proceed if an appropriate explanation is given);

    f.   Ms. Diamond did not have a disciplinary history of assaultive behavior (though the policy indicates placements may still proceed if an appropriate explanation is given);

    g.   Ms. Diamond did not have a conviction for a violent offense (though, once again, the policy indicates placements may still proceed if an appropriate explanation is given).

*See* GDC's Standard Operating Procedure on the Classification and Management of Transgender and Intersex Offenders SOP 220.09 (IV)(C)(3) (listing placement criteria).

61.   The materials I reviewed, including GDC offender records, indicate that non-transgender women who have been convicted of similar offenses to Ms. Diamond, or who share her weight or build, are all housed in women's prisons.

62.   I have seen no verifiable data that suggests that Ms. Diamond has any of the significant risk factors that would preclude or otherwise raise any concerns about such a transfer under objective classification criteria. Although Ms. Diamond reports receiving a recent set of disciplinary reports—including a report that she had a sexual relationship with another inmate—these reports even if credited as true would not serve to disqualify Ms. Diamond for a transfer to a female facility under GDC's criteria as written. *See* SOP

220.09 (IV)(A)(9).

63.    In addition, housing Ms. Diamond in a male facility undermines the security and good order of the correctional facility's overall operation. Inmates fundamentally want to be protected and constantly assess their own personal safety vis a vis how the prison and prison system will protect them.

64.    Based on the decisions made regarding Ms. Diamond and the materials I've reviewed, including Ms. Diamond's Declaration and court filings, GDC's written policies allowing female facility placements are not being followed. Defendants over the course of their placement decisions have not given the slightest required level of attention and due diligence to address Ms. Diamond's safety, protection, and medical/mental health needs. The foreseeable consequence has been sexual assaults and endangerment risks.

65.    Regular and ongoing sexualized taunting and intimidation of a prisoner, such as what Ms. Diamond is experiencing, creates the perception,[1] if not validation, that prison officials are unwilling to take basic actions to prevent predictable violence and endangerment within the prison.

### B.    Ms. Diamond's Healthcare Needs

66.    Medical and mental healthcare delivery is a core and essential function of correctional systems, so corrections personnel across the chain of command, including at the level of Commissioner, have a responsibility to ensure that the medical and mental healthcare needs of inmate populations are prioritized to prevent critical events like illness, injury, or death.

67.    The medical diagnosis and treatment of the inmate population cannot be deemed as discretionary because it is necessary to ensure the safety and security of inmates, staff, and the public. "Full faith" compliance is required, including with regard to the diagnosis, treatment, and delivery of mental health and medical care to transgender populations in custody.

68.    In my experience as a correctional professional, operationally ensuring prompt proper mental/medical healthcare to transgender people with gender dysphoria and related conditions (depression, anxiety, suicidality) does not create unworkable or unmanageable operational or security concerns. It is essential for the correctional professional to ensure **all** aspects of medical/mental health delivery is provided to the gender dysphoria offender population. Examples include female clothing packages, hairstyling provisions, and female hygiene items being provided on the commissary.

---

[1] My prison experience reveals the inmates' "perceptions" regarding their safety and security are "99% of reality" to them.

The correctional professional must understand the provisions of medical and mental health treatment and provide such, while mitigating any security concerns that are legitimate and factual. These security concerns cannot be used as justification to deny the prescribed provisions of medical and mental health treatment. Operationally, these issues must be addressed in an appropriate and effective manner without prohibiting the prompt delivery of required medical and mental health treatment as well as facility placement.

69. As such, operational and security concerns cannot credibly be cited as a basis to inhibit, prevent, and/or delay the timely and appropriate medical diagnosis and treatment of gender dysphoric inmates.

## C.   Recent Changes to Ms. Diamond's Security Classification and PREA Designation

70. Confinement agencies use classification systems, including PREA and Security Threat Group (STG) designations, to drive the agency's decisions regarding each inmate's work assignments, housing, programming and many of the activities that comprise life in confinement.

71. Ms. Diamond was classified as a PREA Sexual Victim following her intake at GDC, and again upon her arrival at Coastal. This classification is appropriate under the PREA Standards and classification screenings based on the materials I've reviewed. PREA Sexual Victims are defined as inmate populations that are subjected to sexual predator violence, intimidation, and mistreatment to inflict random and/or systemic sexual related transgressions. Here, Ms. Diamond is appropriately classified as a PREA Victim because she is a transgender woman who has a history of being sexually assaulted, including repeated assaults within GDC.

72. According to Ms. Diamond's Declaration, Ms. Diamond's classification was recently changed to indicate that she is a PREA Sexual Aggressor and STG member based on a disciplinary report that alleges she had a consensual sexual relationship with a male inmate. If true, this is a highly irregular and significant departure from the PREA Standards and sound corrections industry practice.

73. Under the PREA Standards, the PREA Sexual Aggressor designation is reserved for inmates who have a history of engaging in sexual abuse, which is defined as sexual contact in instances where "the victim does not consent, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse." 28 C.F.R. Sec. 115.6. Therefore, a person accused of having a consensual sexual relationship is not a "sex offender" or PREA Sexual Aggressor, although the conduct itself may violate prison rules.

74.   Improperly classifying an inmate who is properly classified as a PREA Sexual Victim, based on information responsive to the screening tools used to identify and classify all inmates as PREA Sexual Victims or Aggressors, would be indicative of retaliation or gross incompetence. Such an improper classification would be especially dangerous, with potentially lethal outcomes. This is because the misclassification of an inmate who is vulnerable to sexual assault and abuse (*i.e.*, a PREA Sexual Victim) as a PREA Sexual Aggressor would expose that vulnerable inmate to placement in dormitories and cells, as well as other environments, amongst inmates who are properly classified as PREA Sexual Aggressors with the chance of victimization and/or lethal outcomes a near certainty.

75.   Likewise, STG designations apply to the segment of prison population that are affiliated with prison gangs and seek to achieve dominance of the prison environment and prison operations through activities such as operating contraband traffic transactions and extortion enterprises, committing murders, and preying upon passive inmate population and inmate population with feminine appearance and behavior patterns. STG members are often identified by their tattoos, literature, color and wearing of clothing, group gatherings, correspondence, manifestoes, extortion money collection documents and attacks upon other inmates and/or staff.

76.   It would be highly improper and a significant deviation from proper prison administration to classify an inmate who is targeted and/or extorted by gang members as a gang member or a STG member by virtue of this extortion or threat. Likewise, designating as a gang for STG classification purposes a group of individuals who are affiliated by commonalities, such as having a similar status as a transgender person, would be contrary to proper prison administration and safety in a prison environment.

77.   Falsely, or inaccurately, designating an inmate as a member of a STG would negatively impact that inmate's access to housing, programming, work assignments and parole determinations. Such a false or inaccurate designation could, and likely would, have lethal outcomes because doing so would expose the inaccurately designated inmate to placement with and amongst actual gang members. A prison official changing a security threat designation of an inmate who had none of the indicia of affiliation with a dangerous gang would be indicative of retaliation or gross incompetence.

### D.   Ms. Diamond's Recent Disciplinary Reports

78.   According to Ms. Diamond's Declaration, Ms. Diamond has received more than a dozen disciplinary reports since October 2020, when she increased her advocacy related to this lawsuit. Ms. Diamond also reports that, prior to this time, she did not have any disciplinary reports on her file since her return to custody.

79.     Within the corrections industry, it is well-known that some prison officials issue
        disciplinary reports to inmates who commence litigation against an agency or are
        considered too outspoken. Regrettably, the practice even has a nickname within some
        prisons—"Reindeer Games," a reference with an etymology in a television show,
        Rudolf the Red-Nosed Reindeer, but which refers to the "game" of targeting an inmate
        for retaliation through issuance of excessive, often baseless, disciplinary reports.

80.     Inmates who receive disciplinary reports must be given an opportunity to adjudicate
        their reports in a hearing before a fair and impartial decision maker who facilitates the
        submission and review of evidence and witness testimony germane to the fact-finding
        process.

81.     From an operational perspective, the adjudication process for disciplinary charges
        should include an objective assessment of the charges as well as an impartial evaluation
        of the evidence and circumstances, the officer's statement, the inmate statement and
        presentation of defendant inmate's information and/or witnesses, the objective findings
        of the committee, the justification of the findings, and, if convicted, the appeal process.
        The review of the findings and punishment by a responsible authority should be separate
        from the hearing to ensure the reasonableness of the process and consistency of the
        punishment.

82.     When disciplinary charges allege rule violations regarding sexual intercourse or
        activity, medical examinations or rape kits that may produce or eliminate the existence
        of physical evidence should be provided when requested and should be presented as
        evidence in the proceeding.

83.     If Ms. Diamond were not provided access to an adjudication process along the lines
        described, it would be a grave and operationally unjustified departure from correction
        industry standards. Any reports that were sustained without benefit of a fair adjudicative
        process would also be suspect and unreliable.

## VIII.   THE ROLES AND RESPONSIBLITIES OF RELEVANT CORRECTIONAL AUTHORITIES

84.     GDC Standard Operating Procedure on the Classification and Management of
        Transgender and Intersex Offenders, SOP 220.09, and GDC's Organizational Chart
        designate Defendants Ward, Lewis, Jackson, Atchison, Holt, and Toole as Responsible
        Authorities over transgender housing, classification, and management in their capacities
        as Commissioner, Statewide Medical Director, Statewide Mental Health Director,
        Assistant Commissioner Facilities Division, and members of the Statewide
        Classification Committee. This includes having responsibility with respect to Ms.
        Diamond's facility placements and request to be housed in a female facility.

85.   Although Ms. Diamond is eligible for a female facility placement under the criteria set forth in the Transgender Classification and Management Policy as noted above, Defendants Ward, Lewis, Jackson, Atchison, Holt, and Toole did not approve Ms. Diamond for such a placement. Instead, they placed Ms. Diamond in male facilities despite her endangerment risks, creating significant threats to her health and safety.

86.   Likewise, although GDC's written policies state that decisions concerning whether to place transgender people in women's or men's facilities must be assessed no less than every 6 months to review and account for safety threats, SOP 208.06 (D)(6)-(7), Defendants Ward, Lewis, Jackson, Atchison, Holt, and Toole also failed to process Ms. Diamond for a safety transfer as threats emerged. These actions have exposed Ms. Diamond to random and systemic sexual violence and constant and unrelenting sexual abuse and harassment.

87.   GDC's Standard Operating Procedure on the Management and Treatment of Offenders Diagnosed with Gender Dysphoria, SOP 507.04.68, and the Organizational Chart in this case designate Defendants Lewis, Jackson, and Sauls as Responsible Authorities over transgender healthcare. As such, they are charged with ensuring delivery of mental and medical healthcare to Ms. Diamond and making adequate provisions for her treatment.

88.   Yet, from the materials I've reviewed, including Dr. Ettner's and Ms. Diamond's Declarations, Ms. Diamond is currently experiencing gaps in treatment that have materialized into acute and potentially lethal health outcomes (i.e. suicide attempts, physical injuries). Assuming these facts are credible, Defendants Lewis, Jackson, and Sauls have abdicated critical function in ensuring the health and safety of the inmate population and, by extension, Ms. Diamond.

89.   Under GDC policy, Defendants Ford and Benton, in their capacity as Wardens, have the operational responsibility and authority to ensure the health and safety of all incarcerated populations, "ensure that all aspects of [GDC's PREA] policy are implemented," and ensure "adequate levels of staffing…to protect offenders from abuse," SOP 208.06 (A)(1), (A)(3). The title of Warden also carries with it the responsibility of training, supervising and discipling staff in a manner that prevents staff-on-inmate or inmate-on-inmate abuse from being normalized as part of the prison culture.

90.   Wardens must take basic but fundamental safeguards to reduce endangerment risks in advance of, and following, critical events like sexual assaults and attack. For instance, Wardens must take care that inmates like Ms. Diamond who are in "celled" housing are secured with doors and gates that are securely locked to prevent unauthorized access and intrusion by predator inmates for purposes of sexual assault, intimidation, theft, or other detrimental activities. Consistent with sound correctional judgment and practice,

the door must also allow reasonable exit and egress by the inmate assigned to the cell to ensure fire safety and to facilitate access to prison services and programming (i.e. meals, healthcare, recreation, reentry).

91.   Based on the materials I reviewed as part of my retainer, even these basic safety and security measures were not taken. These redundant and repeated operational failures contributed to the life endangerment events that Ms. Diamond has experienced, including sexual assaults, sexual harassment, and threats of violence.

92.   In his capacity as Commissioner, Defendant Ward had the responsibility and authority to provide Ms. Diamond operationally reasonable levels of safety, supervision, security, and protection upon her confinement into the Georgia Department of Corrections to prevent, detect, respond to and contain actual and potential endangerments. This includes, but is not limited to, proactively addressing and responding to possible alleged and/or factual deficiencies related to safety and mental/medical healthcare delivery, objectively ensuring the appropriate transformation of staff training and development into actual behaviors of staff after such training, providing a high level of intensity and priority to addressing allegations of staff misconduct or other detrimental issues within the chain of command, objectively and empirically validating compliance and enforcement of legal requirements and policies, and objectively ensuring that transgender healthcare and placement decisions are individualized and not based on "blanket policy" and/or baseless perceptions.

93.   Based on my 49 years of corrections experience and prior tenure as a Commissioner, after receiving notice of Ms. Diamond's PREA complaints and lawsuits, Defendant Ward and any Commissioner reasonably focused on inmate safety should have (1) sought to operationally validate every aspect of the PREA complaint with factual and objective medical, mental health, security and operational requirements and mandated performance criteria; (2) ensured that the Plaintiff's well-being, safety, and treatment is addressed while establishing a validated, objective and empirical manner to ensure the absence of retaliation and intimidation; (3) conducted a factual and objective fact based assessment (investigation) of the alleged issues compared to the validated performance of the various systems that are designed to ensure compliance to statute, regulations, common sense, and sound correctional practice; (4) issued to stakeholders a memorialized and factual official evaluation of the alleged issues relative to the validated information to substantiate or disprove every aspect of the litigation and complaints; (5) developed and implemented a transparent communication vehicle to stakeholders that ensures the highest level of professionalism and transparency; and (6) taken immediate corrective actions and appropriate sanctions for any malfeasance, dereliction of duty, as well as any legal or regulatory violations and placed them in the public domain within the constraints of judicial mandates, proceedings, and criminal

litigation. My initial assessment reveals that basic and fundamental safeguards and measures were not taken at an operational level in this case.

94.   With respect to healthcare, a Commissioner who received reports of medical neglect should have, without further notification, (1) ensured that Ms. Diamond was receiving the appropriate safety, protection, and medical and mental health care at present; (2) once it is established that she was currently receiving the appropriate level and intensity of safety, protection, and medical and mental health treatment by the appropriate professionals, empirically and factually established the specific aspects of the medical neglect and taken whatever legal or administrative measures within the Commissioner's authority necessary to ensure a reoccurrence does not take place if indeed neglect was determined; and (3) made determinations regarding sanctions by employees and made system changes with intense oversight and monitoring. .

95.   Accordingly, Defendant Ward enabled and failed to address critical operational failures that have allowed for Ms. Diamond's continued exposure to life endangerment perils.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Dated: April 7, 2021                    Respectfully submitted,

                                               _____
                                               James Aiken