# EXHIBIT C:

# NATIONAL PRISON RAPE ELIMINATION COMMISSION REPORT (REPORT)



# NATIONAL PRISON RAPE ELIMINATION COMMISSION

# R E P O R T

NATIONAL PRISON RAPE ELIMINATION COMMISSION REPORT

JUNE 2009

# Contents

Preface ...............................................................................................v

Commissioners .............................................................................. vii

Commission Staff and Contributors.......................................................xi

Acknowledgments............................................................................. xiii

Executive Summary ............................................................. 1

Introduction......................................................................... 25

PART I: UNDERSTANDING AND PREVENTING SEXUAL ABUSE ............... 31
    1. A Problem that Must Be Solved .................................................. 32
    2. Leadership Matters ................................................................. 50
    3. Unequal Risk: Vulnerability and Victimization.............................. 68
    4. Inside and Out: Strengthening Oversight .................................... 82

PART II: RESPONDING TO VICTIMS AND PERPETRATORS ..................... 99
    5. Reporting, Investigation, and Punishment ................................. 100
    6. Treating Trauma ................................................................... 124

PART III: SPECIAL POPULATIONS........................................................ 139
    7. When Children Are Involved.................................................... 140
    8. Community Corrections: The Next Frontier ................................. 160
    9. On the Margins: Immigrants in Detention ...................................174

APPENDICES ................................................................................... 189
    A. Endnotes............................................................................. 191
    B. National Standards................................................................ 215
    C. Recommendations................................................................. 237
    D. NPREC Standards Development Expert Committee Members .... 239
    E. Standards Implementation Needs Assessment......................... 243
    F. NPREC Hearing Witnesses .................................................... 245
    G. PREA Initiatives .................................................................. 251

# Preface

On behalf of the National Prison Rape Elimination Commission, I am pleased to submit the following report on our work toward the elimination of sexual abuse in correctional and detention facilities nationwide.

In the years leading up to the passage of the Prison Rape Elimination Act and since then, the work of corrections and detention professionals to address the problem of sexual abuse has been significant and laudable. They have established new policies and programs in some facilities, and expanded and refined existing practices in others. Their determination and commitment has led the way and informed the work of our Commission. Even more important, as a result of their efforts, we have seen ideas transform into actions that by all accounts have the potential to improve safety and security for those living and working within correctional and detention facilities.

Despite this important progress, much remains to be done. Although many correctional systems and individual facilities are ahead of the curve, others lag behind. Some corrections leaders enjoy the full cooperation and support they need from the policymakers who oversee their systems; others struggle to secure necessary resources and political commitments. The problem of prison rape and other forms of sexual abuse is too serious and far-reaching, too devastating to the individuals and communities that it ultimately affects to be left to evolve unevenly. The Commission's report and national standards create a mechanism for advancing the field uniformly, requiring the participation of all to protect people under supervision in every corner of our Nation.

Congress conferred upon the Commission an enormous responsibility: developing national standards that will lead to the prevention, detection, and punishment of prison rape. Yet Congress also and appropriately required us to seriously consider the restrictions of cost, differences among systems and facilities, and existing political structures. We have endeavored to comply with these directives, sometimes struggling to find the correct balance among competing considerations. This report describes the scope and seriousness of the problems, ways of solving them,

and what is at stake. The report also includes inspiring examples of good practices, demonstrating that Congress' goals can be achieved and that the Commission's standards are a realistic blueprint for progress and change.

In our work, the Commissioners have learned more than any of us expected at the outset. We have been challenged to examine problems that we wish did not exist and confronted with accounts of sexual abuse that shocked and saddened us, partly because the pain of the experience was still evident in the victims' voices as they testified before the Commission. At the same time, we have had the opportunity to witness remarkable examples of human resolve, creativity, and strength among survivors of sexual abuse as well as corrections and detention professionals. Through it all, we have questioned our own assumptions and perspectives to fully understand the far-reaching nature of the problems and the potential for solutions.

As we near the end of our time of contribution and deliver our report and standards, I offer my sincere gratitude to Commission staff and others who contributed to this important effort. And for my fellow Commissioners who joined me in this challenging endeavor, I have not only gratitude but also great admiration. This diverse group has never flagged in its determination to complete its task with integrity, thoughtfulness, and respect. Through countless days of working together and hours of difficult and sometimes heated discussion, we have come to know each other well. Our diverse perspectives, insights, and talents and the debates we embraced have enhanced our work.

It has been my honor and privilege to serve as the Chair of the Commission. Along with my distinguished and committed colleagues, I am proud to offer this report and our standards as the next step toward creating correctional and detention settings that are safe and free of the danger and shame of sexual abuse.

The Honorable Reggie B. Walton, Chair

# Commissioners

**Chair Reggie B. Walton**

The Honorable Reggie B. Walton is a Federal district judge, appointed by President George W. Bush to the U.S. District Court for the District of Columbia in 2001. In June 2004, President Bush appointed Judge Walton Chair of the National Prison Rape Elimination Commission.

Before joining the bench of the U.S. District Court, Judge Walton was appointed by President Ronald Reagan to be Associate Judge of the Superior Court of the District of Columbia, where he had served as Deputy Presiding Judge of the Criminal Division. When called upon by President George H.W. Bush to become Associate Director of the Office of National Drug Control Policy in the Executive Office of the President, Judge Walton resigned his Superior Court judgeship to assume the Associate Director's responsibilities. Later, Judge Walton served President George H.W. Bush as Senior White House Advisor for Crime. President George H.W. Bush reappointed Judge Walton to the Superior Court of the District of Columbia, where he thereafter served as Presiding Judge of the Family Division and Presiding Judge of the Domestic Violence Unit.

Judge Walton earned his Bachelor of Arts from West Virginia State College in 1971 and his Juris Doctor from American University's Washington College of Law in 1974.

**Vice-Chair John A. Kaneb**

Commissioner John A. Kaneb is Chairman of the Board of Directors of HP Hood LLC. He is also President of The Catamount Companies and a partner in the Boston Red Sox baseball franchise.

In addition to his other duties, Mr. Kaneb is a Trustee Emeritus of the University of Notre Dame. He is also an Emeritus Trustee of the Massachusetts General Hospital and Emeritus Trustee and former Chairman of the Board of McLean Hospital. Mr. Kaneb has served numerous other boards, committees, and task forces, including the Board of Fellows of the Harvard Medical School.

Mr. Kaneb earned his Bachelor of Arts in economics from Harvard College. He holds Honorary Doctor of Laws degrees from Saint Anselm College and the University of Notre Dame.

### Commissioner James E. Aiken

Commissioner James E. Aiken, President of James E. Aiken & Associates, Inc., consults with attorneys and testifies as an expert witness in death penalty and civil cases.

Mr. Aiken has more than 33 years of experience in correctional administration, facility operations and management, inspection and assessment of facility performance, and technical assistance consulting. Mr. Aiken has served every level of government—Federal, State, county, and local—in the areas of correctional leadership, organizational development, management of prison disturbances, system productivity, cost containment, prison security system enhancement, management of violent youthful offenders in adult prisons, gang and security threat group management, new wardens' training, super-maximum security facility management training, assessment of prison security/operational performance, prison staffing analysis, reduction of prison critical security, and development of prison classification systems designed to better protect inmate populations.

Mr. Aiken earned his Bachelor of Arts from Benedict College in Columbia, South Carolina, and his Master of Arts in criminal justice from the University of South Carolina.

### Commissioner Jamie Fellner

Commissioner Jamie Fellner is Senior Counsel for the U.S. Program of Human Rights Watch. The U.S. Program focuses on human rights violations in the United States.

In addition to her own research and writing, Ms. Fellner works with researchers and advocates in the areas of excessively high criminal sentences; over-incarceration; prison conditions, including treatment of mentally ill offenders, prison rape, and super-maximum security confinement; ex-offender reentry problems; mistreatment of immigrants; and human rights abuses resulting from antiterrorism policies.

Ms. Fellner served as Director of the U.S. Program at Human Rights Watch from 2001 to September 2007 and as Associate Counsel from 1994 to 2001. Before beginning work on U.S. criminal justice issues, Ms. Fellner worked as a researcher and advocate for the organization's Americas Division, focusing on several South American countries. Additionally, Ms. Fellner has worked with several U.S. foundations that operated Latin American social justice programs.

Ms. Fellner earned her Bachelor of Arts from Smith College and her Juris Doctor from Boalt Hall at the University of California, Berkeley. She also completed doctoral studies in Latin American history at Stanford University and has practiced law in the District of Columbia.

## Commissioner Pat Nolan

Commissioner Pat Nolan is the President of Justice Fellowship, the public policy arm of Chuck Colson's Prison Fellowship Ministries. Mr. Nolan is also the author of *When Prisoners Return,* describing the important role the church can play in helping people lead healthy, productive lives following their release.

Mr. Nolan brings a unique background to Justice Fellowship. He served for 15 years in the California State Assembly, including four years as the Assembly's Republican Leader. Mr. Nolan has long been a leader on crime issues, particularly on behalf of victims' rights, and was one of the original sponsors of the Victims' Bill of Rights. Parents of Murdered Children awarded Mr. Nolan its Victims' Advocate Award, and many groups named Mr. Nolan "Legislator of the Year." Then, as part of a Federal Bureau of Investigation sting operation, Mr. Nolan was prosecuted for a campaign contribution he received and pled guilty to one count of racketeering. He served 25 months in a Federal prison and 4 months in a halfway house, and that experience changed the course of his life and work forever.

Mr. Nolan earned his Bachelor of Arts in political science and his Juris Doctor from the University of Southern California.

## Commissioner Gustavus A. Puryear IV

Commissioner Gustavus A. Puryear IV is Executive Vice President, General Counsel, and Secretary of Corrections Corporation of America. As General Counsel, Mr. Puryear is responsible for Corrections Corporation of America's legal and regulatory affairs, including its litigation and risk management, contract management, labor and employment issues, corporate governance matters, and compliance with Federal securities laws. Additionally, Mr. Puryear supervises the company's compliance and ethics program as well as its quality assurance program.

Mr. Puryear graduated from Emory University with highest honors in 1990. He earned his Juris Doctor with honors from the University of North Carolina School of Law in 1993.

### Commissioner Brenda V. Smith

Commissioner Brenda V. Smith is a Professor at American University's Washington College of Law, where she teaches community and economic development law, legal ethics and women, and crime and law. Her research interests center on women in conflict with the law and on sexual abuse of individuals in custody. Professor Smith is also Project Director and Principal Investigator for the U.S. Department of Justice's National Institute of Corrections Cooperative Agreement on Addressing Staff Sexual Misconduct with Offenders. She is an expert on issues affecting women in prison, a topic about which she has widely published and spoken.

Before her appointment to the faculty of the Washington College of Law, Professor Smith was Senior Counsel for Economic Security at the National Women's Law Center. She has also served as the Director of the Center's Women in Prison Project and its Child and Family Support Project.

Professor Smith earned her Bachelor of Arts from Spelman College and her Juris Doctor from Georgetown University Law Center.

### Commissioner Cindy Struckman-Johnson

Commissioner Cindy Struckman-Johnson is a Professor of Psychology at the University of South Dakota in Vermillion. For nearly 25 years, Professor Struckman-Johnson has taught social psychology, sex roles, sexuality, and prejudice classes. Together with her partner, David Struckman-Johnson, a Professor of Computer Science, she has researched sexual coercion in prisons since 1994 and has received two national awards for her work in this area. To date, Professor Struckman-Johnson has studied sexual coercion rates in 10 male and four female prison facilities.

Professor Struckman-Johnson earned her doctorate in social psychology from the University of Kentucky.

# Commission Staff and Contributors

**Staff**

Margaret M. Chiara, General Counsel and Executive Director (Acting)

Jenni Trovillion, Deputy Director and Chief Operating Officer

Julia Dempewolf, Program Associate

Sobha Ketterer, Administrative Officer

Joya Taft-Dick, Research Associate

**Organizations**

The Moss Group, Inc.

National Academy of Public Administration

Palladian Partners, Inc.

The Raben Group

Vera Institute of Justice

**Individuals**

| | | | |
|---|---|---|---|
| Sarah Alexander | Mara Dodson | Jane Hereth | Steven Newman |
| Justin Barasky | Erica Drucker | Richard Hoffman | Emily Niedzwiecki |
| Isra Bhatty | Robert Dumond | Meaghan Hohl | Robert Raben |
| Amanda Bosquez | Christopher Erlewine | Katharine Huffman | Thomas Santaniello |
| Michela Bowman | Kathryn Fanlund | Henry Huggins | Margo Schlanger |
| Angela Browne | Rachel Farbiarz | Leonard Jackson | Kerri Sherlock Talbot |
| Sharon Brett | Nicole Garnett | Juliene James | Jeff Shorba |
| Taavona Brooks | Mark Glaze | Anita Khashu | Nina Siulc |
| Christopher Britten | Tara Graham | Jessie Kirchner | Jessica St. John |
| Alexander Busansky | Haley Griffin | Christy Lopez | Richard Tewksbury |
| Alissa Cambier | Gabrielle Guzzardo | Tony Marks | L. Jackson Thomas, II |
| Christopher Campbell | Allison Hastings | Pamala Micheaux | Jennifer Trone |
| Sherry Carroll | Jennifer Haymes | Marcia Morgan | Jaime Yarussi |
| Kathleen Dennehy | Kristen Henning | Anadora Moss | Jason Zeidenberg |

# Acknowledgments

The Commission's work would not have been possible without the significant contributions of a wide array of individuals and entities. Foremost, Senators Edward Kennedy and Jeffrey Sessions, with their colleagues Senators Mike DeWine, Richard J. Durbin, and Dianne Feinstein and Representatives Frank Wolf and Robert C. "Bobby" Scott, sponsors of the Prison Rape Elimination Act of 2003, have never wavered in their dedication to eliminating sexual abuse in confinement and their support for the efforts of this Commission.

The Office of Justice Programs of the U.S. Department of Justice has provided able administrative support to the Commission throughout its tenure. The Bureau of Justice Assistance, the Bureau of Justice Statistics, the Federal Bureau of Prisons, the National Institute of Corrections, and the National Institute of Justice have been spirited collaborators as we each labored to fulfill our mandate under PREA.

The National Institute of Corrections/American University, Washington College of Law Project on Addressing Prison Rape has provided a valuable service to the Commission by identifying legal resources and subject matter experts and by keeping the Commission abreast of emerging trends in the area of prison rape.

Professional organizations and associations in the field of corrections have provided significant input to the Commission throughout the development of the standards and report. They include the American Correctional Association, the American Jail Association, the Association of State Correctional Administrators, the National Sheriffs' Association, the American Probation and Parole Association, the International Community Corrections Association, and several labor unions, among others. The Commission is also grateful to the many individual corrections professionals who helped inform us about current policies and practices intended to prevent and respond to sexual abuse.

Just Detention International (formerly Stop Prisoner Rape) played a pivotal role in our public hearings by identifying survivors of sexual abuse willing to testify and also by providing emotional and other support to those survivors throughout the process. And to the courageous individuals

who shared their stories of abuse with us, we hope you realize how much your voices and experiences shed light on a problem that is misunderstood by many. In this way, you helped protect others from the kinds of harm you have suffered.

Many generous and gracious hosts provided space for our public meetings and hearings. They included the University of Notre Dame Law School in Indiana; the Cannon House Office Building in Washington, DC; the U.S. District Court, Northern District of California in San Francisco; the Federal Detention Center in Miami, Florida; the John Joseph Moakley U.S. Courthouse in Boston, Massachusetts; the Theodore Levin U.S. Courthouse, Eastern District of Michigan in Detroit; the U.S. Courthouse in Los Angeles, California; the University of Texas School of Law in Austin; and the U.S. Federal District Courthouse, Eastern District of Louisiana in New Orleans.

Finally, the Commission is deeply indebted to the many corrections leaders, researchers, legal experts, advocates, and academics who shared their knowledge and experiences through public hearings, expert committees, roundtable meetings, and public comment on the Commission's draft standards. We regret space does not allow us to acknowledge everyone by name.

# Executive Summary

**R**ape is violent, destructive, and a crime—no less so when the victim is incarcerated. Until recently, however, the public viewed sexual abuse as an inevitable feature of confinement. Even as courts and human rights standards increasingly confirmed that prisoners have the same fundamental rights to safety, dignity, and justice as individuals living at liberty in the community, vulnerable men, women, and children continued to be sexually victimized by other prisoners and corrections staff. Tolerance of sexual abuse of prisoners in the government's custody is totally incompatible with American values.

Congress affirmed the duty to protect incarcerated individuals from sexual abuse by unanimously enacting the Prison Rape Elimination Act of 2003. The Act called for the creation of a national Commission to study the causes and consequences of sexual abuse in confinement and to develop standards for correctional facilities nationwide that would set in motion a process once considered impossible: the elimination of prison rape.

This executive summary briefly discusses the Commission's nine findings on the problems of sexual abuse in confinement and select policies and practices that must be mandatory everywhere to remedy these problems. It also covers recommendations about what leaders in government outside the corrections profession can do to support solutions. The findings are discussed in detail and thoroughly cited in the body of the report, where readers will also find information about all of the Commission's standards. Full text of the standards is included as an appendix to the report.

In the years leading up to the passage of PREA and since then, corrections leaders and their staff have developed and implemented policies and practices to begin to prevent sexual abuse and also to better respond to victims and hold perpetrators accountable when prevention fails. They have been aided by a range of robust Federal initiatives, support from professional corrections associations, and advocates who have vocally condemned sexual abuse in confinement. The landscape is changing. Training curricula for corrections staff across the country now include information about sexual abuse in confinement and how to prevent it.

Sexual abuse is "not part of the penalty that criminal offenders pay for their offenses against society."

—U.S. Supreme Court

Some agencies and facilities have formed sexual assault response teams to revolutionize their responses to sexual abuse. Despite these and other achievements, much remains to be done, especially in correctional environments in which efforts to address the problem of sexual abuse have been slow to start or have stalled. Protection from sexual abuse should not depend on where someone is incarcerated or supervised; it should be the baseline everywhere.

More than 7.3 million Americans are confined in U.S. correctional facilities or supervised in the community, at a cost of more than $68 billion annually. Given our country's enormous investment in corrections, we should ensure that these environments are as safe and productive as they can be. Sexual abuse undermines those goals. It makes correctional environments more dangerous for staff as well as prisoners, consumes scarce resources, and undermines rehabilitation. It also carries the potential to devastate the lives of victims. The many interrelated consequences of sexual abuse for individuals and society are difficult to pinpoint and nearly impossible to quantify, but they are powerfully captured in individual accounts of abuse and its impact.

Former prisoner Necole Brown told the Commission, "I continue to contend with flashbacks of what this correctional officer did to me and the guilt, shame, and rage that comes with having been sexually violated for so many years. I felt lost for a very long time struggling with this. . . . I still struggle with the memories of this ordeal and take it out on friends and family who are trying to be there for me now."

Air Force veteran Tom Cahill, who was arrested and detained for just a single night in a San Antonio jail, recalled the lasting effects of being gang-raped and beaten by other inmates. "I've been hospitalized more times than I can count and I didn't pay for those hospitalizations, the tax payers paid. My career as a journalist and photographer was completely derailed. . . . For the past two decades, I've received a non-service connected security pension from the Veteran's Administration at the cost of about $200,000 in connection with the only major trauma I've ever suffered, the rape."

Since forming, the Commission has convened public hearings and expert committees, conducted a needs assessment that involved site visits to 11 diverse correctional facilities, and thoroughly reviewed the relevant literature. Throughout the process, corrections leaders, survivors of sexual abuse, health care providers, researchers, legal experts, advocates, and academics shared their knowledge, experiences, and insights about why sexual abuse occurs, under what circumstances, and how to protect people.

The Commission used what it learned about the nature and causes of sexual abuse in correctional settings and its impact to develop mandatory standards to prevent, detect, and punish sexual abuse. Two 60-day periods of public comment were critical junctures in the creation of the

*Many of the Commission's standards reflect what corrections professionals acknowledge to be good practices—and are already operational in some places—or are requirements under existing laws.*

standards. The Commission tailored the standards to reflect the full range of correctional environments across the country: adult prisons and jails; lockups and other short-term holding centers; facilities for juveniles; immigration detention sites; and probation, parole, and other forms of community corrections. Many standards reflect what corrections professionals recognize as good practices—and are already operational in some places—or are requirements under existing laws. If correctional agencies incur new costs to comply with the Commission's standards, those costs are not substantial compared to what these agencies currently spend and are necessary to fulfill the requirements of PREA.

The Eighth Amendment of the U.S. Constitution forbids cruel and unusual punishment—a ban that requires corrections staff to take reasonable steps to protect individuals in their custody from sexual abuse whenever the threat is known or should have been apparent. In *Farmer v. Brennan*, the Supreme Court ruled unanimously that deliberate indifference to the substantial risk of sexual abuse violates an incarcerated individual's rights under the Eighth Amendment. As the Court so aptly stated, sexual abuse is "not part of the penalty that criminal offenders pay for their offenses against society."

> Protection from sexual abuse should not depend on where someone is incarcerated or supervised; it should be the baseline everywhere.

## FINDING 1

### Protecting prisoners from sexual abuse remains a challenge in correctional facilities across the country. Too often, in what should be secure environments, men, women, and children are raped or abused by other incarcerated individuals and corrections staff.

Although the sexual abuse of prisoners is as old as prisons themselves, efforts to understand the scale and scope of the problem are relatively new. The first study specifically of prevalence—examining abuse in the Philadelphia jail system—was published in 1968. The most rigorous research produced since then—mainly of sexual abuse among incarcerated men—has yielded prevalence rates in the mid-to-high teens, but none of these are national studies.

With an explicit mandate from Congress under PREA, the Bureau of Justice Statistics (BJS) launched a groundbreaking effort to produce national incidence rates of sexual abuse by directly surveying prisoners. The survey results may not capture the full extent of the problem, but they confirm the urgent need for reform. The Commission recommends that BJS continue this important work and that Congress provide the necessary funding.

> A 2007 survey of State and Federal prisoners suggests that an estimated 60,500 individuals were sexually abused during the 12 months leading up to the survey.

BJS conducted the first wave of surveys in 2007 in a random sample of 146 State and Federal prisons and 282 local jails. A total of 63,817 incarcerated individuals completed surveys, providing the most comprehensive snapshot of sexual abuse in prisons and jails to date. Four-and-a-half percent of prisoners surveyed reported experiencing sexual abuse one or more times during the 12 months preceding the survey or over their term of incarceration if they had been confined in that facility for less than 12 months. Extrapolated to the national prison population, an estimated 60,500 State and Federal prisoners were sexually abused during that 12-month period.

*The sexual abuse of prisoners is widespread, but rates vary across facilities—from a low of zero to a high of 15.7 percent.*

Although sexual abuse of prisoners is widespread, rates vary across facilities. For example, 10 facilities had comparatively high rates, between 9.3 and 15.7 percent, whereas in six of the facilities no one reported abuse during that time period. More prisoners reported abuse by staff than abuse by other prisoners: 2.9 percent of respondents compared with about 2 percent. (Some prisoners reported abuse by other inmates and staff.)

The rate of sexual abuse in jails appears to be slightly lower: 3.2 percent of inmates surveyed reported that they had been sexually abused at least once during the prior 6 months or since they had been confined in that facility. Again, reports of abuse by staff were more common than reports of abuse by other incarcerated persons: 2 percent of respondents compared with 1.6 percent. BJS has not surveyed individuals in halfway houses, treatment facilities, and other community-based correctional settings or individuals on probation or parole.

As the Commission's report goes to press, BJS is conducting the first nationally representative survey of sexual abuse among adjudicated youth in residential juvenile facilities. In a preparatory pilot study, BJS interviewed 645 youth in nine facilities—sites that volunteered to participate in the pilot and were selected based on convenience. Nearly one out of every five youth surveyed (19.7 percent) reported at least one nonconsensual sexual contact during the preceding 12 months or since they had arrived at the facility. Youth were just as likely to report abuse by staff as they were to report nonconsensual sexual encounters with their peers in the facility. These preliminary results are not necessarily an indicator of rates nationally because more than a quarter of the youth interviewed had been adjudicated for perpetrating a sexual assault, compared to less than 10 percent of youth in residential placement nationally.

In conducting this research, BJS has taken advantage of evolving survey technology, using laptop computers with touch screens and an accompanying recorded narration to guide respondents—especially helpful for individuals with limited reading abilities. This method increases the likelihood of capturing experiences of sexual abuse among individuals who would be afraid or ashamed to identify as a victim in face-to-face interviews. Prisoners still must believe strangers' assurances of confidentiality,

however—a huge barrier for some—so the likelihood of underreporting still exists. Researchers also recognize that prevalence levels can be artificially elevated by false allegations. BJS designs its surveys to ask questions of prisoners in several different ways and also uses analytic tools to assess data for false reports.

## FINDING 2

**Sexual abuse is not an inevitable feature of incarceration. Leadership matters because corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse.**

In 2006, the Urban Institute surveyed 45 State departments of corrections about their policies and practices on preventing sexual abuse and conducted in-depth case studies in several States. Not surprisingly, the surveys and case studies identified strong leadership as essential to creating the kind of institutional culture necessary to eliminate sexual abuse in correctional settings. The Commission has defined clear standards that corrections administrators can and must champion to prevent sexual abuse and make facilities safer for everyone—reforms in the underlying culture, hiring and promotion, and training and supervision that vanguard members of the profession are already implementing.

To begin with, every correctional agency must have a written policy mandating zero tolerance for all forms of sexual abuse in all settings, whether it is operated by the government or by a private company working under contract with the government. Although not mandated under the standards, collective bargaining agreements should feature an explicit commitment from unions and their members to support a zero-tolerance approach to sexual abuse. Without it, there is little common ground upon which to build when negotiating the many specific policies and procedures to prevent and respond to sexual abuse.

Ultimately, the culture of an institution is shaped by people not by policies. Leaders need the right staff to create a genuine culture of zero tolerance. In particular, administrators must thoroughly screen all new job applicants and make promotions contingent on a similarly careful review of each staff member's behavior on the job to prevent hiring, retaining, or promoting anyone who has engaged in sexual abuse. Conducting criminal background checks, making efforts to obtain relevant information from past employers to the extent permissible under law, and questioning applicants about past misconduct must be mandatory. Rigorous vetting is not enough, however. Correctional agencies urgently need support in

*Leaders need the right staff to create a genuine culture of zero tolerance. Rigorous vetting is crucial; so are supporting and promoting staff that demonstrate commitment to preventing sexual abuse.*

developing competitive compensation and benefits packages so that they can recruit and retain appropriate staff. Equally important, administrators should support and promote staff that demonstrate a commitment to preventing sexual abuse.

Even qualified individuals need training on sexual abuse to fulfill their job responsibilities. Only through training can staff understand the dynamics of sexual abuse in a correctional environment, be well informed about the agency's policies, and acquire the knowledge and skills necessary to protect prisoners from abuse and respond appropriately when abuse does occur. The Commission recognizes the corrections profession's investment to date in training staff and the fruits of those efforts. The Commission designed its standards to ensure that no facility is left behind and that training everywhere meets certain basic criteria. Additionally, the Commission recommends that the National Institute of Corrections continue the training and technical assistance it has provided in the years leading up to PREA and since then and that Congress provide funding for this purpose.

The corollary to staff training is a strong educational program for prisoners about their right to be safe and the facility's commitment to holding all perpetrators of sexual abuse—staff and inmates—accountable. Facilities must convey at least basic information during intake in languages and other formats accessible to all prisoners. Armed with this information, prisoners are better able to protect themselves and seek help from staff before abuse occurs.

Supervision is the core practice of any correctional agency, and it must be carried out in ways that protect individuals from sexual abuse. The Commission believes it is possible to meet this standard in any facility, regardless of design, through appropriate deployment of staff. Direct supervision, which features interaction between staff and prisoners, should be used wherever possible because it is the most effective mode of supervision for preventing sexual abuse and other types of violence and disorder. In addition, correctional facilities must assess, at least annually, the need for and feasibility of incorporating additional monitoring equipment. Technologies are not replacements for skilled and committed security officers, but they can greatly improve what good officers are able to accomplish. The Commission recommends that the National Institute of Corrections help correctional agencies advance their use of monitoring technologies and that Congress fund this assistance.

Cross-gender supervision is an area in which the Commission has set clear standards. Some of the widespread abuse that occurred in women's prisons across Michigan in the 1990s was facilitated by rules that required officers, including men, to meet a daily quota of pat-down searches for weapons, drugs, or other contraband. Physical searches are necessary security procedures. The potential for abuse is heightened, however, when

> Direct supervision is the most effective mode of supervision for preventing sexual abuse and should be used wherever possible.

staff of the opposite gender conduct them. In the Commission's view, the risks are present whether the officers are female or male. Historically, few women worked in corrections, but this is rapidly changing.

The Commission understands that cross-gender supervision can have benefits for incarcerated persons and staff. The Commission's standard on this issue is not intended to discourage the practice generally or to reduce employment opportunities for men or women. However, strict limits on cross-gender searches and the viewing of prisoners of the opposite gender who are nude or performing bodily functions are necessary because of the inherently personal nature of such encounters. Court decisions have recognized that both male and female prisoners retain some rights to privacy, especially in searches of their bodies and in being observed in states of undress by staff of the opposite gender.

With proper leadership practices and clear policies, corrections administrators can foster a culture that promotes safety. The Commission's standards are intended to support these efforts. In addition, the Commission recommends that the Bureau of Justice Assistance continue to provide grants to diverse correctional agencies to support the development of innovative practices and programs and that Congress fund this important work as well as continued research by the National Institute of Justice on the nature of sexual abuse in correctional facilities.

## FINDING 3

**Certain individuals are more at risk of sexual abuse than others. Corrections administrators must routinely do more to identify those who are vulnerable and protect them in ways that do not leave them isolated and without access to rehabilitative programming.**

Preventing sexual abuse depends in part on risk assessment. Unfortunately, knowledge in this area is still limited. Research to date has focused on vulnerability to abuse by other prisoners, rather than by staff, and on the risks for men and boys rather than for women and girls. This caveat aside, some risk factors do stand out.

Youth, small stature, and lack of experience in correctional facilities appear to increase the risk of sexual abuse by other prisoners. So does having a mental disability or serious mental illness. Research on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals. A 1982 study in a medium-security men's facility in California, for example, found the rate of abuse was much higher among gay prisoners (41 percent)

than heterosexual prisoners (9 percent). A history of sexual victimization, either in the community or in the facility in which the person is incarcerated, tends to make people more vulnerable to subsequent sexual abuse.

Unless facility managers and administrators take decisive steps to protect these individuals, they may be forced to live in close proximity or even in the same cell with potential assailants. When Alexis Giraldo was sentenced to serve time in the California correctional system, her male-to-female transgender identity and appearance as a woman triggered a recommendation to place her in a facility with higher concentrations of transgender prisoners, where she might be safer. Yet officials ignored the recommendation and sent her to Folsom Prison in 2006, where she was raped and beaten by two different cellmates.

Some correctional agencies, including the Federal Bureau of Prisons and the California Department of Corrections and Rehabilitation, now use written instruments to screen all incoming prisoners specifically for risk of sexual assault. Evidence-based screening must become routine nationwide, replacing the subjective assessments that many facilities still rely on and filling a vacuum in facilities where no targeted risk assessments are conducted. The Commission's standards in this area accelerate progress toward this goal by setting baseline requirements for when and how to screen prisoners for risk of being a victim or perpetrator of sexual abuse. To be effective, the results of these screenings must drive decisions about housing and programming. Courts have commented specifically on the obligation of correctional agencies to gather and use screening information to protect prisoners from abuse.

The Commission is concerned that correctional facilities may rely on protective custody and other forms of segregation (isolation or solitary confinement) as a default form of protection. And the Commission learned that desperate prisoners sometimes seek out segregation to escape attackers. Serving time under these conditions is exceptionally difficult and takes a toll on mental health, particularly if the victim has a prior history of mental illness. Segregation must be a last resort and interim measure only. The Commission also discourages the creation of specialized units for vulnerable groups and specifically prohibits housing prisoners based solely on their sexual orientation or gender identity because it can lead to demoralizing and dangerous labeling.

The Commission is also concerned about the effect of crowding on efforts to protect vulnerable prisoners from sexual abuse. Crowded facilities are harder to supervise, and crowding systemwide makes it difficult to carve out safe spaces for vulnerable prisoners that are less restrictive than segregation. When Timothy Taylor was incarcerated in a Michigan prison, internal assessments suggested that he was likely to be a target of sexual abuse because of his small size—he was five feet tall and 120 pounds—and diminished mental abilities, yet he was placed in a prison dormitory

> Evidence-based screening for risk of sexual abuse must become routine nationwide, replacing the subjective assessments that many facilities still rely on and filling a vacuum in facilities where no targeted risk assessments are conducted.

to save bed space for new arrivals. Shortly thereafter, he was sexually assaulted by another prisoner.

According to the Bureau of Justice Statistics, 19 States and the Federal system were operating at more than 100 percent of their highest capacity in 2007. An equal number of States operated at somewhere between 90 and 99 percent of capacity. When facilities operate at or beyond capacity, prisoners also have fewer or no opportunities to participate in education, job training, and other programming. Idleness and the stress of living in crowded conditions often lead to conflict. Meaningful activities will not end sexual abuse, but they are part of the solution. It is critical that lawmakers tackle the problem of overcrowding. If facilities and entire systems are forced to operate beyond capacity and supervision is a pale shadow of what it must be, our best efforts to identify and protect vulnerable individuals will be stymied.

Classification has evolved from little more than ad hoc decisions to an increasingly objective, evidence-based process. Although knowledge about the risk factors associated with sexual abuse is far from complete, corrections administrators can identify and protect many vulnerable individuals from abuse.

> Crowded facilities are harder to supervise, and crowding systemwide makes it difficult to carve out safe spaces for vulnerable prisoners that are less restrictive than solitary confinement and other forms of segregation.

## FINDING 4

**Few correctional facilities are subject to the kind of rigorous internal monitoring and external oversight that would reveal why abuse occurs and how to prevent it. Dramatic reductions in sexual abuse depend on both.**

The most effective prevention efforts are targeted interventions that reflect where, when, and under what conditions sexual abuse occurs. Sexual abuse incident reviews, as required under the Commission's standards, produce the kind of information administrators need to deploy staff wisely, safely manage high-risk areas, and develop more effective policies and procedures. A number of State departments of corrections already conduct some type of review.

Correctional agencies also must collect uniform data on these incidents, including at least the data necessary to answer all questions on the most recent version of the Bureau of Justice Statistics Survey on Sexual Violence. In aggregate form, the data can reveal important patterns and trends and must form the basis for corrective action plans that, along with the aggregated data, are released to the public. Transparency is essential.

Even the most rigorous internal monitoring, however, is no substitute for opening up correctional facilities to outside review. The Commission

requires detailed, robust audits of its standards by independent auditors at least every 3 years. The auditor must be prequalified through the U.S. Department of Justice to perform audits competently and without bias. The Commission recommends that the National Institute of Corrections design and develop a national training program for auditors and that Congress provide funding specifically for this purpose.

The Commission also supports external oversight beyond the mandatory audits. In particular, the Commission endorses the American Bar Association's 2006 resolution urging Federal, State, and territorial governments to establish independent public entities to regularly monitor and report on the conditions in correctional facilities operating within their jurisdiction. Oversight by inspectors general, ombudsmen, legislative committees, or other bodies would work hand-in-hand with regular audits of the Commission's standards.

Courts provide a crucial role, especially when other modes of oversight fail. Civil court cases can spark reforms reaching far beyond the individual plaintiffs to protect other prisoners. The Commission is convinced that the Prison Litigation Reform Act (PLRA) that Congress enacted in 1996 has compromised the regulatory role of the courts and the ability of incarcerated victims of sexual abuse to seek justice in court. Under the PLRA, prisoners' claims in court will be dismissed unless they have exhausted all "administrative remedies" available to them within the facility.

In testimony to a House Judiciary Subcommittee, Garrett Cunningham recalled, "At first, I didn't dare tell anyone about the rape. . . . I would have had to file a first prison grievance within 15 days [to begin the process of exhausting the facility's administrative remedies]. . . . Even if I had known, during those first 15 days, my only thoughts were about suicide and. . . how to get myself into a safe place. . . so I would not be raped again." The Commission recommends that Congress amend two aspects of the PLRA for victims of sexual abuse: the requirement that prisoners exhaust all internal administrative remedies before their claims can proceed in court and the requirement to prove physical injury to receive compensatory damages, which fails to take into account the very real emotional and psychological injuries that often follow sexual assault. In the meantime, correctional agencies must deem that victims of sexual abuse have exhausted their administrative remedies within 90 days after the abuse is reported—or within 48 hours in emergency situations—regardless of who reports the incident and when it allegedly occurred.

Corrections administrators need robust mechanisms and systems to monitor their facilities, identify problems, and implement reforms. They must apply that discipline internally and accept it from outside. The very nature of correctional environments demands that the government and the public have multiple ways to watch over correctional settings and intervene when individuals are at risk.

Even the most rigorous internal monitoring is no substitute for opening up correctional facilities to outside review.

## FINDING 5

**Many victims cannot safely and easily report sexual abuse, and those who speak out often do so to no avail. Reporting procedures must be improved to instill confidence and protect individuals from retaliation without relying on isolation. Investigations must be thorough and competent. Perpetrators must be held accountable through administrative sanctions and criminal prosecution.**

Even when prisoners are willing to report abuse, their accounts are not necessarily taken seriously and communicated to appropriate officials within the facility. "When I told one of the guards I trusted how tired I was of putting up with abuse [by other youth in a Hawaii facility], he told me to just ignore it," Cyryna Pasion told the Commission. According to a 2007 survey of youth in custody by the Texas State Auditor's Office, 65 percent of juveniles surveyed thought the grievance system did not work.

Changing that dynamic begins by providing easy ways for individuals to report sexual abuse they have experienced or know about, backed up by clear policies requiring staff and administrators to act on every allegation. Although some correctional systems and individual facilities have made great strides in this area in recent years, the Commission's standards guarantee that all prisoners can easily report abuse, that staff are required to report abuse, and that reports are taken seriously in every facility across the country. A serious response to every report of sexual abuse is also the best way to handle any false allegations.

Victims and witnesses often are bullied into silence and harmed if they speak out. In a letter to the advocacy organization Just Detention International, one prisoner conveyed a chilling threat she received from the male officer who was abusing her: "Remember if you tell anyone anything, you'll have to look over your shoulder for the rest of your life." Efforts to promote reporting must be accompanied by policies and protocols to protect victims and witnesses from retaliation. And because some incarcerated individuals will never be comfortable reporting abuse internally, facilities must give prisoners the option of speaking confidentially with a crisis center or other outside agency.

Facilities have a duty to thoroughly investigate every allegation of sexual abuse without delay and to completion, regardless of whether or not the alleged victim cooperates with investigators. Six years after the passage of PREA, many statewide correctional systems and individual facilities now

> We need to create correctional environments in which prisoners feel safe reporting sexual abuse and are confident that their allegations will be investigated.

have policies, protocols, and trained staff in place to investigate allegations of sexual abuse. Yet there are still facilities—particularly those that confine juveniles, those under the umbrella of community corrections, and smaller jails—that lag behind in this crucial area. The Commission's standard establishing the duty to investigate is followed by a detailed standard to ensure the quality of investigations. Unless investigations produce compelling evidence, corrections administrators cannot impose discipline, prosecutors will not indict, and juries will not convict abusers.

*Many individuals responsible for investigating allegations of sexual abuse lack the training to be effective. Unless investigations produce compelling evidence, corrections administrators cannot impose discipline, prosecutors will not indict, and juries will not convict abusers.*

In particular, when the sexual abuse has occurred recently and the allegation is rape, facilities must offer female and male victims a forensic exam by a specially trained professional. An evaluation of sexual assault nurse examiner (SANE) programs published in 2003 by the National Institute of Justice found that they improve the quality of forensic evidence and increase the ability of law enforcement to collect information, file charges, and prosecute and convict perpetrators while also providing better emergency health care. Correctional facilities must also implement a protocol that dictates how to collect, maintain, and analyze physical evidence and that stipulates the responsibilities of the forensic examiner and other responders—drawing on "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents" created by the Department of Justice in 2004 to improve investigations of sexual abuse in the community. To facilitate the implementation of this standard, the Commission recommends that the Department of Justice adapt the protocol specifically for use in correctional facilities nationwide.

The work of investigating sexual abuse in a correctional environment is complex, requiring skill and sensitivity. According to a report published in 2007 by the National Institute of Corrections, many sexual abuse investigators are so unfamiliar with the dynamics inside a correctional facility that they cannot operate effectively. Because the deficits in some jurisdictions are so great, the Commission's standard in this area requires facilities to ensure that investigators are trained in up-to-date approaches and specifies certain minimum training requirements. And whenever correctional agencies outsource investigations to local law enforcement agencies, they must attempt to forge a memorandum of understanding with the agency specifying its role and responsibilities. Investigators do not work alone; any report of sexual abuse in a correctional facility must also trigger an immediate response from security staff; forensic, medical, and mental health care practitioners; and the head of the facility. To meet the needs of victims while conducting a thorough investigation, these professionals must coordinate their efforts.

No national data have been collected on how often correctional facilities investigate reported abuses, and there is no body of research describing the quality of those investigations. But correctional facilities

substantiate allegations of sexual abuse at very low rates. According to the Bureau of Justice Statistics, facilities substantiated just 17 percent of all allegations of sexual violence, misconduct, and harassment investigated in 2006. In 29 percent of the alleged incidents, investigators concluded that sexual abuse did not occur. But in the majority of allegations (55 percent) investigators could not determine whether or not the abuse occurred. Substantiation rates in some states are considerably lower than the rate nationally. Standards that mandate investigations and improve their quality should increase the proportion of allegations in which the finding is definitive and perpetrators can be held accountable.

Despite that fact that most incidents of sexual abuse constitute a crime in all 50 States and under Federal law, very few perpetrators of sexual abuse in correctional settings are prosecuted. Only a fraction of cases are referred to prosecutors, and the Commission repeatedly heard testimony that prosecutors decline most of these cases. Undoubtedly, some investigations do not produce evidence capable of supporting a successful prosecution. But other dynamics may be at play: some prosecutors may not view incarcerated individuals as members of the community and as deserving of their services as any other victim of crime.

Allegations of sexual abuse must also trigger an internal administrative investigation, and when the allegations are substantiated, the perpetrator must be disciplined. Until more cases are successfully prosecuted, many inmate and staff perpetrators of serious sexual abuse will be subject only to administrative discipline, making sanctions especially important. Individuals conducting administrative investigations must base their conclusions on what the "preponderance of the evidence" shows—a standard less stringent than that required to convict someone of a crime but adequate to protect individuals from being labeled as perpetrators and sanctioned internally without cause.

Sanctions must be fair, consistent, and sufficiently tough to deter abuse. It is crucial that labor and management reach agreements that allow reassigning officers during an investigation when safety is at issue and appropriate sanctions for staff perpetrators. Prisoners should never be punished for sexual contact with staff, even if the encounter was allegedly consensual. The power imbalance between staff and prisoners vitiates the possibility of meaningful consent, and the threat of punishment would deter prisoners from reporting sexual misconduct by staff.

Everyone who engages in sexual abuse in a correctional setting must be held accountable for their actions. There has been too little accountability for too long. The Commission's standards in these areas encourage incarcerated individuals and staff to report abuse and require correctional facilities to protect those who speak out, conduct effective investigations, and ensure appropriate punishment.

> Until more cases are successfully prosecuted, abusers will be subject only to administrative discipline, making it especially important for these sanctions to be fair and sufficiently tough to deter abuse.

### FINDING 6

**Victims are unlikely to receive the treatment and support known to minimize the trauma of abuse. Correctional facilities need to ensure immediate and ongoing access to medical and mental health care and supportive services.**

As corrections administrators work to create a protective environment in the facilities they manage, they also have a legal duty to ensure that when systems fail and abuse occurs, victims have access to appropriate medical and mental health services. Healing from sexual abuse is difficult; without adequate treatment, recovery may never occur.

Although sexual abuse typically leaves few visible scars, most victims report persistent, if not lifelong, mental and physical repercussions. After Sunday Daskalea was abused on multiple occasions by staff and other inmates in the District of Columbia jail, she became crippled by fear and anxiety. She slept only during the day, afraid of what might happen to her at night. Even after being released, Daskalea suffered from insomnia, struggled with eating disorders, and spent months emotionally debilitated, withdrawn and depressed. At age 18, Chance Martin was sexually abused while incarcerated in the Lake County Jail in Crown Point, Indiana. "I've abused drugs and alcohol and tried to kill myself on the installment plan," Martin told the Commission.

The psychological aftereffects of sexual abuse are well documented. They include posttraumatic stress disorder, anxiety disorders, fear of loud noises or sudden movements, panic attacks, and intense flashbacks to the traumatic event. Each of these consequences alone has the ability to re-traumatize victims for years. The trauma can also lead to serious medical conditions, including cardiovascular disease, ulcers, and a weakened immune system. Studies indicate that sexual abuse victims have poorer physical functioning in general and more physical ailments than non-abused individuals, even after controlling for emotional disturbances such as depression. In addition, many victims are physically injured during the course of a sexual assault. A study of incarcerated men showed that more than half of all sexual assaults resulted in physical injury. Moreover, the study found that internal injuries and being knocked unconscious were more common outcomes of sexual abuse than of other violent encounters in prison.

Exposure to HIV and other sexually transmitted infections are other potential consequences of sexual abuse. Michael Blucker tested negative for HIV when he was admitted to the Menard Correctional Center in Illinois, but approximately 1 year later, after being raped multiple times by

*The psychological effects of sexual abuse can re-traumatize victims for years following an assault, and studies show that victims have more physical health problems than non-abused individuals.*

other prisoners, he tested positive. According to testimony before the Commission, the Centers for Disease Control and Prevention (CDC) lacks data to assess the extent to which sex in correctional facilities, whether rape or consensual, contributes to the high prevalence of HIV in prisons and jails. One CDC study did find that individuals in confinement may contract HIV in a variety of ways, including sexual contact.

Because of the disproportionate representation of minority men and women in correctional settings, it is likely that the spread of these diseases in confinement would have an even greater impact in minority communities. As such, the Commission recommends that Congress provide funding to appropriate entities for research into whether consensual and/or non-consensual sexual activity in the correctional system plays a role in infecting populations outside of corrections with HIV/AIDS and other sexually transmitted infections.

It has been more than three decades since the Supreme Court established in *Estelle v. Gamble* that deliberate indifference to the health of prisoners is a form of cruel and unusual punishment. Since then, correctional agencies have struggled, and sometimes failed with tragic results, to meet the medical and mental health care needs of a large and often ill prisoner population. Correctional health care is underfunded nearly everywhere, and most facilities are in dire need of additional skilled and compassionate health care practitioners. Recently, independent researchers analyzed the Bureau of Justice Statistics' 2002 survey of jail inmates and 2004 survey of State and Federal prisoners and found that many prisoners with persistent problems had never been examined by a health care professional in the facility where they were incarcerated. The failing was much worse in jails than in prisons: 68 percent of jail inmates with medical problems reported never being examined, compared with 14 percent of Federal prisoners and 20 percent of State prisoners.

Given the potentially severe and long-lasting medical and mental health consequences of sexual abuse, facilities must ensure that victims have unimpeded access to emergency treatment and crisis intervention and to ongoing health care for as long as necessary—care that matches what is generally acceptable to medical and mental health care professionals. Because some victims feel pressure to conceal abuse, all health care practitioners must have the training to know when a prisoner's mental or physical health problems might indicate that abuse has occurred.

Health care practitioners working in correctional facilities, like all staff, have a duty to report any indications of sexual abuse and must alert prisoners about their duty before providing treatment. Confidential treatment is not in the best interest of the victim or the safety of the facility. At the same time, they must provide care regardless of whether the victim names the perpetrator. Without such a policy, sexual abuse victims may decide that the risk of retaliation is too great and choose not to seek treatment.

> Correctional health care is underfunded nearly everywhere, and most facilities are in dire need of additional skilled and compassionate health care practitioners.

Because some victims will never feel comfortable or safe disclosing their experience of sexual abuse to a corrections employee, agencies must give prisoners information about how to contact victim advocates and other support services in the community—underscoring that their communications will be private and confidential to the extent permitted by law. Collaborations with community-based service providers can also increase the likelihood that victims of sexual abuse are supported as they transition from a correctional facility back to their home communities.

*Victims are entitled to treatment whether or not they name the perpetrator of the abuse.*

For some victims of sexual abuse, cost may be a barrier to treatment. In the majority of States, legislatures have passed laws authorizing correctional agencies to charge prisoners for medical care—fees as little as $5 that are beyond the means of many prisoners. Under the Commission's standards, agencies must provide emergency care to victims of sexual abuse free of charge. Additionally, the Commission encourages correctional systems to define common and persistent aftereffects of sexual abuse as chronic conditions and to exempt them from fees.

Financial barriers to treatment come in other forms, as well. Guidelines for distributing funds provided under the Victims of Crime Act (VOCA) prohibit serving any incarcerated persons, including victims of sexual abuse. Similarly, grants administered under the Violence Against Women Act (VAWA) cannot be used to assist anyone convicted of domestic or dating violence, sexual assault, or stalking. All survivors of sexual abuse need and deserve treatment and support services. The Commission recommends that the VOCA grant guidelines be changed and that Congress amend VAWA.

Unimpeded access to treatment by qualified medical and mental health care practitioners and collaboration with outside providers are critical to ensuring that victims of sexual abuse can begin to heal.

## FINDING 7

### Juveniles in confinement are much more likely than incarcerated adults to be sexually abused, and they are particularly at risk when confined with adults. To be effective, sexual abuse prevention, investigation, and treatment must be tailored to the developmental capacities and needs of youth.

A daily snapshot of juveniles in custody in 2006 showed that approximately 93,000 youth were confined in juvenile residential facilities in the United States and more than half of them were 16 years or younger. Preventing, detecting, and responding to sexual abuse in

these facilities demands age-appropriate interventions. The Commission's set of standards for juvenile facilities parallels those for adult prisons and jails, with modifications to reflect the developmental capacities and needs of youth.

When the State exercises custodial authority over children, "its responsibility to act in the place of parents *(in loco parentis)* obliges it to take special care." Youth may pass through the justice system once or twice, never to return. Yet if they are sexually abused, they may live with lifelong consequences that can include persistent mental illness and tendencies toward substance abuse and criminality. Juvenile justice agencies thus have a responsibility and a challenge: prevent sexual abuse now, or risk long-term consequences for victims.

Rates of sexual abuse appear to be much higher for confined youth than they are for adult prisoners. According to the Bureau of Justice Statistics (BJS), the rate of sexual abuse in adult facilities, based only on substantiated allegations captured in facility records, was 2.91 per 1,000 incarcerated prisoners in 2006. The parallel rate in juvenile facilities was more than five times greater: 16.8 per 1,000. The actual extent of sexual abuse in residential facilities is still unknown. BJS is currently conducting the first nationally representative survey of confined youth.

Juveniles are ill-equipped to respond to sexual advances by older, more experienced youth or adult caretakers. Based on reports of rampant physical violence and sexual abuse in a juvenile correctional facility in Plainfield, Indiana, the U.S. Department of Justice began investigating conditions of confinement in 2004. Investigators were shocked by the age and size disparity between many of the youth involved. Youth as old as 18 were assaulting or coercing children as young as 12; children weighing as little as 70 pounds were sexually abused by youth outweighing them by 100 pounds.

Simply being female is a risk factor. Girls are disproportionately represented among sexual abuse victims. According to data collected by BJS in 2005–2006, 36 percent of all victims in substantiated incidents of sexual violence were female, even though girls represented only 15 percent of confined youth in 2006. And they are much more at risk of abuse by staff than by their peers. Pervasive misconduct at a residential facility for girls in Chalkville, Alabama, beginning in 1994 and continuing through 2001, led 49 girls to bring charges that male staff had fondled, raped, and sexually harassed them. Abusive behavior is not limited to male staff. In 2005, the Department of Justice found that numerous female staff in an Oklahoma juvenile facility for boys had sexual relations with the youth under their care.

Youth are also vulnerable to sexual victimization while under juvenile justice supervision in the community. Nearly half (48 percent) of the more than 1.1 million youth who received some juvenile court sanction in 2005 were placed under the supervision of State, local, or county probation

Youth who are sexually abused may live with lifelong consequences that can include persistent mental illness and tendencies toward substance abuse and criminality.

officers or counselors. A 50-year-old man who had served as a youth proba-
tion officer for 11 years with the Oregon Youth Authority was convicted of
sexually abusing boys in his care, including a 14-year-old mentally disabled
boy with attention deficit/hyperactivity disorder. Victims and their families
had complained for years about this officer, but officials took no action.

Staff training and supervision are crucial. Staff need to understand
the distinctive nature of sexual abuse involving children and teens and its
potential consequences. Their responsibilities—including a duty to report
any information about abuse—must be clear, and they must be informed
that they will be held accountable for their actions and omissions. Admin-
istrators must uphold these policies and ensure that every report of abuse
is promptly investigated.

Although research has yet to pinpoint the characteristics of youth
who are at greatest risk of being victimized or perpetrating sexual abuse in
juvenile facilities, many of the factors associated with vulnerability to sex-
ual abuse among adults also appear to place juveniles at risk. In addition to
screening all youth, facilities can take a simple step to protect youth from
sexual abuse: encourage all residents during intake to tell staff if they fear
being abused. This message, combined with affirmative statements about
the facility's commitment to safety and zero tolerance of sexual abuse,
makes it more likely that vulnerable youth will seek protection when they
need it—before an assault occurs. Youth may be segregated only as a last
resort and for short periods of time when less restrictive measures are in-
adequate to keep them safe.

Reducing sexual abuse also requires creating conditions that en-
courage youth to report abuse. Internal reporting procedures must be
simple and secure; victims and witnesses must have unimpeded access to
their families, attorneys, or other legal representatives; and facilities must
provide parents and lawyers with information about the rights of residents
and internal grievance procedures. Because many youth fail to recognize
certain coercive and harmful behaviors as "abuse," juvenile facilities must
improve sexual education programs and sexual abuse prevention curricula.

Youth who perpetrate sexual violence in juvenile facilities present
a challenge for facility administrators who must apply developmentally
appropriate interventions. They may need treatment as much as, or more
than, punishment. Studies have shown that youth who commit sexual
offenses typically have a history of severe family problems. Correctional
medical and mental health practitioners must be trained to recognize the
signs of sexual abuse and to provide age-appropriate treatment. And be-
cause young victims may lack the confidence to seek help from corrections
staff, they must have access to victim advocates in the community to en-
sure that they are not left without support and treatment.

More than any other group of incarcerated persons, youth incar-
cerated with adults are probably at the highest risk for sexual abuse.

*Simply being female is a
risk factor: girls are over
represented among young
victims of sexual abuse.*

According to BJS, 7.7 percent of all victims in substantiated incidents of violence perpetrated by prisoners in adult facilities in 2005 were under the age of 18. Data collected by BJS in 2006 show that on any given day, almost 8,500 youth under the age of 18 are confined with adults in prisons and jails. Civil rights attorney Deborah LaBelle told the Commission that 80 percent of the 420 boys sentenced to life without parole in Michigan, Illinois, and Missouri reported that, within the first year of their sentence, they had been sexually assaulted by at least one adult male prisoner. Because of the extreme risk of sexual victimization for youth in adult facilities, the Commission urges that individuals under the age of 18 be held separately from the general population.

The Commission's inquiry into the sexual abuse of youth in juvenile justice and adult corrections has revealed disturbing information about its prevalence, gravity, and consequences. Hope lies in the fact that necessary precautions and remedies are clear and rehabilitation remains a guiding principle in the field of juvenile justice.

## FINDING 8

**Individuals under correctional supervision in the community, who outnumber prisoners by more than two to one, are at risk of sexual abuse. The nature and consequences of the abuse are no less severe, and it jeopardizes the likelihood of their successful reentry.**

By the end of 2007, there were more than 5.1 million adults under correctional supervision in the community, either on probation or parole, and the numbers are growing. They too are at risk of sexual abuse. As both Federal and State governments attempt to reduce incarceration costs in the face of looming deficits, the number of individuals under some form of community supervision—before, after, or in lieu of confinement—is likely to rise. Despite the number of individuals under supervision in the community, there is a lack of research on this population, and responses to PREA have been slow to take root in this area of corrections. The Commission has developed a full set of standards governing community corrections.

Community corrections encompasses a diverse array of agencies, facilities, and supervision structures on the Federal, State, and local levels. Supervision can occur in halfway houses, prerelease centers, treatment facilities, and other residential settings. Nonresidential supervision can include probation, parole, pretrial supervision, court-mandated substance abuse treatment, court diversionary programs, day-reporting centers,

Community corrections agencies, just like prisons and jails, have a special responsibility to protect the individuals they supervise from sexual abuse.

community service programs, probation before judgment, furloughs, electronic monitoring, and home detention.

As in other correctional settings, courts have found that sexual abuse in community corrections violates the Eighth Amendment of the U.S. Constitution prohibiting cruel and unusual punishment. As a result, community corrections agencies, like prisons and jails, have a special responsibility to protect the people they supervise. Courts also have determined that the authority staff have over the individuals they monitor makes a truly consensual sexual relationship impossible. Community corrections agencies are accountable for sexual abuse incidents, regardless of whether the circumstances in which the abuse occurred were under the direct control of the agency or a separate organization working under contract with the agency. Anyone in a supervisory position can be held liable for abuse. For example, in *Smith v. Cochran,* Pamela Smith was in jail but participating in a work release program. Her supervisor on the job sexually assaulted her, and the court ruled that important "penological responsibilities" had been delegated to him.

Although individuals under correctional supervision in the community may experience sexual abuse at the hands of other supervisees, the dynamics of supervision make them particularly vulnerable to abuse by staff. Coercion and threats carry great weight because individuals under supervision are typically desperate to avoid being incarcerated. Staff also have virtually unlimited access to the individuals they supervise, sometimes in private and intimate settings. In Ramsey County, Minnesota, for example, a male community corrections officer visiting a former prisoner's apartment to discuss her failure in a drug treatment program instead requested and had sex with her.

The diverse roles and obligations of staff present risks. They operate as enforcement officers in the interest of public safety and also function as counselors and social workers. Drawing and maintaining boundaries is a challenge even for staff with the best intentions. Moreover, because community corrections staff operate with significantly less direct supervision than their counterparts in secure facilities, it is easier for them to conceal sexual misconduct. Clear policies rooted in an ethic of zero tolerance for sexual abuse coupled with good training can mitigate these dangers by giving staff the direction, knowledge, and skills they need to maintain appropriate relationships with the individuals they supervise. Of course, preventing sexual abuse begins with hiring the right staff.

Although community corrections agencies face significant challenges in preventing abuse, they may have advantages in responding to victims. By definition, community corrections agencies tend to have access to skilled professionals and other resources that are beyond the reach of many secure correctional facilities, especially prisons sited in remote locations. For example, coordinated sexual assault response teams,

> Drawing and maintaining boundaries is a challenge even for community corrections staff with the best intentions, and the autonomous nature of their work makes it easier to conceal sexual misconduct.

widely recognized as an optimal way to respond to incidents of sexual abuse, exist in many communities and may be available to partner with local correctional agencies. Partnerships with victim advocates and counselors in the community also ensure that people under correctional supervision are able to disclose abuse and receive treatment confidentially, if they so choose. Some individuals under supervision will disclose abuse that occurred while they were incarcerated. Agencies must report past abuse to the facilities where the abuse occurred. This is necessary to trigger an investigation and also to improve the accuracy of facility records and provide insights on reasons incarcerated victims of sexual abuse remain silent.

The mission of community corrections is centered on helping offenders establish productive and law-abiding lives. Protecting them from sexual abuse and helping victims recover from past abuses is an essential part of that mission.

## FINDING 9

### A large and growing number of detained immigrants are at risk of sexual abuse. Their heightened vulnerability and unusual circumstances require special interventions.

Preventing, detecting, and responding to sexual abuse of immigrants in custody require special measures not included in the Commission's standards for correctional facilities. These measures are contained in a set of supplemental standards that apply to any facility that houses individuals detained solely because their right to remain in the United States is in question. The Commission's work in this area advances efforts by U.S. Immigration and Customs Enforcement (ICE) to protect detainees from sexual abuse.

In the 15 years from 1994 to 2009, the number of immigrants held in detention pending a judicial decision about their legal right to remain in the United States increased nearly 400 percent. For the 2009 fiscal year, ICE has budgeted enough money to detain 33,400 people on any given night and more than 400,000 people over the course of the year. The population of immigration detainees includes adults, thousands of "unaccompanied" children, and whole families confined together.

The prevalence of sexual abuse among immigration detainees is unknown and has yet to receive the attention and research it merits, but accounts of abuse by other detainees and staff have been coming to light for more than 20 years. Many factors—personal and circumstantial, alone or in combination—make immigration detainees especially vulnerable to

For the 2009 fiscal year, ICE expects to detain 33,400 people on any given night and more than 400,000 over the course of the year.

sexual abuse. One of the most pervasive factors is social isolation. Individuals are often confined far from family or friends and may not speak the language of other detainees or staff. Those who have already suffered terrifying experiences in their home countries or in the United States can be almost defenseless by the time they are detained and may even expect to be abused.

Preventing abuse requires precautions beyond those mandated for other prisoners. In particular, when immigration detainees are confined in ordinary prisons, jails, and lockups—a common practice—they must be housed apart from the general population, but they should not be placed in segregation. Depending on the conditions in protective custody cells and units, the experience can enhance the feeling of aloneness already common among immigration detainees and lead to depression and other problems.

Families who are in ICE custody are currently detained in several facilities in the United States. Stays are not always brief: women with children, including babies and toddlers, may be detained for days, weeks, or even months. In testimony before a congressional subcommittee on immigration, Texas Representative Sheila Jackson noted that families in these facilities often are "deprived of the right to live as a family unit, denied adequate medical and mental health care, and face overly harsh disciplinary tactics." Facilities face the challenge of protecting residents of all ages from sexual abuse while also preserving family unity. One specific challenge is ensuring that both adults and children can report sexual abuse in a confidential manner, which is especially important for situations in which children are at risk of abuse within the family unit.

Because immigration detainees are confined by the agency with the power to deport them, officers have an astounding degree of leverage—especially when detainees are not well informed of their rights and lack access to legal counsel. The Commission learned that officers have propositioned women whose cases they control, telling them that if they want to be released they need to comply with their sexual demands. The fear of deportation cannot be overstated and also functions to silence many individuals who are sexually abused. Those brave enough to speak out may face retaliation. After women detainees at the Krome immigration detention facility in Miami reported sexual abuse by staff, several of them wrote, "We are afraid. . . each time one of us is interviewed by investigating officers. . . . [S]ome of the women who have given statements have either been transferred or deported to their countries." Transfers can completely derail the complaint process, which has lasting consequences for victims who may be eligible for a special visa to remain in the United States. When staff cannot protect victims and witnesses in the facility where the abuse occurred, ICE must consider releasing and monitoring them in the community during the course of the investigation.

The fear of deportation is a tool in the hands of abusive officers, both to coerce sex and to silence victims.

There also are institutional barriers that block or discourage victims and witnesses from reporting abuse. Grievance procedures can seem impossibly complex, especially for detainees who speak languages other than English or Spanish. A 2006 audit by the U.S. Department of Homeland Security's Office of the Inspector General revealed that detainees often do not receive information on reporting abuse and other grievances in a language they can understand.

Although detainees have periodic contact with immigration judges, those judges have no jurisdiction over the conditions of their detention. Even advocacy groups in the local community may lack the language skills and cultural competency to assist them. Detainees need access to outside entities able and authorized to receive and respond to reports of sexual abuse. Specifically, facilities must provide immigration detainees with access to telephones with free, preprogrammed numbers to ICE's Office for Civil Rights and Civil Liberties and to the Department of Homeland Security's Office of the Inspector General. They also must have access to telephones to contact diplomatic or consular personnel from their countries of citizenship, along with a list of those phone numbers.

Detainees who are victims of sexual abuse also need a lifeline to outside organizations with experience counseling immigrant victims of crime and assurances that their communications with outside advocates are confidential to the extent permitted by law. At the same time, facilities must still ensure that their own staff have the training to respond in culturally appropriate ways to sexual abuse.

Protection for all immigration detainees and services for victims of sexual abuse are not what they should be. And little is known about this fast-growing area of confinement, one in which preventing, detecting, and responding to sexual abuse is especially challenging.

> More than other incarcerated victims of sexual abuse, immigration detainees depend on outside entities for help— from consulates to counselors who specialize in assisting immigrant victims of crime.

The Commission sunsets 60 days following the submission of its report and standards to Congress, the President, the Attorney General, and other Federal and State officials. The real work of implementation begins then, particularly on the part of the Attorney General and his staff. Within a year of receiving the Commission's report and standards, the Attorney General is required to promulgate national standards for the detection, prevention, reduction, and punishment of detention facility sexual abuse.

The Commission recommends that the Attorney General establish a PREA Advisory Committee pursuant to the Federal Advisory Committee Act of 1972. The purpose of the Advisory Committee is to assist the Attorney General with the promulgation of the PREA standards and thereafter assess their implementation and propose amendments as needed to increase their efficacy. The Commission also recommends that the Attorney

The Commission has seen ideas transformed into actions that have the potential to improve safety. This is just the beginning.

General create a full-time Special Assistant for PREA within the Office of the Deputy Attorney General. The Special Assistant would have primary responsibility for ensuring the implementation of the standards as central to the national effort of eliminating prison rape.

PREA represents a sea change in public consciousness and in national commitment to protecting individuals under correctional supervision from sexual abuse. Already, the Commission has seen ideas transformed into actions that by all accounts have the potential to improve safety. This is just the beginning. When the Attorney General issues mandatory standards, they will accelerate the pace of reform and ensure that the same fundamental protections are available in every correctional and detention setting. Our obligations, both moral and legal, require nothing less.

# Introduction

S exual abuse is among the most destructive of crimes, brutal and devastating in the moment and carrying the potential to haunt victims forever. In the recent past, our society often blamed victims of sexual abuse for being attacked, and many perpetrators were not held accountable. Americans now recognize sexual abuse as a violent crime with life-changing consequences. Yet the public has been slow to incorporate that perspective into its understanding of sexual violence in correctional environments. Many still consider sexual abuse an expected consequence of incarceration, part of the penalty and the basis for jokes; some people doubt that incarcerated victims of sexual abuse experience trauma or terror and may even believe they are willing participants in the assaults against them.

In reality, sexual abuse in correctional environments is a serious concern with dire consequences, especially for victims. Individuals confined in correctional facilities or under supervision in the community must be protected from sexual predators. They do not relinquish their fundamental human rights when they are incarcerated or otherwise constrained. They still have the right to be treated in a manner consistent with basic human dignity, the right to personal safety, and the right to justice if they become victims of crime. Prisons, jails, and other correctional environments are part of the justice system, not apart from it.

More than 7.3 million Americans are in prison, jail, a residential facility for adults or juveniles, or supervised in the community, at a cost of more than $68 billion annually. These numbers reflect America's increased reliance in recent decades on incarceration as a criminal justice tool. This tough-on-crime approach was intended to improve public safety, and some would argue that declining crime rates demonstrate its success. However, it has also resulted in the largest prison population in the world and has stretched correctional resources to their limits.

Our society depends on correctional agencies to protect the public from dangerous individuals, to punish those who engage in criminal activity, and—most important for public safety in the long term—to change negative patterns of behavior among the incarcerated and supervised.

**1980** Congress passes the Civil Rights of Institutionalized Persons Act, authorizing the U.S. Attorney General to investigate and litigate abusive conditions of confinement in Federal, State, and local facilities.

**1984** Filing of *Cason v. Seckinger.* One of the first contemporary court cases to address widespread abuse of women prisoners by staff, it compelled significant reforms in Georgia.

**1985** Activist and abuse survivor Stephen Donaldson becomes president of Stop Prisoner Rape. Renamed Just Detention International in 2008, it is the only organization in the United States dedicated exclusively to eliminating sexual violence in detention.

**1994** In *Farmer v. Brennan,* the U.S. Supreme Court rules that corrections officials have a legal duty to protect prisoners from sexual abuse.

**1994** In *Women Prisoners of District of Columbia Dept. of Corrections v. District of Columbia,* the U.S. District Court for the District of Columbia finds that a widespread pattern and practice of sexual abuse of women inmates violates the Eighth Amendment of the U.S. Constitution.

**1996** The National Institute of Corrections begins working with corrections administrators to reduce staff sexual misconduct.

**1996** The *Journal of Sex Research* publishes "Sexual Coercion Reported by Men and Women in Prison."

**1996** Human Rights Watch publishes *All Too Familiar: Sexual Abuse of Women in U.S. State Prisons,* detailing sexual abuse in the District of Columbia, Michigan, and Georgia.

**1997** The U.S. Department of Justice sues the State of Arizona and intervenes in women prisoner cases in Michigan to challenge pervasive sexual abuse of women prisoners during cross-gender pat downs. Consent judgments the following year create moratoriums on cross-gender pat downs of women in both States.

**1999**  The Association of State Correctional Administrators passes a resolution strongly encouraging each of its member agencies to adopt and enforce policies prohibiting all forms of staff sexual misconduct.

**1999**  In *Lucas v. White*, three female inmates are awarded $500,000 in damages after male staff at a Federal prison "sold them as slaves." The case prompted the Federal Bureau of Prisons to issue *Sexual Abuse/Assault Prevention and Intervention, A System Response and Agency Plan.*

**2000**  A coalition of religious and human rights groups organized by Michael Horowitz of the Hudson Institute presses for a Federal law to address the sexual abuse of prisoners.

**2001**  Human Rights Watch publishes *No Escape: Male Rape in U.S. Prisons.*

**2002**  Stop Prisoner Rape mobilizes 100 advocacy organizations to halt a 7UP® commercial that jokes about prison rape.

**2002**  **Beginning in July 2002 and continuing through April 2003, Congress holds hearings on a "Prison Rape Reduction Act."**

**2003**  The American Jail Association passes a resolution to support the implementation of policies that prohibit staff sexual misconduct.

**2003**  **On September 4, President Bush signs the Prison Rape Elimination Act.**

**2004**  The National Institute of Corrections launches an intensive training and technical assistance program under PREA.

**2004**  The National Institute of Justice launches a series of research publications in response to PREA, beginning with *Prison Rape: A Critical Review of the Literature.*

**2004**  **The newly appointed members of the National Prison Rape Elimination Commission hold their first meeting in July.**

Institutional violence and sexual abuse in particular undermine the very purposes of corrections. They make facilities less safe for everyone, they consume scarce resources, and their consequences extend into our cities and towns as 95 percent of all prisoners are one day released.

Congress affirmed the duty to protect incarcerated individuals from sexual abuse by enacting the Prison Rape Elimination Act of 2003, taking the first national step toward a new understanding of the problem. Supported by the work of advocacy groups from diverse perspectives and political positions, the House and Senate voted unanimously to pass the Act. As part of that work, Congress created the National Prison Rape Elimination Commission to study the causes and consequences of sexual abuse in confinement and to develop standards for eliminating abuse.

Since its formation, the Commission has convened public hearings and committees of experts around the country. Corrections leaders, survivors of abuse, health care providers, researchers, legal experts, advocates, and academics shared their knowledge and experience with the Commission. We conducted a thorough review of the existing literature and tasked others to conduct new studies to resolve some of the unanswered questions about causality and intervention.

At the center of this work was our effort to develop standards to prevent, detect, and punish sexual abuse in all correctional settings. The Commission customized these standards to address the specific circumstances under which sexual abuse occurs in facilities for juveniles, in the growing field of community corrections, and among immigrants detained in the course of removal proceedings. Persons on probation and parole or otherwise supervised in the community, either before or after their criminal case is adjudicated, are within the scope of the standards, which encompass staff sexual misconduct and sexual abuse between prisoners. Although the issue of prisoners sexually assaulting staff is a serious matter, it is not included within the statutory mandate of PREA and thus is not addressed directly in the Commission's standards or report. However, the Commission believes that our standards and the requirements they outline to protect prisoners from sexual abuse will also make institutions and individual staff members safer.

The Commission consulted informally with Native American leaders and heard distressing testimony at a public hearing about the conditions of tribal detention facilities (those operated by the Bureau of Indian Affairs and other facilities where Native Americans are detained). Correctional facilities in Indian Country are certainly within PREA's ambit. However, the time-consuming work of consulting with numerous and diverse sovereign nations and entities posed an insurmountable challenge. We encourage Native American leaders to adapt the standards to

their cultures and communities. The Commission also hopes that military detention facilities funded by the Federal Government and correctional facilities in the territories will implement similar standards to protect prisoners from sexual abuse.

Two 60-day periods of public comment proved to be critical junctures in the development of the standards. The Commission received written comments from more than 225 institutions, entities, and individuals. Additionally, both during and after the periods of public comment, we convened a series of roundtable discussions involving key stakeholders, including representatives of the Federal Bureau of Prisons, associations of corrections professionals, diverse advocacy groups, law enforcement associations, large and small correctional facilities, community corrections agencies, and survivors of sexual abuse. In the course of these discussions, participants conveyed their particular concerns and offered important and useful suggestions for refining the standards.

During the public comment period, the Commission also conducted a Standards Implementation Needs Assessment (SINA) project. The Commission used the SINA process to elicit feedback on the standards through a series of "case studies" at particular facilities. More than 40 facilities from around the country applied to participate in the SINA process; the Commission selected 11 sites that reflected differences in capacity, populations, and geographic settings and that included jails and prisons; facilities for men, women, and juveniles; and community corrections facilities. Each site visit took place over 1-and-a-half days and included a facility tour and five structured interviews: one with the warden or superintendent, the others with small groups discussing general issues, training, medical and mental health, and investigations. With the exception of the meeting with the warden or superintendent, interviews involved a variety of staff with experience relevant to the particular interview topic.

The specific practical advice and constructive feedback we received throughout the standards review process were extremely useful and resulted in significant and substantial revisions. One outstanding area of concern was the anticipated cost of some changes required by the standards as originally drafted. Although concerns about cost are understandable, Congress, State legislatures, and county and city officials must provide adequate resources to ensure safe correctional and detention facilities. The Commission acknowledges that this is a formidable task, especially in the current economic climate. From the outset, we have been mindful of the statutory prohibition against recommending standards that would impose substantial additional costs compared to current expenditures. With the assistance of information provided during the public comment period, the Commission attempted to further limit potential new costs and to shape realistic standards that represent what is minimally required to meet Congress' mandate to eliminate sexual abuse in confinement.

**2004** The American Correctional Association begins to adopt sexual abuse accreditation standards in response to PREA.

**2004** The Bureau of Justice Assistance issues the first grants to States to support PREA reforms, ultimately providing funding to 34 States and one territory.

**2004** In *Everson v. Michigan Department of Corrections*, a Federal appeals court approves barring male staff from supervising women prisoners to protect privacy and prevent custodial sexual abuse.

**2005** The Office of the Inspector General for the U.S. Department of Justice publishes *Special Report: Deterring Staff Sexual Abuse of Federal Inmates*.

**2005** **On March 31, the Commission holds its first public meeting at the University of Notre Dame Law School in Indiana to discuss the issue of prison sexual violence.**

**2005** **On June 14, the Commission holds a hearing in Washington, D.C., examining the cost of victimization and why the country must confront prison rape.**

**2005** The Bureau of Justice Statistics publishes *Sexual Violence Reported by Correctional Authorities, 2004*, the first national look at reported incidents of sexual violence in custody. Updates for adult prison and jail populations were published in 2006 and 2007.

**2005** **On August 19, the Commission holds a hearing in San Francisco on vulnerable populations at risk of sexual abuse.**

**2005** The California legislature passes the Sexual Abuse in Detention Elimination Act, the first state law corollary to PREA.

**2006** **On March 23, the Commission holds a hearing in Miami exploring how corrections professionals view prison rape.**

**2006** The National Sheriffs' Association passes a resolution encouraging sheriffs to vigorously enforce explicit policies prohibiting all forms of sexual harassment and abuse between jail staff and detainees.

| | |
|---|---|
| **2006** | The Vermont legislature criminalizes staff sexual abuse of persons in custody, the last State to do so. |
| **2006** | **On June 1, the Commission holds a hearing in Boston on juveniles at risk of sexual abuse.** |
| **2006** | A scandal at the Tallahassee Federal Correctional Institution involving officers allegedly smuggling contraband to prisoners in exchange for money and sex gains national attention when a corrections officer shoots and kills a U.S. Department of Justice Special Agent serving arrest warrants at the facility. |
| **2006** | **On August 3, the Commission holds a hearing in Detroit on reporting, investigating, and prosecuting prison rape.** |
| **2006** | **December 13–14, the Commission holds a hearing in Los Angeles exploring staffing and labor relations as well as sexual abuse in immigration facilities.** |
| **2007** | The Texas legislature forms a committee to investigate widespread sexual abuse in the Texas Youth Commission (TYC), ultimately discovering hundreds of allegations by youth against staff and implementing reforms that included creating multiple external mechanisms to oversee the TYC. |
| **2007** | **March 26–27, the Commission holds a hearing in Austin to examine lockups, detention facilities for Native Americans, and conditions in correctional facilities in Texas for adults and juveniles.** |
| **2007** | **Beginning in November 2007 and continuing throughout 2008, the Commission holds roundtable discussions with corrections professionals and a wide range of other interested groups.** |

Many of the requirements set forth in the standards reflect basic obligations already mandated by existing laws on the health and safety of confined persons, and many correctional systems and facilities currently meet those mandates. To the extent that the standards create new costs, those expenditures are necessary to fulfill the requirements outlined in PREA. And those costs are not substantial when compared to the significance of lives damaged or destroyed by sexual abuse and the broader costs of undermining the purposes of corrections in America.

The Commissioners invite readers of this final report to consider what we discovered about sexual abuse in confinement. Our core findings open each chapter. What follows is a discussion of the facts that led us to reach that conclusion and to formulate specific standards to ameliorate that aspect of the problem. The nine chapters are grouped into three parts, beginning with a look at the prevalence and nature of sexual abuse and broad strategies to prevent abuse, ranging from leadership, to screening, to oversight. It is followed by chapters on how to respond to victims and perpetrators. The final part of the report encompasses chapters exploring the problem of sexual abuse among three special populations: juveniles, people under supervision in the community, and immigration detainees.

The Commission worked assiduously to ensure the accuracy and credibility of all sources of information. We have attempted to communicate complex concepts through a combination of personal accounts and reflections, many of them conveyed in sworn testimony to the Commission; historic and contemporary research; data; and information about current policies and practices provided by corrections administrators and staff. In the case of accounts of sexual abuse and other comments by survivors, the Commission held itself to a significantly high standard, typically requiring that information be drawn only from court cases, most of them resolved, or through sworn testimony to the Commission. As a result, several incidents of sexual abuse described in the report occurred many years ago. Nevertheless, the Commission believes they illustrate continuing problems and challenges in correctional facilities today.

Relevant standards appear in the margin of the report for easy reference and are briefly discussed in the text.* Neither the content of the report

---

*The Commission developed four sets of standards: *Adult Prisons and Jails* (including supplemental standards for facilities with immigration detainees), *Lockups, Juvenile Facilities,* and *Community Corrections*. The standards referenced in the margins in Parts I and II of the report—chapters covering all correctional and detention settings—come from *Adult Prisons and Jails*. These standards generally have parallels in the other sets of standards. Standards referenced in the margins in Part III of the report—chapters exploring specific correctional populations and settings—come from *Juvenile Facilities, Community Corrections,* or the supplemental standards for facilities with immigration detainees.

nor the discussion accompanying each standard modifies the mandatory nature of the standards. A complete list of standards is available as an appendix to the report. Separate volumes of each set of standards also contain helpful checklists and further discussion. Readers can learn more about policies, practices, and programs implemented in facilities across the country by consulting the sample of PREA Initiatives also included as an appendix. Despite fiscal and other constraints, conscientious administrators have made impressive progress in the facilities they manage both before and since the passage of PREA.

The Commission has formulated recommendations about what leaders in government outside corrections can do to support PREA. We discuss these recommendations throughout the report, and a complete list is included as an appendix. In particular, additional resources are needed to continue the research, training, and technical assistance begun and funded through PREA and to make the aims of the legislation a reality. Also, given the Commission's own arduous journey, we are mindful of the resources the Attorney General will need on receipt of our report and standards.

The Commission sunsets 60 days following the submission of our report and standards to Congress, the President, the Attorney General, and other Federal and State officials. The real work of implementation begins then, on the part of the Attorney General and his staff; corrections and detention professionals throughout the United States; and the many survivors, advocates, and service providers committed to this issue. Within a year of receiving our report and standards, the Attorney General is required to promulgate national standards for the detection, prevention, reduction, and punishment of detention facility sexual abuse.

The Commissioners remain ready to assist the Attorney General, Congress, our Nation's many corrections and detention leaders and staff, and others as they move forward on this matter of moral and legal consequence to incarcerated individuals, those who are responsible for their safety, and the American public.

| Year | Event |
|------|-------|
| **2007** | **December 5–6, the Commission holds a hearing in New Orleans covering medical and mental health care for survivors, abuse in community corrections settings, and oversight of correctional facilities and agencies.** |
| 2007 | The Bureau of Justice Statistics publishes *Sexual Victimization in State and Federal Prisons Reported by Inmates, 2007,* the first national survey on the subject. |
| 2008 | The U.S. Department of Justice Review Panel on Prison Rape holds hearings over the course of several months on correctional facilities with the highest and lowest prevalence of sexual victimization according to the national survey results and publishes separate reports on rape in U.S. prisons and U.S. jails. |
| **2008** | **On May 5, the Commission releases draft standards for adult prisons and jails as well as for facilities holding immigration detainees and seeks public comment through July 7.** |
| **2008** | **On June 16, the Commission releases three sets of draft standards covering lockups, juvenile facilities, and community corrections and seeks public comment through August 15.** |
| 2008 | The Bureau of Justice Statistics publishes *Sexual Victimization in Local Jails Reported by Inmates, 2008,* the first national survey on the subject. |
| 2008 | The Bureau of Justice Statistics releases *Sexual Violence Reported by Juvenile Correctional Authorities, 2005–2006.* |

# PART I

# UNDERSTANDING AND PREVENTING SEXUAL ABUSE

# FINDING

Protecting prisoners from sexual abuse remains a challenge in correctional facilities across the country. Too often, in what should be secure environments, men, women, and children are raped or abused by other incarcerated individuals and corrections staff.

1

# A Problem that Must Be Solved

**A**cross the country, corrections officials are confronting the problem of sexual abuse in the facilities they manage. The sexual abuse of prisoners is as old as prisons themselves, but recognition of the duty to protect incarcerated individuals from harm codified in law, human rights documents, and professional standards is a relatively recent development.[1] Historically, prisons and jails were conceived of and used solely as holding places.[2] Although self-improvement and rehabilitation became a goal in theory, by the end of the 18th century, filthy living conditions, ongoing criminality, and sexual predation prevailed.[3] Prominent English prison reformer Elizabeth Gurney Fry wrote in 1813 of guards treating the women's ward of London's Newgate Prison like a brothel.[4] In 1826, in one of the first published mentions of prison rape in the United States, the Reverend Louis Dwight, prison reformer and founder of the Prison Discipline Society of Boston, wrote that "boys [were] prostituted to the lust of old convicts" in institutions from Massachusetts to Georgia.[5]

For more than a century, such protests fell on deaf ears, and the sexual abuse of prisoners remained largely hidden and unexamined.[6] Most victims were silent, in many cases fearing retaliation and knowing that authorities were unlikely to believe or help them—or even to record their reports. The lack of reliable data made the problem even more opaque and subject to denial.

T.J. Parsell is among countless individuals who were sexually abused in America's prisons and jails before the problem was widely recognized or well understood. Parsell was 17 in 1978 when he was sentenced to serve 4 years in an adult prison in Michigan for robbing a Fotomat with a toy gun. In testimony before the National Prison Rape Elimination Commission years later, Parsell recalled, "[I] didn't last 24 hours before an inmate spiked my drink with Thorazine and then ordered me down to his dorm. . . . [They] nearly suffocated me as they shoved my head into a pillow to muffle my screams. . . . One of them grabbed my hair. . . . and pulled my head down while the others took turns sodomizing me. . . . They were unmoved by my crying."[7]

After the rape, Parsell was "too afraid to come forward, even to see a doctor."[8] He told the Commission he felt the assailants "had stolen my manhood, my identity, and part of my soul." This was only the beginning of continued violent abuse. "Being gang raped in prison has scarred me in ways that can't be seen or imagined. . . . I've undergone years of therapy to get where I am, but I still don't sleep well at night. I start up at the slightest noise. And as a gay man, I blamed myself for many years. You're degraded so much in there that after a while you start to believe it."

Once stories like Parsell's began to surface, they came in waves. Incarcerated men, women, and youth who had suffered sexual abuse by other incarcerated individuals or corrections staff began talking about their experiences. Their accounts prompted research, legal challenges, advocacy, development of human rights frameworks addressing custodial rape, creation of new protocols and prevention efforts by corrections administrators and staff, and new legislation that in combination increasingly shed light on the pervasiveness and nature of the problem. We now know that sexual abuse while incarcerated has devastating effects on prisoners and serious repercussions for their families, correctional facilities, and the public at large.[9] We also know that some prisoners are more at risk of being sexually abused than others. Being young and incarcerated for the first time—like Parsell when he entered prison—puts a person at higher risk of victimization. So does being gay. And there are other risk factors. Screening and classification systems, when used consistently, can help identify vulnerable individuals so that facilities can plan housing and services to lessen the risk of sexual abuse. These systems need refinement, along with many other practices that reduce sexual abuse in correctional facilities. Solutions are being designed and implemented, although much work remains to be done.

> "Being gang raped in prison has scarred me in ways that can't be seen or imagined. . . . I've undergone years of therapy to get where I am, but I still don't sleep well at night. I start up at the slightest noise. And as a gay man, I blamed myself for many years. You're degraded so much in there that after a while you start to believe it."

Passage of the Prison Rape Elimination Act of 2003 ushered in a new era of rigorous national data collection and analysis to add to our knowledge of the nature and scope of the problem.[10] Estimates of the annual incidence rates of sexual abuse in America's prisons, jails, and residential juvenile facilities are now available to complement more focused and in-depth studies of specific facilities or systems.[11] The data may not capture the full extent of the problem, but they confirm its scale and the urgent need for reform.

## Duty to Protect

T he Eighth Amendment of the U.S. Constitution forbids cruel and unusual punishment—a ban that requires corrections staff to protect incarcerated individuals from sexual abuse whenever the threat is known.[12] Facilities that fail to implement adequate protective measures risk exposure to civil lawsuits from current and former prisoners and the U.S. Department of Justice. However, this was not always the case. Historically, incarcerated individuals found courts unwilling to intercede on their behalf. In 1809, for example, a court rejected a habeas corpus petition on the grounds that it was not appropriate "to interfere with the jailer in the exercise of the discretion vested in him, as to the security of prisoners."[13] In the majority of decisions through the mid-20th century, judges agreed that it was not their function to supervise the discipline and treatment of incarcerated individuals.[14] The Supreme Court ended this hands-off approach with its 1974 decision in *Wolff v. McDonnell*, in which the Court stated: "There is no iron curtain drawn between the Constitution and the prisons of this country."[15]

In the wake of *Wolff v. McDonnell,* certain aspects of prisoner rights have become clear. For example, in the 1994 case *Farmer v. Brennan,* a transgender woman alleged that corrections officials failed to protect her from repeated sexual assaults. The Supreme Court ruled unanimously that deliberate indifference to the substantial risk of sexual abuse violates incarcerated individuals' rights under the Eighth Amendment and that courts have an active, supervisory role in ensuring prisoners' safety. The court made clear that officials have a duty to protect prisoners because, "having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."[16] Furthermore, being violently assaulted in a correctional facility is simply "not part of the penalty that criminal offenders pay for their offenses against society."[17]

**"There is no iron curtain drawn between the Constitution and the prisons of this country."**

Jurisdictions cannot use insufficient funding as an excuse for failing to ensure the constitutional rights of incarcerated individuals. The Federal courts have long rejected such arguments.[18] Regardless of funding, States and the Federal Government must provide minimum conditions of confinement to incarcerated persons to avoid the Constitution's prohibition against cruel and unusual punishment.[19]

With these decisions, courts have underscored their crucial role in protecting the rights of incarcerated individuals. The Supreme Court specifically emphasized the need for judicial oversight, noting that "judicial intervention is *indispensable* if constitutional dictates—not to

**Regardless of funding, States and the Federal Government must provide minimum conditions of confinement to incarcerated persons to avoid the Constitution's prohibition against cruel and unusual punishment.**

mention considerations of basic humanity—are to be observed in the prisons."[20] Courts will intervene in instances in which facilities tolerate unconstitutional conditions. In discussing this oversight function, the Seventh Circuit observed that "[j]udges are not wardens, but we must act as wardens to the limited extent that unconstitutional prison conditions force us to intervene when those responsible for the conditions have failed to act."[21]

## Against the Law

After conviction for a drug offense, Marilyn Shirley was placed in a Federal facility in Fort Worth, Texas, for women in need of specialized medical and mental health services.[22] One night in March 2000, a senior prison official, who was the only officer on duty at the time, awakened Shirley. He ordered her from her room and took her to the officers' station. There, he made a call asking for a signal if the supervisor approached the camp. After he hung up the phone, he began kissing and groping Shirley and pushed her into a supply room. "The more that I begged and pleaded for him to stop, the more violent he became," she told the Commission.[23] "He tried to force me to perform oral sex on him." As she resisted, he became increasingly brutal, throwing her against the wall and slamming her head against it repeatedly. He then violently raped her, all the while warning that if she ever talked about it, no one would believe her.

The assault ended only when the officer received a signal over the radio that someone was approaching. After the attack, he continued to harass and threaten her. In her testimony, she recounted, "[I] stayed silent for 7 months, having nowhere to hide. I went to sleep every night not knowing if [he] was going to order me out [to] the officer's station again."[24] She was terrified about what would happen if she reported the assault, only informing the camp administrator on the day of her release months later.

Years after she was raped, Marilyn Shirley still experienced paralyzing panic attacks and intense nightmares. Fear continued to dominate her life, and she took five different medications to treat her conditions. "I see his face everywhere. Every day I relive this rape," she told the Commission.[25]

Incarcerated women have always been vulnerable to sexual coercion and abuse.[26] For example, in the mid-1800s, the Indiana State Prison ran a "prostitution service" for male guards using female prisoners.[27] Efforts to protect and better serve female prisoners began with a movement in the early 1800s to create separate prisons for women. It wasn't until 1834 that prisons began to house women separately, and it took

another four decades, until 1873, before the first women's facility was constructed and staffed entirely by women.[28] Same-sex staff for women remained the norm until the latter half of the 20th century, when women successfully challenged their exclusion from staff positions in men's prisons.[29] This in turn created opportunities for men to once again enter women's institutions as workers.[30] Cross-gender supervision remains a concern in women's prisons and has become a concern in facilities for men as well, as female staff make up an increasingly large proportion of the workforce.[31]

The officer who attacked Shirley was ultimately convicted and sentenced to 12-and-a-half years in prison. However, many incidences of sexual abuse by staff or prisoners are never prosecuted. For most of this Nation's history, no criminal laws specifically prohibited corrections staff from sexually abusing incarcerated individuals.[32] Even as late as 1990, the majority of States and the Federal Government did not have such laws.[33] Today in all 50 States, it is a crime for facility staff to engage in any sexual conduct with individuals in custody; similarly, laws prohibit such conduct among staff working for the Federal Bureau of Prisons.[34] These laws are essential, but unfortunately, not all explicitly cover staff working in halfway houses and other community-based correctional settings. As of January 2008, eight States did not have laws covering sexual abuse in community corrections.

**"The more that I begged and pleaded for him to stop, the more violent he became," Marilyn Shirley told the Commission. "He tried to force me to perform oral sex on him." As she resisted, the prison official became increasingly brutal, throwing her against the wall and slamming her head against it repeatedly. He then violently raped her, all the while warning that if she ever talked about it, no one would believe her.**

Successfully prosecuting these cases remains difficult, and sentences tend to be lenient compared to penalties for sexual abuse committed in other settings.[35] In three States, sex with a prisoner is still a misdemeanor, not a felony, for corrections staff.[36] Prisoners who commit sexual offenses are rarely prosecuted.[37] More often they receive administrative sanctions, such as increased custody status or loss of parole.

## Beginning to Count

How common is sexual abuse in American correctional settings? Historical accounts describe sexual abuse as a feature of incarceration from the beginning, but our knowledge about the prevalence of these incidents, even today, is extremely limited.[38] Only anecdotal reports of sexual abuse existed until the mid-20th century, when Alan Davis conducted his groundbreaking study of sexual abuse in

the Philadelphia jail system.[39] Released in 1968 and based on in-person interviews with more than 3,300 prisoners and 562 staff members during a 2-year period, this comprehensive study estimated that at least 3 percent of the 60,000 individuals in Philadelphia jails were sexually victimized annually, which translates into at least 2,000 incidents of sexual abuse in 12 months. Two-thirds of the reported incidents were completed rapes. Young, slightly built prisoners seemed to be at extreme risk. Davis was careful to point out that the actual prevalence was probably much higher because many victims were reluctant to report their experiences.

Most subsequent studies have yielded considerably higher prevalence rates, depending on the target population and the amount of time assessed. A 1982 study in a medium-security men's facility in California, which housed individuals at high risk of abuse in single cells (gay men, mentally ill prisoners, and other high-risk prisoners), found that 14 percent of randomly selected prisoners reported through an anonymous questionnaire that they had been sexually victimized.[40] Rates for gay prisoners (41 percent) were much higher than rates for heterosexual prisoners in the facility (9 percent). A 1996 study, also using anonymous questionnaires, surveyed prisoners and

**Only anecdotal reports of sexual abuse existed until the mid-20th century, when Alan Davis conducted his groundbreaking study of sexual abuse in the Philadelphia jail system.**

staff in the State prison system in Nebraska.[41] Of the 528 men and women prisoners who returned completed surveys, 20 percent reported being pressured or forced to have sexual contact at least once while incarcerated in a Nebraska State facility. In facilities for men, the incident rate was 22 percent. Prisoners reported that staff were the perpetrators in 18 percent of the incidents. The 264 corrections staff responding to the survey estimated a sexual abuse rate of 15 percent in the State's prison system.

To date, most of the research on prevalence has focused on incarcerated men; only a few studies have assessed rates among incarcerated women. One such study, conducted in 2002, investigated rates of sexual abuse at three Midwestern prisons for women, each housing maximum-, medium-, and minimum-security prisoners.[42] The researchers asked women about experiences of sexual abuse during the entire time they had been incarcerated in that facility. The rate of sexual abuse in one facility—described as a "rough prison"—was 19 percent.[43] Many respondents in this facility "cited problems with inadequate surveillance, predatory staff, noncaring and unresponsive staff, and policies that protected rather than punished staff and inmate sexual predators." Two other facilities had rates of 6 and 8 percent. A little more than half of the reported perpetrators were staff. Only about one-third of the victims reported the incidents to prison officials. Victims who did not report explained that they feared retaliation and that no one would believe them.

More recently, a study conducted from March 2005 to June 2006 of 436 women in a large southern prison found that 17 percent reported experiencing some type of sexual victimization while incarcerated, ranging from penetration, attempted penetration, and sexual touching to sexual abuse without physical contact; 3 percent reported completed rape.[44]

## Understanding the Numbers

Different estimates of prevalence are partly the result of researchers using different definitions of sexual abuse.[45] Some studies count only completed acts of nonconsensual sex that involve penetration; others include a wider range of acts, including coercion or sexual pressure, sexualized touching, voyeurism, and exposure.[46] The methods researchers use to estimate the prevalence of sexual abuse incidents also have a major impact on their findings.[47] Many studies of sexual abuse in prison involve interviews with individual prisoners. Because sexual abuse is a sensitive topic for women and men, and the stigma associated with being a victim is real, individuals may hesitate to report incidents and details in a face-to-face interview.[48] Men may be especially reluctant to report sex with other men, even when it involves forced sex, for fear they will appear weak and helpless; heterosexual men in particular may be concerned about being perceived as gay.[49]

Having prisoners report anonymously on survey forms about sexual abuse addresses some of these concerns, but using written forms has drawbacks as well.[50] Literacy rates are often lower among incarcerated persons; some respondents may refuse to participate because they cannot read the survey.[51] Requesting help to fill out a written survey negates the privacy of the information, again leading to reluctance to report sexual abuse.[52] And many prisoners find it hard to trust promises of confidentiality and anonymity in an environment characterized by a lack of privacy and loss of control.

Recent research studies have begun to take advantage of evolving technology, using laptop computers with touch screens and an accompanying recorded narration to guide people through surveys.[53] This method mitigates concerns about reading level and privacy. Respondents still must believe strangers' assurances of confidentiality, however, so the likelihood of underreporting remains.

Although underreporting may be a large source of the problem, the Commission recognizes that false allegations may also create inaccuracies in prevalence levels.[54] Prisoners have been known to fabricate accounts of sexual abuse as a means to achieve some other purpose, such as a change in housing or to manipulate other prisoners or staff. The Bureau of Justice Statistics (BJS) and other researchers design surveys to ask questions

of prisoners in several different ways, and they also use analytic tools to assess data for false reports. Moreover, because an anonymous survey captures neither the identity of the reporter nor the accused, there would appear to be little motivation to fabricate accounts in this context, except perhaps to damage the overall reputation of the correctional facility. The extent to which empirical studies of sexual abuse among prisoners unwittingly capture some number of false reports deserves further research.

## The First National Incidence Rates

I n the Prison Rape Elimination Act, Congress stated that existing data about sexual abuse in correctional facilities was not sufficient to understand the scope of the problem and respond appropriately.[55] In particular, the Act called for new research to provide national incidence rates.[56] Congress tasked the Bureau of Justice Statistics (BJS) with collecting and reporting those data. BJS launched a groundbreaking effort to discover how many prisoners each year are victims of sexual abuse by other prisoners and by staff as well as the nature of that abuse.

In 2007, BJS surveyed incarcerated men and women in a random sample of 146 State and Federal prisons and 282 local jails across the United States, using audio computer-assisted self-interviews. A total of 63,817 incarcerated individuals completed surveys that formed the basis of the study: 23,398 in State and Federal prisons and 40,419 in local jails. Respondents in prison were asked about incidents of sexual abuse during the 12 months prior to the interview; those who had been incarcerated at that facility for less than 12 months were asked about their experiences since arriving. The average time of incarceration among respondents in prison was 8.5 months. Respondents in jails were asked about sexual abuse incidents during the 6 months prior to the interview or since admission if they had been confined in that facility for less than 6 months. The average time of incarceration among respondents in jail was 2.6 months. All respondents used a touch screen to respond to a questionnaire accompanied by audio instructions delivered through headphones.[57]

The national scope of these surveys yields the most comprehensive snapshot of sexual abuse in prisons and jails yet available. The data confirm that sexual abuse of prisoners is widespread, with great variation in rates of abuse across facilities, and reveal the presence of force, coercion, and physical injury to incarcerated victims.

In prisons in 2007, 4.5 percent of respondents reported experiencing sexual abuse one or more times during the 12 months preceding the survey.[58] Extrapolated to the national prison population, an estimated 60,500 State and Federal prisoners were sexually abused during that 12-month period. Ten of the facilities in the sample had comparatively high prevalence rates,

between 9.3 percent and 15.7 percent. At the other extreme, in six of the facilities sampled, no respondents reported having been sexually abused during this time frame. About 2 percent of all respondents reported incidents in which the perpetrator was another prisoner; 2.9 percent reported incidents perpetrated by corrections staff. (Some respondents had been abused by both staff and other prisoners.) In cases involving staff, a majority of the victims reported sexual activity beyond being touched in a sexual way.

In jails, 3.2 percent of respondents reported that they had been sexually abused at least once during the prior 6 months or since they had been in that facility. Among those surveyed, 1.6 percent reported abuse by another inmate, and 2 percent reported incidents perpetrated by staff.[59] Published reports on the survey of jail inmates include more detailed information than reports on the survey of State and Federal prisoners.

**The data confirm that sexual abuse of prisoners is widespread, with great variation in rates of abuse across facilities, and reveal the presence of force, coercion, and physical injury to incarcerated victims.**

In jails, sexual abuse perpetrated by other inmates typically occurred in victims' cells or rooms, whereas incidents involving staff as perpetrators were most likely to occur in unobserved areas, such as closets, offices, or locked rooms. Approximately 20 percent of all victims said that they had been physically injured during the course of the abuse; most of those (85 percent) reported sustaining at least one serious injury. Women were more likely than men to be sexually victimized (5 percent compared with 3 percent). Rates were higher among younger inmates: 4.6 percent among respondents 18 to 24 years old, compared with 2.4 percent among respondents 25 years and older. Nearly a fifth (18.5 percent) of inmates who identified as homosexual and 9.8 percent who identified as bisexual or "other orientation" reported being sexually victimized, compared with 2.7 percent of heterosexual inmates.

Until recently, what we knew about prevalence rates among incarcerated youth came mainly from facility records of investigated and substantiated allegations of sexual abuse. These records do not reflect incidents that were never reported, those for which an investigation was never conducted even if a report was made, and those for which there was not enough evidence to substantiate a claim. When allegations of sexual abuse are reported to corrections staff and recorded, those allegations, as well as the official responses, become a part of the facility's administrative records. Substantiated incidents are those for which an investigation was conducted and a finding of sexual abuse recorded. Reporting and record-keeping policies vary greatly across facilities. For example, some facilities record and maintain all allegations of abuse, whereas others only keep data on incidents in which officials substantiated the allegations.

Based on administrative records, youth are at especially high risk of sexual abuse, whether they are confined with other youth or incarcerated with adults. As reported by correctional facilities to BJS, the rate of sexual abuse in adult facilities—based only on allegations reported to correctional authorities and recorded in administrative records—was 2.91 per 1,000 incarcerated prisoners in 2006, across those facilities responding.[60] In contrast, the rate in residential juvenile facilities—also reported by BJS and based on administrative records—was more than five times greater: 16.8 per 1,000 in 2006.[61] Some of this difference may be due to laws that mandate adult caregivers to report child abuse and laws specifying that all sexual contacts with youth under a certain age are nonconsensual.[62] Boys were the victims in nearly two-thirds of substantiated incidents, but girls were overrepresented. Thirty-six percent of all victims in substantiated incidents across the facilities responding were girls, even though girls represented only 15 percent of youth in residential placement in 2006.[63]

**Extrapolated to the national prison population, an estimated 60,500 State and Federal prisoners were sexually abused during the 12-month period.**

Youth confined with adults also are at high risk of sexual abuse. In 2005, for example, individuals under the age of 18 made up less than 1 percent of all inmates in U.S. jails.[64] Yet 21 percent of all victims of substantiated incidents of sexual abuse involving jail inmates that year were under the age of 18.[65]

At the time of this report, BJS is conducting the first nationally representative survey of sexual abuse among adjudicated youth in residential juvenile facilities. In a pilot study to prepare for the national survey, BJS interviewed 645 youth in nine facilities. Almost all the youth surveyed were male (90 percent) and 15 years or older (91 percent). The facilities housed youth with fairly serious histories: more than a quarter of the youth interviewed had been adjudicated for perpetrating a sexual assault, compared to less than 10 percent of youth in residential placement nationally. Facilities volunteered to participate in the pilot and were selected based on convenience.

In this study, nearly one out of every five youth surveyed—19.7 percent—reported at least one nonconsensual sexual contact during the preceding 12 months or since they had arrived at the facility if they had been there less than 12 months.[66] Nonconsensual experiences included sex in return for offers of favors or protection (8.7 percent), sex due to pressure or force other than physical force (8.8 percent), and sex with physical force or the threat of physical force (6.4 percent).

Any sexual contact with staff was considered to be nonconsensual and is therefore included in the 19.7 percent. Sexual contact with other youth reported as consensual is not included. Staff were just as likely as youth to be the perpetrators of nonconsensual sexual abuse. Notably, 7.8 percent of all youth interviewed reported sexual contacts with staff that involved physical

force or the threat of force; some other type of force or pressure; or sex in return for money, protection, favors, or other kinds of special treatment.[67]

In addition to directly surveying individuals confined in adult and juvenile facilities annually, BJS will continue to collect and review administrative records. Although administrative records can only hint at the actual rates of sexual abuse—at least for now—they have important information to convey. There is evidence, for example, of a 21 percent increase in allegations of sexual abuse comparing administrative records from 2003 (when Congress passed PREA) and 2006.[68] Rather than signaling an increase in actual abuse, the rise may indicate that prisoners are more confident reporting sexual abuse when it does occur, that facilities are keeping better records, or both.

Regular review of administrative records nationally can illuminate who reports abuse, characteristics of perpetrators in these cases, circumstances surrounding reported incidents, and how facilities respond to reports of sexual abuse—in particular, what disciplinary or legal sanctions facilities impose on perpetrators and what treatment is provided to victims.[69] In the future, BJS also will examine whether certain characteristics of facilities, such as size, security level, crowding, staff ratios, staff demographics, and assaults on staff, are associated with higher rates of sexual abuse.[70]

The research by BJS, especially the surveys of incarcerated individuals, offers perhaps the most convincing data so far that some level of sexual abuse is a reality in the vast majority of America's prisons and jails. Important and uninvestigated areas remain: lockups, community corrections settings, detention centers for immigrants, tribal detention facilities operated by the Bureau of Indian Affairs, and those run by the military. The prevalence and scope of sexual abuse in these arenas are virtually unknown.

## Facing the Numbers

**E**ven conservative estimates of rates of sexual abuse translate into high numbers of victims each year in America's vast correctional system.[71] In just two decades—between 1987 and 2007—America's incarcerated population nearly tripled. At the end of 2007, the daily population of U.S. prisons, jails, and juvenile facilities totaled approximately 2.4 million people.[72] That figure only hints at the millions of people who cycle through these facilities over the course of a year. And it does not count individuals in pretrial detention, on probation, on parole, or under some other form of correctional supervision in the community.[73] By the end of 2007, there were more than 5.1 million adults on probation or parole—about one in every 45 adults in the United States.[74] Seventy percent of the adult corrections population is under community corrections supervision, and the numbers are growing.[75]

Dramatic increases in the prisoner population over the past 20 years are due more to legislative changes than to increases in crime rates.[76] The "war on drugs" that began in the 1980s and continued over the last two decades resulted in new policies requiring incarceration for drug-related offenses that previously involved primarily probation or diversion. Coupled with mandatory-minimum sentences, many more people were incarcerated and for longer periods of time. The "three-strikes" laws, introduced in 1993, mandated sentences from 15 years to life in prison for persons convicted of three crimes.[77] As of 2008, nearly half of the States had some form of a "three-strikes" law, although the criteria for applying the law vary across jurisdictions.[78] In some jurisdictions, all three crimes must be felonies or violent felonies for the three strikes to count. Other jurisdictions include minor crimes, even misdemeanors, in the calculation, adding to the rapid growth in incarceration.

**With almost 2.5 million people living behind bars on any given day—an experience that directly shapes the lives of approximately 1 in 130 Americans, including youth—the United States bears a special burden to ensure the safety of prisoners and to protect their rights.**

Along with the rapidly increasing number of people incarcerated, the demographics of those individuals have changed in ways that have flooded facilities with individuals who are especially vulnerable to sexual abuse. The number of incarcerated adult women increased by 757 percent from 1977 to 2007.[79] Legislative changes in 45 States since 1992 also made it easier to incarcerate juveniles with adults.[80] Between 1990 and 2004, the number of juveniles sentenced to adult jails and prisons increased 208 percent; some jurisdictions incarcerate youth under the age of 16 with adults.[81] The types of crimes for which people are incarcerated have changed as well; more than half of all newly incarcerated individuals between 1985 and 2000 were imprisoned for nonviolent drug or property offenses.[82]

With almost 2.5 million people living behind bars on any given day—an experience that directly shapes the lives of approximately 1 in 130 Americans, including youth—the United States bears a special burden to ensure the safety of prisoners and to protect their rights.[83]

## Hard to Heal

Although sexual abuse typically leaves few visible scars, most victims report persistent, if not lifelong, mental and physical repercussions. Sexual abuse experienced in any environment commonly invokes shock, numbness, withdrawal, and denial.[84] Almost all victims of an invasive or violent sexual assault develop some symptoms of posttraumatic stress disorder (PTSD) in the weeks after the

attack.[85] These include numbing, intrusive thoughts, nightmares, insomnia, flashbacks during which the victim vividly re-experiences the event, outbursts of anger or irritability, and panic attacks.[86] For some victims, PTSD symptoms resolve several months after the incident; for others, PTSD becomes chronic. Victims with long-term PTSD are more likely to develop other mental health problems as well.[87]

Victims of sexual abuse often struggle with long-lasting effects, including anxiety, a sense of alienation and isolation, mistrust of others, hostility, depression, and helplessness.[88] Thoughts of suicide are common. In non-correctional settings, one-third to one-half of rape victims consider suicide; between 17 and 19 percent actually attempt suicide.[89]

The closed nature of correctional facilities can lead to especially devastating effects for sexual abuse victims. In confinement, victims cannot hide from or escape their perpetrators; they are trapped with their assailant unless corrections officials intervene.[90] The constant threat of subsequent abuse and physical proximity to danger are likely to increase the risk of developing PTSD and other aftereffects.[91] The consequences of sexual abuse may be worse for those who are young, have a past history of sexual abuse, or have a preexisting mental illness.[92] Victims cannot easily avail themselves of support networks and resources available outside prison walls, and truly confidential counseling in corrections is virtually nonexistent. These conditions exacerbate post-trauma responses and may prevent healing and recovery. In her testimony before the Commission, Necole Brown described her symptoms after repeated sexual victimization while in prison: "I continue to contend with flashbacks of what this correctional officer did to me and the guilt, shame, and rage that comes with having been sexually violated for so many years. I felt lost for a very long time, struggling with this. . . . I still struggle with memories of this ordeal and take it out on friends and family who are trying to be there for me now."[93]

**Although sexual abuse typically leaves few visible scars, most victims report persistent, if not lifelong, mental and physical repercussions.**

For some victims, the trauma of sexual abuse has physical manifestations. Sexual assault is strongly associated with chronic medical conditions, such as insomnia, fatigue, chronic pain, nausea, ulcers, and disturbed sleeping and eating patterns.[94] Almost all victims of forced penetration also experience some type of physical injury, such as soreness, bruising, bleeding, or lacerations.[95] Some victims are brutally attacked and sustain severe physical injuries, including concussions, broken bones, and deep lacerations. The physical brutality may be even more extreme when there are multiple perpetrators working together.[96] Exposure to the HIV virus and other sexually transmitted diseases is another potential consequence of sexual abuse, one that may not be evident immediately

following an assault. Testimony from prison rape survivors who became HIV-positive after being raped illustrates the potential lifelong repercussions of being sexually victimized while incarcerated.[97]

In 1994, Keith DeBlasio was sentenced to 5 years in a minimum-security Federal prison for fraud.[98] He was later transferred to a high-security facility in Milan, Michigan, and placed in a dormitory with about 150 inmates, dozens of blind spots, and only one officer on duty at any given time. "It was here," DeBlasio testified "that I was sexually assaulted by the same assailant more times than I can even count."[99] The sexual abuse began when the assailant moved into DeBlasio's dormitory after spending 3 days in segregation for "brutally assaulting another inmate in a stairwell. . . . There were numerous assaults and a long period of ongoing abuse, especially after prison officials moved my assailant into the same cubicle with me as my bunk mate. I couldn't defend myself because he had fellow gang members standing watch."

> **An officer at the Tucker Women's Unit in Arkansas raped Laura Berry in 1993. When she informed the officer that she thought she might be pregnant, he forced her to drink quinine and turpentine in an attempt to cause an abortion.**

Eventually, DeBlasio became ill. After repeated requests to medical staff for an HIV test, he was tested and diagnosed as HIV-positive.[100] DeBlasio testified that he later learned that "prison officials knew the assailant was emotionally disturbed, on psychotropic medications, a repeat predator with serious mental problems, and yet they did nothing to protect me. . . . I was a nonviolent offender, but I was given a life sentence. I was repeatedly denied protection from a known predator with HIV."

Sexual assaults by men against women prisoners also carry the risk of pregnancy, another long-term consequence that may not be detected until weeks or months after the assault.[101] Fear of retaliation, threats from the perpetrator, and fear of punishment may keep incarcerated women victims from seeking pregnancy testing or medical care once they realize that they are pregnant. The case of *Berry v. Oswalt* highlights these risks.[102] An officer at the Tucker Women's Unit in Arkansas raped Laura Berry in 1993. When she informed the officer that she thought she might be pregnant, he forced her to drink quinine and turpentine in an attempt to cause an abortion. When the threat of pregnancy persisted, the officer told Berry to conceal the pregnancy and blame someone else if questioned. The court awarded Berry $80,000 in compensation for the assault and subsequent abuse she endured.

## Far-Reaching Consequences

**S**exual abuse damages individual prisoners, often in lasting ways, but the harm does not end there. U.S. correctional facilities release millions of people every year.[103] Individuals suffering from the psychological and physical effects of sexual abuse carry those effects home with them. Many victims require ongoing medical and mental health care, increasing the burden on already struggling public health care systems.[104] Individuals dealing with the consequences of sexual abuse may find it difficult to reintegrate into society, relate to their families, and rebuild their lives. Some self-medicate with alcohol and drugs to escape emotional or physical suffering.[105] Some turn back to crime, become homeless, or reenter the criminal justice system.[106]

Taxpayers bear much of the cost associated with the thousands of sexual assaults in corrections, as illustrated by the testimony of Tom Cahill, an Air Force veteran. Cahill told the Commission about his arrest and subsequent detention for civil disobedience during a labor strike at a factory in 1967. As he entered a crowded holding cell in a San Antonio jail, one prisoner yelled, "fresh meat!"[107] After lights out, "Six or seven men beat me and raped [me] while another two dozen just looked away. I remember being bounced off the walls and the floor and a bunk. . . . [I]t went on and on and on. . . . [O]ne of my cellmates told me later that the guards lied and told them I was a child molester. . . . After I was released from jail, I tried to live a normal life, but the rape haunted me. . . . I was diagnosed with post-traumatic stress disorder."

Cahill estimates that "that one day I spent in jail has cost the Government and the tax payers at least $300,000," explaining, "I've been hospitalized more times than I can count and I didn't pay for those hospitalizations, the tax payers paid. My career as a journalist and photographer was completely derailed. . . . For the past two decades, I've received a non-service connected security pension from the Veterans' Administration at the cost of about $200,000 in connection with the only major trauma I've ever suffered, the rape."[108]

Sexual abuse of prisoners also places great strains on correctional facilities. As Congress stressed in its PREA findings, sexual abuse in correctional settings "increases the costs incurred by Federal, State, and local jurisdictions to administer. . . prison systems."[109] These costs, affecting operations ranging from health care to housing, are extremely hard to quantify.[110] For example, victims suffering from the

> **Tom Cahill estimates that "that one day I spent in jail has cost the Government and the tax payers at least $300,000," explaining, "For the past two decades, I've received a non-service connected security pension from the Veteran's Administration at the cost of about $200,000 in connection with the only major trauma I've ever suffered, the rape."**

effects of sexual abuse may repeatedly seek counseling or medical care, or break rules in an attempt to escape a perpetrator, whether or not they disclose the abuse. Although the dollar amounts may be elusive, the impact is clear: facilities rife with sexual abuse cannot function effectively.

The sexual abuse of prisoners undermines the very purpose of corrections in America. It is an offense against the victim, an affront to the interests and values of civil society, and a violation of the highest order of American legal jurisprudence, which forbids the "unnecessary and wanton infliction of pain" upon prisoners by corrections officials or by other prisoners.[111]

## Answering the Call

Protecting prisoners from sexual abuse is, without a doubt, an enormously daunting challenge for all involved. The reasons are many and are discussed throughout this report. They include gaps in understanding of the problem due to underreporting and a lack of research, insufficient resources for responses to sexual abuse, the challenges of training a vast workforce and enhancing safety in outdated facilities, intricacies of dealing with vulnerable populations, and many more. Despite these complicated factors, a growing and diverse group of individuals, governmental entities, and nongovernmental organizations have worked to answer the call, coming together to confront powerfully this once hidden and unexamined problem.

Prior to PREA, there was no national understanding of the scope of the problem, nor were there coordinated efforts to address it. Yet promising work was taking place, paving the way for subsequent PREA efforts. Beginning in the 1990s, civil rights litigation drew the attention of the corrections field and the public to the issue of staff sexual misconduct.[112] In response, organizations and individuals began to acknowledge and address the problem. In 1996, the National Institute of Corrections (NIC) began providing technical assistance and training across the Nation, helping correctional systems focus on effective management to stop staff sexual misconduct, rather than reactive, crisis-driven policymaking.[113] In the years leading up to and just after PREA, well-respected professional organizations—the American Correctional Association, the American Jail Association, the American Probation and Parole Association, the Association of

**The landscape is changing. Reporting hotlines and zero-tolerance posters are becoming commonplace. Some agencies and facilities have revolutionized their responses to sexual abuse, instituting sexual assault response teams and organizing in-house multidisciplinary committees to address PREA.**

State Correctional Administrators, and the National Sheriffs' Association—adopted resolutions strongly condemning staff sexual misconduct.[114]

Human rights, faith-based, and prison rape advocacy organizations raised their voices condemning sexual abuse in confinement, creating the consensus necessary to pass national legislation.[115] PREA's goal is zero tolerance for sexual abuse in correctional settings. The Act proposes to accomplish this through a number of tools, including data collection, research, grants and technical assistance to States to improve their practices, development of national standards, and the reduction of funding to States that fail to comply with the standards.[116] PREA's passage underscores the scope and gravity of the problem—confirmed by the best and most recent data—and signals that Congress is committed to ending sexual abuse in American corrections.[117]

Already, much work has been done in the wake of PREA. BJS has conducted groundbreaking surveys and published other research findings on the nature and scope of the problem. NIC continues to provide technical assistance and training around the country—every State has received assistance in this area. The National Institute of Justice has funded research on issues surrounding sexual abuse in correctional facilities that promises to deepen our understanding of the best ways to prevent sexual abuse and respond to victims and perpetrators when prevention fails. Professional organizations, including those already mentioned and the International Community Corrections Association, have led significant PREA initiatives, workshops, and trainings. And the Bureau of Justice Assistance has distributed grants to 34 States and one territory, funding that has been used in a variety of innovative ways. The Commission recommends that these important Federal initiatives continue.

In short, the landscape is changing. Reporting hotlines and zero-tolerance posters are becoming commonplace. Some agencies and facilities have revolutionized their responses to sexual abuse, instituting sexual assault response teams and organizing in-house multidisciplinary committees to address PREA. Training on PREA is an expected part of curricula for corrections staff nationwide. (See the PREA Initiatives appendix for a sample.) Though the challenge is great, these promising developments mean that pleas for protection and justice by the likes of Elizabeth Gurney Fry and Reverend Louis Dwight no longer fall on deaf ears. The Nation is poised to answer the call to eliminate prison rape.

The chapters that follow discuss a crucial mechanism for eliminating prison rape—national standards developed by the Commission to prevent and detect sexual abuse in every correctional setting and to hold accountable those who perpetrate and permit this abuse.

FINDING

Sexual abuse is not an inevitable feature of incarceration. Leadership matters because corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse.

2

# Leadership Matters

"**T**oni Bunton heard the guard coming down the hallway. He wore cheap cologne, and his breath smelled like cigarettes. He scuffed his boots against the floor and opened the door to her cell in Scott Correctional Facility, a women's prison in Plymouth Township. 'Come here,' he ordered. The guard pulled Bunton into a bathroom. She wore jogging pants, a T-shirt and socks. She was the guard's prized possession, a pretty young thing, as he said, 'just the way I like 'em,'—short and cute with brown hair, brown eyes and porcelain skin."[1]

So begins a Detroit newspaper's account of a culture inside a Michigan prison that allowed widespread sexual abuse of women prisoners by male officers. According to Bunton, she was just 19 when the officer pushed her against the bathroom sink and raped her, smiling as he walked away. It took more than a decade for Bunton to speak publicly about this rape and being the victim of seven other sexual assaults between 1993 and 1996.

When Bunton found her voice, it was one that people believed. In February 2008, a jury in Ann Arbor determined that the Michigan Department of Corrections, the former director of the department, and the warden at Scott knew about the "sexually hostile prison environment," where nearly a third of male officers allegedly engaged in sexual misconduct and failed to protect Bunton and nine other women.[2] The jury awarded the women $15.4 million and then did something out of the ordinary; they apologized. "We the members of the jury. . . as representatives of the citizens of Michigan, would like to express our extreme regret and apologies for what you have been through."[3] In January 2009, the Michigan Court of Appeals upheld the jury's verdict.[4] This case was only the beginning. More than 500 women who are or were incarcerated in Michigan prisons are suing the State in a class action lawsuit.

Even before women in Michigan began telling their stories in court, human rights organizations and the U.S. Department of Justice alleged extensive sexual assaults by corrections staff over a period of years in several women's prisons in Michigan. In the early 1990s, advocacy groups warned the Michigan Department of Corrections that "sexual assault and harassment are not isolated incidents and. . . fear of reporting such incidents

is a significant problem."[5] It was not until a group of women brought civil actions in 1996 and the Department of Justice's Civil Rights Division filed suit in 1997 that corrections officials in Michigan began to address the issue. In its investigation, the Department of Justice found evidence of criminal behavior ranging from sexual assault to officers exposing their genitals to prisoners.[6] Faced with these allegations, the Michigan Department of Corrections signed a settlement agreeing to severely limit male corrections officers' access to incarcerated women and to educate officers and prisoners about sexual abuse.[7]

Over the last few years, corrections leaders in Michigan have implemented additional reforms, including training for officers designed to shape a culture that prevents abuse.[8] New work assignment rules, including banning male officers from the housing units where women live, were designed to prevent sexual misconduct and harassment.[9] Administrators refer all allegations of sexual misconduct or abuse to internal affairs as well as to the Michigan State Police for investigation, and there are now tougher legal penalties for staff who have sexual contact with incarcerated persons.[10] As of May 2009, the approximately 2,000 women prisoners in Michigan will all be housed in a facility in Ann Arbor with health care, education, and other programming provided in part by the University of Michigan.[11]

> **To allow any level of sexual abuse in a correctional setting creates a security breach that jeopardizes the safety of staff and prisoners.**

To allow any level of sexual abuse in a correctional setting creates a security breach that jeopardizes the safety of staff and prisoners.[12] This chapter explores the essential role of corrections administrators in preventing sexual abuse in the correctional settings they oversee. Simply stated, the problem cannot be solved without committed, enthusiastic leadership within the profession. The Commission has defined clear standards that corrections administrators can champion to prevent sexual abuse and make facilities safer for everyone—reforms in the underlying culture, hiring and promotion, and training and supervision that vanguard members of the profession are already implementing.

## From the Top Down

The class action lawsuit in Michigan revealed an unhealthy correctional culture in which sexual abuse flourished. Rhode Island Corrections Director A.T. Wall explained to the Commission that a facility's culture is its "way of life . . . [t]he sum of the attitudes or the norms, the values, the beliefs, of those people who live and work in it."[13] In hierarchical organizations like correctional facilities, that "way of life" is

shaped from the top down. Although changing the culture is an enormous challenge, wise and impassioned leaders can do it.[14] As Wall noted, "Culture is not inherent. Culture is learned, and therefore, it can be changed."[15]

In 2006, the Urban Institute surveyed 45 State departments of corrections about their policies and practices on preventing sexual abuse and conducted in-depth case studies in several States.[16] Not surprisingly, the surveys and the case studies identified strong leadership as essential to creating the kind of institutional culture necessary to eliminate sexual abuse in correctional settings.[17] In his testimony, Martin Horn, Commissioner of the New York City Department of Corrections, agreed. Culture change "has to start at the top, and you have to talk about it. And if we don't talk about it, the people under us won't," he told the Commission.[18] "[C]ulture is passed by word of mouth and by behavior. You have to walk the walk and talk the talk. You have to do it consistently. You can't sell out. You have to be willing to take the anger that people may direct at you for trying to change the culture."

Recognizing that corrections leaders need knowledge and skills to craft and champion reforms, the National Institute of Corrections (NIC) has offered technical assistance and training to the field on staff sexual misconduct since 1996. Over the years, that assistance has included executive briefings; strategies to assist executive and senior-level staff; workshops conducted in partnership with national, State, and local professional associations; and help developing the critical management and operational practices that minimize staff sexual misconduct. Corrections administrators in every State have received assistance from NIC. The Commission recommends that NIC continue to conduct training and educational programs and to offer technical assistance to Federal, State, tribal, and local authorities responsible for the prevention, investigation, and punishment of prison rape.

STANDARD

Zero tolerance of sexual abuse

The agency has a written policy mandating zero tolerance toward all forms of sexual abuse and enforces that policy by ensuring all of its facilities comply with the PREA standards. The agency employs or designates a PREA coordinator to develop, implement, and oversee agency efforts to comply with the PREA standards.

## Zero Tolerance "with Teeth"

The positive culture Horn and Wall allude to is rooted in the idea and ethics of zero tolerance for sexual abuse. "I'm talking about zero tolerance with teeth," Wall testified.[19] In such cultures, staff and incarcerated individuals understand what constitutes sexual abuse, know penalties exist for perpetration by prisoners or staff, and believe management will treat all incidents seriously. Staff are alert to warning signs and prepared to implement approved procedures in response to incidents, facilities encourage

**Good leaders not only have a policy on paper, they ensure that the policy is reflected in practice by carefully assessing and responding to attitudes, beliefs, and values that support or conflict with a culture of zero tolerance.**

**Contracting with other entities for the confinement of inmates**

If public correctional agencies contract for the confinement of their inmates, they do so only with private agencies or other entities, including other government agencies, committed to eliminating sexual abuse in their facilities, as evidenced by their adoption of and compliance with the PREA standards. Any new contracts or contract renewals include the entity's obligation to adopt and comply with the PREA standards and specify that the public agency will monitor the entity's compliance with these standards as part of its monitoring of the entity's performance.

reporting of abuse, and prisoners are confident that genuine investigations will follow. Staff also know that there are penalties for simply standing by when sexual abuse is occurring and for non-reporting, whether the abuse is perpetrated by prisoners or other staff. The Commission's first two standards require that every correctional agency have a written policy mandating zero tolerance for all forms of sexual abuse in all correctional settings, whether they are operated by government or by private companies working under contract with the government.

Zero-tolerance policies prohibit *any* sexual contact between staff, volunteers, or contractors and incarcerated individuals. Moreover, all forms of forced or coercive sexual contact occurring among incarcerated persons will be fully investigated, sanctioned (if authority to do so exists), and referred for prosecution if the prohibited conduct violates State criminal laws.[20] Facilities in which administrators and management do not emphasize a zero-tolerance culture intrinsically tolerate some level of sexual abuse. An unclear or inconsistent policy sends mixed messages to staff and incarcerated persons about the acceptability of sexual abuse in that setting.

Good leaders not only have a policy on paper, they ensure that the policy is reflected in practice by carefully assessing and responding to attitudes, beliefs, and values that support or conflict with a culture of zero tolerance. Such an assessment demands recognizing that some line officers as well as managers may use sexual abuse and exploitation to manipulate and control prisoners for personal gain or gratification. The abuse in Michigan prisons was not unique. Landmark class action lawsuits describe other correctional environments in which the systemic sexual abuse of incarcerated individuals by staff and other prisoners flourished over time.[21]

Creating a genuine culture of zero tolerance hinges on making the right decisions about who to hire, retain, and promote; providing comprehensive training for staff and education for prisoners on sexual abuse; and using modes of supervision that encourage appropriate contact between staff and prisoners while also setting clear limits. "[I]t's not a sprint. It's a marathon," Wall explained.[22]

## The Right Staff

In December 2002, while working a night shift at the Pennington County Jail in Rapid City, South Dakota, a new recruit entered a woman's cell three times after the facility was locked down for the night—in clear violation of facility regulations—and sexually abused her each time.[23] Once, when she resisted, he slammed her head against the wall so forcefully that he set off his CB radio. The recruit was under the supervision of a senior corrections officer who "was supposed to observe [him]

closely."[24] The facility also had monitoring devices, including a panel of lights indicating whether cell doors were locked or unlocked, and the supervisor had a clear view of the victim's cell from his post. The court concluded that, because "entry of a correctional officer into a cell after lockdown was an unusual and (literally) noteworthy event," the supervisor would have known that the officer had no legitimate reason to enter the victim's cell, much less to enter it multiple times.[25] At one point, the new officer showed his supervisor drawings he had taken from the victim's cell. Despite these warnings, the supervisor did nothing to prevent the assault, nor did he document the cell entry as required or report the incident to his superiors.

As this case illustrates, without a commitment to zero tolerance among managers and line staff—and a willingness to intervene—sexual abuse cannot be prevented. Hiring and retaining high-quality employees is one of the main challenges facing corrections officials.[26] As one department director noted, "We all have the responsibility to attract, hire, and retain qualified staff in a relatively low-paying, relatively high-risk profession with relatively unpleasant working conditions and hours."[27] The kind of culture change many administrators want and that the Commission believes is required would greatly improve the work environment. Yet that shift in culture depends in part on hiring, retaining, and promoting individuals who will not only refrain from sexual abuse, but also actively work to prevent it and to reestablish safety when it occurs.[28]

One way to attract this caliber of staff is through strategic recruiting efforts. Critically reviewing previous recruitment initiatives, highlighting positive aspects of correctional employment (e.g., job stability and security), focusing on a variety of media to advertise vacancies, and personalizing the selection process may play a role in creating a strategic and proactive recruitment plan. A recent study focusing on effective recruitment and retention of jail staff found a variety of such efforts already in place.[29] These included intern programs to help students envision corrections as a career option, community outreach to improve the image of the jail, and mentoring and leadership programs to support new hires.

Careful vetting of all job applicants is also essential to maintaining quality staff. The Commission's standards require conducting criminal background checks, making efforts to obtain relevant information from past employers, and questioning applicants about past misconduct. For States in which the law limits a prospective employer's right to inquire about previous employment, especially disciplinary actions or arrests not leading to conviction, the Commission urges correctional agencies to ask job applicants to sign waivers (unless they are also prohibited from doing so by law) affirming that the applicant foregoes his or her legal right to claim libel, defamation, or slander regarding any information provided by previous employers.

STANDARD

## Hiring and promotion decisions

The agency does not hire or promote anyone who has engaged in sexual abuse in an institutional setting or who has engaged in sexual activity in the community facilitated by force, the threat of force, or coercion. Consistent with Federal, State, and local law, the agency makes its best effort to contact all prior institutional employers for information on substantiated allegations of sexual abuse; must run criminal background checks for all applicants and employees being considered for promotion; and must examine and carefully weigh any history of criminal activity at work or in the community, including convictions for domestic violence, stalking, and sex offenses. The agency also asks all applicants and employees directly about previous misconduct during interviews and reviews.

Preventing sexual abuse in correctional settings necessitates screening for staff and prospective staff who have a history of sexual misconduct, either in correctional settings or in the community. To meet the Commission's standard prohibiting hiring or promoting anyone who has engaged in prior sexual abuse, administrators must thoroughly screen all new job applicants and make promotions contingent on a similarly careful review of every staff member's conduct while employed. Past perpetration of sexual abuse in any setting, including in the community and within the family, is a warning sign that an individual poses a risk that must be carefully evaluated.[30] Nonsexual physical abuse is also a warning sign.[31] Even behaviors demonstrating disrespect, such as a pattern of yelling at or demeaning incarcerated individuals, indicate that a staff member may find it difficult to support a zero-tolerance approach to sexual abuse and indeed may act to undermine such a policy.[32]

Biases and prejudice also may influence the willingness or ability of staff to support a zero-tolerance policy. One study found that some officers were more willing to protect heterosexual prisoners from abuse than those with other sexual identities.[33] Biases against any group, including women, create hostile environments that prevent staff from protecting these individuals.[34] In discussing women's facilities, psychiatrist Terry Kupers warned, "when there is an acceptance of misogynist jokes, of. . . little slaps on the bottom. . . when the management does not stop that and does not want to hear about it, that is where sexual assault occurs."[35]

Psychological tests can flag many of these risk factors as well as positive attributes.[36] Studies suggest, for example, that successful corrections officers tend to be emotionally stable—particularly when it comes to anger and impulse control—dependable, rational, and mature.[37] To identify the best candidate for the job, the vetting process also should explore an applicant's willingness to foster a culture that discourages abuse and to intervene to prevent abuse in specific situations, including in those difficult situations in which the perpetrator is another corrections staff member.

Finally, corrections administrators face the challenge of retaining their best staff. One way to retain corrections staff is to keep salaries competitive with other law enforcement agencies.[38] Low salaries, especially in relation to other law enforcement jobs, are one reason people leave jobs in corrections for work in other professions.[39] However, funds to provide competitive salary lines are often extremely limited. Correctional facilities urgently need support in developing competitive compensation and benefits packages.

> **"Psychiatrist Terry Kupers warned, "[W]hen there is an acceptance of misogynist jokes, of . . . little slaps on the bottom . . . when the management does not stop that and does not want to hear about it, that is where sexual assault occurs.""**

Promoting staff who demonstrate a commitment to preventing sexual abuse is another way to keep good staff and send a clear message to everyone in the facility. Over time, those promotions will produce a higher-caliber staff and management structure and make it easier to create and sustain a safe and orderly environment. But promotions and raises alone will not solve the problem. Even the best staff will succumb to stress and burnout without the right guidance and support from their managers and leaders.[40]

## Progress in Training and Education

In 1997, Human Rights Watch surveyed State corrections departments and the Federal Bureau of Prisons about steps they were taking to address the problem of prison rape. Only a few departments, including Arkansas, Illinois, Massachusetts, North Carolina, New Hampshire, and Virginia, responded that they trained corrections officers to recognize, prevent, and respond to sexual assault among incarcerated persons.[41] When the Urban Institute surveyed 45 State departments of corrections nearly a decade later in 2006, 36 departments reported offering training on sexual abuse for frontline staff.[42] Training initiatives also have reached law enforcement agencies that operate lockups and other short-term holding facilities. A training curriculum specifically for law enforcement and a guide to developing policy are now available online, and trainings have been provided on site to individual agencies and through national and State conferences.[43] According to Susan McCampbell, President of the Center for Innovative Public Policies, these training efforts are essential because "very few [law enforcement] agencies have heard of PREA. The potential impact of PREA on these facilities is different than for jails and prisons, due to the visibility and size of the [detention] function within the agency, the condition and flexibility of the physical plants, [and] the ability of agencies to screen and segregate arrestees," among other issues.[44]

The Commission recognizes the profession's investment to date in training staff. This is an area in which much has been done. The standards in this area are designed to ensure that no facility is left behind and that training programs everywhere meet certain basic criteria. The Commission believes most jurisdictions can meet these goals without burdensome or unrealistic financial investment. Today there are many resources that correctional agencies can turn to for help. For example, the Safe Prisons Program developed by the Texas Department of Criminal Justice and the Ten Point Plan created by the Ohio Department of Rehabilitation and Correction both feature comprehensive training programs for staff.[45] An appendix in each volume of the Commission's standards lists suggested topics and procedures for training line staff.

STANDARD

**Employee training**

The agency trains all employees to be able to fulfill their responsibilities under agency sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and relevant Federal, State, and local law. The agency trains all employees to communicate effectively and professionally with all inmates. Additionally, the agency trains all employees on an inmate's right to be free from sexual abuse, the right of inmates and employees to be free from retaliation for reporting sexual abuse, the dynamics of sexual abuse in confinement, and the common reactions of sexual abuse victims. Current employees are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all employees to ensure that they know the agency's most current sexual abuse policies and procedures. The agency maintains written documentation showing employee signatures verifying that employees understand the training they have received.

**Volunteer and contractor training**

The agency ensures that all volunteers and contractors who have contact with inmates have been trained on their responsibilities under the agency's sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and relevant Federal, State, and local law. The level and type of training provided to volunteers and contractors is based on the services they provide and level of contact they have with inmates, but all volunteers and contractors who have contact with inmates must be notified of the agency's zero-tolerance policy regarding sexual abuse. Volunteers must also be trained in how to report sexual abuse. The agency maintains written documentation showing volunteer and contractor signatures verifying that they understand the training they have received.

The Commission's standards in this area are based on evidence showing that effective training programs focus on prevention and intervention, include training in meeting the medical and mental health needs of victims, and are grounded in clear policies. They should be provided at the beginning of employment and be updated or expanded annually.[46] The main objectives of a training program on sexual abuse are to ensure that staff, volunteers, and contractors understand the facility's or agency's zero-tolerance policy and that no sexual abuse will be tolerated, are aware of the dynamics of sexual abuse in adult and juvenile correctional settings, possess the knowledge and skills necessary to prevent abuse from occurring, identify early warning signs that someone is at risk of being abused, and take the appropriate actions when they learn about an incident of sexual abuse. Role-play exercises and opportunities to rehearse or discuss responses to sexual abuse and misconduct can help to dispel discomfort and are good preparation for dealing with actual situations.[47] In addition, trainings must cover the responsibility of staff, volunteers, and contractors to report any signs of sexual abuse and the consequences for failing to do so.

The Commission requires that training also include how to communicate effectively and professionally with incarcerated persons, including those of different races, ethnicities, cultural and religious backgrounds, ages, genders, sexual orientations, and cognitive abilities.[48] Effective communication builds trust between prisoners and staff, which is essential to create an environment in which individuals feel comfortable seeking protection and reporting abuse. Drawing on what they learn, staff should consistently model the attitudes and behaviors they expect their peers as well as prisoners to display.[49]

To determine whether facilities are meeting mandatory requirements for training, administrators must maintain written documentation about the training provided, including signed verification by participants that they understand the information conveyed. This kind of documentation, and good training generally, will help facilities defend themselves when prisoners file lawsuits against them and may discourage litigation altogether.[50]

The corollary to staff training is conveying the same information about zero tolerance and related policies to all persons incarcerated in a facility. A strong educational program on sexual abuse sends the message that an agency will not tolerate sexual abuse by staff or prisoners and that preventing abuse and holding perpetrators accountable are top priorities. Trainings should include information on warning signs of sexual abuse and ways for prisoners to protect themselves.[51] Equipped with this

**A strong educational program on sexual abuse sends the message that an agency will not tolerate sexual abuse by staff or prisoners and that preventing abuse and holding perpetrators accountable are top priorities.**

information, incarcerated individuals are better able to protect themselves and others by seeking help when necessary and are more likely to report abuse when it does occur.

The Commission's standard requires correctional facilities to inform individuals during the intake process about their right to be protected from sexual abuse and how to report suspicions or incidents of abuse and, soon thereafter, to engage prisoners in a detailed, interactive educational session. Facilities have an obligation to convey information in formats accessible to all prisoners, including those who speak a language other than English; have limited English proficiency; are deaf, visually impaired, or otherwise disabled; or who have limited reading skills. Educational information must also reach individuals in solitary confinement and protective custody, and facilities are required to document in writing participation in educational sessions. As with staff training, periodic refresher courses are important and required. The Commission also believes that crucial information about sexual abuse, facility policies, and the rights of incarcerated persons should be widely available at all times through posters, handbooks, and other means.[52]

## Patrolling and Protecting

In his testimony before the Commission, San Francisco Sheriff Michael Hennessey talked about daily life in a correctional facility that relies on what's known in the profession as direct supervision. "[T]he deputy is right there amongst them and everybody is talking to him," Hennessey said.[53] "They're complaining about food. They're complaining about their clothing. They're complaining about their release date. And in the meantime they can also say, 'By the way, I think something is going down between this inmate and that inmate.'"

In a direct supervision facility, officers are stationed in living units and supervise incarcerated individuals by moving around and interacting with them and with other staff members.[54] Direct supervision allows officers to get to know individual prisoners. The officers' movements and locations are, by definition, fluid and somewhat random, thus preventing dead zones—locations and periods of time when prisoners know they will not be watched. Direct supervision enables officers to directly observe behavior and to intervene and prevent sexual abuse, and it also allows incarcerated individuals easy access to staff without attracting attention, making it easier to report sexual abuse.[55] This type of supervision provides an enhanced level of safety while also allowing incarcerated persons some privacy and movement. For these reasons, the Commission believes this is the most promising mode of supervision for preventing sexual abuse in correctional facilities and that agencies and facilities should use it whenever possible.

**STANDARD**

**Inmate education**

During the intake process, staff informs inmates of the agency's zero-tolerance policy regarding sexual abuse and how to report incidents or suspicions of sexual abuse. Within a reasonably brief period of time following the intake process, the agency provides comprehensive education to inmates regarding their right to be free from sexual abuse and to be free from retaliation for reporting abuse, the dynamics of sexual abuse in confinement, the common reactions of sexual abuse victims, and agency sexual abuse response policies and procedures. Current inmates are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all inmates to ensure that they know the agency's most current sexual abuse policies and procedures. The agency provides inmate education in formats accessible to all inmates, including those who are LEP, deaf, visually impaired, or otherwise disabled as well as inmates who have limited reading skills. The agency maintains written documentation of inmate participation in these education sessions.

**Accommodating inmates
with special needs**

The agency ensures that in-
mates who are limited English
proficient (LEP), deaf, or dis-
abled are able to report sexual
abuse to staff directly, through
interpretive technology, or
through non-inmate interpret-
ers. Accommodations are made
to convey all written information
about sexual abuse policies,
including how to report sexual
abuse, verbally to inmates who
have limited reading skills or
who are visually impaired.

**Inmate supervision**

Security staff provides the in-
mate supervision necessary
to protect inmates from sexual
abuse. The upper management
officials responsible for re-
viewing critical incidents must
examine areas in the facility
where sexual abuse has oc-
curred to assess whether physi-
cal barriers may have enabled
the abuse, the adequacy of
staffing levels in those areas
during different shifts, and the
need for monitoring technology
to supplement security staff
supervision (DC-1). When prob-
lems or needs are identified,
the agency takes corrective ac-
tion (DC-3).

In reality today, many jails and prisons rely on a different method of supervision, dictated by the structure of facilities built to confine people in rows of cells. An officer patrols these corridors or along catwalks at designated intervals in what is known as linear surveillance. Officers have only brief and intermittent views of prisoners and may have little or no opportunity for meaningful contact.[56] Such supervision structures empower dominant and predatory prisoners or groups and make preventing sexual abuse more dif-ficult. As Cynthia Malm, a former jail administrator from Madison County, Idaho, told the Commission, "In a linear jail, inmates often are in control of the housing units because the officer cannot see what is happening inside the unit at all times. The officer makes checks usually every 30 minutes, which leaves a lot of time for inmates to engage in illicit behavior."[57]

A third type, remote indirect supervision, has emerged as monitor-ing technologies and correctional architecture have evolved. Used primari-ly in high-security facilities, officers are stationed in secure control booths, from which they observe incarcerated individuals via video and other monitoring equipment and lock and unlock gates and doors remotely.[58] Officers have only sporadic direct contact with prisoners, and the physical barriers separating them from the individuals they are responsible for pro-tecting can compromise their ability to intervene and stop abuse.[59]

The Commission's standards require correctional facilities to pro-vide the supervision necessary to protect incarcerated persons from sexual abuse. The Commission believes it is possible to meet this standard in any facility, regardless of design. Installing cameras in a linear jail, for example, would enhance prevention and detection, if coupled with rou-tine, unscheduled patrols by officers. Technologies are not replacements for skilled and committed security officers, but they can greatly improve what good officers are able to accomplish.

Sexual abuse can occur almost anywhere in a facility, but it is the "hiding places or blind spots," according to Sheriff Hennessey, "where most of the mischief or illegal activity takes place."[60] Although his remark sounds obvious, Hennessey emphasizes the point because facilities can be rife with blind spots. They include areas that may not be routinely super-vised—the chapel, for example, or work areas such as the kitchen during off-hours. Showers tend to be a danger spot as well as empty hallways, closets, and stairwells. Any place out of an officer's line of sight or too dim to see clearly poses a risk. Corrections professionals believe that there is a particularly high risk for sexual assault by other incarcerated individuals when they are housed together in a cell or in crowded dormitories.[61]

Because eliminating blind spots is a key to effective supervision, the Commission's standard requires management to examine areas in the facility where sexual abuse has occurred to assess whether physical bar-riers, inadequate staffing, or lack of monitoring technology may have con-tributed to its occurrence and to undertake needed improvements.

## Adding Electronic Eyes and Ears

**M**onitoring blind spots before abuse occurs is an even better way to protect prisoners and avoid lawsuits. Michelle Tafoya was assigned to cooking and cleaning duties in the Huerfano County, Colorado, jail where she was detained.[62] The jail had installed surveillance cameras in areas where past sexual assaults had occurred, but not in the kitchen, because it had never been the site of a sexual assault. On two occasions in December 2001 when Tafoya was on kitchen duty alone, a male officer who knew her whereabouts sexually assaulted her. In deciding this case, the court noted that the facility "knew that blind spots remained even after the installation of the new cameras, and knew that having some cameras in the jail was not enough to deter assaults in [remaining] unmonitored areas."[63]

The Commission's standard in this area requires correctional facilities to make use of cost-effective and appropriate monitoring technologies to aid staff supervision by assessing, at least annually, the need for and feasibility of incorporating additional monitoring equipment or new technologies. Commander Donald Rodriguez of the Los Angeles County Sheriff's Department told the Commission that cameras, if well-placed, discourage prisoners and staff from engaging in abuse; increase the number of areas that staff can monitor at one time; and, when cameras capture misconduct or abuse on video, provide an objective record of what happened to support investigations.[64] Many facilities now use closed-circuit television video surveillance, in which video cameras transmit a signal to a limited set of monitors. Digital video recorders allow images to be stored directly on a computer hard drive in greatly compacted formats, permitting staff to quickly review footage. Cameras equipped with motion or vibration sensors that trigger recording or send an alert to a central control monitor provide an efficient way to monitor isolated or intermittently used areas, such as stairways, closets, chapels, and property storage rooms. Some facilities also use audio surveillance technologies.

Radio frequency identification (RFID) is another technology, albeit an expensive one, with the potential to reduce sexual assault in correctional environments. RFID tags are commonly used in security access cards, smart cards used in credit and debit transactions, and for tracking shipments. Corrections staff can use RFID to track the movements of prisoners and staff and plot them on a two-dimensional computer-generated grid, showing their locations at all times.[65]

> "[T]he deputy is right there amongst them and everybody is talking to him," Hennessey said. "They're complaining about food. They're complaining about their clothing. They're complaining about their release date. And in the meantime they can also say, 'By the way, I think something is going down between this inmate and that inmate.'"

STANDARD

**Assessment and use of monitoring technology**

The agency uses video monitoring systems and other cost-effective and appropriate technology to supplement its sexual abuse prevention, detection, and response efforts. The agency assesses, at least annually, the feasibility of and need for new or additional monitoring technology and develops a plan for securing such technology.

**Limits to cross-gender viewing and searches**

Except in the case of emergency, the facility prohibits cross-gender strip and visual body cavity searches. Except in the case of emergency or other extraordinary or unforeseen circumstances, the facility restricts nonmedical staff from viewing inmates of the opposite gender who are nude or performing bodily functions and similarly restricts cross-gender pat-down searches. Medical practitioners conduct examinations of transgender individuals to determine their genital status only in private settings and only when an individual's genital status is unknown.

RFID has already stirred interest among corrections officials. The California Department of Corrections and Rehabilitation tested an RFID system to track prisoners and found that it lowered rates of violence, illegal conduct, and property damage in its facilities (as well as detecting people going through the food line more than once).[66] The Commission recommends that NIC provide technical assistance to Federal, State, tribal, and local authorities who plan to introduce or enhance monitoring technology in their correctional facilities.

## Setting Limits on Cross-Gender Supervision

Clothed pat-down searches, strip searches, body cavity searches, and visually observing individuals while undressed are necessary security procedures. However, searches carried out by staff of the opposite gender heighten the potential for abuse. Ironically, rules that required officers to meet a daily quota of pat-down searches for weapons, drugs, or other contraband—five pat-downs per shift—facilitated some of the abuse that occurred in women's prisons across Michigan in the 1990s. A Detroit newspaper account reported that "[s]ome officers did it the proper way, quickly and with professionalism. But others exploited this directive, picking out the pretty women to search, the ones who were young and had long sentences."[67]

Former Michigan prisoner Toni Bunton, a plaintiff in the class action lawsuit, recalled one incident that took place in the prison's recreation yard. "Give me a shakedown," an officer commanded Bunton.[68] According to what she wrote in her prison journal, she lifted her arms, and the officer "rubbed his hands down her neck, across her back and around to her chest. He caressed her breasts. He rubbed her stomach. He squeezed her buttocks, rubbing up and down her thighs. His hand brushed against her pelvic bone, as he pulled himself closer to her. Another officer watched. 'That's the way you do it,' the second officer said."

State corrections officials claimed they had written policies prohibiting the abuse of authority in this context and did not realize some officers took advantage of the requirement to pat-down prisoners. Today, those requirements have changed in Michigan. Only women staff are permitted to search incarcerated women, except in cases of emergency.

In the Commission's view, the risks are present whether the officers are female or male.[69] Case law, policy, and common perceptions of sexual abuse in correctional facilities have focused on male officers abusing their authority with female prisoners.[70] Historically, few women worked in corrections, but this situation is changing rapidly. As Martin Horn told the Commission, "Forty percent of my officers are women. My last three recruit classes, approximately 50 percent of the new officers are women. In

the next 3 years, one-third of my workforce is eligible to retire. Three years from today more than 50 percent of the officers in New York City will be women supervising men. We're going to have to deal with this issue of cross-gender supervision."[71]

Some of the women who have joined corrections, like some of the men, are willing to cross the line to use their authority in sexually abusive ways. "[W]e have to be very careful and very attentive to our female staff who work with male inmates as well as our male staff who work with females," Richard Stalder, past president of the Association of State Correctional Administrators and the former Louisiana Corrections Secretary, told the Commission.[72]

The Commission understands that cross-gender supervision can have benefits for incarcerated persons and staff. Many experienced corrections professionals believe, for example, that women officers have a calming effect in male units. The Commission's standard on this issue is not intended to discourage the practice generally or to limit employment opportunities for men or women. To prevent abuse, however, the standard on this subject strictly prohibits nonmedical staff from conducting cross-gender strip and visual body cavity searches—except in the case of emergency—because of their extraordinarily intrusive nature. The standard also mandates that corrections administrators restrict nonmedical staff from conducting cross-gender pat-down searches and viewing prisoners of the opposite gender who are nude or performing bodily functions except in emergency situations or under other extraordinary or unforeseen circumstances.

**"Give me a shakedown," an officer commanded Bunton. According to what she wrote in her prison journal, she lifted her arms, and the officer "rubbed his hands down her neck, across her back and around to her chest. He caressed her breasts. He rubbed her stomach. He squeezed her buttocks, rubbing up and down her thighs. His hand brushed against her pelvic bone, as he pulled himself closer to her. Another officer watched. 'That's the way you do it,' the second officer said."**

Several courts have recognized that prolonged and direct viewing by male staff violates an incarcerated woman's right to privacy. In *Jordan v. Gardner,* women at the Washington Correction Center for Women, containing minimum- and medium-security units and a special needs center, challenged a cross-gender supervision policy based on the claim that it violated their Eighth Amendment right to be free from cruel and unusual punishment.[73] Prior to January 1989, the facility had a policy that allowed only women officers to search women prisoners. On July 5, 1989, a new warden—citing the need for an increase in the number of searches—ordered corrections officers of either gender to conduct searches. The court noted that the warden adopted this policy despite the fact that more than 85 percent of women in the facility had reported a history of past sexual abuse and

that facility staff warned the warden about the psychological impact cross-gender searches would have on these women. In light of these facts, the court found that the policy violated the Eighth Amendment because the warden was deliberately indifferent to the pain it would cause so many women in the facility.

In *Colman v. Vasquez*, the plaintiff had a documented history of sexual abuse and was placed in a Federal prison program for survivors of sexual abuse.[74] Despite her history, male officers forced her to endure multiple pat-down searches that sometimes included inappropriate touching and unwarranted sexual advances. The court found that the circumstances could violate the Fourth Amendment's prohibition against unreasonable searches and its more general guarantee of a right to some measure of bodily privacy.[75] States also may be liable for sexual abuse if facilities have a policy and practice of permitting male staff to view and supervise incarcerated women, especially in isolated or remote settings, without female staff present.[76]

Some courts have found that incarcerated men hold a right to privacy that protects them from certain conduct as well. In *Wilson v. City of Kalamazoo*, corrections staff forced newly booked men to strip and placed them in cells naked, without any covering.[77] Each man was monitored by video surveillance, at times by female corrections officers. In finding that these men had some right to privacy, the court noted that the "plaintiffs were denied any and all means of shielding their private body parts from viewing by others, at least by video surveillance, for at least six, and as many as 18, hours."[78] These decisions and others echo the Supreme Court's declaration in *Turner v. Safley* that "prison walls do not form a barrier separating prison inmates from the protections of the Constitution."[79]

## Bargaining with the Unions

**B**oth labor and management have a stake in reducing sexual abuse in correctional facilities. Collective bargaining agreements should feature an explicit commitment from unions and their members as well as management to support a zero-tolerance approach to sexual abuse. Without such a commitment, there is little common ground upon which to build when negotiating about policies, procedures, and training.

Cooperation between unions and management in many areas is essential if the Commission's standards are to be real and meaningful in practice. Management also should involve union representatives when a facility assesses and considers implementing new technologies, partly because staff members are more likely to embrace new technologies when

unions understand them and can articulate their benefits. For example, staff may be initially apprehensive about the introduction of surveillance technologies, such as cameras. Union representatives can explain that these technologies help protect staff from false allegations of sexual misconduct and make the work environment safer.

A particularly thorny issue in management–union relations, and one with significant repercussions in the area of sexual abuse, concerns management's authority to reassign or sanction staff. For example, in some States when a staff member bids on and wins a job, it becomes his or hers to keep. In this situation, union rules may prevent facility management from moving the staff member to another assignment against his or her will.[80]

The case of *Riley v. Olk-Long* illustrates how such bidding systems can make it difficult to ensure safety and hold abusers accountable.[81] In January 1995, two women at the Iowa Correctional Institution for Women reported that a male officer had sexually assaulted them. The facility conducted an investigation. Although it was deemed inconclusive, the officer received a 10-day suspension for threatening "'to get the snitch'" who reported his behavior.[82] In June 1995, a report circulated that the same officer had picked up a paroled prisoner at a bus stop en route to her work release program. He allegedly took her home,

> **"[T]he union was never against the principle of PREA," but it was "concerned about the process. . . . Working with the union is important to success in implementing PREA."**

had sex with her, and later drove her to her destination. His supervisor investigated the report but could not substantiate it because the former prisoner did not report the incident to her residential correctional facility or her parole officer. In October 1995, the officer accosted Pamela Riley. He asked if she was having sex with her roommate and if he could watch. Approximately 10 days later, he entered her room during a lockdown and attempted to reach under her nightshirt but left when she resisted. On another occasion, he rubbed against her from behind while grabbing her breasts. Riley was afraid to report the harassment and abuse for fear she would not be believed and would be disciplined. The officer remained in his post until someone actually witnessed him sexually abuse Riley when he went into her room during a routine head count of prisoners in November 1995. At that point, nearly a year after the initial reports, the officer was terminated. He was charged and pled guilty to sexual misconduct.

In responding to a civil suit against the facility, prison officials contended that the collective bargaining agreement with the union precluded them from either permanently assigning the officer to an area where he did not have direct contact with prisoners or assigning another employee to shadow him. They also argued that under the agreement, they believed

that they had insufficient cause to fire him. The court did not agree, however. The warden and the director of security were held personally liable and were required to pay monetary damages. An appellate court later upheld this decision, maintaining that the collective bargaining agreement did not change the fact that the facility was "responsible for providing a safe environment for inmates" and had failed to do so.[83]

Given challenges like these, it is crucial that labor and management reach agreements that allow reassignment of officers when safety is at issue. Wisconsin's Department of Corrections brought in union leadership in the beginning of its PREA initiative and engaged in early collaboration on policy and practice regarding sexual abuse.[84] Rick Raemisch, the Secretary of the Wisconsin Department of Corrections, said that "the union was never against the principle of PREA," but it was "concerned about the process. . . . Working with the union is important to success in implementing PREA."[85]

Administrators can also devise creative interim solutions to protect incarcerated persons, such as paid administrative leave and surprise observations by supervisors.[86] Technological monitoring may also be useful to deter or document abuse while an investigation is ongoing.

Collective bargaining agreements also should support disciplinary sanctions for perpetrators of sexual abuse. Such agreements protect both the facility and the union. Wayne Meyers, a staff representative for the American Federation of State, County, and Municipal Employees, told the Commission, "[A]s a union rep, we give them due process, but they're a safety and security issue to us. And if they are found guilty and did commit this, we're not interested in having them work with us either."[87]

> **"When we as leaders can connect your standards to the approaches that we are taking to foster the changes we seek, then the values of PREA will take root in our agencies. They will outlast the Commission and they will outlast us."**

Corrections staff may have appeal rights if they are terminated from their job. A National Academy of Public Administrators panel, formed at the Commission's request, found that unions have often negotiated to ensure a grievance procedure that offers resolution by arbitration, which may run counter to zero-tolerance responses to sexual abuse.[88] According to Joseph Gunn, former Executive Director of the California Corrections Independent Review Panel, the appeals process in California is flawed in just that way. A staff member who has been disciplined may appeal to a State Personnel Board and, "[i]n the majority of cases that are appealed to this board, they overturn management's recommendations for discipline, and all that does is weaken management's authority and also enhance the code of silence."[89] The Pennsylvania State Police's disciplinary process, which also applies to the Department of Corrections, provides a better model.

Serious acts of misconduct mandate dismissal, and management's decision is final when a serious infraction has occurred.

With strong leadership and clear policies, corrections administrators can foster a culture within every facility that promotes safety. The Commission intends for its standards to support these efforts. As veteran professional and director of the Rhode Island Department of Corrections, A.T. Wall said, "When we as leaders can connect your standards to the approaches that we are taking to foster the changes we seek, then the values of PREA will take root in our agencies. They will outlast the Commission and they will outlast us."[90]

FINDING

Certain individuals are more at risk of sexual abuse than others. Corrections administrators must routinely do more to identify those who are vulnerable and protect them in ways that do not leave them isolated and without access to rehabilitative programming.

3

# Unequal Risk:
# Vulnerability and Victimization

J ust weeks after entering Clemens Unit, a State prison in Brazoria County, Texas, Rodney Hulin began pleading with prison officials to protect him from other prisoners who were repeatedly beating and raping him and forcing him to perform oral sex. "I'm afraid to go to sleep, to shower or just about anything else. I am afraid that when I am doing these things, I might die at any time. Please, sir, help me."[1]

Rodney was 16 years old when he entered Clemens Unit in 1995 and small even for his age, weighing about 125 pounds and standing just 5′2″ tall. He had been convicted of second-degree arson with property damage totaling less than $500 as a result of setting a neighborhood dumpster on fire, and he had been sentenced to 8 years in adult prison.[2] Rodney's mother, Linda Bruntmyer, told the Commission the whole family was afraid that Rodney would be "targeted by older and tougher inmates."[3] Indeed, the first rape occurred almost immediately

> **"[W]e have many, many special needs populations in our jails and prisons. . . . [T]hey're going to need a different kind of attention than someone who is not fragile."**

and was confirmed by a medical examination that revealed tears in Rodney's rectum. Despite Rodney's pleas to be moved out of the general population, after receiving medical treatment he was returned to the same unit where he had been raped. Rodney continued to write urgent requests for a transfer; these requests were also denied. According to Bruntmyer, prison staff told her son that he did not meet "emergency criteria" and that he needed to "grow up."[4] Desperate, Rodney started breaking rules so that staff would place him temporarily in the prison's disciplinary segregation unit, where his attackers could not reach him.[5] Officials eventually moved Rodney to a segregated unit, but the transfer came too late. After only 75 days in the facility, Rodney committed suicide by hanging himself in his prison cell.[6]

Courts have clearly established that correctional facilities have a duty to protect incarcerated persons from harm and cannot display "deliberate indifference."[7] Rodney's tragic experience at Clemens Unit raises some hard questions: Why didn't Rodney's age, his obvious physical

vulnerability, and his palpable fear trigger a response that protected him from repeated rapes when he entered Clemens? How can corrections officials protect the Rodney Hulins under their care? As the past president of the Association of State Correctional Administrators and the former Louisiana Corrections Secretary Richard Stalder told the Commission, "[W]e have many, many special needs populations in our jails and prisons. . . . [T]hey're going to need a different kind of attention than someone who is not fragile."[8]

A limited amount of research points to factors that increase the risk of sexual abuse in confinement.[9] Most of this research has focused on the risks of being abused by other prisoners rather than by staff and on vulnerability factors for men and boys rather than women and girls. This chapter discusses those factors and also explores what corrections administrators can do to identify and protect vulnerable individuals.

### Young, Small, and Naive

"You can't show any fear, they pick up on that. You gotta show strength. . . . Never look down, like you're afraid to look 'em in the eye. . . . You gotta be a man all the time, and a man according to the standards in here."[10] As the comment above suggests, abusive prisoners notice and take advantage of any sign of fear, loneliness, or uncertainty. Younger, smaller individuals and those who are unfamiliar with prison culture—both male and female—are more vulnerable to abuse, partly because they feel overwhelmed and appear ill at ease.[11] Initial offers of friendship or protection may suddenly become manipulative or morph into demands for "payback."[12]

Chance Martin was 18 years old and still in high school when he was arrested for possession of hashish and detained in a county jail in Indiana in 1973. He told the Commission, "I must have looked as scared and dejected as I felt, because this guy came up and sat on the bunk next to me and said, 'Let's cheer you up and play some cards.' I couldn't even figure out what they were playing. . . but then they said, 'Okay. You lost. Pay up.'"[13] Payment turned out to be a brutal gang rape by at least six men.

**"You can't show any fear, they pick up on that. You gotta show strength. . . . Never look down, like you're afraid to look 'em in the eye. . . . You gotta be a man all the time, and a man according to the standards in here."**

Martin never reported the rape that happened on his first day in jail, but he told the Commission that he carries the scars of that experience with him every day.

Corrections officers also may target inexperienced or naive prisoners. Interviews with women residing in California prisons have indicated

that some male corrections officers seek out "younger female prisoners who are new to the prison system or unfamiliar with the prison environment" and those serving short sentences who "want to go home" and, therefore, are less likely to file complaints.[14] In another case, for example, the court found that female staff members at an alternative juvenile facility for those with learning disabilities and mental illness had sexually targeted younger male residents.[15]

## "Turned Out" or Traumatized

T.J. Parsell was raped for the first time in 1978 when he entered Riverside Correctional Facility in Ionia, Michigan. His experience illustrates how being known as a victim literally attracts predators. "I hoped no one would find out about it, but as I walked the yard in a daze, other inmates pointed and laughed," he told the Commission.[16] "Once an inmate has been turned out, he's considered a target wherever he goes." According to Robert Dumond, a researcher and clinician with expertise in prison sexual abuse, the culture inside men's correctional facilities makes it extremely difficult for prisoners to change such perceptions, even over time.[17] Unless facility managers and administrators take decisive steps to protect these individuals, they may end up being abused throughout their terms of incarceration.

Even if survivors are not branded as easy targets, the emotional scars of being previously sexually abused—either inside the facility or previously in the community—can create a vulnerability to future abuse. Sexual abuse prior to incarceration appears to be much more common among incarcerated women than men. Studies found that from 31 to 59 percent of incarcerated women reported being sexually abused as children, and 23 to 53 percent reported experiencing sexual abuse as adults.[18] The Bureau of Justice Statistics also found that incarcerated mentally ill prisoners were more than twice as likely to have a history of prior sexual abuse as the general incarcerated population.[19] Past victimization may contribute to feelings of helplessness in the face of danger and inhibit victims' ability to seek protection.[20] Effects of these prior experiences, coupled with social messages that threats and acts of victimization are inescapable parts of life, put them at increased risk of further exploitation.[21]

*Peddle v. Sawyer* documents how a male corrections officer in a Federal women's prison in Danbury, Connecticut, sexually assaulted a prisoner, Sharon Peddle, whose case file described a history of sexual abuse and vulnerability to being manipulated by men she viewed as authority figures.[22] The officer, who had been investigated several times for sexually abusing other prisoners, read Peddle's case file without authorization. He then sexually assaulted her regularly throughout 1995 and 1996 and

threatened to have her transferred to another facility, away from her family members, if she told anyone or refused to submit to him. Other officers were aware of the abuse, and some even helped to facilitate it. A fellow officer in the housing unit would call Peddle out of her cell and leave her with the abusive officer in an area where they would not be observed. Even after she was reassigned to a special mental health unit for victims of chronic abuse, the officer followed her. He arranged to be reassigned to the unit and "regularly woke Ms. Peddle and took her to the TV room or stairwell where he compelled her to submit to oral and vaginal sex."[23] After more than a year of raping Peddle, the officer was arrested and pled guilty to six counts of sexual abuse.

## Disabled and At Risk

Unlike being young or inexperienced, some risk factors may be longer-lasting. Physical and developmental disabilities and mental illnesses can significantly affect an individual's ability to function and remain safe in a correctional facility. Individuals with severe developmental disabilities are at especially high risk of being sexually abused. Their naivety, tendency to misinterpret social cues, and desire to fit in make many developmentally disabled individuals vulnerable to manipulation and control by others.[24] If they've previously lived in group homes or other institutions, they may have been conditioned to follow directions from others without regard to their best interests or safety and may have a history of mistreatment and abuse by the time they enter a correctional facility.[25]

Past traumatic experiences condition some developmentally disabled men and women to expect abuse and view submission as a requirement for survival. Prisoners in Kuskokwim Correctional Center in Bethel, Alaska, brutally assaulted a developmentally disabled inmate in his 40s and a much younger man. According to Sean Brown, the attorney who represented the men and who prevailed in a civil lawsuit against the department of corrections, "One of the [victims] had his eyebrows ripped off, was kicked and hit, and was sexually assaulted with a toilet plunger"—abuses that occurred not over the course of minutes or hours, but over 3 days.[26]

For men, women, and juveniles coping with serious mental illness, both the disease itself and the treatment can render them extremely vulnerable.[27] Symptoms ranging from hallucinations and paranoia to anxiety and depression may make it difficult to build the kind of supportive social networks that could protect

**"One of the [victims] had his eyebrows ripped off, was kicked and hit, and was sexually assaulted with a toilet plunger"—abuses that occurred not over the course of minutes or hours, but over 3 days.**

prisoners from sexual abuse.[28] Psychotropic medications often have side effects, such as sleepiness, slowed reactions, uncontrolled movements, and withdrawal, that increase a person's vulnerability as well.[29] Moreover, medications are often dispensed in open areas of the facility during peak traffic periods, such as around meal times, effectively "outing" people with a mental illness.

Dumond told the Commission that "[j]ails and prisons in the United States have become the de facto psychiatric facilities of the 21st century," housing more mentally ill individuals than public and private psychological facilities combined.[30] The data back up this assertion: a survey of prisoners in 2006 suggests that more than half of all individuals incarcerated in State prisons suffer from some form of mental health problem and that the rate in local jails is even higher.[31]

## Gender Rules

Research on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations (gay, lesbian, or bisexual) as well as individuals whose sex at birth and current gender identity do not correspond (transgender or intersex).[32] Scott Long, Director of the Lesbian, Gay, Bisexual, and Transgender Rights Program at Human Rights Watch, told the Commission, "[E]very day, the lives and the physical integrity of lesbian, gay, bisexual, and transgender people are at stake within our prison systems."[33] The discrimination, hostility, and violence members of these groups often face in American society are amplified in correctional environments and may be expressed by staff as well as other incarcerated persons.[34]

Men's correctional facilities tend to have very rigid cultures that reward extreme masculinity and aggression and perpetuate negative stereotypes about men who act or appear different.[35] In this environment, gay, bisexual, and gender-nonconforming individuals are often the targets of sexual abuse precisely because the dominant "straight" males expect and demand submission.[36] Criminal justice research indicates that some officials "erroneously assume that inmates who are homosexual or presumed to be homosexual are consenting to the sexual act," which may cause them to ignore those incidents.[37]

Male-to-female transgender individuals are at special risk. Dean Spade, founder of the Sylvia Rivera Law Project, testified before the Commission that one of his transgender clients was deliberately placed in a cell with a convicted sex offender to be raped.[38] The assaults continued for more than 24 hours, and her injuries were so severe that she had to be hospitalized. Legal cases confirm the targeting of transgender individuals.

In 2008, a male officer at the Correctional Treatment Facility in the District of Columbia was convicted of sexually assaulting a transgender individual in the restroom by forcing her to perform fellatio on him.[39]

Like the individual just discussed, most male-to-female transgender individuals who are incarcerated are placed in men's prisons, even if they have undergone surgery or hormone therapies to develop overtly feminine traits.[40] Their obvious gender nonconformity puts them at extremely high risk for abuse.[41] Cecilia Chung, a transgender woman, testified before the Commission about her experience of being placed in the "gay pod" at the San Francisco jail in 1993. "Unfortunately, the gay pod contained all kinds of inmates, and that includes sexual predators. . . . One of the inmates sexually propositioned me, and it caught me off guard. I was too intimidated to deny him. I did not know what would happen to me if I said no. . . . I had sex out of fear."[42] In determining whether to house transgender individuals in men's or women's facilities, the Commission requires individualized determinations based on other factors in addition to the person's current genital status.

> **"[E]very day, the lives and the physical integrity of lesbian, gay, bisexual, and transgender people are at stake within our prison systems."**

Lesbian and bisexual women also are targeted in women's correctional settings. One study reported that a quarter of the women sexually abused in several Midwestern correctional facilities were either lesbian or bisexual—a higher proportion than their representation in the correctional population.[43] The majority of the abuse of lesbian women was perpetuated by male corrections officers. One woman from an Illinois prison told Human Rights Watch that some male corrections officers regarded her sexual orientation as a challenge and recalled one officer saying, "You need a good man," before he sexually assaulted her.[44]

## Screening and Classification of Prisoners

When Glen Goord, former Commissioner of the New York State Department of Correctional Services, testified before the Commission, he talked about classification as an integral part of prevention. "[P]lacing resources and emphasis on classification allows us to address a potential problem even before it starts."[45]

In the most basic terms, classification is the process of assessing and sorting prisoners to promote safety and security within facilities and meet the needs of individual prisoners. Over the decades, classification has evolved from little more than ad hoc decisions to an increasingly objective, evidence-based process—the "principal management tool for

allocating scarce prison resources efficiently and minimizing the potential for violence. . . ."[46]

Classification needs to be objective and free of individual biases. According to James Austin, the former Executive Vice President of the National Council on Crime and Delinquency, "Without an objective classification system, it is impossible to determine which inmates should be separated from one another, how staff should be deployed, how best to control crowding, how to avoid unnecessary litigation, and how to plan the next generation of correctional facilities. Without classification, a correctional facility can never be truly secure."[47]

There are two forms of classification: external and internal. External classification determines which security level and facility within the system is most appropriate, based on the person's crime or the charges against them; their criminal history and any escape attempts; and other significant factors, including age and gang affiliation.[48] Internal classification occurs when someone enters a facility and focuses primarily on how that person should be housed and the programming and resources required based on his or her past conduct, vulnerabilities, and special needs, such as mental or physical health care.[49] Some facilities, particularly jails and jurisdictions with limited security levels or capacity, conduct these screenings concurrently; the availability of bed space often significantly affects screening decisions.

Whatever the process, careful screening for risk of sexual abuse as a victim or perpetrator must occur during both external and internal classifications to protect vulnerable prisoners.[50] Without this process, vulnerable individuals may be forced to live in close proximity or even in the same cell with sexual assailants. Screening is a critical part of the classification process when trying to prevent sexual abuse by other incarcerated individuals. Unfortunately, there is not yet research on how to screen individuals to protect them from abuse by staff.

Because many characteristics that make individuals susceptible to abuse may not be immediately apparent, careful screening is important to identify special needs and vulnerabilities.[51] In the past, screening focused primarily on spotting predatory prisoners, based primarily on their past offenses.[52] However, there is almost no research on risk factors for perpetration of sexual abuse while incarcerated, thus making it challenging to identify potential abusers.[53] Fairly consistent evidence, however, identifies characteristics that increase a prisoner's risk of sexual victimization. Evidence-based, objective screening instruments designed to identify these risk factors are vital tools to protect vulnerable individuals from abuse by other prisoners.[54] Use of information gained from effective screening enables corrections staff to plan for safety and needed resources. Standardizing the process also reduces the chance that a staff member's personal views or lack of expertise will bias assessments.

## STANDARD

### Screening for risk of victimization and abusiveness

All inmates are screened during intake, during the initial classification process, and at all subsequent classification reviews to assess their risk of being sexually abused by other inmates or sexually abusive toward other inmates. Employees must conduct this screening using a written screening instrument tailored to the gender of the population being screened. Although additional factors may be considered, particularly to account for emerging research and the agency's own data analysis, screening instruments must contain the criteria described below. All screening instruments must be made available to the public upon request.

- At a minimum, employees use the following criteria to screen male inmates for risk of victimization: mental or physical disability, young age, slight build, first incarceration in prison or jail, nonviolent history, prior convictions for sex offenses against an adult or child, sexual orientation of gay or bisexual, gender nonconformance (e.g., transgender or intersex identity), prior sexual victimization, and the inmate's own perception of vulnerability.

- At a minimum, employees use the following criteria to screen male inmates for risk of being sexually abusive: prior acts of sexual abuse and prior convictions for violent offenses.

- At a minimum, employees use the following criteria to screen female inmates for risk of sexual victimization: prior sexual victimization and the inmate's own perception of vulnerability.

- At a minimum, employees use the following criteria to screen female inmates for risk of being sexually abusive: prior acts of sexual abuse.

**Medical and mental health screenings—history of sexual abuse**

Qualified medical or mental health practitioners ask inmates about prior sexual victimization and abusiveness during medical and mental health reception and intake screenings. If an inmate discloses prior sexual victimization or abusiveness, whether it occurred in an institutional setting or in the community, during a medical or mental health reception or intake screening, the practitioner provides the appropriate referral for treatment, based on his or her professional judgment. Any information related to sexual victimization or abusiveness that occurred in an institutional setting must be strictly limited to medical and mental health practitioners and other staff, as required by agency policy and Federal, State, or local law, to inform treatment plans and security and management decisions, including housing, bed, work, education, and program assignments. Medical and mental health practitioners must obtain informed consent from inmates before reporting information about prior sexual victimization that did not occur in an institutional setting, unless the inmate is under the age of 18.

Facilities are required to use a written instrument to guide the screening process. The first of the Commission's standards on the subject specifies areas of inquiry that every instrument must cover when screening men and, separately, women. As National Institute of Corrections (NIC) Director Morris Thigpen testified, to be effective, screening "systems need to be responsive to gender differences."[55] The screening process also must solicit incarcerated persons' views about their own vulnerability. A NIC study supports this aspect of the standard, finding their perspectives to be essential.[56] In addition to looking for markers of vulnerability, the standard requires screening for signs that a prisoner may abuse others. Although there is much less research on perpetration than victimization, facilities must at least screen men for prior acts of sexual abuse and convictions for violent offenses and women for prior acts of sexual abuse.

Some correctional agencies, including the Federal Bureau of Prisons and the California Department of Corrections and Rehabilitation, now use written instruments to screen all incoming prisoners specifically for risk of sexual assault. Evidence-based screening should become routine nationwide, replacing the subjective assessments that many facilities still rely on and filling a vacuum for facilities that do not conduct targeted risk assessments.[57] The Commission intends for its standards in this area to accelerate progress toward this goal by setting baseline requirements for when and how to screen prisoners for risk of being a victim or perpetrator of sexual assault and how to use the results of these screenings.

Correctional health care practitioners have an important role to play in the screening process as well. Most correctional facilities conduct brief medical and mental health assessments during intake and more comprehensive evaluations a week or two later.[58] According to the Commission's standard on this aspect of screening, staff must inquire about any past experience as a victim or perpetrator of sexual abuse. Staff also must clearly inform prisoners that they are not required to answer such questions and should explain that any information they do provide will be given to other staff on a need-to-know basis as governed by law or agency policy. If a prisoner discloses information about sexual victimization that occurred in the community, the standard requires correctional health practitioners to obtain informed consent from the prisoner—unless the person is under the age of 18—before sharing any information about that victimization with facility staff responsible for making housing, program, education, and work placements. The standards also require that all screeners receive training in

> **Over the decades, classification has evolved from little more than ad hoc decisions to an increasingly objective, evidence-based process—the "principal management tool for allocating scarce prison resources efficiently and minimizing the potential for violence. . . ."**

how to inquire about sensitive personal information, ranging from disabilities to sexual orientation.[59]

Screening an individual only at intake is not sufficient. Even the most skilled interviewers may fail to elicit complete answers during the initial screening. Additionally, some risk factors, such as mental illness; fear of being assaulted; and a propensity to manipulate, control, or abuse others, may develop or become apparent only after a person has spent some time confined in a facility.[60] For these reasons, the Commission mandates regular review of sexual abuse risk assessments: recommending reviews within 6 months of the initial screening and every year thereafter in prisons, and within 60 days of the initial screening and every 90 days thereafter in jails.

The research underlying risk assessment continues to evolve even as this report goes to press, and requirements outlined in the standards are only a starting point. The Commission urges corrections administrators to craft and refine their screening instruments to reflect the latest research. Tailoring screening instruments to reflect the demographic and site-specific culture of the facilities these administrators operate as well as what they learn about the characteristics of victims and perpetrators through regular review of their own incident data will enhance the instruments' effectiveness. NIC advises correctional agencies to review their screening protocols and classification systems annually and conduct a formal evaluation every 3 years.[61]

## Using Screening to Enhance Safety

**T**o be effective, the results of these screenings must then drive decisions about housing and programming. When Kenneth Young was sentenced to 5 years in prison for a counterfeit deal amounting to $42 in 1988, he described himself as "small, young, white, and effeminate."[62] After a few months in a lower-security facility, Young was placed in a two-person cell in a high-security Federal prison in Lewisburg, Pennsylvania, among prisoners convicted of serious crimes. Young's first cellmate continuously threatened him with sexual abuse. After repeated requests, Young was moved, only to face immediate assaults and threats from his new cellmate. This new cellmate eventually attached a razor blade to a toothbrush and, holding it to Young's throat, forced him to perform a sexual act. Young wrote letters to prison officials detailing this attack and others to no avail. Finally, he became so desperate for help that he flooded his cell to attract officers' attention. As punishment, Young was placed in a "dry cell" with no access to running water, a toilet, or a shower for 96 hours.

In ruling in Young's favor in *Young v. Quinlan,* the court stated, "It would be an abomination of the Constitution to force a prisoner to live

**Use of screening information**

Employees use information from the risk screening (SC-1) to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive. The facility makes individualized determinations about how to ensure the safety of each inmate. Lesbian, gay, bisexual, transgender, or other gender-nonconforming inmates are not placed in particular facilities, units, or wings solely on the basis of their sexual orientation, genital status, or gender identity. Inmates at high risk for sexual victimization may be placed in segregated housing only as a last resort and then only until an alternative means of separation from likely abusers can be arranged. To the extent possible, risk of sexual victimization should not limit access to programs, education, and work opportunities.

in his own excrement for four days. . ." and noted that prison officials subjected Young to "dehumanizing conditions" while ignoring his urgent pleas for help.[63]

Courts have commented specifically on the obligation of correctional agencies to gather and use screening information to protect prisoners from abuse. While awaiting trial in a State prison in Puerto Rico in 1999, Jesús Manuel Calderón-Ortiz was detained in a housing unit with violent prisoners.[64] The lone officer on duty, stationed in an enclosed control area at the entrance of the unit, could not see into the cells, and made no patrols that day. No one intervened when four prisoners from Calderón-Ortiz's unit entered his cell, threw a blanket over his face, and threatened to kill him. They then gang-raped him for more than half an hour, leaving him unable to move because of his injuries.

In deciding in his favor, the First Circuit concurred with allegations that "'housing inmates without adequate regard to their custody and security needs and/or adequate classification is "unreasonably dangerous". . .'" and stated that "'at a constitutional minimum [correctional facilities] must adopt some system of classifying and housing prisoners to assure [sic] that a prisoner's propensity for violence as well as an inmate's emotional and physical health be accounted for so as to minimize the risk of harm from fellow inmates to which the prisoners are now exposed.'"[65]

> **No one intervened when four prisoners from Calderón-Ortiz' unit entered his cell, threw a blanket over his face, and threatened to kill him. They then gang-raped him for more than half an hour, leaving him unable to move because of his injuries.**

## Protection Not Segregation

The Commission's second standard on screening requires correctional agencies and facilities to use the information gathered to separate vulnerable individuals from likely abusers in housing, employment, education, and other programming.

When Alexis Giraldo was sentenced to serve time in the California correctional system, her male-to-female transgender identity and appearance as a woman triggered a recommendation to place her in a facility with higher concentrations of transgender prisoners, where she might be safer.[66] Officials ignored this recommendation and sent her to Folsom Prison in 2006.

At Folsom, a male prisoner employed as a lieutenant's clerk requested Giraldo as his cellmate; the facility granted this request. He then "'sexually harassed, assaulted, raped, and threatened' [her] on a daily basis."[67] Soon thereafter, the cellmate introduced Giraldo to another prisoner, who subsequently requested Giraldo as his cellmate. That request was also granted. Giraldo's new cellmate also raped and beat her daily. It was only

after her cellmate attacked her with a box cutter and raped her that officials moved Giraldo to a more protected environment. In ruling on this case, an appellate court in California found that "the relationship between them is protective by nature, such that the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others. This. . . is the epitome of a special relationship, imposing a duty of care on a jailer owed to a prisoner."[68]

Even when corrections administrators intend to fulfill their "duty of care," they sometimes intervene too late. Kendell Spruce said he was "scared to death" when he entered an Arkansas State prison in 1991 at the age of 28.[69] Within 2 weeks, he was raped at knifepoint. Afterward, officials placed him in protective custody, but he was not safe there either. The unit also housed known sexual offenders, who often become the targets of abuse in prison. "I was put in a [double] cell with a rapist who had full-blown AIDS. Within 2 days he forced me to give. . . him oral sex and anally raped me. I yelled for guards, but it was so loud in there, no one came to help me."[70] Spruce began to break prison rules, believing that the punishment—administrative segregation, which involved being locked day and night in a cell alone—was the only thing that would save him.

Kendell Spruce's experience reveals failures in screening and classification, day-to-day management of bed space, and supervision that are not unusual. Corrections staff may rely on segregation units to protect vulnerable prisoners from sexual abuse, and some victims experiencing severe assaults may seek transfer to segregation to escape their attackers. These placements are intended to be temporary but, in practice, can last for months.[71]

Relying on segregation in any form to protect vulnerable prisoners from sexual abuse presents several serious problems. These units typically cannot accommodate everyone needing protection.[72] Additionally, the living conditions in protective custody may be as restrictive as those imposed to punish prisoners. In a typical protective custody unit, individuals are placed in maximum-security cells.[73] Privileges are greatly reduced, with as little as an hour a day outside the cell for exercise, extremely limited contact with other prisoners, and reduced or no access to educational or recreational programs.[74]

Professor Vincent M. Nathan, a consultant to the U.S. Department of Justice in several investigations conducted under the authority of the Civil Rights of Institutionalized Persons Act, contends that all types of segregation "carry with them a level of control that is punitive in effect if not in intent," and noted that any programming available is likely to be presented via closed circuit television.[75] Serving time under these conditions is exceptionally difficult and takes a toll on mental health, particularly if the victim has a prior history of mental illness.[76] Studies confirm that psychological distress increases along with the degree of restrictions in segregation.[77]

The Commission's standards allow facilities to segregate victims or potential victims of sexual abuse only as a last resort. The standard permits facilities to place individuals in protective custody, especially if they request it, but only on a short-term basis. When an individual is vulnerable to sexual abuse and feels threatened, providing protective custody while other remedies are arranged may be the only way to prevent an attack.[78] While aiming to keep these placements short-term, facilities must also provide programming, employment, and education to every extent possible: the Seventh Circuit has applied the principle of equal protection in this area.[79] Moreover, research suggests that academic and vocational programs are associated with lower recidivism and better employment opportunities after release.[80]

When prisoners at high risk of victimization cannot be safely housed anywhere other than in segregation, the Commission suggests that facilities consider a transfer to another facility. The Commission discourages the creation of specialized units for vulnerable groups, and the standard specifically prohibits housing assignments based solely on a person's sexual orientation, gender identity, or genital status because this practice can lead to labeling that is both demoralizing and dangerous.[81] Many corrections administrators agree. San Francisco Sheriff Michael Hennessey told the Commission that his city's jails no longer have so-called gay units.[82]

## The Risks of Crowding

In *Taylor v. Michigan Department of Corrections,* the court described Timothy Taylor as "five foot tall, 120 pounds. . . mildly mentally retarded with an IQ of 66, . . . youthful looking features, and [suffering from] a seizure disorder."[83] The court also noted that Taylor had a history of suicidal behavior. Despite assessments within the facility that Taylor "belonged to a class of prisoners likely to be a target of sexual pressure in prison and that he could easily be in danger if placed in the general prison population," he was transferred to a prison dormitory to save bed space for new arrivals.[84] Soon after moving into the dormitory in September 1985, another prisoner sexually assaulted Taylor.

Crowding is both a risk factor—environmental rather than personal—and a real barrier to carving out safe spaces for vulnerable prisoners. In 2007, 19 States and the Federal system were operating at more than 100 percent of their highest capacity.[85] An equal number of States operated at somewhere between 90 and 99 percent of

**As a facility's population expands, prisoners also have fewer or no opportunities to participate in education and job training. Idleness and the stress of living in crowded conditions lead to conflict.**

capacity. One study found that facilities designed for 1,800 women held almost 4,000, and cells designed for four women held eight.[86]

Forced to accommodate a larger prisoner population than most facilities were designed to house, administrators have taken drastic measures.[87] Cells designed for one person now hold two, with double-celling now the norm in many facilities, significantly increasing the opportunities for sexual abuse.[88] Many corrections administrators make use of any unoccupied space as housing.[89] Facilities convert day rooms, cafeterias, classrooms, storage areas, and basements into makeshift dormitories, with intrinsic risk for abuse and supervision challenges.[90]

Larger prison and jail populations, combined with staff shortages, typically mean that officers have more people to supervise, making it harder for officers to prevent abuse.[91] An Oregon corrections officer described a dorm in his facility with 88 prisoners and only one officer "working the floor."[92] As a facility's population expands, prisoners also have fewer or no opportunities to participate in education and job training. Idleness and the stress of living in crowded conditions lead to conflict.[93] Employment, education, and other programming prepare incarcerated individuals to become law-abiding members of communities instead of individuals so damaged by abuse they have little hope of success after release.[94] Meaningful activities will not end sexual abuse, but they are part of the solution.

It is critical that lawmakers tackle the problem of overcrowding head on. As Timothy Taylor's experience illustrates, vulnerable individuals become even more vulnerable under these conditions. If facilities and entire systems are forced to operate beyond capacity and supervision is a pale shadow of what it must be, our best efforts to identify vulnerable individuals through objective screening and to protect them from sexual assault by acting on those assessments will fall far short of the goal PREA is designed to reach.



FINDING

Few correctional facilities are subject to the kind of rigorous internal monitoring and external oversight that would reveal why abuse occurs and how to prevent it. Dramatic reductions in sexual abuse depend on both.

4

# Inside and Out: Strengthening Oversight

**B**eginning in fall 2003, the Texas Youth Commission (TYC), the agency responsible for the care and custody to all youth committed to Texas juvenile facilities, began receiving reports of sexual misconduct at the West Texas State School.[1] Concerned school staff reported that the assistant superintendent and the school principal called boys out of their dorm rooms during the night to spend time alone with them.[2] TYC administrators in Austin did not respond to those reports for nearly a year. Finally, in late 2004, a high-ranking TYC director who knew one of the suspected administrators was sent to the school to investigate. Despite the fact that the school's security log showed that boys were indeed being called out of their rooms to be with the assistant superintendent after hours and that he had unauthorized access to the student grievance box, the TYC official declared the allegations of sexual abuse to be unfounded and urged one of the staff members who had reported abuse to be more supportive of the administration.[3]

A few months later, in February 2005, two boys approached a volunteer math tutor and told him something "icky" was going on.[4] One boy confided that the assistant superintendent was sexually abusing him and claimed he could name five other boys who were similarly victimized. Later that week, the tutor witnessed the same man escorting students to a conference room near his office after hours. The tutor immediately informed the state police agency, the Texas Rangers, who conducted a thorough investigation and uncovered long-standing sexual abuse by the assistant superintendent and the school principal.

**Both men were allowed to resign quietly; the principal subsequently became principal of a charter school in another part of Texas. The school's superintendent was briefly suspended but later promoted. The high-ranking TYC director who failed to uncover any abuse received no sanctions.**

A subsequent internal investigation by the TYC's Inspector General confirmed the Rangers' findings—noting that the assistant superintendent and school principal had taken boys into darkened broom closets and out on the grounds in golf carts at night and sexually molested them. The internal investigation also alluded to a pervasive culture of secrecy,

STANDARD

**Sexual abuse incident reviews**

The facility treats all instances of sexual abuse as critical incidents to be examined by a team of upper management officials, with input from line supervisors, investigators, and medical/mental health practitioners. The review team evaluates each incident of sexual abuse to identify any policy, training, or other issues related to the incident that indicate a need to change policy or practice to better prevent, detect, and/or respond to incidents of sexual abuse. The review team also considers whether incidents were motivated by racial or other group dynamics at the facility. When incidents are determined to be motivated by racial or other group dynamics, upper management officials immediately notify the agency head and begin taking steps to rectify those underlying problems. The sexual abuse incident review takes place at the conclusion of every sexual abuse investigation, unless the allegation was determined to be unfounded. The review team prepares a report of its findings and recommendations for improvement and submits it to the facility head.

suppression of reporting, and retaliation.[5] Corrections staff had threatened victims with lengthened sentences and lack of services after release if they reported the abuse; boys who dared to complain were punished. The report noted that the superintendent had received multiple reports of wrongdoing by the assistant superintendent but failed to respond properly or report the allegations to more senior administrators in Austin. Both men were allowed to resign quietly; the principal subsequently became principal of a charter school in another part of Texas. The school's superintendent was briefly suspended but later promoted. The high-ranking TYC director who failed to uncover any abuse received no sanctions.[6] Until 2007, a story of extensive sexual victimization, deliberate indifference, and massive cover-up seemed to just fade away in the vast landscape of West Texas.

Indeed, what stands out most in the story up to this point is the complete lack of accountability. The only people watching out for the children were the staff, yet when they diligently reported the incidents, their reports were ignored. At the time, the systems and mechanisms were not in place that would have made it impossible for TYC officials to look the other way. This chapter describes such systems and mechanisms: ones corrections administrators create and manage internally to monitor themselves, and others that are intentionally beyond their direct control but that have significant impact on reducing sexual abuse in correctional facilities.

## Incident Reviews: Micro to Macro

Incidents of sexual abuse are as dangerous to a facility's overall safety as nonsexual assaults. They constitute a breach of security that demands a full inquiry into what factors allowed sexual abuse to occur. The Commission's standards establish two levels of review: at the incident level following any occurrence of abuse and at the facility or agency level at regularly planned intervals.

The most effective prevention efforts are targeted interventions that reflect where, when, and under what conditions sexual abuse occurs as well as how staff respond. That knowledge can be gained through routine incident reviews following every report of sexual abuse. These reviews reveal patterns, such as vulnerable locations, times of highest risk, and other conditions. Although investigations to substantiate allegations and collect the evidence necessary to support sanctions or criminal prosecution offer many insights, they are not enough. Systematic incident reviews generate information administrators need to make efficient use of limited resources, deploy staff wisely, safely manage high-risk areas, and develop more effective policies and procedures.[7] A number of State departments of corrections already conduct some type of review of sexual abuse incidents, including departments in Alabama, Arizona, Colorado, North Carolina, Pennsylvania, and Utah.[8]

**84**

The Commission's standard on this subject requires correctional facilities to treat every report of sexual abuse as a critical incident to be examined by a team of upper management officials, with input from line supervisors, investigators, and medical and mental health practitioners. The sexual abuse incident review takes place at the conclusion of every sexual abuse investigation, unless the allegation was determined to be unfounded. By reviewing all facts and circumstances surrounding an incident and the quality of the facility's response, officials can spot problems and take steps to remedy them.

A critical incident review may reveal, for example, dangerous, unmonitored areas of a facility, housing assignments that put vulnerable individuals at risk of sexual abuse, officers who are not complying with facility regulations, divisive racial dynamics motivating sexual abuse, or slow responses by frontline staff. A review will also reveal what is working well: This might include reporting mechanisms, screening for risk of victimization, collection of forensic evidence, or cooperation between investigators and mental health staff. A clear protocol should guide the review so that staff conduct each one in the same way. The Commission's standard requires the review team to prepare a report for the facility head that summarizes the review's findings and recommendations.

As Doug Dretke, former Director of the Texas Department of Criminal Justice, told the Commission: "Internal accountability begins with knowing what is actually occurring within a prison facility."[9] The Commission's standards require correctional agencies to collect uniform data on every reported incident of sexual abuse from sources that must include investigation files and incident reviews and to aggregate those data at least annually.[10] Agencies must collect information from each facility or program with which an agency contracts. At a minimum, facilities must collect the data necessary to answer all questions on the most recent version of the Bureau of Justice Statistics' Survey on Sexual Violence. The Commission encourages administrators to collect any additional data that would help them understand and address the problem of sexual abuse in their systems.

Aggregate data are especially useful in documenting patterns and trends and in measuring performance within facilities and throughout entire correctional systems. The Commission urges standardization of the questions across jurisdictions so that information can be compared. Uniform data collection puts an end to each department (or correctional facility) creating its own reports and analysis with different rules for

**STANDARD**

**Data collection**

The agency collects accurate, uniform data for every reported incident of sexual abuse using a standardized instrument and set of definitions. The agency aggregates the incident-based sexual abuse data at least annually. The incident-based data collected includes, at a minimum, the data necessary to answer all questions from the most recent version of the BJS Survey on Sexual Violence. Data are obtained from multiple sources, including reports, investigation files, and sexual abuse incident reviews. The agency also obtains incident-based and aggregated data from every facility with which it contracts for the confinement of its inmates.

**A critical incident review may reveal, for example, dangerous, unmonitored areas of a facility, housing assignments that put vulnerable individuals at risk of sexual abuse, officers who are not complying with facility regulations, divisive racial dynamics motivating sexual abuse, or slow responses by frontline staff.**

STANDARD

**Data storage, publication, and destruction**

The agency ensures that the collected sexual abuse data are properly stored, securely retained, and protected. The agency makes all aggregated sexual abuse data, from facilities under its direct control and those with which it contracts, readily available to the public at least annually through its Web site or, if it does not have one, through other means. Before making aggregated sexual abuse data publicly available, the agency removes all personal identifiers from the data. The agency maintains sexual abuse data for at least 10 years after the date of its initial collection unless Federal, State, or local law allows for the disposal of official information in less than 10 years.

interpretation; instead, information can be compared across systems and over time.[11] Former Secretary of the North Carolina Department of Correction Theodis Beck told the Commission about the benefits of collecting and tracking data statewide: "Data related to inmate-on-inmate assaults and inappropriate relationships between staff and inmates are maintained electronically in the Department's offender population unified system. . . . The database tracks information regarding perpetrators of sexual violence, victims of sexual violence, and inmates involved in inappropriate relationships with employees. Th[ese] data [are] readily accessible for analysis and help. . . correctional staff to make appropriate housing assignments and provide proper supervision of these inmates."[12]

Correctional agencies must report these data to the proper officials and make aggregate sexual abuse data available to the public to review at least annually through their Web sites or, if an agency does not have a Web site, through other means. The objective is transparency that meets the public's right to be accurately informed about the functioning of a crucial government institution and that also protects corrections administrators and all staff from false impressions or accusations about sexual abuse in the facilities they operate.[13]

Because sexual abuse databases will include names and sensitive personal information, security is required to safeguard the privacy of individuals involved in sexual abuse incidents and guarantee the integrity of the data. Suggested security restrictions include limiting the number of persons who have access to the data and storing the data in an encrypted form in a secure location. Before publishing aggregate data or releasing them to anyone outside of the agency, all personal identifiers must be removed so that individual prisoners cannot be identified. The Commission's standard requires agencies to retain their sexual abuse data for at least 10 years unless State law mandates earlier disposal.

The data that correctional agencies collect, aggregate, and review form the basis for taking action to reduce sexual abuse. According to the Commission's standard, each facility must formulate corrective action plans based on what the data reveal about trends, patterns, and persistent problems. Beck put it this way: "We can't make a dent in this problem if we don't have a full understanding of what is really going on inside our facilities. . . . With accurate data in hand, our final step is to critically examine our actions and our outcomes."[14] The standards also require correctional agencies to prepare annual reports that describe problems, the specific action plans a facility will follow to correct them,

> **"We can't make a dent in this problem if we don't have a full understanding of what is really going on inside our facilities. . . . With accurate data in hand, our final step is to critically examine our actions and our outcomes."**

and action plans for the agency as a whole. The annual report also must compare the current year's data and action plans with those from prior years and assess the agency's progress in addressing sexual abuse. Administrators are required to submit their reports to the appropriate legislative body and make them readily available to the public through the agency's Web site or through other means.

## Independent Audits

**R**outine incident reviews, data collection, and analysis allow administrators to spot and correct problems before they spiral out of control and to refine good practices. Yet even the most rigorous internal monitoring cannot replace the value of opening up correctional facilities to review by outsiders. In her testimony before the Commission, Professor Michele Deitch, a nationally recognized expert in oversight of correctional systems, talked about how internal and external mechanisms work together to help corrections leaders operate safe and humane facilities, contending, "Effective prison management demands both internal accountability measures and external scrutiny. The two go hand-in-hand, and neither is a replacement for the other."[15]

Any time institutions bear responsibility for the control of dependent individuals, it is imperative that there be outside reviews to ensure the proper treatment and safety of persons in their care. To meet this imperative, the Commission requires detailed, robust audits by qualified independent auditors in all correctional facilities to measure compliance with the standards. Independent audits give corrections administrators the opportunity to receive objective feedback on their performance from skilled reviewers and enhance the public's understanding of what goes on behind the walls of America's prisons and jails.

Audits are not a new idea. The American Correctional Association (ACA), the leading corrections professional organization in the country, has issued professional standards and accredited correctional facilities based on audits of compliance with those standards since the 1970s.[16] ACA accreditation is an extensive, labor-intensive process for both auditors and corrections administrators. It involves a review of documents supporting the facility's compliance with the standards and a 3-day in-person audit of the facility. ACA then submits the results of its inquiry to a three-to-five-member panel of the Commission on Accreditation for Corrections—professionals across a range of disciplines with expertise in correctional practice. During a hearing, a facility representative has the opportunity to discuss issues and address concerns from the panel before it makes a recommendation about accreditation. Correctional facilities pay ACA to audit them, and the process is strictly voluntary.

STANDARD

**Data review for corrective action**

The agency reviews, analyzes, and uses all sexual abuse data, including incident-based and aggregated data, to assess and improve the effectiveness of its sexual abuse prevention, detection, and response policies, practices, and training. Using these data, the agency identifies problem areas, including any racial dynamics underpinning patterns of sexual abuse, takes corrective action on an ongoing basis, and, at least annually, prepares a report of its findings and corrective actions for each facility as well as the agency as a whole. The annual report also includes a comparison of the current year's data and corrective actions with those from prior years and provides an assessment of the agency's progress in addressing sexual abuse. The agency's report is approved by the agency head, submitted to the appropriate legislative body, and made readily available to the public through its Web site or, if it does not have one, through other means. The agency may redact specific material from the reports when publication would present a clear and specific threat to the safety and security of a facility, but it must indicate the nature of the material redacted.

**Audits of standards**

The public agency ensures that all of its facilities, including contract facilities, are audited to measure compliance with the PREA standards. Audits must be conducted at least every three years by independent and qualified auditors. The public or contracted agency allows the auditor to enter and tour facilities, review documents, and interview staff and inmates, as deemed appropriate by the auditor, to conduct comprehensive audits. The public agency ensures that the report of the auditor's findings and the public or contracted agency's plan for corrective action (DC-3) are published on the appropriate agency's Web site if it has one or are otherwise made readily available to the public.

Although ACA has been a leader in promoting accountability within the corrections profession and publishes a list of all accredited facilities on its Web site, ACA audits and their results also are not always available to the public. These audits are the property of each jurisdiction to publish or not; as a matter of policy, ACA does not release them. Additionally, the ACA standards are less comprehensive than the Commission's standards in terms of the causes of sexual abuse and the mechanisms necessary to prevent and respond to abuse.

In its standards, the Commission outlines an audit process that promotes transparency as well as accountability. Specifically, the Commission requires independent audits to measure compliance with its standards at least every 3 years. The independence of the auditor is crucial. The individual or entity cannot be employed by the correctional agency but may be a staff or contract worker hired by the jurisdiction or someone authorized by law, regulation, or the judiciary to perform audits. The auditor must be prequalified through the U.S. Department of Justice to perform audits competently and without bias. The Commission recommends that the National Institute of Corrections design and develop a national training program for this purpose. The ability to operate without constraint is crucial. The auditor must have unfettered access to all parts of the facility as well as all documents, staff, and prisoners. The agency must publish the auditor's report on its Web site, if it has one, or otherwise make it easily available to the public.

The comprehensive information generated by independent audits and the corresponding corrective action plans—coupled with the rigor and transparency of the process—will enhance public confidence in correctional agencies and their willingness and ability to prevent sexual abuse. When audits show an agency struggling or failing to prevent sexual abuse, outsiders will have the data they need to intervene.

## Beyond Audits

In February 2007, as Texas Youth Commission Director Dwight Harris sat before the Texas Senate Finance Committee presenting his agency's fiscal needs, a senator confronted him with the allegations of sexual abuse at the West Texas State School. A legislative staffer had been tipped off a few months earlier in October 2006.[17] Harris tried to assure the Committee that "his staff had done everything in their power to address" the problem—even claiming that staff had alerted the Texas Rangers—and that the investigation was closed.[18] Not persuaded, the Texas Legislature formed a Joint Select Committee on Operation and Management of the TYC to investigate the entire system.

The Ranger who conducted the 2005 investigation at the West Texas State School testified before the Committee about what he had seen, remembering, "When I interviewed the victims. . . I saw kids with fear in their eyes, kids who knew they were trapped in an institution within a system that would not respond to their cries for help."[19] After deploying investigators throughout the State, the Committee found that youth had filed a stunning 750 complaints of sexual misconduct against TYC corrections officers and other TYC staff since 2000. In June 2007,[20] the Texas Legislature enacted a series of reforms, including multiple external oversight mechanisms for the TYC. The two administrators were ultimately indicted on various charges, including sexual assault and improper sexual activity with persons in custody.[21] Outcomes for the victims in the West Texas State School are unknown.

In the end, it took outsiders with authority—the Texas Legislature—to reveal the sexual abuse of children within the TYC and to hold those responsible for the abuse accountable. But the legislature did not stop there. In addition to the Joint Committee, the legislature created a permanent ombudsman to oversee the TYC. Will Harrell currently occupies that post and believes his role is important even in facilities in which administrators and staff are working diligently to do the right thing. "If you walk by a problem every single day, you begin to think that's just the way that it is," Harrell testified to the Commission.[22] "To bring in external fresh eyes is usually helpful to a local administrator."

Many corrections administrators share Harrell's views. "It's a good thing when outsiders come in and take a look at the place, and there may be something that I can be doing a little bit better," Joseph Oxley, former Sheriff of Monmouth County, New Jersey, told the Commission.[23] Across the country, there is growing recognition that the watchful eyes of outsiders can help transform institutions that had been "insular, opaque places," in the words of Matthew Cate, Secretary of the California Department of Corrections and Rehabilitation and former Inspector General of the department.[24] The problem of sexual abuse, in particular, "cannot be solved without some form of public oversight of our Nation's prisons and jails," Cate told the Commission.[25]

**"When I interviewed the victims. . . I saw kids with fear in their eyes, kids who knew they were trapped in an institution within a system that would not respond to their cries for help."**

For some time now, several States and localities have been developing forms of external oversight that vary widely in scope, function, and authority—from ombudsmen like Harrell to Ohio's eight-member legislative committee, also forged in the wake of allegations of sexual and other abuse of juveniles. Other examples of correctional oversight include what appears to be a unique grand jury system in Oregon, a board of visitors in

Maine, and a Prison Society in Pennsylvania. A board of correction monitors New York City jails, whereas in Los Angeles, the Office of Independent Review oversees every investigation of officer misconduct.

In 2006, many of the Nation's corrections leaders, along with lawmakers, judges, journalists, advocates, and scholars, participated in a conference at which they reached consensus about the value of and need for external oversight of America's prisons and jails.[26] Based on that consensus, the American Bar Association (ABA) adopted a formal resolution urging Federal, State, and territorial governments to "establish public entities that are independent of any correctional agency to regularly monitor and report publicly on the conditions in all prisons, jails, and other adult and juvenile correctional and detention facilities operating within their jurisdiction."[27]

Although the resolution does not impose a particular model of external oversight and acknowledges the value of multiple forms of oversight, its 20 requirements capture the characteristics that experts and practitioners generally agree are necessary to achieve true accountability and transparency.[28] Perhaps most important, the person or body overseeing corrections must operate independently of any public or private entity that could exert enough pressure to compromise or corrupt its work.

**"It's a good thing when outsiders come in and take a look at the place, and there may be something that I can be doing a little bit better."**

Beyond independence, other key characteristics include the authority and capacity to monitor facilities and examine past abuses to prevent future problems; a mandate to regularly inspect facilities without necessarily providing advance notice; unfettered and confidential access to prisoners, staff, documents, and other materials; a holistic approach, drawing on diverse sources of information; a mandate to publicly report findings and require a prompt and public response from the correctional agency; and adequate resources and control over its budget.[29] The Commission believes that when external oversight is strong in these ways, everyone's interests are served, perhaps especially those of corrections administrators who depend on educated legislatures and the public to support significant reform in the facilities they manage.

Several oversight entities incorporate at least some of these factors. California's Office of the Inspector General (OIG) is one of the most complex in terms of formal authority and operational design. As a matter of law, the OIG has a "golden key" to California's State-run prisons and juvenile facilities. OIG staff have the authority to enter any facility at any time and speak to any person or review any documentation. The OIG also has subpoena powers, authority to arrest and to seek search warrants, and a mandate to provide real-time oversight of the department's own internal affairs investigations. In addition, a special ombudsman within the OIG is

specifically tasked to investigate reports of sexual abuse that the department may have mishandled.[30] To ensure transparency, the OIG is required to post results of its semiannual facility audits and other facility reviews on its Web site, along with summaries describing the outcomes of criminal and administrative investigations and the department's own staff disciplinary processes. Complete institutional separation from the California Department of Corrections and Rehabilitation, a 6-year appointment for the inspector general with removal only for cause, and a budget determined by caseload strengthen the OIG's independence.[31]

External oversight by inspectors general, ombudsmen, legislative committees, or other bodies would work hand-in-hand with regular audits of the Commission's standards. The Commission endorses the ABA's resolution on external oversight and urges governments to act quickly to create forms of external oversight strong enough to make all correctional facilities more transparent, accountable, and, ultimately, safe.

## When Protection Requires Court Intervention

Courts cannot replace internal monitoring, audits, and ombudsmen or inspectors general, yet society depends on them when other modes of oversight fail or are lacking altogether. According to Margo Schlanger, an expert on prison litigation, court orders have had an enormous impact on the Nation's jails and prisons. "In requiring or forbidding specified policies and practices, court orders are a major part of the regulatory backdrop against which many types of governmental and nongovernmental actors operate."[32] Beyond the reforms courts usher in, their scrutiny of abuses elicits attention from the public and reaction from lawmakers in a way that almost no other form of oversight can accomplish.

Corrections officials themselves have told us that they rely in part on litigation to command the resources they need to protect prisoners from sexual abuse. In her testimony before a House Judiciary Subcommittee, former Warden of San Quentin State Prison and former head of the California Department of Corrections and Rehabilitation Jeanne Woodford said, "Any good prison administrator should not fear the involvement of the courts. From my experience over the last 30 years as a corrections official, I have come to understand the importance of court oversight. The courts have been especially crucial during recent years, as California's prison population has exploded, and prison officials have been faced with the daunting task of running outdated and severely overcrowded facilities. . . . All of this court intervention has been necessary because of my state's unwillingness to provide the Department with the resources it requires. These lawsuits have helped the state make dramatic improvements to its deeply flawed prison system."[33]

*Cason v. Seckinger,* filed in 1984, was one of the first court cases to reveal pervasive sexual abuse and compel system-wide reforms.[34] The case against the Georgia Department of Corrections grew to include more than 200 women prisoners, many of whom experienced sexual abuse by staff, among other unconstitutional conditions. Clear procedures for reporting and investigating complaints of abuse, treatment and counseling for victims, and staff training were among the requirements imposed by the magistrate judge in this case and accepted by the department.[35] Most importantly, corrections staff were specifically prohibited from sexually harassing or abusing women prisoners.

As discussed, State facilities have a duty to protect those under their supervision. The Supreme Court has held that, "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."[36] If prisoners are sexually abused because the correctional facility failed to protect them, they have a right to seek justice in court.[37] This could take the form of financial compensation for past abuses that corrections officials could and should have prevented or "injunctive relief," which requires the facility to put specific protections in place to prevent sexual abuse in the future.

**Civil court cases such as *Cason v. Seckinger* have the potential to spark reforms reaching far beyond the individual plaintiffs to protect other prisoners.**

Civil court cases such as *Cason v. Seckinger* have the potential to spark reforms reaching far beyond the individual plaintiffs to protect other prisoners. This is true for individual and class-action lawsuits alike. In February 2009, for example, a panel of three Federal judges announced its preliminary intention to order California to reduce its prison population by as much as a third. The court found that California's "desperately overcrowded" facilities violate prisoners' rights under the Eighth Amendment of the Constitution prohibiting cruel and unusual punishment.[38] The judges issued the decision after a trial in two long-running cases brought by prisoners who claimed that medical staff could not provide adequate health care in such overcrowded facilities.[39]

Beginning in the 1960s, successful prisoner litigation secured important improvements in prison conditions and increased protection for prisoners' rights. Concerned about a perceived rise in frivolous lawsuits by prisoners, Congress enacted the Prison Litigation Reform Act (PLRA) in 1996 to "reduce the quantity and improve the quality of prisoner [law]suits."[40] This occurred despite the fact that the number of lawsuits had remained relatively stable between 1993 and 1996, even with a substantial increase in the prison population.[41]

Statements by sponsors of the PLRA indicate that the law was never intended to erode the constitutional rights of prisoners.[42] But the PLRA requirements present such serious hurdles that they block access to the courts for many victims of sexual abuse. The dire consequences for individual victims are obvious. What is perhaps less apparent is the way the law has constrained the ability of courts to play the role that is a part of their mandate.

The PLRA's provisions apply to all Federal civil suits about prison life that incarcerated persons may bring, including claims based on physical abuse, sexual abuse, and use of excessive force.[43] Under the PLRA, corrections officials can move to have prisoners' legal claims dismissed for failure to properly exhaust "administrative remedies" before filing suit. Correctional agencies define those remedies and the grievance process, which typically includes filling out specific complaint forms within specific time frames and moving through several levels of appeal. Any mistakes, such as using an incorrect form, may forever bar an incarcerated individual from real access to the courts.[44]

Jeanne Woodford testified before a House Judiciary Subcommittee that "it is absurd to expect prisoners to file grievances. . . without *ever* making a mistake."[45] Woodford reminded the subcommittee members that "[m]any of these prisoners are mentally ill or barely literate."[46] Woodford went on to give examples of circumstances that may derail any prisoner's claim completely, noting that "prisoners may be transferred from one institution to another or paroled before they are able to fulfill each level of appeal. Grievances may be rejected because the prisoner could not clearly articulate his complaint, or for a minor problem such as using handwriting that is too small."[47]

**Jeanne Woodford testified before a House Judiciary Subcommittee that "it is absurd to expect prisoners to file grievances. . . without *ever* making a mistake." Woodford reminded the subcommittee members that "[m]any of these prisoners are mentally ill or barely literate."**

The more convoluted or technical the process, the more likely prisoners will fail in their efforts to exhaust their administrative remedies. Facilities' deadlines for filing a grievance or an appeal are usually very short; prisoners have at most 3 weeks to begin the grievance process, and in some facilities, the window is only 48 hours.[48] In civil lawsuits against schools or hospitals, by contrast, the statute of limitations is typically no less than 1 year.

Garrett Cunningham was raped in the prison laundry by the officer charged with supervising his work. Even before the rape, Cunningham was frightened. The officer had made lewd comments, watched him while he showered, and touched him inappropriately during searches for contraband.[49] When Cunningham reported the abuse to the Assistant Warden of the Luther Unit in Navasota, Texas, and to his second in command, they

STANDARD

**Exhaustion of administrative remedies**

Under agency policy, an inmate has exhausted his or her administrative remedies with regard to a claim of sexual abuse either (1) when the agency makes a final decision on the merits of the report of abuse (regardless of whether the report was made by the inmate, made by a third party, or forwarded from an outside official or office) or (2) when 90 days have passed since the report was made, whichever occurs sooner. A report of sexual abuse triggers the 90-day exhaustion period regardless of the length of time that has passed between the abuse and the report. An inmate seeking immediate protection from imminent sexual abuse will be deemed to have exhausted his or her administrative remedies 48 hours after notifying any agency staff member of his or her need for protection.

said he was exaggerating. Even the prison psychologist offered no real help. One day in September 2000, the officer assaulted Cunningham as he finished his job in the prison's laundry, knocking him to the floor. The officer was literally twice his weight and could have easily overpowered him, but he handcuffed Cunningham and then violently raped him. Cunningham testified that, "When I screamed from the terrible pain, [the officer] told me to shut up. . . . After it was over, I was dazed. He took me to the shower in handcuffs, turned on the water and put me under it. I was crying under the shower and saw blood running down my legs."[50]

Afterward, the officer warned Cunningham that if he reported what happened he would have him transferred to a rougher unit where prison gang members would rape him repeatedly. He told Cunningham that prison officials were his friends and would do nothing. Cunningham was too frightened to file a grievance. As he testified before a House Judiciary Subcommittee, "At first, I didn't dare tell anyone about the rape. . . . [To begin the process of exhausting the facility's administrative remedies] I would have had to file a first prison grievance within 15 days. . . . I had no idea, at that point, that I was even required to file a grievance in order to bring a lawsuit. Even if I had known, during those first 15 days, my only thoughts were about suicide and. . . how to get myself into a safe place. . . so I would not be raped again."[52] Instead, he wrote twice to internal affairs for help and requested a private interview with an investigator, but they never responded. The officer was never prosecuted but was later convicted for sexual offenses against another prisoner in the Luther Unit. He never served time.

"For me, I have found no justice," Cunningham told members of the Subcommittee.[52] "Because I didn't file a grievance with the friends of [the assailant] within 15 days of being raped by him, I was forever barred from filing a lawsuit about it in Federal court. My hope is that Congress will acknowledge the realities of prison life, which makes 'exhausting administrative remedies' under the PLRA impossible at times."[53]

At least one court has held that officials cannot "play hide-and-seek with administrative remedies" and that a remedy that is "unknown and unknowable is unavailable."[54] But simple awareness of the grievance procedure from a facility handbook may not be enough. Incarcerated persons experiencing the trauma of sexual abuse, as well as those with vulnerabilities such as mental illness or developmental disadvantages, may have extreme difficulty filling out the correct forms and meeting the strict deadlines. (See Chapter 5 for a detailed discussion of what correctional facilities must do to facilitate the reporting of sexual abuse.)

The PLRA also requires plaintiffs to prove physical injury to receive compensatory damages.[55] A few courts have found that sexual assault alone does not constitute a "physical injury" as defined in the PLRA.[56] That

requirement and these court rulings fail to take into account the very real emotional and psychological injuries that often follow sexual assault, ranging from temporary fear and emotional numbness to nightmares and major depressive episodes that can occur months or years after an assault. In the words of the Second Circuit, determining that sexual assault meets the physical injury requirement of the PLRA is "a matter of common sense."[57] Medical professionals, corrections experts, and victim advocates have provided extensive information indicating that requiring individuals who are sexually abused in correctional facilities to exhaust all available administrative remedies has consequences far beyond the PLRA's objective. The Commission also is convinced that victims of sexual abuse are losing vital avenues for relief because they cannot prove physical injury as defined in the PLRA. Victims deserve their day in court.

> **"At first, I didn't dare tell anyone about the rape. . . . I would have had to file a first prison grievance within 15 days. . . . I had no idea, at that point, that I was even required to file a grievance in order to bring a lawsuit. Even if I had known, during those first 15 days, my only thoughts were about suicide and. . . how to get myself into a safe place. . . so I would not be raped again."**

The Commission recommends that Congress amend the administrative exhaustion provision and physical injury requirement in the PLRA to remove barriers to the courts for victims of sexual abuse. In the meantime, corrections officials must take immediate steps to change unreasonable administrative policies. The Commission understands that officials should have an opportunity to investigate and respond to a complaint before having to defend themselves in court. This is both fair and conserves scarce resources in the way the framers of PLRA intended. However, there is no reason that a sexually victimized prisoner should have to file a grievance within several days or weeks after being sexually assaulted or successfully complete every step of a complex process to seek protection and compensation in court.

The Commission's standard requires corrections agencies to adopt a policy stating that a victim of sexual abuse is deemed to have exhausted his or her administrative remedies within 90 days after the incident of sexual abuse is *reported,* even if someone other than the victim makes the report and regardless of when the abuse allegedly occurred. Finally, the standard recognizes that there may be emergency situations in which a prisoner is in immediate danger and only a court order will provide protection. In such cases, the standard requires correctional agencies to deem that all administrative remedies have been exhausted within 48 hours after the report is made.

## Oversight by the Department of Justice

Correctional facilities are also subject to oversight by the U.S. Department of Justice. The Civil Rights of Institutionalized Persons Act, passed in 1980, allows the department to investigate any correctional facility suspected of routinely subjecting prisoners to "egregious or flagrant conditions" in violation of the U.S. Constitution.[58] The investigations culminate in "finding letters" that include recommendations for specific reforms that can then become the basis of court-filed complaints. By statute and practice, the Special Litigation Section takes a problem-solving approach and tries to work cooperatively with agencies under investigation. The strength of the evidence gathered and the threat of costly litigation is usually enough to compel reforms; the lawsuits are most often settled, usually with a settlement agreement filed simultaneously with the court complaint.

In 2006, for example, the Department of Justice began a broad investigation of the King County Jail in Seattle.[59] Although the Federal investigation covered a range of problems, a "string of allegations" against King County corrections officers for sexual misconduct triggered Federal involvement.[60] In a report prepared following the agency's request for assistance from the National Institute of Corrections and released around the same time that the Department of Justice launched its investigation, the department found that "a sexualized work environment, meager training and poor communication [were] among the root causes of the string of sexual-misconduct allegations against corrections officers with the King County Department of Adult and Juvenile Detention."[61] Corrections officials signaled their willingness to cooperate with Federal investigators and hired consultants to suggest how to curtail sexual misconduct within the main jail.[62]

*Leaders need robust mechanisms and systems to monitor their facilities, identify problems, and implement reforms. They need to apply that discipline internally and to accept it from outside.*

The Department of Justice concluded its investigation approximately 1 year later, in November 2007, finding that persistent conditions in the county jail violated the constitutional rights of prisoners.[63] Among the many specific failings outlined in its finding letter, the department found that the King County Jail lacked the mechanisms necessary to thoroughly investigate complaints of sexual abuse, noting that, "A number of these investigations remain open, while others have been closed with 'undetermined' or 'non-sustained' findings and 'no discipline due to timeliness.'. . . Essential elements of an internal investigation system includes [sic] a comprehensive investigation procedures manual, and adequately trained investigators to implement the investigations process. [King County Correctional Facility]

is lacking in both of these essential elements."[64] The letter required jail administrators and county officials to work cooperatively with the Department of Justice to resolve the problems and avoid a lawsuit.

It took a year of negotiation for the two parties to agree on specific reforms, although corrections officials disagreed with the department's finding that the constitutional rights of prisoners were violated.[65] The reforms approved in January 2009 by the Metropolitan King County Council include commitments to improve internal investigations, medical and mental health care, and suicide prevention to benefit victims of sexual abuse and prevent future incidence of abuse.[66] Nationally recognized experts will monitor the agreement, which will remain in effect for up to 3 years.

As this case illustrates, Federal investigations are a potentially powerful form of oversight, but only a few correctional agencies have come under the scrutiny of the Special Litigation Section in recent years.[67] The Commission urges the Department of Justice to provide adequate resources to the Special Litigation Section.

The Department of Justice also has authority to criminally prosecute anyone "acting under color of state law" for violating a prisoner's constitutional rights.[68] Criminal prosecution at the Federal level is essential when local jurisdictions lack the political will or resources to prosecute cases of sexual abuse. Criminal prosecutions should be used in addition to, not instead of, systemic reform of policies and practices that fosters a culture of safety.

Preventing sexual abuse in any correctional facility fundamentally rests with the leadership of that facility and each staff member's ability and willingness to make protecting prisoners a priority. But good intentions and commitment are not enough. Leaders need robust mechanisms and systems to monitor their facilities, identify problems, and implement reforms. They need to apply that discipline internally and to accept it from outside. The very nature of prisons, jails, and other correctional settings demands that government and the public have multiple means to watch over them and to intervene when both the institution and individuals are at risk.

# PART II

# RESPONDING TO VICTIMS AND PERPETRATORS

FINDING

Many victims cannot safely and easily report sexual abuse, and those who speak out often do so to no avail. Reporting procedures must be improved to instill confidence and protect individuals from retaliation without relying on isolation. Investigations must be thorough and competent. Perpetrators must be held accountable through administrative sanctions and criminal prosecution.

5

# Reporting, Investigation, and Punishment

**W**hen Dana Ragsdale entered the Federal Detention Center in Philadelphia in summer 2003, she carried with her a history of childhood sexual abuse. Early during her stay there, another prisoner told Ragsdale that a male officer had sexually assaulted her. As a survivor of sexual abuse, this deeply concerned Ragsdale. In testimony to the Commission, she said she had wanted to report the incident—both to protect the other woman and because she feared for her own safety—but was afraid of speaking out. "I wanted to tell someone, but I knew that inmates who file reports against corrections officials are usually put into isolation. I did not want to be put in the special housing unit, lose my privileges or spend nearly every hour of the day in my cell. Inmates who make reports are often labeled as snitches and risk retaliation by corrections officers or other inmates. I stayed silent and prayed that I would not be victimized."[1]

Ragsdale only reported the abuse when she was transferred to a correctional facility in Danbury, Connecticut, with a warden known for her commitment to take allegations of sexual abuse seriously, and Ragsdale also met a staff member she felt she could trust. "I was literally in a state of panic, shaking and sweating profusely like I am right now as I gave them a description of the guard and the name of the inmate being abused. . . . Looking back on it, it was terrifying to be in a situation where I felt completely unsafe, particularly in view of my own history of sexual abuse."[2]

Like Dana Ragsdale, many prisoners are reluctant to report abuse they know about or have experienced. This chapter explores reasons why prisoners, as well as staff, stay silent and how to earn their confidence and promote reporting. This chapter also discusses how to achieve significant improvements in investigating allegations of abuse in confinement and in punishing perpetrators—challenging areas in correctional practice, law enforcement, and prosecution.

STANDARDS

### Inmate reporting

The facility provides multiple internal ways for inmates to report easily, privately, and securely sexual abuse, retaliation by other inmates or staff for reporting sexual abuse, and staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse. The facility also provides at least one way for inmates to report the abuse to an outside public entity or office not affiliated with the agency that has agreed to receive reports and forward them to the facility head (RP-2), except when an inmate requests confidentiality. Staff accepts reports made verbally, in writing, anonymously, and from third parties and immediately puts into writing any verbal reports.

### Third-party reporting

The facility receives and investigates all third-party reports of sexual abuse (IN-1). At the conclusion of the investigation, the facility notifies in writing the third-party individual who reported the abuse and the inmate named in the third-party report of the outcome of the investigation. The facility distributes publicly information on how to report sexual abuse on behalf of an inmate.

# Breaking the Silence

The persistent silence surrounding incidents of sexual abuse in correctional facilities is a reality that both victims and professionals in the field acknowledge. Capturing the extent of underreporting is difficult, however, and involves giving individuals in confinement an opportunity to provide information about sexual abuse in their facilities on anonymous surveys, collecting information from facilities' administrative records on incidents of abuse known to corrections officials, and comparing the two sets of data. As a result of PREA, the Bureau of Justice Statistics is much closer to providing these comparisons.[3]

Although the degree of underreporting is not known, solutions to the problem are clear: Efforts to increase reporting begin by providing easy ways for individuals to communicate information about sexual abuse they have experienced or know about to staff or corrections officials, backed up by a clear policy requiring authorities and staff to act on every allegation. Even when prisoners are willing to report abuse, their accounts are not necessarily taken seriously and communicated to appropriate officials within the facility. "When I told one of the guards I trusted how tired I was of putting up with abuse [by other youth in the facility], he told me to just ignore it," Cyryna Pasion told the Commission.[4] Kendell Spruce testified to the Commission that he was raped by 27 different inmates. "I reported it, but it didn't ever get me anywhere."[5] And Garrett Cunningham wrote twice to internal affairs and requested a private interview with an investigator to report an officer who had violently raped him and was continuing to touch him inappropriately, but he told the Commission, "They never addressed my concerns and failed to take precautions to protect me."[6]

Although some correctional systems and individual facilities have made great strides in this area in recent years, the Commission crafted its standards to guarantee that reporting is encouraged and taken seriously in every correctional facility. A serious response to all reports of abuse that follows clear protocols is also the best way to efficiently handle any false allegations of abuse, which are a concern to many corrections staff and administrators. The standards ensure that anyone can report abuse—including prisoners' friends or family members—and know that the allegations will result in an immediate response from the facility. The standards require all staff to act on reports of abuse conveyed verbally or in writing, including anonymous written reports.

Additionally, all employees and volunteers—including those who provide medical and mental health services—have a duty to report sexual abuse. That means they must report any information about or suspicion of abuse, whether it occurred in their facility or another correctional facility. In nearly every correctional facility today, employees already have a duty to report, but fewer facilities extend that obligation to volunteers.[7] Administrators must forward reports about sexual abuse that occurred in another

facility to the head of that facility. Importantly, unless the law of the jurisdiction states otherwise, the duty to report is not contingent on receiving consent from the provider of the information. Facility administrators need to know about abuse to prevent it in the future and to hold perpetrators accountable. At the same time, the sensitive nature of the information means it must be shared only among staff who have a critical need to know, and prisoners must be clearly informed that all staff have a duty to report.

Preparing staff to meet their obligations is essential. Staff should be educated about the type of information they might hear or receive in writing, trained on how to respond to allegations of abuse as well as less clear signs that abuse might be occurring, and informed that they will be held accountable if they fail to follow reporting procedures.[8] Mandatory reporting policies are powerful antidotes to the code of silence. As Matthew Cate, former Inspector General overseeing corrections in California, told the Commission, these defensive postures are common among correctional officers, just as they are among "individuals in any stressful profession, the military, officers on the street, physicians. . . or nurses in an operating room."[9]

Some incarcerated individuals will never be comfortable reporting abuse internally. For this reason, the Commission's standard on inmate reporting requires that prisoners have the option of speaking confidentially with a community-based crisis center or other outside agency. This requirement reflects what some corrections professionals and other experts agree to be the preferred practice. As New York City Corrections Director Martin Horn told the Commission, "I believe very deeply, and we do this in New York, that. . . there must be confidential means of reporting."[10] Information about how to contact the outside agency should be widely posted in the facility and otherwise readily available. The correctional facility and the outside agency must formalize their agreement in a memorandum of understanding specifying that the outside agency has agreed to accept reports of sexual abuse from prisoners and forward them to the head of the facility unless the prisoner wants the report to remain confidential.

Experience in the Arkansas Department of Correction demonstrates that access to hotlines operated by the internal affairs investigative division can promote reports of sexual abuse that otherwise might remain hidden and convince incarcerated individuals that the facility is committed to ending sexual abuse. According to Chief Deputy Director of Institutions Ray Hobbs, "The inmates have new confidence that they will be taken seriously. . . . The first sign was the implementation of the hotline. We had a highly visible case, in the media too, of a male staff member who sexually abused a male inmate. The staff member was sneaky and even took the

## STANDARD

### Staff and facility head reporting duties

All staff members are required to report immediately and according to agency policy any knowledge, suspicion, or information they receive regarding an incident of sexual abuse that occurred in an institutional setting; retaliation against inmates or staff who reported abuse; and any staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse or retaliation. Apart from reporting to designated supervisors or officials, staff must not reveal any information related to a sexual abuse report to anyone other than those who need to know, as specified in agency policy, to make treatment, investigation, and other security and management decisions. Unless otherwise precluded by Federal, State, or local law, medical and mental health practitioners are required to report sexual abuse and must inform inmates of their duty to report at the initiation of services. If the victim is under the age of 18 or considered a vulnerable adult under a State or local vulnerable persons statute, the facility head must report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

**"When I told one of the guards I trusted how tired I was of putting up with abuse [by other youth in the facility], he told me to just ignore it."**

**Reporting to other confinement facilities**

When the facility receives an allegation that an inmate was sexually abused while confined at another facility, the head of the facility where the report was made notifies in writing the head of the facility where the alleged abuse occurred. The head of the facility where the alleged abuse occurred ensures the allegation is investigated.

lens off the cameras so he wouldn't be seen. He failed to transfer [another] inmate, as he had promised him, and the inmate squealed on him through the hotline."[11] Importantly, this report to the hotline resulted in action on the part of the administration, leading to sanctions for the sexual misconduct. Hobbs told the Commission, "The staff copped-out to it. He was prosecuted and got 5 to 7 years in prison."

As illustrated by this example, successful efforts to enhance reporting depend both on the accessibility and safety of mechanisms to report and on serious and timely responses by officials once reports are made. Staff should clearly convey these factors, as well as information on ways to report abuse, during sessions to educate prisoners about sexual abuse, their right to be safe, and the facility's policies. Easy-to-read posters and brochures, available in the native languages of the facility's prisoner population, should capture the same information.

The results of a proactive approach to reporting can be dramatic. In 2006, the North Carolina Department of Correction received just 31 reports of sexual abuse. The following year, after revising its reporting policies and raising awareness among prisoners and staff, the number of reports jumped to 151. According to Correctional Planner Charlotte Price, "It was a big increase, which we felt was positive, because staff were more aware and inmates were coming forward. . . . The awareness has been our biggest change, and it has helped on every level, including investigations. It has been a positive experience for both staff and inmates."[12] Sharp increases in reporting should be expected when constructive reforms make prisoners feel safer reporting abuse and more confident that the facility will take action. Facilities should be prepared to communicate to the public that increased reporting is a positive development and does not necessarily reflect a rise in actual abuse.

## Protection from Retaliation

**N**ecole Brown was sexually abused over the course of 5 years by a corrections officer she first encountered in a Michigan State prison in 1996 who stalked and victimized her even while she was on parole. In her testimony to the Commission, she recalled that the officer "constantly threatened me, that if I told anybody, he would make sure that I would either be punished by being sent to administrative seg[regation] or that I would lose my privileges such as the phone, visits with my family and friends, and even that I would not be allowed to leave the prison. . .  He had the ability to write me up for so-called misconduct any time he wanted. . . [T]he more tickets I got, the more good time I lost, meaning the release on parole would be delayed. I felt like I had to do the things that he asked me to do so I could survive in prison and to be able

to come home."[13] When Brown finally reported the abuse and sought help from an attorney, the retaliation grew worse and involved other staff. "Correctional officers would interrupt my attorney visits, withhold my mail, search me or try to degrade me in front of other people for no reason."

Victims of sexual abuse are silenced by threats as well as by actions taken against them, and some are punished when they do speak out. Retaliation by staff can include unwarranted disciplinary action, unfavorable changes in housing and work assignments, and threats of violence against the victim or even the victim's family. In a letter to the advocacy organization Just Detention International, one prisoner conveyed a chilling threat she received from the male officer who was abusing her: "Remember if you tell anyone anything, you'll have to look over your shoulder for the rest of your life."[14] An incarcerated person who reports sexual abuse perpetrated by another prisoner also risks retaliation, which can range from violence, to being shunned by other prisoners, to being falsely reported for breaking facility rules.

Isela Gutierrez, who coordinates the Texas Coalition Advocating Justice for Juveniles, told the Commission about a 2007 survey of 3,279 youth in custody by the Texas State Auditor's Office that suggests that youth have little confidence that the reporting process is credible and safe. Sixty-five percent of juveniles surveyed thought the grievance system did not work, and 43 percent indicated they had firsthand knowledge of residents who experienced retaliation after filing grievances related to physical or sexual abuse. Moreover, half of the juveniles surveyed felt that the Texas Youth Commission did not take immediate action regarding their safety and welfare.[15]

The culture of the correctional environment can make staff and offenders fearful of reporting. In *Baron v. Hickey*, a correctional officer reported misconduct that he observed in his facility in 2003.[16] As a result, his tires were slashed, he was called a "rat," and coworkers threatened him.[17] He complained more than 30 times to leadership and ultimately resigned. He filed suit against the agency for these retaliatory actions and was awarded $500,000 in damages.

Correctional facilities have to demonstrate a commitment to protecting individuals who report abuse from retaliation. As former Commissioner of the Massachusetts Department of Correction Kathleen Dennehy told the Commission, "We need to create environments where inmates fully disclose incidents of sexual violence."[18] The Commission's standard in this area requires facilities to monitor prisoners and staff who report abuse for at least 90 days to ensure that they are not experiencing retaliation or threats. If threats or actual retaliation do occur, the facility must take immediate action to stop the threatening behavior. The

STANDARD

**Agreements with outside public entities and community service providers**

The agency maintains or attempts to enter into memoranda of understanding (MOUs) or other agreements with an outside public entity or office that is able to receive and immediately forward inmate reports of sexual abuse to facility heads (RE-1). The agency also maintains or attempts to enter into MOUs or other agreements with community service providers that are able to: (1) provide inmates with confidential emotional support services related to sexual abuse and (2) help victims of sexual abuse during their transition from incarceration to the community (RE-3, MM-3). The agency maintains copies of agreements or documentation showing attempts to enter into agreements.

**"Remember if you tell anyone anything, you'll have to look over your shoulder for the rest of your life."**

**Agency protection against retaliation**

The agency protects all inmates and staff who report sexual abuse or cooperate with sexual abuse investigations from retaliation by other inmates or staff. The agency employs multiple protection measures, including housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates or staff who fear retaliation for reporting sexual abuse or cooperating with investigations. The agency monitors the conduct and/or treatment of inmates or staff who have reported sexual abuse or cooperated with investigations, including any inmate disciplinary reports, housing, or program changes, for at least 90 days following their report or cooperation to see if there are changes that may suggest possible retaliation by inmates or staff. The agency discusses any changes with the appropriate inmate or staff member as part of its efforts to determine if retaliation is taking place and, when confirmed, immediately takes steps to protect the inmate or staff member.

standard also requires facilities to take affirmative steps to prevent retaliation. Such precautions also may be essential to the investigation because victims and witnesses who feel intimidated are less likely to cooperate with investigators.

Protective measures may include moving a prisoner to a different housing unit, transferring them to a different facility, or adjusting staff work assignments. Transfers, however, should not be an automatic response, especially since they may involve disrupting an investigation, provision of needed services, and in some cases access to family. Talking to prisoners about their safety concerns can be constructive and suggest a range of possible precautions. Case-by-case assessments will help prevent transfers that prisoners could perceive as punitive. Because segregation can have a negative impact on a prisoner's mental health, staff should only use segregation when absolutely necessary to ensure the safety of the prisoner and integrity of the investigative process.[19] As noted above, some prisoners who would otherwise report abuse remain silent because they cannot bear the restrictions of life in segregation.

# Investigating Without Fail

Eventually Necole Brown contacted a lawyer, who helped her report the officer who was abusing her. "Investigators interviewed me, but failed to follow up on information about my complaint," Brown told the Commission.[20] She testified that the local prosecutor also declined to pursue the case because he believed the evidence was insufficient. The Commission's standards on investigation are intended to ensure that every allegation of sexual abuse is thoroughly investigated. The stakes are high: failure to investigate allegations sends a message to staff and prisoners that speaking out may put the victim at risk but has no consequences for the abuser. In such environments, silence prevails and abuse flourishes. Unless investigations produce compelling evidence, corrections administrators cannot impose discipline, prosecutors will not indict, and juries will not convict abusers.

Six years after the passage of PREA, many statewide correctional systems and individual facilities now have policies, protocols, and staff in place to investigate allegations of sexual abuse. (See the PREA Initiatives appendix for a sample.) Prison and jail staff across the country have attended professional training programs on investigating sexual abuse. According to Lorie Brisbin, an investigator working for the Idaho Department of Correction, PREA was a catalyst for improving investigations in facilities statewide, and the results have been dramatic: "We have a case that is going through the courts right now [where one prisoner raped another prisoner]. Our staff did such a good job securing the crime scene

that it is a solid case. This would not have happened before PREA. . . . We have never had an inmate-inmate prosecution at all."[21] The Georgia Department of Corrections also implemented sweeping reforms, including a policy to investigate all allegations of sexual abuse and the provision of specialized training for investigators. According to Angela Grant, Deputy Warden of Care and Treatment at Pulaski State Prison, "We have investigators now who only deal with sexual assault cases. There are specialists in all four of our regions. We are doing more thorough investigations. We referred eight cases in 2007 for prosecution. . . . We are now more proactive and definitely pursue these cases all the way to prosecution."[22]

Although advances such as those in Idaho and Georgia are extremely encouraging, there are still facilities—particularly those that confine juveniles, those under the umbrella of community corrections, and smaller jails—that lag behind in this crucial area.[23] Weaknesses and gaps are not necessarily for lack of effort. Training and resources specifically for staff of juvenile facilities, for example, have only been available recently.[24]

The Commission's first standard on investigation is clear: facilities have a duty to immediately and thoroughly investigate every allegation of sexual abuse to completion, including reports by third parties and anonymous reports. Investigators must pursue direct and circumstantial evidence, whether or not the alleged victim confirms that the abuse occurred and is willing to cooperate. Even if the person who reported the abuse later wants to withdraw the complaint, the investigation must continue if the facts indicate that abuse may have occurred. The transfer or release of prisoners involved in an investigation, either as victims or witnesses, and the reassignment, termination, or resignation of involved staff may complicate an investigation but do not justify closing it before completion. Complainants must be notified in writing about the outcome of the investigation and any disciplinary or criminal sanctions imposed, consistent with what laws in the jurisdiction allow.

Allegations of sexual abuse always warrant an administrative investigation; a criminal investigation is often necessary as well. Criminal and administrative investigations conform to different rules and procedures. A criminal investigation focuses on determining whether there is sufficient evidence to prove that the alleged abuser violated specific criminal statutes and, therefore, should be prosecuted. The focus of a criminal investigation is relatively narrow, the standard of proof stringent, and the potential penalties severe. An administrative investigation, which is wider in scope, is two pronged: first, it focuses on whether sufficient evidence exists to demonstrate that the alleged abuser violated agency policies and

**STANDARD**

**Duty to investigate**

The facility investigates all allegations of sexual abuse, including third-party and anonymous reports, and notifies victims and/or other complainants in writing of investigation outcomes and any disciplinary or criminal sanctions, regardless of the source of the allegation. All investigations are carried through to completion, regardless of whether the alleged abuser or victim remains at the facility.

**The stakes are high: failure to investigate allegations sends a message to staff and prisoners that speaking out may put the victim at risk but has no consequences for the abuser. In such environments, silence prevails and abuse flourishes.**

STANDARD

### Agreements with outside law enforcement agencies

If an agency does not have the legal authority to conduct criminal investigations or has elected to permit an outside agency to conduct criminal or administrative investigations of staff or inmates, the agency maintains or attempts to enter into a written MOU or other agreement specific to investigations of sexual abuse with the law enforcement agency responsible for conducting investigations. If the agency confines inmates under the age of 18 or other inmates who fall under State and local vulnerable persons statutes, the agency maintains or attempts to enter into an MOU with the designated State or local services agency with the jurisdiction and authority to conduct investigations related to the sexual abuse of vulnerable persons within confinement facilities. When the agency already has an existing agreement or long-standing policy covering responsibilities for all criminal investigations, including sexual abuse investigations, it does not need to enter into a new agreement. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

should be disciplined; second, it assesses whether training, practices, or policies should be revised to prevent future sexual abuse.

Many correctional agencies rely on outside law enforcement agencies to conduct criminal investigations, and some agencies enlist outsiders to conduct administrative investigations, although that practice is less common. Whenever agencies outsource investigations, the Commission's standards require that the correctional agency attempt to develop a memorandum of understanding with the law enforcement agency; the Commission suggests specifying roles and responsibilities in the agreement. More than a mere formality, such agreements can improve the quality of investigations. According to Kimberly Hendricks, PREA coordinator in the Oregon Department of Corrections, the department's memorandum of understanding enabled law enforcement to begin investigating much sooner following an allegation of abuse. "Everyone is clear [about] roles and timelines. It got a more rapid response. It has improved the information flow."[25]

The Commission's standard establishing the duty to investigate is followed by a detailed standard to ensure the quality of investigations. The quality of an investigation and resulting written report will determine whether the process is viewed as credible and greatly influences decisions to prosecute and/or impose administrative sanctions. As stated in this standard, effective sexual abuse investigations are prompt, thorough, objective, and conducted by individuals who have received special training in sexual abuse investigations. Additionally, the standard specifies that all investigations must meet the following requirements:

- Investigations are initiated and completed within the timeframes established by the highest-ranking facility official, and the highest-ranking official approves the final investigative report.

- Investigators gather direct and circumstantial evidence, including physical and DNA evidence when available; interview alleged victims, suspected perpetrators, and witnesses; and review prior complaints and reports of sexual abuse involving the suspected perpetrator.

- When the quality of evidence appears to support criminal prosecution, prosecutors are contacted to determine whether compelled interviews may be an obstacle for subsequent criminal prosecution.

- Investigative findings are based on an analysis of the evidence gathered and a determination of its probative value.

- The credibility of a victim, suspect, or witness is assessed on an individual basis and is not determined by the person's status as inmate or staff.

- Investigations include an effort to determine whether staff negligence or collusion enabled the abuse to occur.

- Administrative investigations are documented in written reports that include a description of the physical and testimonial evidence and the reasoning behind credibility assessments.

- Criminal investigations are documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and provides a proposed list of exhibits.

- Substantiated allegations of conduct that appears to be criminal are referred for prosecution.

Many of these requirements are discussed in the sections that follow.

STANDARD

**Criminal and administrative agency investigations**

Agency investigations into allegations of sexual abuse are prompt, thorough, objective, and conducted by investigators who have received special training in sexual abuse investigations (TR-4). When outside agencies investigate sexual abuse, the facility has a duty to keep abreast of the investigation and cooperate with outside investigators (RP-3). Investigations also include the additional elements listed on pp. 108–109.

## Proceeding Without Delay

Timeliness is essential. An investigation of sexual abuse must begin as soon as possible after the alleged incident. Physical evidence degrades quickly. In addition, launching an investigation immediately reassures victims and witnesses that officials are taking their allegations seriously, which can facilitate cooperation and increase the likelihood of gathering strong evidence.

Completing investigations without delay is equally important. Although particularly complex investigations will take more time and deadlines should reflect that reality, the goal in every investigation must be to work efficiently and adhere to the timeline established by the highest-ranking facility official. Protracted investigations undermine the facility's credibility and become increasingly difficult as evidence disappears and key witnesses' memories fade. It is unfair to victims as well as the accused to allow allegations of sexual abuse to linger unresolved for months or years.[26] In some States (including California, Florida, Louisiana, Maryland, and Rhode Island), an investigation must be completed within 1 year, or no administrative discipline may be imposed.[27] Such policies should put pressure on officials to complete investigations quickly. Without strong and committed leadership, however, these policies could become a reason to allow investigations to linger or wither.

Of course, when victims and witnesses report abuse long after it occurred, investigators operate under compromised circumstances. U.S. Attorney for the Northern District of Florida Gregory Miller captured what is at stake in his testimony to the Commission: "Delays in reporting put the investigators at a disadvantage from the outset. During the interval between the time when the crime is committed and when it is brought to law enforcement's attention, valuable physical evidence can be lost or

destroyed. As days and even months intervene, the victim's memory of the details or the date or time of the assault may blur, making it difficult to corroborate their account through prison work schedules or other means."[28] Texas prosecutor Gina DeBottis told the Commission that "if [a victim] waits over 96 hours, it's very difficult to collect [physical] evidence."[29] In a 2006 study of sexual abuse in the Texas prison system, research confirmed that in a majority of substantiated cases—those in which an investigation determined that sexual abuse occurred—reports were made on the same day or within 2 days of the assault.[30]

## Gathering Evidence

Investigating sexual abuse that has occurred in correctional facilities is complex, requiring skill and sensitivity.[31] In some States and localities, however, individuals responsible for investigating sexual abuse in correctional facilities receive no specialized training.[32] Moreover, many facilities around the country rely on State or local police officers, who may have little or no experience investigating cases in a correctional facility.[33] According to a report published by the National Institute of Corrections, many sexual abuse investigators are so unfamiliar with the dynamics inside a correctional facility that they cannot operate effectively, making mistakes that are in some instances glaring.[34] A staff member in one correctional facility remembered an investigator who "came in and asked a whole housing unit of inmates if they had witnessed an assault."[35] Serious missteps in interviewing victims, witnesses, and suspects can undermine or even ruin an investigation.

"[The] investigator was so frightening and insensitive," Dana Ragsdale recalled in her testimony to the Commission.[36] "He propped his feet up on his desk, he crossed his arms, and he glared at me." Investigators need to understand and be responsive to the dynamics of victimization, not only to be sensitive but also to be effective. Victims are often reluctant to discuss a sexual assault with someone who is or appears to be unsympathetic to their situation.[37] One corrections staff member commented, "You can't just ask an inmate point blank if he has been assaulted. Part of the job is building rapport with inmates. You have to lead up to these questions."[38]

> **According to a report published by the National Institute of Corrections, many sexual abuse investigators are so unfamiliar with the dynamics inside a correctional facility that they cannot operate effectively, making mistakes that are in some instances glaring.**

"In the practice of interviewing victims of sexual abuse, there are many times when what the victim is not saying speaks volumes about what has happened or what is not happening," Chief Inspector of the Rhode Island

Department of Corrections Aaron Aldrich told the Commission.[39] "Active listening is so much more than just remaining silent when the victim is speaking. It's about getting the trust of that person. It's about convincing the victim that you are willing to do whatever it takes to make a bad situation better. It's not about asking a question and receiving an answer. It's about asking a question and gauging a response. Each victim is different. Some are emotionally shattered. Some are angry and exhibit negative actions. . . . [S]ome might quite coolly deny that anything ever happened or took place." At the most fundamental level, according to Aldrich, investigators must be able to see the prisoner as a victim. "Investigative personnel can be trained [and] proficient [in] investigatory techniques, standards, [and] protocols and yet fail in securing either successful prosecution or termination of violators if they do not recognize the basic premise that an offender can also be a victim. . . ."[40]

A thorough investigation obtains all direct and circumstantial evidence of the alleged incident. In most situations, investigators have to aggressively and creatively pursue corroborating evidence. When victims and witnesses are not cooperating—out of fear or adherence to a code of silence—or when they cooperate initially and later recant, corroboration can clarify otherwise perplexing events and salvage an investigation. As Cynthia Schnedar, Counsel to the Inspector General for the U.S. Department of Justice, told the Commission, "[T]he key to any successful prosecution is corroboration, corroboration, corroboration."[41]

Best practices for gathering evidence include: visitor lists, camera footage, telephone logs, staff time cards, post assignment records, descriptions of areas where incarcerated persons are not generally allowed, statements from co-workers and housing mates, and patterns of abuse documented in past complaints and investigations.[42] Gathering that evidence requires training as well as special tools. Body wires, electronic monitoring, controlled calls, and polygraphs are among the tools that investigators may have available to them.[43]

Director of the Rhode Island Department of Corrections A. T. Wall captured the nature of this kind of investigative work in his testimony to the Commission. In a correctional facility, "[e]verybody talks to everybody all the time. And so an aggressive investigator has options. You talk to everybody anywhere near the alleged perpetrator or the victim. You get statements. You look at logs. You review camera footage. You monitor the recorded telephone calls. You take it to the community. You talk to former cellmates who are now living in freedom. You talk to family members. You consider controlled phone calls. You look at possibly, in some cases. . . using a wire. And ultimately you also, as I've said before, have to get the investment of staff. . . . [I]f they think the security risk is great enough or they are offended enough by the content, they will tell you what you need to know, but you have to till that soil by working with staff to change their attitudes."[44]

Getting the "investment of staff" often hinges on having the support of unions. Labor and management should structure agreements in ways that facilitate, or at least do not impede, thoroughly investigating staff accused of sexual misconduct.[45] (See Chapter 2 for more information about collective bargaining agreements.)

Although results from polygraphs and computerized stress voice analyzer tests do not constitute admissible evidence in a courtroom, agencies do rely on them when evaluating whether to pursue a case. Polygraph findings or refusal to take a polygraph should never be used as the only reason to suspend or close an investigation or as the sole basis for determining whether or not an allegation is true, however.[46]

Proper use of *Miranda*- and *Garrity*-type warnings is also critical. In *Garrity v. New Jersey*, the Supreme Court ruled that statements taken under threat of terminating employment are considered compelled statements and cannot be used directly or indirectly against the suspect in a criminal investigation or prosecution.[47] The standard *Garrity* warning includes the following notice: "If you do answer, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceeding. However, these statements may be used against you in relation to subsequent departmental charges."[48]

> **"Investigative personnel can be trained [and] proficient [in] investigatory techniques, standards, [and] protocols and yet fail in securing either successful prosecution or termination of violators if they do not recognize the basic premise that an offender can also be a victim. . . ."**

Whether and when to compel a statement depends on a variety of factors, including the nature of the offense and the likelihood of criminal prosecution. Caution should be used in making this decision and also in determining how to use such statements and whether to share them with officers assigned to the criminal investigation.

## Analyzing the Evidence

In some cases, the most difficult component of an investigation is reviewing the evidence and reaching findings consistent with what the evidence shows. Objectivity is obviously crucial. An investigator must be able to weigh and analyze the evidence without bias toward any party or the outcome. For example, irrelevant discrepancies in testimony or the inability to recall detail should never become the basis for deciding that testimony is unreliable. Similarly, investigators must not scrutinize evidence in cases involving staff more strictly than evidence in cases among prisoners.

In situations where one prisoner has allegedly abused another prisoner, "the question of consent goes to the heart of the matter," Wall told the Commission, "because investigators are going to have to find ways to interpret and understand the relationship that took place. And that's going to be a particular challenge for the profession."[49] Distinguishing between consensual and nonconsensual sex in an environment in which sex is traded for protection or comfort is difficult, especially absent physical injury and witnesses. In a study of women prisoners published in 2008, participants suggested that "young, naive, or scared offenders entered into relationships with more aggressive women, offering commissary and sexual intimacy in return for protection. Yet, female inmates typically saw these relationships as consensual."[50] The study of the Texas prison system previously mentioned revealed that line staff in one facility for women expect the prisoners to have sex with one another and viewed it as "part of the[ir] life style."[51] Although consensual sex may be a reality in correctional facilities for women as well as for men, when confronted with an allegation of abuse between prisoners, investigators must not erroneously or prematurely conclude that the encounter was not forced.

Through training, investigators can learn the characteristics of an objective investigative process and outcome and how to recognize and reject stereotypes that hinder objectivity.[52] They may learn, for example, not to assume that a sexual encounter is consensual simply because there are no discernible physical injuries or because the alleged victim or perpetrator is homosexual. Although training cannot overcome deeply rooted prejudices, when it is accompanied by good supervision, investigators are more likely to remain objective as they weigh the evidence and formulate their findings.

To promote objectivity when investigating allegations of sexual abuse by staff, some correctional agencies now require that staff based outside the facility where the incident allegedly occurred conduct the criminal investigation. It also may be prudent to request independent law enforcement agencies to criminally investigate high-profile cases. The involvement of an outside law enforcement agency can reduce concerns about conflicts of interest as well as *Garrity* violations that could compromise the criminal case.[53]

Investigators also need clear guidance on what the evidence must show to substantiate allegations in an administrative investigation and to refer a case to a prosecuting authority. To ensure that the standard of proof in administrative investigations is fair and consistently applied whether the alleged perpetrator is a staff member or a prisoner, the Commission's standards explicitly require investigators to base their conclusions on what the "preponderance of the evidence" shows. This standard of proof is significantly less stringent than what is required to convict someone of a

**STANDARD**

**Evidence standard for administrative investigations**

Allegations of sexual abuse are substantiated if supported by a preponderance of the evidence.

**Specialized training: Investigations**

In addition to the general training provided to all employees (TR-1), the agency ensures that agency investigators conducting sexual abuse investigations have received comprehensive and up-to-date training in conducting such investigations in confinement settings. Specialized training must include techniques for interviewing sexual abuse victims, proper use of *Miranda-* and *Garrity*-type warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. The agency maintains written documentation that investigators have completed the required specialized training in conducting sexual abuse investigations.

crime but is adequate to protect individuals from being labeled as perpetrators and punished without cause. The Commission's standards require the lead investigator to provide a written report of the findings, accompanied by supporting documentation, to the highest-ranking facility official.

Because specialized training for sexual abuse investigators is so important and because the deficits in some correctional systems and facilities are so great, the Commission's standards require facilities to ensure that investigators are trained in the most up-to-date approaches to investigating sexual abuse in a correctional setting and to maintain written documentation showing that investigators have completed such training. The standard on training specifies minimum components for training programs: techniques for interviewing sexual abuse victims, proper use of *Miranda* and *Garrity* warnings when interviewing alleged perpetrators, protocols for collecting evidence in a correctional facility, and the evidentiary criteria required to substantiate a case for administrative sanctions and, separately, for referral to a prosecuting authority.

The Commission also recognizes that, in many correctional facilities and their surrounding local jurisdictions, investigators are scarce. One correctional administrator commented, "We need three investigators for 500 inmates. I have one."[54] Jail administrators often have difficulty getting local police to investigate reports of sexual abuse in their facilities.[55] Several prison administrators have commented that law enforcement in their jurisdictions is stretched so thin that the State police asked the legislature to allocate additional resources to the department of corrections so that the department could hire internal affairs investigators with the authority to make arrests.[56]

## Coordinating Responders

Any report of sexual abuse in a correctional facility must trigger an immediate response from security staff; forensic, medical, and mental health care practitioners; investigators; and the head of the facility. To meet the needs of victims while conducting a thorough investigation likely to hold perpetrators accountable, the Commission's standards require these professionals to coordinate their efforts. Facility administrators have a responsibility to specify the scope and nature of what must be coordinated. Formal coordination in response to reports of sexual abuse is already a feature in some State correctional systems, including Alabama, Arkansas, Colorado, Connecticut, Minnesota, Ohio, Oregon, and Utah.[57] Corrections departments should work with community-based sexual abuse advocates to develop a model of coordination intended to be truly responsive to the needs of victims in a correctional setting.[58]

Coordination sounds simple but can be challenging to realize in practice. Cross-training is crucial because each responder needs to understand

the impact of his or her work on the situation overall. Clear channels of communication and flexibility are also important so that the professionals involved can adapt how they work together based on the circumstances of the incident and when it is reported. For example, if a prisoner reports an illicit relationship that occurred 6 months earlier with a corrections officer, an investigator will likely take the lead, working in coordination with any mental health practitioners involved. In contrast, if a prisoner reports being raped by an officer earlier that same day, a forensic medical examiner, a housing/security officer, and medical and mental health practitioners may take the lead initially, working closely with an investigator.

Corrections officers or other security personnel often respond to reports of sexual abuse before anyone else. Their first duty, under the Commission's standards, is to ensure the immediate safety of the victim by separating the victim and alleged abuser. Their other immediate actions, as mandated under the Commission's standards, have a significant impact on the investigation. They are responsible for securing the crime scene and instructing the victim not to take any actions that could destroy semen, saliva, skin cells, hair, and other physical evidence. For many victims, their initial instinct is to take a shower or throw away clothing they were wearing during the assault.[59] "They get rid of this evidence because of their shame. . . and ignorance. . ." one corrections officer commented.[60] Such feelings are normal and common among victims of sexual abuse.

First responders set the stage for the work of forensic examiners. When the sexual abuse has occurred recently and the allegation is rape, the Commission's standards require facilities to offer the victim a forensic exam by a specially trained professional. Sexual assault forensic examiners and sexual assault nurse examiners (SANEs) have the knowledge and skills to document physical findings and collect pertinent evidence from victims, including evidence that the sexual activity was not consensual.[61] They recognize what evidence is important, how to preserve it, how to establish a chain of custody, and how to prepare the evidence for submission to a crime lab for analysis. Skill in this area is critical to successfully investigating and prosecuting sexual abuse.

As forensic nurse Leanne Holland told the Commission, "[W]hen I was an emergency room nurse, not that I wasn't qualified, but I did not have the specialized training that I have today. . . . [T]hose cases did not go forward with prosecution, and those offenders, those perpetrators, are most likely still out there. . . compared to last week when there were three guilty pleas as a result of my education and training and working collaboratively with a team to, hopefully, make a difference in someone's life."[62] An evaluation of SANE programs and multidisciplinary sexual assault response teams published in 2003 by the National Institute of Justice found that they improve the quality of forensic evidence and increase the ability of law enforcement to collect information, file charges, and prosecute and

STANDARD

Coordinated response

All actions taken in response to an incident of sexual abuse are coordinated among staff first responders, medical and mental health practitioners, investigators, and facility leadership. The facility's coordinated response ensures that victims receive all necessary immediate and ongoing medical, mental health, and support services and that investigators are able to obtain usable evidence to substantiate allegations and hold perpetrators accountable.

**Staff first responder duties**

Upon learning that an inmate was sexually abused within a time period that still allows for the collection of physical evidence, the first security staff member to respond to the report is required to (1) separate the alleged victim and abuser; (2) seal and preserve any crime scene(s); and (3) instruct the victim not to take any actions that could destroy physical evidence, including washing, brushing his or her teeth, changing his or her clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is a non-security staff member, he or she is required to instruct the victim not to take any actions that could destroy physical evidence and then notify security staff.

convict perpetrators while also providing better emergency health care for women who have been sexually assaulted.[63]

According to the International Association of Forensic Nurses, at least 276 SANE programs operate throughout the United States and its territories. Most (75 percent) are based in hospitals, but some (25 percent) operate in other settings.[64] The Commission recognizes that specially trained forensic examiners are not readily available in all communities, particularly in rural areas. Forensic professionals who provided advice to the Commission have expressed an interest in expanding the network of trained examiners to ensure that victims of rape in any correctional facility have the option of receiving a thorough forensic exam.

Because physical evidence is crucial to a successful investigation, the Commission's standards require correctional facilities to implement a protocol that dictates how to collect, maintain, and analyze physical evidence and that stipulates the responsibilities of the forensic examiner. In developing a custom protocol, facilities must consult the 2004 U.S. Department of Justice's Office of Violence Against Women publication "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents" (or subsequent editions, or similarly comprehensive and authoritative protocols developed after 2004).[65] At the time of its publication, law enforcement officials and forensic medical examiners considered the national protocol the gold standard of sexual assault evidence protocols.

Several correctional agencies, including the Arizona Department of Corrections, have adapted the national protocol to reflect the significant differences of collecting forensic evidence in a confinement setting as opposed to in the community, including that the victim and perpetrator are usually located within the same facility, that the offender may be in a position of authority, that confidentiality is seldom possible, and that victims are less likely to cooperate with the investigation.[66] Given the prevalence of sexual abuse in correctional facilities and the need to improve evidence collection, the Commission recommends that the Department of Justice develop a forensic evidence protocol specifically adapted to confinement and that can be used in all correctional facilities.

Criminal and administrative investigators should be involved as soon as possible after an incident of sexual abuse is reported, and the Commission's standards require investigators to coordinate their separate efforts. In particular, individuals conducting an administrative investigation must coordinate with criminal investigators as well as prosecutors, facility administrators, and their legal counsel before taking compelled statements, which, as discussed, cannot be used against a defendant in a criminal case.[67]

When responders coordinate their work, each person can be more effective. Investigators may have more success interviewing victims and assessing their credibility, for example, if they consult first with mental health practitioners. Clinical input about the effects of trauma can help

**116**

an investigator properly assess the person's statements, especially if the victim appears under- or over-emotional. Even basic coordination between investigators and victim advocates can have a benefit.[68] A woman who was sexually abused in a California prison and was initially uncooperative later gave the investigator all the information he needed to refer the case for prosecution after he told her that she would be able to talk confidentially with a counselor from a local rape crisis center. "My impression is that the inmate viewed the offer of confidential counseling services as a gesture of trust and concern," Wendy Still, former Associate Director of Female Offender Programs for the California Department of Corrections and Rehabilitation, told the Commission.[69] (See Chapter 6 for information about the many benefits of providing outside counseling to incarcerated victims of sexual abuse.)

Security staff also have a role to play beyond their immediate response. For example, many correctional systems designate specific staff to handle housing and other security issues that arise in conjunction with allegations of sexual abuse.[70] Individuals in that role should coordinate with other responders to ensure that their decisions support the victim's recovery and do not unnecessarily restrict the victim's movements within the facility and participation in work, education, and other programming.

## Unsubstantiated but Not Untrue

Consistently and thoroughly investigating reports of abuse encourages incarcerated persons and staff to speak out and facilitates holding perpetrators accountable. No national data have been collected on how often correctional facilities investigate reported abuses, and there is no body of research describing the quality of those investigations. We do know, however, that correctional facilities substantiate allegations of sexual abuse at very low rates. According to a report by the Bureau of Justice Statistics, facilities substantiated just 17 percent of all allegations of sexual violence, misconduct, and harassment investigated in 2006.[71] That same year, 29 percent of allegations were determined to be "unfounded"—meaning that investigators concluded that sexual abuse did not occur. But the majority of allegations—55 percent— were "unsubstantiated," which means that investigators could not determine whether or not the abuse occurred.

Substantiation rates in some States are considerably lower than the national rate. For example, the 2006 study conducted in Texas found that only 43 out of 1,938 allegations of sexual assaults by inmates, or approximately 2 percent, were substantiated.[72] The situation in California appears similar. "The California correctional system today houses about 167,000 human beings inside its walls," State Senator Gloria Romero told the

**STANDARD**

**Evidence protocol and forensic medical exams**

The agency follows a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions. The protocol must be adapted from or otherwise based on the 2004 U.S. Department of Justice's Office on Violence Against Women publication "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents," subsequent updated editions, or similarly comprehensive and authoritative protocols developed after 2004. As part of the agency's evidence collection protocol, all victims of inmate-on-inmate sexually abusive penetration or staff-on-inmate sexually abusive penetration are provided access to forensic medical exams performed by qualified forensic medical examiners. Forensic medical exams are provided free of charge to the victim. The facility makes available a victim advocate to accompany the victim through the forensic medical exam process.

Commission.[73] "Yet when we took a look at the statistics that were reported stemming from [PREA], the State [substantiated] 23 inmate-on-inmate sexual assaults and 75 staff-on-inmate assaults in the prison walls within the last year. . . . If we take a look at the Division of Juvenile Justice in California, formerly known as the California Youth Authority, there were nine [substantiated] allegations of sexual assaults that were made in a population of about 3,000. . . . So if we look at those statistics collectively, clearly we find [that] either California is doing tremendously well, we're very safe, or California just hasn't gotten it right. I tend to think it's the latter."

An "unsubstantiated" finding may be the result of a poor-quality investigation or reflect the legitimate difficulty of gathering sufficient evidence. Whatever the cause, the high proportion of unsubstantiated allegations—coupled with a failure to understand the difference between "unsubstantiated" and "unfounded"—can lead legislators, judges, and the public to conclude that sexual abuse of prisoners is less prevalent and serious than it really is.

Prisoners do sometimes fabricate accounts of sexual abuse, for example, to punish or control a staff member or another inmate, to be moved to a different housing unit, or to avoid shame and possibly also disciplinary action when caught in a consensual sexual act with another inmate.[74] There is no reason to believe, however, that extremely low

**No national data have been collected on how often correctional facilities investigate reported abuses, and there is no body of research describing the quality of those investigations. We do know, however, that correctional facilities substantiate allegations of sexual abuse at very low rates.**

substantiation rates are attributable to a high number of false allegations. There is very limited research on false reporting and no consensus on rates. The more rigorous studies of false reporting in the community (as opposed to in confinement) suggest that rates might range from 2 to 8 percent.[75] Certainly, there are motivations and rewards for falsely reporting sexual abuse in a correctional facility that have no parallel in the community. At the same time, the real risks associated with reporting even genuine sexual abuse are a strong disincentive to fabricating allegations.

So why are so few allegations of sexual abuse substantiated? As discussed, many problems can compromise the success of investigations, starting with a lack of clear policies on reporting and investigations and failure to establish a coordinated response. Other common problems include: too few investigators and not enough resources to support their work, a lack of specialized training for investigators, a weak protocol for the collection and preservation of evidence, the difficulty of investigating delayed reports of abuse, and a lack of coordination between administrative and criminal investigators.

## Prosecuting Abusers

The corrections officer that Dana Ragsdale reported for sexual abuse continued to work at the Federal Detention Center in Philadelphia and at one point assaulted a woman so brutally she hemorrhaged and was sent to the hospital. He was eventually charged with and pleaded guilty to felony counts of engaging in sexual acts with three women prisoners, but he was not prosecuted for assaulting the woman who first confided in Ragsdale. The officer received 4 months in jail for sexual misconduct with three incarcerated women, followed by 3 years of probation—"in my view an inexcusably short sentence," Ragsdale told the Commission.[76]

No culture of safety and of zero tolerance for sexual abuse can exist when perpetrators operate with impunity, without fear of serious consequences for their behavior, and are free to retaliate against or further victimize their accusers or others. If perpetrators are not held accountable, victims and witnesses of abuse will view reporting as futile and remain silent.[77] Punishing perpetrators also has a deterrent effect, cautioning those who might be inclined to engage in abuse to think twice.[78] And it is, of course, what justice requires.

The reality today, however, is considerably different. Despite the fact that most incidents of sexual abuse constitute a crime in all 50 States and under Federal law, very few inmate and staff perpetrators of sexual abuse in correctional settings are prosecuted. According to data collected by the Bureau of Justice Statistics, only 33 percent of substantiated cases of sexual abuse between prisoners and 45 percent of substantiated cases involving staff perpetrators were referred for prosecution in 2006, the most recent year for which data are available.[79] Given that the substantiation rate nationally is just 17 percent, the proportion of cases referred for prosecution is small indeed.

There are no national data on how many referred cases are actually prosecuted; however, the Commission repeatedly heard testimony that prosecutors decline most referrals. Data provided by the Colorado Department of Corrections and the Federal Bureau of Prisons provide encouraging counterpoints. From 2005 to 2008, prosecutors in Colorado accepted 31 of the 65 cases referred. Over nearly a decade, from October 1999 to April 2009, 1,622 complaints of sexual abuse were submitted to the U.S. Office of the Inspector General. During this same time period, Federal prosecutors accepted 166 of the 321 cases presented and prevailed in 133 cases, either by verdict, plea, or pretrial diversion.

Prosecutors cite several reasons for turning away cases: the investigations were too poorly conducted to support a successful prosecution, the potential criminal penalties are minimal, and juries are generally unsympathetic toward incarcerated victims and unwilling to believe their

**Agreements with the prosecuting authority**

The agency maintains or attempts to enter into a written MOU or other agreement with the authority responsible for prosecuting violations of criminal law. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

allegations.[80] As Martin Horn told the Commission, overburdened prosecutors "choose not to prosecute crimes when committed behind bars by individuals already serving a long sentence."[81] According to John Rees, Commissioner of the Kentucky Department of Corrections, the difficulty of winning cases of staff sexual misconduct is a significant disincentive for prosecutors. In his testimony to the Commission, Rees described these cases as "extremely difficult and extremely complicated. . . . [U]nfortunately. . . the weight of the testimony of a convicted felon is held in the balance when put up against an individual who has not been convicted of a felony."[82]

In some jurisdictions, other dynamics are in play: some prosecutors do not view incarcerated individuals as members of the community and as deserving of their services as any other victim of crime. In smaller jurisdictions where the correctional facility is a major employer, a "company town" mentality may predominate, with prosecutors reluctant to take on cases in which the defendant is a corrections officer.

Limited views about what constitutes sexual abuse and who engages in abuse also can be a barrier to prosecution. Patricia Caruso, Director of the Michigan Department of Corrections, testified to the Commission about a case in which a female staff member had sexually abused a male prisoner: "I know that sometimes people feel that parties may be in love or that it is 'consensual.' There may be things in the world that fit that criteria. In prison they do not. . . . For a long time, it was more acceptable for women [than men] to resign and go on with their life. That is not acceptable in this department."[83] Caruso went to the Prosecuting Attorneys Association of Michigan and talked to them specifically about issues of staff sexual misconduct.[84] In her experience, stereotypes can be overcome, in this case by educating prosecutors and juries about how female staff have helped male prisoners escape, brought dangerous contraband into the facility, and put other prisoners' lives in danger by sharing confidential information.

Caruso requires prison wardens throughout Michigan to take the same kind of initiative. "I told the wardens when you have a case of sexual misconduct, I expect you to go personally to your local prosecutor. Part of being a warden—I was a warden more than half of my career in this department. . . is having a personal relationship in your community with local law enforcement," Caruso said.[85] Jesse Neely, Executive Assistant to the Commissioner of the Tennessee Department of Correction, agreed about the need to raise awareness. "State attorneys general and district attorneys need to be educated regarding PREA" to become more "sympathetic to the cause," he told the Commission.[86]

Dialogue between corrections professionals and prosecutors should continue to occur through workshops and trainings organized by each group's professional associations. The process began through a project sponsored by the Washington College of Law at American University and

funded by the National Institute of Corrections to train prosecutors on investigating allegations of staff sexual misconduct with offenders.[87] There also are national models of prosecutorial collaboration. In Massachusetts, for example, county district attorney offices have appointed a "prison liaison."[88] In Pennsylvania, from 1998 through 2005, corrections officials worked with district attorneys to convict 10 staff members of sexual misconduct.[89] The State of Texas has taken an unusual step. A special unit, funded through the governor's office, is charged with prosecuting all crimes that occur within any State correctional facility.[90] Prosecutors in the unit encounter many of the above-mentioned difficulties, but their specialized experience, according to Chief Prosecutor Gina DeBottis, has enabled them to develop specific strategies for cases of prison sexual violence.[91] The conviction rate for inmate and staff sexual abuse is modest but increasing annually.[92]

> **"I told the wardens when you have a case of sexual misconduct, I expect you to go personally to your local prosecutor."**

The Commission's standards require correctional agencies to attempt to formalize a relationship with the prosecuting authority in their jurisdictions through a memorandum of understanding or other agreement. These agreements should be the basis for making cases of prison sexual violence a higher priority for prosecutors. They can also provide a framework for the kind of working relationship that leads to effective investigations and more criminal convictions. As Aaron Aldrich told the Commission, such agreements are "imperative."[93]

Although prosecutors must endeavor to take on and win more cases in court, San Francisco Sheriff Michael Hennessey reminded the Commission that just the fact of a referral can have a deterrent effect on prisoners who might otherwise perpetrate sexual abuse. "[Confinement facilities] have very effective grapevines, . . . and inmates know what's taken seriously and what's not taken seriously. And if a person is. . . booked and charged with sexual assault in a county jail, even if there [is no] prosecution because of evidence or witness problems, they know that that has happened. . . . [I]f [the perpetrator goes] to another institution, . . . when the State prison officers classify that person, they're going to red flag it. . . , and that may prevent sexual assault at the next facility. . . ."[94]

## Tightening Administrative Sanctions

Every allegation of sexual abuse must trigger an administrative investigation; when the investigation substantiates those allegations, the perpetrator of the abuse must be disciplined. Sanctions should never be the sole response to rape and other serious forms of sexual abuse. Until more cases are successfully prosecuted, however,

STANDARD

**Disciplinary sanctions for staff**

Staff is subject to disciplinary sanctions up to and including termination when staff has violated agency sexual abuse policies. The presumptive disciplinary sanction for staff members who have engaged in sexually abusive contact or penetration is termination. This presumption does not limit agency discretion to impose termination for other sexual abuse policy violations. All terminations for violations of agency sexual abuse policies are to be reported to law enforcement agencies and any relevant licensing bodies.

many perpetrators of serious sexual abuse will be subject only to administrative discipline, making sanctions in these cases especially important. It is crucial that sanctions be fair, consistent, and sufficiently stringent to serve as a deterrent to continued abuse. Applying sanctions in an arbitrary or biased fashion undermines their purpose and the broader mandate to demonstrate zero tolerance to sexual abuse. Unfortunately, no national data exist on which to base conclusions about whether correctional facilities are consistently meting out discipline appropriate for the culpability and conduct of perpetrators. The data available provide only a basic breakdown of the sanctions applied.

According to data collected by the Bureau of Justice Statistics on substantiated incidents of sexual abuse in 2006, the sanctions for staff perpetrators of sexual abuse, applied alone or in combination, were: discharge (44 percent of all sanctions), demotion/diminished responsibilities (1 percent), reprimand/discipline (10 percent), and transfer to another facility (1 percent).[95] In addition, although not technically sanctions, the outcomes also included resignation prior to the investigation (26 percent) and resignation after the investigation was completed (7 percent). When the perpetrators of abuse were other prisoners, the Bureau of Justice Statistics reported the following sanctions, applied alone or in combination: placement in solitary confinement (78 percent of all sanctions), cell confinement (16 percent), placement in a higher level of custody (22 percent), loss of privileges (20 percent), and transfer to another facility (22 percent).[96]

When staff perpetrate sexually abusive contact or penetration, termination must be the presumptive sanction according to the Commission's standards. Termination may also be the appropriate response when staff deliberately or repeatedly violate sexual abuse policies, such as the duty to report. Union contracts affirm the ability of employers to

**Until more cases are successfully prosecuted, however, many perpetrators of serious sexual abuse will be subject only to administrative discipline, making sanctions in these cases especially important.**

discipline staff for just cause, although in practice, some agreements either limit an agency's ability to sanction staff or provide avenues that too easily allow sanctions to be overturned. Agencies and unions should amend such agreements. Institutional safety is impossible without equilibrium between a union's obligation to protect its members and management's duty to impose reasonable sanctions. Correctional agencies must also provide law enforcement agencies and relevant licensing entities with the names of all terminated staff to help prevent an employee fired for sexual abuse from being employed by a facility in another jurisdiction and potentially abusing prisoners there.

When prisoners perpetrate sexual abuse, the Commission's standards require that discipline be commensurate with the nature of the

abuse, the prisoner's disciplinary history, and the sanctions imposed in response to similar offenses by other prisoners with comparable histories. When determining what type of sanction, if any, to impose, the disciplinary process must consider whether a mental disability or mental illness may have contributed to the abusive behavior. Interventions designed to address and correct underlying reasons or motivations for sexual abuse, such as requiring the perpetrator to participate in therapy or counseling, also must be considered.

Sanctions should support the facility's zero-tolerance policy without being unduly punitive or counterproductive. In particular, perpetrators should not be placed for prolonged periods in disciplinary segregation because conditions in these units have the potential to cause or aggravate symptoms of mental illness and to limit access to needed mental health services.[97] Finally, facilities should fully integrate their disciplinary process with their classification system, triggering a review of the prisoner's classification to manage the risk that the person will sexually abuse other prisoners.

Although agencies must sanction staff for sexual contact with prisoners, incarcerated persons should not be punished for their involvement, regardless of whether or not the encounter was allegedly consensual. The power imbalance between staff and prisoners vitiates the possibility of meaningful consent. In addition, the threat of being punished for a relationship deemed to be consensual would deter prisoners from reporting sexual abuse by staff.

Of course, prisoners sometimes engage in sexual relationships with staff to further illicit activities. The U.S. Department of Justice's Office of the Inspector General found that Federal prisoners had engaged in sexual relations with staff to obtain drugs; use unmonitored phones; communicate with other prisoners while in isolation; learn sensitive information about other prisoners, such as who may be acting as an informant; or access information that could help them escape.[98] Prisoners should be held responsible for these crimes and rule violations but not for any underlying sexual relationship with staff that facilitated their behavior.

In sum, everyone who engages in sexual abuse in a correctional facility or other corrections setting must be held accountable for their actions. There has been too little accountability for too long. The Commission designed its standards in this area to change the dynamic by encouraging incarcerated individuals and staff to report abuse and by requiring correctional facilities to protect those who speak out, conduct effective investigations, and ensure appropriate punishment.

**Disciplinary sanctions for inmates**

Inmates are subject to disciplinary sanctions pursuant to a formal disciplinary process following an administrative ruling that the inmate engaged in inmate-on-inmate sexual abuse or following a criminal finding of guilt for inmate-on-inmate sexual abuse. Sanctions are commensurate with the nature and circumstances of the abuse committed, the inmate's disciplinary history, and the sanctions meted out for comparable offenses by other inmates with similar histories. The disciplinary process must consider whether an inmate's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed. Possible sanctions also include interventions designed to address and correct underlying reasons or motivation for the abuse, such as requiring the offending inmate to participate in therapy, counseling, or other programs.

FINDING

Victims are unlikely to receive the treatment and support known to minimize the trauma of abuse. Correctional facilities need to ensure immediate and ongoing access to medical and mental health care and supportive services.

6

# Treating Trauma

I t was a warm July night in the District of Columbia and the jail's air conditioning was not working, so staff left the cell doors open.[1] The senior officer in charge, a woman, was known to organize events where women inmates stripped and danced naked on the dining room tables. As inmates and male and female staff mingled in the heat on this particular evening in 1995, an officer started playing loud music in the dining room. A crowd soon formed and several inmates began dancing. Sunday Daskalea, the victim of ongoing sexual harassment while detained at the jail, fled to her cell,

**Daskalea testified in court that she felt "constant stress, anxiety, and dread of imminent sexual attack." Even her release from jail in August 1995 did not free her. Daskalea suffered from insomnia, struggled with eating disorders, and "spent months emotionally and psychologically debilitated, withdrawn and depressed."**

afraid of being forced to participate. After a few minutes, the officer in charge demanded that Daskalea be brought out. The music stopped and the crowd, which now also included maintenance workers, began chanting Daskalea's name.

Two inmates dragged Daskalea out of her cell and into the center of the crowd, where the officer in charge ordered her to dance. Daskalea complied, removing all her clothes except her underwear, but was so frightened that her legs trembled. Staff and inmates watched her as she danced, "shouting and clapping; some flashed money."[2] One inmate grabbed Daskalea and rubbed baby oil all over her body. When Daskalea fell to the floor, that inmate lay on top of her, rubbing her body against Daskalea's. When Daskalea was questioned about the incident a few days later, she told the interviewer she was afraid something would happen to her if she provided any details. Indeed, a few days later, all of her underwear was confiscated as "contraband" and she was placed in solitary confinement, initially without a mattress.[3]

This was only the latest in a string of abusive incidents Daskalea had suffered at the facility. On one earlier occasion, an officer pulled her out of her cell and forced her into a room where a male inmate, known for

his sexual misconduct, was waiting. The man attacked Daskalea and attempted to rape her. The sexual harassment and abuse escalated over time. Daskalea reported the abuse to jail officials and to the judge who sentenced her; although the judge held a hearing and recommended that Daskalea be moved out of the D.C. jail for her safety, jail authorities took no action.[4]

Completely without protection, Daskalea became crippled by fear. She slept only during the day, afraid of what officers might do to her at night. She testified in court that she felt "constant stress, anxiety, and dread of imminent sexual attack."[5] Even her release from jail in August 1995 did not free her. Daskalea suffered from insomnia, struggled with eating disorders, and "spent months emotionally and psychologically debilitated, withdrawn and depressed." According to the U.S. Court of Appeals for the District of Columbia, "These injures are hardly surprising or unexpected in light of the abuse Daskalea suffered. . . . [I]t does not take an expert to confirm the jury's common sense with respect to both their existence and cause."[6] The court awarded Daskalea compensatory damages for mental and emotional distress. Court records do not reveal what clinical treatment, if any, Daskalea received following the attempted rape and the extraordinary abuses she endured while confined, but her testimony suggests that she was in urgent need of counseling and support services while she was incarcerated and after her release.

As corrections administrators work to create a protective environment in the facilities they manage, they also have a legal duty to ensure that when systems fail and abuse occurs, victims have unfettered access to appropriate medical and mental health services.[7] Healing from sexual abuse is difficult under the best circumstances; without adequate treatment, recovery may never occur. This chapter describes common mental and physical effects of sexual abuse—underscoring why treatment is so important—and explores why many victims do not seek or receive the medical and mental health care they need and to which they are entitled by law.

## An Assault on Body and Mind

As sexual assault nurse examiner Jennifer Pierce-Weeks told the Commission, experiences of sexual abuse have the potential to harm a person in every dimension of life: "psychological, physical, spiritual, and social. . . ."[8] Potentially long-lasting psychological aftereffects of sexual abuse are well documented. They include posttraumatic stress disorder (PTSD), anxiety disorders, fear of loud noises or sudden movements, panic attacks, and intense flashbacks to the traumatic event.[9] Each of these consequences alone has the ability to re-traumatize victims for years.[10]

Almost all victims of an invasive or violent sexual assault develop some symptoms of PTSD, although the symptoms may not show up until weeks or months after the abuse.[11] PTSD is not unique to victims of sexual abuse; it is a possible response to any life-changing event that is destructive and destabilizing.[12] Symptoms of PTSD vary and include sadness, explosive anger, feelings of hopelessness, changes in memory or thinking, feeling marked or changed in a permanent way, obsessing about the event or persons involved, relating to others differently, losing trust in others, and other detrimental reactions.[13] Some victims experience PTSD for just a few weeks or months; for others, the symptoms are long lasting and hard to overcome.

Hope Hernandez was raped by a corrections officer in 1997 in the hospital ward of the same jail in which Daskalea was sexually abused. In her testimony to the Commission, Hernandez spoke about the lasting effects of sexual assault. "Although it's been eight years, I'm still suffering from the effects of that rape. On the one-year anniversary of this rape, I kept seeing the guard's face over me. . . . I wanted to see something besides his face. . . . [M]y husband has tried to be intimate with me. All I could see was this guard's face flashing back in my mind, and I would become ill."[14] Such vivid flashbacks are not uncommon for victims of sexual abuse.[15]

Avoiding stimuli likely to trigger a flashback or other emotional responses is particularly difficult in a correctional facility, where victims may regularly encounter the setting where the abuse occurred—in some cases their own cell. It also may be impossible to avoid their abuser, causing them to continually relive the incident and maintaining the trauma.[16] When victims remain at risk of repeated abuse, their fears are both rational and debilitating. For this reason, the Commission's standards require first responders to separate the victim from the alleged abuser. (See Chapter 5 for a detailed discussion of responsibilities of first responders.)

> **"Although it's been eight years, I'm still suffering from the effects of that rape. On the one-year anniversary of this rape, I kept seeing the guard's face over me. . . . I wanted to see something besides his face. . . . [M]y husband has tried to be intimate with me. All I could see was this guard's face flashing back in my mind, and I would become ill." Such vivid flashbacks are not uncommon for victims of sexual abuse.**

"I've abused drugs and alcohol and tried to kill myself on the installment plan," Chance Martin told the Commission. "I couldn't successfully commit suicide; although, I wanted to worse than anything in the world."[17] At age 18, Martin was sexually abused while incarcerated in the Lake County Jail in Crown Point, Indiana. Martin's wish to end his life is not atypical among victims of sexual abuse. In non-correctional settings, one-third to one-half of rape victims consider suicide; between 17 and 19 percent actually attempt suicide.[18] Young women are particularly susceptible to thoughts of suicide following a traumatic personal event.[19]

For young women and girls, any experience that threatens their sense of safety or one that unsettles their understanding of morality can lead to thoughts of self-harm.[20]

There also appears to be a strong correlation between the psychological responses to trauma and self-mutilating behaviors, such as head-banging, cutting, and swallowing razors or glass.[21] A study of teenage girls who had experienced sexual abuse found that almost half of them suffered from clinical levels of depression, anxiety, and PTSD, and 62 percent engaged in self-mutilating behavior.[22] Victims may use self-mutilation as punishment if they blame themselves for the abuse, or they may be using physical pain to block unbearably painful emotions.[23] The risk of suicide and self-mutilation make it especially important for sexual abuse victims to have immediate access to treatment and for medical and mental health care professionals and other corrections staff to monitor survivors closely and respond quickly to any warning signs.

**Sexual abuse and emotional and psychological responses may also lead to serious medical conditions. For both men and women, responses like chronic anxiety, hyperarousal, sleep disturbances, and eating disorders are strongly associated with development of long-term health problems, including cardiovascular disease, ulcers, and a weakened immune system.**

Studies of incarcerated individuals also suggest that men and women victims may react differently and in varying degrees to sexual trauma.[24] In addition to the psychological responses already described, reactions of males to sexual victimization by other men in confinement may include feeling that one has lost "status" in the facility, lack of confidence in one's masculinity, and feeling that one has been made more feminine as a result of the abuse.[25] Male victims who did not identify as gay or bisexual prior to their incarceration may develop confusion about their sexual orientation or gender identity if sexually victimized by other men. Other prisoners or staff also may taunt a male victim about being a "woman" or make the victim feel that his sexual orientation was compromised as a result of the experience.[26]

Sexual abuse and emotional and psychological responses may also lead to serious medical conditions. For both men and women, responses like chronic anxiety, hyper-arousal, sleep disturbances, and eating disorders are strongly associated with development of long-term health problems, including cardiovascular disease, ulcers, and a weakened immune system.[27] Women victims can develop fibromyalgia, a chronic disorder characterized by musculoskeletal pain and tender spots across the body.[28] Rape of women by men also carries the risk of pregnancy.[29] Studies indicate that sexual abuse victims have poorer physical functioning in general and more physical ailments than non-abused individuals, even after controlling for emotional disturbances such as depression.[30]

In addition to the mental and physical problems that stem from sexual abuse, many victims are physically injured during the course of a sexual assault. Depending on the degree of force, the size of the perpetrator in relation to the victim, and any weapons involved, physical injuries can include bruises, lacerations, bleeding, broken bones, concussions, knocked-out teeth, internal injuries, and even more serious physical damages.[31] Physical injuries incurred by women as a result of rape also may lead to persistent pelvic pain, excessive menstrual bleeding and cramping, and other gynecological disorders.[32]

A study of incarcerated men found that more than half of all sexual assaults resulted in physical injury. Men assaulted by other prisoners were somewhat more likely than those assaulted by corrections staff to be injured physically (67 percent compared with 53 percent). Only a quarter of the injuries documented in this study—those to the anus or throat—were a direct consequence of forced penetration. However, victims of sexual assaults by other prisoners were more likely to sustain internal injuries or be knocked unconscious than victims of physical but nonsexual assaults.[33]

Exposure to HIV and other sexually transmitted infections is another potential consequence of sexual abuse, although if a prisoner is infected with one of these diseases, the symptoms may not be evident for months following an assault. Michael Blucker tested negative for HIV when he was admitted to the Menard Correctional Center in Illinois in 1993 but, approximately a year later, after being raped multiple times by other prisoners, Blucker tested positive.[34] Although he eventually lost his lawsuit against the corrections staff he believes were deliberately indifferent to his victimization, his case prompted Illinois legislators to pass a law protecting prisoners against acts that have the potential to result in an "unadjudicated death sentence."[35]

In 2005–2006, 21,980 State and Federal prisoners were HIV positive or living with AIDS.[36] Researchers believe the prevalence of hepatitis C in correctional facilities is dramatically higher, based on number of prisoners with a history of injecting illegal drugs prior to incarceration. Sexually transmitted infections, such as gonorrhea, syphilis, and chlamydia, are also prevalent in the incarcerated population.[37] According to testimony before the Commission, the Centers for Disease Control and Prevention (CDC) lacks data to assess the extent to which sex in correctional facilities, whether rape or consensual, contributes to the

**A study of incarcerated men found that more than half of all sexual assaults resulted in physical injury.**

high prevalence of HIV in prisons and jails.[38] One CDC study did find that individuals in confinement may contract HIV in a variety of ways, including sexual contact.[39]

The CDC has made a number of recommendations to address and potentially mitigate the risk of HIV/AIDS for incarcerated individuals and

the community, including HIV education, peer-education programs, testing, and prevention counseling for prisoners.[40] The CDC study also noted that "providing condoms to sexually active persons is an integral part of HIV prevention interventions outside of prison."[41] The Commission does not endorse the use of condoms in prisons and notes that sexual activity, whether consensual or not, is generally prohibited in correctional systems, but refers to this study because we believe that the incidence of HIV in certain populations outside correctional systems is likely attributable in part to such activity within correctional systems.

Because of the disproportionate representation of minority men and women in correctional settings, it is likely that the spread of these diseases in confinement will have an even greater impact on minority men, women, and children and their communities. As such, the Commission recommends that funds be made available to the appropriate entities for research into whether consensual and/or nonconsensual sexual activity in the corrections system may play a role in infecting populations outside corrections with HIV/AIDS and other sexually transmitted infections.

## A Duty to Care and Unmet Needs

**W**hile incarcerated in the Women's Correctional Institute in New Castle, Delaware, in 1995, Valerie Daniels was sexually assaulted by one of the officers working in the facility.[42] The officer entered Daniels's cell, forced her to perform oral sex on him, and then proceeded to vaginally rape her. Daniels did not report the rape or seek treatment until she began to feel ill and suspected she might be pregnant. A positive pregnancy test conducted at the facility's health center confirmed her suspicions. Although Daniels reported feeling upset following the rape and had a history of emotional problems as well as developmental disabilities, she was not offered rape counseling or any other form of therapy at the facility, but only prescribed antidepressants. Daniels failed to persuade the court that prison officials were deliberately indifferent to her health care needs. However, experts testified on her behalf that antidepressants alone are not an appropriate form of treatment for a woman who has been raped.

More than three decades have passed since the U.S. Supreme Court established in *Estelle v. Gamble* that deliberate indifference to the health of prisoners is a form of cruel and unusual punishment.[43] Since then, correctional agencies have struggled, and sometimes failed with tragic results, to meet the medical and mental health care needs of a large and often ill prisoner population. According to surveys of prisoners conducted by the Bureau of Justice Statistics (BJS) in 2004, 44 percent of people confined in State correctional facilities and 39 percent of Federal prisoners reported a

current medical condition.[44] Self-reports of mental illness are even higher. In the same BJS survey, more than half of incarcerated individuals reported a recent history or symptoms of a mental heath problem—56 percent of State prisoners, 45 percent of Federal prisoners, and 64 percent of jail inmates.[45] Medical and mental health care for adults and youth in confinement deserves careful attention.

BJS is also the primary source of national data about the availability of treatment. A study published in 1999 that focused on mental health care found that only 60 percent of Federal and State prisoners and 41 percent of individuals confined in jails reported receiving necessary mental health services.[46] More recently, independent researchers analyzed BJS' 2002 survey of jail inmates and 2004 survey of State and Federal prisoners and found that many prisoners with persistent problems had never been examined by a health care professional in the facility where they were incarcerated.[47] This problem was much worse in jails than in prisons: 68 percent of jail inmates with medical problems reported never being examined, compared with 14 percent of Federal prisoners and 20 percent of State prisoners.

Although the National Commission on Correctional Health Care (NCCHC) developed a set of standards that clearly define what is needed to run a functional medical and mental health program, prisons and jails are not required to comply with those standards.[48] NCCHC accreditation requires a fee and is strictly voluntary; many facilities elect not to engage in this process. As a result, only 225 jails, 135 prisons, and 59 juvenile detention facilities are currently NCCHC accredited.[49]

Correctional health care is seriously underfunded almost everywhere, and most facilities are in dire need of additional skilled and compassionate health care practitioners.[50] Appropriate mental health screening and treatment, in conjunction with careful classification, will protect vulnerable prisoners from sexual victimization. (See Chapter 3 for a detailed discussion of risk and vulnerability.) When abuse does occur, providing appropriate treatment often is the most effective way to promote recovery and reduce the chance that the trauma of sexual abuse will lead to lasting or life-threatening medical or mental health problems.

**More than three decades have passed since the U.S. Supreme Court established in *Estelle v. Gamble* that deliberate indifference to the health of prisoners is a form of cruel and unusual punishment. Since then, correctional agencies have struggled, and sometimes failed with tragic results, to meet the medical and mental health care needs of a large and often ill prisoner population.**

STANDARD

**Access to emergency medical and mental health services**

Victims of sexual abuse have timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment. Treatment services must be provided free of charge to the victim and regardless of whether the victim names the abuser. If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, security staff first responders take preliminary steps to protect the victim (OR-3) and immediately notify the appropriate medical and mental health practitioners.

# Delivering Quality Care by Trained Professionals

Given the potentially severe and long-lasting medical and mental health consequences of sexual abuse, the Commission's standards require facilities to ensure that victims have unimpeded access to emergency medical treatment and crisis intervention as well as continuing medical and/or mental health evaluations and care for as long as necessary.

Generally, emergency care after sexual assaults includes diagnosing and treating any physical injuries, arranging for a forensic medical exam when appropriate and with the victim's consent, assessing the victim's medical and mental health needs, and planning follow-up care. Health practitioners, not security or other staff, must determine the nature and scope of the treatment based on their professional judgment. The quality of this initial response is crucial. As Jennifer Pierce-Weeks told the Commission, "receiving compassionate care at the time of the assault by an appropriately trained examiner. . . can assist all victims in their short and long-term healing process."[51]

The initial response is only the beginning. The Commission designed its standard on ongoing treatment to ensure that skilled medical and mental health care practitioners assess and respond to a victim's evolving medical and mental health care needs. Victims of sexual abuse may experience health problems that manifest weeks or months after the abuse has occurred. In terms of ongoing medical care, the Commission strongly urges medical staff to encourage victims to be tested for HIV and viral hepatitis 6 to 8 weeks following an incident of abuse and to obtain pregnancy tests in cases of vaginal penetration. These tests must be voluntary. The standard also requires facilities to conduct a mental health evaluation of all known abusers and to provide the treatment recommended.

Although diagnosing and treating emotional and psychological repercussions of sexual abuse is complex, there are a number of effective interventions and treatment modalities.[52] In particular, studies suggest that group therapy is an effective intervention for victims of sexual abuse because it offers a supportive environment, prevents victims from feeling isolated, and validates their experiences and feelings.[53] Because correctional facilities are closed environments, the use of group therapy should be carefully handled—victims could be in danger if sensitive information filters out beyond the group to other prisoners or staff. Clinicians have used other treatment approaches with victims of sexual abuse, including psycho-education and cognitive behavioral therapy, and can easily adapt these approaches to correctional settings.[54] The challenge, clinicians agree, is finding the right intervention for victims at each stage of the healing process.

Incarcerated individuals often do not report sexual abuse. In such cases, ensuring appropriate treatment hinges on knowing when an incarcerated individual's mental or physical health problems might indicate that abuse has occurred. For this reason, the Commission's standards require correctional facilities to ensure and document that all full- and part-time medical and mental health care practitioners receive training in the detection and assessment of sexual abuse. Correctional administrators seeking guidance on how to meet this standard can look to their peers in Alabama, Minnesota, and Texas. These systems provide this kind of training to the health care practitioners who work in their facilities.[55]

The appropriate treatment method for victims of sexual abuse may vary, depending on the type of facility or setting. For example, the more open, communal nature of community corrections may allow for types of treatment that would not work as well in more secure settings. Treatment in juvenile facilities will also differ from treatment in adult facilities due to the psychological, cognitive, and developmental differences between youth and adults. As a result of these differences, the Commission's Standards for juvenile facilities require that medical and mental health practitioners working with youth be specially trained on how to provide treatment to young victims of sexual abuse.

The Commission's standard on ongoing medical and mental health treatment requires that care provided in correctional facilities match what is generally acceptable to medical and mental health care professionals. The Commission acknowledges that meeting this seemingly simple standard is a real challenge, especially for facilities in remote locations, where specialists, community providers, and other treatment resources may be scarce. Partnerships between correctional systems and local medical and mental health care providers are helping to meet this need. Hampden County, Massachusetts, was one of the first places to pilot such a program, referred to as Community Oriented Correctional Health Services. Through the program, doctors, nurses, and case managers from the community serve as the medical and mental health care practitioners in the jail. Hampden County's success inspired other jurisdictions, including Washington, D.C., and Ocala, Florida.[56] Similar partnerships are in place elsewhere. For example, the Connecticut Department of Correction contracts with the University of Connecticut to provide health care to all State prisoners. Incarcerated individuals who are victims of sexual assault can receive free counseling and other medical and mental health services for as long as necessary.[57]

Such partnerships operate with the goal of raising the quality of correctional medical and mental health care and ensuring that all victims of

**STANDARD**

**Ongoing medical and mental health care for sexual abuse victims and abusers**

The facility provides ongoing medical and/or mental health evaluation and treatment to all known victims of sexual abuse. The evaluation and treatment of sexual abuse victims must include appropriate follow-up services, treatment plans, and, when necessary, referrals for continued care following their release from custody. The level of medical and mental health care provided to inmate victims must match the community level of care generally accepted by the medical and mental health professional communities. The facility conducts a mental health evaluation of all known abusers and provides treatment, as deemed necessary by qualified mental health practitioners.

**"[R]eceiving compassionate care at the time of the assault by an appropriately trained examiner. . . can assist all victims in their short and long-term healing process."**

STANDARD

**Specialized training: Medical and mental health care**

The agency ensures that all full- and part-time medical and mental health care practitioners working in its facilities have been trained in how to detect and assess signs of sexual abuse and that all medical practitioners are trained in how to preserve physical evidence of sexual abuse. All medical and mental health care practitioners must be trained in how to respond effectively and professionally to victims of sexual abuse and how and to whom to report allegations or suspicions of sexual abuse. The agency maintains documentation that medical and mental health practitioners have received this specialized training.

sexual abuse have access to adequate treatment during and after their period of confinement.[58] Continued care is important to the long-term medical and mental health of victims and also to protecting community health—each year, jails and prisons release more than 1.5 million people with infectious diseases, many of which can spread through sexual contact.[59]

## Addressing an Ethical Dilemma "as Old as Prisons Are Themselves"

Regardless of the quality of available treatment, some victims of sexual abuse in confinement settings may be reluctant to access medical and mental health services.[60] When sexual abuse occurs in the community, victims—unless they are children—can see a doctor or counselor and be assured that the information they provide will remain confidential. Anyone can understand the desire for absolute confidentiality, especially when the circumstances involve something as intimate as sexual abuse, but the nature of life in a correctional facility and the goals of safety and security make that impossible. "Absolute confidentiality is a nice idea. And in an ideal world, I would concur wholeheartedly," Art Beeler told the Commission.[61] Beeler, a former warden of the Federal Correctional Complex in Butner, North Carolina, explained that facility staff need to know when abuse occurs and who is allegedly involved to adequately protect victims. "Without [this information], a correctional officer or unit staff member may house the [victim] with the perpetrator's best buddy. Or worse yet, with the perpetrator. . . . If this information was not available to correctional personnel, your decision in housing an offender may be, in fact, a death sentence."[62]

Former Medical Director of the New Mexico Department of Corrections Mike Puisis raised the same concerns in his testimony to the Commission, "Medical professionals [who work in correctional facilities] should be required to report rape. . . . [M]edical ethics and patient safety are the reasons that reporting rape should be a professional obligation. Hopefully, the reporting of rape will result in the safety of the patient."[63]

Although the potential consequences of withholding information are clear, striking the right balance in terms of sharing sensitive information among corrections staff is not easy. As Beeler noted, "The ethical dilemma of whom to share information with in a prison environment is probably as old as prisons are themselves. On one side. . . is the desire that the information not be shared with those who do not have the sensitivity to handle the information in a professional manner. On the other side is the need to keep staff and inmates safe and the institution secure."[64]

The Commission believes that absolute confidentiality is not in the best interest of the victim or the safety of the facility. The standards require that

**134**

all facility staff, including medical and mental health care practitioners, report any allegations or suspicions of sexual abuse. Many States—including New Mexico where Puisis worked, as well as California, Georgia, and Texas—already have policies that meet this standard. At the same time, correctional mental and medical health care professionals must discreetly handle information provided by victims of sexual abuse, sharing it with other staff only on a need-to-know basis and following clear protocols. They also must inform prisoners of their duty to report before providing services.

Because physician-patient confidentiality is a hallmark of medical care in the community, doctors, nurses, and counselors must be clearly informed about their duties as mandatory reporters. The Commission's standard on training for medical and mental health practitioners requires facilities to ensure that all full- and part-time staff receive training on how and to whom to report information about sexual abuse. Policies on mandatory reporting must also be covered in sexual abuse education programs for prisoners. Clear policies communicated effectively to both medical and mental health care practitioners and prisoners ensure that everyone has the same understanding of what mandatory reporting entails.

> **"Absolute confidentiality is a nice idea. And in an ideal world, I would concur wholeheartedly," Art Beeler told the Commission. Beeler explained that facility staff need to know when abuse occurs and who is allegedly involved to adequately protect victims.**

## Offering Other Options

Many incarcerated individuals will only access medical or mental health treatment if they feel confident that doing so will not put them at risk for further harm. Individuals who testified before the Commission often expressed fear that speaking out about abuse and naming abusers may lead to retaliation.[65] Retaliation can take many different forms. Lost privileges, internal sanctions, and threats of injury are possible when individuals name perpetrators of sexual abuse. Victims as well as witnesses may be reluctant to seek treatment because they are afraid to name the perpetrator and follow through with a formal complaint and investigation. (See Chapter 5 for a more detailed discussion.) For these reasons, the Commission's standards mandate that medical and mental health care practitioners provide a sexual abuse victim needed treatment, regardless of whether he or she names the perpetrator. Without this policy, sexual abuse victims may decide that the risk of further harm is too great and elect not to access treatment.

**Inmate access to outside confidential support services**

In addition to providing on-site mental health care services, the facility provides inmates with access to outside victim advocates for emotional support services related to sexual abuse. The facility provides such access by giving inmates the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national victim advocacy or rape crisis organizations and enabling reasonable communication between inmates and these organizations. The facility ensures that communications with such advocates are private, confidential, and privileged, to the extent allowable by Federal, State, and local law. The facility informs inmates, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged.

The Commission realizes that some victims will never feel comfortable or safe disclosing their experience of sexual abuse to a corrections employee. The standards, therefore, require facilities to give prisoners information about how to contact victim advocates and other support services in the community and underscore that victim communication with outside advocates be private and confidential to the extent permitted by law. Meeting this standard can be as simple as prominently posting toll-free hotline numbers. However, the Commission requires correctional facilities to try to develop real relationships with community-based organizations, formalized through memoranda of understanding—not only to fulfill this particular standard but, when possible, to ensure that victims of sexual abuse have support as they transition from the facility back to their home communities. Collaborations with community-based crisis centers are currently in place in numerous States, including California, Iowa, Ohio, Pennsylvania, and Utah.[66]

"Paths to Recovery," a pilot program operated by Just Detention International (formerly Stop Prisoner Rape) in collaboration with the California Department of Corrections and Rehabilitation, pairs community-based rape crisis professionals with nearby prisons. As of early 2009, the program was being tested in two sites. Sexual abuse counselors travel to these prisons to provide confidential services to survivors of sexual abuse regardless of whether the abuse occurred in that facility or elsewhere. Wendy Still, former Associate Director of Female Offender Programs and Services for the department, believes the program is accomplishing much more than its frontline service objective. "If survivors of sexual assault know that confidential support services are available, if they see the institution providing for their emotional as well as medical needs, they will be more likely to access the services and. . . feel safe enough to file these formal complaints so that proper action may be taken against the perpetrator."[67] As Still highlighted in her testimony, the impact of providing quality treatment services reaches beyond individual victims to foster an environment in correctional facilities that actively discourages sexual abuse.

## Eliminating Cost as a Barrier to Treatment

Cost may also be a barrier to treatment for victims of sexual abuse. In the majority of States, legislatures have passed laws authorizing correctional agencies to charge prisoners for medical care.[68] Fees and co-payments are viewed as a way to reduce budget deficits and eliminate abuses of the sick call system, assuming that prisoners are willing to pay only when they really need to see a doctor, nurse, or therapist. The problem, however, is that an unknown and perhaps large number of prisoners who "opt out" actually need medical

or mental health care. Most incarcerated individuals have scant financial resources, and some delay seeking treatment until their symptoms worsen or until they need emergency care because a fee as little as $5 is beyond their means. When New Jersey implemented a $5 co-payment for medical care in prisons in the mid-1990s, for example, a 60 percent drop in sick calls followed.[69] Recent research across 36 States indicates that co-payment programs reduced sick calls between 16 and 50 percent.[70]

Victims of sexual abuse should not have to consider whether they can afford to see a doctor or a counselor. The Commission's standards require facilities to provide emergency medical and mental health care services to victims of sexual abuse free of charge. Meeting this standard in facilities that currently charge prisoners for emergency care will require changes in policy and practice. Many correctional systems go further by crafting co-pay and fee-for-service systems that include exemptions for chronic care. Because sexual abuse can lead to ongoing medical and mental health problems, and because victims may delay reporting abuse, the Commission urges systems that already have such exemptions to include common and persistent aftereffects of sexual abuse among the list of chronic health problems. For those correctional systems without such exemptions, the Commission encourages them to consider this approach.

Financial barriers to treatment come in other forms, as well. In her written testimony for the Commission, Sandra Matheson, Director of the State Office of Victim/Witness Assistance at the New Hampshire Attorney General's Office, described a case involving a corrections officer at Shea Farm Halfway House in Concord and the multiple abuses he perpetrated against women confined there during the early 2000s.[71] (See Chapter 8 for more details on this case.) After describing the physical brutality and sexual assaults women residents at Shea Farm endured, Matheson went on to explain how the New Hampshire Department of Corrections responded when the abuse came to light.

**Victims of sexual abuse should not have to consider whether they can afford to see a doctor or a counselor.**

Matheson worked with the Director of Community Corrections to set up a meeting for women at Shea Farm to brief them on the case and to offer support services. The department also brought in mental health practitioners and a local rape crisis center. Because of their lack of trust in the system after the assaults, the women were not comfortable seeking treatment from the department's mental health practitioners; they wanted to see a therapist within the community.[72] In recognition of the costs associated with obtaining outside treatment, Matheson helped victims file a claim with the State's Victim Compensation Program. However, the women of Shea Farm suffered another setback: the State denied their claims due to a rule that prohibited inmates from receiving compensation for these services.

The prohibition in New Hampshire on compensating formerly incarcerated individuals stems from the 1984 Victims of Crime Act (VOCA). Money from the Act funds victim assistance and crime compensation programs. Office for Victims of Crime guidelines prohibit using VOCA money to serve incarcerated victims of sexual violence, even if the victimization occurred while in custody. Similarly, grants administered under the Violence Against Women Act (VAWA) cannot be used to assist incarcerated victims of sexual abuse who have been convicted of domestic or dating violence, sexual assault, or stalking. The Commission recommends that the VOCA grant guidelines be changed and that Congress amend VAWA to acknowledge that all survivors of sexual abuse deserve treatment and support services.

Unimpeded access to treatment, care by qualified medical and mental health care practitioners, and structured collaborations with outside providers are critical to ensuring that incarcerated victims of sexual abuse receive the medical and mental health care services they need to heal, be safe, and begin rebuilding their lives.

# PART III

# SPECIAL POPULATIONS

FINDING

Juveniles in confinement are much more likely than incarcerated adults to be sexually abused, and they are particularly at risk when confined with adults. To be effective, sexual abuse prevention, investigation, and treatment must be tailored to the developmental capacities and needs of youth.

7

# When Children Are Involved

I n summer 2004, the Plainfield Juvenile Correctional Facility in Indiana housed nearly 300 boys, most between the ages of 12 and 18.[1]  Based on reports of rampant physical violence and sexual abuse, the U.S. Department of Justice began investigating conditions of confinement and the safety of the residents. That investigation revealed pervasive sexual activity of almost unimaginable proportions. Acts of sexual abuse occurred throughout the facility—in dormitories, day rooms, the recreation area, bathrooms and showers, storage closets, and even in the campus security van. Sexual contact among youth was so widespread that authorities at the facility used flow charts to document the incidents, charting each youth involved and the nature of the sexual activities. One incident involved eight boys; another involved 14.

The investigators were especially concerned by the "alarming" age and size disparity between many of the youth involved and noted that "[w]hen older, bigger, and/or more sophisticated youths have access to younger and/or smaller youths, the risk of abuse and exploitation is particularly high."[2]  Youth as old as 18 were assaulting or coercing children as young as 12; children weighing as little as 70 pounds were sexually abused by youth outweighing them by 100 pounds. Older youth were inappropriately housed with and had easy access to 12-year-old boys. In one case, a 16-year-old gave a 12-year-old clothing to entice him into having sex with him in the dayroom. In another, an 18-year-old youth attempted on two occasions to force a 12-year-old to have sex with him in a bathroom.

Very little seemed to deter abusive behavior at Plainfield. Assaults often occurred without staff intervening or even being aware of them. At their best, staff ratios were one staff member for 30 youth, and sometimes there was only one staff member to supervise 48 youth, decimating the ability of staff to prevent incidents, protect vulnerable residents, or "respond in a safe and timely manner" when sexual assaults did occur.[3] Housing arrangements at Plainfield exacerbated the danger. For example, sexual offenders were housed in large dormitories with bunk beds—a design known to increase the risk of sexual abuse.

In its report, the Department of Justice emphasized that Plainfield administrators had a duty under the U.S. Constitution to take reasonable measures to protect vulnerable residents from abuse and exploitation by more sophisticated, sexually predatory youth and also to provide a "rehabilitative environment for all young sex offenders."[4] State officials converted Plainfield into an adult facility in October 2005, shortly after they received the report.[5]

A daily snapshot of juveniles in custody in 2006 showed that approximately 93,000 youth ages 20 and under were confined in juvenile facilities in the United States; more than half (55,978) were 16 years old or younger.[6] Preventing, detecting, and responding to sexual abuse in these facilities demands age-appropriate interventions. The Commission's standards for juvenile facilities parallel those for adult prisons and jails, with modifications to reflect the developmental capacities and needs of children.

This chapter discusses why confined youth are especially vulnerable to sexual abuse and how to protect them, with an emphasis on standards that are significantly different in a juvenile justice context.

## Heightened Vulnerability, Special Responsibility

**H**istorically, the juvenile justice system was designed to provide a therapeutic and rehabilitative environment for youth who violate the law.[7] Therefore, most juvenile facilities differ from adult prisons and jails in their theoretical emphasis on rehabilitation. Notwithstanding recent punitive approaches to juvenile delinquency, new scientific evidence confirms that youth are especially amenable to treatment. As the Supreme Court noted in 2005, the character of a juvenile is less "fixed" than that of an adult.[8] Researchers have identified several features of adolescence that make youth particularly open to rehabilitation, including significant and rapid changes in intellectual capacities and evidence of positive responses to adjustments in family, peer group, school, and other settings that influence development.[9] As a result, most youth will mature out of misdemeanor and other criminal behavior between the teenage years and young adulthood; few youth persist in a life of crime as adults.[10]

Youth may pass through the system once or twice, never to return. Yet if they are sexually abused, they may live with lifelong consequences.[11] Juvenile justice agencies thus have an opportunity and a challenge: prevent sexual abuse now, or risk long-term consequences for victims.

Juveniles are not yet fully developed physically, cognitively, socially, and emotionally and are ill-equipped to respond to sexual advances and protect themselves.[12] Younger teenagers and preteens, in particular, are unprepared to cope with sexualized coercion or aggression from older,

more experienced youth or adult corrections staff, and such abuse may permanently damage them.[13] Because of their age, youth are entitled to even greater protections from abuse and unnecessary pain than incarcerated adults. Youth in criminal justice settings have a right to "bodily integrity" under the 14th Amendment of the Constitution, as would any child in school.[14] Indeed, when the State exercises custodial authority over children, "its responsibility to act in the place of parents *(in loco parentis)* obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm."[15]

It is especially egregious when staff are the perpetrators of sexual abuse against youth and when facilities fail to hold perpetrators accountable. Over a period of almost a year in 1997 and 1998, L.C. was allegedly sexually abused by two staff members of the residential juvenile detention facility in Chalkville, Alabama.[16] On one occasion, when L.C. was 16 years old, she was granted a pass to travel to another town to visit her mother. A Chalkville corrections officer followed her there without her knowledge and coerced her into meeting him at a local restaurant. By threatening to use his authority over her at the facility, he made her accompany him to a motel. Once at the motel, he raped her. These off-site rapes happened on two occasions. The officer repeatedly made sexually explicit statements to L.C., said she didn't seem like a virgin, and told her about having sex with other girls at the facility. L.C. submitted a written complaint reporting the abuse to the facility superintendent, but he wrote back that "he could not control the actions of Chalkville Campus' employees when they were off-site."[17]

> **Youth may pass through the system once or twice, never to return. Yet if they are sexually abused, they may live with lifelong consequences. Juvenile justice agencies thus have an opportunity and a challenge: prevent sexual abuse now, or risk long-term consequences for victims.**

The State's obligation to protect youth in juvenile facilities covers not just staff but also residents, contract employees, and volunteers. The story of A.S., a 15-year-old girl at Chalkville, illustrates the harm caused by failure to protect youth from sexual abuse. Over a period of months beginning in September 2000, a male security guard employed by the Department of Youth Services (DYS) allegedly sexually abused A.S.[18] One night, when agency records confirm that he escorted her back to her cottage, the security guard raped her. He continued to threaten and harass her for the rest of his time at the facility. Eight months later, when allegations of sexual abuse at Chalkville reached the police, the assailant was placed on administrative leave. The girl continued to fear for her safety, however, because other staff on leave for sexual abuse still visited the facility. When DYS took no action to reassure her, her emotional trauma escalated

until she became suicidal. She was placed in in-patient care, where she remained for the duration of her sentence.

The pervasive misconduct at Chalkville and the systemic failure to respond led 49 girls to bring charges that "male staff had fondled, raped and sexually harassed" them.[19] DYS officials received notices about sexual abuse in the form of letters, complaint forms, and incident reports beginning in 1994 and continuing into 2001.[20] Although DYS investigated some of the complaints, it ignored many because the girls were "presumed to be liars and troublemakers."[21] One court opinion noted that—with the number of complaints of sexual abuse over such a long period of time, often involving the same staff members—any "reasonable supervisor should have realized that he or she had a bigger problem."[22] Ultimately, the pervasiveness of the abuse was impossible for the State to ignore, and legislation was passed making custodial sexual misconduct a crime.[23] Fifteen employees were fired or resigned as a result of the allegations. The litigation ended with a $12.5 million settlement.[24]

**The officer repeatedly made sexually explicit statements to L.C., said she didn't seem like a virgin, and told her about having sex with other girls at the facility.**

The gravity of what happened in Chalkville cannot be overstated; the risk and consequences of abuse among confined youth deserve serious attention. Rates of sexual abuse appear to be much higher for youth in confinement than they are for adult prisoners. This is true of recorded allegations of sexual abuse as well as incidents that investigators deemed "substantiated." The Bureau of Justice Statistics (BJS) found that the rate of sexual abuse in adult facilities, based only on substantiated allegations reported to corrections authorities that were captured in administrative records, was 2.91 per 1,000 incarcerated prisoners in 2006.[25] The rate in juvenile facilities, also reported by BJS and based on administrative records, was more than five times greater: 16.8 per 1,000 in 2006.[26] This difference in rates may be due, in part, to State and local mandatory reporting laws specifying that sexual acts involving persons under a certain age are nonconsensual by definition and must be reported to authorities.

The actual extent of sexual abuse in residential facilities is still unknown.[27] At the time this report went to press, the best national data available on the sexual abuse of youth in confinement were based on juvenile facilities' administrative records of allegations and substantiated or unsubstantiated incidents. To be substantiated, the abuse first has to be reported and recorded by the facility. Substantiating an allegation also requires a formal investigation, availability of adequate and still-viable evidence, and entering a finding that sexual abuse occurred into official records. All these steps can be compromised by reluctance on the part of youth or staff to report abuse or to conduct or participate in an investigation, officials' concerns about publicity and liability, and a lack of

adequate procedures or training on how to respond to reports and investigate alleged incidents.[28]

As directed by PREA, BJS is now conducting the first nationally representative survey of sexual abuse in residential detention, based on computer-assisted interviews. Youth use a touch screen to respond to a questionnaire accompanied by audio instructions delivered through headphones.[29] This research will provide the best estimate yet on rates of abuse in juvenile facilities and allow comparisons with BJS' groundbreaking sexual abuse surveys of adult prisoners. A pilot study of 645 residents in nine facilities for youth adjudicated for committing severe offenses suggests that juveniles may be more vulnerable to sexual abuse in confinement than anyone imagined. Nearly one of every five youth surveyed (19.7 percent) reported at least one sexual contact during the preceding 12 months or since they had arrived at that facility if they had been there less than 12 months.[30] Staff were as likely as youth to perpetrate sexual abuse: nearly 8 percent of the youth interviewed reported sexual contacts with staff involving physical force or threat of force; other types of force or pressure; or sex in return for money, protection, or other special treatment.

## Who's at Risk

In September 2008, the Department of Justice Review Panel on Prison Rape prepared a report on sexual assault in Federal and State prisons that included a comprehensive profile of common characteristics of victims and perpetrators of rape in adult correctional facilities.[31] To date, there has been no similarly comprehensive study of the characteristics of youth who are at greatest risk of being victimized or of perpetrating sexual abuse in juvenile facilities.[32] However, some characteristics—including past abuse history, small size, inexperience with the justice system, sex, sexual orientation, gender identity, and mental and physical disabilities—may be associated with higher vulnerability to sexual abuse.

**Youth in juvenile detention span a wide range of ages and developmental stages. In some States, youth as young as 6 and as old as 20 fall within juvenile court jurisdiction and can be housed, at least in theory, in the same facility. This mix is fraught with danger.**

Youth in juvenile detention span a wide range of ages and developmental stages. In some States, youth as young as 6 and as old as 20 fall within juvenile court jurisdiction and can be housed, at least in theory, in the same facility.[33] This mix is fraught with danger because younger and smaller residents may be particularly vulnerable to force, violence, sexual abuse, and intimidation from older and stronger residents.[34] A 2005–2006

BJS survey of juvenile facilities found that, across facilities that provided data, 60 percent of victims of substantiated incidents of sexual violence perpetrated by other youth were 15 years of age or younger. In contrast, victims of staff sexual violence were usually older: 65 percent of staff victims were 16 or 17, and 19 percent were 18 or above.[35]

Studies in the community suggest that youth with a history of abuse or neglect may be extremely vulnerable to subsequent victimization as well—a risk that can persist into adulthood.[36] President of the National Juvenile Detention Association Leonard Dixon testified before the Commission that "[y]outh who enter the juvenile justice system often come to [the facility] from abusive and neglect[ful] families. In Michigan alone, twenty percent of the juvenile justice youth have been victims of child abuse and neglect."[37] These youth often feel powerless at the hands of adults: a feeling likely to be heightened in the authoritarian environment of juvenile detention, where they are expected to follow all orders issued by the adults in charge, submit to strip searches by adults, and depend on those in authority to meet basic needs and protect them from potential perpetrators.

Inexperience with the criminal justice system and commingling juveniles with different offense histories also contribute to the vulnerability of thousands of confined youth. When M.W., a 14-year-old boy weighing 98 pounds, was detained in the reception area of the West Palm Beach, Florida, juvenile detention center after an arrest for burglary, he was placed in a cell by himself.[38] Microphones and cameras allowed staff to monitor cells in the detention center, but some officers lacked access to the monitoring equipment, so cell doors were often left open to give counselors a direct view of the youth inside. Officers later placed another boy in the cell with M.W. This boy was 15 years old, 6′2″ tall, and weighed 160 pounds. Half an hour later, officers placed an additional boy in the cell. This boy was 16 years old, 6′2″ tall, weighed 195 pounds, and had a long history of violent crimes.

**"Youth who enter the juvenile justice system often come to [the facility] from abusive and neglect[ful] families. In Michigan alone, twenty percent of the juvenile justice youth have been victims of child abuse and neglect."**

Less than 1 hour after the boys entered the cell, one boy attempted to force M.W. to perform oral sex while the other boy watched. An officer, who noticed that the cell door was almost completely closed, entered and witnessed the assault in progress. The officer pulled M.W. out of the cell and asked if he had been hurt. However, M.W. was never given a medical examination or provided mental health treatment while detained at the facility. Several months after the assault, M.W. developed chronic nightmares and posttraumatic stress disorder. A court later awarded $100,000 in compensatory damages to him and $5,575 to his father.

In many jurisdictions, the juvenile justice system is responsible not only for the care and confinement of youth charged with crimes, but also for youth identified as "status offenders" for violating rules that only apply to persons under a certain age. Status offenses are typically minor and include curfew violations, running away, disobeying parental orders, and truancy.[39] Some runaways are fleeing abuse and violence at home.[40] Youth who are in the custody of child protective services agencies also may end up in the juvenile justice system for minor offenses that would not involve the justice system if they were living with their parents.[41] Although States that receive formula grants under the Juvenile Justice and Delinquency Prevention Act of 2002 are prohibited from placing status offenders in secure facilities, many jurisdictions take advantage of exceptions to this rule and confine youth with minor infractions in facilities for serious offenders.[42]

According to national census data, approximately 4,800 status offenders were in the custody of a juvenile residential facility on census day in 2006.[43] This tally increases to nearly 20,000 (or more than one-fifth of all youth in custody) if juveniles who have committed a technical violation, such as a violation of probation or other valid court order, are included.[44] In 2002, the Department of Justice's Civil Rights Division found that 75 percent of girls in two training schools in Mississippi were confined solely for status offenses, probation violations, or contempt of court.[45] These youth often have little or no experience with the juvenile justice system and are particularly vulnerable to abuse or coercion by more experienced, sophisticated, and violent residents as well as by staff.

Simply being female is a risk factor. Girls are disproportionately represented among sexual abuse victims in general and in juvenile justice settings. The 2005–2006 BJS survey found that 36 percent of all victims in substantiated incidents of sexual violence in the State systems and local or private juvenile facilities providing data were female, even though girls represented only 15 percent of youth in residential placement in 2006.[46] Girls were the victims in more than half (51 percent) of all substantiated incidents perpetrated by staff, compared to being the victims in only 21 percent of incidents perpetrated by other youth.

**According to Jody Marksamer, Director for the Youth Project of the National Center for Lesbian Rights, juvenile facilities are often homophobic places that are emotionally, physically, and sexually unsafe for these youth.**

During the past two decades, the number of girls in the juvenile justice system as a whole—and in secure detention facilities in particular—increased substantially, due in part to an increase in arrests and detention for technical violations of probation.[47] This shifting demographic poses a significant challenge to the juvenile justice system and individual facilities, which were traditionally designed to meet the needs of boys and

STANDARD

## Obtaining information about residents

During intake and periodically throughout a resident's confinement, employees obtain and use information about each resident's personal history and behavior to keep all residents safe and free from sexual abuse. At a minimum, employees attempt to ascertain information about prior sexual victimization or abusiveness; sexual orientation and gender identity; current charges and offense history; age; level of emotional and cognitive development; physical size/stature; mental illness or mental disabilities; intellectual/developmental disabilities; physical disabilities; and any other specific information about individual residents that may indicate heightened needs for supervision, additional safety precautions, or separation from certain other residents. This information may be ascertained through conversations with residents at intake and medical and mental health screenings; during classification assessments; and by reviewing court records, case files, facility behavioral records, and other relevant documentation from the residents' files. Medical and mental health practitioners are the only staff permitted to talk with residents to gather information about their sexual orientation or gender identity, prior sexual victimization, history of engaging in sexual abuse, mental health status, and mental or physical disabilities. If the facility does not have medical or mental health practitioners available, residents are given an opportunity to discuss any safety concerns or sensitive issues privately with another employee.

may not have enough women staff to supervise and monitor girls who enter the system.

Facilities also may be ill-equipped to protect gay, lesbian, bisexual, and gender-nonconforming youth. According to Jody Marksamer, Director for the Youth Project of the National Center for Lesbian Rights, juvenile facilities are often homophobic places that are emotionally, physically, and sexually unsafe for these youth.[48] A lawsuit filed by the Hawaii chapter of the American Civil Liberties Union provides a stark illustration of how youth who are gay, transgender, or merely perceived to be gay may be threatened by staff or assaulted and harassed by other youth. This case resulted in a $25,000 settlement to be used for developing new policies at the facility and a $600,000 settlement to three plaintiffs who were subjected to unwanted sexual touching, threatened with rape, and repeatedly harassed because of their sexual orientation.[49]

Transgender girls are especially vulnerable. Despite their feminine gender and appearance, they are almost always placed in boys' facilities, where they are expected to shower and sleep with boys.[50] Cyryna Pasion told the Commission about the sexual abuse she faced as a transgender girl in the Hawaii Youth Correctional Facility in 2004 and 2005.[51] Placed in a boys' unit against the advice of medical staff and counselors, Cyryna suffered sexual harassment, unwanted touching, taunting, and threats of violence and rape. "I felt tortured and alone," she told the Commission.[52] "The boys threatened to beat me up if I wrote a complaint. . . ."

Youth with physical and mental disabilities who are dependent on others for care are another vulnerable group and may have special difficulty comprehending and communicating danger.[53] "Robert," a severely mentally disabled 15-year-old boy with an IQ of 32, was raped by another resident after corrections officers at the Leon Regional Juvenile Detention Center in Tallahassee, Florida, delegated the duties of bathing and changing Robert's diaper to a 17-year-old sex offender.[54] For these actions, the older boy was later convicted of one count of sexual battery on a victim with a mental defect.[55] There are no national data on the prevalence of cognitive and emotional disorders among confined youth, but studies suggest rates are much higher than in the general population of U.S. youth.[56] Disorders most commonly noted among confined youth in juvenile facilities include depression, attention deficit/hyperactivity disorder, learning disabilities, posttraumatic stress disorder, and developmental disabilities.[57]

## Identifying and Protecting Vulnerable Youth

**W**ithout evidence-based information on risk factors for confined youth, juvenile facilities are at a disadvantage in identifying potential victims and perpetrators, yet they can be held liable for failing to separate vulnerable residents from those most likely to harm them.[58] Judgments about placements are frequently made through informal procedures, which may be swayed by bias and are rarely consistent enough to be fair and effective.[59] The Commission's standard on obtaining information about residents of juvenile facilities requires a more stringent approach to screening. Until more research on vulnerability factors for confined youth is conducted, agency and facility staff should use available evidence and professional judgment to develop screening and information-gathering protocols that take into account the risk of sexual abuse in juvenile facilities, and they should develop procedures to keep residents safe without penalizing those who are vulnerable.

At a minimum, facility staff must attempt to gather information about the risk factors described above—both during intake and periodically throughout a youth's confinement. A variety of sources can provide this information, including facility records, case files, conversations with residents, and court records. Judges often have wide, although by no means absolute, discretion to take into account many factors when making sentencing determinations.[60] As a result, facility staff should look to judicial opinions, which may shed light on certain vulnerabilities or other relevant characteristics in the information-gathering process. Because addressing certain personal issues can be traumatic for youth, the standard limits questioning about sexual orientation, gender identity, prior sexual victimization, history of engaging in sexual abuse, and mental and physical health to medical and mental health practitioners. In addition to screening, facilities can take a simple step to protect youth from sexual abuse: encourage all residents during intake to tell staff if they fear being abused. This message, combined with affirmative statements about the facility's commitment to safety and zero tolerance of sexual abuse, makes it more likely that vulnerable youth will seek protection when they need it—before an assault occurs.

The Commission's standard on the placement of youth in juvenile facilities mandates that staff use all information about the risk of sexual abuse to determine safe housing, bed, program, education, and work assignments. Any information that may indicate heightened vulnerability to sexual abuse, including those elements

**STANDARD**

**Placement of residents in housing, bed, program, education, and work assignments**

Employees use all information obtained about the resident at intake and subsequently to make placement decisions for each resident on an individualized basis with the goal of keeping all residents safe and free from sexual abuse. When determining housing, bed, program, education and work assignments for residents, employees must take into account a resident's age; the nature of his or her offense; any mental or physical disability or mental illness; any history of sexual victimization or engaging in sexual abuse; his or her level of emotional and cognitive development; his or her identification as lesbian, gay, bisexual, or transgender; and any other information obtained about the resident (AP-1). Residents may be isolated from others only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged.

**"Robert," a severely mentally disabled 15-year-old boy with an IQ of 32, was raped by another resident after corrections officers. . . delegated the duties of bathing and changing Robert's diaper to a 17-year-old sex offender.**

**Resident reporting**

The facility provides multiple internal ways for residents to report easily, privately, and securely sexual abuse, retaliation by other residents or staff for reporting sexual abuse, and staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse. The facility also provides at least one way for residents to report the abuse to an outside public entity or office not affiliated with the agency that has agreed to receive reports and forward them to the facility head (RP-3). Staff accepts reports made verbally, in writing, anonymously, and from third parties and immediately puts into writing any verbal reports.

**Third-party reporting**

The facility receives and investigates all third-party reports of sexual abuse and refers all third-party reports of abuse to the designated State or local services agency with the authority to conduct investigations into allegations of sexual abuse involving child victims (IN-1 and RP-4). At the conclusion of the investigation, the facility notifies in writing the third-party individual who reported the abuse and the resident named in the third-party report of the outcome of the investigation. The facility distributes information on how to report sexual abuse on behalf of a resident to residents' parents or legal guardians, attorneys, and the public.

identified in the standard, must be taken into consideration in determining appropriate placements. The Commission strongly discourages the practice of segregating vulnerable residents because isolation may aggravate symptoms of mental illness and limit access to education, programming, and mental health services. Youth may be segregated as a last resort for short periods when less restrictive measures are inadequate to keep them and other residents safe.[61]

In cases of ongoing danger, the Commission suggests that facilities consider transferring vulnerable youth to other facilities better able to meet their needs. Because vulnerability factors, the mix of potential predators and victims, and other characteristics change over time, staff must reassess residents periodically and adjust placements when necessary to keep all residents safe from sexual abuse. If an incident of sexual abuse occurs and is discovered, staff must reassess placement decisions for the victim and, if the abuse was perpetrated by another resident, for the perpetrator as well.

## Encouraging Reporting

Reducing sexual abuse requires creating conditions in which every incident is reported and triggers an immediate response. Just crossing that first hurdle can be a challenge, however.[62] Many youth are reluctant to report abuse for understandable reasons. They must weigh the ramifications of disclosure, including shame, stigma, the risk that they won't be believed, the possibility that they will be housed in isolation, and retaliation by perpetrators. Staff who sexually abuse youth may threaten to extend their period of confinement or move them to a more restrictive housing unit or even to a different facility if they report the abuse.[63]

Recognizing the developmental, emotional, and systemic barriers that discourage youth from reporting sexual abuse, the Commission's standards require internal reporting procedures to be easy, private, and secure; teenagers and even younger children cannot be expected to follow complicated or impractical grievance procedures. Specifically, the Commission requires facility staff to accept reports from victims and third parties verbally or in writing, including anonymous reports. The standard on reporting also requires that agencies provide youth with at least one way to report sexual abuse to a person or entity not affiliated with the facility or agency.

Many confined youth will look to their parents or to another known and trusted adult in a time of crisis. For this reason, and because juveniles are unlikely to comprehend or appreciate the complex legal procedures involved in a claim of sexual abuse, the Commission requires facilities to provide residents with unimpeded access to their families, attorneys, or other

legal representatives. Under the Commission's standards, information about the facility's grievance system and sexual abuse must be made available to parents and lawyers, who can help residents understand their rights and procedures within the facility.

Reforms designed to make it easier for youth to report sexual abuse must be grounded in education for residents on the nature of sexual abuse, the facility's policy of zero tolerance of sexual abuse, procedures for reporting abuse, and the facility's response to allegations. Because many youth fail to recognize certain coercive and harmful behaviors as "rape" or "abuse"—particularly if they come from backgrounds in which this conduct has occurred—juvenile facilities should work to improve sexual education programs and sexual abuse prevention curricula.

Educational materials and presentations for youth will be of little value, however, if they do not use age-appropriate language and concrete examples, especially when discussing how to report abuse. Given the range of ages in many facilities, a one-size-fits-all approach will not work. Presentations, materials, and follow-up contacts should be structured to match the emotional, cognitive, and sexual development of particular age groupings of children and teens and must reach youth who speak limited or no English, have limited reading skills, are visually impaired, or are deaf. Agencies must also implement appropriate technologies and procedures to ensure that youth with disabilities can report abuse and access medical and mental health services without relying on other residents to translate or relay information.

Training for staff is equally important. Staff often do not understand the distinctive nature of sexual abuse involving children and teens or its potential consequences. This kind of education must include training about the nature of sexual abuse, its effects on youth, and the unique dynamics of dealing with children and adolescents around sexual topics and reporting, coupled with training on the facility's zero-tolerance policies and reporting and response procedures. Staff must know that they will be held accountable for their actions and omissions. When sexual abuse occurs, all staff—from line staff to leadership—have the responsibility to ensure that the incident is reported and addressed. In 2005, the Department of Justice found that numerous female staff in an Oklahoma juvenile facility had sexual relations with male youth and concluded that the State failed to provide adequate supervision and monitoring to protect youth from inappropriate sexual relationships with staff and other residents.[64] In facilities such as these, the failure of administrators and management to adopt and enforce

**In 2005, the Department of Justice found that numerous female staff in an Oklahoma juvenile facility had sexual relations with male youth and concluded that the State failed to provide adequate supervision and monitoring to protect youth.**

STANDARD

**Resident access to outside support services and legal representation**

In addition to providing on-site mental health care services, the facility provides residents with access to outside victim advocates for emotional support services related to sexual abuse. The facility provides such access by giving residents the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national victim advocacy or rape crisis organizations and enabling reasonable communication between residents and these organizations. The facility ensures that communication with such advocates is private, to the extent allowable by Federal, State, and local law. The facility informs residents, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged. The facility also provides residents with unimpeded access to their attorney or other legal representation and their families.

**Resident education**

During the intake process, staff informs residents of the agency's zero-tolerance policy regarding sexual abuse and how to report incidents or suspicions of sexual abuse in an age-appropriate fashion. Within a reasonably brief period of time following the intake process, the agency provides comprehensive, age-appropriate education to residents regarding their right to be free from sexual abuse and to be free from retaliation for reporting abuse, the dynamics of sexual abuse in confinement, the common reactions of sexual abuse victims, and agency sexual abuse response policies and procedures. Current residents are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all residents to ensure that they know the agency's most current sexual abuse policies and procedures. The agency provides resident education in formats accessible to all residents, including those who are LEP, deaf, visually impaired, or otherwise disabled as well as inmates who have limited reading skills. The agency maintains written documentation of resident participation in these education sessions.

a zero-tolerance policy sends mixed messages to staff and confined youth about the acceptability of sexual abuse in that setting.

Studies of child sexual abuse survivors outside confinement settings have found that children and youth faced with interviews and formal investigative processes may become intimidated or demoralized; attempt to escape the painful aftereffects of abuse or the dangers of retaliation by denying that the incident ever occurred; and recant, change their reports, or refuse to cooperate with investigators.[65] Risks for youth in confinement are even greater. To address these challenges, interviewers must be trained to communicate effectively and in a manner sensitive to the specific vulnerabilities and developmental capacities of young victims.[66]

In spite of efforts to educate youth and train staff, some victims will remain silent following an incident of sexual abuse. Although trauma, fear of retaliation, and limited knowledge of legal rights and procedures discourage reporting among adults, the impact of these factors on youth is even greater. Youth in confinement express serious doubts that their reports will be formally investigated and recount multiple incidents in which officers destroyed grievance forms and refused to follow through on investigations in an effort to protect themselves or their co-workers.[67]

The Commission's standards mandate that administrative remedies be deemed exhausted no later than 90 days after a report of sexual abuse is made. State agencies must not dismiss complaints by youth who fail to file a report within a specific time period and should not impose complicated exhaustion requirements before youth can access the courts. Legal precedent supports this view. At least one court has found that the developmental stage of youth is integral to the question of whether a plaintiff has satisfied the administrative exhaustion requirement of the Prison Litigation Reform Act. As long as the State has fair notice of a complaint, juveniles' "young age, their lack of experience with the criminal system, and their relatively short period of confinement entitle them to greater protection. . . ."[68] When the victim of abuse seeks urgent, emergency intervention or injunctive relief from the court to prevent imminent harm, the State agency must deem the resident's administrative remedies exhausted 48 hours after the report.

The Commission requires that any report of sexual abuse received in any form trigger an agency response and investigation. To be successful, investigators of sexual abuse in juvenile settings need special skills. To ensure that investigators have the knowledge and skills to work sensitively and effectively with child and teen victims of sexual assault, the Commission requires special training. Investigators should understand the developmental capacities and sexual development of children, build rapport with the youth in a safe and private space, pay attention to physical cues from the youth, ask open-ended questions that eventually shift to specific details, and remain nonjudgmental throughout the interview.[69]

# Helping Young Victims Heal

Youth who are sexually abused in confinement and other justice settings are likely to experience serious and long-standing emotional and psychological consequences throughout adolescence and into adulthood.[70] Because the experience of sexual abuse is severely damaging, it can increase tendencies toward criminality and substance abuse among youth in confinement.[71] Other potential long-term effects include major and persistent depression and posttraumatic stress disorder. Like adult victims of sexual abuse, youth may experience significant problems with impulse control, flashbacks, dissociative episodes, anger, persistent distrust and withdrawal, loss of faith, hopelessness, despair, and a poor sense of self resulting in shame, guilt, and self-blame.[72] A history of childhood sexual abuse is strongly correlated with higher rates of attempted suicide, alcohol dependence, nicotine dependence, social anxiety, and divorce.[73] For those with a history of sexual abuse, victimization in confinement may recall past experiences and replicate prior traumas, exacerbating negative outcomes.[74]

Sensitivities about sexual development and body changes add to the damage that may occur as a result of sexual abuse. In 2000, two girls with histories of mental health problems were subjected to numerous invasive strip searches in juvenile detention facilities in Connecticut.[75] Facility staff performed several of these searches without any reasonable suspicion that the girls had contraband or posed any other threat. The U.S. Court of Appeals for the Second Circuit, in its decision regarding the searches, quoted the Supreme Court's view on the vulnerability of children: "'youth. . . is a. . . condition of life when a person may be most susceptible. . . to psychological damage.'"[76] Because of this, the court reasoned that "children are especially susceptible to possible traumas from strip searches."[77] The court ultimately found that several of the searches were unconstitutional after balancing "the risks to the psychological health of the children from performing the searches and the risks to their well-being and to institutional safety from not performing the searches."[78]

Studies suggest that justice-involved girls tend to have higher rates of major depression and anxiety disorders, including posttraumatic stress disorder and somatization, than their male counterparts.[79] Adding to the complexity, girls are more likely than boys to enter the juvenile justice system with histories of physical and sexual abuse, which can lead to significant and long-lasting mental health problems. These may be compounded if sexual trauma reoccurs.[80] Unfortunately, mental health and other services in many juvenile facilities are "generic, coeducational, and not gender-sensitive or trauma-informed."[81]

Medical and mental health practitioners must be able to recognize the signs of sexual abuse and should understand and know how to

STANDARDS

**Accommodating residents with special needs**

The agency ensures that residents who are limited English proficient (LEP), deaf, or disabled are able to report sexual abuse to staff directly, through interpretive technology, or through non-resident interpreters. Accommodations are made to convey all written information about sexual abuse policies, including how to report sexual abuse, verbally to residents who have limited reading skills or who are visually impaired.

**Employee training**

The agency trains all employees to be able to fulfill their responsibilities under agency sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and under relevant Federal, State, and local law. The agency trains all employees to communicate effectively and professionally with all residents. Additionally, the agency trains all employees on a resident's right to be free from sexual abuse, the right of residents and employees to be free from retaliation for reporting sexual abuse, the dynamics of sexual abuse in confinement, and the common reactions of sexual abuse victims. Current employees are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all employees to ensure that they know the agency's most current sexual abuse policies and procedures. The agency maintains written documentation showing employee signatures verifying that employees understand the training they have received.

### Specialized training: Investigations

In addition to the general training provided to all employees (TR-1), the agency ensures that agency investigators conducting sexual abuse investigations have received comprehensive and up-to-date training in conducting such investigations in confinement settings. Specialized training must include techniques for interviewing young sexual abuse victims, proper use of *Miranda-* and *Garrity*-type warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. The agency maintains written documentation that investigators have completed the required specialized training in conducting sexual abuse investigations.

### Specialized training: Medical and mental health care

The agency ensures that all full- and part-time medical and mental health care practitioners working in its facilities have been trained in how to detect and assess signs of sexual abuse and that all medical practitioners are trained in how to preserve physical evidence of sexual abuse. All medical and mental health care practitioners must be trained in how to respond effectively and professionally to young victims of sexual abuse and how and to whom to report allegations or suspicions of sexual abuse. The agency maintains documentation that medical and mental health practitioners have received this specialized training.

respond to the developmental and psychological needs of young victims. They must also be trained in the provision of ongoing age-appropriate treatment and care. To ensure staff are prepared to meet these complex obligations, the Commission requires that all full- and part-time medical and mental health care practitioners receive special training.

Sexual abuse incidents occurring within a facility often leave victims without enough confidence in the environment or its staff to report the incident or seek help within the facility. To ensure that young victims receive the care and support they need, facilities must provide residents with access to emotional support from outside victim advocates as well, such as local, State, or national victim support groups, rape crisis organizations, or toll-free abuse hotlines. Perhaps the most effective way to provide access to these services is to establish relationships with community service organizations and transition services, thereby linking residents to the range of services available in the community.

## Responding to Young Perpetrators

Youth who perpetrate sexual violence in juvenile facilities present a particularly complicated challenge for facility administrators, who must apply developmentally appropriate discipline or other interventions. Youthful perpetrators of sexual abuse may need treatment as much as, or more than, punishment. Studies have shown that youth who commit sexual offenses typically have a history of severe family problems, separation from parents, neglect, physical abuse, sexual abuse, social awkwardness or isolation, and academic or behavioral problems at school.[82] In addition, developmental research suggests that adolescent immaturity and inexperience may limit a youth's decision-making capacity, especially in highly stressful environments, and cause youth to make poor, shortsighted judgments.[83] Successful treatment models address multiple aspects of a child's life, including behavior modification, family relations, peer relations, and academic performance.[84]

When abuse perpetrated by a resident is discovered in juvenile justice settings, interventions and decisions about punishment must take into account the social, sexual, emotional, and cognitive development of the juvenile as well as any mental health problems that may have contributed to the abusive behavior. Accordingly, treatment, counseling, educational programs, disciplinary sanctions, and other interventions must ensure the safety of all residents and staff while working to rehabilitate the young perpetrator so that he or she can interact with others in a safe and constructive manner.

If a facility decides to impose disciplinary sanctions on a juvenile perpetrator, the discipline must be proportional to the offense committed

and commensurate with the perpetrator's disciplinary history. Discipline also should be consistent with that meted out to other residents for similar conduct and with similar disciplinary histories. Juvenile disciplinary sanctions should be fully integrated with screening and placement decisions to promote safety and security. Any act of sexual abuse by a juvenile perpetrator must trigger a reassessment of placement decisions to address the individual's risk of being sexually abusive toward other residents. Disciplining residents with prolonged periods of isolation, however, is potentially very dangerous for the resident, and the Commission strongly discourages this practice.[85] The facility also must ensure that the perpetrator understands his or her rights and responsibilities during the disciplinary process. These safeguards will promote fairness and legitimacy in the system of discipline and foster a sense of responsibility and accountability on the part of the perpetrator.

Discipline must also account for the stage of the youth's psychosocial and sexual development. Adolescence is a time of sexual confusion and experimentation. This developmental reality should be kept in mind when determining interventions, supports, and sanctions.[86]

## Confined with the Grown-Ups

**A**lthough the Juvenile Justice and Delinquency Prevention Act of 2002 prohibits the incarceration of juveniles with adults except in very limited circumstances, this protection does not apply to youth who are prosecuted as adults.[87] Approximately 200,000 youth are tried as adults each year; in some States, there is no minimum age at which a youth can be tried as an adult.[88] Between 1990 and 2004, the number of juveniles in adult jails increased 208 percent.[89] Currently, children as young as 13 and 14 are housed in adult facilities.[90] Data collected in 2006 show that, on any given day, almost 8,500 youth under the age of 18 are confined with adults in adult prisons and jails.[91] Two-thirds are held in jails, and the others are incarcerated in State and Federal prisons.[92]

In terms of risk for sexual abuse while in confinement, youth incarcerated in adult prisons and jails are probably at the highest risk of all. For example, juveniles comprised less than 1 percent of jail inmates in 2005, yet they accounted for 21 percent of all

**Youthful perpetrators of sexual abuse may need treatment as much as, or more than, punishment.**

victims of substantiated incidents of inmate-perpetrated sexual violence in jails that year.[93] Although the risks appear somewhat lower, youth do not fare much better in State prisons. Youth accounted for less than 0.2 percent of all inmates under State correctional control, yet in 2005 they represented 0.9 percent of all victims of substantiated incidents of inmate-perpetrated

STANDARD

**Exhaustion of administrative remedies**

Under agency policy, a resident has exhausted his or her administrative remedies with regard to a claim of sexual abuse either (1) when the agency makes a final decision on the merits of the report of abuse (regardless of whether the report was made by the resident, made by a third party, or forwarded from an outside official or office) or (2) when 90 days have passed since the report was made, whichever occurs sooner. A report of sexual abuse triggers the 90-day exhaustion period regardless of the length of time that has passed between the abuse and the report. A resident seeking immediate protection from imminent sexual abuse will be deemed to have exhausted his or her administrative remedies 48 hours after notifying any agency staff member of his or her need for protection.

**Interventions for residents who engage in sexual abuse**

Residents receive appropriate interventions if they engage in resident-on-resident sexual abuse. Decisions regarding which types of interventions to use in particular cases, including treatment, counseling, educational programs, or disciplinary sanctions, are made with the goal of promoting improved behavior by the resident and ensuring the safety of other residents and staff. When imposing disciplinary sanctions in lieu of or in addition to other interventions, the facility informs residents of their rights and responsibilities during the disciplinary process, including how to appeal sanctions, and only imposes sanctions commensurate with the type of violation committed and the resident's disciplinary history. Intervention decisions must take into account the social, sexual, emotional, and cognitive development of the resident and the resident's mental health status.

sexual violence. To give the bigger picture, 7.7 percent of all victims of substantiated violence perpetrated by people confined in adult prisons and jails combined were under the age of 18 in 2005.[94]

Although only 20 percent of youth in juvenile facilities are confined for a violent offense, nearly 50 percent of adult prisoners are violent offenders sentenced for greater lengths of time than youth in juvenile facilities.[95] The environment is especially difficult for juveniles to navigate safely because many adult facilities fail to provide juveniles with basic services, such as prison survival skills, family counseling, career training, and educational programming.[96] Research consistently shows that youthful prisoners who lack the experience and knowledge to cope with the volatile, predatory environment common in prisons and jails are at greater risk for sexual abuse while housed there.[97] Recent efforts have hinted at the extent of the problem by bringing to light the previously undocumented stories of young prisoners who were sexually victimized.[98]

Civil rights attorney Deborah LaBelle told the Commission that 80 percent of the 420 boys sentenced to life without parole in three States—Michigan, Illinois, and Missouri—reported that, within the first year of their sentence, they had been sexually assaulted by at least one adult male prisoner.[99] She also told the Commission that girls as young as 14 years old were being housed along with adult women under the supervision of male staff and asserted that girls confined in an adult prison are 20 times more likely to be sexually assaulted by staff than by prisoners in the general population.[100] Risks of negative effects following sexual assault, such as suicide, are compounded by the lack of special programming for juveniles in most State adult facilities.[101]

Confining youth with an adult and more experienced criminal population has very little deterrent value and has failed to improve public safety.[102] In fact, a recent study found that youth transferred to the criminal justice system are more likely to reoffend.[103] As long as youth remain in adult prisons and jails, facility staff and State administrators must recognize this group as an especially vulnerable population requiring additional protection. Accordingly, the Commission has designed a number of standards to protect vulnerable populations within adult facilities, including youth. Specifically, the Commission requires

**Civil rights attorney Deborah LaBelle told the Commission that 80 percent of the 420 boys sentenced to life without parole in three States—Michigan, Illinois, and Missouri—reported that, within the first year of their sentence, they had been sexually assaulted by at least one adult male prisoner.**

that, during intake into adult prisons and jails, agency staff screen prisoners for risk of victimization, including youthfulness in age or appearance, and use the information gathered to make appropriate housing, bed, work, education, and program assignments.

Because of the extreme risk of sexual victimization for youth in adult facilities, the Commission urges that individuals below the age of 18 be held separately from the general population. This may present difficulties for smaller facilities, where separating youth from adults might mean housing youth in an infirmary or in administrative segregation. Transferring such youth to facilities more suited to their needs should be considered; in any case, careful attention should be paid to ensure that youth have the support, education, and programming necessary for healthy development.

## At Risk While Under Community Supervision

Youth are also vulnerable to sexual victimization while under juvenile justice supervision in the community. Nearly half (48 percent) of the more than 1.1 million youth who received some juvenile court sanction in 2005 were placed under the supervision of State, local, or county probation officers or counselors.[104] These youth can be assigned to a wide range of community settings, such as small group homes, therapeutic foster care, therapeutic day centers, and day and evening reporting centers.[105] Not much is known about the prevalence of sexual abuse among youth supervised in the community. Despite the lack of data, however, sexual abuse does occur.

In October 2005, a 50-year-old man who had served as a youth probation officer for 11 years with the Oregon Youth Authority (OYA) was sentenced to 80 years in prison for sexually abusing the boys in his care.[106] Victims and their families complained to OYA officials for years about this officer, but they took no action and the man continued to supervise young boys.[107] D.B., a 14-year-old mentally disabled boy with ADHD, fell under the officer's supervision in 1994 after the boy was arrested for firing a cap gun in his front yard. The officer promised D.B.'s grandmother that "the boy would receive the best treatment the state had to offer."[108] She reluctantly gave up custody of D.B., and the boy was placed in Lakeside Shelter in Corvallis, Oregon, which conducts mental health evaluations.[109] The grandmother became concerned that something was wrong when the officer "began to rub her grandson's back, neck and shoulders 'erotically'" during a meeting to plan his treatment.[110] An investigation later revealed that the officer checked D.B. out of the shelter on several occasions, taking him to his home for hours at a time. When shelter officials recommended that D.B. be placed in a more secure facility, the probation officer intercepted the order and had him placed in a foster home in Portland instead, where a police affidavit later confirmed that the man was "a frequent visitor."[111] Although the boy's grandmother wrote repeatedly to OYA officials reporting her suspicions of sexual abuse, D.B. was left in the foster home under the officer's supervision for nearly a year.

While D.B.'s grandmother "fought unsuccessfully" to protect him, another developmentally disabled boy, A.M., was placed on the officer's caseload.[112] Although A.M. never said anything about sexual abuse while under the officer's supervision, his aunt became suspicious when she found out that A.M. spent nights at the man's home. The officer also tried to cut off communication between A.M. and his aunt. She too reported her concern to the authorities, but they told her that she was being "'overly sensitive [and] that [the officer] was a good caseworker'. . . ."[113] In 1998, the officer placed A.M. in the same foster home where D.B had been abused. When his aunt visited the home, she discovered that it had photos of naked men on the walls and several sexually explicit statues. She confronted the officer, then called his supervisor, who told her, "'Officer M. knows what he's doing, and we really don't have another place for [A.M.].'" The boy remained under the officer's supervision for 4 years, until he was sent to prison at age 18 for commission of an assault.

It wasn't until the officer was finally arrested for the sexual abuse of minors in 2004 that A.M. began to describe the abuses he had suffered. His aunt stated that, "Everything you can imagine happening to a child happened to him" under the officer's care.[114] The probation officer was charged with the sexual abuse of five boys and more than 70 counts of sex crimes with minors. But reporting the abuse began to haunt A.M.; his aunt reported that his "mood turned dark and he was having trouble coping—afraid that if the trial became too public, he would be labeled a homosexual and a snitch." Just 5 days before he was scheduled for release from prison in January 2005, A.M. hanged himself. Law enforcement officials said that "at least seven additional victims. . . [were] either unwilling or too emotionally unstable to testify."

As with other corrections staff, the men and women who supervise youth in the community should be adequately supervised to ensure they do not engage in abuse. Even well-intentioned staff should be trained in how to maintain appropriate boundaries with the youth they supervise and must be clearly informed that any sexual misconduct will be punished. Similar to the Commission's approach to youth in other correctional settings, the community corrections standards recognize that juveniles are less developed than adults and therefore are especially vulnerable to abuse. Accordingly, education about sexual abuse for youth under supervision must incorporate age-appropriate information and methods.

**"Everything you can imagine happening to a child happened to him" under the officer's care. The probation officer was charged with the sexual abuse of five boys and more than 70 counts of sex crimes with minors.**

Youth under community supervision may have more access to services and protections provided by the community than confined youth; they are protected by State or local vulnerable persons statutes, for example. To

take advantage of existing protections, the Commission requires that agencies convey reports of sexual abuse made by youth to the entity responsible for enforcing these statutes and also outsource investigations regarding allegations of sexual abuse to this entity. Youth who do not feel comfortable reporting sexual abuse internally would then have this avenue, among others, for reporting abuse and accessing support services.

The Commission's inquiry into the sexual abuse of youth in juvenile justice and adult corrections has revealed disturbing information about the prevalence, gravity, and consequences. Youth deserve, and are legally entitled to, care and protection; hope lies in the fact that necessary precautions and remedies are clear and rehabilitation remains a guiding principle in the field of juvenile justice.

FINDING

Individuals under correctional supervision in the community, who outnumber prisoners by more than two to one, are at risk of sexual abuse. The nature and consequences of the abuse are no less severe, and it jeopardizes the likelihood of their successful reentry.

8

# Community Corrections: The Next Frontier

The Shea Farm Halfway House in Concord, New Hampshire, is a minimum-security facility for women transitioning back to the community after being incarcerated in State prison. In 2002, an officer who had been accused of sexual harassment against a woman corrections officer at another facility was transferred to become the night supervisor at Shea Farm. In this position, he had a significant amount of power over the approximately 45 women living there. "He had the authority to lower their security classification, approve or limit overnight leave requests, telephone privileges, and/or visits with family members, and essentially, he had the ability to write the women up for disciplinary infractions and 'send them back behind bars,'" Sandra Matheson, Director of the State Office of Victim/Witness Assistance at the New Hampshire Attorney General's Office, told the Commission.[1] As Matheson and others would later learn, he used this power to repeatedly sexually abuse and violently assault residents. According to Matheson, he told the women that nobody would believe them, that he was a good friend of the Director of Community Corrections, and that if the Director did not believe a corrections officer who had accused him of acting inappropriately, the Director certainly would not believe them.[2]

Despite these warnings, in June 2005, one woman came forward to report the abuse. After a lengthy State police investigation, the supervisor was indicted on 54 charges involving 12 different women in the halfway house. The charges included multiple counts of violent sexual assault; vaginal, oral, and anal rape; and punching and choking the women in his care.

As Kimberly Hendricks, PREA Coordinator for the Oregon Department of Corrections, observed, "PREA is not just about prisons."[3] Individuals under community supervision are also at risk of sexual abuse. By the end of 2007, there were more than 5.1 million adults under supervision in the community, either on probation or parole.[4] This figure translates to about one out of every 45 adults in the United States, and the numbers are growing.[5] During 2007, the community supervision population expanded by more than 100,000 people.[6] Seventy percent of the adult corrections

population is now under some form of community corrections supervision.[7] As both Federal and State governments attempt to reduce incarceration costs in the face of looming deficits, the number of individuals under some form of community supervision—before, after, or in lieu of confinement—is likely to rise. With this expected increase comes a greater burden to ensure that these women, men, and children are protected from sexual abuse.

Leaders in community corrections have already undertaken promising efforts to address the problem of sexual abuse. For nearly a decade, the National Institute of Corrections (NIC) has provided information, training, and technical assistance to the field on staff sexual misconduct.[8] For example, in 2005, NIC convened a town hall meeting at the American Probation and Parole Association National Training Conference and held a meeting of Statewide Probation and Parole Network executives in 2008. Community corrections professionals from around the country discussed implications of PREA for their work and outlined a systematic approach for dealing with sexual abuse in community corrections settings.[9] As this report goes to press, the American Probation and Parole Association, in conjunction with the International Community Corrections Association and the Pretrial Justice Institute, is developing a handbook for frontline community corrections staff and supervisors on preventing and responding to sexual abuse.[10]

> **As both Federal and State governments attempt to reduce incarceration costs in the face of looming deficits, the number of individuals under some form of community supervision—before, after, or in lieu of confinement—is likely to rise. With this expected increase comes a greater burden to ensure that these women, men, and children are protected from sexual abuse.**

In addition to standards governing secure correctional settings, the Commission has developed a full set of standards for community corrections. Standards addressed here emphasize aspects of community corrections that distinguish it from traditional custodial settings. This chapter discusses the wide range of practices known collectively as community corrections; dynamics and circumstances of supervising people in the community that increase the risk of sexual abuse by staff or by other supervisees; and reasons why efforts to prevent, detect, and respond to sexual abuse have taken shape more gradually in this segment of corrections.

## Many and Varied

**C**ommunity corrections is an umbrella term encompassing a diverse array of agencies, facilities, and supervision structures on the Federal, State, and local levels. The Commission's standards define community corrections as the "supervision of individuals, whether adults or juveniles, in a community setting as a condition of incarceration, pretrial release, probation, parole, or post-release supervision."[11] Supervision can occur in halfway houses like Shea Farm, pre-release centers, treatment facilities, and other places where individuals reside pursuant to a court order or condition of supervision for purposes of confinement, care, and/or treatment. These facilities may be owned by public, private, or nonprofit agencies.

Supervision provided in a community-based residential facility is similar to what may occur in a prison, jail, or juvenile facility, but there are also significant differences. Residents in community corrections facilities usually are allowed to work, attend school, participate in treatment and other support programs in the community, and receive medical care in the community. Consequently, their supervision extends beyond the walls of a facility. Thus, they have greater freedom than individuals confined in prisons, jails, or secure juvenile facilities.

Nonresidential supervision is even more diverse and less structured. It can include probation, parole, pretrial supervision, court-mandated substance abuse treatment, court diversionary programs, day-reporting centers, community service programs, probation before judgment, furloughs, electronic monitoring, and home detention. Individuals generally live in their own homes and have an even greater degree of freedom, as long as they abide by the conditions of their release agreement. They may report to a community corrections officer to update their status or for drug testing, or an officer may visit them at their home or workplace. These meetings may take place at predetermined times or randomly, and they can occur at any hour, day or night.

There is also great variety in the number and type of agencies responsible for providing residential and nonresidential supervision in the community. Responsibility for community corrections may reside with the judiciary, the executive branch, departments of corrections, or some combination of these or other government entities.[12] In the Federal system, courts—specifically Federal judges—are responsible for supervising individuals in the community. Each State varies in the way community corrections is organized and operated. A State's department of corrections may control community supervision, or supervision may be decentralized, with authority over community corrections located at the county or municipal level.[13]

STANDARD

**Contracting to house or supervise defendants/ offenders under community corrections authority**

If public community corrections agencies contract for housing or supervision of their defendants/ offenders, they do so only with private agencies or other entities, including nonprofit or other government agencies, committed to eliminating sexual abuse, as evidenced by their adoption of and compliance with the PREA standards. Any new contracts or contract renewals include the entity's obligation to adopt and comply with the PREA standards and specify that the public agency will monitor the entity's compliance with these standards as part of its monitoring of the entity's performance. Only in emergency circumstances, in which all reasonable attempts to find a private agency or other entity in compliance with the PREA standards have failed, should a contract be entered into with an entity that fails to comply with these standards. The public agency must document these efforts.

In some States, a separate statewide agency oversees community corrections; in other States, authority resides with the State in some localities, whereas other localities administer their own system.[14] In addition, government entities often contract with for-profit and nonprofit organizations to operate residential facilities, conduct nonresidential supervision, and provide programming.[15] The mix of entities involved in community corrections in a particular jurisdiction, and the wide range of operational models around the country, make it uniquely challenging to develop and implement regulations to protect individuals from sexual abuse.

Increasing reliance on contractors to provide direct services will likely accompany the rapid growth of community corrections.[16] Contractors are often the most cost-effective way to provide a wide variety of services, especially over a large geographic area.[17] Governments contract with other public agencies, nonprofit organizations, and private corporations to provide services. Outsourcing carries the risk, however, that contractors will fail to adhere to the agency's policies and meet the same standards. This is particularly troubling when the policies concern the safety of individuals under supervision.

Community corrections agencies are accountable for sexual abuse incidents, regardless of whether the circumstances in which the abuse occurred were under the direct control of the agency or a separate organization working under contract with the agency.[18] Community corrections authorities should make special provisions so that people under their jurisdiction who are supervised by others remain safe from sexual abuse. The Commission's standards mandate that community corrections agencies must make certain that any public or private entities contracted to provide residential housing or supervision are committed to eliminating sexual abuse and adhere to the community corrections agency's policies and procedures as well as the standards for responding to sexual abuse incidents. They must also ensure that contract entities and their staff are trained about sexual abuse and their roles in implementing the agency's policies and procedures. Community corrections agencies must contract only with organizations committed to eliminating sexual abuse. Only in emergency situations, after failing to find an organization that meets the Commission's standards, can the agency use another organization.

**The mix of entities involved in community corrections in a particular jurisdiction, and the wide range of operational models around the country, make it uniquely challenging to develop and implement regulations to protect individuals from sexual abuse.**

# Prevalence Unknown

**D**espite the increasingly high number of people under some form of community supervision, there is a lack of research on this population.[19] Although the Bureau of Justice Statistics now conducts comprehensive national surveys of people confined in prisons, jails, and juvenile facilities to assess rates of sexual abuse, no similar survey of people under supervision in the community has been conducted. This leaves a critical gap in knowledge about the prevalence of sexual abuse, both in residential and nonresidential settings.

The Commission's standards require community corrections agencies to regularly and systematically collect data on staff sexual abuse as well as abuse that occurs between persons under supervision in the community. Although improving administrative data does not negate the need for surveys and other research, it will increase knowledge about prevalence of sexual abuse in community corrections settings. The data will also help community corrections agencies develop a more complete understanding of the circumstances under which sexual abuse occurs; risk factors associated with victimization and perpetration; and how sexual abuse may relate to community reintegration, recidivism, and other issues. Using this information, community corrections agencies can then develop and implement informed policies and procedures to prevent sexual abuse.

Community corrections agencies also have an opportunity to increase understanding of the prevalence of sexual abuse in custody by collecting data on reports of prior sexual abuse that occurred while individuals were confined in a prison, jail, or a juvenile residential facility. Although some victims of sexual abuse in secure facilities report the abuse while still incarcerated, others do not disclose their experience until after they are released.[20] Collecting these data and reporting back to the facilities where the abuse occurred will help administrators of those facilities maintain more accurate records of sexual abuse and will also provide insights on reasons people choose not to report abuse until they are released. With this information, correctional facilities can begin to address gaps in reporting structures and data collection and, most importantly, the safety concerns of victims who delay reporting until after they are released.

**Although some victims of sexual abuse in secure facilities report the abuse while still incarcerated, others do not disclose their experience until after they are released.**

## Data collection

The agency or facility collects accurate, uniform data for every reported incident of sexual abuse using a standardized instrument and set of definitions. The agency aggregates the incident-based sexual abuse data at least annually. The incident-based data collected includes, at a minimum, the data necessary to answer all questions from the most recent version of the BJS Survey on Sexual Violence. Data are obtained from multiple sources, including reports, investigation files, and sexual abuse incident reviews. The agency also obtains incident-based and aggregated data from every community corrections facility with which it contracts.

STANDARD

**Employee training**

The agency or facility trains all employees to be able to fulfill their responsibilities under agency or facility sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and under relevant Federal, State, and local law. The agency or facility trains all employees to communicate effectively and professionally with all defendants/offenders. Additionally, the agency or facility trains all employees on a defendant/offender's right to be free from sexual abuse, the right of defendants/offenders and employees to be free from retaliation for reporting sexual abuse, the dynamics of sexual abuse, and the common reactions of sexual abuse victims. Current employees are educated as soon as possible following the agency's or facility's adoption of the PREA standards, and the agency or facility provides periodic refresher information to all employees to ensure that they know the agency's or facility's most current sexual abuse policies and procedures. The agency or facility maintains written documentation showing employee signatures verifying that employees understand the training they have received.

## Same Rights and Protections

As in other correctional settings, courts have found that sexual abuse in community corrections violates the Eighth Amendment of the U.S. Constitution prohibiting cruel and unusual punishment.[21] As a result, community corrections agencies, like prisons and jails, have a special responsibility to protect the people they supervise.

When determining liability, courts also have determined that the authority staff have over the individuals they monitor makes a truly consensual sexual relationship impossible.[22] Courts will look closely at an agency's efforts to prevent sexual abuse, including staff training, reporting policies, and how the agency investigates allegations, sanctions perpetrators, and responds to victims.[23] Finally, courts will look to make sure that community corrections agencies protect anyone who reports abuse from retaliation.[24]

Judicial decisions have also expanded protection of individuals in community corrections by holding agencies responsible for the actions of anyone in a supervisory position.[25] For example, in *Smith v. Cochran,* Pamela Smith was in jail but on a work release program and assigned to the Department of Public Safety (DPS). While working there, Smith's supervisor on the job sexually assaulted her.[26] After her release, Smith filed a lawsuit, alleging an Eighth Amendment violation. Although the DPS supervisor claimed that, because they were co-workers, the Eighth Amendment did not apply, the court ruled that "[i]mportant penological responsibilities were delegated to him as an employee of DPS" and that individuals "acting under that delegated authority also bore the duty under the Eighth Amendment to refrain from using excessive force against prisoners."[27]

Gaps in legal protection under the law remain, however. Although 42 States and the District of Columbia specifically prohibit sexual contact or abuse between community corrections staff and individuals they monitor, many limit coverage to staff with "supervisory or disciplinary authority."[28] This definition overlooks the possibility of a community corrections staff member who does not directly supervise a parolee but who can still influence that person's community corrections status. For example, a nonsupervisory staff member may retaliate against someone who resists sexual advances by persuading their supervisor to change the parolee's status or by reporting false parole violations. A parolee might be coerced into sexual relations with a community corrections officer if threatened with the possibility of losing parole or probation status.

**As in other correctional settings, courts have found that sexual abuse in community corrections violates the Eighth Amendment of the U.S. Constitution prohibiting cruel and unusual punishment. As a result, community corrections agencies, like prisons and jails, have a special responsibility to protect the people they supervise.**

Only 25 States, the District of Columbia, and the Federal Government have statutes explicitly stating that consent is not a defense to allegations of staff sexual misconduct.[29] In Marion County, Illinois, a male community corrections supervisor was jailed for an alleged relationship with a former prisoner in home detention. The officer was charged with three felony counts of sexual misconduct for engaging in a relationship with a woman he was monitoring on home detention. According to the Marion County prosecutor, the relationship was "consensual" but "completely inappropriate."[30]

Even when State laws are explicit, some agencies have taken the step of instituting policies stating that staff are not permitted to engage in sexual relationships with any individual under the agency's supervision.[31] In Prince William County, Virginia, two women officers were arrested for having sexual relations with a man on house arrest.[32] In this case, it was unclear if either woman had actual supervisory authority over the man. However, according to State law and department policy, they were deemed to have supervisory authority by nature of their employment.[33]

## A Complex Relationship

Although an individual confined in a locked correctional facility obviously cannot flee a potential abuser, the relative mobility of someone under supervision in the community is no guarantee of safety. Less structured environments and highly personal modes of supervision carry unique risks. Individuals under community supervision may experience sexual abuse at the hands of other supervisees, but the dynamics of community corrections may make them more vulnerable to staff sexual abuse.

In both residential and nonresidential community supervision, staff have virtually unlimited access to individuals, sometimes in private and intimate settings. Barbara Broderick, Chief Probation Officer for the Maricopa County Adult Probation and Parole Department in Arizona, described the risks to the Commission, noting that "staff contact clients in their homes, at their places of business, at community offices, at counseling offices and educational programs, etc."[34] In Ramsey County, Minnesota, for example, a male community corrections officer, visiting a former prisoner's apartment to discuss her failure in a drug treatment program, instead

STANDARD

**Hiring and promotion decisions**

The agency or facility does not hire or promote anyone who has engaged in sexual abuse in an institutional setting or who has engaged in sexual activity in the community facilitated by force, the threat of force, or coercion. Consistent with Federal, State, and local law, the agency or facility makes its best effort to contact all prior institutional employers for information on substantiated allegations of sexual abuse and must run criminal background checks for all applicants and employees being considered for promotion and examine and carefully weigh any history of criminal activity at work or in the community, including convictions or adjudications for domestic violence, stalking, and sex offenses. The agency or facility also asks all applicants and employees directly about previous misconduct during interviews and reviews.

**Less structured environments and highly personal modes of supervision carry unique risks. Individuals under community supervision may experience sexual abuse at the hands of other supervisees, but the dynamics of community corrections may make them more vulnerable to staff sexual abuse.**

## Screening for risk of victimization and abusiveness

All defendants/offenders are screened during intake to assess their risk of being sexually abused by other defendants/offenders or sexually abusive toward other defendants/offenders. Employees must review information received with the defendant/offender as well as discussions with the defendant/offender. Employees must conduct this screening using a written screening instrument tailored to the gender of the population being screened. Although additional factors may be considered, particularly to account for emerging research and the agency's or facility's own data analysis, screening instruments must contain the criteria described below. For defendants/offenders under the age of 18 or applicable age of majority within that jurisdiction, screening must be conducted by medical or mental health practitioners. If the facility does not have medical or mental health practitioners available, these young defendants/offenders are given an opportunity to participate in screenings in private. All screening instruments must be made available to the public upon request.

- At a minimum, employees use the following criteria to screen male defendants/offenders for risk of victimization: mental or physical disability, young age, slight build, nonviolent history, prior convictions for sex offenses against an adult or child, sexual orientation of gay or bisexual, gender nonconformance (e.g., transgender or intersex identity), prior sexual victimization, and the defendant/offender's own perception of vulnerability.

(continued on adjoining page)

requested and had sex with her.[35] Broderick also noted that because community corrections staff work with significantly less direct supervision than their counterparts in secure correctional facilities, it is much easier for them to conceal sexual abuses, "making the task of detecting and responding to abuse all the more difficult."[36]

Thomas Beauclair, Deputy Director of NIC, made similar points in his testimony to the Commission. "Community corrections workers generally work autonomously and have large caseloads. . . . [M]uch of their work allows significant discretion and is done outside normal office parameters and away from supervisors and peers. . . . [B]y the very nature of their work, staff and offenders can be put in difficult situations."[37]

The different roles staff are called upon to play also present risks. Staff not only monitor and try to control the behavior of individuals they supervise, they also aim to facilitate behavior change.[38] They operate as enforcement officers in the interest of public safety and also function as counselors and social workers, helping with job preparation, determining appropriate living environments, recommending treatment programs, and providing moral support. Drawing and maintaining boundaries is a challenge even for staff with the best intentions.[39] The ambiguity of the supervisor's role may be especially pronounced in smaller communities, where staff are already familiar with some of the individuals they supervise, perhaps from school or previous employment, and also know and interact with their families. These connections may influence staff to relax the professional boundaries their role requires.[40]

An individual's conditional release status gives supervising officers significant leverage, which can also be used to facilitate sexual abuse. As Barbara Broderick pointed out, "the issue of intimidation or retaliation may be [even] greater when the abuse occurs outside of an institutional setting."[41] Staff may explicitly or implicitly threaten to revoke an offender's community status and return them to prison or jail by falsely reporting that the offender has not complied with the terms and conditions of their release. Such threats carry great weight because individuals under supervision in the community are typically desperate to avoid being incarcerated. Unlike in a prison or jail setting, where other staff or prisoners may be in a position to confirm or deny that the person violated a regulation, in the community corrections context, there may be no one to challenge the supervisor's version of events other than the individual in question. This power imbalance makes people under community corrections supervision extremely vulnerable to staff who abuse their authority.[42]

Clear policies rooted in an ethic of zero tolerance of sexual abuse coupled with good training can mitigate these dangers by giving staff the direction, knowledge, and skills they need to maintain appropriate relationships with the individuals they supervise.[43]

Of course, preventing sexual abuse begins with hiring the right staff. Community corrections agencies must be committed to thoroughly vetting all job applicants by conducting criminal background checks, making diligent efforts to consult prior employers, and directly questioning applicants about any previous misconduct. Agencies should also elicit applicants' views about maintaining appropriate relationships with the individuals they supervise. The Commission's standards expressly prohibit hiring or promoting anyone with a history of sexual abuse.

## Screening and Responding

Having trained staff screen individuals during intake is essential to preventing sexual abuse in residential community corrections settings. The Commission's standards require staff to use a written screening instrument to identify individuals who may be potential victims or perpetrators of sexual abuse. Effective and systematic screenings are critical to preventing future sexual abuse and providing appropriate support services to victims. Research on the most effective methods for screening sexual abusers and victims in community corrections is evolving. However, it is clear that screening strategies must address the full range of factors affecting the conduct of individuals under supervision.[44] Criteria and risk factors may differ, depending on age, developmental stage, gender identity, and whether the individual is male or female. The Commission's standards require screening at intake and recommend reviews on a periodic basis, depending on the length of involvement of the person under residential supervision. The Commission also urges staff to review the screening results within 60 days of the initial screening and every 90 days thereafter. Screening strategies and assessment instruments should also be reviewed over time for effectiveness and suitability. The Commission encourages community corrections officials to consult emerging research to ensure the most up-to-date screening instruments are used in the community corrections arena.

The use of objective risk and needs assessments to develop treatment and other programming plans is the core of any good community corrections program.[45] Results from screenings and assessments enable community corrections agencies to effectively assign people to programs that will provide the most benefit while reducing risks to others and the community at large.[46] Information from secure facilities about sexual victimization or aggression involving former prisoners also substantially improves the screening and placement process. Jeff Renzi, Associate Director of Planning and Research at the Rhode Island Department of Corrections, spoke about the importance of alerting community corrections staff to known victims and perpetrators of sexual abuse in confinement when

**Screening for risk of victimization and abusiveness**
*(continued from adjoining page)*

- At a minimum, employees use the following criteria to screen male defendants/offenders for risk of being sexually abusive: prior acts of sexual abuse and prior convictions for violent offenses.

- At a minimum, employees use the following criteria to screen female defendants/offenders for risk of sexual victimization: prior sexual victimization and the defendant/offender's own perception of vulnerability.

- At a minimum, employees use the following criteria to screen female defendants/offenders for risk of being sexually abusive: prior acts of sexual abuse.

**Use of screening information**

Employees use information from the risk screening (SC-1) to inform housing, bed, work, education, and program assignments. In many community corrections facilities, it is difficult, if not impossible, to keep defendants/offenders totally separate or segregated from each other. However, the facility can determine, based on the screening information, whether a particular defendant/offender should receive greater supervision, should have more frequent contact with staff, or is more appropriately housed in some alternative type of placement. The facility makes individualized determinations about how to ensure the safety of each defendant/offender. Lesbian, gay, bisexual, transgender, or other gender-nonconforming defendants/offenders are not placed in particular housing assignments solely on the basis of their sexual orientation, genital status, or gender identity.

**Staff and agency or facility head reporting duties**

All staff members are required to report immediately and according to agency or facility policy any knowledge, suspicion, or information they receive regarding an incident of sexual abuse that occurred in a facility setting or while under supervision; retaliation against defendants/offenders or staff who reported abuse; and any staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse or retaliation. Apart from reporting to designated supervisors or officials, staff must not reveal any information related to a sexual abuse report to anyone other than those who need to know, as specified in agency or facility policy, to make treatment, investigation, and other security and management decisions. Unless otherwise precluded by Federal, State, or local law, staff medical and mental health practitioners are required to report sexual abuse and must inform defendants/offenders of their duty to report at the initiation of services. If the victim is under the age of 18 or applicable age of majority within that jurisdiction, or considered a vulnerable adult under a State or local vulnerable persons statute, staff must report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

he said, "No one is walking out tomorrow without probation and parole knowing who is a victim and a perpetrator."[47] Upon learning of sexual victimization or abusiveness during initial screenings or from staff at secure facilities, community corrections officers must consider that information when making decisions about work assignments, treatment or interventions, appropriate housing, and the type of supervision that may be necessary to ensure safety and successful reintegration.

## Duty to Report

The silence surrounding sexual abuse may be even greater in the field of community corrections than in some prisons, jails, lock-ups, and juvenile facilities, especially in the arena of nonresidential supervision. Staff may mistakenly believe that consensual relationships with individuals under their supervision are permissible, and individuals under supervision are often afraid to resist or report staff who perpetrate sexual misconduct.

Staff who work in the field of community corrections have a duty to report any knowledge or suspicion of sexual abuse involving individuals under supervision. This obligation, according to the Commission's standards, is no different than what is required of any other corrections staff member. All corrections staff must receive training on their agency's reporting policies and protocols to fulfill their responsibilities.[48] In addition to developing clear zero-tolerance policies and training staff in their implementation, administrators should consistently discipline staff when they fail to uphold their duty to report.

If individuals in community corrections report sexual abuse that occurred while they were incarcerated, community corrections staff may find themselves serving as "first responders" to abuse incidents that are long past. In these situations, the community corrections agency must report back to the facility where the incident occurred or to the agency overseeing that facility. Correctional facilities have an obligation under the Commission's standards to thoroughly investigate every report of sexual abuse, regardless of whether or not the victim is still incarcerated in the facility where the incident took place. (See Chapter 5 for detailed discussion of reporting and investigation.)

Although this requirement seems simple enough, Jacqueline Kotkin, Field Services Executive for the Vermont Department of Corrections, told the Commission, "Because probation and parole may be organizationally and geographically removed from prison, jail and other corrections residential

**The silence surrounding sexual abuse may be even greater in the field of community corrections than in some prisons, jails, lockups, and juvenile facilities.**

settings, reporting allegations of prior institutional abuse often proves challenging."[49] Kotkin stressed the importance of developing "clear, understandable procedures" for reporting allegations in accordance with department policies and State laws.[50] For example, in North Carolina, the Division of Community Corrections (part of the Department of Corrections) has a policy requiring any report of sexual abuse involving an employee or agent of the Department of Corrections be forwarded to the head of the department.[51] This kind of clear directive enables community corrections staff to know what to do when they receive reports of past sexual abuse. Although such procedures are essential everywhere, they are easier to develop in States such as North Carolina with a unified correctional system.[52] In decentralized systems, it may be useful to designate a particular entity that could act as a clearinghouse for this type of information, ensuring that administrators receive information about sexual abuse that occurred in a facility they manage.

## A Real Communal Effort

**R**esponding effectively to an incident of sexual abuse requires cooperation and coordination among a range of professionals: agency staff who will be first responders, forensic specialists, mental health professionals, victim advocates, investigators, prosecutors, and agency leadership. Because community corrections operates in the community, rather than apart from it, these agencies may have access to skilled professionals with experience in responding to sexual abuse. In her testimony before the Commission, Anadora Moss, President of The Moss Group, Inc., stressed the importance of collaborating with community partners in the context of community corrections. "In partnering with groups such as faith based organizations, sexual assault experts, counseling professionals, and law enforcement, the community corrections universe must wrap these partnerships around the mission of reentry. . . for all clients and offenders suffering from sexual victimization."[53]

Coordinated sexual assault response teams (SARTs) are widely recognized as an optimal way to respond to incidents of sexual abuse. SARTs exist in many communities and may be available to partner with local correctional agencies. Where SARTs do not exist, the Commission's standards require community corrections agencies to ensure multidisciplinary collaboration by some other means. The U.S. Department of Justice's "A National Protocol for Sexual Assault Medical Forensic Examinations: Adults/Adolescents" is

**SARTs exist in many communities and may be available to partner with local correctional agencies.**

### Reporting to other agencies or facilities

When the agency or facility receives an allegation that a defendant/offender was sexually abused while in a community corrections facility or while under supervision, the head of the agency or facility where the report was made notifies in writing the head of the agency or facility where the alleged abuse occurred. The head of the agency or facility where the alleged abuse occurred ensures the allegation is investigated.

### Coordinated response

All actions taken in response to an allegation of sexual abuse are coordinated among staff first responders, medical and mental health practitioners, investigators, and agency or facility leadership. The agency's or facility's coordinated response ensures that victims receive all necessary immediate and ongoing medical, mental health, and support services and that investigators are able to obtain usable evidence to substantiate allegations and hold perpetrators accountable.

**Agreements with outside public entities and community service providers**

The agency or facility maintains or attempts to enter into written memoranda of understanding (MOUs) or other agreements with an outside public entity or office that is able to receive and immediately forward defendant/offender reports of sexual abuse to agency or facility heads (RE-1). The agency also maintains or attempts to enter into MOUs or other agreements with community service providers that are able to: (1) provide defendants/offenders with confidential emotional support services related to sexual abuse and (2) help victims of sexual abuse during their transition from a community corrections facility into the community. The agency or facility maintains copies of written agreements or documentation showing attempts to enter into agreements.

**Agreements with outside law enforcement agencies**

If an agency or facility does not have the legal authority to conduct criminal investigations or has elected to permit an outside agency to conduct criminal or administrative investigations of staff or defendants/offenders, the agency or facility maintains or attempts to enter into a written MOU or other agreement specific to investigations of sexual abuse with the law enforcement agency responsible for conducting investigations. If an agency or facility confines defendants/offenders under the age of 18 or applicable age of

(continued on adjoining page)

the recommended resource.[54] (Appendix A of the protocol provides methods to customize sexual abuse investigations for diverse community settings.[55])

Establishing formal partnerships with victim advocates and other support services in the community is essential. Individuals under community supervision may not be comfortable reporting recent or past sexual abuse to a staff member of the agency. Although some individuals have constructive relationships with their supervising officers, that is not always the case. When staff perpetrate the abuse, it may be difficult or impossible for individuals to be confident that the agency will believe abuse allegations and protect them from retaliation. Therefore, the Commission's standards require that individuals under supervision have the option of reporting abuse to an outside agency and are able to request confidentiality, if they prefer.

Additionally, community-based advocates are likely to be the only source of professional counseling for victims of sexual abuse. As discussed in detail in Chapter 6, medical and mental health effects of sexual abuse may be severe and long-lasting. The trauma of recent or past sexual abuse may hinder a person's ability to integrate into the community, restore connections with family or other intimates, refrain from abuse of alcohol or other drugs, and find and maintain stable employment. Without the necessary support, victims may find themselves violating conditions of supervision and perhaps facing incarceration as a result.[56] In the most extreme cases, individuals who were sexually abused while incarcerated may act out their anger by perpetrating physical or sexual violence when they return to the community.[57] For all these reasons, community corrections agencies have an obligation to ensure that victims of sexual abuse receive the ongoing mental health care they need to heal. Fulfilling that requirement depends on forging strong and formal partnerships with community-based victim advocates and other appropriate services providers.

The Commission's standards require community corrections agencies to attempt to establish memoranda of understanding (MOUs) with appropriate community-based agencies to receive reports of sexual abuse and immediately forward that information to the agency, unless the person had requested confidentiality, and to provide emotional support and other specialized services to victims. If partnerships with local service providers are not possible, victims must be given information about how to contact regional or national groups that can meet these needs.

The work of investigating and prosecuting sexual abuse also is challenging, requiring cooperation among corrections administrators, investigators, medical and mental health care providers, victim advocates, prosecutors, and others. Very few community corrections agencies employ their own investigative staff. Smaller agencies simply cannot afford to hire investigators, and even some larger agencies do not have legal authority to conduct criminal investigations.[58] As a result,

community corrections agencies typically depend on local police, State bureaus of criminal investigation, or some other law enforcement entity to investigate allegations of sexual abuse.

Reliance on outside law enforcement entities to conduct these investigations creates a need for agreement on the roles and responsibilities of outside investigators as well as the agency's expectations in terms of timeliness, gathering and sharing evidence, informing victims, and other key issues. The Commission's standards mandate that community corrections agencies attempt to establish MOUs or other formal agreements with outside law enforcement agencies. For some community corrections agencies, forging such agreements is new terrain. Even when agencies rely on external investigators, however, community corrections staff will be the first responders and, therefore, need clear direction and training on how to secure a crime scene and preserve evidence.

Formal agreements with prosecuting authorities are just as important; diligent attempts to establish MOUs with prosecutors are also required under the Commission's standards. One of the most effective ways to demonstrate zero tolerance is to prosecute perpetrators to the full extent permitted by law. In some jurisdictions, however, prosecutors do not prioritize these cases and may be even less aware and informed about sexual abuse in community corrections than about abuse that occurs in prisons, jails, and juvenile facilities.[59] In the process of forging an MOU, community corrections officials have opportunities to educate prosecutors about the reality and repercussions of sexual abuse in this context. They also can learn from prosecutors about how to improve investigations so that more perpetrators are held accountable.

The Director of Probation and Parole for Louisiana, Eugenie Powers, told the Commission, "To the extent that offenders are treated humanely while they are detained or incarcerated, it is expected they will integrate more successfully into the community."[60] Community corrections has the opportunity to strengthen the success of this transition by protecting men, women, and youth from sexual abuse while they engage in the difficult work of establishing productive, law-abiding lives.

### Agreements with outside law enforcement agencies
*(continued from adjoining page)*

majority within that jurisdiction, or other defendants/offenders who fall under State and local vulnerable persons statutes, the agency or facility maintains or attempts to enter into an MOU with the designated State or local services agency with the jurisdiction and authority to conduct investigations related to the sexual abuse of vulnerable persons within community corrections facilities. When the agency or facility already has an existing agreement or long-standing policy covering responsibilities for all criminal investigations, including sexual abuse investigations, it does not need to enter into a new agreement. The agency or facility maintains a copy of the written agreement or documentation showing attempts to enter into an agreement.

### Agreements with the prosecuting authority

The agency or facility maintains or attempts to enter into a written MOU or other agreement with the authority responsible for prosecuting violations of criminal law. The agency or facility maintains a copy of the written agreement or documentation showing attempts to enter into an agreement.

FINDING

A large and growing number of detained immigrants are at risk of sexual abuse. Their heightened vulnerability and unusual circumstances require special interventions.

9

# On the Margins:
# Immigrants in Detention

The Krome immigration detention facility in Miami, Florida, opened in 1980. As early as 1983, reports of sexual abuse began to emerge.[1] These reports persisted for years and ranged from rape to sexual molestation to trading sex for favors.[2] In May 1990, the Federal Bureau of Investigation began investigating sexual and physical abuse at Krome.[3] Despite the glare of publicity and an ongoing investigation, the abuse apparently continued. In early 1991, a woman detainee said she was raped by a staff member in the health clinic. Advocates were told an investigation had been conducted and the U.S. Department of Justice would produce findings. An official report was never made public, and it appears no disciplinary or legal actions were taken.

More than 8 years later, in August 1998, officers at Krome wrote a memo complaining about the treatment of women and children, reporting that criminal and male detainees shared the same restroom with minors, women and children ate their meals on the floor, and there were only six beds for 39 women to sleep or sit on.[4] In their complaint, they noted that when officers had reported concerns in the past, they were labeled as troublemakers. Again, no action was taken.

Widespread reports of sexual abuse at Krome resurfaced in May 2000; some of the same staff implicated in the sex scandal in 1990 were subjects of the new allegations as well.[5] In her testimony before the Commission, Cheryl Little, of the Florida Immigrant Advocacy Center, reported that sexual abuse at Krome appeared to be pervasive and involved allegations against at least 15 Immigration and Naturalization Service (INS) officers and one public health service officer. A Department of Justice investigation that year revealed that roughly 10 percent of female detainees at Krome had come forward with reports of sexual misconduct by INS officers that included sexual harassment, fondling during searches, and sexual assault.[6] Two women were impregnated by officers during their time at Krome.[7] As recently as 2008, the Florida Immigrant Advocacy Center reported sexual abuse at the Krome facility.

The prevalence of sexual abuse in immigration detention facilities is unknown, but accounts of abuse by staff and by detainees have

been coming to light for more than 20 years. As a group, immigration detainees are especially vulnerable to sexual abuse and its effects while detained due to social, cultural, and language isolation; poor understanding of U.S. culture and the subculture of U.S. prisons; and the often traumatic experiences they have endured in their culture of origin.[8] Preventing, detecting, and responding to sexual abuse of immigrants in custody requires special measures not included in the Commission's standards for correctional facilities. These measures are contained in a set of supplemental standards

**The prevalence of sexual abuse in immigration detention facilities is unknown, but accounts of abuse by staff and by detainees have been coming to light for more than 20 years. As a group, immigration detainees are especially vulnerable to sexual abuse and its effects while detained due to social, cultural, and language isolation; poor understanding of U.S. culture and the subculture of U.S. prisons; and the often traumatic experiences they have endured in their culture of origin.**

that apply to any facility that houses individuals detained solely because their right to remain in the United States is in question.

This chapter discusses the special circumstances and vulnerabilities of adult and child immigration detainees—a subject that has yet to receive the attention and research it merits—and how the Commission's supplemental standards can decrease their risk of sexual abuse and ensure they receive help if victimized.

The Commission's work in this area will advance efforts by U.S. Immigration and Customs Enforcement (ICE) to protect detainees from sexual abuse. ICE first published standards regarding the treatment of detainees in detention in 2000. When ICE updated and reconfigured those standards as performance-based detention standards in 2008, it expanded the standards to include sexual abuse prevention. Although the ICE standards are not enforceable in court, they cover important topics, such as screening and classification of detainees and procedures for reporting sexual abuse. The Commission's standards build upon and in some areas exceed the ICE standards by including more specific requirements. Combined, the two sets of standards can make detention safer for hundreds of thousands of immigrants—individuals we have a duty to protect as long as they remain in our custody.

## Knowing Who They Are

In the 15 years from 1994 to 2009, the number of immigrants held in detention pending a judicial decision about their legal right to remain in the United States increased nearly 400 percent.[9] For the 2009 fiscal year, ICE budgeted enough money to detain 33,400 people on any given night and more than 400,000 people over the course of the year.[10]

Who comprises this increasingly large group of de facto prisoners? As Asa Hutchinson, Former Under Secretary for Border and Transportation Security at the U.S. Department of Homeland Security, noted, most immigrants in detention do not have criminal backgrounds.[11] Approximately one out of every 10 immigration detainees is seeking asylum—petitioning for safe haven in the United States, often after fleeing severe and life-threatening violence in his or her home country.[12] Other categories of detainees include adults and children who entered the country without the proper documentation, families confined together, and thousands of "unaccompanied" children without families in the United States.

Unaccompanied minors from birth to age 18 are generally transferred from the Department of Homeland Security custody to the Office of Refugee Resettlement (ORR) and may remain in custody for several months.[13] In 2008, an estimated 10,350 unaccompanied children were transferred into ORR custody.[14] ORR places unaccompanied children and teenagers in a variety of settings, including foster care, shelters, group homes, and secure juvenile detention facilities. A few detainees have committed crimes that place them at risk of deportation.

What all immigration detainees have in common is an indeterminate wait while their immigration case proceeds through the court system. For adults, the waiting can take place in "service processing centers" operated by ICE, contract detention facilities, local jails, State and Federal prisons—where they may commingle with the general prisoner population—and short-term detention facilities run by Customs and Border Protection ("Border Patrol"). ICE also has two family facilities specifically to house parents and children together.

## Isolated and Defenseless

Many factors—personal and circumstantial, alone or in combination—make immigration detainees especially vulnerable to sexual abuse. One of the most pervasive factors is social isolation. As Anne Wideman, a clinical psychologist from Arizona, told the Commission, "Many immigrants have shared with me that they don't fit into their particular group in detention. Either they're too home country or they're too Americanized to fit into their particular group. This increases their isolation and their lack of protection [from] violence."[15]

The isolation and confusion immigration detainees experience inside a locked facility is often exacerbated because they are far from family, friends, lawyers, and, in some cases, anyone who even speaks their language. Shiu-Ming Cheer, a legal advocate with the South Asian Network in Los Angeles, told the Commission, "Vietnamese-speaking detainees have been held in rural Texas jails for years without any information given to them in their native language. This increases the likelihood of sexual abuse."[16]

Some detainees left their home countries because of life-threatening civil and political unrest or to escape physical or sexual abuse from family members. Many of them have witnessed beatings, rapes, or killings and experienced severe physical and sexual assault themselves before immigrating to the United States. Asylum seekers and refugees who fled violence or starvation in their home countries often have posttraumatic stress disorder (PTSD) and other trauma responses.[17] Hallmarks include difficulty problem-solving and a sense of hopelessness and lack of control, all of which make individuals more susceptible to sexual victimization and also less likely to report it.[18] "They become easily overwhelmed by what is happening to them and have difficulty deciding on and following through with a course of action to change the situation," Wideman testified.[19]

> **Immigration officers "hold the key"—or at least it can appear that way. Little told the Commission that deportation officers have propositioned women whose cases they control, telling them that if they want to be released they need to comply with the officers' sexual demands.**

A 2003 study by Physicians for Human Rights, based on interviews with 70 detained asylum seekers, found that detention has a particularly debilitating impact on them, especially on torture survivors, noting, "Detention can induce fear, isolation and hopelessness, and exacerbate the severe psychological distress frequently exhibited by asylum seekers who are already traumatized."[20] A quarter of the asylum seekers interviewed reported having been sexually assaulted prior to immigrating. Not surprisingly, the study found extremely high levels of depression (86 percent), anxiety (77 percent), PTSD (50 percent), and worsened psychological health (70 percent) among asylum-seeking detainees.

Children in detention also are particularly vulnerable. The Border Patrol apprehended an estimated 90,000 children along the southern U.S. border in 2007, and most were quickly repatriated.[21] Some may be detained in Border Patrol facilities, however, while awaiting repatriation. In these holding centers, children are often in close proximity with adults and, therefore, in danger of sexual abuse. Some detained children have suffered through terrifying experiences that may have stripped away their defenses and even led them to expect abuse. "Some of these children are victims of human trafficking, brought to the U.S. for sexual exploitation or forced labor. Other children are smuggled into the U.S. on thousand-mile journeys, at each stop of the way at incredibly high risk for abuse and sexual exploitation," Sergio Medina, Field Coordinator with Lutheran Immigration and Refugee Service, told the Commission.[22] Once in detention, the aftereffects of traumas they have experienced, coupled with fear of their circumstances and of the adults in charge, leave them extremely vulnerable to sexual abuse by adult caretakers and also by predatory youth.

Immigration detainees may be especially vulnerable to sexual abuse by staff because they are confined by the same agency with the power to deport them. In this context, officers who are inclined to abuse their authority have an astounding degree of leverage, especially when detainees are not well-informed of their rights and lack access to legal counsel. In the words of Cheryl Little, immigration officers "hold the key"—or at least it can appear that way.[23] Little told the Commission that deportation officers have propositioned women whose cases they control, telling them that if they want to be released they need to comply with the officers' sexual demands.

## Reason to Remain Silent

As in other correctional settings, immigration detainees fear retaliation by perpetrators, that their reports will not be believed, and that reports will be handled in a way that is damaging. However, for immigrants, the fear of deportation is an additional and critical barrier. Immigration detainees' greatest fear is often of causing any trouble that might damage their case.[24]

After women detainees at the Krome immigration detention facility in Miami reported sexual abuse by staff, several of them wrote to then Attorney General Janet Reno, telling her, "We are afraid. . . each time one of us is interviewed by investigating officers. . . . [S]ome of the women who have given statements have either been transferred or deported to their countries."[25] At one point, two of the women whom officers viewed as "'ringleaders'" behind the allegations were transferred to the maximum security Federal Detention Center in downtown Miami and held in isolation for 12 and 13 days, respectively.[26] During this time, staff did not allow them to call their attorneys or their families, and they had no access to recreation; they were even denied shampoo and combs. When they appeared before the grand jury, their hair had not been combed for 10 days.

> "We are afraid. . . each time one of us is interviewed by investigating officers. . . . [S]ome of the women who have given statements have either been transferred or deported to their countries."

The determination of the victims at Krome to seek justice and protection is unusual. Fearing the possibility of retaliatory deportation, immigration detainees tend to be less likely than other prisoners to challenge the conditions of their confinement.[27] Families are threatened with separation, creating enormous pressure on parents that they will lose their children if a family member causes disruption.[28] For asylum seekers, the prospect of deportation often carries especially severe consequences. And if detainees come from countries where prisoners are routinely treated

poorly or even tortured, they may be unlikely to believe that detention officers will protect them from sexual abuse even if they do report it.[29]

The fear of stigma if they report sexual victimization also may be more severe for some immigrant victims than for others in confinement. In many cultures, families and communities view victims of sexual assault very unsympathetically after the abuse becomes known.[30] Sexual abuse victims may be perceived as disgracing the family and even be at risk for retaliation by their own family members. This added danger, coupled with unfamiliarity with the processes of reporting or even with the right to report, makes it even less likely that immigration detainees will disclose sexual abuse experiences.

**"[A] detainee tried to touch me in my personal place, and it made me very uncomfortable. . . . The others were making fun of me. The last time, I pushed him and told him to go. I defended myself and I was put in segregation. The guards didn't give me an opportunity to explain. They just told me it was my fault. . . ."**

Reporting sexual abuse can be especially difficult for detained children. Most of them do not have guardians, attorneys, or advocates whom they trust and can confide in. One unaccompanied minor, a 17-year-old boy detained in the San Francisco Bay area, was the victim of ongoing sexual abuse by a staff member. According to Tom Plummer, Staff Attorney for Legal Services for Children in San Francisco, the alleged conduct included the staff person visiting the boy's bedroom during evening bed checks, sitting on the bed with him, touching him on the face and neck, kissing him, and expressing intimate affection and physical attraction.[31] The boy reported the abuse to staff on at least four occasions. When no one took action to stop the behavior, he felt forced to disclose his sexual victimization during a house meeting in front of his peers.

Another teenage boy, interviewed by Physicians for Human Rights, recalled that: "[A] detainee tried to touch me in my personal place, and it made me very uncomfortable. . . . The others were making fun of me. The last time, I pushed him and told him to go. I defended myself and I was put in segregation. The guards didn't give me an opportunity to explain. They just told me it was my fault. . . . I told one of the officers that another detainee bothered me and touched me in the night. I was ashamed to tell the officer, but I tried. The officer didn't pay attention. He said he can't do anything. . . [now] I am afraid to complain because I fear I will be put in segregation."[32] Forty percent of asylum-seeking detainees interviewed by Physicians for Human Rights reported that they had been threatened with disciplinary segregation while detained; 26 percent were actually placed in segregation at some time during their detention.[33]

An atmosphere of intimidation in a facility can also suppress reporting.[34] Fifty-four percent of detainees interviewed by Physicians for Human Rights reported that they had experienced verbal abuse while in

detention, including being called criminals and liars and being yelled and sworn at, often in circumstances they did not understand."[35] This is not an environment in which victims of sexual abuse are likely to speak out.

There are other institutional barriers that block or discourage victims and witnesses from reporting abuse. The ICE detention standards require the posting of information about how to report sexual abuse.[36] A "sexual assault awareness" poster is to be displayed in English and Spanish with a "sexual assault awareness information" pamphlet distributed in most detention facilities.[37] The poster encourages victims of a sexual abuse to report the assault and promises confidentiality for the reported information. Posters may not be enough to inform all detainees of their rights and the process, however, especially those who are not fluent in the language. And grievance procedures can seem impossibly complex, especially for detainees who speak languages other than English or Spanish.

A 2006 audit by the U.S. Department of Homeland Security's Office of the Inspector General revealed that detainees often do not receive information on reporting and grievance procedures in a language they can understand.[38] Detainees who don't speak English or Spanish must request assistance from others to translate materials they are given or to write letters or fill out forms reporting the abuse—a serious barrier given the sensitive nature of the subject matter.[39] Additionally, if victims of sexual abuse see other complaints go unanswered, from poor medical care to denial of religious services, they may have little confidence that their claims of sexual abuse will be treated any differently.[40]

## Screen and Separate

The Commission's standards for adult prisons and jails require that specific criteria be used to screen all incarcerated persons for risk of victimization and abusiveness. (See Chapter 3 for a detailed discussion of screening.) In the immigration context, additional precautions are required. Although most immigrants in detention do not have criminal histories, the Commission's supplemental standards require facilities to make every reasonable effort to obtain and review the prior institutional and criminal records of all immigration detainees before screening them for risk of victimization and abusiveness.

Additionally, when immigration detainees are confined in prisons, jails, and lockups, the supplemental standards require separate housing for immigrants. Bryan Lonegan, who provides legal assistance to immigrants detained in northern New Jersey jails, told the Commission, "when those [immigrants] were detained last week, they were all held in the same jail with the people who were jumping the turnstiles, people who were there for shoplifting or drug offenses. . . . The point is, that within the jails

*Supplement to*
**Screening for risk of victimization and abusiveness**

The facility makes every reasonable effort to obtain institutional and criminal records of immigration detainees in its custody prior to screening for risk of victimization and abusiveness. Screening of immigration detainees is conducted by employees who are culturally competent.

*Supplement to*
**Use of screening information**

Any facility that houses both inmates and immigration detainees houses all immigration detainees separately from other inmates in the facility and provides heightened protection for immigration detainees who are identified as particularly vulnerable to sexual abuse by other detainees through the screening process (SC-1). To the extent possible, immigration detainees have full access to programs, education, and work opportunities.

*Supplement to*
**Inmate education**

Sexual abuse education (TR-3) for immigration detainees is provided at a time and in a manner that is separate from information provided about their immigration cases, in detainees' own languages and in terms that are culturally appropriate, and is conducted by a qualified individual with experience communicating about these issues with a diverse population.

**Detainee handbook**

Every detainee is provided with an ICE Detainee Handbook upon admission to the facility, and a replacement is provided whenever a detainee's handbook is lost or damaged. The Detainee Handbook contains notice of the agency's zero-tolerance policy toward sexual abuse and contains all the agency's policies related to sexual abuse, including information about how to report an incident of sexual abuse and the detainees' rights and responsibilities related to sexual abuse. The Detainee Handbook will inform immigration detainees how to contact organizations in the community that provide sexual abuse counseling and legal advocacy for detainee victims of sexual abuse. The Detainee Handbook will also inform detainees how to contact the Office for Civil Rights and Civil Liberties, the Office of the Inspector General (OIG) for the Department of Homeland Security (DHS), and diplomatic or consular personnel.

that I work in northern New Jersey, there is no way to distinguish potential violators from the people who would be violated."[41]

Screening must also look for signs of heightened vulnerability. Currently, the initial assessment required by the ICE detention standards does not include screening for all of the characteristics that may indicate vulnerability to abuse, such as self-reported history of past abuse, gender, sexual orientation, or physical appearance.[42] Recognizing that some immigration detainees are more at risk of sexual abuse than others, the supplemental standards require culturally competent employees to assess all detainees for risk of victimization and abusiveness and to provide heightened protection for individuals identified as vulnerable. Today, not all facilities take even basic precautions, such as separating detainees by gender or age.

The Commission also is concerned that the default mode of protection for vulnerable detainees has become housing them in conditions approaching isolation. Depending on conditions in protective custody cells and units, isolation can enhance the feeling of aloneness already common among immigration detainees and lead to depression and other problems.[43] For individuals from cultures that emphasize close interpersonal connections, isolation may be particularly destructive. Language barriers further intensify the isolation experience of protective custody. Detainees also may experience segregation as punishment and remain silent instead of reporting sexual abuse.

## Educate to Protect

Immigration detainees will be less vulnerable to sexual abuse if they know their rights and the protections and support available to them. The Commission's supplemental standard on inmate education mandates that sexual abuse education for immigration detainees be provided in the detainees' own language, in terms that are culturally appropriate, and that it be conducted by a qualified individual with experience communicating about these issues to a diverse population.

ICE has made progress toward meeting this requirement through its own standard mandating facilities to provide information about sexual abuse through an orientation handbook, an orientation video, and a poster encouraging detainees who become victims of sexual abuse to report the assault to "any staff person you trust."[44] However, a 2006 audit of five detention facilities by the Homeland Security's Office of the Inspector General found that all five facilities distributed handbooks to detainees that did not explain the process for reporting allegations related to abuse. Some detainees were not aware that they could report allegations related to abuse or civil rights violations directly to the Department of Homeland Security's Office of the Inspector General or that there were reporting procedures for officer's sexual misconduct.[45]

The Commission's standards not only require every detainee to receive a handbook upon admission to the facility—as ICE's own standards already mandate—but also outline information that the handbook must cover: the agency's zero-tolerance policy toward sexual abuse and all the related policies, how to report an incident of sexual abuse, detainees' rights and responsibilities in regard to sexual abuse, and how to contact organizations in the community that provide sexual abuse counseling and legal advocacy for detainee victims of sexual abuse. When facilities receive reports of sexual abuse, the supplemental standard regarding data collection requires them to record the victim's immigration status and to update that information at the conclusion of the investigation.

## Lifelines to the Outside World

**C**onfinement, by definition, involves separating individuals from the community, at least to some degree. Immigration detainees, more than other confined populations, are likely to be almost entirely cut off from the world outside the facility in which they are residing. Individuals are often held in remote facilities, far from family or friends, and may be linguistically and culturally isolated within the detention setting. Often advocacy groups in the surrounding community lack the language skills and cultural competency to assist them.

Diocesan Migrant and Refugee Services administers ICE's Legal Orientation Program to detention facilities in and around El Paso, Texas. According to Iliana Holguin, the organization's Executive Director, "Many times the [Legal Orientation Program] is the only opportunity that detainees have to ask a nongovernmental official for information related to their particular case, for an explanation of the court system which they will soon be forced to navigate, and to express their concerns regarding the conditions of their detention or report any abuses that may have occurred while being detained."[46] Although detainees have periodic contact with immigration judges, those judges have no jurisdiction over the conditions of their detention.

Preventing and responding to sexual abuse among immigration detainees requires ensuring that detainees can easily contact outside entities authorized to receive and respond to reports of sexual abuse. The Commission's standards in this area echo what ICE's own standard already requires: facilities must provide immigration detainees with access to telephones with free, preprogrammed numbers to ICE's Office for Civil Rights and Civil Liberties and to the Department of Homeland Security's Office

STANDARDS

*Supplement to*
Data collection
The facility collects additional data whenever an immigration detainee is the victim or perpetrator of an incident of sexual abuse in custody. The additional incident-based data collected indicate whether the victim and/or perpetrator was an immigration detainee, his or her status at the initiation of the investigation, and his or her status at the conclusion of the investigation.

*Supplement to*
Inmate reporting
The agency provides immigration detainees with access to telephones with free, preprogrammed numbers to ICE's Office for Civil Rights and Civil Liberties and the DHS OIG. In addition, the agency must provide immigration detainees with a list of phone numbers for diplomatic or consular personnel from their countries of citizenship and access to telephones to contact such personnel.

**Immigration detainees, more than other confined populations, are likely to be almost entirely cut off from the world outside the facility in which they are residing.**

*Supplement to*
**Inmate access to outside confidential support services**

All immigration detainees have access to outside victim advocates who have experience working with immigration detainees or immigrant victims of crime for emotional support services related to sexual abuse. The facility provides such access by giving immigration detainees the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national organizations that provide these services and enabling reasonable communication between immigration detainees and these organizations. The facility ensures that communications with such advocates is private, confidential, and privileged to the extent allowable by Federal, State, and local law. The facility informs immigration detainees, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged.

*Supplement to*
**Agreements with outside public entities and community service providers**

Any facility that houses immigration detainees maintains or attempts to enter into memoranda of understanding (MOUs) or other agreements with one or more local or, if not available, national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime (RE-3, MM-3). The agency maintains copies of agreements or documentation showing attempts to enter into agreements.

of the Inspector General. They also must have access to telephones to contact diplomatic or consular personnel from their countries of citizenship, along with a list of those phone numbers.[47]

Although many facilities have a telephone system, a U.S. Government Accounting Office (GAO) investigation in 2007 found widespread problems. Of the 17 facilities GAO visited that used this system, 16 had problems that restricted detainees' abilities to reach their consulates, nongovernmental organizations, pro bono legal assistance providers, and the Department of Homeland Security's Office of the Inspector General complaint hotline. The contractor detainee telephone system was extremely cumbersome and complicated to use. "For example, at Pamunkey Regional Jail [in Hanover, Virginia] the automated system required eight different actions by the user to place a call. One of these actions added further confusion by instructing a detainee to select 'collect call' in order to make a pro bono telephone call."[48] GAO also found that the Inspector General's number was blocked or otherwise restricted at 12 of the facilities.

Immigration detainees who are victims of abuse also need a lifeline to organizations with experience providing support and counseling for immigrant victims of crime. Attorneys and paralegals are not generally trained in how to counsel individuals who have been raped or have been victims of sexual assault.[49] For these reasons, the Commission's supplemental standards require facilities to attempt to reach formal agreements, such as a memorandum of understanding, with one or more local or, if not available, national organizations equipped to provide both legal advocacy and confidential emotional support services to immigration detainees who are victims of sexual abuse. The standards also require facilities to make contact information for these organizations easily accessible and to ensure that detainees can communicate with outside advocates on a confidential basis, to the extent allowed by law.

## Culturally Appropriate and Effective

Even though the Commission's supplemental standards emphasize the need to link victims of sexual abuse with culturally competent outside advocates, facilities still must ensure that their own staff can respond appropriately to sexual abuse. The first line of response to sexual abuse in detention facilities may be staff and frontline providers, yet most are not trained to respond to sexual victimization.

In her testimony before the Commission, Anne Wideman observed that medical staff in detention facilities often are not available to respond to sexual abuse victims and that staff are not well trained in detecting or following up on sexual abuse.[50] According to Cheryl Little, doctors evaluating sexual abuse victims at the Krome detention facility in Miami did

not even conduct a gynecological exam after reported incidents of sexual victimization.[51] Bryan Lonegan believes there are other forces at work as well: "The pressure on the medical staff is to limit the cost of medical care inside the facility. And with that, people look the other way."[52] Lonegan has known of practitioners who provided a substandard level of care. "I had a client who had anal fissures because he had AIDS, and for that he was given Motrin."

A report by two refugee advocacy organizations examining family detention facilities found inadequate medical and mental health services, including lack of access to doctors and inappropriate treatment of serious symptoms. The report concluded that "staff should receive continued specialized training in the unique physical and psychological needs of immigrant families."[53] Some immigrants come from cultures in which emotional distress is expressed somatically.[54] In its report, Physicians for Human Rights recommended that facility staff should receive training in how physical symptoms and complaints may serve as indicators of sexual abuse.[55]

In July 2008, Congress repealed the statutory ban against visits or migration to the United States by HIV-positive persons.[56] As this report went to press, the U.S. Department of Health and Human Services is considering modifying its regulations to remove HIV from the list of communicable diseases. Currently, immigrants known to be HIV-positive request a waiver to seek legal status in the United States—a requirement that applies to all immigrants with communicable diseases.[57] Because of this additional administrative hurdle and the possibility that requests for waivers can be denied, the Commission's supplemental standards require facilities to counsel all detainees about the immigration consequences of a positive HIV test at the time they are offered testing. Medical practitioners should keep abreast of the most current state of the law regarding HIV status and its consequences for the immigration process.

Addressing deficiencies in correctional health care is a complex and vexing issue, requiring training for staff and other interventions mandated in the Commission's core standards. (See Chapter 6 for more information.) The Commission designed its supplemental standard on staff training to ensure that all staff can at least identify signs of sexual abuse among immigration detainees and provide an initial response that is culturally appropriate and effective. The mixture of languages, cultural traditions, and personal experiences represented among immigration detainees nationally makes adequate training a significant challenge. Detainees come from cultures with differing notions of appropriate sexual behavior, and their own experiences of sexual abuse vary widely, along with how they understand the repercussions of reporting abuse to government authorities.

The Commission's supplemental standard on training aims to be responsive to these realities by requiring that all employees, including

*Supplement to*
**Employee training and specialized training of investigators and medical and mental health care**

Any facility that holds immigration detainees provides special additional training to employees, including medical and mental health practitioners and investigators. This additional training includes the following topics: cultural sensitivity toward diverse understandings of acceptable and unacceptable sexual behavior, appropriate terms and concepts to use when discussing sex and sexual abuse with a culturally diverse population, sensitivity and awareness regarding past trauma that may have been experienced by immigration detainees, and knowledge of all existing resources for immigration detainees both inside and outside the facility that provide treatment and counseling for trauma and legal advocacy for victims.

*Supplement to*
**Ongoing medical and mental health care for sexual abuse victims and abusers**

All immigration detainees are counseled about the immigration consequences of a positive HIV test at the time they are offered HIV testing.

*Supplement to*
**Protection of detainee
victims and witnesses**

ICE never removes from the country or transfers to another facility immigration detainees who report sexual abuse before the investigation of that abuse is completed, except at the detainee victim's request. ICE considers releasing detainees who are victims of or witnesses to abuse and monitoring them in the community to protect them from retaliation or further abuse during the course of the investigation.

medical and mental health practitioners and investigators, be trained in cultural sensitivity toward diverse understandings of acceptable and unacceptable sexual behavior, appropriate terms and concepts to use when discussing sex and sexual abuse with a culturally diverse population, sensitivity and awareness regarding past trauma that immigration detainees may have experienced, and knowledge of all existing support services for detainees, both within and outside the facility.

## Justice Interrupted: Transfers and Removals

In testifying before the Commission, Bryan Lonegan described what happened after a detainee in El Paso lodged a complaint about sexual abuse: "He made the complaint, and the next thing you know he was sent over to New Mexico. And then he was bounced back to Texas again and then back down into New Mexico. And during that time he was trying to maintain correspondence with somebody who would address his complaint. And every time he was transferred, he lost his legal papers, he lost his documents. He was never able to receive [the] documents back."[58]

Immigration detainees are housed in hundreds of facilities around the country and are often transferred among facilities as they await a decision in their court case.[59] Reasons for transfers usually involve space availability, cost, and security. The experience of frequent transfers is obviously hard on detainees and compromises their ability to build and present a strong case in immigration court. When a detainee is the victim of sexual abuse, transfers interrupt—and sometimes completely derail—the complaint process, as the story of the detainee from El Paso illustrates. Additionally, immigrants who are victims of certain sex crimes may be eligible for a special visa that allows them to remain in the country, so it is critically important that an investigative finding be made while the detainee still has an opportunity to apply for such a visa.[60]

> **"He made the complaint, and the next thing you know he was sent over to New Mexico. And then he was bounced back to Texas again and then back down into New Mexico. And during that time he was trying to maintain correspondence with somebody who would address his complaint. And every time he was transferred, he lost his legal papers, he lost his documents. He was never able to receive [the] documents back."**

In some cases, ICE decides to transfer a known victim or witness of sexual abuse to protect the person from subsequent abuse or retaliation for reporting. Although protective measures are essential and mandated, the Commission's supplemental standard on protection forbids transferring or

**186**

deporting a detainee who reports sexual abuse until an investigation has been completed, except at the detainee's own request.

When staff cannot protect victims and witnesses in the facility where the abuse occurred, ICE must consider releasing and monitoring them in the community during the course of the investigation. Immigration detainees are in civil custody, and most have not committed crimes in the United States. Furthermore, research has shown that immigrants can be supervised in the community without undue risk of flight. A test of intensive community supervision in New York City from February 1997 to March 2000 showed that 91 percent of participants attended all required court hearings.[61] The test also found community supervision was more cost-effective than detention.

## Specifically for Families

Families who are in ICE custody are currently detained in several facilities in the United States. Stays are not always brief: women with children, including babies and toddlers, may be detained for days, weeks, or even months.[62] Although families can be held in Customs and Border Protection facilities—typically for short periods of time—and in regular detention facilities operated by or under contract with ICE, most parents and children who are detained together are housed in one of two family detention facilities, operated exclusively for this purpose.

In testimony before a congressional subcommittee on immigration, Texas Representative Sheila Jackson noted that family facilities often are modeled on the criminal justice system. Immigrants in these facilities are "deprived of the right to live as a family unit, denied adequate medical and mental health care, and face overly harsh disciplinary tactics."[63] The Lutheran Immigration and Refugee Services report concluded that, in addition to the need for specialized training about immigrant families, "[a]ll staff training should be based upon a child and family welfare model and not a criminal or juvenile justice model."[64] The report also found health care to be inadequate, citing the inability of adults and children to get access to doctors and inappropriate treatment of serious symptoms. Compounding these conditions, Michelle Brané, Director of the Detention and Asylum Program for Women's Refugee Commission, contends that families are sometimes threatened with separation, creating enormous pressure on parents that they will lose their children if a family member causes disruption.[65]

According to the Commission's standards, housing and other placement decisions based on a child or adult's risk of sexual abuse must preserve the integrity of the family unit and strive to keep members together.

**STANDARDS**

**Screening of immigration detainees in family facilities**

Family facilities develop screening criteria to identify those families and family members who may be at risk of being sexually victimized that will not lead to the separation of families. Housing, program, educational, and work assignments are made in a manner that protects families and in all cases prioritizes keeping families together.

**Reporting of sexual abuse in family facilities**

The facility provides parents with the ability to report sexual abuse in a manner that is confidential from their children. The facility also provides children with the ability to report abuse by a parent confidentially to staff.

**Investigations in family facilities**

Parents are questioned confidentially by investigators about any incident of sexual abuse, away from their children. A parent or parents are present when a child is questioned by investigators about any incident of sexual abuse, unless (1) the child has alleged abuse by the parent or (2) staff suspects abuse by the parent. The decision to exclude a parent from an interview based on staff suspicion of abuse by that parent is always made by a qualified mental health practitioner.

STANDARD

**Access to medical and mental health care in family facilities**

All family members are offered mental health counseling (as required in MM-2 and MM-3) when one family member is a victim of sexual abuse in the facility. Following an incident of sexual abuse, parents and adult family members are examined confidentially by medical and mental health practitioners and away from children. Following an incident of sexual abuse, a parent or parents are allowed to be present during all medical and mental health examinations of a minor child, unless (1) that child has alleged sexual abuse by the parent or (2) staff suspects abuse by the parent. The decision to exclude a parent from an examination based on staff suspicion of abuse by that parent is always made by a qualified mental health practitioner. In the event that a child is sexually abused, a qualified mental health practitioner interviews the child to determine whether either parent was present or aware of the abuse and whether the parent or parents were threatened in connection with the abuse.

Screening criteria used in facilities for adults and those used in facilities for children are generally inappropriate in a family context. The purpose of family facilities is to keep families together, so protection cannot be accomplished by separating individuals on the basis of age, gender, or sexuality. There is almost no research to suggest what screening criteria might be appropriate, so the burden is on ICE to develop good protocols that protect individuals from abuse while maintaining family unity.

Disincentives for reporting abuse may be even greater when parents and children are confined together with little or no privacy. Under the Commission's standards, facilities must somehow ensure that both adults and children can report abuse in a confidential manner. This is especially important in the situations where children are at risk of abuse within the family unit.

Family facilities must be sensitive to parents' desire to protect their children from sexual abuse and even from hearing about abuse unnecessarily because that may disturb a child. Facilities also must be responsive to the discomfort a parent might feel discussing sexual abuse in front of their children. The Commission's standards require investigators and health care practitioners to question parents confidentially, away from their children, about any incident of sexual abuse. On the other hand, when children are known or suspected to be victims of sexual abuse, the standards require parents to be present when investigators are questioning their children and allow parents to be present during medical and mental health exams, unless the parent is the alleged abuser. A qualified mental health practitioner must make the decision to exclude a parent from an interview or medial exam based on suspicion of abuse.

Florida immigrant advocate Cheryl Little concluded her testimony to the Commission by stating, "Detainees [in Florida] have paid a heavy price for sexual misconduct by their jailers and the message to victims is clear: Complain and you are transferred to a remote facility far removed from your lawyer and loved ones or, worse, you risk deportation. . . . The message to abusive guards is likewise clear: No matter the seriousness of the abuse, you are not likely to be punished or held accountable for your acts."[66] The decades of unchecked sexual abuses at the Krome facility are one example, albeit extreme, that protections for immigration detainees and accountability for perpetrators are not what they should be. Almost equally concerning, we know less about this area of confinement than any other, yet it is one of the fastest growing and an area in which preventing, detecting, and responding to abuse is especially challenging.

APPENDICES

# Appendix A

# Endnotes

## PART I: UNDERSTANDING AND PREVENTING SEXUAL ABUSE

### Chapter 1. A Problem that Must Be Solved

1. Clemmer, D. (1940). *The prison community.* Boston: Christopher Publishing House (hereafter Clemmer, *The prison community*).

2. The Eighth Amendment, proportionality, and the changing meaning of "punishments." (2009). *Harvard Law Review, 122*(3), 960–981.

3. McShane, M. (2008). *Prisons in America.* El Paso, TX: LFB Scholarly Publishing LLC.

4. Craig, R. L. (2006). Women in corrections: Elizabeth Gurney Fry. *Journal of Correctional Education. 57*(2), 141–144.

5. Dumond, R., & Dumond, D. (2002). The treatment of sexual assault victims. In C. Hensley (Ed.), *Prison sex: Practice and policy* (pp. 67–87). Boulder, CO: Lynne Rienner Publishers, Inc. (hereafter Dumond, "Treatment").

6. Alan Davis conducted his groundbreaking study of sexual abuse in jail systems during this period. Davis, A. J. (1968). Sexual assaults in the Philadelphia prison system and sheriff's vans. *Transaction, 6*(2), 8–16 (hereafter Davis, "Sexual assaults").

7. Testimony of Parsell, T. J. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 33). San Francisco: National Prison Rape Elimination Commission Public Hearing.

8. Ibid., at 34.

9. Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq. (hereafter PREA).

10. Ibid.

11. Bureau of Justice Statistics. (2004). *Data collections for the Prison Rape Elimination Act of 2003.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs (hereafter BJS, *Data collections*).

12. *Farmer v. Brennan*, 511 U.S. 825 (1994) (hereafter *Farmer*).

13. Bayard, M. (1983). *Inside justice.* London: Farleigh Dickinson University Press, p. 225.

14. *Stroud v. Swope*, 187 F.2d 850, 851–852 (9th Cir. 1951).

15. *Wolff v. McDonnell*, 418 U.S. 539, 555–556 (1974).

16. *Farmer,* at 833.

17. Ibid., at 834 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

18. See *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 370 (1992); *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992); *Moore v. Morgan*, 922 F.2d 1553, 1557 n. 4 (11th Cir. 1991); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 336–337 (3d Cir. 1987); *Lareau v. Manson*, 651 F.2d 96, 104 (2d Cir. 1981); *Battle v. Anderson*, 564 F.2d 388, 396 (10th Cir. 1977); *Thomas v. Baca*, 514 F.Supp.2d 1201, 1218 (C.D.Cal. 2007).

19. *See Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991); *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983).

20. *Rhodes v. Chapman*, 452 U.S. 337, 354 (1981).

21. *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988).

22. Testimony of Shirley, M. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape* (p. 67). Washington, D.C.: National Prison Rape Elimination Commission Public Hearing.

23. Ibid., at 69.

24. Ibid., at 71.

25. Ibid., at 73.

26. Browne, A., & Lichter, E. (2001). Imprisonment in the United States. In J. Worell (Ed.), *Encyclopedia of women and gender: Sex similarities and differences and the impact of society on gender* (Vol. 1). San Diego: Academic Press (hereafter Browne, "Imprisonment"); Young, V., & Reviere, R. (2005). *Women behind bars: Gender & race in U.S. prisons.* Boulder, CO: Lynne Rienner Publishers (hereafter Young, *Women behind bars*); Rafter, N. (1990). *Partial justice: Women, prisons, and social control* (2nd ed., rev.). New Brunswick, NJ: Transaction Publishers (hereafter Rafter, *Partial justice*).

27. Freedman, E. (1981). *Their sisters' keepers: Women's prison reform in America, 1830–1930.* Ann Arbor: University of Michigan Press, p. 16.

28. Young, *Women behind bars*; Rafter, *Partial justice.*

29. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. See *Griffin v. Michigan DOC*, 654 F.Supp. 690 (E.D. Mich. 1982); *Harden v. Dayton Human Rehabilitation Center*, 520 F.Supp. 769 (S.D. Ohio 1981); Smith, B. (2003). Watching

you, watching me. *Yale Journal of Law & Feminism, 15*(2), 225–288.

30. See Jurado, R. (1999). The essence of her womanhood: Defining the privacy rights of women prisoners and the employment rights of women guards. *American University Journal of Gender Social Policy & Law, 7*(1), 21–53.

31. U.S. Department of Labor. (2007). *Quick facts: Employment status for women and men in 2007.* Women's Bureau Web site. Available at http://www.dol.gov/wb/factsheets/Qf-ESWM07.htm

32. Smith, B. (2008). *Prosecuting sexual violence in correctional settings: Examining prosecutors' perceptions.* American University, Washington College of Law Research Paper No. 2008-50 (hereafter Smith, *Prosecuting sexual violence*); National Institute of Corrections. (2006). State criminal laws prohibiting sexual misconduct with offenders in 1990. Available at http://nicic.org/Downloads/PDF/Library/021770.pdf

33. Smith, *Prosecuting sexual violence.*

34. National Institute of Corrections/Washington College of Law Project on Addressing Prison Rape. (2008). State laws prohibiting sexual misconduct with individuals in custody checklist. American University, Washington College of Law Web site. Available at https://www.wcl.american.edu/nic/legal_responses_to_prison_rape/fifty_state_checklist.pdf?rd=1

35. Smith, *Prosecuting sexual violence.*

36. National Institute of Corrections/Washington College of Law Project on Addressing Prison Rape. (2008). Fifty-state survey of criminal laws prohibiting the sexual abuse of individuals in custody. American University, Washington College of Law Web site. Available at http://www.wcl.american.edu/nic/responses.cfm

37. Smith, *Prosecuting sexual violence*; Testimony of Worthy, K. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 217). Detroit: National Prison Rape Elimination Commission Public Hearing.

38. Clemmer, *The prison community.*

39. Davis, "Sexual assaults."

40. Wooden, W. S., & Parker, J. (1982). *Men behind bars: Sexual exploitation in prison.* New York: Plenum Press.

41. Struckman-Johnson, C., Struckman-Johnson, D., Rucker, L., Bumby, K., & Donaldson, S. (1996). Sexual coercion reported by men and women in prison. *Journal of Sex Research, 33*(1), 67–76.

42. Struckman-Johnson, C., & Struckman-Johnson, D. (2002). Sexual coercion reported by women in three Midwestern prisons. *Journal of Sex Research, 39*(3), 217–227 (hereafter Struckman-Johnson, "Sexual coercion reported by women").

43. Ibid., at 224–225.

44. Blackburn, A., Mullings, J., & Marquart, J. (2008). Sexual assault in prison and beyond: Toward an understanding of lifetime sexual assault among incarcerated women. *The Prison Journal, 88*(3), 351–377.

45. Jones, T. R., & Pratt, T. C. (2008). The prevalence of sexual violence in prison: The state of the knowledge base and implications for evidence-based correctional policy making. *International Journal of Offender Therapy and Comparative Criminology, 52*(3), 280–295 (hereafter Jones, "Prevalence of sexual violence").

46. Gaes, G., & Goldberg, A. (2004). *Prison rape: A critical review of the literature.* National Institute of Justice Working Paper. Washington, D.C.: U.S. Department of Justice.

47. Jones, "Prevalence of sexual violence."

48. Bowling, A. (2005). Mode of questionnaire administration can have serious effects on data quality. *Journal of Public Health, 27*(3), 281–291.

49. Donaldson, S. (1994). *Rape trauma syndrome in male prisoners.* Los Angeles: Just Detention International (hereafter Donaldson, *Rape trauma*).

50. Aquilino, W. S. (1994). Interview mode effects in surveys of drug and alcohol use. *Public Opinion Quarterly, 58*(2), 210–240 (hereafter Aquilino, "Interview mode effects").

51. Greenberg, E., Dunleavy, E., Kutner, M., & White, S. (2006). *Literacy behind bars: Results from the 2003 National Assessment of Adult Literacy Prison Survey.* Washington, D.C.: U.S. Department of Education, National Center for Education Statistics, Institute of Education Sciences.

52. Aquilino, "Interview mode effects" (stating that in studies involving sensitive information, two key factors influencing willingness to participate are the confidentiality and anonymity of the responses provided).

53. BJS, *Data collections.*

54. Beck, A. J., & Harrison, P. M. (2008). *Sexual victimization in State and Federal prisons reported by inmates, 2007.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *State and Federal prisons, 2007*); Struckman-Johnson, "Sexual coercion reported by women."

55. PREA, at § 15601.

56. Ibid., at § 15602(4).

57. Beck, *State and Federal prisons, 2007*; Beck, A. J., & Harrison, P. M. (2008). *Sexual victimization in local jails reported by inmates, 2007.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *Local jails, 2007*).

58. Beck, *State and Federal prisons, 2007.*

59. Beck, *Local jails, 2007.*

60. Beck, A. J., Harrison, P. M., & Adams, D. B. (2007). *Sexual violence reported by correctional authorities, 2006.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *Correctional authorities, 2006*).

61. Beck, A. J., Adams, D. B., & Guerino, P. (2008). *Sexual violence reported by juvenile correctional authorities, 2005–2006.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *Juvenile correctional authorities, 2005–2006*).

62. Beck, *Correctional authorities, 2006.*

63. Beck, *Juvenile correctional authorities, 2005–2006.*

64. Office of Juvenile Justice and Delinquency Prevention. (2006). *Juvenile offenders and victims: 2006 national report.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs.

65. Beck, A. J., & Harrison, P. M. (2006). *Sexual violence reported by correctional authorities, 2005*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

66. Bureau of Justice Statistics. (2007, August 28). *Data presented at the Prison Rape Elimination Act Workshop: National Survey of Youth in Custody*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs.

67. Ibid.

68. Beck, *Correctional authorities, 2006*.

69. BJS, *Data collections*; Beck, *Correctional authorities 2006*; Beck, *Juvenile correctional authorities, 2005–2006*.

70. Beck, *State and Federal prisons, 2007*.

71. Struckman-Johnson, "Sexual coercion reported by women."

72. West, H. C., & Sabol, W. J. (2009). *Prisoners in 2007*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

73. Useem, B. (2008). *Prison state: The challenge of mass incarceration*. New York: Cambridge University Press.

74. Glaze, L. E., & Bonczar, T. P. (2008). Probation and parole in the United States—2007 statistical tables. Bureau of Justice Statistics Web site. Available at http://www.ojp.gov/bjs/abstract/ppus07st.htm

75. National Institute of Corrections. (n.d.). Essay: Specialized caseloads. *Community Corrections Quarterly*. Available at http://www.nicic.org/pubs/pre/period13.pdf

76. Browne, "Imprisonment."

77. Clark, J., Austin, J., & Henry, D. A. (1997). *"Three strikes and you're out": A review of State legislation*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice; Walsh, J. E. (2007). *Three strikes laws (historical guides to controversial issues in America)*. Westport, CT: Greenwood Publishing Group.

78. Total Criminal Defense, Inc. (2008). Understanding "three strikes and you're out" laws. Total Criminal Defense Web site. Available at http://www.totalcriminaldefense.com/overview/three-strikes-law.aspx

79. Talvi, S. (2007). *Women behind bars: The crisis of women in the U.S. prison system*. Emeryville, CA: Seal Press.

80. Austin, J., Johnson, K. D., & Gregoriou, M. (2000). *Juveniles in adult prisons and jails: A national assessment*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance; Snyder, H., & Sickmund, M. (1999). *Juvenile offenders and victims: 1999 national report*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

81. Hartney, C. (2006). Fact sheet: Youth under age 18 in the adult criminal justice system. National Council on Crime and Delinquency Web site. Available at http://www.nccdcrc.org/nccd/pubs/2006may_factsheet_youthadult.pdf; Equal Justice Initiative. (2007). *Cruel and unusual: Sentencing 13- and 14-year-old children to die in prison*. Montgomery, AL: Author.

82. Mauer, M. (1999). *Race to incarcerate*. New York: The New Press.

83. Sabol, W. J., Minton, T. D., & Harrison, P. M. (2007). *Prison and jail inmates at midyear 2006*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (stating that "At midyear 2006, 750 persons per 100,000 U.S. residents were in prison or jail, the equivalent to 1 in every 133 residents.").

84. Resick, P. A. (1993). The psychological impact of rape. *Journal of Interpersonal Violence, 8*(2), 223–255; Burgess, A. W., & Holmstrom, L. L. (1974). Rape trauma syndrome. *American Journal of Psychiatry, 131*(9), 981–986 (hereafter Burgess, "Rape trauma"); Council on Scientific Affairs, American Medical Association. (1992). Violence against women: Relevance for medical practitioners. *JAMA, 267*(23), 3184–3189 (hereafter AMA, "Violence against women"); Donaldson, *Rape trauma*.

85. American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders: DSM-IV-TR*. Washington, D.C.: Author (hereafter APA, *Manual of mental disorders*); Resnick, H., Acierno, R., Holmes, M., Kilpatrick, D., & Jager, N. (1999). Prevention of post-rape psychopathology: Preliminary findings of a controlled acute rape treatment study. *Journal of Anxiety Disorders, 13*(4), 359–370.

86. APA, *Manual of mental disorders*.

87. Hensley, L. G. (2002). Treatment of survivors of rape: Issue and interventions. *Journal of Mental Health Counseling, 24*, 330–347 (hereafter Hensley, "Treatment of survivors").

88. AMA, "Violence against women"; Koss, M. P., & Harvey, M. R. (1991). *The rape victim: Clinical and community interventions*. Thousand Oaks, CA: Sage Publications (hereafter Koss, *The rape victim*); Donaldson, *Rape trauma*.

89. AMA, "Violence against women."

90. Dumond, "Treatment"; Donaldson, *Rape trauma*.

91. APA, *Manual of mental disorders*.

92. Dumond, R. W. (2003). Confronting America's most ignored crime problem: The Prison Rape Elimination Act of 2003. *Journal of the American Academy of Psychiatry and the Law, 31*(3), 354–360; Burgess, "Rape trauma."

93. Testimony of Brown, N. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 29). Detroit: National Prison Rape Elimination Commission Public Hearing.

94. Koss, *The rape victim*; Golding, J. M. (1999). Sexual-assault history and long-term physical health problems: Evidence from clinical and population epidemiology. *Current Directions in Psychological Science, 8*(6), 191–194; Hensley, "Treatment of survivors"; Scarce, M. (2001). *Male on male rape*. New York: Basic Books.

95. AMA, "Violence against women."

96. Mariner, J. (2001). Rape scenarios. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch.

97. Dannenberg, A. L., McNeil, J. G., Brundage, J. F., & Brookmeyer, R. (1996). Survival and HIV infection: Mortality follow-up of 4,147 HIV seropositive military service applicants. *JAMA, 276*(21), 1743–1746.

98. Testimony of DeBlasio, K. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape* (p. 84). Washington, D.C.: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of DeBlasio); Ross, J. I. (2006, April 18). Jailhouse blue. American

Civil Liberties Union of Texas Web site. Available at http://www.aclutx.org/projects/article.php?aid=276&cid=16

99. NPREC Testimony of DeBlasio, at 85.

100. Ibid., at 87.

101. Holmes, M. M., Resnick, H. S., & Kilpatrick, D. G. (1996). Rape-related pregnancy: Estimates and characteristics from a national sample of women. *American Journal of Obstetric Gynecology. 175*(22), 320–325; Jenny, C., Hooton, T. M., Bowers, A., Copass, M. K., Krieger, J. N., Hillier, S. L., et al. (1990). Sexually transmitted disease in victims of rape. *New England Journal of Medicine, 322*(11), 713–716.

102. *Berry v. Oswalt*, 143 F.3d 1127 (8th Cir. 1998).

103. Hughes, T., & Wilson, D. J. (2003). *Reentry trends in the United States*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics; Petersilia, J. (2005). Hard time: Ex-offenders returning home after prison. *Corrections Today, 67*(2), 66 (stating that 93 percent of prisoners will eventually be released).

104. Lovell, D., Gagliardi, G. J., & Peterson, P. D. (2002). Recidivism and use of services among persons with mental illness after release from prison. *Psychiatric Services, 53*(10), 1290–1296 (stating that few people receive clinically meaningful levels of service during the first year after release).

105. Ullman, S. E., Townsend, S. M., Starzynski, L. L., & Long, L. M. (2006). Correlates of comorbid PTSD and polysubstance use in sexual assault victims. *Violence and victims, 21*(6), 725–743.

106. PREA, at §15601(14)(A); Petersilia, J. (2001). When prisoners return to communities: Political, economic, and social consequences. *Federal Probation, 65*(1), 3–8.

107. Testimony of Cahill, T. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape* (p. 80). Washington, D.C.: National Prison Rape Elimination Commission Public Hearing.

108. Ibid., at 82.

109. PREA, at §15601(14)(A).

110. James, D. J., & Glaze, L. E. (2006). *Mental health problems of prison and jail inmates*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics; Maruschak, L. M. (2008). *Medical problems of prisoners*.

Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

111. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (holding that "punishment must not involve the unnecessary and wanton infliction of pain" or "be grossly out of proportion to the severity of crime" to avoid implicating the Eighth Amendment). The Fifth Amendment's Due Process Clause offers similar protection to pretrial detainees. See Mariner, J. (2001). Legal context. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch (noting that the Eighth Amendment bars cruel and unusual *punishment* and so is logically limited only to convicted individuals. However, in practice, "the standards applied to pretrial detainees under the Fifth Amendment's Due Process Clause have followed those applied to convicted prisoners under the Eighth.").

112. Moss, A., & Wall, T. A. (2005). Addressing the challenge of inmate rape. *Corrections Today, 67*(5), 74–78.

113. Ibid.

114. American Jail Association Board of Directors. (2003). Staff sexual misconduct. Available at http://www.aja.org/aja/about/resolutions.shtml#STAFF_SEXUAL_MISCONDUCT; American Probation and Parole Association. (2003). Staff sexual misconduct. Available at http://www.appa-net.org/eweb/Dynamicpage.aspx?site=APPA_2&webcode=IB_Resolution&wps_key=825560aa-b5da-46b7-95bf-57debadaaa5c; Association of State Correctional Administrators. (2006). Resolution #3—Establishment of policies regarding staff sexual harassment, activity or abuse of offenders. Association of State Correctional Administrators Resolutions. Available at http://asca.net/documents/Harassment.pdf; National Sheriffs' Association. (2006). Development of policies on standards of conduct for jail and local correctional facility staff. Available at http://www.sheriffs.org/userfiles/file/2006_2NSAResolutions.pdf

115. Smith, B. V. (2008). *The Prison Rape Elimination Act: Implementation and unresolved issues*. American University, Washington College of Law Research Paper No. 2008-49 (hereafter Smith, *Implementation*).

116. PREA, at §§ 15602–15607; see also Smith, *Implementation*.

117. Public Law 108-79 §§ 3(1), (5).

## Chapter 2. Leadership Matters

1. Seidel, J. (2009, January 4). Sexual assaults on female inmates went unheeded. *Detroit Free Press*, p. 1 (hereafter Seidel, "Sexual assaults").

2. *Neal v. Department of Corrections*, No. 285232, *9 (Mich. App. 1/27/2009) (hereafter *Neal*).

3. Seidel, J. (2009, January 7). Jury awarded $15.4 million to inmates. *Detroit Free Press*, p. 2.

4. *Neal* at *1.

5. *Everson v. Michigan Department of Corrections*, 391 F.3d 737, 741 (6th Cir. 2004) (quoting the Michigan Women's Commission report).

6. Ibid., at 743.

7. Settlement Agreement, Civil Action No. 97-CVB-71514-BDT, District Court for the Eastern District of Michigan, Southern Division.

8. Seidel, "Sexual assaults."

9. *Everson v. Michigan Department of Corrections*, 391 F.3d 737, 745–746 (6th Cir. 2004); Caruso, P. (2009, February 17). Telephone interview (hereafter Caruso, Telephone interview); Seidel, "Sexual assaults."

10. Seidel, "Sexual assaults."

11. Caruso, Telephone interview.

12. Owen, B., Wells, J., Pollock, J., Muscat, B., & Torres, S. (2008). *Gendered violence and safety: A contextual approach to improving security in women's facilities*. Washington, D.C.: U.S.

Department of Justice, Office of Justice Programs, National Institute of Justice (hereafter Owen, *Gendered violence*).

13. Testimony of Wall, A. T. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 74). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Wall).

14. Zweig, J. M., & Blackmore, J. (2008). *Research for practice: Strategies to prevent prison rape by changing the correctional culture*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (hereafter Zweig, *Strategies to prevent*).

15. NPREC Testimony of Wall, at 75.

16. Zweig, J., Naser, R. L., Blackmore, J., & Schaffer, M. (2006). *Addressing sexual violence in prisons: A national snapshot of approaches and highlights of innovative strategies*. Washington, D.C.: Urban Institute (hereafter Zweig, *Addressing sexual violence*). According to the authors, the purpose of this study was to "provide a national snapshot of department of correction initiatives to address prison sexual violence, as well as to identify specific practices that seemed to be, in the absence of formal evaluations, particularly promising or innovative in nature" (p. i).

17. Zweig, *Strategies to prevent*.

18. Testimony of Horn, M. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (pp. 84–85). Miami: The National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Horn).

19. NPREC Testimony of Wall, at 75.

20. Thompson, R. A., Nored, L. S., & Dial, K. C. (2008). The Prison Rape Elimination Act (PREA): An evaluation of policy compliance with illustrative excerpts. *Criminal Justice Policy Review, 19*(4), 414–437.

21. *Cason v. Seckinger*, Civil Action File No. 84-313-1-MAC (M.D. Ga. Mar. 4, 1994); *Women Prisoners v. District of Columbia*, 877 F.Supp. 634 (D.D.C. 1994); Elliott-Wilkins, T. (2007). *Texas Youth Commission: Summary report for administrative review. Dallas Morning News* Web site. Available at http://www.dallasnews.com/sharedcontent/dws/img/02-07/0218tyc_pages1.pdf

22. NPREC Testimony of Wall, at 79.

23. *Kahle v. Leonard*, 477 F.3d 544, 547–548 (8th Cir. 2007). All information about this case is taken from court records.

24. Ibid., at 547.

25. Ibid., at 548.

26. Clem, C., Krauth, B., & Wenger, P. (2000). *Recruitment, hiring, and retention: Current practices in U.S. jails*. Washington, D.C.: U.S. Department of Justice, National Institute of Corrections (hereafter Clem, *Recruitment*).

27. Dowd, D. (2007). No vacancies? Osceola County finds keys to attract and retain officer staff. *LJN Exchange*, 19–24, at 19 (hereafter Dowd, "No vacancies").

28. National Academy of Public Administration. (2007). *Eliminating prison rape: Policy and strategy*. Washington, D.C.: Author (hereafter NAPA, *Eliminating prison rape*).

29. Stinchcomb, J. B., McCampbell, S. W., & Leip, L. (2009). *The future is now: Recruiting, retaining, and developing the*

*21st century jail workforce*. Naples, FL: Center for Innovative Public Policies, Inc.

30. Clem, *Recruitment*; Scrivner, E. (2006). *Innovations in police recruitment and hiring: Hiring in the spirit of service*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services.

31. McCampbell, S. W., & Fischer, L. S. (2002). *Staff sexual misconduct with inmates: Policy development guide for sheriffs and jail administrators*. Naples, FL: Center for Innovative Public Policies, Inc.

32. Testimony of Kupers, T. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars*. San Francisco: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Kupers).

33. Eigenberg, H. M. (2000). Correctional officers and their perceptions of homosexuality, rape and prostitution in male prisons. *The Prison Journal, 80*(4), 415–433 (hereafter Eigenberg, "Correctional officers").

34. Harrington, P. E., Spillar, K., Lonsway, K. A., Webber, R., Baldwin, K. A., Besser, et al. (2001). *Recruiting and retaining women: A self-assessment guide for law enforcement*. Los Angeles: National Center for Women and Policing; Owen, *Gendered violence*.

35. NPREC Testimony of Kupers, at 117.

36. Clem, *Recruitment*.

37. Ibid.; Dowd, "No vacancies."

38. Corrections Independent Review Panel. (2004). *Reforming corrections*: *Report of the Corrections Independent Review Panel*. Sacramento, CA: California Performance Review (hereafter CIRP, *Reforming corrections*).

39. Davenport, D. K. (2001). *Performance audit, Arizona Department of Corrections, Human Resources Management*. Phoenix: State of Arizona Office of the Auditor General; Clem, *Recruitment*; CIRP, *Reforming corrections*.

40. Jacobs, J. B., & Olitsky, E. (2004). Leadership and correctional reform. *Pace Law Review, 24*(2), 477–496.

41. Mariner, J. (2001). Anomaly or epidemic: The incidence of prisoner-on-prisoner rape. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch.

42. Zweig, *Addressing sexual violence*.

43. McCampbell, S. (2009, May 4). Telephone interview.

44. Ibid.

45. Ohio Department of Rehabilitation and Correction. (2004). *Ohio correctional institution sexual assault abatement: A ten point plan*. Columbus: Ohio Department of Rehabilitation and Correction; Texas Department of Criminal Justice. (2009). Safe Prison Program. Correctional Institutions Division Web site. Available at http://www.tdcj.state.tx.us/cid/cid_safe_prison_pgm.htm

46. Kunselman, J., Tewksbury, R., Dumond, R., & Dumond, D. A. (2002). Nonconsensual sexual behavior. In C. Hensley (Ed.), *Prison sex: Practice and policy*. Boulder, CO: Lynne Rienner Publishers, Inc.; Eigenberg, "Correctional officers"; Zweig, *Strategies to prevent*.

47. Hensley, C. (2000). *Prison sex: Practice and policy*. Boulder, CO: Lynne Rienner Publishers, Inc.

48. Owen, *Gendered violence*.

49. Zweig, *Strategies to prevent*.

50. See NPREC Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Adult Prisons and Jails, Standards TR-1, TR-2, OR-1, and OR-3.

51. See National Institute of Corrections. (2005). *Speaking up: Discussing prison sexual assault: A tool kit designed to assist facility staff in educating women offenders to local sexual assault policies and practices* [CD ROM]. Washington, D.C.: Author; Owen, *Gendered violence*.

52. Smith, B. V. (2002). *An end to silence: Prisoners' handbook on identifying and addressing sexual misconduct* (2nd ed.). Washington, D.C.: American University, Washington College of Law; Smith, B. V. (1998). *An end to silence: Women prisoners' handbook on identifying and addressing sexual misconduct.* Washington, D.C.: National Women's Law Center.

53. Testimony of Hennessey, M. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 276). San Francisco: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Hennessey).

54. Clem, C., Gordon, C., Sheanin, D., & Smith, T. (2006). *Direct supervision jails: 2006 sourcebook*. Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, Jails Division.

55. Wener, R. (2006). Effectiveness of the direct supervision system of correctional design and management: A review of the literature. *Criminal Justice and Behavior, 33*(3), 392–410.

56. Nelson, W. R. (1993). New generation jails. In *Podular, direct supervision jails: Information packet* (pp. 25–41). Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, Jails Division (hereafter Nelson, "New generation").

57. Testimony of Malm, C. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (p. 95). Miami: National Prison Rape Elimination Commission Public Hearing.

58. Nelson, "New generation."

59. Ibid.

60. NPREC Testimony of Hennessey, at 275.

61. Owen, B., & Wells, J. (2006). *Staff perspectives: Sexual violence in adult prisons & jails*. Washington, D.C.: U.S. Department of Justice, National Institute of Corrections; Testimony of Beck, A. (2005, July 19). *The Systemic and Institutional Drivers of Abuse and Lack of Safety: Personal Accounts* (p. 31). Newark, NJ: Commission on Safety and Abuse in America's Prisons Public Hearing.

62. *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008). All information about this case is taken from court records.

63. Ibid., at 919.

64. Testimony of Rodriguez, R. (2006, December 13–14). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (pp. 10–11). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

65. National Law Enforcement and Corrections Technology Center. (2005, Summer). Technology primer: Radio frequency identification. *TechBeat, 6–8*.

66. Financing for RFID prison system: GE public finance will offer special rates to states deploying cutting-edge prisoner tracking technology. (2002, December 31). *RFID Journal*.

67. Seidel, "Sexual assaults," at 6.

68. Ibid., at 7.

69. Smith, B. V. (2003). Watching you, watching me. *Yale Journal of Law & Feminism, 15*(2), 225–288.

70. Levine, K. L. (2006). No penis, no problem. *Fordham Urban Law Journal, 33,* 357–405 (discussing how men are just as constrained as women by gender stereotypes and societal expectations and, as a result, are often unable to recognize themselves as victims of sexual abuse perpetrated by women); Beck, A. J., & Harrison, P. M. (2005). *Sexual violence reported by correctional authorities, 2004.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

71. NPREC Testimony of Horn, at 81.

72. Testimony of Stalder, R. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (p. 80) Miami: National Prison Rape Elimination Commission Public Hearing.

73. *Jordan v. Gardner*, 986 F.2d 1521, 1525 (9th Cir. 1993). All information about this case is taken from court records.

74. *Colman v. Vasquez*, 142 F.Supp.2d 226 (D. Conn. 2001). All information about this case is taken from court records.

75. Ibid., at 232.

76. See *Cash v. County of Erie*, 2007 WL 2027844 (W.D.N.Y. July 11, 2007); *Herckenlaible v. Virginia Peninsula Regional Jail Authority*, 491 F.Supp.2d 544 (2007). But also see *Balbridge v. Jeffreys*, 2009 WL 275669 (E.D. Mich. 2009).

77. *Wilson v. City of Kalamazoo*, 127 F.Supp.2d 855 (W.D. Mich. 2000). All information about this case is taken from court records.

78. Ibid., at 861.

79. *Turner v. Safley*, 482 U.S. 78, 84 (1987).

80. Ingram, J. D. (2000). Prison guards and inmates of opposite gender: Equal employment opportunity versus right of privacy. *Duke Journal of Gender Law & Policy, 7,* 3–27 (discussing how courts have attempted equal employment laws with constitutional privacy rights).

81. *Riley v. Olk-Long*, 282 F.3d 592, 594 (11th Cir. 2002). All information about this case is taken from court records.

82. Ibid.

83. Ibid., at 597.

84. Raemisch, R. (2009, May 4). Telephone interview.

85. Ibid.

86. NAPA, *Eliminating prison rape*.

87. Testimony of Meyers, W. (2006, December 13–14). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 13). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

88. NAPA, *Eliminating prison rape*.

89. Testimony of Gunn, J. (2006, December 14). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 132). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

90. NPREC Testimony of Wall, at 80.

## Chapter 3. Vulnerability and Victimization

1. Testimony of Bruntmyer, L. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape* (p. 76). Washington, D.C.: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Bruntmyer). See also Mariner, J. (2001). Case history of Rodney Hulin. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch (hereafter Mariner, "Case history").

2. Berryhill, M. (1997, August 7). What really happened to Rodney Hulin? *Houston Press*.

3. NPREC Testimony of Bruntmyer, at 75.

4. Ibid., at 76.

5. Mariner, "Case history."

6. NPREC Testimony of Bruntmyer.

7. *Farmer v. Brennan*, 511 U.S. 825, 833–834 (1994) (citing *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).

8. Testimony of Stalder, R. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (pp. 77–78). Miami: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Stalder).

9. Man, C. D., & Cronan, J. P. (2001). Forecasting sexual abuse in prison: The prison subculture of masculinity as a backdrop for "deliberate indifference. *Journal of Criminal Law & Criminology, 92*(1), 127–186 (hereafter Man, "Forecasting"); Mariner, J. (2001). Predators and victims. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch (hereafter Mariner, "Predators"). Warren, J. (2009). *Risk markers for sexual victimization and violence in prison*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (hereafter Warren, *Risk markers*).

10. Smith, N. E., & Batiuk, M. E. (1989). Sexual victimization and inmate social interaction. *The Prison Journal, 69*(2), 29–38, at 33.

11. Dumond, R. W. (2000). Inmate sexual assault: The plague that persists. *The Prison Journal, 80*(4) 407–414; Warren, *Risk markers*; Mariner, "Predators."

12. Sisco, M. M., & Becker, J. V. (2007). Beyond predicting the risk of sexual victimization in prison—considering inherent options and reporting avenues for addressing an inherent problem. *Criminology & Public Policy, 6*(3), 573–584 (hereafter Sisco, "Beyond predicting"); Kunselman, J., Tewksbury, R., Dumond, R. W., & Dumond, D. A. (2002). Nonconsensual sexual behavior. In C. Hensley (Ed.), *Prison sex: Practice and policy*. Boulder, CO: Lynne Rienner Publishers.

13. Testimony of Martin, C. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (pp. 12–13). San Francisco: National Prison Rape Elimination Commission Public Hearing. All details about Martin's experiences are based on his testimony to the Commission.

14. Thomas, D. Q. (1996). *All too familiar: Sexual abuse of women in U.S. prisons* (p. 76). New York: Human Rights Watch (hereafter Thomas, *All too familiar*).

15. *Hill v. New Jersey Department of Corrections Commissioner*, 776 A.2d 828 (N.J. Super. Ct. App. Div. 2001).

16. Testimony of Parsell, T. J. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (pp. 34, 36). San Francisco: National Prison Rape Elimination Commission Public Hearing.

17. Testimony of Dumond, R. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape*. Washington, D.C.: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Dumond).

18. Browne, A., Miller, B., & Maguin, E. (1999). Prevalence and severity of lifetime physical and sexual victimization among incarcerated women. *International Journal of Law and Psychiatry, 22*(3–4), 301–322; Zlotnick, C. (1997). Posttraumatic stress disorder (PTSD), PTSD comorbidity, and childhood abuse among incarcerated women. *Journal of Nervous and Mental Disease, 185*(12), 761–763; Bloom, B., Chesney, L. M., & Owen, B. (1994). *Women in California prisons: Hidden victims of the war on drugs*. San Francisco: Center on Juvenile and Criminal Justice.

19. James, D. J., & Glaze, L. E. (2006). *Special report: Mental health problems of prison and jail inmates*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter James, *Mental health problems*).

20. Owen, B., Wells, J., Pollock, J., Muscat, B., & Torres, S. (2008). *Gendered violence and safety: A contextual approach to improving security in women's facilities*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (hereafter Owen, *Gendered violence*).

21. Richie, B. (1995). *Compelled to crime: The gender entrapment of battered, black women*. New York: Routledge.

22. *Peddle v. Sawyer*, 64 F. Supp. 2d 12 (D.C. Conn. 1999). All information about this case is taken from court records.

23. Ibid., at 14.

24. McDermott, B. E., Hardison, K. A., & MacKenzie, C. (2005). Individuals with developmental disabilities in correctional settings. In C. L. Scott & J. B. Gerbasi (Eds.), *Handbook of correctional mental health*. Washington, D.C.: American Psychiatric Publishing; Petersilia, J. R. (2001). Crime victims with developmental disabilities. *Criminal Justice and Behavior, 28*(6), 655–694 (hereafter Petersilia, "Crime victims").

25. Petersilia, "Crime victims"; Davis, L. A. (2005). *People with intellectual disabilities and sexual violence*. Silver Spring, MD: The Arc of the United States.

26. Demer, L. (2009, January 13). Assaulted inmates settle suit with state. *Anchorage Daily News*, p. 1.

27. Kupers, T. (1999). *Prison madness: The mental health crisis behind bars and what we must do about it*. San Francisco: Jossey-Bass (hereafter Kupers, *Prison madness*); Abramsky, S., & Fellner, J. (2003). Difficulties mentally ill prisoners face coping in prison. In *Ill-equipped: U.S. prisons and offenders with mental illness*. New York: Human Rights Watch.

28. Sigurdson, C. (2000). The mad, the bad, and the abandoned: The mentally ill in prisons and jails. *Corrections Today, 88*(6), 70–78.

29. National Institute of Mental Health. (2008). *Mental health medications*. Bethesda, MD: U.S. Department of Health and

Human Services, National Institutes of Health; Kupers, *Prison madness*.

30. NPREC Testimony of Dumond, at 157.

31. James, *Mental health problems*.

32. Wooden, W. S., & Parker, J. (1982). *Men behind bars: Sexual exploitation in prison*. New York: Da Capo Press; Jenness, V., Maxson, C. L., Matsuda, K. N., & Sumner, J. M. (2007). *Violence in California correctional facilities: An empirical examination of sexual assault*. Irvine, CA: Center for Evidence-Based Corrections; Struckman-Johnson, C., & Struckman-Johnson, D. (2006). A comparison of sexual coercion experiences reported by men and women in prison. *Journal of Interpersonal Violence, 21*(12), 1591–1615; Mariner, "Predators."

33. Testimony of Long, S. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 233). San Francisco: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Long).

34. Berrill, K. T. (1992). Anti-gay violence and victimization in the United States: An overview. In G. M. Herek & K. T. Berrill (Eds.), *Hate crimes: Confronting violence against lesbians and gay men*. Newbury Park, CA: Sage; Peek, C. (2004). Breaking out of the prison hierarchy: Transgender prisoners, rape, and the Eighth Amendment, *Santa Clara Law Review, 44*, 1211–1248 (hereafter Peek, "Breaking out").

35. Man, "Forecasting."

36. Ibid.

37. Ibid., at 178.

38. Testimony of Spade, D. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars*. San Francisco: National Prison Rape Elimination Commission Public Hearing.

39. *White v. United States*, No. 06-CF-942 (D.C. Oct. 16 2008).

40. NPREC Testimony of Long.

41. Peek, "Breaking out"; David, E. S. (1975). The law and transsexualism: A faltering response to a conceptual dilemma. *Connecticut Law Review, 7*, 288.

42. Testimony of Chung, C. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (pp. 23–24). San Francisco: National Prison Rape Elimination Commission Public Hearing.

43. Struckman-Johnson, C. J., & Struckman-Johnson, D. L. (2002). Sexual coercion reported by women in three Midwestern prisons. *Journal of Sex Research, 39*(2): 217–227.

44. Thomas, *All too familiar*.

45. Testimony of Goord, G. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (p. 265). Miami: National Prison Rape Elimination Commission Public Hearing.

46. Hardyman, P. L., Austin, J., Alexander, J., Johnson, K. D., & Tulloch, O. C. (2002). *Internal prison classification systems: Case studies in their development and implementation* (p. 1). Washington, D.C.: U.S. Department of Justice, National Institute of Corrections (hereafter Hardyman, *Internal prison classification*).

47. Austin, J. (1994). Managing facilities: Objective offender classification is key to proper housing decisions. *Corrections Today, 56*(4), 94–96, at 96.

48. Austin, J., & Hardyman, P. L. (2004). *Objective prison classification: A guide for correctional agencies*. Washington, D.C.:

U.S. Department of Justice, National Institute of Corrections (hereafter Austin, *Objective prison classification*); Hardyman, P. L., Austin, J., & Peyton, J. (2004). *Prisoner intake systems: Assessing needs and classifying prisoners*. Washington, D.C.: U.S. Department of Justice, National Institute of Corrections (hereafter Hardyman, *Prisoner intake*); Brennan, T., & Wells, D. (1992). Importance of inmate classification in small jails. *American Jails, 6*(2), 49–52.

49. Hardyman, *Prisoner intake*; Austin, *Objective prison classification*.

50. Austin, J., Hardyman, P. L., & Brown, S. D. (2001). *Critical issues and developments in prison classification*. Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, Prisons Division; Thompson, R. A. (2008). The Prison Rape Elimination Act (PREA): An evaluation of policy compliance with illustrative excerpts. *Criminal Justice Policy Review, 19*(4), 414–437 (hereafter Thompson, "PREA").

51. Austin, *Objective prison classification*; Sisco, "Beyond predicting."

52. Thompson, "PREA."

53. Sisco, "Beyond predicting"; Owen, *Gendered violence*.

54. Austin, *Objective prison classification*.

55. Testimony of Thigpen, M. L. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (p. 280). Miami: National Prison Rape Elimination Commission Public Hearing.

56. Hardyman, *Internal prison classification* (citing Alexander, J., Austin, J., Brown, S., Chan, L., He, S., & Stokes, P. (1997). *Internal prison classification systems: A field test of three approaches*. San Francisco: National Council on Crime and Delinquency).

57. Hardyman, *Internal prison classification*.

58. NPREC Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Adult Prisons and Jails, Standard MM-1, Discussion.

59. Tarzwell, S. (2006). The gender lines are marked with razor wire: Addressing State prison policies and practices for the management of transgender prisoners. *Columbia Human Rights Law Review, 38*(1), 167–219; Written Testimony of Daley, C. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars*. San Francisco: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Daley); Testimony of Marksamer, J. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars*. San Francisco: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Marksamer).

60. Haney, C. (2001). *The psychological impact of incarceration: Implications for post-prison adjustment*. Paper presented at From Prison to Home: The Effect of Incarceration and Reentry on Children, Families, and Communities, Washington, D.C.

61. Hardyman, *Internal prison classification* (citing Alexander, J., Austin, J., Brown, S., Chan, L., He, S., & Stokes, P. (1997). *Internal prison classification systems: A field test of three approaches*. San Francisco: National Council on Crime and Delinquency).

62. *Young v. Quinlan*, 960 F.2d 351, 353 n.2 (3rd Cir. 1992). All information about this case is taken from court records.

63. Ibid., at 363, 364–365.

64. *Calderón-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60 (1st Cir. 2002). All information about this case is taken from court records.

65. Ibid., at 65 (citing *Dawson v. Kendrick*, 527 F.Supp. 1252, 1294 (S.D.W.Va 1981)).

66. *Giraldo v. California Department of Corrections and Rehabilitation*, 168 Cal.App.4th 231 (Cal. Ct. App. 2008). All information about this case is taken from court records.

67. Ibid., at 239.

68. Ibid., at 250–251.

69. Testimony of Spruce, K. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 28). San Francisco: National Prison Rape Elimination Commission Public Hearing.

70. Ibid., at 29.

71. Gibbons, J. J., & Katzenbach, N. (2006). *Confronting confinement: Report of the Commission on Safety and Abuse in America's Prisons*. Washington, D.C.: Vera Institute of Justice (citing Correctional Association of New York. (2003). *Lockdown New York: Disciplinary confinement in New York State prisons*. New York: Author).

72. Struckman-Johnson, C. J., Struckman-Johnson, D., Rucker, L., Bumby, K., & Donaldson, S. (1996). Sexual coercion reported by men and women in prison. *Journal of Sex Research, 33*(1), 67–76 (noting that in one survey, residents of a rural Midwestern State prison identified increased supervision as the best way to prevent sexual abuse).

73. McShane, M. D., & Williams, F. D. (eds.). (1996). *Encyclopedia of American prisons*. New York: Routledge; O'Keefe, M. L. (2008). Administrative segregation from within: A corrections perspective. *The Prison Journal, 88*(1), 124–143 (hereafter O'Keefe, "Administrative").

74. O'Keefe, "Administrative."

75. Written Testimony of Nathan, V. M. (2005, July 19). *The Systemic and Institutional Drivers of Abuse and Lack of Safety* (p. 7). Newark, NJ: Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997a, et seq.

76. Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency, 49*(1), 124–156; Abramsky, S., & Fellner, J. (2003). Mentally ill prisoners and segregation. In *Ill-equipped: U.S. prisons and offenders with mental illness*. New York: Human Rights Watch (hereafter Abramsky, "Mentally ill prisoners"); Miller, H. A., & Young, G. R. (2006). Prison segregation: Administrative detention remedy or mental health problem? *Criminal Behavior and Mental Health, 7*(1), 85–94; Bonner, R. L. (2006). Stressful segregation housing and psychosocial vulnerability in prison suicide ideators. *Suicide and Life-Threatening Behavior, 36*(2), 250–254.

77. Pizarro, J., & Stenius, V. M. K. (2004). Supermax prisons: Their rise, current practices, and effect on inmates. *The Prison Journal, 84*(2), 248–264; Beven, G. E. (2005). Offenders with mental illnesses in maximum- and super-maximum-security settings. In C. L. Scott & J. B. Gerbasi (Eds.), *Handbook of correctional mental health*. Arlington, VA: American Psychiatric Publishing; Abramsky, "Mentally ill prisoners."

78. Fagan, T. J., Wennerstrom, D., & Miller, J. (1996). Sexual assault of male inmates: Prevention, identification, and intervention. *Journal of Correctional Health Care, 3*(1), 49–65; NPREC Testimony of Marksamer.

79. *Williams v. Lane*, 851 F.2d 867, 881–883 (7th Cir. 1988) (finding that it was correctional administrators' responsibility to provide substantially equivalent programming).

80. Ibid.; Lawrence, S., Mears, D. P., Dubin, G., & Travis, J. (2002). *The practice and promise of prison programming*. Washington, D.C.: Urban Institute (hereafter Lawrence, *The practice*) (citing Gerber, J., & Fritsch, E. (1994). The effects of academic and vocational program participation on inmate misconduct and reincarceration. In *Prison education research project: Final report* (pp. 23–32). Huntsville, TX: Sam Houston State University).

81. NPREC Testimony of Long; NPREC Testimony of Daley; NPREC Testimony of Stalder, at 77.

82. Testimony of Hennessey, M. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars*. San Francisco: National Prison Rape Elimination Commission Public Hearing.

83. *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 77–78 (6th Cir. 1995). All information about this case is taken from court records.

84. Ibid., at 78.

85. West, H. C., & Sabol, W. J. (2009). *Prisoners in 2007*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

86. Warren, *Risk markers*.

87. Hensley, C. (2002). Introduction: Life and sex in prison. In *Prison sex: Practice and policy* (pp. 1–11). Boulder, CO: Lynne Rienner Publishers (hereafter Hensley, "Introduction"); Haney, C. (2006). The wages of prison overcrowding: Harmful psychological consequences and dysfunctional correctional reactions. *Washington University Journal of Law and Policy, 22*, 265–293 (hereafter Haney, "The wages").

88. Hensley, "Introduction."

89. Ibid.

90. Sultan, B. J. (2006). The insanity of incarceration and the maddening reentry process: A call for change and justice for males with mental illness in United States prisons. *Georgetown Journal of Poverty Law and Policy, 13*(2), 357–382; Hensley, "Introduction"; Warren, *Risk markers*.

91. Testimony of Beck, A. (2005, July 19). *The Systemic and Institutional Drivers of Abuse and Lack of Safety: Personal Accounts* (p. 31). Newark, NJ: Commission on Safety and Abuse in America's Prisons Public Hearing; Barrett, C. I. (2005). Does the Prison Rape Elimination Act adequately address the problems posed by prison overcrowding? If not, what will? *New England Law Review, 29*, 391–424; Haney, "The wages."

92. Testimony of Harkins, G. (2005, July 19). *The Systemic and Institutional Drivers of Abuse and Lack of Safety: Personal Accounts* (p. 69). Newark, NJ: Commission on Safety and Abuse in America's Prisons Public Hearing.

93. Haney, "The wages."

94. Pyle, K. L. (1997). Prison employment: A long-term solution to the overcrowding crisis. *Boston University Law Review, 77* (1), 151–180; Lawrence, *The practice*.

## Chapter 4. Inside and Out: Strengthening Oversight

1. Swanson, D. (2007, February 18). Sex abuse reported at youth jail: Complaints about staffers ignored, covered up, investigation reveals. *The Dallas Morning News*; Blakeslee, N. (2007, February 23). Hidden in plain sight: How did alleged abuse at a youth facility in West Texas evade detection for so long? *The Texas Observer* (hereafter Blakeslee, "Hidden").

2. Witness Interview Summaries: Robert Freeman. (2007). *Texas Youth Commission: Summary report for administrative review. Dallas Morning News* Web site. Available at http://www.dallasnews.com/sharedcontent/dws/img/02-07/0218tyc_pages1.pdf

3. Blakeslee, "Hidden."

4. Ibid., para. 11.

5. Ibid.

6. Ibid.

7. Elias, G. (2007). *How to collect and analyze data: A manual for sheriffs and jail administrators* (3rd ed.). Washington, D.C.: U.S. Department of Justice, National Institute of Corrections.

8. Williams, W. (2009, March 12). Telephone interview; Frigo, J. (2009, March 20). Telephone interview; Archuletta, L. (2009, March 12). Telephone interview; Price, C., & Jordan-Williams, C. (2009, March 13). Telephone interview; Zullinger, N., Zorzina, K., Flaherty, B., & Buckley, K. (2009, April 22). Telephone interview; Fawson, D., & Dauarell, S. (2009, April 2). Telephone interview.

9. Written Testimony of Dretke, D. (2007, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 2). New Orleans: National Prison Rape Elimination Commission Public Hearing.

10. Bureau of Justice Statistics. (2004). *Data collections for the Prison Rape Elimination Act of 2003*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs.

11. National Academy of Public Administration. (2007). *Eliminating prison rape: Policy and strategy*. Washington, D.C.: Author.

12. Written Testimony of Beck, T. (2007, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 4). New Orleans: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Written Testimony of Beck).

13. Written Testimony of Deitch, M. (2007, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 4). New Orleans: National Prison Rape Elimination Commission Public Hearing (Hereafter NPREC Written Testimony of Deitch).

14. NPREC Written Testimony of Beck, at 4.

15. NPREC Written Testimony of Deitch, at 4.

16. Keve, P. W. (1996). *Measuring excellence: The history of standards & accreditation*. Alexandria, VA: American Correctional Association.

17. Joint Select Committee on Operation and Management of the Texas Youth Commission. (2007). *Preliminary Report of Initial Findings and Recommendations*. Texas Senate Web site. Available at http://www.senate.state.tx.us/75r/senate/commit/c885/TYC-Report.pdf

18. Blakeslee, "Hidden," para. 2.

19. Sandberg, L. (2007, March 9). Ranger keeps promise to kids: Investigator who broke case tells lawmakers of TYC failures. *Houston Chronicle*, para. 3.

20. Swanson, D. (2007, March 6). TYC sex allegations exceed 750. *The Dallas Morning News*.

21. Grand Jury Indictment, *The State of Texas vs. Ray Edward Brookins*. February Term 2007, 143rd Judicial District Court; Grand Jury Indictment, *The State of Texas vs. John Paul Hernandez*, February Term 2007, 143rd Judicial District Court.

22. Testimony of Harrell, W. (2007, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (pp. 169–170). New Orleans: National Prison Rape Elimination Commission Public Hearing.

23. Testimony of Oxley, J. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (p. 62). Miami: National Prison Rape Elimination Commission Public Hearing.

24. Testimony of Cate, M. (2007, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 126). New Orleans: National Prison Rape Elimination Commission Public Hearing.

25. Written Testimony of Cate, M. (2007, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 1). New Orleans: National Prison Rape Elimination Commission Public Hearing.

26. Criminal Justice Section, American Bar Association. (2008). 104B urges oversight of correctional and detention facilities. American Bar Association Web site. Available at http://www.abanet.org/crimjust/policy/cjpol.html#am08104b

27. Ibid., para. 2.

28. Ibid.

29. Ibid.

30. Cate, M. L. (2007). *2007 annual report*. Sacramento: State of California Office of the Inspector General.

31. California Penal Code § 6125-6141.

32. Schlanger, M. (2006). Civil rights injunctions over time: A case study of jail and prison court orders. *New York University Law Review, 81*(2), 550–630.

33. Prepared Statement of Woodford, J. (2008, April 22). Prison Abuse Remedies Act of 2007 (p. 81). Washington, D.C.: House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security Hearing on H.R. 4109 (hereafter Prepared Statement of Woodford).

34. *Cason v. Seckinger*, 231 F.3d 777 (11th Cir. 2000).

35. *Cason v. Seckinger*, Civil Action File No. 84-313-1-MAC, Permanent Injunction (1994, March 7).

36. *DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189, 199–200 (1989).

37. *Women Prisoners of the District of Columbia Dep't of Corrections v. District of Columbia*, 877 F. Supp. 634, 666 (D.D.C. 1994).

38. California's crowded prisons [Editorial]. (2009, February 14). *The New York Times*, para. 1.

39. Rothfeld, M. (2009, February 10). Jurists issue tentative ruling in lawsuit brought by inmates, who say overcrowding in state prisons violates their right to adequate healthcare. *The Los Angeles Times*.

40. *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (referencing the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e)(a) (hereafter PLRA)).

41. Camp, C., & Camp, G. (1997). *Corrections yearbook 1997*. Middletown, CT: Criminal Justice Institute, Inc.

42. Golden, D. (2006). *The Prison Litigation Reform Act—a proposal for closing the loophole for rapists*. Washington, D.C.: American Constitution Society for Law and Policy.

43. *Booth v. Churner*, 532 U.S. 731, 736 (2001).

44. PRLA, § 1997(e)(a); *Woodford v. Ngo*, 548 U.S. 81 (2006).

45. Prepared Statement of Woodford, at 82–83.

46. Ibid., at 83–84.

47. Ibid., at 83.

48. Herivel, T., & Wright, P. (2002). *Prison nation: The warehousing of America's poor*. New York: Routledge.

49. Testimony of Cunningham, G. (2005, June 14). *The Cost of Victimization: Why our Nation Must Confront Prison Rape*. Washington, D.C.: National Prison Rape Elimination Committee Public Hearing. All information about his experience is taken from his testimony.

50. Ibid., at 3.

51. Testimony of Cunningham, G. (2007, November 8). Testimony of Garrett Cunningham about the Prison Litigation Reform Act (pp. 1–2). Washington, D.C.: House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security.

52. Ibid., at 2.

53. Ibid., at 1–2.

54. *Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007). See also *Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003); *Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000); *Davis v. Berks County*, 2007 U.S. Dist. LEXIS 9892, 2007 WL 516128 (E.D. Pa. 2007).

55. PLRA, § 1997(e)(e).

56. *Hancock v. Payne*, 2006 WL 21751, *3 (S.D.Miss 2006); Schlanger, M., & Shay, G. (2009). Preserving the rule of law in America's jails and prisons: The case for amending the Prison Litigation Reform Act. *Journal of Constitutional Law, 11*(1), 139–154.

57. *Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999).

58. PRLA, § 1997(a).

59. Carter, M. (2006, December 5). Inquiry into jail begins. *Seattle Times* (hereafter Carter, "Inquiry").

60. Sullivan, J. (2006, July 25). Former King County Jail guard accused of having sex with juvenile inmates. *Seattle Times*, para. 7.

61. Carter, "Inquiry," para. 7.

62. Carter, "Inquiry"; Castro, H. (2006, December 6). Feds look into King County Jail problems. *Seattle Post-Intelligencer*.

63. Comisac, R. J. (2007, November 13). Letter to the Honorable Ron Sims about the King County Correctional Facility, p. 8.

64. Ibid.

65. King County, Department of Justice reach agreement on proposed jail improvements [press release]. (2009, January 5). King County, Washington.

66. Ibid.

67. Gibbons, J. J., & Katzenbach, N. (2006). *Confronting confinement: Report of the Commission on Safety and Abuse in America's Prisons*. Washington, D.C.: Vera Institute of Justice.

68. 18 U.S.C. §§ 241-242 (1996); Mariner, J. (2001). Legal context. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch.

# PART II: RESPONDING TO VICTIMS AND PERPETRATORS

## Chapter 5. Reporting, Investigation, and Punishment

1. Testimony of Ragsdale, D. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 8). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Ragsdale).

2. Ibid., at 10, 13.

3. Beck, A., Harrison, P., & Adams, D. B. (2007). *Sexual violence reported by correctional authorities, 2006*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *Correctional authorities*, 2006); Beck, A., & Harrison, P. (2007). *Sexual victimization in State and Federal prisons reported by inmates, 2007*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

4. Testimony of Pasion, C. (2006, June 1). *Elimination of Prison Rape: Focus on Juveniles* (p. 10). Boston: National Prison Rape Elimination Commission Public Hearing.

5. Testimony of Spruce, K. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 47). San Francisco: National Prison Rape Elimination Commission Public Hearing.

6. Testimony of Cunningham, G. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape* (p. 63). Washington, D.C.: National Prison Rape Elimination Commission Public Hearing.

7. National Academy of Public Administration (2007). *Eliminating prison rape: Policy and strategy*. Washington, D.C.: Author (hereafter NAPA, *Eliminating prison rape*).

8. Thompson, R. A., Nored, L. S., & Dial, K. C. (2008). The Prison Rape Elimination Act (PREA): An evaluation of policy compliance with illustrative excerpts. *Criminal Justice Policy Review, 19*(4), 414–437.

9. Testimony of Cate, M. (2002, December 6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 127). New Orleans: National Prison Rape Elimination Commission Public Hearing.

10. Testimony of Horn, M. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (pp. 48–49). Miami: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Horn).

11. Hobbs, R. (2009, January 27). Telephone interview.

12. Price, C. (2009, January 29). Telephone interview.

13. Testimony of Brown, N. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (pp. 21–22, 26). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Brown).

14. Testimony of Anonymous Survivor in Loretta, VA. (2008). Los Angeles: Just Detention International Web site, para. 9. Available at http://www.justdetention.org/en/survivortestimony/stories/loretta_va.aspx

15. Testimony of Gutierrez, I. (2007, March 27). *Lockups, Native American Detention Facilities, and Conditions in Texas Penal and Youth Institutions* (pp. 113–114). Austin, TX: National Prison Rape Elimination Commission Public Hearing.

16. *Baron v. Hickey*, 242 F.Supp.2d 66 (D. Mass. 2003). All information about this case is taken from court records.

17. Ibid., 70.

18. Testimony of Dennehy, K. (2006, March 23). *Elimination of Prison Rape: The Corrections Perspective* (p. 107). Miami: National Prison Rape Elimination Commission Public Hearing.

19. Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency, 49*(1), 124–156 (hereafter Haney, "Mental health issues"); Abramsky, S., & Fellner, J. (2003). Mentally ill prisoners and segregation. In *Ill-equipped: U.S. prisons and offenders with mental illness.* New York: Human Rights Watch (hereafter Abramsky, "Mentally ill prisoners"); Miller, H. A., & Young, G. R. (2006). Prison segregation: Administrative detention remedy or mental health problem? *Criminal Behavior and Mental Health, 7*(1), 85–94 (hereafter Miller, "Prison segregation"); Bonner, R. L. (2006). Successful segregation housing and psychosocial vulnerability in prison suicide ideators. *Suicide and Life-Threatening Behavior, 36*(2), 250–254 (hereafter Bonner, "Successful segregation").

20. NPREC Testimony of Brown, at 27.

21. Brisbin, L. (2009, January 27). Telephone interview.

22. Grant, A. (2009, January 28). Telephone interview.

23. Dennehy, K. (2009, May 5). Telephone interview.

24. Dennis, G. (2009, April 23). Telephone interview.

25. Hendricks, N. (2009, January 27). Telephone interview.

26. Testimony of Rees, J. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 143). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Rees).

27. Cal. Gov. Code § 3304(d)(2005); Fla. Stat. Ann. § 112.532(6)(a); La. Rev. Stat. Ann. § 40:2531(7)(2008); Md. Code Ann., Pub. Safety § 3-106 (a)(2009); R.I. Gen. Laws § 42-28.6-4(a)(2008).

28. Testimony of Miller, G. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (pp. 304–305). Detroit: National Prison Rape Elimination Commission Public Hearing.

29. Testimony of DeBottis, G. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 320). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of DeBottis).

30. Austin, J., Fabelo, T., Gunter, A., & McGinnis, K. (2006). *Sexual violence in the Texas prison system.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (hereafter Austin, *Sexual violence*).

31. NAPA, *Eliminating prison rape.*

32. Zweig, J., Naser, R. L., Blackmore, J., & Schaffer, M. (2006). *Addressing sexual violence in prisons: A national snapshot of approaches and highlights of innovative strategies.* Washington, D.C.: Urban Institute (hereafter Zweig, *Addressing sexual violence*).

33. NAPA, *Eliminating prison rape.*

34. Owen, B., McCampbell, S. W., & Wells, J. (2007). *Staff perspectives: Sexual violence in adult prisons & jails: Investigating sexual assaults in correctional facilities.* Washington, D.C.: U.S. Department of Justice, National Institute of Corrections (hereafter Owen, *Staff perspectives*).

35. Ibid., at 6.

36. NPREC Testimony of Ragsdale, at 14.

37. Owen, *Staff perspectives.*

38. Ibid.

39. Testimony of Aldrich, A. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (pp. 170–171). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Aldrich).

40. Ibid., at 166.

41. Testimony of Schnedar, C. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 210). Detroit: National Prison Rape Elimination Commission Public Hearing.

42. NAPA, *Eliminating prison rape.*

43. Ibid.

44. Testimony of Wall, A. T. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 133). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Wall).

45. Owen, *Staff perspectives.*

46. 42 U.S.C. § 3796gg-8(a)-(b).

47. *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967) (hereafter *Garrity*).

48. Americans for Effective Law Enforcement. (n.d.). *Interview warnings (for disciplinary and criminal investigations)*. Americans for Effective Law Enforcement Web site. Available at http://www.aele.org/law/warnings.html

49. NPREC Testimony of Wall, at 124.

50. Owen, B., Wells, J., Pollock, J., Muscat, B., & Torres, S. (2008). *Gendered violence and safety: A contextual approach to improving security in women's facilities* (p. 42). Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice.

51. Austin, *Sexual violence*, at 56.

52. National Institute of Corrections. (2007). *Report to the Congress of the United States on the activities of the Department of Justice in relation to the Prison Rape Elimination Act (Public Law 108-79)*. Washington, D.C.: U.S. Department of Justice (hereafter NIC, *Report to the Congress*).

53. Gerlicher, C. (2009, May 4). Telephone interview.

54. Owen, *Staff perspectives*, at 16.

55. NAPA, *Eliminating prison rape*.

56. Ibid.

57. Williams, W. (2009, March 12). Telephone interview; Hobbs, R. (2009, March 26). Telephone interview; Archuletta, L. (2009, March 12). Telephone interview; Lance, T., Lajoie, M., & Gallagher, M. (2009, March 12). Telephone interview; Crist, D. (2009, April 28). Telephone interview; Croft, G. (2009, April 22). Telephone interview; Hendricks, K. (2009, April 2). Telephone interview; Durelle, S. (2009, April 2). Telephone interview.

58. Zweig, *Addressing sexual violence*.

59. Owen, *Staff perspectives*, at 6.

60. Ibid.

61. Office on Violence Against Women. (2004). *A national protocol for sexual assault medical forensic examinations: Adults/adolescents*. Washington, D.C.: U.S. Department of Justice (hereafter OVAW, *A national protocol*).

62. Testimony of Holland, L. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 273). Detroit: National Prison Rape Elimination Commission Public Hearing.

63. Crandall, S., & Helitzer, D. (2003). *Impact evaluation of a sexual assault nurse examiner (SANE) program*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice.

64. National Institute of Justice. (2007). *Effective responses to sexual assault*. U.S. Department of Justice Web site. Available at http://www.ojp.gov/nij/topics/crime/rape-sexual-violence/response.htm

65. OVAW, *A national protocol*.

66. Frigo, J. (2009, January 29). Telephone interview.

67. *Garrity*.

68. Zweig, *Addressing sexual violence*; OVAW, *A national protocol*.

69. Written Testimony of Still, W. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 3). New Orleans: National Prison Rape Elimination Commission Public Hearing.

70. Zweig, *Addressing sexual violence*.

71. Beck, *Correctional authorities, 2006*.

72. Austin, *Sexual violence*.

73. Testimony of Romero, G. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (pp. 60–62). San Francisco: National Prison Rape Elimination Commission Public Hearing.

74. Zweig, *Addressing sexual violence*; Owen, *Staff perspectives*.

75. Longsway, K. A., Archambault, J., & Lisak, D. (2009). False reports: Moving beyond the issue to successfully investigate and prosecute non-stranger sexual assault. Alexandria, VA: American Prosecutors Research Institute, National Center for Prosecution of Violence Against Women. *The Voice, 3*(1), 1–12.

76. NPREC Testimony of Ragsdale, at 16; See also Daughen, J. (2005, June 28). He gets 4 months for jailhouse sex. *The Philadelphia Inquirer.*

77. Thomas, D. Q. (1996). *All too familiar: Sexual abuse of women in U.S. state prisons*. New York: Human Rights Watch; NPREC Testimony of Ragsdale, at 13–14.

78. Office of the Inspector General, U.S. Department of Justice. (2005). *Deterring staff sexual abuse of Federal inmates*. Washington, D.C.: Author (hereafter OIG, *Deterring staff*).

79. Beck, *Correctional authorities, 2006*.

80. Smith, B. V., & Yarussi, J. (2008). *Prosecuting sexual violence in correctional settings: Examining prosecutors' perceptions*. American University, Washington College of Law Research Paper No. 2008-50.

81. NPREC Testimony of Horn, at 16.

82. NPREC Testimony of Rees, at 120–121.

83. Testimony of Caruso, P. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (pp. 87, 90). Detroit: National Prison Rape Elimination Commission Public Hearing.

84. Ibid., at 87.

85. Ibid., at 88.

86. Neely, J. (2009, March 27). Telephone interview.

87. NIC, *Report to the Congress*.

88. Zweig, *Addressing sexual violence*.

89. Ibid.

90. NPREC Testimony of DeBottis, at 314.

91. Ibid., at 317.

92. DeBottis, G. (2009, April 6). Telephone interview.

93. NPREC Testimony of Aldrich, at 167.

94. Testimony of Hennessy, M. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (pp. 278–279). San Francisco: National Prison Rape Elimination Commission Public Hearing.

95. Beck, *Correctional authorities, 2006*.

96. Ibid.

97. Haney, "Mental health issues"; Abramsky, "Mentally ill prisoners"; Miller, "Prison segregation"; Bonner, "Successful segregation."

98. OIG, *Deterring staff*.

## Chapter 6. Treating Trauma

1. *Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000). All information about this case is taken from court records.

2. Ibid., at 439.

3. Ibid.

4. Ibid.

5. Ibid., at 444.

6. Ibid.

7. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). See also *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977).

8. Testimony of Pierce-Weeks, J. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 126). New Orleans: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Pierce-Weeks).

9. Foa, E., & Riggs, D. (1993). Posttraumatic stress disorder and rape. In J. M. Oldham, M. B. Riba, & A. Tasman (Eds.), *Review of psychiatry*. Washington, D.C.: American Psychiatric Press (hereafter Foa, "Posttraumatic stress").

10. Resick, P. (1993). The psychological impact of rape. *Journal of Interpersonal Violence, 8*(2), 223–255.

11. American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders: DSM-IV-TR*. Washington, D.C.: Author; Resnick, H., Acierno, R., Holmes, M., Kilpatrick, D. G., & Jager, N. (1999). Prevention of post-rape psychopathology: Preliminary findings of a controlled acute rape treatment study. *Journal of Anxiety Disorders, 13*(4), 359–370.

12. Dumond, R. W., & Dumond, D. A. (2002). Treatment of sexual assault victims. In C. Hensley (Ed.), *Prison sex: Practice & policy*. Boulder, CO: Lynne Rienner Publishers (hereafter Dumond, "Treatment").

13. Stop Prisoner Rape. (2006). *Hope for healing: Information for survivors of sexual assault in detention*. Los Angeles: Author.

14. Testimony of Hernandez, H. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 21). San Francisco: National Prison Rape Elimination Commission Public Hearing.

15. Duke, L. A., Allena, D. N., Rozeeb, P. D., & Bommaritto, M. (2008). The sensitivity and specificity of flashbacks and nightmares to trauma. *Anxiety Disorders, 22*(2), 319–327; Halligan, S. L. (2003). Posttraumatic stress disorder following assault: The role of cognitive processing, trauma memory, and appraisals. *Journal of Consulting and Clinical Psychology, 71*(3), 419–431; Brewin, C. R. (2001). A cognitive neuroscience account of posttraumatic disorder and its treatment. *Behavior Research and Therapy, 39*(4), 373–393.

16. Dumond, "Treatment."

17. Testimony of Martin, C. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars* (p. 16). San Francisco: National Prison Rape Elimination Commission Public Hearing.

18. Council on Scientific Affairs, American Medical Association. (1992). Violence against women: Relevance for medical practitioners. *JAMA, 267*(23), 3184–3189.

19. Ibid.; Waldrop, A., Hanson, R. F., Resnick, H. S., Kilpatrick, D. G., Naugle, A. E., & Saunders, B. E. (2007). Risk factors for suicidal behavior among a national sample of adolescents: Implications for prevention. *Journal of Traumatic Stress, 20*(5), 869–879.

20. Gutierrez, P., Thakkar, R., & Kuczen, C. (2000). **Exploration of the relationship between physical and/or sexual abuse, attitudes about life and death, and suicidal ideation in young women. *Death Studies, 24*(6), 675–688.

21. Brier, J., & Gil, E. (1998). Self-mutilation in clinical and general population samples: Prevalence, correlates, and functions. *American Journal of Orthopsychiatry, 68*(4), 609–620 (hereafter Brier, "Self-mutilation").

22. Cyr, M., McDuff, P., Wright, J., Thériault, C., & Cinq-Mars, C. (2005). Clinical correlates and repetition of self-harming behaviors among female adolescent victims of sexual abuse. *Journal of Child Sexual Abuse, 14*(2), 49–68.

23. Brier, "Self-mutilation."

24. Dumond, "Treatment"; Struckman-Johnson, C., & Struckman-Johnson, D. (2006). A comparison of sexual coercion experiences reported by men and women in prison. *Journal of Interpersonal Violence, 21*(12), 1591–1615.

25. Dumond, R. W. (1992). Male sexual assault victims in incarcerated settings. *International Journal of the Sociology of Law, 20*(2), 135–157.

26. Donaldson, S. (1993). *Prisoner rape education tapes: Overview for jail/prison administrators and staff*. Brandon, VT: Safer Society Press.

27. Newman, A. B., Enright, P. L., Manolio, T. A., Haponik, E. F., & Wahl, P. W. (1997). Sleep disturbance, psychosocial correlates, and cardiovascular disease in 5,201 older adults: The cardiovascular health study. *Journal of American Geriatric Sociology, 45*(1), 1–7. See also Clum, G., Nishith, P., & Resick, P. (2001). Trauma-related sleep disturbance and self-reported physical health symptoms in treatment-seeking female rape victims. *Journal of Nervous and Mental Disease, 189*(9), 618–622; Koss, M. P., & Harvey, M. R. (1991). *The rape victim: Clinical and community interventions*. Thousand Oaks, CA: Sage (hereafter Koss, *The rape victim*); Golding, J. M. (1999). Sexual-assault history and long-term physical health problems: Evidence from clinical and population epidemiology. *Current Directions in Psychological Science, 8*(6), 191–194 (hereafter Golding, "Sexual-assault history and long-term"); Hensley, L. G. (2002). Treatment of survivors of rape: Issue and interventions. *Journal of Mental Health Counseling, 24*(4), 330–347; Scarce, M. (2001). *Male on male rape*. New York: Basic Books.

28. Golding, "Sexual-assault history and long-term."

29. Holmes, M. M., Resnick, H. S., & Kilpatrick, D. G. (1996). Rape-related pregnancy: Estimates and characteristics from a national sample of women. *American Journal of Obstetric Gynecology, 175*(2), 320–325; Jenny, C., Hooton, T. M., Bowers, A., Copass, M. K., Krieger, J. N., Hillier, S. L., et al. (1990).

Sexually transmitted disease in victims of rape. *New England Journal of Medicine, 322*(11), 713–716.

30. Golding, J. M. (1994). Sexual assault history and limitations in physical functioning in two general population samples. *Research in Nursing and Health, 19*(1), 33–44.

31. Mariner, J. (2001). Body and soul: The physical and psychological injury of prison rape. In *No escape: Male rape in U.S. prisons.* New York: Human Rights Watch.

32. Golding, "Sexual-assault history and long-term."

33. Wolff, N., & Shi, J. (2009). Contextualization of physical and sexual assault in male prisons: Incidents and their aftermath. *Journal of Correctional Health Care, 15*(1), 58–77.

34. Word for word/prison rape; From thief to cellblock sex slave: A convict's testimony. (1997, October 19). *The New York Times.*

35. Dickey, F. (2002, November 3). Rape, how funny is it? *The Los Angeles Times.*

36. Maruschak, L. M. (2008). *HIV in prisons, 2006.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

37. Hammett, T. M. (2009). Sexually transmitted diseases and incarceration. *Current Opinion in Infectious Diseases, 22*(1), 77–81.

38. Testimony of Potter, R. (2005, June 14). *The Cost of Victimization: Why Our Nation Must Confront Prison Rape.* Washington, D.C.: National Prison Rape Elimination Commission Public Hearing.

39. Centers for Disease Control and Prevention. (2006). HIV transmission among male inmates in a State prison system—Georgia, 1992–2005. *Morbidity and Mortality Weekly Report, 55*(15), 421–428.

40. Ibid.

41. Ibid., para. 13.

42. *Daniels v. Delaware,* 120 F.Supp.2d 411, 417 (D.C. Del. 2000). All information about this case is taken from court records.

43. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976).

44. Maruschak, L. (2008). *Medical problems of prisoners.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

45. James, D., & Glaze, L. (2006). *Mental health problems of prison and jail inmates.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

46. Ditton, P. (1999). *Mental health and treatment of inmates and probationers.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

47. Wilper, A. P., Woolhandler, S., Boyd, J. W., Lasser, K. E., McCormick, D., Bor, D. H., et al. (2009). The health and health care of U.S. prisoners: Results of a nationwide survey. *American Journal of Public Health, 99*(4), 666–672.

48. Abramsky, S., & Fellner, J. (2003). Inadequate mental health treatment in prisons. In *Ill-equipped: U.S. prisons and offenders with mental illness.* New York: Human Rights Watch.

49. Piatek, E. (2009, April 30). Email correspondence.

50. Clemmitt, M. (2007). Prison health care. *CQ Researcher, 17*(1).

51. NPREC Testimony of Pierce-Weeks, at 126.

52. Koss, M. (1993). Rape: Scope, impact, interventions and public policy responses. *American Psychologist, 48*(10), 1062–1069.

53. Koss, *The rape victim.*

54. Ibid.; Foa, E. B., & Rothbaum, B. O. (2001). *Treating the trauma of rape: Cognitive-behavioral therapy for PTSD.* New York: Guilford Press; Foa, "Posttraumatic stress."

55. Williams, W., & Yarborough, R. (2009, March 12). Telephone interview; Crist, D. (2009, April 28). Telephone interview; Blount, C. (2007, June 7). Presentation to the American Correctional Health Services Association's Multidisciplinary Professional Development Conference, Reno, Nevada.

56. Community Oriented Correctional Health Services. (2009). Sites. Community Oriented Correctional Health Services Web site. Available at http://www.cochs.org/implementations

57. Gallagher, M. (2009, March 18). Email correspondence.

58. Gibbons, J. J., & Katzenbach, N. (2006). *Confronting confinement: A report of the Commission on Safety and Abuse in America's Prisons.* Washington, D.C.: Vera Institute of Justice.

59. National Commission on Correctional Health Care. (2002). *Health status of soon-to-be-released inmates: A report to Congress.* Chicago: Author.

60. Kimerling, R., & Calhoun, K. S. (1994). Somatic symptoms, social support, and treatment seeking among sexual assault victims. *Journal of Consulting and Clinical Psychology, 62*(2), 333–340; Draucker, C. B. (1999). The psychotherapeutic needs of women who have been sexually assaulted. *Perspectives in Psychiatric Care, 35*(1), 18–29.

61. Testimony of Beeler, A. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 210). New Orleans: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Beeler).

62. Ibid., at 209–210.

63. Testimony of Puisis, M. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 188). New Orleans: National Prison Rape Elimination Commission Public Hearing.

64. NPREC Testimony of Beeler, at 205.

65. See Testimony of Hejnar, E. (2007, March 26). *Lockups, Native American Detention Facilities, and Conditions in Texas Penal and Youth Institutions* (p. 21). Austin, TX: National Prison Rape Elimination Commission Public Hearing; Testimony of Doe, J. (2007, March 27). *Lockups, Native American Detention Facilities, and Conditions in Texas Penal and Youth Institutions* (pp. 92, 97). Austin, TX: National Prison Rape Elimination Commission Public Hearing; Testimony of Soto, M. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 68). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

66. Dumond, R., & Dumond, D. (2007). Correctional health care since the passage of PREA. *Corrections Today, 69*(5), 76–69.

67. Testimony of Still, W. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and*

*Mental Health Care, Community Corrections Settings, and Oversight* (p. 230). New Orleans: National Prison Rape Elimination Commission Public Hearing.

68. National Institute of Corrections. (1997). *Fees paid by jail inmates: Findings from the Nation's largest jails*. Longmont, CO: U.S. Department of Justice.

69. Peterson, M. (1996, December 2). Charging inmates for care raises issues of health risk. *The New York Times*.

70. Written Testimony of Stana, R. (2000, April 6). *Federal prisons: Containing health care costs for an increasing inmate population*. Washington, D.C.: Subcommittee on Criminal Justice Oversight Hearing.

71. Written Testimony of Matheson, S. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight*. New Orleans: National Prison Rape Elimination Commission Public Hearing.

72. Ibid.

# PART III: SPECIAL POPULATIONS

## Chapter 7. When Children Are Involved

1. Schlozman, B. J. (2005, September 9). Letter to Mitch Daniels, Governor, Indiana, Regarding Investigation of the Plainfield Juvenile Correctional Facility, Indiana (hereafter Bradley, Letter to Mitch Daniels).

2. Ibid., at 6–7.

3. Ibid., at 7.

4. Ibid., at 6.

5. *Settlement Agreement, United States v. State of Indiana, the Logansport Intake/Diagnostic Facility and the South Bend Juvenile Correctional Facility*. (2006).

6. National Center for Juvenile Justice. (2008). *Easy access to the Census of Juveniles in Residential Placement*. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention Web site. Available at http://ojjdp.ncjrs.gov/ojstatbb/ezacjrp

7. Scott, E. S., & Grisso, T. (1997). The evolution of adolescence: A developmental perspective on juvenile justice reform. *Journal of Criminal Law and Criminology, 88*, 137–189 (hereafter Scott, "The evolution of adolescence"); *In re* Gault, 387 U.S. 1, 14–16 (1967).

8. *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (banning death penalty for youth who committed crime before the age of 18).

9. Steinberg, L., & Cauffman, E. (1999). A developmental perspective on serious juvenile crime: When should juveniles be treated as adults? *Federal Probation, 63*, 52–57.

10. Scott, "The evolution of adolescence."

11. Cohen, M. A., & Piquero, A. R. (2007). *New evidence on the monetary value of saving a high risk youth*. Somerville, MA: YouthBuild USA.

12. Woolard, J. L., & Reppucci, N. D. (2000). Researching juveniles' capacities as defendants. In T. Grisso & R. G. Schwartz (Eds.), *Youth on trial: Developmental perspective on juvenile justice*. Chicago: University of Chicago Press (hereafter Woolard, "Researching juveniles"; Berliner, L., & Conte, J. R. (1990). The process of victimization: The victim's perspective. *Child Abuse and Neglect, 14*(1), 29–40.

13. Morrissette, P. J. (1999). Post-traumatic stress disorder in childhood sexual abuse: A synthesis and analysis of theoretical models. *Child and Adolescent Social Work Journal, 16*(2), 77–97; Davenport, C., Browne, K., & Palmer, R. (1994). Opinions of the traumatizing effects of child sexual abuse: Evidence for consensus. *Child Abuse and Neglect, 18*(9), 725–738; Finkelhor, D. (1990). Early and long-term effects of child sexual abuse: An update. *Professional Psychology, 21*(5), 129–140.

14. See *K.M. v. Alabama Department Youth Services*, 360 F.Supp.2d 1253, 1258–1259 (M.D. Ala. 2005).

15. *N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) (citing *Schall v. Martin*, 467 U.S. 253, 265 (1984)).

16. Restated and Amended Consolidated Complaint, *Byrd v. Alabama Department of Youth Services* (N.D. Ala. Aug.14, 2003) (No 01433-LSC). All information about this case is taken from court records.

17. Ibid., at 22.

18. Ibid.

19. Walton, V. (2007, May 5). Chalkville: $12.5 million paid to end sex scandal at DYS. *Birmingham News*, para. 2 (hereafter Walton, "Chalkville").

20. *Campbell v. Wood*, CV-01-CO-1433-S (N.D. Ala. 2005), consolidated with *Seitz v. Alabama Department of Youth Services*, CV-01-CO-2156-S (N.D. Ala. 2005).

21. Ibid.

22. Ibid.

23. Ala. Code § 14-11-31 (2004).

24. Walton, "Chalkville."

25. Beck, A. J., Harrison, P. M., & Adams, D. B. (2007). *Sexual violence reported by correctional authorities, 2006*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *Correctional authorities, 2006*).

26. Beck, A. J., Adams, D. B., & Guerino, P. (2008). *Sexual violence reported by juvenile correctional authorities, 2005–2006*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter Beck, *Juvenile correctional authorities, 2005–2006*).

27. Beck, A. J., & Hughes, T. A. (2005). *Sexual violence reported by correctional authorities, 2004*. Washington, D.C.: U.S.

Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

28. Ziedenberg, J., & Schiraldi, V. (1998). The risks juveniles face: Housing juveniles in adult institutions is self-destructive and self-defeating. *Corrections Today, 60*(5)22–26.

29. Beck, A. J., & Harrison, P. M. (2008). *Sexual victimization in State and Federal prisons reported by inmates, 2007.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics; Beck, A. J., & Harrison, P. M. (2008). *Sexual victimization in local jails reported by inmates, 2007.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

30. Data presented at The Prison Rape Elimination Act Workshop: National Survey of Youth in Custody, Washington, D.C. (2007, August 28).

31. McFarland, S. T., & Ellis, C. A. (2008). *Report on rape in Federal and State prisons in the U.S. based on public hearings and review of documentary evidence by the Review Panel on Prison Rape: Findings and best practices.* Washington, D.C.: U.S. Department of Justice, Review Panel on Prison Rape.

32. Ibid.

33. King, M., & Szymanski, L. (2006). *National overviews: State juvenile justice profiles.* Pittsburgh: National Center for Juvenile Justice; Griffin, P., Torbet, P., & Szymanski, L. (1998). *Trying juveniles as adults in criminal court: An analysis of State transfer provisions.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

34. Schlozman, Letter to Mitch Daniels.

35. Beck, *Juvenile correctional authorities, 2005–2006.*

36. Black, D. A., Heyman, R. E., & Smith Slep, A. M. (2001). Risk factors for child sexual abuse. *Aggression and Violent Behavior, 6*(2–3), 203–229; Putnam, F. W. (2003). Ten-year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry, 42*(3), 269–278 (hereafter Putnam, "Ten-year research") (stating that history of prior child sexual abuse has also been correlated with higher rates of rape after age 18).

37. Testimony of Dixon, L. (2006, June 1). *Elimination of Prison Rape: Focus on Juveniles* (p. 60). Boston: National Prison Rape Elimination Commission Public Hearing.

38. *State Department of Health & Rehabilitative Services v. Whaley,* 531 So.2d 723, 724 (Fla. Dist. Ct. App. 1988). All information about this case is taken from court records.

39. Kendall, J. R. (2007). *Juvenile status offenses: Treatment and early intervention.* Washington, D.C.: American Bar Association, Division for Public Education.

40. Thornberry, T. P., Huizinga, D., & Loeber, R. (2004). Causes and correlates: Findings and implications. *Juvenile Justice, 9*(1), 3–19 (citing Widom, C. S. (1989). The cycle of violence. *Science, 244*(4901), 160–166); Zingraff, M. T., Leiter, J., Myers, K. A., & Johnsen, M. C. (1993). Child maltreatment and youthful problem behavior. *Criminology, 31*(2), 173–202); Widom, C. S. (2003) Understanding child maltreatment and juvenile delinquency, the research. In J. Wiig & C. S. Widom (Eds.), *Understanding child maltreatment & juvenile delinquency: From research to effective program, practice, and systemic solutions.* Washington, D.C.: Child Welfare League of America Press.

41. *ABA policy and report on crossover and dual jurisdiction youth.* (2008, February). Washington, D.C.: ABA Commission on Youth at Risk. Available at http://www.abanet.org/youthatrisk/crossoveryouthpolicy.html; Ryan, J. P., Herz, D., Hernandez, P. M., & Marshall, J. M. (2007). Maltreatment and delinquency: Investigating child welfare bias in juvenile justice processing. *Children and Youth Services Review, 29*(8), 1035–1050.

42. Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. §§ 5601, et seq. (hereafter JJDPA); 42 U.S.C. § 5633(a)(11) (stating that exceptions to the rule include a child's violation of a valid court order).

43. Sickmund, M., Sladky, T. J., & Kang, W. (2008). *Census of Juveniles in Residential Placement databook.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

44. Ibid.

45. Boyd, Jr., R. F. (2003, June 19). Letter to Ronnie Musgrove, Governor of Mississippi, Re CRIPA Investigation of Oakley and Columbia Training Schools in Raymond and Columbia, Mississippi.

46. Beck, *Juvenile correctional authorities, 2005–2006.*

47. Porter, G. (2000). *Detention in delinquency cases, 1988–1997.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention; Sherman, F. T. (2005). *Pathways to juvenile detention reform: Detention reform and girls.* Baltimore, MD: Annie E. Casey Foundation.

48. Testimony of Marksamer, J. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars.* San Francisco: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Marksamer).

49. Niesse, M. (2006, May 11). State to pay $625,000 in youth prison suit. *Honolulu Star-Bulletin;* Complaint, *R.G. v. Koller* (D. Haw. Sept. 1, 2005)(No. 05-00566 JMS/LEK).

50. Marksamer, J. (2008). And by the way, do you know he thinks he's a girl? The failures of law, policy, and legal representation for transgender youth in juvenile delinquency courts. *Sexuality Research and Social Policy, 5*(1), 72–92; NPREC Testimony of Marksamer.

51. Testimony of Pasion, C. (2005, June 1). *Elimination of Prison Rape: Focus on Juveniles* (p. 4). Boston: National Prison Rape Elimination Commission Public Hearing.

52. Ibid., at 10.

53. See Putnam, "Ten-year research" (finding that youth with physical disabilities have an increased risk of sexual abuse in the larger U.S. population).

54. Miller, C. M. (2005, October 20). Herald watchdog: Juvenile justice: State put disabled boy in sex offender's care. *Miami Herald.*

55. *Donton v. State,* 1 So.3d 1092, 1101 (Fla. Dist. Ct. App. 2009).

56. See Mental Health America. (2005). *Position statement 51: Children with emotional disorders in the juvenile justice system.* Alexandria, VA: Author (recognizing that percentage may be as high as 60 to 75 percent). See also Teplin, L., Abram, K. M., McClelland, G. M., Dulcan, M. K., & Mericle, A. M. (2002).

Psychiatric disorders in youth in juvenile detention. *Archives of General Psychiatry, 59*(12), 1133–1143 (finding that 70 percent of females and 60 percent of males in detention in Chicago had a psychiatric diagnosis other than conduct disorder).

57. Ibid.; Leone, P. E., Christle, C. A., Nelson, C. M., Skiba, R., Frey, A., & Jolivette, K. (2003). *School failure, race and disability: Promoting positive outcomes, decreasing vulnerability for involvement with the juvenile delinquency system.* College Park, MD: National Center on Education, Disability, and Juvenile Justice.

58. *Smith v. Wade*, 461 U.S. 30 (1983) (finding that facility's failure to separate aggressive youth from potential victims could demonstrate callous or reckless indifference, making them liable for the victim's injury).

59. Hoge, R. (2002). Standardized instruments for assessing risk and need in youthful offenders. *Criminal Justice and Behavior, 29*(4), 380–396.

60. Hartjen, C. A. (2008). *Youth, crime & justice: A global inquiry.* New Brunswick, NJ: Rutgers University Press; Park, J. (2008). Balancing rehabilitation and punishment: A legislative solution for unconstitutional judicial waiver policies. *George Washington Law Review, 76,* 786–816.

61. Campaign for Youth Justice. (2007). *Jailing juveniles: The dangers of incarcerating youth in adult jails in America.* Washington, D.C.: Author (hereafter CYJ, *Jailing juveniles*).

62. Testimony of Labelle, D. (2005, August 19). *At Risk: Sexual abuse and Vulnerable Groups Behind Bars.* San Francisco: National Prison Rape Elimination Commission Pubic Hearing.

63. Swanson, D. J. (2007, February 18). Sex abuse reported at youth jail: Complaints about staffers ignored, covered up, investigation reveals. *The Dallas Morning News*; Blakeslee, N. (2007, February 23). Hidden in plain sight: How did alleged abuse at a youth facility in West Texas evade detection for so long? *The Texas Observer.*

64. Acosta, R. A. (2005, June 8). Letter to Brad Henry, Governor, Oklahoma, Re Investigation of the L.E. Rader Center, Sand Springs, Oklahoma (hereafter Acosta, Letter to Brad Henry).

65. Paine, M. L., & Hansen, D. J. (2002). Factors influencing children to self-disclose sexual abuse. *Clinical Psychology Review, 22*(2), 271–295.

66. Rosado, L. (2000, September). *Talking to Teens in the Justice System: Strategies for Interviewing Adolescent Defendants, Witnesses, and Victims.* Washington, D.C.: ABA Juvenile Justice Center, Juvenile Law Center, Youth Law Center; Krebs, C. (2007). *Video: Interviewing the Child Client.* Washington, D.C.: American Bar Association, Section of Litigation.

67. *See, e.g.,* Schlozman, Letter to Mitch Daniels; Schlozman, B. J. (2005, August 4). Letter to Linda Lingle, Governor of Hawaii, Re Investigation of the Hawaii Youth Correctional Facility, Kailua, Hawaii, p. 20.; Boyd, Jr., R. (2003, June 19). Letter to Ronnie Musgrove, Governor of Mississippi, CRIPA Investigation of Oakley and Columbia Training Schools in Raymond and Columbia, Mississippi. See also Miller, C. M. (2005, November 11). Lost lockup tapes called coverup, *Miami Herald* (reporting on the loss of tapes from the exact date and location of a rape).

68. *J.P. v. Taft,* 439 F.Supp.2d 793, 826 (S.D. Ohio 2006).

69. Rosado, L. (2000, September). *Talking to teens in the justice system: Strategies for interviewing adolescent defendants,*

witnesses, and victims. Washington, D.C.: ABA Juvenile Justice Center, Juvenile Law Center, Youth Law Center; Krebs, C. (2007). *Video: Interviewing the child client.* Washington, D.C.: American Bar Association, Section of Litigation.

70. Putnam, "Ten-year research"; Kilpatrick, D. G., Saunders, B. E., & Smith, D. W. (2003). *Research in brief: Youth victimization: Prevalence and implications.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (hereafter Kilpatrick, *Youth victimization*).

71. See Menard, S. (2002). *Short- and long-term consequences of adolescent victimization.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office Juvenile Justice and Delinquency Prevention; Schlozman, Letter to Mitch Daniels.

72. Putnam, "Ten-year research"; Kilpatrick, *Youth victimization.*

73. Putnam, "Ten-year research."

74. Lewis, M. (2006). Conditions of confinement: Abusive treatment. In *Custody and control: Conditions of confinement in New York's juvenile prisons for girls.* New York: Human Rights Watch & American Civil Liberties Union (hereafter Lewis, "Condition of confinement").

75. *N.G. v. Connecticut,* 382 F.3d 225 (2d Cir. 2004).

76. Ibid., at 233 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)).

77. Ibid. (quoting *Flores v. Meese*, 681 F.Supp. 644, 667 (1988)).

78. Ibid., at 237.

79. Veysey, B. M. (2003). *Adolescent girls with mental health disorders involved with the juvenile justice system.* Delmar, NY: National Center for Mental Health and Juvenile Justice (hereafter Veysey, *Adolescent girls*).

80. Lewis, "Conditions of confinement."

81. Veysey, *Adolescent girls,* at 3.

82. Veneziano, C., Veneziano, L., & LeGrand, S. (2000). The relationship between adolescent sex offender behaviors and victim characteristics with prior victimization. *Journal of Interpersonal Violence, 15*(4), 363–374; Way, I., & Urbaniak, D. (2008). Delinquent histories of adolescents adjudicated for criminal sexual conduct. *Journal of Interpersonal Violence, 23*(9), 1197–1212.

83. Woolard, "Researching juveniles"; Schmidt, M. G., Reppucci N. D., & Woolard, J. L. (2003). Effectiveness of participation as a defendant: The attorney-juvenile client relationship. *Behavioral Sciences & the Law, 21*(2), 175–198.

84. Ronis, S. T., & Borduin, C. M. (2007). **Individual, Family, peer and academic characteristics of male juvenile sexual offenders.** *Journal of Abnormal Child Psychology, 35*(2),153–163; Worling, J. R., & Curwen, T. (2000). Adolescent sexual offender recidivism: success of specialized treatment and implications for risk prediction. *Child Abuse & Neglect, 24*(7), 965–982.

85. CYJ, *Jailing juveniles.*

86. See Acosta, Letter to Brad Henry (discussing circumstances that facilitated consensual sexual between youth in the L.E. Rader Center).

87. JJDPA, at §5633(a)(12–13).

88. Wolfson, J. (2005). *Childhood on trial: The failure of trying and sentencing youth in adult criminal court.* Washington, D.C.: The Coalition on Juvenile Justice (stating juveniles are transferred to adult court through statutes that set juvenile court

jurisdiction below the age of 18, that allow prosecutors unreviewable discretion to transfer youth to adult court, that permit judges to transfer youth after judicial hearings, and that create blended sentencing schemes that allow juveniles to be sentenced to juvenile and adult facilities); Hahn, R., McGowan, A., Liberman, A., Crosby, A., Fullilove, M., Johnson, R., et al. (2007). Effects on violence of laws and policies facilitating the transfer of juveniles from the juvenile justice system to the adult justice system: A report on recommendations of the Task Force on Community Preventive Services. *Morbidity and Mortality Weekly Report*, *56*(RR-9), 1–11 (hereafter Hahn, "Effects on violence"); See Alaska Stat. § 47.12.100(a,b) (2004) (juvenile court may waive jurisdiction for any child after hearing if it finds probable cause to believe minor is delinquent and child is not amenable to rehabilitation by age 20); Del. Code Ann. tit. 10, §§921, 1010 (2007) (child of any age who is found not amenable to rehabilitation of the juvenile court may be referred to superior court for prosecution); Idaho Code § 20-509 (2007) (juvenile court may waive jurisdiction over child of any age who is charged with certain enumerated violent offenses).

89. Ryan, L., & Ziedenberg, J. (eds.). (2007). *The consequences aren't minor: The impact of trying youth as adults and strategies for reform*. Washington, D.C.: Campaign for Youth Justice.

90. Equal Justice Initiative. (2007). *Cruel and unusual punishment: Sentencing 13- and 14-year-old children to die in prison*. Montgomery, AL: Author.

91. William, S. J., Minton, T. D., & Harrison, P. M. (2008). *Prison and jail inmates at midyear 2006*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (hereafter William, *Midyear 2006*).

92. See Austin, J., Johnson, K. D., & Gregoriou, M. (2000). *Juveniles in adult prisons and jails: A national assessment*. Washington, D.C.: U.S. Department of Justice, Office of Justice Assistance, Bureau of Justice Assistance.

93. William, *Midyear 2006*; Beck, A. J., & Harrison, P. M. (2006). *Sexual violence reported by correctional authorities*, *2005*. Washington, D.C.: U.S. States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

94. Ibid.

95. Bishop, D. M. (2000). Juvenile offenders in the adult criminal justice system. In M. Tonry (Ed.), *Crime and justice* (Vol. 27). Chicago: University of Chicago Press (hereafter Bishop, "Juvenile offenders").

96. Ibid.; CYJ, *Jailing juveniles*.

97. Bishop, "Juvenile offenders."

98. Parker, A., & Berger, D. (2005). *The rest of their lives: Life without parole for child offenders in the United States*. New York: Human Rights Watch; Mariner, J. (2001). Predators and Victims. In *No escape: Male rape in U.S. prisons*. New York: Human Rights Watch.

99. Testimony of LaBelle, D. (2005, August 19). *At Risk: Sexual Abuse and Vulnerable Groups Behind Bars*. San Francisco: National Prison Rape Elimination Commission Public Hearing.

100. Ibid.

101. Reddington, F. P., & Sapp, A. D. (1997). Juveniles in adult prisons: Problems and prospects. *Journal of Crime and Justice, 20*(2), 139–152; Bishop, "Juvenile offenders."

102. See Redding, R. (2008). *Juvenile transfer laws: An effective deterrent to delinquency?* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention (describing a compilation of studies on the effectiveness of juvenile transfer laws).

103. Hahn, "Effects on violence."

104. Office of Juvenile Justice and Delinquency Prevention. (2008). *Statistical briefing book*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs.

105. Austin, J., Johnson, K. D., & Weitzer, R. (2005). *Juvenile justice bulletin: Alternatives to the secure detention and confinement of juvenile offenders*. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

106. Saker, A. (2005, October 14). Teens' abuser gets locked up for life. *The Oregonian*.

107. Roberts, M. (2005, March 6). State failed to heed abuse warnings. The Carter Center Web site. Available at http://www.cartercenter.org/news/documents/doc2064.html

108. Ibid., at para 25.

109. Ibid.

110. Ibid., at para. 28.

111. Ibid., at para. 39.

112. Ibid., at para. 40.

113. Ibid., at paras. 46, 48.

114. Ibid., at paras. 63, 65, 12.

## Chapter 8. Community Corrections: The Next Frontier

1. Written Testimony of Matheson, S. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 2). New Orleans: National Prison Rape Elimination Commission Public Hearing.

2. Ibid., at 3.

3. Hendricks, K. (2009, April 2). Telephone interview.

4. Glaze, L. E., & Bonczar, T. P. (2008). Probation and parole in the United States—2007 statistical tables. Bureau of Justice Statistics Web site. Available at http://www.ojp.gov/bjs/abstract/ppus07st.htm

5. Ibid.

6. Ibid.

7. National Institute of Corrections. (n.d.). Essay: Specialized caseloads. *Community Corrections Quarterly*. Available at http://www.nicic.org/pubs/pre/period13.pdf

8. Testimony of Moss, A. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and*

*Mental Health Care, Community Corrections Settings, and Oversight* (p. 352). New Orleans: National Prison Rape Elimination Commission Public Hearing; National Institute of Corrections/Washington College of Law. (2001–2006). Training: Addressing staff sexual misconduct with offenders. American University Web site. Available at https://www.wcl.american.edu/nic/training.cfm

9. See generally National Institute of Corrections. (2005, July). PREA town hall meeting. Presentation to the American Probation and Parole Association National Training Conference, New York (hereafter NIC, "PREA town hall"); Testimony of Kotkin, J. (2007, December 5–6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 381–384). New Orleans: National Prison Rape Elimination Commission Public Hearing.

10. Written Testimony of Abner, C. (2007, December 5–6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 6). New Orleans: National Prison Rape Elimination Commission Public Hearing.

11. NPREC Standards for the Prevention, Detection, Response and Monitoring of Sexual Abuse in Community Corrections, Glossary.

12. McCampbell, S., Buell, M., Layman, E., & Smith, B. V. (2003). Addressing sexual misconduct in community corrections. *Perspectives, 27*(2), 26–37 (hereafter McCampbell, "Addressing sexual misconduct"); *State run adult community corrections programs*. (2006). Washington, D.C.: National Institute of Corrections & American University, Washington College of Law (hereafter *State run adult*); Krauth, B., & Linke, L. (1999). *State organizational structures for delivering adult probation services*. Washington, D.C.: U.S. Department of Justice, National Institute of Corrections.

13. *State run adult* (citing states whose departments of corrections run community corrections—Alaska, Michigan, New Mexico, Oklahoma, and Vermont—and states in which community corrections is decentralized—Iowa, Massachusetts, and Tennessee).

14. *State run adult* (citing states in which community corrections is a different agency—Arkansas, South Carolina, and New Jersey—and states in which community corrections is operated locally in only some counties—Minnesota and Alabama).

15. Testimony of Abner, C. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 286). New Orleans: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Abner).

16. Smyth, J. C. (2009, April 28). Prison crowding taking toll in Ohio. *Associated Press*; Furillo, A. (2009, April 25). California prison officials propose releasing 8,000 inmates to cut costs. *The Sacramento Bee*; Bauer, S. (2009, April 22). Report: Cutting prison population would save $2B. *Associated Press*.

17. Lucken, K. (1997). Privatizing discretion: "Rehabilitating" treatment in community corrections. *Crime & Delinquency, 43*(3), 243–259.

18. NIC, "PREA town hall"; Comments by Malloy, D. (2005, July). PREA town hall meeting. Presentation at the American Probation and Parole Association National Training Conference, New York.

19. Testimony of Moss, A. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 358). New Orleans: National Prison Rape Elimination Commission Public Hearing; Harrison, P. (2008, October 3). Email correspondence (concerning data collection from community corrections agencies).

20. See generally Testimony of Ragsdale, D. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 8). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Ragsdale); Testimony of Brown, N. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* (p. 31). Detroit: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Brown).

21. *Smith v. Cochran*, 339 F.3d 1205 (10th Cir. 2003) (hereafter *Smith*).

22. Ibid.

23. See *Campos v. Nueces County*, 162 S.W.3d 778 (Tex. App. 2005).

24. Smith, B. (2005, October 4). Legal issues in addressing prison rape in community corrections. Presentation to the New England Council on Crime and Delinquency: Prison Rape Elimination Act Training, Killington, Vermont.

25. *West v. Atkins*, 487 U.S. 42 (1988) (finding that "a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State").

26. *Smith*.

27. Ibid., at 1213.

28. National Institute of Corrections/Washington College of Law Project on Addressing Prison Rape. (2008). Fifty-state survey of criminal laws prohibiting the sexual abuse of individuals in custody. American University, Washington College of Law Web site. Available at http://www.wcl.american.edu/nic/responses.cfm

29. Ibid.

30. Corrections employee faces sexual misconduct charges. (2006, October 24). *TheIndyChannel.com*

31. *Policies and procedures: Anti fraternization*. (n.d.). NIC/WCL Project on Addressing Prison Rape Web site. Available at http://www.wcl.american.edu/nic/policies.cfm#anti

32. Vargas, T. (2007, August 15). Officer charged with sexual misconduct. *The Washington Post*; Goodman, C. (2007, August 17). 2nd officer charged in sex scandal: Both women accused of misconduct with same man on house arrest. *The Washington Post* (hereafter Goodman, "2nd officer").

33. Goodman, "2nd officer."

34. Written Testimony of Broderick, B. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 2). New Orleans: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Written Testimony of Broderick).

35. Gustafson, P. (2007, May 22). Corrections officer admits a sexual offense. *Minneapolis Star Tribune*.

36. NPREC Written Testimony of Broderick, at 2.

37. Testimony of Beauclair, T. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (pp. 306–307). New Orleans: National Prison Rape Elimination Commission Public Hearing.

38. Ibid., at 305–306.

39. McCampbell, "Addressing sexual misconduct."

40. Ibid.

41. NPREC Written Testimony of Broderick, at 2.

42. Rivera, E. (2004, February 25). Ex-deputy guilty of having sex with inmates. *The Washington Post*; McDonald, K. (2006, August 7). Conduct may cost officer his job. *The Journal Star*; Wang, B. (2006, January 13). Court papers report ex-sergeant repeatedly assaulted inmates. *Associated Press*.

43. Simonian, N. M., & Smith, B. V. (2007, Winter). Anti-fraternization policies in community corrections: A tool to address staff sexual misconduct in community corrections agencies. *Perspectives*, 43–48.

44. Testimony of Abner, at 292.

45. Public Safety Performance Project. (2007). *What works in community corrections: An interview with Joan Petersillia*. Washington, D.C.: Pew Charitable Trusts.

46. Ibid.

47. Renzi, J. (2009, April 2). Telephone interview.

48. National Institute of Corrections. (2007). *PREA statewide probation and parole direction*. Washington, D.C.: U.S. Department of Justice.

49. Written Testimony of Kotkin, J. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 2). New Orleans: National Prison Rape Elimination Commission Public Hearing.

50. Ibid.

51. Division of Community Corrections, North Carolina Department of Corrections. (2008). *Officer and staff requirements, policy II.F.* Raleigh, N.C.: Author.

52. Renzi, J. (2008, November 12). Telephone interview; Hahn, C. (2008, October 30). Telephone interview.

53. Written Testimony of Moss, A. (2007, December 5). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 4). New Orleans: National Prison Rape Elimination Commission Public Hearing.

54. Office on Violence Against Women. (2004). *A national protocol for sexual assault medical forensic examinations: Adults/adolescents*. Washington, D.C.: U.S. Department of Justice.

55. Ibid.

56. Comments by Walton, R. (2005, July). PREA town hall meeting. Presentation at the American Probation and Parole Association National Training Conference, New York.

57. Cotton, D. J., & Groth, A. N. (1982). Inmate rape: Prevention and intervention. *Journal of Prison and Jail Health*, 2(1): 47–57.

58. National Institute of Corrections/Washington College of Law. (2001–2008). Training: Investigating allegations of staff sexual misconduct with offenders. American University Web site. Available at https://www.wcl.american.edu/nic/training.cfm (Although no official data were collected over nearly 10 years during training by NIC, only one agency has had any authority to begin a criminal investigation: Maine Department of Corrections. All other investigations were conducted by agency staff only until a criminal component became apparent. At that point, the agency investigators continued with administrative investigations and allowed either local or State police to complete the criminal investigation).

59. See generally National Prison Rape Elimination Commission. (2006, August 3). *Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?* Detroit: National Prison Rape Elimination Commission Public Hearing; See also NIC/WCL Project on Addressing Prison Rape. (2006, October 27). Improving prosecutions of allegations of sexual abuse in correctional settings: A meeting with Federal prosecutors (attendance list on file with author).

60. See Written Testimony of Powers, E. (2007, December 5–6). *Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight* (p. 1). New Orleans: National Prison Rape Elimination Commission Public Hearing.

## Chapter 9. On the Margins: Immigrants in Detention

1. Stop Prisoner Rape. (2004). *No refuge here: A first look at sexual abuse in immigration detention*. Los Angeles: Author (hereafter SPR, *No refuge here*).

2. Testimony of Little, C. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 4). Los Angeles: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Little).

3. Women's Commission for Refugee Women and Children. (2000). *Behind locked doors: Abuse of refugee women at the Krome Detention Center*. New York: Author (hereafter WCRWC, *Behind locked doors*).

4. Ibid.

5. Sachs, S. (2000, October 5). Sexual abuse reported at an immigration center. *The New York Times*; WCRWC, *Behind locked doors*.

6. SPR, *No refuge here* (citing Solomon, A. (2002, March 20–26). The gatekeeper: Watch on the INS. Nightmare in Miami. *The Village Voice* (hereafter Solomon, "The gatekeeper").

7. Solomon, "The gatekeeper."

8. Testimony of Wideman, A. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 108). Los Angeles: National Prison

Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Wideman); SPR, *No refuge here*; Testimony of Lonegan, B. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations*. (p. 117). Los Angeles: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Lonegan); Dow, M. (2004). *American gulag: Inside U.S. immigration prisons*. Berkeley, CA: University of California Press; Welch, M. (2002). *Detained: immigrations laws and the expanding INS jail complex*. Philadelphia: Temple University Press (hereafter Welch, *Detained*).

9. Roberts, M. (2009, March 15). AP IMPACT: Immigrants face detention, few rights. *Associated Press*.

10. Statement of Hayes Jr., J. T. (2009, March 3). *Medical care and treatment of immigration detainees and deaths in DRO custody*. (p. 4). Washington, D.C.: House Appropriations Committee, Subcommittee on Homeland Security.

11. Testimony of Hutchinson, A. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 35). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

12. Ibid.

13. Chien, E., & Micek, P. (2006, March 7). For children in immigration limbo, detention may be as good as it gets. *New America Media*; Testimony of Nugent, C. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 231). Los Angeles: National Prison Rape Elimination Commission Public Hearing; Homeland Security Act of 2002, H.R. 5710, § 462.

14. Office of the Inspector General, U.S. Department of Health and Human Services. (2008). *Department of Unaccompanied Alien Children's Services: Efforts to serve children*. Washington, D.C.: Author.

15. NPREC Testimony of Wideman, at 109.

16. Testimony of Cheer, S.-M. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (pp. 90–91). Los Angeles: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Cheer).

17. Kinzie, J. D. (2006). Immigrants and refugees: The psychiatric perspective. *Transcultural Psychiatry, 43*(4), 577–591; NPREC Testimony of Wideman, at 110; Physicians for Human Rights & the Bellevue/NYU Program for Survivors of Torture. (2003). *From persecution to prison: The health consequences of detention for asylum seekers*. Boston: Author (hereafter PHR, *From persecution*).

18. American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders: DSM-IV-TR*. Washington, D.C.: Author; Resnick, H., Acierno, R., Holmes, M., Kilpatrick, D., & Jager, N. (1999). Prevention of post-rape psychopathology: Preliminary findings of a controlled acute rape treatment study. *Journal of Anxiety Disorders, 13*(44), 359–370.

19. NPREC Testimony of Wideman, at 110.

20. PHR, *From persecution*, at 1.

21. Women's Refugee Commission. (2009). *Halfway home: Unaccompanied children in immigration custody*. Washington, D.C.: Orrick, Herrington & Sutcliffe, LLP.

22. Testimony of Medina, S. (2006, December 13*). The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (pp. 222–223). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

23. NPREC Testimony of Little, at 78.

24. NPREC Testimony of Wideman, at 108.

25. NPREC Testimony of Little, at 54.

26. Ibid., at 54–55.

27. Just Detention International. (2009). *Sexual abuse in U.S. immigration detention*. Los Angeles: Author.

28. Brané, M. (2009, March 19). Personal communication.

29. NPREC Testimony of Wideman, at 108–109.

30. NPREC Testimony of Cheer, at 93; Hyder, A. A., & Malik, F. A. (2007). Violence against children: A challenge for public health in Pakistan. *Journal of Health, Population and Nutrition*, *25*(2): 168–178; Johnson, D. M., Pike, J. L., & Chard, K. M. (2001). Factors predicting PTSD, depression, and dissociative severity in female treatment-seeking childhood sexual abuse survivors. *Child Abuse & Neglect, 25*(1): 179–189; Erulkar, A. S. (2004). The experience of sexual coercion among young people in Kenya. *International Family Planning Perspectives*, *30*(4):182–189; Oral Statement by the OMCT Violence Against Women Programme. (2005, March 14–April 22). United Nations Commission on Human Rights, 61st Session, Item 12. OMCT Web site. Available at http://www.omct.org/index.php?id=&lang=eng&articleSet=Documents&articleId=5351

31. Testimony of Plummer, T. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (pp. 71–72). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

32. PHR, *From persecution*, at 121.

33. Ibid.

34. Welch, *Detained*.

35. PHR, *From persecution*.

36. U.S. Department of Homeland Security. (2008). ICE/DRO detention standard: Sexual abuse and assault prevention and intervention (hereafter DHS, "Standard: Sexual abuse"); U.S. Department of Homeland Security. (2008). ICE/DRO detention standard: Admission and release; Testimony of Tosado, R. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (p. 146). Los Angeles: National Prison Rape Elimination Commission Public Hearing (hereafter NPREC Testimony of Tosado).

37. DHS, "Standard: Sexual abuse"; NPREC Testimony of Tosado, at 147; Office of Inspector General, U.S. Department of Homeland Security. (2006). *Treatment of immigration detainees housed in Immigration and Customs Enforcement facilities*. Washington, D.C.: Author (hereafter OIG, *Treatment of immigration detainees*).

38. OIG, *Treatment of immigration detainees*.

39. NPREC Testimony of Wideman, at 111–112.

40. NPREC Testimony of Cheer, at 95.

41. NPREC Testimony of Lonegan, at 101.

42. U.S. Department of Homeland Security. (2008). ICE/DRO detention standard: Classification system.

43. Kerwin, D. (2001, Winter). Looking for asylum, suffering in detention. *American Bar Association Human Rights Magazine*. Available at http://www.abanet.org/irr/hr/winter01/kerwin.html

44. DHS, "Standard: Sexual abuse."

45. OIG, *Treatment of immigration detainees*.

46. Testimony of Holguin, I. (2006, December 13). *The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations* (pp. 162–163). Los Angeles: National Prison Rape Elimination Commission Public Hearing.

47. U.S. Department of Homeland Security. (2008). ICE/DRO detention standard: Telephone access.

48. U.S. Government Accountability Office. (2007). *Alien detention standards: Telephone access problems were pervasive at detention facilities; other deficiencies did not show a pattern of noncompliance*. Washington, D.C.: Author, p. 12.

49. NPREC Testimony of Cheer, at 94.

50. NPREC Testimony of Wideman, at 108.

51. NPREC Testimony of Little, at 52.

52. NPREC Testimony of Lonegan, at 124.

53. Lutheran Immigration and Refugee Services & Women's Commission for Refugee Women and Children. (2007). *Locking up family values: The detention of immigrant families*. New York: Women's Commission for Refugee Women and Children, p. 47 (hereafter LIRS, *Locking up family values*).

54. NPREC Testimony of Wideman, at 123.

55. PHR, *From persecution*.

56. The Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008, Pub. L. No. 110-293.

57. 8 U.S.C. § 1182(d)(3)(a,g) (stating that aliens determined to have a communicable disease of public health significance are bared from entry into the United States but may request a waiver).

58. NPREC Testimony of Lonegan, at 119.

59. Office of Inspector General, U.S. Department of Homeland Security. (2009). *Immigration and Customs Enforcement's tracking and transfers of detainees*. Washington, D.C.: Author.

60. U.S. Citizenship and Immigration Services. (2008). *Adjudicator's field manual*. Washington, D.C.: Author.

61. Sullivan, E., Mottino, F., Khashu, A., & O'Neil, M. (2000). *Testing community supervision for the INS: An evaluation of the Appearance Assistance Program*. New York: Vera Institute of Justice.

62. Brané, M. (2008, August 14). Women's Commission letter to the National Prison Rape Elimination Commission.

63. Statement of Jackson, S. L. (2008, March 5). House Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law Oversight Hearing on the Department of Homeland Security, p. 70 (citing LIRS, *Locking up family values*).

64. LIRS, *Locking up family values*, at 47.

65. Brané, M. (2009, March 19). Personal communication.

66. NPREC Testimony of Little, at 59.

# Appendix B

# National Standards

## NPREC Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Adult Prisons and Jails, including Supplemental Standards for Facilities with Immigration Detainees

### I. PREVENTION AND RESPONSE PLANNING

### Prevention Planning (PP)

#### PP-1: Zero tolerance of sexual abuse

The agency has a written policy mandating zero tolerance toward all forms of sexual abuse and enforces that policy by ensuring all of its facilities comply with the PREA standards. The agency employs or designates a PREA coordinator to develop, implement, and oversee agency efforts to comply with the PREA standards.

#### PP-2: Contracting with other entities for the confinement of inmates

If public correctional agencies contract for the confinement of their inmates, they do so only with private agencies or other entities, including other government agencies, committed to eliminating sexual abuse in their facilities, as evidenced by their adoption of and compliance with the PREA standards. Any new contracts or contract renewals include the entity's obligation to adopt and comply with the PREA standards and specify that the public agency will monitor the entity's compliance with these standards as part of its monitoring of the entity's performance.

#### PP-3: Inmate supervision

Security staff provides the inmate supervision necessary to protect inmates from sexual abuse. The upper management officials responsible for reviewing critical incidents must examine areas in the facility where sexual abuse has occurred to assess whether physical barriers may have enabled the abuse, the adequacy of staffing levels in those areas during different shifts, and the need for monitoring technology to supplement security staff supervision (DC-1). When problems or needs are identified, the agency takes corrective action (DC-3).

#### PP-4: Limits to cross-gender viewing and searches

Except in the case of emergency, the facility prohibits cross-gender strip and visual body cavity searches. Except in the case of emergency or other extraordinary or unforeseen circumstances, the facility restricts nonmedical staff from viewing inmates of the opposite gender who are nude or performing bodily functions and similarly restricts cross-gender pat-down searches. Medical practitioners conduct examinations of transgender individuals to determine their genital status only in private settings and only when an individual's genital status is unknown.

#### PP-5: Accommodating inmates with special needs

The agency ensures that inmates who are limited English proficient (LEP), deaf, or disabled are able to report sexual abuse to staff directly, through interpretive technology, or through non-inmate interpreters. Accommodations are made to convey all written information about sexual abuse policies, including how to report sexual abuse, verbally to inmates who have limited reading skills or who are visually impaired.

#### PP-6: Hiring and promotion decisions

The agency does not hire or promote anyone who has engaged in sexual abuse in an institutional setting or who has engaged in sexual activity in the community facilitated by force, the threat of force, or coercion. Consistent with Federal, State, and local law, the agency makes its best effort to contact all prior institutional employers for information on substantiated allegations of sexual abuse; must run criminal background checks for all applicants and employees being considered for promotion; and must examine and carefully weigh any history of criminal activity at work or in the community, including convictions for domestic violence, stalking, and sex offenses. The agency also asks all applicants and employees directly about previous misconduct during interviews and reviews.

#### PP-7: Assessment and use of monitoring technology

The agency uses video monitoring systems and other cost-effective and appropriate technology to supplement its sexual abuse prevention, detection, and response efforts. The agency assesses, at least annually, the feasibility of and need for new or additional monitoring technology and develops a plan for securing such technology.

### Response Planning (RP)

#### RP-1: Evidence protocol and forensic medical exams

The agency follows a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions. The protocol must be adapted from or otherwise based on the 2004 U.S. Department of Justice's Office on Violence Against Women publication "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents," subsequent updated editions, or similarly comprehensive and authoritative protocols developed after 2004. As part of the agency's evidence collection protocol,

all victims of inmate-on-inmate sexually abusive penetration or staff-on-inmate sexually abusive penetration are provided access to forensic medical exams performed by qualified forensic medical examiners. Forensic medical exams are provided free of charge to the victim. The facility makes available a victim advocate to accompany the victim through the forensic medical exam process.

### RP-2: Agreements with outside public entities and community service providers

The agency maintains or attempts to enter into memoranda of understanding (MOUs) or other agreements with an outside public entity or office that is able to receive and immediately forward inmate reports of sexual abuse to facility heads (RE-1). The agency also maintains or attempts to enter into MOUs or other agreements with community service providers that are able to: (1) provide inmates with confidential emotional support services related to sexual abuse and (2) help victims of sexual abuse during their transition from incarceration to the community (RE-3, MM-3). The agency maintains copies of agreements or documentation showing attempts to enter into agreements.

### RP-3: Agreements with outside law enforcement agencies

If an agency does not have the legal authority to conduct criminal investigations or has elected to permit an outside agency to conduct criminal or administrative investigations of staff or inmates, the agency maintains or attempts to enter into a written MOU or other agreement specific to investigations of sexual abuse with the law enforcement agency responsible for conducting investigations. If the agency confines inmates under the age of 18 or other inmates who fall under State and local vulnerable persons statutes, the agency maintains or attempts to enter into an MOU with the designated State or local services agency with the jurisdiction and authority to conduct investigations related to the sexual abuse of vulnerable persons within confinement facilities. When the agency already has an existing agreement or long-standing policy covering responsibilities for all criminal investigations, including sexual abuse investigations, it does not need to enter into a new agreement. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

### RP-4: Agreements with the prosecuting authority

The agency maintains or attempts to enter into a written MOU or other agreement with the authority responsible for prosecuting violations of criminal law. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

## II. PREVENTION

### Training and Education (TR)

### TR-1: Employee training

The agency trains all employees to be able to fulfill their responsibilities under agency sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and relevant Federal, State, and local law. The agency trains all employees to communicate effectively and professionally with all inmates. Additionally, the agency trains all employees on an inmate's right to be free from sexual abuse, the right of inmates and employees to be free from retaliation for reporting sexual abuse, the dynamics of sexual abuse in confinement, and the common reactions of sexual abuse victims. Current employees are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all employees to ensure that they know the agency's most current sexual abuse

policies and procedures. The agency maintains written documentation showing employee signatures verifying that employees understand the training they have received.

### TR-2: Volunteer and contractor training

The agency ensures that all volunteers and contractors who have contact with inmates have been trained on their responsibilities under the agency's sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and relevant Federal, State, and local law. The level and type of training provided to volunteers and contractors is based on the services they provide and level of contact they have with inmates, but all volunteers and contractors who have contact with inmates must be notified of the agency's zero-tolerance policy regarding sexual abuse. Volunteers must also be trained in how to report sexual abuse. The agency maintains written documentation showing volunteer and contractor signatures verifying that they understand the training they have received.

### TR-3: Inmate education

During the intake process, staff informs inmates of the agency's zero-tolerance policy regarding sexual abuse and how to report incidents or suspicions of sexual abuse. Within a reasonably brief period of time following the intake process, the agency provides comprehensive education to inmates regarding their right to be free from sexual abuse and to be free from retaliation for reporting abuse, the dynamics of sexual abuse in confinement, the common reactions of sexual abuse victims, and agency sexual abuse response policies and procedures. Current inmates are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all inmates to ensure that they know the agency's most current sexual abuse policies and procedures. The agency provides inmate education in formats accessible to all inmates, including those who are LEP, deaf, visually impaired, or otherwise disabled as well as inmates who have limited reading skills. The agency maintains written documentation of inmate participation in these education sessions.

### TR-4: Specialized training: Investigations

In addition to the general training provided to all employees (TR-1), the agency ensures that agency investigators conducting sexual abuse investigations have received comprehensive and up-to-date training in conducting such investigations in confinement settings. Specialized training must include techniques for interviewing sexual abuse victims, proper use of *Miranda-* and *Garrity-* type warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. The agency maintains written documentation that investigators have completed the required specialized training in conducting sexual abuse investigations.

### TR-5: Specialized training: Medical and mental health care

The agency ensures that all full- and part-time medical and mental health care practitioners working in its facilities have been trained in how to detect and assess signs of sexual abuse and that all medical practitioners are trained in how to preserve physical evidence of sexual abuse. All medical and mental health care practitioners must be trained in how to respond effectively and professionally to victims of sexual abuse and how and to whom to report allegations or suspicions of sexual abuse. The agency maintains documentation that medical and mental health practitioners have received this specialized training.

Screening for Risk of Sexual Victimization and Abusiveness (SC)

### SC-1: Screening for risk of victimization and abusiveness

All inmates are screened during intake, during the initial classification process, and at all subsequent classification reviews to assess their risk of being sexually abused by other inmates or sexually abusive toward other inmates. Employees must conduct this screening using a written screening instrument tailored to the gender of the population being screened. Although additional factors may be considered, particularly to account for emerging research and the agency's own data analysis, screening instruments must contain the criteria described below. All screening instruments must be made available to the public upon request.

- At a minimum, employees use the following criteria to screen male inmates for risk of victimization: mental or physical disability, young age, slight build, first incarceration in prison or jail, nonviolent history, prior convictions for sex offenses against an adult or child, sexual orientation of gay or bisexual, gender nonconformance (e.g., transgender or intersex identity), prior sexual victimization, and the inmate's own perception of vulnerability.
- At a minimum, employees use the following criteria to screen male inmates for risk of being sexually abusive: prior acts of sexual abuse and prior convictions for violent offenses.
- At a minimum, employees use the following criteria to screen female inmates for risk of sexual victimization: prior sexual victimization and the inmate's own perception of vulnerability.
- At a minimum, employees use the following criteria to screen female inmates for risk of being sexually abusive: prior acts of sexual abuse.

### SC-2: Use of screening information

Employees use information from the risk screening (SC-1) to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive. The facility makes individualized determinations about how to ensure the safety of each inmate. Lesbian, gay, bisexual, transgender, or other gender-nonconforming inmates are not placed in particular facilities, units, or wings solely on the basis of their sexual orientation, genital status, or gender identity. Inmates at high risk for sexual victimization may be placed in segregated housing only as a last resort and then only until an alternative means of separation from likely abusers can be arranged. To the extent possible, risk of sexual victimization should not limit access to programs, education, and work opportunities.

## III. DETECTION AND RESPONSE

### Reporting (RE)

### RE-1: Inmate reporting

The facility provides multiple internal ways for inmates to report easily, privately, and securely sexual abuse, retaliation by other inmates or staff for reporting sexual abuse, and staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse. The facility also provides at least one way for inmates to report the abuse to an outside public entity or office not affiliated with the agency that has agreed to receive reports and forward them to the facility head (RP-2), except when an inmate requests confidentiality. Staff accepts reports made verbally, in writing, anonymously, and from third parties and immediately puts into writing any verbal reports.

### RE-2: Exhaustion of administrative remedies

Under agency policy, an inmate has exhausted his or her administrative remedies with regard to a claim of sexual abuse either (1) when the agency makes a final decision on the merits of the report of abuse (regardless of whether the report was made by the inmate, made by a third party, or forwarded from an outside official or office) or (2) when 90 days have passed since the report was made, whichever occurs sooner. A report of sexual abuse triggers the 90-day exhaustion period regardless of the length of time that has passed between the abuse and the report. An inmate seeking immediate protection from imminent sexual abuse will be deemed to have exhausted his or her administrative remedies 48 hours after notifying any agency staff member of his or her need for protection.

### RE-3: Inmate access to outside confidential support services

In addition to providing on-site mental health care services, the facility provides inmates with access to outside victim advocates for emotional support services related to sexual abuse. The facility provides such access by giving inmates the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national victim advocacy or rape crisis organizations and enabling reasonable communication between inmates and these organizations. The facility ensures that communications with such advocates are private, confidential, and privileged, to the extent allowable by Federal, State, and local law. The facility informs inmates, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged.

### RE-4: Third-party reporting

The facility receives and investigates all third-party reports of sexual abuse (IN-1). At the conclusion of the investigation, the facility notifies in writing the third-party individual who reported the abuse and the inmate named in the third-party report of the outcome of the investigation. The facility distributes publicly information on how to report sexual abuse on behalf of an inmate.

## Official Response Following an Inmate Report (OR)

### OR-1: Staff and facility head reporting duties

All staff members are required to report immediately and according to agency policy any knowledge, suspicion, or information they receive regarding an incident of sexual abuse that occurred in an institutional setting; retaliation against inmates or staff who reported abuse; and any staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse or retaliation. Apart from reporting to designated supervisors or officials, staff must not reveal any information related to a sexual abuse report to anyone other than those who need to know, as specified in agency policy, to make treatment, investigation, and other security and management decisions. Unless otherwise precluded by Federal, State, or local law, medical and mental health practitioners are required to report sexual abuse and must inform inmates of their duty to report at the initiation of services. If the victim is under the age of 18 or considered a vulnerable adult under a State or local vulnerable persons statute, the facility head must report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

### OR-2: Reporting to other confinement facilities

When the facility receives an allegation that an inmate was sexually abused while confined at another facility, the head of the facility where the report was made notifies in writing the head of the facility where the alleged abuse occurred. The head of the facility where the alleged abuse occurred ensures the allegation is investigated.

### OR-3: Staff first responder duties

Upon learning that an inmate was sexually abused within a time period that still allows for the collection of physical evidence, the first security staff member to respond to the report is required to (1) separate the alleged victim and abuser; (2) seal and preserve any crime scene(s); and (3) instruct the victim not to take any actions that could destroy physical evidence, including washing, brushing his or her teeth, changing his or her clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is a non-security staff member, he or she is required to instruct the victim not to take any actions that could destroy physical evidence and then notify security staff.

### OR-4: Coordinated response

All actions taken in response to an incident of sexual abuse are coordinated among staff first responders, medical and mental health practitioners, investigators, and facility leadership. The facility's coordinated response ensures that victims receive all necessary immediate and ongoing medical, mental health, and support services and that investigators are able to obtain usable evidence to substantiate allegations and hold perpetrators accountable.

### OR-5: Agency protection against retaliation

The agency protects all inmates and staff who report sexual abuse or cooperate with sexual abuse investigations from retaliation by other inmates or staff. The agency employs multiple protection measures, including housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates or staff who fear retaliation for reporting sexual abuse or cooperating with investigations. The agency monitors the conduct and/or treatment of inmates or staff who have reported sexual abuse or cooperated with investigations, including any inmate disciplinary reports, housing, or program changes, for at least 90 days following their report or cooperation to see if there are changes that may suggest possible retaliation by inmates or staff. The agency discusses any changes with the appropriate inmate or staff member as part of its efforts to determine if retaliation is taking place and, when confirmed, immediately takes steps to protect the inmate or staff member.

### Investigations (IN)

### IN-1: Duty to investigate

The facility investigates all allegations of sexual abuse, including third-party and anonymous reports, and notifies victims and/or other complainants in writing of investigation outcomes and any disciplinary or criminal sanctions, regardless of the source of the allegation. All investigations are carried through to completion, regardless of whether the alleged abuser or victim remains at the facility.

### IN-2: Criminal and administrative agency investigations

Agency investigations into allegations of sexual abuse are prompt, thorough, objective, and conducted by investigators who have received special training in sexual abuse investigations (TR-4). When outside agencies investigate sexual abuse, the facility has a duty to keep abreast of the investigation and cooperate with outside investigators (RP-3). Investigations include the following elements:

- Investigations are initiated and completed within the timeframes established by the highest- ranking facility official, and the highest-ranking official approves the final investigative report.
- Investigators gather direct and circumstantial evidence, including physical and DNA evidence when available; interview alleged victims, suspected perpetrators, and witnesses; and

review prior complaints and reports of sexual abuse involving the suspected perpetrator.
- When the quality of evidence appears to support criminal prosecution, prosecutors are contacted to determine whether compelled interviews may be an obstacle for subsequent criminal prosecution.
- Investigative findings are based on an analysis of the evidence gathered and a determination of its probative value.
- The credibility of a victim, suspect, or witness is assessed on an individual basis and is not determined by the person's status as inmate or staff.
- Investigations include an effort to determine whether staff negligence or collusion enabled the abuse to occur.
- Administrative investigations are documented in written reports that include a description of the physical and testimonial evidence and the reasoning behind credibility assessments.
- Criminal investigations are documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and provides a proposed list of exhibits.
- Substantiated allegations of conduct that appears to be criminal are referred for prosecution.

### IN-3: Evidence standard for administrative investigations

Allegations of sexual abuse are substantiated if supported by a preponderance of the evidence.

### Discipline (DI)

### DI-1: Disciplinary sanctions for staff

Staff is subject to disciplinary sanctions up to and including termination when staff has violated agency sexual abuse policies. The presumptive disciplinary sanction for staff members who have engaged in sexually abusive contact or penetration is termination. This presumption does not limit agency discretion to impose termination for other actual sexual abuse policy violations. All terminations for violations of agency sexual abuse policies are to be reported to law enforcement agencies and any relevant licensing bodies.

### DI-2: Disciplinary sanctions for inmates

Inmates are subject to disciplinary sanctions pursuant to a formal disciplinary process following an administrative ruling that the inmate engaged in inmate-on-inmate sexual abuse or following a criminal finding of guilt for inmate-on-inmate sexual abuse. Sanctions are commensurate with the nature and circumstances of the abuse committed, the inmate's disciplinary history, and the sanctions meted out for comparable offenses by other inmates with similar histories. The disciplinary process must consider whether an inmate's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed. Possible sanctions also include interventions designed to address and correct underlying reasons or motivation for the abuse, such as requiring the offending inmate to participate in therapy, counseling, or other programs.

### Medical and Mental Health Care (MM)

### MM-1: Medical and mental health screenings—history of sexual abuse

Qualified medical or mental health practitioners ask inmates about prior sexual victimization and abusiveness during medical and mental health reception and intake screenings. If an inmate discloses prior sexual victimization or abusiveness, whether it occurred in an institutional setting or in the community, during a medical or mental health reception or intake screening, the practitioner provides the appropriate referral for treatment, based on his or her professional judgment. Any information related to sexual

victimization or abusiveness that occurred in an institutional setting must be strictly limited to medical and mental health practitioners and other staff, as required by agency policy and Federal, State, or local law, to inform treatment plans and security and management decisions, including housing, bed, work, education, and program assignments. Medical and mental health practitioners must obtain informed consent from inmates before reporting information about prior sexual victimization that did not occur in an institutional setting, unless the inmate is under the age of 18.

### MM-2: Access to emergency medical and mental health services

Victims of sexual abuse have timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment. Treatment services must be provided free of charge to the victim and regardless of whether the victim names the abuser. If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, security staff first responders take preliminary steps to protect the victim (OR-3) and immediately notify the appropriate medical and mental health practitioners.

### MM-3: Ongoing medical and mental health care for sexual abuse victims and abusers

The facility provides ongoing medical and/or mental health evaluation and treatment to all known victims of sexual abuse. The evaluation and treatment of sexual abuse victims must include appropriate follow-up services, treatment plans, and, when necessary, referrals for continued care following their release from custody. The level of medical and mental health care provided to inmate victims must match the community level of care generally accepted by the medical and mental health professional communities. The facility conducts a mental health evaluation of all known abusers and provides treatment, as deemed necessary by qualified mental health practitioners.

## IV. MONITORING

### Data Collection and Review (DC)

### DC-1: Sexual abuse incident reviews

The facility treats all instances of sexual abuse as critical incidents to be examined by a team of upper management officials, with input from line supervisors, investigators, and medical/mental health practitioners. The review team evaluates each incident of sexual abuse to identify any policy, training, or other issues related to the incident that indicate a need to change policy or practice to better prevent, detect, and/or respond to incidents of sexual abuse. The review team also considers whether incidents were motivated by racial or other group dynamics at the facility. When incidents are determined to be motivated by racial or other group dynamics, upper management officials immediately notify the agency head and begin taking steps to rectify those underlying problems. The sexual abuse incident review takes place at the conclusion of every sexual abuse investigation, unless the allegation was determined to be unfounded. The review team prepares a report of its findings and recommendations for improvement and submits it to the facility head.

### DC-2: Data collection

The agency collects accurate, uniform data for every reported incident of sexual abuse using a standardized instrument and set of definitions. The agency aggregates the incident-based sexual abuse data at least annually. The incident-based data collected includes, at a minimum, the data necessary to answer all questions from the most recent version of the BJS Survey on Sexual Violence. Data are obtained from multiple sources, including reports, investigation files, and sexual abuse incident reviews. The agency also obtains incident-based and aggregated data from every facility with which it contracts for the confinement of its inmates.

### DC-3: Data review for corrective action

The agency reviews, analyzes, and uses all sexual abuse data, including incident-based and aggregated data, to assess and improve the effectiveness of its sexual abuse prevention, detection, and response policies, practices, and training. Using these data, the agency identifies problem areas, including any racial dynamics underpinning patterns of sexual abuse, takes corrective action on an ongoing basis, and, at least annually, prepares a report of its findings and corrective actions for each facility as well as the agency as a whole. The annual report also includes a comparison of the current year's data and corrective actions with those from prior years and provides an assessment of the agency's progress in addressing sexual abuse. The agency's report is approved by the agency head, submitted to the appropriate legislative body, and made readily available to the public through its Web site or, if it does not have one, through other means. The agency may redact specific material from the reports when publication would present a clear and specific threat to the safety and security of a facility, but it must indicate the nature of the material redacted.

### DC-4: Data storage, publication, and destruction

The agency ensures that the collected sexual abuse data are properly stored, securely retained, and protected. The agency makes all aggregated sexual abuse data, from facilities under its direct control and those with which it contracts, readily available to the public at least annually through its Web site or, if it does not have one, through other means. Before making aggregated sexual abuse data publicly available, the agency removes all personal identifiers from the data. The agency maintains sexual abuse data for at least 10 years after the date of its initial collection unless Federal, State, or local law allows for the disposal of official information in less than 10 years.

### Audits  (AU)

### AU-1: Audits of standards

The public agency ensures that all of its facilities, including contract facilities, are audited to measure compliance with the PREA standards. Audits must be conducted at least every three years by independent and qualified auditors. The public or contracted agency allows the auditor to enter and tour facilities, review documents, and interview staff and inmates, as deemed appropriate by the auditor, to conduct comprehensive audits. The public agency ensures that the report of the auditor's findings and the public or contracted agency's plan for corrective action (DC-3) are published on the appropriate agency's Web site if it has one or are otherwise made readily available to the public.

## SUPPLEMENTAL STANDARDS FOR FACILITIES WITH IMMIGRATION DETAINEES

### ID-1: Supplement to RP-2: Agreements with outside public entities and community service providers

Any facility that houses immigration detainees maintains or attempts to enter into memoranda of understanding (MOUs) or other agreements with one or more local or, if not available, national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime (RE-3, MM-3). The agency maintains copies of agreements or documentation showing attempts to enter into agreements.

### ID-2: Supplement to TR-1, TR-4, and TR-5: Employee training and specialized training of investigators and medical and mental health care

Any facility that holds immigration detainees provides special additional training to employees, including medical and mental health practitioners and investigators. This additional training includes the following topics: cultural sensitivity toward diverse understandings of acceptable and unacceptable sexual behavior, appropriate terms and concepts to use when discussing sex and sexual abuse with a culturally diverse population, sensitivity and awareness regarding past trauma that may have been experienced by immigration detainees, and knowledge of all existing resources for immigration detainees both inside and outside the facility that provide treatment and counseling for trauma and legal advocacy for victims.

### ID-3: Supplement to TR-3: Inmate education

Sexual abuse education (TR-3) for immigration detainees is provided at a time and in a manner that is separate from information provided about their immigration cases, in detainees' own languages and in terms that are culturally appropriate, and is conducted by a qualified individual with experience communicating about these issues with a diverse population.

### ID-4: Detainee handbook

Every detainee is provided with an ICE Detainee Handbook upon admission to the facility, and a replacement is provided whenever a detainee's handbook is lost or damaged. The Detainee Handbook contains notice of the agency's zero-tolerance policy toward sexual abuse and contains all the agency's policies related to sexual abuse, including information about how to report an incident of sexual abuse and the detainees' rights and responsibilities related to sexual abuse. The Detainee Handbook will inform immigration detainees how to contact organizations in the community that provide sexual abuse counseling and legal advocacy for detainee victims of sexual abuse. The Detainee Handbook will also inform detainees how to contact the Office for Civil Rights and Civil Liberties, the Office of the Inspector General (OIG) for the Department of Homeland Security (DHS), and diplomatic or consular personnel.

### ID-5: Supplement to SC-1: Screening for risk of victimization and abusiveness

The facility makes every reasonable effort to obtain institutional and criminal records of immigration detainees in its custody prior to screening for risk of victimization and abusiveness. Screening of immigration detainees is conducted by employees who are culturally competent.

### ID-6: Supplement to SC-2: Use of screening information

Any facility that houses both inmates and immigration detainees houses all immigration detainees separately from other inmates in the facility and provides heightened protection for immigration detainees who are identified as particularly vulnerable to sexual abuse by other detainees through the screening process (SC-1). To the extent possible, immigration detainees have full access to programs, education, and work opportunities.

### ID-7: Supplement to RE-1: Inmate reporting

The agency provides immigration detainees with access to telephones with free, preprogrammed numbers to ICE's Office for Civil Rights and Civil Liberties and the DHS OIG. In addition, the agency must provide immigration detainees with a list of phone numbers for diplomatic or consular personnel from their countries of citizenship and access to telephones to contact such personnel.

### ID-8: Supplement to RE-3: Inmate access to outside confidential support services

All immigration detainees have access to outside victim advocates who have experience working with immigration detainees or immigrant victims of crime for emotional support services related to sexual abuse. The facility provides such access by giving immigration detainees the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national organizations that provide these services and enabling reasonable communication between immigration detainees and these organizations. The facility ensures that communications with such advocates is private, confidential, and privileged to the extent allowable by Federal, State, and local law. The facility informs immigration detainees, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged.

### ID-9: Protection of detainee victims and witnesses

ICE never removes from the country or transfers to another facility immigration detainees who report sexual abuse before the investigation of that abuse is completed, except at the detainee victim's request. ICE considers releasing detainees who are victims of or witnesses to abuse and monitoring them in the community to protect them from retaliation or further abuse during the course of the investigation.

### ID-10: Supplement to MM-3: Ongoing medical and mental health care for sexual abuse victims and abusers

All immigration detainees are counseled about the immigration consequences of a positive HIV test at the time they are offered HIV testing.

### ID-11: Supplement to DC-2: Data collection

The facility collects additional data whenever an immigration detainee is the victim or perpetrator of an incident of sexual abuse in custody. The additional incident-based data collected indicate whether the victim and/or perpetrator was an immigration detainee, his or her status at the initiation of the investigation, and his or her status at the conclusion of the investigation.

## Supplemental Standards for Family Facilities

The following standards must be followed in ICE family facilities.

### IDFF-1: Screening of immigration detainees in family facilities
(This standard replaces rather than supplements SC-1 and SC-2)

Family facilities develop screening criteria to identify those families and family members who may be at risk of being sexually victimized that will not lead to the separation of families. Housing, program, educational, and work assignments are made in a manner that protects families and in all cases prioritizes keeping families together.

### IDFF-2: Reporting of sexual abuse in family facilities

The facility provides parents with the ability to report sexual abuse in a manner that is confidential from their children. The facility also provides children with the ability to report abuse by a parent confidentially to staff.

### IDFF-3: Investigations in family facilities

Parents are questioned confidentially by investigators about any incident of sexual abuse, away from their children. A parent or parents are present when a child is questioned by investigators about any incident of sexual abuse, unless (1) the child has alleged abuse by the parent or (2) staff suspects abuse by the parent. The decision to exclude a parent from an interview based on staff suspicion of abuse by that parent is always made by a qualified mental health practitioner.

**IDFF-4: Access to medical and mental health care in family facilities**

All family members are offered mental health counseling (as required in MM-2 and MM-3) when one family member is a victim of sexual abuse in the facility. Following an incident of sexual abuse, parents and adult family members are examined confidentially by medical and mental health practitioners and away from children. Following an incident of sexual abuse, a parent or parents are allowed to be present during all medical and mental health examinations of a minor child, unless (1) that child has alleged sexual abuse by the parent or (2) staff suspects abuse by the parent. The decision to exclude a parent from an examination based on staff suspicion of abuse by that parent is always made by a qualified mental health practitioner. In the event that a child is sexually abused, a qualified mental health practitioner interviews the child to determine whether either parent was present or aware of the abuse and whether the parent or parents were threatened in connection with the abuse.

# NPREC Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Lockups

## I. PREVENTION AND RESPONSE PLANNING

### Prevention Planning (PP)

**PP-1: Zero tolerance of sexual abuse**

The agency has a written policy mandating zero tolerance toward all forms of sexual abuse and enforces that policy by ensuring all of its lockups comply with the PREA standards. The agency employs or designates a PREA coordinator to develop, implement, and oversee agency efforts to comply with the PREA standards.

**PP-2: Contracting with other entities for the confinement of detainees**

If law enforcement agencies contract for the confinement of their detainees, they do so only with private agencies or other entities, including other government agencies, committed to eliminating sexual abuse in their lockups, as evidenced by their adoption of and compliance with the PREA standards. Any new contracts or contract renewals include the entity's obligation to adopt and comply with the PREA standards and specify that the law enforcement agency will monitor the entity's compliance with these standards as part of its monitoring of the entity's performance.

**PP-3: Detainee supervision**

Law enforcement staff provides the detainee supervision necessary to protect detainees from sexual abuse. The upper management officials responsible for reviewing critical incidents must examine areas in the lockup where sexual abuse has occurred to assess whether physical barriers may have enabled the abuse, the adequacy of staffing levels in those areas during different shifts, and the need for monitoring technology to supplement law enforcement staff supervision (DC-1). When problems or needs are identified, the agency takes corrective action (DC-3).

**PP-4: Heightened protection for vulnerable detainees**

Any intake screening or assessment includes consideration of a detainee's potential vulnerability to sexual abuse. When vulnerabilities are identified, law enforcement staff provides heightened protection to vulnerable detainees, which may require continuous direct sight and sound supervision or single-cell housing. Absent intake screenings or assessments, any time a law enforcement staff member observes any physical or behavioral characteristics of a detainee that suggest he or she may be vulnerable to sexual abuse, the staff member provides sufficient protection to that detainee to prevent sexual abuse.

**PP-5: Limits to cross-gender viewing and searches**

Except in the case of emergency, the agency prohibits cross-gender strip and visual body cavity searches. Except in the case of emergency or other extraordinary or unforeseen circumstances, the agency restricts law enforcement staff from viewing detainees of the opposite gender who are nude or performing bodily functions and similarly restricts cross-gender pat-down searches. Any examination to determine the genital status of a detainee must be conducted in a private setting by a medical practitioner and only when the genital status is unknown to the agency.

**PP-6: Accommodating detainees with special needs**

The agency ensures that detainees who are LEP, deaf, or disabled are able to report sexual abuse to staff directly, through interpretive technology, or through non-detainee interpreters. Accommodations are made to convey all written information about sexual abuse policies, including how to report sexual abuse, verbally to detainees who have limited reading skills or who are visually impaired.

**PP-7: Hiring and promotion decisions**

The agency does not hire or promote anyone who has engaged in sexual abuse in an institutional setting or who has engaged in sexual activity in the community facilitated by force, the threat of force, or coercion. Consistent with Federal, State, and local law, the agency makes its best effort to contact all prior institutional employers for information on substantiated allegations of sexual abuse; must run criminal background checks for all applicants and employees being considered for promotion; and must examine and carefully weigh any history of criminal activity at work or in the community, including convictions for domestic violence, stalking, and sex offenses. The agency also asks all applicants and employees directly about previous misconduct during interviews and reviews.

**PP-8: Assessment and use of monitoring technology**

The agency uses video monitoring systems and other cost-effective and appropriate technology to supplement its sexual abuse prevention, detection, and response efforts. The agency assesses, at least annually, the feasibility of and need for new or additional monitoring technology and develops a plan for securing such technology.

## Response Planning (RP)

### RP-1: Evidence protocol and forensic medical exams

When investigating allegations of sexual abuse in a lockup, the agency follows a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions. The protocol must be adapted from or otherwise based on the 2004 U.S. Department of Justice's Office on Violence Against Women publication "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents," subsequent updated editions, or similarly comprehensive and authoritative protocols developed after 2004. As part of the agency's evidence collection protocol, all victims of detainee-on-detainee sexually abusive penetration or staff-on-detainee sexually abusive penetration are provided with access and transportation to a community medical provider served by qualified forensic medical examiners. Forensic medical exams are provided free of charge to the victim. The agency makes available a victim advocate to accompany the victim through the forensic medical exam process.

### RP-2: Agreements with outside law enforcement agencies

If an agency has elected to permit another law enforcement agency to conduct criminal or administrative investigations of allegations of sexual abuse in its lockups, the agency maintains or attempts to enter into a written memorandum of understanding (MOU) or other agreement specific to investigations of sexual abuse in lockups with the outside law enforcement agency responsible for conducting investigations. If the agency confines detainees under the age of 18 or other detainees who fall under State and local vulnerable persons statutes, the agency maintains or attempts to enter into an MOU with the designated State or local services agency with the jurisdiction and authority to conduct investigations related to the sexual abuse of vulnerable persons within confinement facilities. When the agency already has an existing agreement or long-standing policy covering responsibilities for all criminal investigations, including sexual abuse investigations, it does not need to enter into a new agreement. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

### RP-3: Agreements with the prosecuting authority

The agency maintains or attempts to enter into a written MOU or other agreement with the authority responsible for prosecuting violations of criminal law. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

## II. PREVENTION

## Training and Education (TR)

### TR-1: Employee and volunteer training

The agency trains all lockup employees and any volunteers who have contact with detainees to be able to fulfill their responsibilities under agency sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and under relevant Federal, State, and local law. The agency trains all lockup employees and volunteers who have contact with detainees to communicate effectively and professionally with all detainees. Current lockup employees and volunteers are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all lockup employees and volunteers to ensure that they know the agency's most current sexual abuse policies and procedures. The agency maintains written documentation showing lockup employee and volunteer signatures verifying that they understand the training they have received.

### TR-2: Detainee, attorney, contractor, and inmate worker notification of the agency's zero-tolerance policy

Employees notify all detainees of the agency's zero-tolerance policy regarding sexual abuse during intake. The agency ensures that attorneys, contractors, and inmate workers are informed of the agency's zero-tolerance policy regarding sexual abuse upon entering the lockup.

### TR-3: Specialized training: Investigations

In addition to the general training provided to all employees and volunteers (TR-1), the agency ensures that law enforcement staff who investigate sexual abuse in lockups have received comprehensive and up-to-date training in conducting such investigations in confinement settings. Specialized training must include techniques for interviewing sexual abuse victims, proper use of *Miranda*- and *Garrity*-type warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. The agency maintains written documentation that investigators have completed the required specialized training in conducting sexual abuse investigations.

## III. DETECTION AND RESPONSE

## Reporting (RE)

### RE-1: Detainee reporting

The agency provides multiple ways for detainees to report easily, privately, and securely sexual abuse, retaliation by other detainees or staff for reporting sexual abuse, and staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse. Staff accepts reports made verbally, in writing, anonymously, and from third parties and immediately puts into writing any verbal reports.

### RE-2: Exhaustion of administrative remedies

Under agency policy, a detainee has exhausted his or her administrative remedies with regard to a claim of sexual abuse either (1) when the agency makes a final decision on the merits of the report of abuse (regardless of whether the report was made by the detainee, made by a third party, or forwarded from an outside official or office) or (2) when 90 days has passed since the report was made, whichever occurs sooner. A report of sexual abuse triggers the 90-day exhaustion period regardless of the length of time that has passed between the abuse and the report. A detainee seeking immediate protection from imminent sexual abuse will be deemed to have exhausted his or her administrative remedies 48 hours after notifying any agency staff member of his or her need for protection.

### RE-3: Third-party reporting

The agency receives and investigates all third-party reports of sexual abuse (IN-1). At the conclusion of the investigation, the agency notifies in writing the third-party individual who reported the abuse and the detainee named in the third-party report of the outcome of the investigation. The agency publicly distributes or posts information on how to report sexual abuse on behalf of a detainee.

## Official Response Following a Detainee Report (OR)

### OR-1: Staff and agency head reporting duties

All staff members are required to report immediately and according to agency policy any knowledge, suspicion, or information they receive regarding an incident of sexual abuse that occurred in an institutional setting; retaliation against detainees or staff who reported abuse; and any staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse

or retaliation. Apart from reporting to designated supervisors or officials, staff must not reveal any information related to a sexual abuse report to anyone other than those who need to know, as specified in agency policy, to make treatment and investigation decisions. If the victim is under the age of 18 or considered a vulnerable adult under a State or local vulnerable persons statute, the agency head must report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

### OR-2: Reporting to other confinement facilities
When the agency receives an allegation that a detainee was sexually abused while confined at another facility or lockup, the head of the agency where the report was made notifies in writing the head of the facility or lockup where the alleged abuse occurred. The head of the facility or lockup where the alleged abuse occurred ensures the allegation is investigated.

### OR-3: Staff first responder duties
Upon learning that a detainee was sexually abused within a time period that still allows for the collection of physical evidence, the first law enforcement staff member to respond to the report is required to (1) separate the alleged victim and abuser; (2) seal and preserve any crime scene(s); and (3) instruct the victim not to take any actions that could destroy physical evidence, including washing, brushing his or her teeth, changing his or her clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is a non-law enforcement staff member, he or she is required to instruct the victim not to take any actions that could destroy physical evidence and then notify law enforcement staff.

### OR-4: Coordinated response
All actions taken in response to an incident of sexual abuse are coordinated among staff first responders, medical and mental health practitioners, investigators, and agency leadership. The agency's coordinated response ensures that victims receive all necessary immediate and ongoing medical, mental health, and support services and that investigators are able to obtain usable evidence to substantiate allegations and hold perpetrators accountable.

### OR-5: Agency protection against retaliation
The agency protects all detainees and staff who report sexual abuse or cooperate with sexual abuse investigations from retaliation by other detainees or staff. The agency employs multiple protection measures, including housing changes or transfers for detainee victims or abusers, removal of alleged staff or detainee abusers from contact with victims, and emotional support services for staff members who fear retaliation for reporting sexual abuse or cooperating with investigations. The agency monitors the conduct and/or treatment of staff who have reported sexual abuse or cooperated with investigations. When retaliation is determined to be taking place, the agency takes immediate steps to protect the detainee or staff member.

## Investigations (IN)

### IN-1: Duty to investigate
The agency investigates all allegations of sexual abuse, including third-party and anonymous reports, and notifies victims and other complainants in writing of investigation outcomes and any disciplinary or criminal sanctions, regardless of the source of the allegation. All investigations are carried through to completion, regardless of whether the alleged abuser or victim remains at the lockup.

### IN-2: Criminal and administrative agency investigations
Agency investigations into allegations of sexual abuse are prompt, thorough, objective, and conducted by investigators who have

received special training in sexual abuse investigations (TR-3). When outside agencies investigate sexual abuse, the agency has a duty to keep abreast of the investigation and cooperate with outside investigators (RP-2). Investigations include the following elements:
- Investigations are initiated and completed within the timeframes established by the highest- ranking agency official, and the highest-ranking official approves the final investigative report.
- Investigators gather direct and circumstantial evidence, including physical and DNA evidence when available; interview alleged victims, suspected perpetrators, and witnesses; and review prior complaints and reports of sexual abuse or misconduct involving the suspected perpetrator.
- When the quality of evidence appears to support criminal prosecution, prosecutors are contacted to determine whether compelled interviews may be an obstacle for subsequent criminal prosecution.
- Investigative findings are based on an analysis of the evidence gathered and a determination of its probative value.
- The credibility of a victim, suspect, or witness is assessed on an individual basis and is not determined by the person's status as detainee or staff.
- Investigations include an effort to determine whether staff negligence or collusion enabled the abuse to occur.
- Administrative investigations are documented in written reports that include a description of the physical and testimonial evidence and the reasoning behind credibility assessments.
- Criminal investigations are documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and provides a proposed list of exhibits.
- Substantiated allegations of conduct that appears to be criminal are referred for prosecution.

### IN-3: Evidence standard for administrative investigations
Allegations of sexual abuse are substantiated if supported by a preponderance of the evidence.

## Discipline (DI)

### DI-1: Disciplinary sanctions for staff
Staff is subject to disciplinary sanctions up to and including termination when staff has violated agency sexual abuse policies. The presumptive disciplinary sanction for staff members who have engaged in sexually abusive contact or penetration is termination. This presumption does not limit agency discretion to impose termination for other sexual abuse policy violations. All terminations for violations of agency sexual abuse policies are to be reported to appropriate law enforcement agencies and any relevant licensing bodies.

### DI-2: Referrals for prosecution for detainee-on-detainee sexual abuse
When there is probable cause to believe that a detainee sexually abused another detainee, the agency refers the matter to the appropriate prosecuting authority.

## Medical and Mental Health Care (MM)

### MM-1: Access to emergency medical and mental health services
Victims of sexual abuse have timely, unimpeded access to emergency medical services following an incident of sexual abuse, regardless of whether they name an abuser. Treatment services must be provided free of charge to the victim. The agency is responsible for ensuring their safe and timely transportation to community medical providers and for referring victims to appropriate community mental health services.

## IV. MONITORING

### Data Collection and Review (DC)

#### DC-1: Sexual abuse incident reviews

The agency treats all instances of sexual abuse as critical incidents to be examined by a group of upper management officials, with input from line supervisors and investigators. The review team evaluates each incident of sexual abuse to identify any policy, training, or other issues related to the incident that indicate a need to change policy or practice to better prevent, detect, and/or respond to incidents of sexual abuse. The review team also considers whether incidents were motivated by racial or other group dynamics at the lockup. When incidents are determined to be motivated by racial or other group dynamics, upper management officials immediately notify the agency head and begin taking steps to rectify those underlying problems. The sexual abuse incident review takes place at the conclusion of every sexual abuse investigation, unless the allegation was determined to be unfounded. The review team prepares a report of its findings and recommendations for improvement and submits it to the agency head.

#### DC-2: Data collection

The agency collects accurate, uniform data for every reported incident of sexual abuse using a standardized instrument and set of definitions. The agency aggregates the incident-based sexual abuse data at least annually. The incident-based data collected includes, at a minimum, the data necessary to answer all questions from the most recent version of the BJS Survey on Sexual Violence. Data are obtained from multiple sources, including reports, investigation files, and sexual abuse incident reviews. The agency also obtains incident-based and aggregated data from every agency with which it contracts for the confinement of its detainees.

#### DC-3: Data review for corrective action

The agency reviews, analyzes, and uses all sexual abuse data, including incident-based and aggregated data, to assess and improve the effectiveness of its sexual abuse prevention, detection, and response policies, practices, and training. Using these data, the agency identifies problem areas, including any racial or other group dynamics underpinning patterns of sexual abuse, takes corrective action on an ongoing basis, and, at least annually, prepares a report of its findings and corrective actions for each lockup as well as the agency as a whole. The annual report also includes a comparison of the current year's data and corrective actions with those from prior years and provides an assessment of the agency's progress in addressing sexual abuse. The agency's report is approved by the agency head, submitted to the appropriate legislative body, and made readily available to the public through its Web site or, if it does not have one, through other means. The agency may redact specific material from the reports when publication would present a clear and specific threat to the safety and security of an agency, but it must indicate the nature of the material redacted.

#### DC-4: Data storage, publication, and destruction

The agency ensures that the collected sexual abuse data are properly stored, securely retained, and protected. The agency makes all aggregated sexual abuse data, from lockups under its direct control and those entities with which it contracts, readily available to the public at least annually through its Web site or, if it does not have one, through other means. Before making aggregated sexual abuse data publicly available, the agency removes all personal identifiers from the data. The agency maintains sexual abuse data for at least 10 years after the date of its initial collection unless Federal, State, or local law allows for the disposal of official information in less than 10 years.

### Audits (AU)

#### AU-1: Audits of standards

The public agency ensures that all of its lockups, including contract facilities, are audited to measure compliance with the PREA standards. Audits must be conducted at least every three years by independent and qualified auditors. The public or contracted agency allows the auditor to enter and tour lockups, review documents, and interview staff and detainees, as deemed appropriate by the auditor, to conduct comprehensive audits. The public agency ensures that the report of the auditor's findings and the public or contracted agency's plan for corrective action (DC-3) are published on the appropriate agency's Web site if it has one or are otherwise made readily available to the public.

# NPREC Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Juvenile Facilities

## I. PREVENTION AND RESPONSE PLANNING

### Prevention Planning (PP)

#### PP-1: Zero tolerance of sexual abuse

The agency has a written policy mandating zero tolerance toward all forms of sexual abuse and enforces that policy by ensuring all of its facilities comply with the PREA standards. The agency employs or designates a PREA coordinator to develop, implement, and oversee agency efforts to comply with the PREA standards.

#### PP-2: Contracting with facilities for the confinement of residents

If public juvenile justice agencies contract for the confinement of their residents, they do so only with private agencies or other entities, including other government agencies, committed to eliminating sexual abuse in their facilities, as evidenced by their adoption of and compliance with the PREA standards. Any new contracts or contract renewals include the entity's obligation to adopt and comply with the PREA standards and specify that the agency will monitor the entity's compliance with these standards as part of its general monitoring of the entity's performance.

### PP-3: Resident supervision

Direct care staff provides the resident supervision necessary to protect residents from sexual abuse. The facility administrators and supervisors responsible for reviewing critical incidents must examine areas in the facility where sexual abuse has occurred to assess whether there are any physical barriers that may have enabled the abuse, the adequacy of staffing levels during different shifts, and the need for monitoring technology to supplement direct care staff supervision (DC-1). When problems or needs are identified, facility administrators and supervisors take corrective action (DC-3).

### PP-4: Limits to cross-gender viewing and searches

Except in the case of emergency, the facility prohibits cross-gender strip and visual body cavity searches. Except in the case of emergency or other extraordinary or unforeseen circumstances, the facility restricts nonmedical staff from viewing residents of the opposite gender who are nude or performing bodily functions and similarly restricts cross-gender pat-down searches. Medical practitioners conduct examinations of transgender individuals to determine their genital status only in private settings and only when an individual's genital status is unknown.

### PP-5: Accommodating residents with special needs

The agency ensures that residents who are limited English proficient (LEP), deaf, or disabled are able to report sexual abuse to staff directly, through interpretive technology, or through non-resident interpreters. Accommodations are made to convey all written information about sexual abuse policies, including how to report sexual abuse, verbally to residents who have limited reading skills or who are visually impaired.

### PP-6: Hiring and promotion decisions

The agency does not hire or promote anyone who has engaged in sexual abuse in an institutional setting or who has engaged in sexual activity in the community facilitated by force, the threat of force, or coercion. Consistent with Federal, State, and local law, the agency makes its best effort to contact all prior institutional employers for information on substantiated allegations of sexual abuse; must run criminal background checks for all applicants and employees being considered for promotion; and must examine and carefully weigh any history of criminal activity at work or in the community, including convictions for domestic violence, stalking, child abuse and sex offenses. The agency also asks all applicants and employees directly about previous misconduct during interviews and reviews.

### PP-7: Assessment and use of monitoring technology

The agency uses video monitoring systems and other cost-effective and appropriate technology to supplement its sexual abuse prevention, detection, and response efforts. The agency assesses, at least annually, the feasibility of and need for new or additional monitoring technology and develops a plan for securing such technology.

## Response Planning (RP)

### RP-1: Evidence protocol and forensic medical exams

The agency follows a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions. The protocol must be adapted from or otherwise based on the 2004 U.S. Department of Justice's Office on Violence Against Women publication "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents," subsequent updated editions, or similarly comprehensive and authoritative protocols developed after 2004. As part of the agency's evidence collection protocol, all victims of resident-on-resident sexually abusive penetration or staff-on-resident sexually abusive penetration are provided access to forensic medical exams performed by qualified forensic medical examiners who are trained in the unique psychological and emotional conditions of younger victims of sexual abuse. Forensic medical exams are provided free of charge to the victim. The facility makes available a victim advocate to accompany the victim through the forensic medical exam process.

### RP-2: Agreements with outside public entities and community service providers

The agency maintains or attempts to enter into memoranda of understanding (MOUs) or other agreements with an outside public entity or office that is able to receive and immediately forward resident reports of sexual abuse to facility heads (RE-1). The agency also maintains or attempts to enter into MOUs or other agreements with community service providers that are able to: (1) provide residents with emotional support services related to sexual abuse and (2) help victims of sexual abuse during their transition from incarceration to the community (RE-3, MM-3). The agency maintains copies of agreements or documentation showing attempts to enter into agreements.

### RP-3: Agreements with outside law enforcement agencies

If an agency does not have the legal authority to conduct criminal investigations or has elected to permit an outside agency to conduct criminal or administrative investigations of staff or residents, the agency maintains or attempts to enter into a written MOU or other agreement specific to investigations of sexual abuse with the law enforcement agency responsible for conducting investigations. The agency also maintains or attempts to enter into an MOU with the designated State or local services agency with the jurisdiction and authority to conduct investigations related to the sexual abuse of children within confinement facilities. When the agency already has an existing agreement or long-standing policy covering responsibilities for all criminal investigations, including sexual abuse investigations and child abuse investigations conducted by a designated State or local services agency, it does not need to enter into new agreements. The agency maintains copies of its agreements or documentation showing attempts to enter into agreements.

### RP-4: Agreements with the prosecuting authority

The agency maintains or attempts to enter into a written MOU or other agreement with the authority responsible for prosecuting violations of criminal law. The agency maintains a copy of the agreement or documentation showing attempts to enter into an agreement.

## II. PREVENTION

## Training and Education (TR)

### TR-1: Employee training

The agency trains all employees to be able to fulfill their responsibilities under agency sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and under relevant Federal, State, and local law. The agency trains all employees to communicate effectively and professionally with all residents. Additionally, the agency trains all employees on a resident's right to be free from sexual abuse, the right of residents and employees to be free from retaliation for reporting sexual abuse, the dynamics of sexual abuse in confinement, and the common reactions of sexual abuse victims. Current employees are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all employees to ensure that they know the agency's most current sexual abuse policies and procedures. The agency maintains written documentation showing employee signatures verifying that employees understand the training they have received.

## TR-2: Volunteer and contractor training

The agency ensures that all volunteers and contractors who have contact with residents have been trained on their responsibilities under the agency's sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and relevant Federal, State, and local law. The level and type of training provided to volunteers and contractors is based on the services they provide and level of contact they have with residents, but all volunteers and contractors who have contact with residents must be notified of the agency's zero-tolerance policy regarding sexual abuse. Volunteers must also be trained in how to report sexual abuse. The agency maintains written documentation showing volunteer and contractor signatures verifying that they understand the training they have received.

## TR-3: Resident education

During the intake process, staff informs residents of the agency's zero-tolerance policy regarding sexual abuse and how to report incidents or suspicions of sexual abuse in an age-appropriate fashion. Within a reasonably brief period of time following the intake process, the agency provides comprehensive, age-appropriate education to residents regarding their right to be free from sexual abuse and to be free from retaliation for reporting abuse, the dynamics of sexual abuse in confinement, the common reactions of sexual abuse victims, and agency sexual abuse response policies and procedures. Current residents are educated as soon as possible following the agency's adoption of the PREA standards, and the agency provides periodic refresher information to all residents to ensure that they know the agency's most current sexual abuse policies and procedures. The agency provides resident education in formats accessible to all residents, including those who are LEP, deaf, visually impaired, or otherwise disabled as well as inmates who have limited reading skills. The agency maintains written documentation of resident participation in these education sessions.

## TR-4: Specialized training: Investigations

In addition to the general training provided to all employees (TR-1), the agency ensures that agency investigators conducting sexual abuse investigations have received comprehensive and up-to-date training in conducting such investigations in confinement settings. Specialized training must include techniques for interviewing young sexual abuse victims, proper use of *Miranda-* and *Garrity*-type warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. The agency maintains written documentation that investigators have completed the required specialized training in conducting sexual abuse investigations.

## TR-5: Specialized training: Medical and mental health care

The agency ensures that all full- and part-time medical and mental health care practitioners working in its facilities have been trained in how to detect and assess signs of sexual abuse and that all medical practitioners are trained in how to preserve physical evidence of sexual abuse. All medical and mental health care practitioners must be trained in how to respond effectively and professionally to young victims of sexual abuse and how and to whom to report allegations or suspicions of sexual abuse. The agency maintains documentation that medical and mental health practitioners have received this specialized training.

## Assessment and Placement of Residents (AP)

### AP-1: Obtaining information about residents

During intake and periodically throughout a resident's confinement, employees obtain and use information about each resident's personal history and behavior to keep all residents safe and free from sexual abuse. At a minimum, employees attempt to ascertain information about prior sexual victimization or abusiveness; sexual orientation and gender identity; current charges and offense history; age; level of emotional and cognitive development; physical size/stature; mental illness or mental disabilities; intellectual/developmental disabilities; physical disabilities; and any other specific information about individual residents that may indicate heightened needs for supervision, additional safety precautions, or separation from certain other residents. This information may be ascertained through conversations with residents at intake and medical and mental health screenings; during classification assessments; and by reviewing court records, case files, facility behavioral records, and other relevant documentation from the residents' files. Medical and mental health practitioners are the only staff permitted to talk with residents to gather information about their sexual orientation or gender identity, prior sexual victimization, history of engaging in sexual abuse, mental health status, and mental or physical disabilities. If the facility does not have medical or mental health practitioners available, residents are given an opportunity to discuss any safety concerns or sensitive issues privately with another employee.

### AP-2: Placement of residents in housing, bed, program, education, and work assignments

Employees use all information obtained about the resident at intake and subsequently to make placement decisions for each resident on an individualized basis with the goal of keeping all residents safe and free from sexual abuse. When determining housing, bed, program, education and work assignments for residents, employees must take into account a resident's age; the nature of his or her offense; any mental or physical disability or mental illness; any history of sexual victimization or engaging in sexual abuse; his or her level of emotional and cognitive development; his or her identification as lesbian, gay, bisexual, or transgender; and any other information obtained about the resident (AP-1). Residents may be isolated from others only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged.

## III. DETECTION AND RESPONSE

## Reporting (RE)

### RE-1: Resident reporting

The facility provides multiple internal ways for residents to report easily, privately, and securely sexual abuse, retaliation by other residents or staff for reporting sexual abuse, and staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse. The facility also provides at least one way for residents to report the abuse to an outside public entity or office not affiliated with the agency that has agreed to receive reports and forward them to the facility head (RP-3). Staff accepts reports made verbally, in writing, anonymously, and from third parties and immediately puts into writing any verbal reports.

### RE-2: Exhaustion of administrative remedies

Under agency policy, a resident has exhausted his or her administrative remedies with regard to a claim of sexual abuse either (1) when

the agency makes a final decision on the merits of the report of abuse (regardless of whether the report was made by the resident, made by a third party, or forwarded from an outside official or office) or (2) when 90 days have passed since the report was made, whichever occurs sooner. A report of sexual abuse triggers the 90-day exhaustion period regardless of the length of time that has passed between the abuse and the report. A resident seeking immediate protection from imminent sexual abuse will be deemed to have exhausted his or her administrative remedies 48 hours after notifying any agency staff member of his or her need for protection.

### RE-3: Resident access to outside support services and legal representation

In addition to providing on-site mental health care services, the facility provides residents with access to outside victim advocates for emotional support services related to sexual abuse. The facility provides such access by giving residents the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national victim advocacy or rape crisis organizations and enabling reasonable communication between residents and these organizations. The facility ensures that communications with such advocates are private, to the extent allowable by Federal, State, and local law. The facility informs residents, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged. The facility also provides residents with unimpeded access to their attorney or other legal representation and their families.

### RE-4: Third-party reporting

The facility receives and investigates all third-party reports of sexual abuse and refers all third-party reports of abuse to the designated State or local services agency with the authority to conduct investigations into allegations of sexual abuse involving child victims (IN-1 and RP-4). At the conclusion of the investigation, the facility notifies in writing the third-party individual who reported the abuse and the resident named in the third-party report of the outcome of the investigation. The facility distributes information on how to report sexual abuse on behalf of a resident to residents' parents or legal guardians, attorneys, and the public.

## Official Response Following a Resident Report (OR)

### OR-1: Staff and facility head reporting duties

All staff members are required to report immediately and according to agency policy and relevant State or local mandatory child abuse reporting laws any knowledge, suspicion, or information they receive regarding an incident of sexual abuse that occurred in an institutional setting; retaliation against residents or staff who reported abuse; and any staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse or retaliation. Apart from reporting to designated supervisors or officials and designated State or local services agencies, staff must not reveal any information related to a sexual abuse report to anyone other than those who need to know, as specified in agency policy, to make treatment, investigation, and other security and management decisions. Medical and mental health practitioners are required to report sexual abuse to designated supervisors and officials as well as the designated State or local services agency and must inform residents of their duty to report at the initiation of services. Upon receiving any allegation of sexual abuse, the facility head must immediately report the allegation to the agency head, the juvenile court that handled the victim's case or the victim's judge of record, and the victim's parents or legal guardians, unless the facility has official documentation showing the parents or legal guardians should not be notified. If the victim is involved in the

child welfare system, the facility head reports to the victim's caseworker instead of the victim's parents or legal guardians.

### OR-2: Reporting to other confinement facilities

When the facility receives an allegation that a resident was sexually abused while confined at another facility, the head of the facility where the report was made notifies in writing the head of the facility where the alleged abuse occurred. The head of the facility where the alleged abuse occurred ensures the allegation is investigated.

### OR-3: Staff first responder duties

Upon learning that a resident was sexually abused within a time period that still allows for the collection of physical evidence, the first direct care staff member to respond to the report is required to (1) separate the alleged victim and abuser; (2) seal and preserve any crime scene(s); and (3) instruct the victim not to take any actions that could destroy physical evidence, including washing, brushing his or her teeth, changing his or her clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is a non–direct care staff member, he or she is required to instruct the victim not to take any actions that could destroy physical evidence and then notify direct care staff.

### OR-4: Coordinated response

All actions taken in response to an incident of sexual abuse are coordinated among staff first responders, medical and mental health practitioners, investigators, victim advocates, and facility leadership. The facility's coordinated response ensures that victims receive all necessary immediate and ongoing medical, mental health, and support services and that investigators are able to obtain usable evidence to substantiate allegations and hold perpetrators accountable.

### OR-5: Agency protection against retaliation

The agency protects all residents and staff who report sexual abuse or cooperate with sexual abuse investigations from retaliation by other residents or staff. The agency employs multiple protection measures, including housing changes or transfers for resident victims or abusers, removal of alleged staff or resident abusers from contact with victims, and emotional support services for residents or staff who fear retaliation for reporting sexual abuse or cooperating with investigations. The agency monitors the conduct and/or treatment of residents or staff who have reported sexual abuse or cooperated with investigations, including any resident disciplinary reports, housing, or program changes, for at least 90 days following their report or cooperation to see if there are changes that may suggest possible retaliation by residents or staff. The agency discusses any changes with the appropriate resident or staff member as part of its efforts to determine if retaliation is taking place and, when confirmed, immediately takes steps to protect the resident or staff member.

## Investigations (IN)

### IN-1: Duty to investigate

The facility investigates all allegations of sexual abuse, including third-party and anonymous reports, and notifies victims and or other complainants in writing of investigation outcomes and any disciplinary or criminal sanctions, regardless of the source of the allegation. If additional parties were notified of the allegation (OR-1), the facility notifies those parties in writing of investigation outcomes. All investigations are carried through to completion, regardless of whether the alleged abuser or victim remains at the facility and regardless of whether the source of the allegation recants his or her allegation.

### IN-2: Criminal and administrative agency investigations

Agency investigations into allegations of sexual abuse are prompt, thorough, objective, and conducted by investigators who have received special training in sexual abuse investigations involving young victims (TR-4). When outside agencies investigate sexual abuse, the facility has a duty to keep abreast of the investigation and cooperate with outside investigators (RP-4). Investigations include the following elements:

- Investigations are initiated and completed within the time frames established by the highest- ranking facility official, and the highest-ranking official approves the final investigative report.
- Investigators gather direct and circumstantial evidence, including physical and DNA evidence when available; interview alleged victims, suspected perpetrators, and witnesses; and review prior complaints and reports of sexual abuse involving the suspected perpetrator; and potentially corroborating physical or other evidence.
- When the quality of evidence appears to support criminal prosecution, prosecutors are contacted to determine whether compelled interviews may be an obstacle for subsequent criminal prosecution.
- Investigative findings are based on an analysis of the evidence gathered and a determination of its probative value.
- The credibility of a victim, suspect, or witness is assessed on an individual basis and is not determined by the person's status as resident or staff.
- Investigations include an effort to determine whether staff negligence or collusion enabled the abuse to occur.
- Administrative investigations are documented in written reports that include a description of the physical and testimonial evidence and the reasoning behind credibility assessments.
- Criminal investigations are documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and provides a proposed list of exhibits.
- Substantiated allegations of conduct that appears to be criminal are referred for prosecution.

### IN-3: Evidence Standard for Administrative Investigations

Allegations of sexual abuse are substantiated if supported by a preponderance of the evidence.

## Discipline (DI)

### DI-1: Disciplinary sanctions for staff

Staff is subject to disciplinary sanctions up to and including termination when staff has violated agency sexual abuse policies. The presumptive disciplinary sanction for staff members who have engaged in sexually abusive contact or penetration is termination. This presumption does not limit agency discretion to impose termination for other sexual abuse policy violations. All terminations for violations of agency sexual abuse policies are to be reported to law enforcement agencies and any relevant licensing bodies.

### DI-2: Interventions for residents who engage in sexual abuse

Residents receive appropriate interventions if they engage in resident-on-resident sexual abuse. Decisions regarding which types of interventions to use in particular cases, including treatment, counseling, educational programs, or disciplinary sanctions, are made with the goal of promoting improved behavior by the resident and ensuring the safety of other residents and staff. When imposing disciplinary sanctions in lieu of or in addition to other interventions, the facility informs residents of their rights and responsibilities during the disciplinary process, including how to appeal sanctions, and only imposes sanctions commensurate with the type of violation committed and the resident's disciplinary history.

Intervention decisions must take into account the social, sexual, emotional, and cognitive development of the resident and the resident's mental health status.

## Medical and Mental Health Care (MM)

### MM-1: Medical and mental health intake screenings

During medical and mental health reception and intake screenings, qualified medical or mental health practitioners talk with residents to ascertain information regarding the resident's sexual orientation, gender identity, prior sexual victimization or history of engaging in sexual abuse (whether it occurred in an institutional setting or in the community), mental health status, and mental or physical disabilities. Such conversations are conducted in the manner that the medical or mental health practitioner deems appropriate for each resident in light of the resident's age and developmental status according to the practitioner's professional judgment and use inclusive language that avoids implicit assumptions about a young person's sexual orientation. The information obtained during these screenings is strictly limited to medical and mental health practitioners, with information provided to appropriate staff on a need to know basis to the extent needed to inform all housing, bed, program, education, and work assignments for the resident (AP-2). If a resident discloses prior sexual victimization or abusiveness during a medical or mental health reception or intake screening, the practitioner reports the abuse according to agency policy and relevant State or local mandatory child abuse reporting laws (OR-1) and provides the appropriate treatment or referral for treatment, based on his or her professional judgment.

### MM-2: Access to emergency medical and mental health services

Victims of sexual abuse have timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment. Treatment services must be provided free of charge to the victim and regardless of whether the victim names the abuser. If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, direct care staff first responders take preliminary steps to protect the victim (OR-3) and immediately notify the appropriate medical and mental health practitioners.

### MM-3: Ongoing medical and mental health care for sexual abuse victims and abusers

The facility provides ongoing medical and/or mental health evaluation and treatment to all known victims of sexual abuse. The evaluation and treatment of sexual abuse victims must include appropriate follow-up services, treatment plans, and, when necessary, referrals for continued care following their release from custody. The level of medical and mental health care provided to resident victims must match the community level of care generally accepted by the medical and mental health professional communities. The facility conducts a mental health evaluation of all known abusers and provides treatment, as deemed necessary by qualified mental health practitioners.

## IV. MONITORING

## Data Collection and Review (DC)

### DC-1: Sexual abuse incident reviews

The facility treats all instances of sexual abuse as critical incidents to be examined by a team of upper management officials, with input from line supervisors, investigators, and medical/mental

health practitioners. The review team evaluates each incident of sexual abuse to identify any policy, training, or other issues related to the incident that indicate a need to change policy or practice to better prevent, detect, and/or respond to incidents of sexual abuse. The review team also considers whether incidents were motivated by racial or other group dynamics at the facility. When incidents are determined to be motivated by racial or other group dynamics, upper management officials immediately notify the agency head and begin taking steps to rectify those underlying problems. The sexual abuse incident review takes place at the conclusion of every sexual abuse investigation, unless the allegation was determined to be unfounded. The review team prepares a report of its findings and recommendations for improvement and submits it to the facility head.

### DC-2: Data collection

The agency collects accurate, uniform data for every reported incident of sexual abuse using a standardized instrument and set of definitions. The agency aggregates the incident-based sexual abuse data at least annually. The incident-based data collected includes, at a minimum, the data necessary to answer all questions from the most recent version of the BJS Survey on Sexual Violence. See Appendix C for a list of recommended data elements. Data are obtained from multiple sources, including reports, investigation files, and sexual abuse incident reviews. The agency also obtains incident-based and aggregated data from every facility with which it contracts for the confinement of its residents.

### DC-3: Data review for corrective action

The agency reviews, analyzes, and uses all sexual abuse data, including incident-based and aggregated data, to assess and improve the effectiveness of its sexual abuse prevention, detection, and response policies, practices, and training. Using these data, the agency identifies problem areas, including any racial dynamics or other group dynamics underpinning patterns of sexual abuse, takes corrective action on an ongoing basis, and, at least annually, prepares a report of its findings and corrective actions for each facility as well as the agency as a whole. The annual report also includes a comparison of the current year's data and corrective actions with those from prior years and provides an assessment of the agency's progress in addressing sexual abuse. The agency's report is approved by the agency head, submitted to the appropriate legislative body, and made readily available to the public through its Web site or, if it does not have one, through other means. The agency may redact specific material from the reports when publication would present a clear and specific threat to the safety and security of a facility, but it must indicate the nature of the material redacted.

### DC-4: Data storage, publication, and destruction

The agency ensures that the collected sexual abuse data are properly stored, securely retained, and protected. The agency makes all aggregated sexual abuse data, from facilities under its direct control and those with which it contracts, readily available to the public at least annually through its Web site or, if it does not have one, through other means. Before making aggregated sexual abuse data publicly available, the agency removes all personal identifiers from the data. The agency maintains sexual abuse data for at least 10 years after the date of its initial collection unless Federal, State, or local law allows for the disposal of official information in less than 10 years.

## Audits (AU)

### AU-1: Audits of standards

The public agency ensures that all of its facilities, including contract facilities, are audited to measure compliance with the PREA standards. Audits must be conducted at least every three years by independent and qualified auditors. The public or contracted agency allows the auditor to enter and tour facilities, review documents, and interview staff and residents, as deemed appropriate by the auditor, to conduct comprehensive audits. The public agency ensures that the report of the auditor's findings and the public or contracted agency's plan for corrective action (DC-3) are published on the appropriate agency's Web site if it has one or are otherwise made readily available to the public.

# NPREC Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Community Corrections

## I. PREVENTION AND RESPONSE PLANNING

### Prevention Planning (PP)

☒ Community Corrections Facilities    ☒ Pretrial, Probation, and Parole

### PP-1: Zero tolerance of sexual abuse

The agency has a written policy mandating zero tolerance toward all forms of sexual abuse and enforces that policy by ensuring all of its facilities and community supervision functions comply with the PREA standards. The agency employs or designates a PREA coordinator to oversee agency efforts to comply with the PREA standards.

☒ Community Corrections Facilities    ☒ Pretrial, Probation, and Parole

### PP-2: Contracting to house or supervise defendants/offenders under community corrections authority

If public community corrections agencies contract for housing or supervision of their defendants/offenders, they do so only with private agencies or other entities, including nonprofit or other government agencies, committed to eliminating sexual abuse, as evidenced by their adoption of and compliance with the PREA standards. Any new contracts or contract renewals include the entity's obligation to adopt and comply with the PREA standards and specify that the public agency will monitor the entity's compliance with these standards as part of its monitoring of the entity's performance. Only in emergency circumstances, in which all

reasonable attempts to find a private agency or other entity in compliance with the PREA standards have failed, should a contract be entered into with an entity that fails to comply with these standards. The public agency must document these efforts.

☒ Community Corrections  Facilities

## PP-3: Defendant/offender supervision

Facility staff provides the defendant/offender supervision necessary to protect defendants/offenders from sexual abuse. The facility administrators and supervisors responsible for reviewing critical incidents must examine areas in the facility where sexual abuse has occurred or may be likely to occur to assess whether physical barriers may allow the abuse to go undetected, the adequacy of staffing levels in those areas during different shifts, and the need for monitoring technology to supplement facility staff supervision. When problems or needs are identified, facility administrators and supervisors take corrective action (DC-3).

☒ Community Corrections  Facilities

## PP-4: Limits to cross-gender viewing and searches

Except in the case of emergency, the facility prohibits cross-gender strip and visual body cavity searches. Except in the case of emergency or other extraordinary or unforeseen circumstances, the facility restricts nonmedical staff from viewing defendants/offenders of the opposite gender who are nude or performing bodily functions and similarly restricts cross-gender pat-down searches. Medical practitioners conduct examinations of transgender individuals to determine their genital status only in private settings and only when an individual's genital status is unknown.

☒ Community Corrections  Facilities       ☒ Pretrial, Probation, and Parole

## PP-5: Accommodating defendants/offenders with special needs

The agency or facility ensures that defendants/offenders who are limited English proficient (LEP), deaf, or disabled are able to report sexual abuse to staff directly, through interpretive technology, or through nondefendant/offender interpreters. Accommodations are made to convey all written information about sexual abuse policies, including how to report sexual abuse, verbally to defendants/offenders who have limited reading skills or who are visually impaired.

☒ Community Corrections  Facilities       ☒ Pretrial, Probation, and Parole

## PP-6: Hiring and promotion decisions

The agency or facility does not hire or promote anyone who has engaged in sexual abuse in an institutional setting or who has engaged in sexual activity in the community facilitated by force, the threat of force, or coercion. Consistent with Federal, State, and local law, the agency or facility makes its best effort to contact all prior institutional employers for information on substantiated allegations of sexual abuse and must run criminal background checks for all applicants and employees being considered for promotion and examine and carefully weigh any history of criminal activity at work or in the community, including convictions or adjudications for domestic violence, stalking, and sex offenses. The agency or facility also asks all applicants and employees directly about previous misconduct during interviews and reviews.

## Response Planning (RP)

☒ Community Corrections  Facilities

## RP-1: Evidence protocol and forensic medical exams

The agency or facility follows a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for

administrative proceedings and criminal prosecutions. The protocol must be adapted from or otherwise based on the 2004 U.S. Department of Justice's Office on Violence Against Women publication "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents," subsequent updated editions, or similarly comprehensive and authoritative protocols developed after 2004. As part of the agency's or facility's evidence collection protocol, the agency or facility refers all victims of defendant/offender-on-defendant/offender sexually abusive penetration or staff-on-defendant/offender sexually abusive penetration to forensic medical exams performed by qualified forensic medical examiners. Forensic medical exams are provided free of charge to the victim. The agency or facility makes available or provides referrals to a victim advocate to accompany the victim through the forensic medical exam process.

☒ Community Corrections  Facilities

## RP-2: Agreements with outside public entities and community service providers

The agency or facility maintains or attempts to enter into written memoranda of understanding (MOUs) or other agreements with an outside public entity or office that is able to receive and immediately forward defendant/offender reports of sexual abuse to agency or facility heads (RE-1). The agency also maintains or attempts to enter into MOUs or other agreements with community service providers that are able to: (1) provide defendants/offenders with confidential emotional support services related to sexual abuse and (2) help victims of sexual abuse during their transition from a community corrections facility into the community. The agency or facility maintains copies of written agreements or documentation showing attempts to enter into agreements.

☒ Community Corrections  Facilities

## RP-3: Agreements with outside law enforcement agencies

If an agency or facility does not have the legal authority to conduct criminal investigations or has elected to permit an outside agency to conduct criminal or administrative investigations of staff or defendants/offenders, the agency or facility maintains or attempts to enter into a written MOU or other agreement specific to investigations of sexual abuse with the law enforcement agency responsible for conducting investigations. If the agency or facility confines defendants/offenders under the age of 18 or applicable age of majority within that jurisdiction, or other defendants/offenders who fall under State and local vulnerable persons statutes, the agency or facility maintains or attempts to enter into an MOU with the designated State or local services agency with the jurisdiction and authority to conduct investigations related to the sexual abuse of vulnerable persons within community corrections facilities. When the agency or facility already has an existing agreement or long-standing policy covering responsibilities for all criminal investigations, including sexual abuse investigations, it does not need to enter into a new agreement. The agency or facility maintains a copy of the written agreement or documentation showing attempts to enter into an agreement.

☒ Community Corrections  Facilities

## RP-4: Agreements with the prosecuting authority

The agency or facility maintains or attempts to enter into a written MOU or other agreement with the authority responsible for prosecuting violations of criminal law. The agency or facility maintains a copy of the written agreement or documentation showing attempts to enter into an agreement.

## II. PREVENTION

### Training and Education (TR)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

#### TR-1: Employee training

The agency or facility trains all employees to be able to fulfill their responsibilities under agency or facility sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and under relevant Federal, State, and local law. The agency or facility trains all employees to communicate effectively and professionally with all defendants/offenders. Additionally, the agency or facility trains all employees on a defendant/offender's right to be free from sexual abuse, the right of defendants/offenders and employees to be free from retaliation for reporting sexual abuse, the dynamics of sexual abuse, and the common reactions of sexual abuse victims. Current employees are educated as soon as possible following the agency's or facility's adoption of the PREA standards, and the agency or facility provides periodic refresher information to all employees to ensure that they know the agency's or facility's most current sexual abuse policies and procedures. The agency or facility maintains written documentation showing employee signatures verifying that employees understand the training they have received.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

#### TR-2: Volunteer and contractor training

The agency or facility ensures that all volunteers and contractors who have contact through the agency or facility with defendants/offenders have been trained on their responsibilities under the agency's sexual abuse prevention, detection, and response policies and procedures; the PREA standards; and relevant Federal, State, and local law. The level and type of training provided to volunteers and contractors is based on the services they provide and level of contact they have with defendants/offenders, but all volunteers and contractors who have contact with defendants/offenders must be notified of the agency's or facility's zero-tolerance policy regarding sexual abuse. Volunteers must also be trained in how to report sexual abuse. The agency or facility maintains written documentation showing volunteer and contractor signatures verifying that they understand the training they have received.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

#### TR-3: Defendant/offender education

During the intake process into a facility or upon initial stages of supervision, staff informs defendants/offenders of the agency's or facility's zero-tolerance policy regarding sexual abuse and how to report incidents or suspicions of sexual abuse. Within a reasonably brief period of time, the agency or facility provides comprehensive education to defendants/offenders regarding their right to be free from sexual abuse and to be free from retaliation for reporting abuse, the dynamics of sexual abuse, the common reactions of sexual abuse victims, and agency or facility sexual abuse response policies and procedures. Current defendants/offenders are educated as soon as possible following the agency's or facility's adoption of the PREA standards, and the agency or facility provides periodic refresher information to all defendants/offenders to ensure that they know the agency's or facility's most current sexual abuse policies and procedures. Periodic refresher training may or may not be necessary in community corrections facilities given the shorter time period defendants/offenders may reside in these facilities. The agency or facility provides defendant/offender

education in formats accessible to all defendants/offenders, including those who are LEP, deaf, visually impaired, or otherwise disabled as well as defendants/offenders who have limited reading skills. All information provided to defendants/offenders is communicated in a manner that is appropriate for the defendant/offender's age and level of cognitive and emotional development. The agency or facility maintains written documentation of defendant/offender participation in these education sessions.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

#### TR-4: Specialized training: Investigations

In addition to the general training provided to all employees (TR-1), the agency or facility ensures that investigators employed by the agency or facility and conducting sexual abuse investigations have received comprehensive and up-to-date training in conducting such investigations in community corrections settings. Specialized training must include population-appropriate techniques for interviewing sexual abuse victims, proper use of *Miranda*- and *Garrity*-type warnings, sexual abuse evidence collection in community corrections settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. The agency or facility maintains written documentation that investigators have completed the required specialized training in conducting sexual abuse investigations.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

#### TR-5: Specialized training: Medical and mental health care

The agency or facility ensures that all medical and mental health care practitioners employed or contracted with by the community corrections or pretrial, probation, or parole agency have been trained in how to detect and assess signs of sexual abuse and how to preserve physical evidence of sexual abuse. All medical and mental health care practitioners must be trained in how to respond effectively and professionally to victims of sexual abuse and how and to whom to report allegations or suspicions of sexual abuse. The agency or facility maintains documentation that medical and mental health practitioners have received this specialized training.

### Screening for Risk of Sexual Victimization and Abusiveness (SC)

☒ Community Corrections  Facilities

#### SC-1: Screening for risk of victimization and abusiveness

All defendants/offenders are screened during intake to assess their risk of being sexually abused by other defendants/offenders or sexually abusive toward other defendants/offenders. Employees must review information received with the defendant/offender as well as discussions with the defendant/offender. Employees must conduct this screening using a written screening instrument tailored to the gender of the population being screened. Although additional factors may be considered, particularly to account for emerging research and the agency's or facility's own data analysis, screening instruments must contain the criteria described below. For defendants/offenders under the age of 18 or applicable age of majority within that jurisdiction, screening must be conducted by medical or mental health practitioners. If the facility does not have medical or mental health practitioners available, these young defendants/offenders are given an opportunity to participate in screenings in private. All screening instruments must be made available to the public upon request.
- At a minimum, employees use the following criteria to screen male defendants/offenders for risk of victimization: mental or physical disability, young age, slight build, nonviolent history,

prior convictions for sex offenses against an adult or child, sexual orientation of gay or bisexual, gender nonconformance (e.g., transgender or intersex identity), prior sexual victimization, and the defendant/offender's own perception of vulnerability.
- At a minimum, employees use the following criteria to screen male defendants/offenders for risk of being sexually abusive: prior acts of sexual abuse and prior convictions for violent offenses.
- At a minimum, employees use the following criteria to screen female defendants/offenders for risk of sexual victimization: prior sexual victimization and the defendant/offender's own perception of vulnerability.
- At a minimum, employees use the following criteria to screen female defendants/offenders for risk of being sexually abusive: prior acts of sexual abuse.

☒ Community Corrections Facilities

### SC-2: Use of screening information
Employees use information from the risk screening (SC-1) to inform housing, bed, work, education, and program assignments. In many community corrections facilities, it is difficult, if not impossible, to keep defendants/offenders totally separate or segregated from each other. However, the facility can determine, based on the screening information, whether a particular defendant/offender should receive greater supervision, should have more frequent contact with staff, or is more appropriately housed in some alternative type of placement. The facility makes individualized determinations about how to ensure the safety of each defendant/offender. Lesbian, gay, bisexual, transgender, or other gendernonconforming defendants/offenders are not placed in particular housing assignments solely on the basis of their sexual orientation, genital status, or gender identity.

## III. DETECTION AND RESPONSE

### Reporting (RE)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

### RE-1: Defendant/offender reporting
The agency or facility provides multiple internal ways for defendants/offenders to report easily, privately, and securely sexual abuse, retaliation by other defendants/offenders or staff for reporting sexual abuse, and staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse. The agency or facility also provides at least one way for defendants/offenders to report the abuse to an outside pubic entity or office not affiliated with the agency that has agreed to receive reports and forward them to the agency or facility head (RP-2), except when a defendant/offender requests confidentiality. Staff accepts reports made verbally, in writing, anonymously, and from third parties and immediately puts into writing any verbal reports.

☒ Community Corrections Facilities

### RE-2: Exhaustion of administrative remedies
Under agency or facility policy, a defendant/offender has exhausted his or her administrative remedies with regard to a claim of sexual abuse either (1) when the agency or facility makes a final decision on the merits of the report of abuse (regardless of whether the report was made by the defendant/offender, made by a third party,

or forwarded from an outside official or office) or (2) when 90 days have passed since the report was made, whichever occurs sooner. A report of sexual abuse triggers the 90-day exhaustion period regardless of the length of time that has passed between the abuse and the report. A defendant/offender seeking immediate protection from imminent sexual abuse will be deemed to have exhausted his or her administrative remedies 48 hours after notifying any agency or facility staff member of his or her need for protection.

☒ Community Corrections Facilities

### RE-3: Defendant/offender access to outside confidential support services
The facility provides defendants/offenders with access to outside victim advocates for emotional support services related to sexual abuse. The facility provides such access by giving defendants/offenders the current mailing addresses and telephone numbers, including toll-free hotline numbers, of local, State, and/or national victim advocacy or rape crisis organizations and enabling reasonable communication between defendants/offenders and these organizations. The facility ensures that communications with such advocates are private, confidential, and privileged, to the extent allowable by Federal, State, and local law. The facility informs defendants/offenders, prior to giving them access, of the extent to which such communications will be private, confidential, and/or privileged.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

### RE-4: Third-party reporting
The agency or facility receives and investigates all third-party reports of sexual abuse (IN-1). At the conclusion of the investigation, the agency or facility notifies in writing the third-party individual who reported the abuse and the defendant/offender named in the third-party report of the outcome of the investigation. The agency or facility distributes publicly information on how to report sexual abuse on behalf of a defendant/offender.

### Official Response Following a Defendant/Offender Report (OR)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

### OR-1: Staff and agency or facility head reporting duties
All staff members are required to report immediately and according to agency or facility policy any knowledge, suspicion, or information they receive regarding an incident of sexual abuse that occurred in a facility setting or while under supervision; retaliation against defendants/offenders or staff who reported abuse; and any staff neglect or violation of responsibilities that may have contributed to an incident of sexual abuse or retaliation. Apart from reporting to designated supervisors or officials, staff must not reveal any information related to a sexual abuse report to anyone other than those who need to know, as specified in agency or facility policy, to make treatment, investigation, and other security and management decisions. Unless otherwise precluded by Federal, State, or local law, staff medical and mental health practitioners are required to report sexual abuse and must inform defendants/offenders of their duty to report at the initiation of services. If the victim is under the age of 18 or applicable age of majority within that jurisdiction, or considered a vulnerable adult under a State or local vulnerable persons statute, staff must report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## OR-2: Reporting to other agencies or facilities

When the agency or facility receives an allegation that a defendant/offender was sexually abused while in a community corrections facility or while under supervision, the head of the agency or facility where the report was made notifies in writing the head of the agency or facility where the alleged abuse occurred. The head of the agency or facility where the alleged abuse occurred ensures the allegation is investigated.

☒ Community Corrections Facilities

## OR-3: Staff first responder duties

Upon learning that a defendant/offender has alleged sexual abuse within a time period that still allows for the collection of physical evidence, the first facility staff member to respond to the report is required to (1) separate the alleged victim and abuser; (2) seal and preserve any crime scene(s); and (3) instruct the victim not to take any actions that could destroy physical evidence, including washing, brushing his or her teeth, changing his or her clothes, urinating, defecating, smoking, drinking, or eating.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## OR-4: Coordinated response

All actions taken in response to an allegation of sexual abuse are coordinated among staff first responders, medical and mental health practitioners, investigators, and agency or facility leadership. The agency's or facility's coordinated response ensures that victims receive all necessary immediate and ongoing medical, mental health, and support services and that investigators are able to obtain usable evidence to substantiate allegations and hold perpetrators accountable.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## OR-5: Agency or facility protection against retaliation

The agency or facility protects all defendants/offenders and staff who report sexual abuse or cooperate with sexual abuse investigations from retaliation by other defendants/offenders or staff. The agency or facility employs multiple protection measures, including housing changes or transfers for defendant/offender victims or abusers, removal of alleged staff or defendant/offender abusers from contact with victims, and emotional support services for defendants/offenders or staff who fear retaliation for reporting sexual abuse or cooperating with investigations. The agency or facility monitors the conduct and/or treatment of defendants/offenders or staff who have reported sexual abuse or cooperated with investigations, including any defendant/offender disciplinary reports, housing changes, or program changes, for at least 90 days following their report or cooperation to assess changes that may suggest possible retaliation by defendants/offenders or staff. The agency or facility discusses any changes with the appropriate defendant/offender or staff member as part of its efforts to determine if retaliation is taking place and, when confirmed, immediately takes steps to protect the defendant/offender or staff member.

## Investigations (IN)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## IN-1: Duty to investigate

The agency or facility investigates all allegations of sexual abuse, including third-party and anonymous reports, and notifies victims and/or other complainants in writing of investigation outcomes

and any disciplinary or criminal sanctions, regardless of the source of the allegation. All investigations are carried through to completion, regardless of whether the alleged abuser or victim remains at the facility or under supervision.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## IN-2: Criminal and administrative agency or facility investigations

Agency or facility investigations into allegations of sexual abuse are prompt, thorough, objective, and conducted by investigators who have received special training in sexual abuse investigations (TR-4). When outside agencies investigate sexual abuse, the agency or facility has a duty to keep abreast of the investigation and cooperate with outside investigators (RP-3). Investigations include the following elements:

- Investigations are initiated and completed within the time-frames established by the highest- ranking official, and the highest-ranking official approves the final investigative report.
- Investigators gather direct and circumstantial evidence, including physical and DNA evidence when available; interview alleged victims, suspected perpetrators, and witnesses; and review prior complaints and reports of sexual abuse involving the suspected perpetrator.
- When the quality of evidence appears to support criminal prosecution, prosecutors are contacted to determine whether compelled interviews may be an obstacle for subsequent criminal prosecution.
- Investigative findings are based on an analysis of the evidence gathered and a determination of its probative value.
- The credibility of a victim, suspect, or witness is assessed on an individual basis and is not determined by the person's status as defendant/offender or staff.
- Investigations include an effort to determine whether staff negligence or collusion enabled the abuse to occur.
- Administrative investigations are documented in written reports that include a description of the physical and testimonial evidence and the reasoning behind credibility assessments.
- Criminal investigations are documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and provides a proposed list of exhibits.
- Substantiated allegations of conduct that appear to be criminal are referred for prosecution.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## IN-3: Evidence standard for administrative investigations

Allegations of sexual abuse are substantiated if supported by a preponderance of the evidence or a lesser standard if allowed under agency or facility policy or State law.

## Discipline (DI)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## DI-1: Disciplinary sanctions for staff

Staff is subject to disciplinary sanctions up to and including termination when staff has violated agency or facility sexual abuse policies. The presumptive disciplinary sanction for staff members who have engaged in sexually abusive contact or penetration is termination. This presumption does not limit agency or facility discretion to impose termination for other sexual abuse policy violations. All terminations for violations of agency or facility sexual abuse policies are to be reported to law enforcement agencies and any relevant licensing bodies.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## DI-2: Disciplinary sanctions for defendants/offenders

Defendants/offenders are subject to disciplinary sanctions pursuant to a formal disciplinary process following an administrative ruling that the defendant/offender engaged in defendant/offender-on-defendant/offender sexual abuse or following a criminal finding of guilt for defendant/offender-on-defendant/offender sexual abuse. Sanctions are commensurate with the nature and circumstances of the abuse committed, the defendant/offender's disciplinary history, and the sanctions meted out for comparable offenses by other defendants/offenders with similar histories. The disciplinary process must consider whether a defendant/offender's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed. Possible sanctions can include discipline within the community corrections facility, new criminal charges, or referral to authorities who may change conditions of a defendant/offender's release status in the community. Sanctions may also include interventions designed to address and correct underlying reasons or motivation for the abuse, such as requiring the offending defendant/offender to participate in therapy, counseling, or other programs. Sanctions and/or interventions for young defendants/offenders must also take into account the social, sexual, emotional, and cognitive development of the defendant/offender.

## Medical and Mental Health Care (MM)

☒ Community Corrections Facilities

## MM-1: Access to emergency medical and mental health services

Victims of sexual abuse have timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment. Treatment services must be provided free of charge to the victim and regardless of whether the victim names the abuser. If the community corrections facility does not have medical or mental health practitioners or they are not on duty at the time a report of recent abuse is made, staff first responders take preliminary steps to protect the victim (OR-3) and immediately notify appropriate staff and community medical and mental health practitioners.

☒ Community Corrections Facilities

## MM-2: Ongoing medical and mental health care for sexual abuse victims and abusers

The facility provides ongoing medical and/or mental health evaluation and treatment to all known victims of sexual abuse. The evaluation and treatment of sexual abuse victims must include appropriate follow-up services, treatment plans, and, when necessary, referrals for continued care following their release from a community corrections facility. The level of medical and mental health care provided to defendant/offender victims must match the community level of care generally accepted by the medical and mental health professional communities. The facility conducts a mental health evaluation of all known abusers and provides treatment, as deemed necessary by qualified mental health practitioners.

## IV. MONITORING

### Data Collection and Review (DC)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## DC-1: Sexual abuse incident reviews

The agency or facility treats all instances of sexual abuse as critical incidents to be examined by a team of upper management officials, with input from line supervisors, investigators, and medical/mental health practitioners. The review team evaluates each incident of sexual abuse to identify any policy, training, or other issues related to the incident that indicate a need to change policy or practice to better prevent, detect, and/or respond to incidents of sexual abuse. The review team also considers whether incidents were motivated by racial or other group dynamics. When incidents are determined to be motivated by racial or other group dynamics, upper management officials immediately notify the agency or facility head and begin taking steps to rectify those underlying problems. The sexual abuse incident review takes place at the conclusion of every sexual abuse investigation, unless the allegation was determined to be unfounded. The review team prepares a report of its findings and recommendations for improvement and submits it to the agency or facility head.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## DC-2: Data collection

The agency or facility collects accurate, uniform data for every reported incident of sexual abuse using a standardized instrument and set of definitions. The agency aggregates the incident-based sexual abuse data at least annually. The incident-based data collected includes, at a minimum, the data necessary to answer all questions from the most recent version of the BJS Survey on Sexual Violence. Data are obtained from multiple sources, including reports, investigation files, and sexual abuse incident reviews. The agency also obtains incident-based and aggregated data from every community corrections facility with which it contracts.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

## DC-3: Data review for corrective action

The agency reviews, analyzes, and uses all sexual abuse data, including incident-based and aggregated data, to assess and improve the effectiveness of its sexual abuse prevention, detection, and response policies, practices, and training. Using these data, the agency identifies problem areas, including any racial dynamics underpinning patterns of sexual abuse, takes corrective action on an ongoing basis, and, at least annually, prepares a report of its findings and corrective actions for each facility as well as the agency as a whole. The annual report also includes a comparison of the current year's data and corrective actions with those from prior years and provides an assessment of the agency's progress in addressing sexual abuse. The agency's report is approved by the agency head, submitted to the appropriate governing body, and made readily available to the public through its Web site or, if it does not have one, through other means. The agency may redact specific material from the reports when publication would present a clear and specific threat to the safety and security of a facility, but it must indicate the nature of the material redacted.

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

### DC-4: Data storage, publication, and destruction

The agency ensures that the collected sexual abuse data are properly stored, securely retained, and protected. The agency makes all aggregated sexual abuse data, including from facilities under its direct control and those with which it contracts, readily available to the public at least annually through its Web site or, if it does not have one, through other means. Before making aggregated sexual abuse data publicly available, the agency removes all personal identifiers from the data. The agency maintains sexual abuse data for at least 10 years after the date of its initial collection unless Federal, State, or local law allows for the disposal of official information in less than 10 years.

## Audits (AU)

☒ Community Corrections Facilities   ☒ Pretrial, Probation, and Parole

### AU-1: Audits of standards

The public agency ensures that all community corrections facilities, including contract facilities and pretrial, probation, and parole agencies are audited to measure compliance with the PREA standards. Audits must be conducted at least every three years by independent and qualified auditors. The public or contracted agency allows the auditor to enter and tour facilities, review documents, and interview staff and defendants/offenders, as deemed appropriate by the auditor, to conduct comprehensive audits. The public agency ensures that the report of the auditor's findings and the public or contracted agency's plan for corrective action (DC-3) are published on the appropriate agency's Web site if it has one or are otherwise made readily available to the public.

# Appendix C

# Recommendations

## Recommendations to the Attorney General

I.   The Commission recommends that the Attorney General, in his capacity as agency head, establish a Prison Rape Elimination Act (PREA) Advisory Committee pursuant to the 1972 Federal Advisory Committee Act (FACA).

The purpose of the Advisory Committee is to assist the Attorney General with the promulgation of the PREA standards and thereafter assess their implementation and propose amendments as needed to increase their efficacy.

To provide such assistance, the Advisory Committee will:

- Gather the views and concerns of PREA stakeholders, including State and Federal departments of corrections, professional organizations, prisoner advocates, former and current prisoners, and other organizations and individuals with expertise and experience regarding prison rape and policies and practices to eliminate it.

- Review statistical studies, academic and other analyses, prisoner litigation addressing prison rape, and prison rape criminal prosecutions.

- Consult with the Bureau of Justice Assistance, the Bureau of Justice Statistics, the National Institute of Corrections, and the National Institute of Justice.

- Review and analyze the results of the audits undertaken to comply with the PREA standards.

The Advisory Committee should be created as soon as the National Prison Rape Elimination Commission provides the Attorney General with its proposed standards and report and its legislative mandate expires.

II.  The Commission recommends that the Attorney General create a full-time Special Assistant for PREA within the Office of the Deputy Attorney General. The Special Assistant will have primary responsibility within the U.S. Department of Justice to ensure the effective implementation of PREA standards and the elimination of prison rape.

The Special Assistant will:

- Monitor and help coordinate the PREA-related work of other offices and divisions within the Department and coordinate with other executive branch agencies as appropriate.

- Ensure the preparation of an annual review of progress implementing PREA, including steps taken by correctional agencies and statistical trends in prison rape.

- Work with the Executive Office for United States Attorneys to help coordinate PREA-related activities and the sharing of information among districts with Federal prison facilities or immigration detention centers within their jurisdictional boundaries.

- Serve as liaison with the PREA Advisory Committee and function as the Designated Federal Official for FACA.

## Recommendations to the U.S. Department of Justice

I.   The Commission recommends that the Department of Justice sponsor the development of a corollary to the 2004 "National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents." Given the prevalence of sexual abuse in correctional facilities and the need to improve evidence collection, the national protocol should be customized to the conditions of confinement.

II.  The Commission recommends that the Department of Justice remove the barrier to Victims of Crime Act funding for treatment and rehabilitative services to incarcerated victims of sexual abuse.

III. The Commission recommends that the Department of Justice continue to ensure that knowledge of issues and practices surrounding the elimination of sexual abuse in confinement be disseminated and increased through the following initiatives:

A.  The National Institute of Corrections should design and develop a national training program to prequalify auditors who will monitor facility compliance with the PREA standards. Qualification for service is required before auditors can be certified by the Department of Justice.

B. The National Institute of Corrections should continue to conduct training and educational programs and to offer technical assistance to Federal, State, tribal, and local authorities responsible for the prevention, investigation, and punishment of prison rape. Provision of services must be equitably distributed among county jails, lock-ups, and juvenile and community corrections facilities in addition to Federal and State prisons.

C. The National Institute of Corrections should provide technical assistance to facilities interested in planning technological advancements in support of their capacity for supervision.

D. The Bureau of Justice Statistics should continue to conduct an annual comprehensive statistical review and analysis of the incidence and effects of prison rape.

E. The Bureau of Justice Assistance should continue to provide grants to diverse correctional settings for the development of innovative practices and programs addressing sexual abuse.

F. The National Institute of Justice should continue to fund research on sexual abuse in correctional facilities.

## Recommendations to Congress

I. The Commission recommends that Congress amend the administrative exhaustion provision and physical injury requirement in the Prison Litigation Reform Act to remove unreasonable barriers to courts for victims of sexual abuse.

II. The Commission recommends that Congress amend the Violence Against Women Act (VAWA) Reauthorization of 2005 to include incarcerated victims of sexual abuse as a class served under VAWA notwithstanding the nature of their criminal convictions.

III. The Commission recommends that Congress ensure that funds are made available for the following initiatives to further the understanding of issues and practices surrounding the elimination of sexual abuse in confinement:

A. Funds should be made available to the National Institute of Corrections to design and develop a national training program for auditors who monitor facility compliance with the PREA standards. The institute will ensure that PREA auditors are prequalified for service before certification by the Department of Justice.

B. Funds should be made available to the National Institute of Corrections to allow it to continue to conduct training and educational programs and to offer technical assistance to Federal, State, tribal, and local authorities responsible for the prevention, investigation, and punishment of prison rape. Provision of services must be equitably distributed among county jails; lockups; and juvenile, community corrections, and tribal facilities in addition to Federal and State prisons.

C. Funds should be made available to the National Institute of Corrections to provide technical assistance to facilities interested in planning for technological advancements in support of their capacity for supervision.

D. Funds should be made available to the Bureau of Justice Statistics to continue conducting an annual comprehensive statistical review and analysis of the incidence and effects of prison rape.

E. Funds should be made available to the Bureau of Justice Assistance to provide grants to diverse correctional settings for the development of innovative practices and programs.

F. Funds should be made available to the National Institute of Justice to sponsor research on sexual abuse in correctional facilities.

G. Funds should be made available to appropriate entities to research the extent to which inmate consensual or nonconsensual sexual activity increases the rate of transmitting HIV/AIDS (and other sexually transmitted infections) to communities and how to prevent it.

# Appendix D

# NPREC Standards Development Expert Committee Members

During the standards development process, the Commission convened expert committees comprised of diverse stakeholders with broad correctional expertise to provide information and guidance. The Commission thanks the members of the expert committees for their participation and contribution.

Organizational affiliations are provided for identification purposes only; committee members were not necessarily acting as representatives of their organizations. This list reflects each committee member's organizational affiliation at the time of participation and may not represent the person's current position. The Commission's standards do not reflect the official views of any of the organizations referenced here.

**Carrie Abner,** Research Associate, American Probation and Parole Association

**Aaron Aldrich,** Chief Inspector, Rhode Island Department of Corrections

**James Austin,** President, JFA Institute

**Roy F. Austin, Jr.,** Partner, McDermott Will & Emery

**Chris Baker,** Lieutenant, Corrections Supervisor/Jail Administrator, Van Buren County Sheriff's Office, Michigan

**David Balagia,** Major, Travis County Sheriff's Office, Texas

**Joe Baumann,** Corrections Officer, California Rehabilitation Center Chapter President, California Correctional Peace Officers Association

**Jeffrey Beard,** Secretary, Pennsylvania Department of Corrections

**Theodis Beck,** Secretary, North Carolina Department of Correction

**Art Beeler,** Warden, Federal Correctional Complex, Federal Bureau of Prisons, U.S. Department of Justice

**Andrea Black,** Coordinator, Detention Watch Network

**Charma Blount,** Sexual Assault Nurse Examiner, Texas Department of Criminal Justice

**Tim Brennan,** Principal, Northpointe Institute for Public Management, Inc.

**Lorie Brisbin,** Program Coordinator, Prisons Division, Idaho Department of Correction

**Barbara Broderick,** Director, Maricopa County Adult Probation Department, Arizona

**Roger Canaff,** Deputy Chief, Sex Offender Management Unit, Office of the Attorney General, New York

**Susan Paige Chasson,** President, International Association of Forensic Nurses

**Gwendolyn Chunn,** Immediate Past President, American Correctional Association

**Suanne Cunningham,** National Director, Corrections/Criminal Justice Program, Heery International

**Karen Dalton,** Director, Correctional Services Division, Los Angeles County Sheriff's Department

**Kim Day,** SAFE Technical Assistance Coordinator, International Association of Forensic Nurses

**Gina DeBottis,** Executive Director, Special Prosecution Unit, Texas Youth Commission

**Kathleen Dennehy,** Superintendent, Security Operations, Bristol County Sheriff's Office, Massachusetts

**Gary Dennis,** Senior Associate, The Moss Group, Inc.

**Ruth Divelbiss,** Captain, Ford County Sheriff's Office, Kansas

**Mark Donatelli,** Partner, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg, and Bienvenu LLP

**Sarah Draper,** Director of Investigations, Office of Investigation and Compliance, Internal Investigation Unit, Georgia Department of Corrections

**Dr. Richard Dudley,** Private Practice of Clinical and Forensic Psychiatry

**Robert Dumond,** President and Licensed Clinical Mental Health Counselor, Consultants for Improved Human Services, PLLC

**Earl Dunlap,** Chief Executive Officer, National Partnership for Juvenile Services

**Maureen Dunn,** Director, Unaccompanied Children's Services, Office of Refugee Resettlement, Administration for Children and Families, U.S. Department of Health and Human Services

**Teena Farmon,** Retired Warden, Central California Women's Facility

**Lisa Freeman,** Staff Attorney, Prisoners' Rights Project, Legal Aid Society, New York City

**Vanessa Garza,** Associate Director for Trafficking Policy, Office of Refugee Resettlement, Administration for Children and Families, U.S. Department of Health and Human Services

**Michael Gennaco,** Chief Attorney, Office of Independent Review, Los Angeles County Sheriff's Department

**Karen Giannakoulias,** Forensic Interviewer/Victim Advocate, U.S. Attorney's Office, Washington, D.C.

**Steve Gibson,** Administrator, Youth Services Division, Montana Department of Corrections

**Simon Gonsoulin,** Former Director, Louisiana Office of Youth Development

**Kathleen Graves,** Director, Community Corrections Services, Kansas Department of Corrections

**Robert L. Green,** Warden, Montgomery County Correctional Facility, Montgomery County Department of Correction and Rehabilitation, Maryland

**Dr. Robert Greifinger,** Correctional Health Care and Quality Management Consultant

**David Guntharp,** Director, Arkansas Department of Community Correction

**Karyn Hadfield,** Training Specialist, Day One: The Sexual Assault and Trauma Resource Center

**Dee Halley,** PREA Program Manager, National Institute of Corrections, Federal Bureau of Prisons, U.S. Department of Justice

**Greg Hamilton,** Sheriff, Travis County, Texas

**Patrick M. Hanlon,** Partner, Goodwin Proctor LLP

**Patricia Hardyman,** Senior Associate, Association of State Correctional Administrators

**Rachel Harmon,** Associate Professor of Law, University of Virginia School of Law

**Michael Hennessey,** Sheriff, City and County of San Francisco, California

**Andrew Jordan,** Consultant, Migima, LLC; Retired Chief of Police, Bend Police Department, Oregon

**Thomas Kane,** Assistant Director, Information, Policy and Public Affairs Division, Federal Bureau of Prisons, U.S. Department of Justice

**Cliff Keenan,** Assistant Director, District of Columbia Pretrial Services Agency

**Jacqueline Kotkin,** Field Services Executive, Probation and Parole, Vermont Department of Corrections

**Deborah LaBelle,** Attorney

**Madie LaMarre,** Consultant

**Neal Langan,** Senior Research Analyst, Office of Research and Evaluation, Federal Bureau of Prisons, U.S. Department of Justice

**Dori Lewis,** Senior Supervising Attorney, Prisoners' Rights Project, Legal Aid Society, New York City

**Cheryl Little,** Executive Director, Florida Immigrant Advocacy Center, Inc.

**Jennifer Long,** Director, National Center for the Prosecution of Violence Against Women

**Christy Lopez,** Partner, Independent Assessment and Monitoring, LLP

**Margaret Love,** Attorney; Consulting Director, American Bar Association Commission on Effective Criminal Sanctions

**Bobbi Luna,** Captain, Multnomah County Sheriff's Office, Oregon

**Martha Lyman,** Director of Research, Hampden County Correctional Center, Massachusetts

**Bob Maccarone,** Director, New York State Division of Probation and Correctional Alternatives

**Cindy Malm,** Consultant, Retired Jail Administrator, Rocky Mountain Corrections

**Michael Marette,** Assistant Director of Corrections, American Federation of State, County, and Municipal Employees

**Jenifer Markowitz,** Forensic Nurse Consultant, DOVE Program, Summa Health System

**Steve Martin,** Attorney/Corrections Consultant

**Susan McCampbell,** President, Center for Innovative Public Policies, Inc., McCampbell & Associates, Inc.

**Ron McCuan,** Captain, U.S. Public Health Service; Public Health Analyst, National Institute of Corrections, Federal Bureau of Prisons, U.S. Department of Justice

**Linda McFarlane,** Mental Health Program Director, Just Detention International

**Jeff McInnis,** PREA Coordinator, District of Columbia Department of Youth Rehabilitation Services

**John Milian,** Detention and Deportation Officer, Criminal Alien Program, Office of Detention and Removal, Immigration and Customs Enforcement, U.S. Department of Homeland Security

**Phyllis Modley,** Correctional Program Specialist, Community Corrections Division, National Institute of Corrections, Federal Bureau of Prisons, U.S. Department of Justice

**Jean Moltz,** Correctional Health Care Consultant

**James Montross,** Director of Mental Health Monitoring, Texas Department of Criminal Justice

**Marcia Morgan,** Consultant, Migima, LLC

**John Moriarty,** Inspector General, Texas Department of Criminal Justice

**Anadora Moss,** President, The Moss Group, Inc.

**Gail D. Mumford,** Juvenile Detention Alternatives Initiative, Annie E. Casey Foundation

**Melissa Nolan,** Executive Assistant, Policy and Public Affairs Division, Federal Bureau of Prisons, U.S. Department of Justice

**Christopher Nugent,** Senior Counsel, Community Services Team, Holland & Knight LLP

**Barbara Owen,** Professor of Criminology, California State University, Fresno

**David Parrish,** Colonel, Commander, Department of Detention Services, Hillsborough County Sheriff's Office, Florida

**T.J. Parsell,** Human Rights Activist, Author of *Fish: A Memoir of a Boy in a Man's Prison*

**Dr. Farah M. Parvez,** Director, Office of Correctional Public Health, New York City Department of Health and Mental Hygiene; National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention, Centers for Disease Control and Prevention

**Susan Poole,** Criminal Justice Consultant; Retired Warden, California Institution for Women

**Roberto Hugh Potter,** Centers for Disease Control and Prevention

**Eugenie Powers,** Director, Probation and Parole, Louisiana Department of Public Safety and Corrections

**Judy Preston,** Deputy Chief, Civil Rights Division, U.S. Department of Justice

**J. Michael Quinlan,** Senior Vice President, Corrections Corporation of America

**Jeffrey Renzi,** Associate Director, Planning and Research, Rhode Island Department of Corrections

**Denise Robinson,** President and CEO, Alvis House; Past-President, International Community Corrections Association

**Melissa Rothstein,** East Coast Program Director, Just Detention International

**David Roush,** Director, National Partnership for Juvenile Services, Center for Research and Professional Development, National Juvenile Detention Association

**Elissa Rumsey,** Compliance Monitoring Coordinator, Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice

**Timothy Ryan,** Director, Miami-Dade County Corrections and Rehabilitation Department

**Teresa Scalzo,** Senior Policy Advisor, Sexual Assault Prevention and Response Office, U.S. Department of Defense

**Vincent Schiraldi,** Director, District of Columbia Department of Youth Rehabilitation Services

**Margo Schlanger,** Professor of Law, Washington University in St. Louis School of Law

**Karen Schneider,** Legal Consultant

**Dana Shoenberg,** Senior Staff Attorney, Center for Children's Law and Policy

**Linda Smith,** Research Consultant

**Donald Specter,** Director, Prison Law Office

**Mai-Linh Spencer,** Deputy State Public Defender, Office of the State Public Defender, California

**Richard Stalder,** Former Secretary, Louisiana Department of Public Safety and Corrections

**Lovisa Stannow,** Executive Director, Just Detention International

**Lara Stemple,** Former Director, Just Detention International; Director, Graduate Studies, University of California, Los Angeles, School of Law

**Tom Stickrath,** Director, Ohio Department of Youth Services

**Victor Stone,** Special Counsel, Office of Enforcement Operations, Criminal Division, U.S. Department of Justice

**Robert Sudlow,** Chief Probation Officer, Ulster County Probation Department, New York

**Anjali Swienton,** Director of Outreach, National Clearinghouse for Science, Technology, and the Law, Stetson University College of Law; President and CEO, SciLaw Forensics Ltd.

**Robin Toone,** Attorney, Foley Hoag LLP

**Cynthia Totten,** Program Director, Just Detention International

**Ashbel T. Wall, II,** Director, Rhode Island Department of Corrections

**Kelly Ward,** Former Warden, David Wade Correctional Center, Louisiana Department of Public Safety and Corrections

**Richard White,** Deputy Commissioner of Operations, City of New York Department of Correction

**Anne Wideman,** Clinical Psychologist

**Reginald Wilkinson,** Executive Director, Ohio Business Alliance for Higher Education and the Economy; Former Director, Ohio Department of Rehabilitation and Correction

**Margaret Winter,** Associate Director, National Prison Project, American Civil Liberties Union

**Jason Ziedenberg,** Consultant; Former Director, Justice Policy Institute

# Appendix E

# Standards Implementation Needs Assessment

During the public comment period, the Commission conducted a Standards Implementation Needs Assessment (SINA). The Commission created the SINA process to provide feedback on the draft standards through a series of "case studies" at particular facilities. More than 40 facilities from around the country applied to participate in the SINA process. The Commission selected 11 sites that reflected ranges in capacity, populations, and geographic settings and that included jails and prisons; facilities for men, women, and juveniles; and community corrections facilities. Each site visit took place over one and a half days and included a facility tour and five structured interviews: one with the Warden or Superintendent, and the others with small groups of staff to discuss general issues, training, medical/mental health, and investigations. These group interviews involved a variety of staff with experience relevant to the particular topic. When possible, we also spoke with inmates detained in the facilities.

### Pilot Site

Montgomery County Correctional Facility
Montgomery County Department of Correction
   and Rehabilitation
Boyds, MD
April 22–23, 2008

### Jails

Suffolk County House of Correction
Suffolk County Sheriff's Department
Boston, MA
May 22–23, 2008

Washington County Jail
Washington County Sheriff's Office
Hillsboro, OR
June 5–6, 2008

### Juvenile Facilities

Cuyahoga Hills Juvenile Correctional Facility
Ohio Department of Youth Services
Highland Hills, OH
July 9–10, 2008

Lynn W. Ross Juvenile Center
Tarrant County Juvenile Probation Department
Tarrant County Juvenile Services
Fort Worth, TX
June 24–25, 2008

### Prisons for Men

James Allred Unit
Texas Department of Criminal Justice
Iowa Park, TX
June 22–23, 2008

Northern Correctional Facility
West Virginia Division of Corrections
Moundsville, WV
July 7–8, 2008

### Prisons for Women

New Mexico Women's Correctional Facility
New Mexico Corrections Department
Grants, NM
June 26–27, 2008

Valley State Prison for Women
California Department of Corrections and Rehabilitation
Chowchilla, CA
June 3–4, 2008

### Community Corrections Facilities

Southwestern Ohio Serenity (SOS) Hall
Hamilton, OH
August 1, 2008

Talbert House
Cincinnati, OH
July 30–31, 2008

# Appendix F

# NPREC Hearing Witnesses

This list reflects organizational affiliation at the time of participation and may not represent the person's current position.

## Public Meeting, March 31, 2005
University of Notre Dame Law School, Notre Dame, Indiana

**Steven Babbitt,** Survivor

**Robert Beckman,** Prosecuting Attorney, LaPorte County, Indiana

**David Donahue,** Commissioner, Indiana Department of Correction

**Jeff Schwartz,** President, LETRA, Inc.

**Nancy Zanning,** Administrator, Michigan Department of Corrections

## The Cost of Victimization: Why Our Nation Must Confront Prison Rape, June 14, 2005
Cannon House Office Building, Washington, DC

**Linda Bruntmyer,** Mother of victim

**Tom Cahill,** Survivor

**Garrett Cunningham,** Survivor

**Keith DeBlasio,** Survivor

**Robert Dumond,** President and Licensed Clinical Mental Health Counselor, Consultants for Improved Human Services, PLLC

**Glenn Fine,** Inspector General, U.S. Department of Justice

**Michael Horowitz,** Senior Fellow, Hudson Institute

**Roberto Hugh Potter,** National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention; Centers for Disease Control and Prevention

**Stanley Richards,** Deputy Executive Director, Fortune Society

**Marilyn Shirley,** Survivor

**Lara Stemple,** Director, Stop Prisoner Rape

**Melissa Turner,** Clinical Social Worker, Veterans Affairs Medical Center

## At Risk: Sexual Abuse and Vulnerable Groups Behind Bars, August 19, 2005
U.S. District Court, Northern District of California, San Francisco, California

**Cecilia Chung,** Survivor

**Christopher Daley,** Director, Transgender Law Center

**Michael Hennessey,** Sheriff, San Francisco County, California

**Hope Hernandez,** Survivor

**Roderick Q. Hickman,** Secretary, California Department of Corrections and Rehabilitation

**Dr. Terry Kupers,** Professor, Graduate School of Psychology, The Wright Institute

**Deborah LaBelle,** Attorney

**Bart Lanni,** Deputy Sheriff, San Francisco County, California

**Representative Barbara Lee,** U.S. Representative, California

**Robin Levi,** Human Rights Director, Justice Now

**Scott Long,** Director, Lesbian, Gay, Bisexual, and Transgender Rights Program, Human Rights Watch

**Jody Marksamer,** Director, Youth Project, National Center for Lesbian Rights

**Chance Martin,** Survivor

**Barbara Owen,** Professor of Criminology, California State University, Fresno, California

**T.J. Parsell,** Survivor

**Sen. Gloria Romero,** Senator, California; Chair, Senate Select Committee on the California Correctional System

**Dean Spade,** Founder, Sylvia Rivera Law Project

**Kendell Spruce,** Survivor

## Elimination of Prison Rape: The Corrections Perspective, March 23, 2006
Federal Detention Center, Miami, Florida

**Jeffrey A. Beard,** Secretary, Pennsylvania Department of Corrections

**Kathleen Dennehy,** Commissioner, Massachusetts Department of Correction

**Douglas Dretke,** Director, Correctional Institutions Division, Texas Department of Criminal Justice

**Margo Frasier,** Professor, Sam Houston State University; Former Sheriff, Travis County, Texas

**Robert Garvey,** Sheriff, Hampshire County, Massachusetts; Chairman, American Correctional Association Commission on Accreditation for Corrections

**Glenn Goord,** Chairman, Standards Committee, American Correctional Association

**Martin F. Horn,** Commissioner, City of New York Department of Correction

**Harley Lappin,** Director, Federal Bureau of Prisons

**Cynthia Malm,** Consultant, Retired Jail Administrator, Rocky Mountain Corrections

**Buddy Maupin,** Director, Corrections Division, AFSCME Council 31

**Joseph Oxley,** President-Elect, American Jail Association

**Timothy Ryan,** Director, Miami-Dade County Department of Corrections and Rehabilitation

**Richard Stalder,** Secretary, Louisiana Department of Public Safety and Corrections; President, Association of State Correctional Administrators

**Morris L. Thigpen,** Director, National Institute of Corrections

**Reginald Wilkinson,** Director, Ohio Department of Rehabilitation and Correction; Chairperson, Advisory Board, National Institute of Corrections

## Elimination of Prison Rape: Focus on Juveniles, June 1, 2006
John Joseph Moakley U.S. Courthouse, Boston, Massachusetts

**Grace Chung Becker,** Deputy Assistant Attorney General, U.S. Department of Justice

**Howard Beyer,** President, Council of Juvenile Corrections Administrators

**Dr. Robert Bidwell,** Physician, Hawaii Office of Youth Services

**Honorable Jay Blitzman,** Judge, Lowell Juvenile Court, Lowell, Massachusetts

**Carl Brizzi,** Prosecuting Attorney, Marion County, Indiana

**Gwendolyn Chunn,** President, American Correctional Association

**Leonard Dixon,** President, National Juvenile Detention Association

**Earl Dunlap,** Chief Executive Officer, National Partnership for Juvenile Services, Center for Research and Professional Development

**Robert Flores,** Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice

**Diane Gadow,** Deputy Director, Arizona Department of Juvenile Corrections

**Steven Gibson,** Director, Montana Department of Corrections, Youth Services Division

**Pamanicka Hardin,** Youth Organizer, Prison Moratorium Project

**Barry Krisberg,** President, National Council on Crime and Delinquency

**Albert Murray,** Commissioner, Georgia Department of Juvenile Justice

**Cyryna Pasion,** Survivor

**David Roush,** Director, National Partnership for Juvenile Services, Center for Research and Professional Development

**Carl Sanniti,** Deputy Secretary, Maryland Department of Juvenile Services

**Mark Solar,** Executive Director, Center for Children's Law and Policy

## Reporting, Investigating, and Prosecuting Prison Rape: What Is Needed to Make the Process Work?, August 3, 2006
Theodore Levin U.S. Courthouse, Eastern District of Michigan, Detroit, Michigan

**Aaron Aldrich,** Chief Inspector of Internal Affairs, Rhode Island Department of Corrections

**Lynn Bissonette,** Superintendent, Massachusetts Correctional Institution at Framingham

**Necole Brown,** Survivor

**Patricia Caruso,** Director, Michigan Department of Corrections

**Gina DeBottis,** Executive Director, Texas Special Prosecution Unit

**John Dignam,** Chief, Office of Internal Affairs, Federal Bureau of Prisons

**Leanne Holland,** Program Coordinator, Sparrow Forensic Nurse Examiner Program

**Barbara Litten,** District Attorney, Forest County, Pennsylvania

**Gregory Miller,** U.S. Attorney, Northern District of Florida

**John Moriarty,** Inspector General, Texas Department of Corrections

**Dana Ragsdale,** Survivor

**John Rees,** Commissioner, Kentucky Department of Corrections

**Al Saucier,** Lieutenant, Massachusetts Department of Corrections

**Cynthia Schnedar,** Counsel to the Inspector General, U.S. Department of Justice

**William Sprenkle,** Deputy Secretary of Administration, Pennsylvania Department of Corrections

**Anjali Swienton,** Director of Outreach, National Clearinghouse for Science Technology and the Law, Stetson University College of Law; President and CEO, SciLaw Forensics Ltd.

**Ashbel T. Wall, II,** Director, Rhode Island Department of Corrections

**Timothy Wittman,** Trooper, Alternate Criminal Investigation Assessment Officer Troop C, Pennsylvania State Police

**Kym L. Worthy,** Prosecuting Attorney, Wayne County, Michigan

### The Elimination of Prison Rape: Immigration Facilities and Personnel/Staffing/Labor Relations, December 13–14, 2006
U.S. Courthouse, Los Angeles, California

**Brian Aldes,** Business Agent, Corrections and Law Enforcement Units, Teamsters Local 320, Minnesota

**Joe Baumann,** Director, California Rehabilitation Center Unit; California Correctional Peace Officers Association

**Michael Beranbaum,** Director of Representation, Department of Corrections Bargaining Unit, Teamsters Local 117, Washington

**Shiu-Ming Cheer,** Program Coordinator, Civil Rights Unit of the South Asian Network; Former Managing Attorney, Los Angeles Detention Project, Catholic Legal Immigration Network, Inc.

**Christina DeConcini,** Director of Policy, National Immigration Forum; Former Director of Public Education and Advocacy, Catholic Legal Immigration Network, Inc.

**Sharon Dolovich,** Professor, University of California Los Angeles School of Law

**Joseph A. Gunn,** Former Commander, Los Angeles Police Department; Former Executive Director, California Corrections Independent  Review Panel

**Katherine Hall-Martinez,** Co-Executive Director, Stop Prisoner Rape

**John Harrison,** Special Agent, California Department of Corrections and Rehabilitation

**Iliana Holgiun,** Executive Director, Diocesan Migrant and Refugee Services, Inc.

**Asa Hutchinson,** Former Undersecretary, Border and Transportation Security for the U.S. Department of Homeland Security

**Cheryl Little,** Executive Director, Florida Immigrant Advocacy Center, Inc.

**Bryan Lonegan,** Staff Attorney, Immigration Law Unit, Legal Aid Society

**Brian Lowry,** President, Council of Prison Locals, American Federation of Government Employees, American Federation of Labor and Congress of Industrial Organizations

**Sergio Medina,** Field Coordinator, Southern California Office of Refugee Resettlement Unaccompanied Minors Program

**Wayne Meyers,** Staff Representative, American Federation of State County and Municipal Employees

**Tixoc Muniz,** President, Arizona Correctional Peace Officer's Association

**Christopher Nugent,** Senior Counsel, Community Services Team, Holland and Knight LLP

**Isaac Ortiz,** President, American Federation of Government Employees, Local 1010

**Tom Plummer,** Skadden Fellow, Staff Attorney, Legal Services for Children, San Francisco

**Donald Rodriguez,** Area Commander, Los Angeles County Sheriff's Department

**Mayra Soto,** Survivor

**Rebekah Tosado,** Director, Review and Compliance; Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security

**Anne Wideman,** Clinical Psychologist

### Lockups, Native American Detention Facilities, and Conditions in Texas Penal and Youth Institutions, March 26–27, 2007
University of Texas School of Law, Austin, Texas

**Charon Asetoyer,** Native American Women's Health Education Resource Center

**James Austin,** President, The JFA Institute

**Ralph Bales,** Safe Prison Program Manager, Texas Department of Criminal Justice

**K.W. Berry,** Major, Harris County Sheriff's Office, Texas

**James Brown,** Associate Director, Commission on the Accreditation of Law Enforcement Agencies

**Sampson Cowboy,** Division Director, Navajo Division of Public Safety

**Mark Decoteau,** Deputy Chief of Training, Indian Police Academy, Federal Law Enforcement Training Center

**Jamie Fields,** Deputy Chief Risk Management, Detroit Police Department

**Genger Galloway,** Mother of survivor

**George Gotschalk,** Chief of Standards and Training, Department of Criminal Justice Services, Secretariat of Public Safety, Virginia; First Vice-President of the International Association of Directors of Law Enforcement Standards and Training

**Kevin Gover,** Professor, Arizona State University

**Lisa Graybill,** Legal Director, American Civil Liberties Union of Texas

**Isela Gutierrez,** Coordinator, Texas Coalition Advocating Justice for Juveniles

**Katherine Hall-Martinez,** Co-Executive Director, Stop Prisoner Rape

**Erica Hejnar,** Survivor

**Claudia Hill,** Chief Detention Standards and Compliance Division, Office of the Federal Detention Trustee, U.S. Department of Justice

**Jay Kimbrough,** Special Master, Investigating the Texas Youth Commission

**Elizabeth Layman,** Consultant, The Center for Innovative Public Policies

**Heather Lowry,** Senior Inspector, U.S. Marshal Service, U.S. Department of Justice

**Lisa Luna,** Training Specialist, Texas Association Against Sexual Assault

**Jerry Madden,** Chairman, Texas House Committee on Corrections

**Jon Perez,** Indian Health Services, U.S. Department of Health and Human Services

**Nathanial Quarterman,** Director, Correctional Institutions Division, Texas Department of Criminal Justice

**Andrea Ritchie,** INCITE! Women of Color Against Violence

**Guillermo Rivera,** Associate Director of Corrections, Bureau of Indian Affairs, U.S. Department of Interior

**Ronald Ruecker,** Interim Police Chief, Sherwood Police Department, International Association of Chiefs of Police

**David Stacks,** Deputy Director, Correctional Institutions Division, Texas Department of Criminal Justice

**Margaret Winter,** Associate Director, National Prison Project, American Civil Liberties Union

## Special Topics in Preventing and Responding to Prison Rape: Medical and Mental Health Care, Community Corrections Settings, and Oversight, December 5–6, 2007

U.S. Federal District Courthouse, Eastern District of Louisiana, New Orleans, Louisiana

**Carrie Abner,** Research Associate, American Probation and Parole Association

**Thomas Beauclair,** Deputy Director, National Institute of Corrections

**Jack Beck,** Director, Prison Visiting Project, Correctional Association of New York

**Theodis Beck,** Secretary, North Carolina Department of Correction; President, Association of State Correctional Administrators

**Art Beeler,** Warden, Federal Correctional Complex, North Carolina

**Antonio Booker,** Director, Adult Residential Services, Johnson County Department of Corrections

**Barbara Broderick,** Director, Adult Probation, Maricopa County Adult Probation, Arizona

**James Carter,** Council Member, New Orleans City Council; Chair, Criminal Justice Committee

**Matthew Cate,** Inspector General, Office of the Inspector General, California Rehabilitation Oversight Board

**James F. DeGroot,** Director of Mental Health, Georgia Department of Corrections

**Michele Deitch,** Professor (Adjunct), University of Texas at Austin, Lyndon B. Johnson School of Public Affairs

**Douglas Dretke,** Executive Director, Correctional Management Institute of Texas, Sam Houston University

**Marty Dufrene,** Major; Corrections Department Head, Lafourche Parish Sheriff's Office, Louisiana

**Charles C. Foti, Jr.,** Louisiana Attorney General

**Robert L. Green,** Warden, Montgomery County Correctional Facility, Montgomery County Department of Correction and Rehabilitation

**Dr. Robert B. Greifinger,** Correctional Health Care and Quality Management Consultant

**Marlin Gusman,** Orleans Parish Criminal Sheriff, Louisiana

**Will Harrell,** Ombudsman, Office of the Independent Ombudsman, Texas Youth Commission

**Norris Henderson,** Soros Justice Fellow and Co-Director, Safe Streets/Strong Communities

**Carrie Hill,** Corrections Law and Criminal Justice Consultant

**Jacqueline Kotkin,** Field Services Executive, Probation and Parole, Vermont Department of Corrections

**Dr. Lannette Linthicum,** Medical Director, Texas Department of Criminal Justice

**Sandra Matheson,** Director of the State Office of Victim/Witness Assistance, New Hampshire Attorney General's Office

**Anadora Moss,** President, The Moss Group, Inc.

**Jennifer Pierce-Weeks,** President-Elect, International Association of Forensic Nurses

**Eugenie Powers,** Director, Probation and Parole, Louisiana Department of Public Safety and Correction

**Dr. Michael Puisis,** Consultant, Former Medical Director at the New Mexico Department of Corrections and the Cook County Jail

**Ben Raimer,** Vice President and CEO, Community Health Services, University of Texas

**Denise Robinson,** President, Alvis House; Past President, International Community Corrections Association

**Dr. Lynn F. Sander,** Representative, National Commission on Correctional Healthcare; Former Medical Director, Denver Sheriff's Department Medical Program; Immediate Past-President, Society of Correctional Physicians

**Margo Schlanger,** Professor of Law and Director, Civil Rights Litigation Clearinghouse, Washington University in St. Louis School of Law

**Wendy Still,** Associate Director, Female Offender Programs and Services, California Department of Corrections and Rehabilitation

**Gina Womack,** Co-Director, Families and Friends of Louisiana's Incarcerated Children

# Appendix G

# PREA Initiatives

All 50 State correctional departments and a national sample of jails, community corrections agencies, and juvenile justice facilities were invited to provide information about policies, practices, and programs implemented before and since the passage of the Prison Rape Elimination Act in 2003. Many agencies responded positively to multiple categories. Examples were selected to ensure geographic and facility diversity. The Commission has not evaluated these PREA initiatives. Interested readers may contact the agencies and facilities to learn more.

| ZERO-TOLERANCE POLICY | |
|---|---|
| **AK** DOC, 907-269-7405 | Zero-tolerance policy |
| **CT** DOC, 860-692-7497 | Commissioner visits all units and reviews sexual abuse data in management meeting |
| **KS** DOC, 785-296-4501 | PREA coordinators at every facility ensure zero-tolerance strategies; Secretary delivers zero-tolerance message on video |
| **OH** Department of Rehabilitation and Correction, 614-728-1152 | 10 Point Plan is intended to reduce sexual abuse in OH Department of Rehabilitation and Correction facilities |
| **AZ** Maricopa County, 602-506-7244 | PREA policies and protocols developed for adult probation department |
| **CO** Pitkin County Jail, Aspen, 970-429-2057 | Zero-tolerance policy |
| **WA** King County Department of Adult and Juvenile Detention, Seattle, 206-296-1268 | Department zero-tolerance memo from leadership to staff and inmates delivered two times annually |
| **IL** Safer Foundation, 312-431-8940 | Zero-tolerance policy |
| **CA** Youth Authority, 916-262-1088 <br> **FL** Department of Juvenile Justice, 850-921-6292 <br> **ME** DOC, Juvenile Services, 207-287-4365 <br> **MA** Department of Youth Services, 617-727-7575 <br> **WV** Division of Juvenile Services, 304-558-9800 | Zero-tolerance policy for juvenile justice facilities |
| PREVENTION PLANNING | |
| **AZ** DOC, 602-771-5583 | Require DOC employees to be on site daily at private facilities to ensure PREA compliance |
| **CA** Department of Corrections and Rehabilitation, 916-322-0019 | Partnered with University of California, Irvine, to improve safety of transgender individuals |
| **LA** DOC, 225-342-1178 | PREA coordinator in each prison facility and one for community corrections |
| **MD** Department of Public Safety & Correctional Services, 410-339-5824 | Department-level interdisciplinary PREA committee |

| | |
|---|---|
| **NC** DOC, 919-716-3720<br>**TX** Department of Criminal Justice, 936-437-8918 | Contracts to house inmates in private facilities include language regarding PREA |
| **OH** Department of Rehabilitation and Correction, 614-728-1152 | Psychological inventory test must be taken by all potential corrections officers to assess behaviors and reactions to more than 66 scenarios. Probationary periods for employees extended to ensure employment suitability. |
| **TN** DOC, 615-741-1000 | Developing a special needs program for male aggressors |
| **UT** DOC, 801-545-5899 | Contract with county jails housing State inmates contains PREA requirements |
| **WY** DOC, 307-777-7208 | Monitor contract facilities compliance with WY DOC PREA policies and protocols |
| **OR** Multnomah County, 503-988-3266 | PREA notice on pre-employment background check waiver |
| **NY** Ulster County Community Corrections Program, 845-340-3330 | Purchase agreement with nonprofit for eight beds for females, nonprofit staff trained in PREA and duty to report |
| **SUPERVISION** | |
| **AR** DOC, 870-267-6300<br>**NC** DOC, 919-716-3720 | Senior staff conduct assessments to identify blind spots at each facility |
| **CO** DOC, 719-226-4696 | Cameras and considering pilot program with radio frequency identification (RFID) |
| **KY** DOC, 502-564-7290 | Piloting RFID technology |
| **MS** DOC, 601-359-5607 | 500 cameras in 1,000-bed maximum security prison; only investigative staff monitor cameras |
| **NY** Department of Correctional Services, 518-457-4951 | Expanded two camera projects in female facilities |
| **UT** DOC, 801-545-5899 | Consider gender-specific strategies in all PREA work |
| **WA** DOC, 360-725-8650 | Acquired 130 bona fide occupational qualification positions for three women's prisons to ensure privacy and limits to cross-gender viewing and searches |
| **AZ** Pinal County Sheriff's Office, 520-866-5180 | Male and female staff on duty together to minimize cross-gender viewing and searches |
| **CA** San Francisco Sheriff's Department, 415-554-7225 | Prohibit cross-gender supervision in housing units |
| **NV** Washoe County, 775-328-6355 | Time Keeper System electronically monitors a "check" of PREA mail box |
| **SD** Pennington County Sheriff's Office, 605-355-3648 | Recording cameras and belt microphones in vans monitor youth when transported; prohibit double cells for juveniles |
| **VA** Arlington County Sheriff's Office, 703-228-4460 | All female staff during the second shift for female inmate supervision |
| **VA** Southside Regional Jail, Emporia, 434-634-2254 | Staff required to contact inmates two times per hour |
| **MO** DOC CC, 573-522-1207 | Purchasing cameras for two community release centers (St. Louis and Kansas City) |
| **FL** Department of Juvenile Justice, 850-921-6292 | Policy prohibiting volunteers to be alone with youth |
| **WI** DOC, Division of Juvenile Corrections, 608-240-5060 | Additional cameras installed in youth facilities |

| EMPLOYEE TRAINING | |
|---|---|
| **AZ** DOC, 602-771-5583 | Curriculum revised periodically; use "pop-quiz" cards to refresh staff |
| **HI** Department of Public Safety, 808-567-1287 | Conducted National Institute of Corrections (NIC) training on staff sexual misconduct |
| **ID** DOC, 208-658-2102 | Investigator training includes victimization and posttraumatic stress disorder (PTSD) |
| **IL** DOC, 217-558-2200 | Developed training for upper-level administrators, shift commanders, and supervisors |
| **IA** DOC, 515-725-5714 | Training on basic victimization dynamics |
| **KS** DOC, 785-296-4501 | Corrections-specific investigator training (videotaping interviews and consultant assessment) |
| **MN** DOC, 651-361-7224 | Coordinated training of investigators, medical and mental health care practitioners |
| **NE** DOC, 402-479-5713 | Revise statutory-based training curriculum annually |
| **NH** DOC, 603- 271-5600 | Academy trains on the connection between sexual abuse and trauma |
| **NM** DOC, 505-827-8600 | Developed facility-level investigator curriculum, Investigating Sexual Assault in Correctional Settings, certified by the New Mexico Law Enforcement Academy |
| **NY** Department of Correctional Services, 518-457-4951 | Assistant Commissioner conducts training sessions at supervisor schools |
| **TN** DOC, 615-741-1000 | Trained victim support team at every facility |
| **UT** DOC, 801-545-5899 | Sexual assault response team (SART) members required to be certified |
| **VT** DOC, 802-241-3956 | Skill-based training to prepare staff for verbal responses to sexualized behavior |
| **AL** Jails, 334-872-6228 | DOC PREA coordinators provide training to jails |
| **KY** Louisville Metropolitan DOC, 502-379-3552 | Pre-service training with NIC materials |
| **PA** Allegheny County Jail, 412-350-2000 | Attended NIC investigator training and developed action plan |
| **SD** Jails, 605-367-5020 | DOC PREA coordinator trained sheriffs' associations and staff at 19 State jails |
| **WA** King County Department of Adult and Juvenile Detention, Seattle, 206-296-1269 | NIC investigator training and technical assistance |
| **CO** DOC CC, 719-226-4696 **MA** DOC CC, 978-405-6610 **RI** DOC CC, 401-462-0373 | Training for community corrections and parole officers |
| **MD** Department of Public Safety & Correctional Services, Division of Parole and Probation, 410-585-3557 | Developed surveys for community corrections agencies/staff to help alleviate underreporting and address other post-release issues stemming from prison rape |
| **AL** Department of Youth Services, 334-215-3802 | NIC trained all staff in 2006; pre-service and annual training required |
| **AK** Department of Health and Social Services, Division of Juvenile Justice, 907-761-7230 | PREA youth training at NIC |
| **CA** Youth Authority, 916-262-1088 | Assisted by Just Detention International to train officers and noncustodial staff |
| **CO** Division of Youth Corrections, 719-546-5108 | Multilevel training for all employees |

| | |
|---|---|
| **DE** Department of Services for Children, Youth, and Their Families, Division of Youth Rehabilitative Services, 302-633-2554 | Senior staff trained; train-the-trainer program in development |
| **FL** Department of Juvenile Justice, 850-921-6292 | Training for staff available in many formats (online, in-service, during shift changes, etc.) |
| **HI** Family Court of the First Judicial Circuit, 808-539-4613 | Training for detention staff, internal investigators, and probation officers; train-the-trainers program available |
| **ME** DOC, Juvenile Services, 207-287-4365 | Training for all staff |
| **MA** Department of Youth Services, 617-727-7575 | Training for 2,000 staff in 2007; pre-service and annual training |
| **MI** Department of Human Services, Bureau of Juvenile Justice, 517-335-6230 | DVD for juvenile staff; training for public and private youth facilities in 2007; also 2-day statewide conference |
| **NY** Division of Juvenile Justice and Opportunities for Youth, 518-473-7793 | Training for all facilities in 2007; facilities updated through NIC DVD Keeping Our Kids Safe |
| **ND** Department of Corrections and Rehabilitation, Division of Juvenile Services, 701-667-1400 | Annual training for staff and community care managers |
| **OR** Youth Authority, 503-378-8261 | Web site with training and policy information (www.oregon.gov.oya/pso). Staff trained on PREA and mandatory child abuse reporting law. Pre-service training includes boundary training, ethics, PREA, housing assignments, reporting, prevention, and access to mental and medical services for sexual assault victims. |
| **SD** Department of Juvenile Justice, 605-394-6645 | Pre-service and annual training for staff |
| **TX** Juvenile Probation Commission, 512-424-6687 | 2008 national conference on investigating sexual abuse in custodial settings |
| **TX** Youth Commission, 512-424-6294 | Developed curriculum with Just Detention International; staff trained within first 2 weeks of employment with annual 3-hour update |
| **WV** Division of Juvenile Services, 304-558-9800 | Annual staff training |
| **TRAINING FOR OTHERS** | |
| **NJ** DOC, 609-292-4617 | Mental and medical health contractors required to complete PREA training; victim advocates receive training on sexual abuse |
| **CO** Division of Youth Corrections, 719-546-5108<br>**SD** Department of Juvenile Justice, 605-394-6645 | PREA training required for volunteers |
| **MA** Department of Youth Services, 617-727-7575<br>**WI** DOC, Division of Juvenile Corrections, 608-240-5060 | PREA training required for contractors |
| **ME** DOC, Juvenile Services, 207-287-4365<br>**ND** Department of Corrections and Rehabilitation, Division of Juvenile Services, 701-667-1400<br>**OR** Youth Authority, 503-378-8261<br>**TX** Youth Commission, 512-424-6294<br>**WV** Division of Juvenile Services, 304-558-9800 | PREA training required for contractors and volunteers |

| INMATE/RESIDENT EDUCATION | |
|---|---|
| **Federal Bureau of Prisons,** Carswell, TX, 202-307-3198 | English and Spanish posters that describe how to report sexual abuse and the criminal sanctions for such acts placed in housing units. Posters include pictures of the institution's psychologists. |
| **CO** DOC, 719-226-4696 | Director of prisons featured in inmate sexual safety training video |
| **IL** DOC, 217-558-2200 | Medical staff conduct PREA orientation with inmates |
| **ME** DOC, 207-893-7011 | Female inmates provided programs to address sexual safety |
| **PA** DOC, 717-975-4930 | Specialized training for criminally insane and sexually dangerous inmates |
| **TX** Department of Criminal Justice, 936-437-8918 | Inmate peer training program (Safe Prisons Program) available in English and Spanish |
| **VA** DOC, 804-674-3000 | Inmates receive PREA training using NIC curriculum at reception; a PREA post-test administered to ensure inmate comprehension |
| **WI** DOC, 608-240-5000 | Inmate gender-specific training program |
| **FL** Miami-Dade County, 786-263-6500 | Inmate PREA education materials available in three languages |
| **MD** Montgomery County, 240-773-9747 | English and Spanish PREA video and posters |
| **WA** King County Department of Adult and Juvenile Detention, Seattle, 206-296-1268 | Inmate PREA orientation video |
| **MA** DOC CC, 978-405-6610 | PREA training for community corrections offenders |
| **AL** Department of Youth Services, 334-215-3802 | PREA PowerPoint presentation at orientation; PREA pamphlets available in dorms |
| **CA** Youth Authority, 916-262-1088 | English and Spanish PREA pamphlets and posters |
| **CO** Division of Youth Services, 719-546-5108 **SD** Department of Juvenile Justice, 605-394-6645 | PREA pamphlets |
| **FL** Department of Juvenile Justice, 850-921-6292 | PREA pamphlets and video |
| **KY** Department of Juvenile Justice, 502-573-2738 **MA** Department of Youth Services, 617-727-7575 | PREA posters |
| **LA** Office of Juvenile Justice, 225-287-7900 | Developing curriculum for youth orientation |
| **ME** DOC, Juvenile Services, 207-287-4365 | PREA handbook, video, and puppet show |
| **MT** DOC, Juvenile Division, 406-444-1547 | Resident orientation includes PREA presentation |
| **NM** Juvenile Justice Services, 505-827-7629 | Developmentally appropriate handbook includes PREA information |
| **ND** Department of Corrections and Rehabilitation, Division of Juvenile Services, 701-667-1400 | PREA pamphlet on how to report with youth sign-off; resident handbooks in cottages |
| **OH** Department of Youth Services, 740-477-2500, ext. 7128 | PREA orientation includes gender-specific sessions and individual meetings |
| **OR** Youth Authority, 503-378-8261 | PREA pamphlet (6–8 grade level) and posters |
| **WV** Division of Juvenile Services, 304-558-9800 | PREA pamphlet and individualized session with counselor |
| **WI** DOC, Division of Juvenile Corrections, 608-240-5060 | English and Spanish PREA posters |

| CLASSIFICATION | |
|---|---|
| **AR** DOC, 870-267-6300 | Revised classification system to identify sexually vulnerable and predatory inmates |
| **CO** DOC, 719-226-4696 | Sexual abuse risk assessment tool |
| **IN** DOC, 317-232-1926 | Developed gender-specific sexual abuse vulnerability assessment tool |
| **IA** DOC, 515-725-5714 | Sexual violence propensity tool informs housing assignment (without limiting programming options) |
| **MA** DOC, 978-405-6610 | Pilot program requires superintendent's signature for housing plan |
| **MI** DOC, 517-780-6545 | Sexual abuse screening tool (validated by external researcher) |
| **MN** DOC, 651-361-7224 | Sexual abuse screening tool informs housing assignments |
| **MS** DOC, 601-359-5607 | Sexual abuse screening tool in development |
| **NE** DOC, 402-479-5713 | Mental health screening conducted at intake |
| **RI** DOC, 401-462-0373 | Assignment of sexual abuse victims and perpetrators to specialized unit in community corrections through high-risk discharge planning strategy |
| **SD** DOC, 605-367-5020 | Gender-specific sexual abuse screening tool (validated for males; developing tool for females) |
| **WY** DOC, 307-777-7208 | Screening tool to evaluate sexual aggression levels (validated) |
| **OR** Multnomah County, 503-988-3266 | Inquire about history of sexual abuse at intake |
| **CO** Division of Youth Corrections, 719-546-5108 **ND** Department of Corrections and Rehabilitation, Division of Juvenile Services, 701-667-1400 **TX** Youth Commission, 512-424-6294 | Screening tool for past sexual victimization and aggressive behaviors |
| REPORTING | |
| **AL** DOC, 334-872-6228 | Inmate hotline to report sexual abuse |
| **AZ** DOC, 602-771-5583 | Anonymous third-party reports of sexual abuse accepted and investigated |
| **CA** Department of Corrections and Rehabilitation, 916-322-0019 | Memorandum of understanding (MOU) with local rape crisis centers to receive reports of sexual abuse |
| **GA** DOC, 478-783-6015 | Staff must report sexual abuse to highest-ranking officer; protection against retaliation for reporting sexual abuse in policy |
| **IN** DOC, 317-232-1926 | Limited email access available for reporting sexual abuse (kiosks) |
| **ME** DOC, 207-893-7011 | Bystander law (Failure to Report Sexual Assault of Person in Custody) holds DOC staff criminally liable for failure to report sexual abuse |
| **MI** DOC, 517-780-6458 | Ombudsman receives reports of sexual abuse |
| **MS** DOC, 601-359-5607 | Third step in grievance procedure permits unsatisfied inmate to access courts |
| **MO** DOC, 573-522-1207 | Inmates' family members receive pamphlet on how to report sexual abuse; reports forwarded for investigation |
| **MT** DOC, 406-444-3930 | Inmate hotline answered by community sexual abuse group |
| **NV** DOC, 775-887-3142 | Community tip line to sheriff's office |
| **NY** Department of Correctional Services, 518-457-4951 | All employees receive duty-to-report training, including mental and medical health |

| **OR** DOC, 503-945-0931 | Governor's Office receives reports |
|---|---|
| **PA** DOC, 717-975-4930 | Inmate hotline to report sexual abuse (institution-specific PIN to ensure anonymity) |
| **SC** DOC, 803-896-8540 | Anonymous inmate hotline to Inspector General's Office |
| **FL** Miami-Dade County, 786-263-6500 | How to report materials (three languages) for families of inmates |
| **ID** Bonneville County Jail, Idaho Falls, 208-529-1315 | Hotline to police detectives |
| **MD** Montgomery County, 240-773-9747 | Fliers on how to report sexual abuse given to visitors |
| **NYC** DOC, 212-361-8977 | Inmate hotline to outside confidential support services |
| **OH** Corrections Center of Northwest Ohio, 419-428-3800 | Sexual abuse reports forwarded to prisons |
| **OR** Multnomah County, 503-988-3266 | Sexual abuse reports forwarded to facility at which incident occurred |
| **VA** Riverside Regional Jail, Hopewell, 804-524-6600 | Inmate hotline to report sexual abuse |
| **LA** DOC CC, 225-342-1190 **MO** DOC CC, 573-522-1207 **NC** DOC CC, 919-716-3720 | Duty to report sexual abuse in policy |
| **OK** DOC CC, 405-425-2505 | Policy requires parole agents to report sexual abuse |
| **VT** DOC CC, 802-241-3956 | Inmate hotline to report sexual abuse |
| **ME** DOC, Juvenile Services, 207-287-4365 | Toll-free hotline for anyone to report sexual abuse |
| **TX** Juvenile Probation Commission, 512-424-6687 | Hotline to report sexual abuse (24-hour direct reporting) |
| **TX** Youth Commission, 512-424-6294 | Ombudsman receives reports of sexual abuse |
| **INVESTIGATIONS** | |
| **AR** DOC, 870-267-6300 **OR** DOC, 503-945-0931 | SART at every facility |
| **AZ** DOC, 602-771-5583 | All staff trained in first responder duties; inmate housing assignment reviewed immediately after an allegation of sexual abuse |
| **CT** DOC, 860-692-7497 | MOU with University of Connecticut Medical Center regarding "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents" (2004) |
| **ID** DOC, 208-658-2102 **IN** DOC, 317-232-1926 | MOU with law enforcement to investigate sexual abuse |
| **MA** DOC, 978-405-6610 | MOU with two county prosecutors |
| **MI** DOC, 517-780-6545 | Staff pocket guide describes first responder duties |
| **MN** DOC, 651-361-7224 | Health services sexual response evidence protocol checklist |
| **MS** DOC, 601-359-5607 | MOU with private medical health provider for forensic medical exams |
| **MT** DOC, 406-444-3930 | MOU with attorney general |
| **NH** DOC, 603- 271-5600 | Contract with New Hampshire Coalition Against Domestic and Sexual Violence |
| **NV** DOC, 775-887-3142 | Supervisors trained on first responder duties |
| **NM** DOC, 505-827-8600 | All allegations of sexual abuse investigated |
| **NC** DOC, 919-716-3720 | PREA investigator at every facility |

| | |
|---|---|
| **OH**  Department of Rehabilitation and Correction, 614-728-1152 | Sexual abuse investigator duties in policy; multidisciplinary response (Sexual Assault Committee Policy) |
| **PA** DOC, 717-975-4930 | Contract with Pennsylvania Coalition Against Rape |
| **RI** DOC, 401-462-0373 | Electronic monitoring used during investigative process |
| **SD** DOC, 605-367-5020 | Purchased polygraph with PREA grant money |
| **UT** DOC, 801-545-5899 | SART representative observes investigative interview and may accompany victim to court |
| **WI** DOC, 608-240-5000 | 20 trained PREA investigators |
| **OR** Deschutes County Sheriff's Office, 541-388-6667 | MOU with St. Charles Hospital for forensic medical exams |
| **NYC** DOC, 212-361-8977 | MOU with outside victim services organization; chaplain does periodic follow-up with victims of sexual abuse |
| **OH** Corrections Center of Northwest Ohio, 419-428-3800 **WA** King County Department of Adult and Juvenile Detention, Seattle, 206-296-1269 | MOU with law enforcement to investigate sexual abuse |
| **VA** Northern Neck Regional Jail, Warsaw, 804-333-6365 | All allegations of sexual abuse investigated |
| **RI** DOC CC, 401-462-0373 | Community corrections staff report allegations directly to the DOC's specialized investigative unit |
| **HI** Family Court of the First Judicial Circuit, 808-539-4613 | Coordinated response to resident sexual abuse in development |
| **OR** Youth Authority, 503-373-7238 | Staff trained on forensic medical exam procedures for evidence protocol |
| **TREATMENT** | |
| **CA** Department of Corrections and Rehabilitation, 916-322-0019 | Post-abuse counseling provided by outside rape crisis counselors (pilot program) |
| **FL** DOC, 850-410-4016 | Unimpeded access to emergency medical and mental health care for victims of sexual abuse |
| **GA** DOC, Mental Health/Mental Retardation Program, 404-651-6483 | Available sexual abuse treatment includes gender-specific response to PTSD |
| **NV** DOC, 775-887-3142 | Mental health services without fee for victims of sexual abuse |
| **OK** DOC, 405-425-2505 | Inmate required to meet with psychologist after reporting sexual abuse; psychologist determines treatment plan |
| **CO** Arapahoe County Sheriff's Office, 720-874-3404 | Inmate services for victims of sexual abuse |
| **PA** Indiana County Jail, 724-471-7500 | Local domestic violence shelter provides counseling to inmates |
| **VA** Northern Neck Regional Jail, Warsaw, 804-333-6365 | Outside agency provides counseling to inmates |
| **OH** Alvis House for Former Offenders, 614-252-8402 | Clinical staff conduct mental health assessments; residents "matched" with particular counselors |
| **OR** Youth Authority, 503-378-8261 | Established sexual abuse medical exam procedures and train all staff on process |

| DISCIPLINE | |
|---|---|
| **OH**  Department of Rehabilitation and Correction, 614-728-1152 | Policy contains staff and inmate sanctions developed by a committee |
| **SC** DOC, 803-896-8540 | Standardized process for staff and inmate sanctions in policy |
| **WA** DOC, 360-725-8650 | Employees trained in how to make disciplinary decisions regarding inmate sexual misconduct |
| **MA** Hampden County Sheriff's Department, 413-547-8000, ext. 2284 | Unsubstantiated allegations do not result in discipline |
| MONITORING | |
| **AL** DOC, 334-872-6228 | Management reviews quarterly reports of sexual abuse to identify trends |
| **AZ** DOC, 602-771-5583 | Sexual abuse incident review by division director and other executives |
| **CT** DOC, 860-692-7497 | Sexual abuse data used to identify blind spots and promote a safe environment |
| **DE** DOC, 302-739-5601 | Designing database to trace inmates from intake to parole; PREA management assessment at women's prison |
| **KY** DOC, 502-564-7290 | Purchased computers for jail facilities to improve data collection; hired jail inspector under PREA grant to enhance PREA implementation |
| **NJ** DOC, 609-292-4617 | Sexual abuse advisory committee reviews all incidents |
| **ND** Department of Corrections and Rehabilitation, 701-328-6100 | Sexual abuse data collected and reviewed monthly; review by sexual abuse advisory committee |
| **TN** DOC, 615-741-1000 | Sexual abuse data reviewed monthly |
| **TX** Department of Criminal Justice, 936-437-8918 | Audits include PREA checks |
| **VT** DOC, 802-241-3956 | PREA management assessment at all facilities |
| **VA** DOC, 804-674-3000 | Director's Task Force on Safety established after an incident of sexual misconduct; consultants reviewed the incident, interviewed inmates and staff, and made recommendations |
| **WV** DOC, 304-558-2036 | Monthly reporting of sexual abuse data to central office |
| **WI** DOC, 608-240-5000 | PREA review panel examines sexual abuse data |
| **NV** Washoe County, 775-328-6355 | Incident database includes method of reporting sexual abuse |
| **PA** Allegheny County Jail, 412-350-2000 | PREA management assessment |
| **GA** DOC CC, 478-783-6015 | Community corrections monthly data report (to DOC) contains sexual abuse data |
| **CA** Youth Authority, 916-262-1088 | Audit based on PREA policies and in anticipation of NPREC standards |
| **KY** Department of Juvenile Justice, 502-573-2738 | Audit process evaluates the availability of PREA information within facilities |
| **MA** Department of Youth Services, 617-727-7575 | Sexual abuse incident review for corrective action |
| **OH** Department of Youth Services, 740-477-2500, ext. 7128 | Central office staff review sexual abuse incidents in real time; computerized reporting system; conduct PREA vulnerability assessments at each facility (includes survey of youth and staff through the victim services staff) |
| **TX** Youth Commission, 512-424-6294 | Sexual abuse data available online |



www.nprec.us