IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

_____

ASHLEY DIAMOND,

                **Plaintiff,**

v.                                   **Case No. 5:20-cv-00453-MTT**

TIMOTHY WARD, *et al.*,

                **Defendants.**

_____

## STATEMENT OF INTEREST OF THE UNITED STATES

Prison officials have an obligation under the Eighth Amendment to the U.S. Constitution to protect all prisoners from sexual abuse and assault by assessing the particular risks facing individual prisoners and taking reasonable steps to keep them safe. *Farmer v. Brennan*, 511 U.S. 825, 843-45 (1994). This duty includes transgender prisoners. *Id.* at 834 (observing in a case about the rape of a transgender woman in prison that "[b]eing violently assaulted in prison is simply not part of the penalty") (internal citation and quotation marks omitted). Prison officials also have an Eighth Amendment obligation to provide all prisoners with adequate medical care for serious medical conditions. *Estelle v. Gamble*, 429 U.S. 97, 103-06 (1976). This duty includes the treatment of gender dysphoria. *Kothmann v. Rosario*, 558 F. App'x 907, 912 (11th Cir. 2014).

In her Motion for Preliminary Injunction (ECF No. 50), Plaintiff Ashley Diamond, a transgender woman, alleges that officials from the Georgia Department of Corrections (GDC) violate the Eighth Amendment by housing her in men's facilities without sufficient regard for the substantial risk of sexual abuse and assault she would—and reportedly did and still does—face in

1

those facilities.  Ms. Diamond also claims that GDC officials violate the Eighth Amendment by failing to adequately treat her gender dysphoria, a serious medical need, in disregard of the advice of treating clinicians and widely accepted professional standards of care.

Without taking a position on questions of fact, the United States files this Statement of Interest to address the Eighth Amendment standards for evaluating Plaintiff's Motion.  The United States submits that the Eighth Amendment requires prison officials to conduct individualized assessments that lead to reasonably safe conditions of confinement and adequate medical care for all prisoners.  These requirements are embodied by the Prison Rape Elimination Act Standards and professional medical standards that are relevant to the Eighth Amendment analysis.  Prison officials violate the Constitution by (1) categorically refusing to assign transgender prisoners to housing that corresponds to their gender identity even if an individualized risk assessment indicates that doing so is necessary to mitigate a substantial risk of serious harm, and (2) failing to individualize the medical care of transgender prisoners for the treatment of gender dysphoria.

## INTEREST OF THE UNITED STATES

The United States files this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States" in any case pending in federal court.[1]  The United States is charged with enforcing the rights of incarcerated individuals under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997 *et seq.* (CRIPA).  Pursuant to CRIPA, the Department of Justice (DOJ) is authorized to investigate

---

[1] The full text of 28 U.S.C. § 517 is: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

conditions of confinement in correctional facilities and bring a civil action against a State or local government to enforce the constitutional rights of prisoners whose rights are violated subject to a pattern or practice of unconstitutional conduct or conditions.  42 U.S.C. § 1997(a).

The United States has an interest in ensuring that conditions of confinement in state and local correctional facilities are consistent with the Constitution and federal law.  For that reason, the Department of Justice has exercised its CRIPA authority to investigate prisons for issues similar to those presented in this case, including protection from sexual violence and access to adequate medical care.[2]

The United States also has a strong interest in protecting the rights of lesbian, gay, bisexual, and transgender individuals.  To that end, the President has issued an Executive Order that recognizes the right of all persons to be "treated with respect and dignity" and to "be able to live without fear" regardless of their gender identity or sexual orientation.[3]  The United States

---

[2] *See, e.g.*, U.S. Dep't of Justice and U.S. Atty's Office for the Middle District of Florida, Investigation of the Lowell Correctional Institution – Florida Dep't of Corrections (Ocala, Florida) (Dec. 22, 2020), *available at* https://www.justice.gov/crt/case-document/file/1347766/download (finding that the Florida Department of Corrections fails to keep prisoners at Lowell safe from sexual abuse by staff); U.S. Dep't of Justice and U.S. Atty's Office for the District of New Jersey, Investigation of the Edna Mahan Correctional Facility for Women (Union Township, New Jersey) (April 2020), *available at* https://www.justice.gov/crt/page/file/1268416/download (concluding that the New Jersey Department of Corrections fails to protect prisoners at Edna Mahan from sexual abuse by staff); Letter from Loretta King, Acting Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Marlin N. Gusman, Sheriff, Orleans Parish Sheriff's Office (Sept. 11, 2009), *available at* http://www.justice.gov/crt/about/spl/documents/parish_findlet.pdf (finding that the Orleans Parish Sheriff's Office failed to provide Orleans Parish Prison detainees with constitutional levels of medical and mental health care); Letter from Thomas Perez, Assistant Att'y Gen. of the United States, U.S. Dep't of Justice, to Carlos A. Gimenez, Mayor, Miami-Dade Cnty. (Aug. 24, 2011), *available at* http://www.justice.gov/crt/about/spl/documents/Miami-Dade_findlet_8-24-11.pdf (finding that the Miami-Dade County Jail failed to provide detainees with appropriate medical and mental health care, including screening, chronic care, and access to services for acute needs).

[3] Exec. Order No. 13988, §1, 86 Fed. Reg. 7023 (Jan 20, 2021).

also filed a Statement of Interest in this court in *Diamond v. Owens*, 131 F. Supp. 3d 1346 (M.D. Ga. 2015), on the adequacy of medical treatment GDC officials provided Ms. Diamond for gender dysphoria.[4]  And the DOJ's Civil Rights Division and the U.S. Attorney's offices throughout Georgia have an open CRIPA investigation into issues related to protection from harm for lesbian, gay, bisexual, and transgender individuals in GDC prisons.[5]

## DISCUSSION

In the First Amended Complaint (Compl.) (ECF No. 36), Ms. Diamond claims that GDC officials violate the prohibition on cruel and unusual punishment under the Eighth Amendment by:  1) refusing to ever house transgender women such as herself in women's facilities despite the substantial risk of serious harm they face in men's facilities; and 2) denying her medically necessary therapeutic doses of hormone therapy and medically necessary gender expression allowances, including access to permanent hair removal, female undergarments, female canteen items, and accommodations for a female hairstyle and grooming standards, which fall short of the adequate medical care required by the Eighth Amendment.  In her Motion for Preliminary Injunction (ECF No. 50), Ms. Diamond also alleges that she has had to shower in facilities surrounded by male prisoners with limited privacy and has been denied transfer to housing where she can be reasonably free from sexual abuse and assault.

---

[4] Statement of Interest of the United States, *Diamond v. Owens*, No. 15-cv-00050 (M.D. Ga. 2015), ECF No. 29, *available at* https://www.justice.gov/sites/default/files/crt/legacy/2015/06/12/diamond_soi_4-3-15.pdf.

[5] U.S. Dep't of Justice, Civil Rights Division, Special Litigation Case Summaries, https://www.justice.gov/crt/special-litigation-section-case-summaries/download#gdc-summ

I.      **Failure to Consider Housing Transgender Inmates in Facilities That Correspond to Their Gender Identity Violates the Eighth Amendment Because Doing So Disregards a Substantial Risk of Serious Harm.**

The Eighth Amendment to the U.S. Constitution prohibits the infliction of "cruel and unusual punishments." *Estelle*, 429 U.S. at 102 (internal citations and quotations omitted). This includes punishments that are "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Id.* (internal citations and quotations omitted). The Eighth Amendment imposes upon prison officials a duty to provide prisoners with "reasonable safety" from serious harm and a substantial risk of serious harm, including violence at the hands of other prisoners. *Farmer*, 511 U.S. at 833, 844 (internal citations omitted). This includes the obligation to protect prisoners from sexual abuse. *Sconiers v. Lockhart*, 946 F.3d 1256, 1259 (11th Cir. 2020) ("Some things are never acceptable, no matter the circumstances. Sexual abuse is one."); *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005) ("A prisoner has a right, secured by the eighth . . . . amendment [], to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates.") (internal quotations and citation omitted).

Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment if they are deliberately indifferent to conditions of confinement that pose a substantial risk of serious harm to prisoners. *Farmer*, 511 U.S. at 828 (internal citations omitted). A prison official acts with deliberate indifference when she or he "knows of and disregards an excessive risk to prisoner health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### a. *Prison officials can be presumed to know of a substantial risk of harm from sexual abuse facing prisoners where that risk is obvious.*

A court may conclude that "a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.  The Supreme Court explained that if a plaintiff demonstrates that prisoners faced a substantial risk of attacks that was "longstanding, pervasive, well-documented, or expressly noted to prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it," a court could conclude that prison officials had knowledge of the risk.  *Id.* at 842-43 (internal quotations and citation omitted).

Whether a prison official had knowledge of a substantial risk of harm facing a prisoner "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.  Congress enacted the Prison Rape Elimination Act (PREA) in 2003 to combat sexual abuse in correctional settings.  34 U.S.C. § 30301 *et seq.*  In 2012, the Attorney General published the National Standards to Prevent, Detect, and Respond to Prison Rape (the PREA standards), which require prison officials to adhere to procedures through which they can assess the risk facing all prisoners in their custody.  28 C.F.R. §§ 115 *et seq*. Knowledge of, and failure to comply with, the PREA standards can serve as further evidence of subjective recklessness with regard to prisoner safety.  *Farmer*, 511 U.S. at 842-43; *Sconiers*, 946 F.3d at 1270-72 (Rosenbaum, J., concurring) (finding PREA and other state legislative enactments to be reliable evidence of contemporary standards of decency) (citing *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015))).

In order to ensure the reasonable safety of all prisoners, the PREA standards require prison officials to screen all prisoners to assess their risk of being sexually abused by, or sexually abusive toward, other prisoners upon their initial intake screening and any transfer to another

6

facility.  28 C.F.R. § 115.41(a).[6]  Among the criteria prison officials must use to assess prisoners'

risk of sexual victimization are: "[w]hether the inmate is or is perceived to be gay, lesbian,

bisexual, transgender, intersex, or gender nonconforming; [w]hether the inmate has previously

experienced sexual victimization; [and] [t]he inmate's own perception of vulnerability."  28

C.F.R. § 115.41(d).  The PREA standards also recognize that transgender prisoners have

"particular vulnerabilities" to sexual abuse and sexual harassment.  *See* National Standards to

Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37109 (June 20, 2012) (explanatory

text).  In 2015, this Court held that Ms. Diamond had adequately stated a claim against GDC

officials under the Eighth Amendment for allegedly failing to protect her from sexual abuse by

placing her in housing units for male prisoners.  *Diamond*, 131 F. Supp. 3d at 1379.  And the

complaint in this matter alleges that GDC officials are aware that Ms. Diamond has been

sexually abused multiple times since GDC officials again placed her in men's prison facilities

starting in 2019.  ECF No. 36 ¶¶ 71, 234-237.

> **b.  *Prison officials demonstrate deliberate indifference to the substantial risk of serious harm facing transgender prisoners by refusing to consider placing them in housing that corresponds to their gender identity.***

Failure to protect prisoners from the risk of sexual abuse through measures such as

screening, classification, and housing assignments can constitute deliberate indifference.  *See*

*Williams v. Bennett*, 689 F.2d 1370, 1375 (11th Cir. 1982) (noting that deliberate indifference

may be found when prison officials make "no realistic attempt . . . to separate violent, aggressive

inmates from those who are passive or weak.") (internal quotations and citation omitted); *Taylor*

*v. Mich. Dep't of Corr.*, 69 F.3d 76, 82–83 (6th Cir. 1995) (noting that certain classes of

---

[6] The PREA standards also mandate that information obtained during PREA screenings remain confidential.  28 C.F.R. § 115.41(i).

prisoners have particular vulnerabilities and that failure to account for those vulnerabilities when assigning housing may constitute deliberate indifference).

According to the PREA standards, prison officials must use information from the prisoners' risk assessments "to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a).  Prison officials must also use this screening information to make "*individualized* determinations about how to ensure the safety of each inmate." 28 C.F.R. § 115.42(b) (emphasis added).[7]  The PREA standards also require reassessment of any prisoner's risk level in the wake of sexual abuse, 28 C.F.R. § 115.41(g), and for all transgender prisoners at least twice a year for the precise purpose of reviewing any threats to their safety, 28 C.F.R. § 115.42(d).

The PREA standards detail specific procedures to which prison officials must adhere in order to provide transgender prisoners reasonable protection from harm.  For example, when determining whether to house a transgender prisoner in a facility for male or female prisoners, the standards require prison officials to "consider *on a case-by-case basis* whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c) (emphasis added).  And transgender prisoners' own views as to their safety must be given "serious consideration." 28 C.F.R. § 115.42(e).  The standards also require that transgender prisoners be permitted to shower separately from other prisoners.  28 C.F.R. § 115.42(f).

---

[7] The PREA standards also contain clear requirements regarding prison officials' response to reports of sexual abuse, investigations, and anti-retaliation.  28 C.F.R. §§ 115.61-67, 115.71-115.73.

In recognition of the particular dangers facing transgender prisoners, the PREA standards not only require prison officials to conduct individualized risk assessments of transgender prisoners to determine their risk of being sexually victimized but specifically allow for placements in housing that corresponds to their gender identity. The failure to conduct individualized assessments that carefully consider the housing placements of transgender prisoners and take steps to mitigate their risk of sexual victimization, up to and including placement in a facility that matches their gender identity if necessary to provide reasonable safety, is contrary to evolving standards of decency. *See Crawford*, 796 F.3d at 260.[8] For these reasons, categorical refusals to transfer transgender prisoners to housing that corresponds to their gender identity without due consideration of the risks identified by screenings and assessments violate the Eighth Amendment's prohibition on cruel and unusual punishment. And a failure to ever house transgender prisoners in housing that corresponds to their gender identity suggests that the requisite screening and assessments are either not taking place or are so inadequate as to be entirely ineffective.[9]

---

[8] Several states also allow for the placement of transgender prisoners in housing that corresponds to their gender identity either upon prisoner request or by default, unless prison officials can demonstrate why such placements compromise safety or security. Massachusetts: Mass. Gen. Laws. Ann. ch. 127 § 32A; Connecticut: Conn. Gen. Stat. Ann. § 18-81ii; California: Cal. Penal Code § 2606(a)(3).

[9] Indeed, the DOJ has issued PREA standard guidance noting the significance of a practice that never results in housing of transgender prisoners in accordance with gender identity: "A PREA auditor must examine a facility or agency's actual practices in addition to reviewing official policy. A PREA audit that reveals that all transgender or intersex inmates in a facility are, in practice, housed according to their external genital status raises the possibility of non-compliance. The auditor should then closely examine the facility's actual assessments to determine whether the facility is conducting truly individualized, case-by-case assessments for each transgender or intersex inmate." *See* U.S. Dep't of Justice, Nat'l PREA Resource Center, PREA Frequently Asked Questions (Mar. 24, 2016), *available at* https://www.prearesourcecenter.org/frequently-asked-questions/does-policy-houses-transgender-or-intersex-inmates-based-exclusively.

II.     **Prison Officials Violate the Eighth Amendment When They Fail to Treat Gender Dysphoria Based on an Individualized Assessment of a Transgender Prisoner's Needs Because Doing So Constitutes Deliberate Indifference to a Serious Medical Condition.**

A prison official's denial of adequate medical care to prisoners constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *Estelle*, 429 U.S. at 103-105; *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1094 (11th Cir. 2014).  To establish a violation of the Eighth Amendment's guarantee of adequate medical treatment, a prisoner must meet two elements.  First, she must demonstrate that she has an objectively serious medical need.  *Estelle*, 429 U.S. at 104.  Second, she must she must show that prison officials exhibited "deliberate indifference" to that need, meaning they knew there was a substantial risk of harm to the plaintiff if that need was not met, yet they disregarded that risk by conduct that amounted to more than mere negligence.  *See Farmer*, 511 U.S. at 837; *Kothmann*, 558 F. App'x at 910; *Lancaster v Monroe Cty. Ala*, 116 F.3d 1419, 1425 (11th Cir. 1997).

> *a.   Gender dysphoria, self-mutilation, and suicide are serious medical conditions.*

As Defendants have admitted and courts have held, gender dysphoria is a "serious medical need" implicating the Eighth Amendment.  GDC Defs.' Answer to Pl.'s Am. Compl. ECF No. 41 ¶ 39; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (per curiam); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408, 412-13 (7th Cir. 1987).

Defendants also admit that, if left untreated, gender dysphoria can result in psychological and physical suffering.  ECF No. 41 ¶ 39.  *See also De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (*De'lonta I*) (holding that a transgender prisoner's "need for protection against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent") (citing *Lee v. Downs,* 641 F.2d 1117, 1121 (4th Cir.1981)); *Belcher v.*

*City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994) ("Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries . . . and a right to be protected from self-inflicted injuries, including suicide.") (citing *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989)).

The World Professional Association of Transgender Health (WPATH) is a professional association that develops "best practices and supportive policies" related to the health and treatment of transsexual, transgender, and gender nonconforming people.  World Professional Association of Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 1 (7th ed. 2011), *available at* https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf (hereinafter WPATH Standards).  According to WPATH, the failure to provide, or the interruption of, medically necessary hormone treatment for gender dysphoria can lead to depression, self-castration, and suicidality.  *Id*. at 68.

        **b.**   ***Prison officials demonstrate deliberate indifference to a substantial risk of serious harm when they fail to provide medical care that is individualized to a particular prisoner's gender dysphoria.***

Prison officials violate the Eighth Amendment by failing to provide medical care outright or by providing some medical treatment for a serious medical condition if that treatment is "grossly inadequate as well as by a decision to take an easier but less efficacious course of treatment."  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (internal citations omitted).  Although the Eighth Amendment does not entitle prisoners to the medical treatment of their choice, it does require prison officials to provide constitutionally adequate medical treatment for serious medical conditions.  *Kothmann*, 558 F. App'x at 910 (citing *Estelle*, 429 U.S. at 103-06).  For this reason, prison officials can violate the Eighth Amendment even when they provide some medical treatment, if that treatment is inadequate as informed by medical

professionals and standards of care.  *Edmo*, 935 F.3d at 787.  This is particularly true where

prison officials "persist[] in a particular course of treatment in the face of resultant pain and risk

of permanent injury."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (internal citation and

quotations omitted) (genuine issue of material fact as to whether prison officials had provided

adequate diet and insulin monitoring to prisoners with insulin-dependent diabetes).

     In assessing possible treatment options for gender dysphoria, prison officials must

consider an individual prisoner's medical needs.  *Keohane v. Fla. Dep't. of Corr. Sec'y*, 952 F.3d

1257, 1266-67 (11th Cir. 2020) ("It seems to us that responding to an inmate's acknowledged

medical need with what amounts to a shoulder-shrugging refusal even to consider whether a

particular course of treatment is appropriate is the very definition of 'deliberate indifference'—

anti-medicine, if you will."); *De'lonta I*, 330 F.3d at 635 (prison officials could be deliberately

indifferent when they abruptly terminated transgender prisoner's hormone therapy based on

policy "rather than on a medical judgment concerning [prisoner's] specific circumstances").

Blanket bans on categories of treatment are at odds with the Eighth Amendment because they do

not account for the individual medical needs of prisoners.  *See Fields v. Smith*, 653 F.3d 550,

557-58 (7th Cir. 2011) (striking down a statute denying transgender prisoners hormone therapy

or surgery); *Kosilek v. Spencer,* 774 F.3d 63, 91 (1st Cir. 2014) (noting that blanket ban on

surgery would be in conflict with the Eighth Amendment); *Soneeya v. Spencer*, 851 F.Supp.2d

228, 246-47 (D. Mass. 2012) (holding that blanket ban on laser hair removal and surgery for

prisoners with gender dysphoria violated the Eighth Amendment).

     When assessing the adequacy of medical treatment that prison officials provide to

prisoners, courts are guided by current professional standards.  *Estelle*, 429 U.S. at 102 (prison

conditions violate the Eighth Amendment when they are contrary to "the evolving standards of

decency that mark the progress of a maturing society.") (internal citations omitted).  WPATH has promulgated Standards of Care that some courts have consulted when assessing the constitutional adequacy of prison officials' treatment of gender dysphoria.  *See, e.g.*, *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013) (*De'lonta II*) (characterizing the WPATH Standards as "generally accepted protocols for the treatment of [gender dysphoria]."); *see also Edmo*, 935 F.3d at 769 (listing the "many [] medical and mental health groups in the United States" that recognize the Standards of Care as the consensus of the medical and mental health professions regarding the appropriate treatment for gender dysphoria); *but see Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (finding that the WPATH Standards reflect only "one side in a sharply contested medical debate over sex reassignment surgery").  The WPATH Standards of Care recommend a range of treatments for gender dysphoria, noting that the number and type of treatments prescribed and the order in which they are administered "may differ from person to person" and must be "individualized" across the full range of options.  WPATH Standards at 5, 9.  Appropriate treatments for gender dysphoria may include but are not limited to: changes in gender expression and role; hormone therapy; hair removal through electrolysis,[10] laser treatment, or waxing; surgery; and psychotherapy.  *Id.* at 9-10.  The Standards of Care also provide specific guidance on the administration and management of hormone therapy.  According to the Standards, hormone therapy "must be individualized," managed by medical professionals, and "the dose, route of administration, and medications used, [] are selected in

---

[10] In 2016, WPATH clarified that, per the Standards, electrolysis is "medically necessary" for individuals whose gender dysphoria can be alleviated by it and that "medical necessity should be determined according to the judgment of the referring physician."  World Prof'l Ass'n for Transgender Health, *WPATH Statement About the Medical Necessity of Electrolysis* (July 15, 2016), *available at* https://s3.amazonaws.com/amo_hub_content/Association140/files/Letter%20Re_Medical%20Necessity%20of%20Electrolysis_7-15-15.pdf.

accordance with the patient's goals." *Id*. at 33, 38, 41.  The Standards further caution that the administration of hormones must be followed by "ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects." *Id*. at 42, 46.

Courts have recognized a wide range of interventions that have been deemed by the Standards of Care and qualified professionals as medically necessary to treat gender dysphoria, depending on the individual needs of the prisoner.  These treatments have included gender expression allowances such as permanent hair removal, undergarments consistent with a prisoner's gender identity, pronouns corresponding to a prisoner's gender identity; and surgery, based on the circumstances of the individual prisoner.  *See Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764 at *14 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction to transgender prisoner for access to hormone therapy, "gender-affirming" canteen items, and permanent hair removal); *Alexander v. Weiner*, 841 F. Supp. 2d 486, 492-94 (D. Mass. 2012) (holding that transgender prisoner had stated an Eighth Amendment claim by alleging that prison officials had denied her access to laser hair removal); *Konitzer v. Frank*, 711 F. Supp. 2d 874, 909-912 (E.D. Wis. 2010) (denying summary judgment to prison officials who refused transgender prisoner access to makeup, undergarments consistent with her gender identity, facial hair removal or growth items, and pronouns consistent with her gender identity); *Edmo*, 935 F.3d at 803 (upholding preliminary injunction for transgender inmate to receive surgery).

Critically, prison officials are not free to pick and choose arbitrarily which medical treatments they provide to transgender inmates with gender dysphoria, particularly when doing so diminishes the effectiveness of treatment or results in pain or injury.  *See Konitzer*, 711 F. Supp. 2d at 908-12 ("Clearly, what the defendants were doing to treat [transgender prisoner] was

14

not working" when she continued to self-mutilate and attempt suicide without access to gender expression allowances.); *De'lonta II*, 708 F.3d at 526 ("just because [prison officials] have provided [transgender prisoner] with some treatment consistent with the [WPATH] Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment").  And at least one federal court has recognized the imperative of monitoring the timing, dosage, and administration of hormone therapy.  *Monroe v. Meeks*, No. 18-CV-00156-NJR, 2020 WL 1048770, at *3 (S.D. Ill. Mar. 4, 2020) (enjoining prison officials to ensure that hormone therapy is provided in a timely manner and when medically necessary, providing appropriate adjustments and monitoring.).

The Eleventh Circuit has held that the Eighth Amendment does not require a prison to allow a particular transgender prisoner access to female clothing and grooming standards where several medical professionals—including members of the prisoner's own treatment team—did not believe such allowances were necessary to treat her gender dysphoria adequately.  *Keohane*, 952 F.3d at 1264.  This dispute among medical professionals as to the necessity of treatment — as well as the extensive security concerns raised by prison officials—was critical to the court's holding.  *Id.* at 1274-77.[11]  Moreover, in *Keohane* the Eleventh Circuit noted that the Florida Department of Corrections was providing the transgender prisoner diagnosed with gender dysphoria with not only hormone therapy and counseling, but also the use of pronouns consistent

---

[11] Whether concerns about prison security can justify the denial of medically necessary treatment for gender dysphoria is a question of fact.  Conclusory opinions without evidence of the precise security risks particular treatments pose have been found an insufficient basis for denying medically necessary treatment for gender dysphoria.  *See Konitzer*, 711 F. Supp. 2d at 909-12 (finding prison's purported security concerns insufficient justification as a matter of law for denying transgender prisoner access to makeup, undergarments consistent with her gender identity, facial hair removal or growth items, and pronouns consistent with her gender identity).

with her gender identity, private shower facilities, and safer housing as part of her treatment plan. *Id.* at 1264.

## CONCLUSION

The failure to keep transgender prisoners reasonably safe from a substantial risk of serious harm or provide them with adequate medical care amounts to cruel and unusual punishment under the Eighth Amendment.  Prison officials demonstrate deliberate indifference to the substantial risk of sexual abuse and assault facing transgender prisoners when they refuse to consider placing them in housing that corresponds to their gender identity without conducting an individualized risk assessment determining what is necessary to keep them reasonably safe. Prison officials are also deliberately indifferent to transgender prisoners' gender dysphoria when they categorically deny certain types of treatment without consideration of individualized assessments conducted by qualified medical professionals and widely-accepted standards of care that indicate such treatments are medically necessary.

Respectfully submitted, this 22nd day of April, 2021.

PETER D. LEARY
Acting United States Attorney
Middle District of Georgia

KEVIN ABERNETHY
Chief, Civil Division
Middle District of Georgia

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Civil Rights Division
Special Litigation Section

LAURA L. COWALL
KERRY KRENTLER DEAN
Deputy Chiefs
Civil Rights Division
Special Litigation Section

/s *Lance Simon*

LANCE SIMON
Assistant United State Attorney
Middle District of Georgia
GA Bar No. 447643
300 Mulberry Street, Suite 400
Macon, GA 31201
Telephone: (478) 621-2663
lance.simon@usdoj.gov

/s *Amy Senier*

AMY SENIER (MA 672912)
Trial Attorney
Civil Rights Division
Special Litigation Section
Telephone: (202) 616-2216
Amy.Senier@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

This 22nd day of April, 2021.

*/s Lance Simon*
LANCE SIMON
ASSISTANT UNITED STATES ATTORNEY