**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| ASHLEY DIAMOND,<br><br>                              Plaintiff,<br><br>            v.<br><br>TIMOTHY WARD, *et al.*,<br><br>                              Defendants. | No. 5:20-cv-00453-MTT |

**PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT OF HER MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

      A.    Ms. Diamond's Reporting and Participation in PREA Investigations and Defendants' Failures to Protect, Investigate, Review or Preserve Evidence .................................................................................................... 2

            1.    Defendants' Knowledge and Responses to Sexual Assaults at GDCP ............................................................................................ 2

            2.    Defendants' Knowledge and Responses to Sexual Assaults at CSP ............................................................................................. 2

      B.    Defendants' Inaction in Response to Ms. Diamond's Repeated and Uncontroverted Reports of Pervasive Sexual Harassment and Coercion ....... 13

      C.    Evidence of Retaliation After Reporting Sexual Assaults ............................. 14

ARGUMENT ...................................................................................................................... 15

  I.    Ms. Diamond Has Demonstrated Her Entitlement to a Preliminary Injunction Based on Defendants' Deliberate Indifference. ........................................................ 15

      A.    Defendants Have Continuously Known that Ms. Diamond Faces a Substantial Risk of Sexual Victimization in GDC Custody .......................... 15

      B.    Defendants' Responses to Ms. Diamond's Risk of Sexual Assault and Her Sexual Abuse Allegations Were Objectively Unreasonable................... 19

            1.    Defendants Failed to Take Reasonable Steps to Protect Ms. Diamond Despite Notice that GDCP and CSP Were Not Safe. ........ 19

            2.    Defendants Cannot Rely on Their Failures to Substantiate Assaults In Order to Justify Their Failure to Ensure Ms. Diamond's Safety.............................................................................. 20

            3.    Defendants' Refusal to Seriously Consider Transferring Ms. Diamond to a Female Facility for Her Safety, Contrary to PREA and GDC Policies and Based on Impermissible Considerations, is Unreasonable............................................................ 26

      C.    Contrary to Defendants' Argument, a Deliberate Indifference Finding Neither Requires That a Victim Participate in PREA Interviews Nor That Prison Officials Substantiate Assault Allegations. ................................. 29

      D.    Defendants' Persistent Inaction Concerning Ms. Diamond's Health and Safety Provides an Additional Basis for a Deliberate Indifference Finding ........................................................................................................ 31

  II.    Defendants Caused Ms. Diamond's Injury.................................................................. 32

  III.    Preliminary Relief Is Needed to Avert Imminent Harm ............................................. 33

IV.     The Public Interest and the Balance of Equities Support an Injunction ..................... 35

CONCLUSION ................................................................................................................ 35

CERTIFICATE OF SERVICE ....................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atkins v. Virginia*,
  536 U.S. 304 (2002)..................................................................................................28

*Becker v. Sherman*,
  No. 16-cv-0828 AWI MJS (PC), 2017 WL 6316836 (E.D. Cal. Dec. 11, 2017)..................27

*Crawford v. Cuomo*,
  796 F.3d 252 (2d Cir. 2015).................................................................................27, 28

*De Veloz v. Miami-Dade Cnty.*,
  756 F. App'x 869 (11th Cir. 2018) ......................................................................27, 35

*Diamond v. Owens*,
  131 F. Supp. 3d 1346 (M.D. Ga. 2015) ...............................................................15, 16, 19

*Doe v. Wash. State Dep't of Corrs.*,
  No. 4:21-CV-5059-TOR, 2021 WL 2453099 (E.D. Wash. May 17, 2021) ....................19, 27

*Dudley v. Singleton*,
  508 F. Supp. 3d 1118 (N.D. Ala. 2020)...............................................................21

*Estelle v. Gamble*,
  429 U.S. 97 (1976)..................................................................................................27

*Farmer v. Brennan*,
  511 U.S. 825 (1994)...........................................................................15, 16, 19, 29, 31, 32

*Flury v. Daimler Chrysler Corp.*,
  427 F.3d 939 (11th Cir. 2005) .............................................................................23

*Goebert v. Lee Cnty.*,
  510 F.3d 1312 (11th Cir. 2007) ...........................................................................21

*Graff v. Baja Marine Corp.*,
  310 F. App'x 298 (11th Cir. 2009) ......................................................................22

*Hale v. Tallapoosa Cnty.*,
  50 F.3d 1579 (11th Cir. 1995) .............................................................................19, 26

*Harmon v. Berry*,
  728 F.2d 1407 (11th Cir. 1984) ...........................................................................30

*Helling v. McKinney*,
509 U.S. 25 (1993)....................................................................................1, 29, 33

*Hoffer v. Jones*,
290 F. Supp. 3d 1292 (N.D. Fla. 2017)...............................................33, 35

*Howard v. Waide*,
534 F.3d 1227 (10th Cir. 2008) .........................................................31

*Hudson v. McMillian*,
503 U.S. 1 (1992)...............................................................................16

*Jacoby v. PREA Coordinator*,
No. 5:17-cv-00053-MHH-TMP, 2017 WL 2962858 (N.D. Ala. Apr. 4, 2017) ...................24

*Johnson v. Lindor*,
No. 20-81032-CV-MIDDLEBROOKS, 2021 WL 3025509 (S.D. Fla. June 10,
2021) ................................................................................................30

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
299 F.3d 1242 (11th Cir. 2002) ........................................................15

*LaMarca v. Turner*,
995 F.2d 1526 (11th Cir. 1993) ...........................................21, 26, 32

*Laube v. Haley*,
234 F. Supp. 2d 1227 (M.D. Ala. 2002) ...........................................35

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
51 F.3d 982 (11th Cir. 1995) ............................................................15

*Riddick v. United States*,
832 F. App'x 607 (11th Cir. 2020) ...................................................16

*Rodriguez v. Sec'y for Dep't of Corrs.*,
508 F.3d 611 (11th Cir. 2007) ..........................................19, 21, 29, 32

*Stanfill v. Talton*,
851 F. Supp. 2d 1346 (M.D. Ga. 2012) .............................................22

*Stover v. Corrs. Corp. of Am.*,
No. 12-cv-00393-EJL, 2015 WL 874288 (D. Idaho Feb. 27, 2015)................26, 27

*Tay v. Dennison*,
457 F. Supp. 3d 657 (S.D. Ill. 2020).............................................19, 26

iv

*Thomas v. Bryant*,
  614 F.3d 1288 (11th Cir. 2010) .................................................................33

*Thomas v. District of Columbia*,
  887 F. Supp. 1 (D.D.C. 1995) ...................................................................16

*Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*,
  877 F. Supp. 634 (1994) ...........................................................................16

*Zollicoffer v. Livingston*,
  169 F. Supp. 3d 687 (S.D. Tex. 2016) ......................................................19

**Statutes**

28 C.F.R. § 115.21 ..........................................................................................24

28 C.F.R. § 115.42 ....................................................................................13, 26

28 C.F.R. § 115.51 ..........................................................................................23

28 C.F.R. § 115.54 ..........................................................................................23

**Other Authorities**

Brooks Holton, *New Jersey's Trans Inmates To Be Housed by Gender Identity,
Not Assigned Sex*, PHILLY VOICE (July 2, 2021),
https://www.phillyvoice.com/new-jersey-prisons-transgender-inmates-brutality-
lawsuit-settlement/ ...........................................................................................27

Dale Chappell, *Connecticut Passes Law to Protect Women, Transgender
Prisoners*, PRISON LEGAL NEWS (Jan. 8, 2019),
https://www.prisonlegalnews.org/news/2019/jan/8/connecticut-passes-law-
protect-women-transgender-prisoners/ ..........................................................27

Danny Robbins, *Young inmate's stabbing death points to state prison system
failures*, THE ATLANTA J.-CONST. (Nov. 19,
2021), https://www.ajc.com/news/young-inmates-murder-points-to-state-prison-
system-failures/XTNT4YFFFNCX5LSKXZWEJDOGUU/ .........................30

Janelle Griffith*, Transgender inmate who alleged abuse is transferred to female
prison*, NBC NEWS (Dec. 27, 2018), https://www.nbcnews.com/news/us-
news/transgender-inmate-who-alleged-abuse-transferred-female-prison-n952486 ....................27

Jonathan McDougle, *California to House Transgender Inmates Based on Gender
Identity*, CBS NEWS (Oct. 7, 2020), https://www.cbsnews.com/news/california-
transgender-prison-inmates-gender-identity-housing/ ...................................27

Madina Toure, *New York City Announces Plan to House Inmates According to Gender Identity*, OBSERVER (Apr. 16, 2018), https://observer.com/2018/04/new-york-inmates-gender-identity-housing/.........................................................................27

Noelle Crombie, *Oregon grants transgender inmate's request to move to women's prison*, THE OREGONIAN/OREGONLIVE (Jan. 23, 2018, updated Jan. 30, 2019), https://www.oregonlive.com/pacific-northwest-news/2018/01/oregon_grants_transgender_inma.html ................................................27

## INTRODUCTION

Ms. Diamond presented evidence at the evidentiary hearing May 12–13, 2021 ("Hearing") showing that she has been repeatedly sexually assaulted and subjected to a pervasive environment of sexual harassment while in GDC custody. No contrary evidence was presented. Overwhelming evidence also shows that Defendants knew about Ms. Diamond's heightened risk of sexual victimization but refused to take corrective measures, including since the Hearing. Accordingly, sexual assaults and sexual harassment continue unabated. Declaration of Ashley Diamond ("Diamond Decl.") ¶¶ 6-7 (Nov. 19, 2021); Pl's Ex. 275 at DEF029540-29541.

Defendants rely on flawed arguments to defend their actions, claiming that unless they substantiate an assault, Ms. Diamond is not at risk of serious harm. ECF 77 at 9. This argument is contrary to controlling law, *see Helling v. McKinney*, 509 U.S. 25, 33–35 (1993), and at odds with the evidence showing the failure to substantiate Ms. Diamond's assaults is based, in large part, on Defendants' failure to investigate. *See infra* at 2-11. Defendants' insistence that Ms. Diamond refused to participate in PREA interviews is also contradicted by the evidence. *See infra* at 2-12. Even if the claim were true, it would not absolve Defendants of their obligation to perform an independent investigation or protect her from sexual abuse. *See Helling*, 509 U.S at 33–35. Ms. Diamond cannot be expected to endure a continuous cycle of sexual victimization and disregard, nor additional sexual assaults, to be entitled to an injunction. *Id.*

Because Ms. Diamond demonstrates all the legal prerequisites for a preliminary injunction on her failure-to-protect claim[1] and the evidence shows Defendants are unable or unwilling to stem Ms. Diamond's sexual victimization, injunctive relief should be granted.

---

[1] Pursuant to the Court's instruction, Plaintiff limits her request for relief to her failure to protect claim, set forth as Count I of her Complaint, ECF 36 at 59–62, without prejudice to her ability to seek equitable relief on the remainder of her claims at another time.

## STATEMENT OF FACTS

On October 29, 2019, Defendants placed Ms. Diamond in Georgia Diagnostic and Classification Prison ("GDCP"), a close security men's facility, for more than seven months despite her medium security classification. Defendants transferred her to Coastal State Prison ("CSP") on June 4, 2020. Pl.'s Ex. 4 at DEF11.

### A.     Ms. Diamond's Reporting and Participation in PREA Investigations and Defendants' Failures to Protect, Investigate, Review or Preserve Evidence

In PREA reports, Court submissions, and at the Hearing, Ms. Diamond described more than a dozen incidents of sexual assault and abuse she has experienced in GDC custody. Defendants determined that 10 sexual assault allegations were "Unfounded" and three were "Unsubstantiated." The evidence reveals that all of the sexual assaults committed by incarcerated men were summarily dismissed without *any* independent investigation.

### 1.   Defendants' Knowledge and Responses to Sexual Assaults at GDCP

Defendants admit they took no specific safety measures to protect Ms. Diamond at GDCP, beyond placing her in "C house," which has no video cameras. Pl.'s Ex. 251 at 13-15. Six incidents of sexual assault or abuse occurred at GDCP. *See*, *e.g.*, Hr'g Tr. 36:20-37:16, 39:3-9, 39:22-25, 40:1-6, 42:2-5, 45:18-46:5 (Diamond); ECF 59-1 ¶ 107. Ms. Diamond reported several assaults directly to GDCP's PREA Compliance Coordinator, Defendant Lachesha Smith. Hr'g Tr. 38:25-40:17 (Diamond). Ms. Diamond also provided Smith a stack of threatening and sexual letters she received. *Id.* at 41:2-23. The letters contained messages such as "Kill yourself before I do it," "fags don't have rites [sic]," and "we're gon murder you bitch." Pl.'s Ex. 225. Smith refused to accept the letters. Hr'g Tr. 41:2-23 (Diamond). Smith moved Ms. Diamond to another cell on November 19, 2019, Pl.'s Ex. 4 at DEF11, but did not initiate an investigation or otherwise take corrective action. Hr'g Tr. 40:2-20 (Diamond).

Ms. Diamond participated in a PREA investigation opened after she mentioned that a GDC staff member grabbed her breast on March 10, 2020 ("March 10, 2020 Assault"). For example, Ms. Diamond provided a witness statement on March 12, 2020, Pl.'s Ex. 234M at DEF1296, and identified potential witnesses to the assault. *Id.* She noted the presence of a camera she believed would clearly show the assault and requested a review and preservation of the video recording.[2] *Id.* Ms. Diamond participated in a recorded interview with Special Agent Johnson. Pl's Ex. 85A at DEF540. One of the witnesses, Lt. Stewart, immediately corroborated Ms. Diamond's version of events in a sworn statement. Pl.'s Ex. 233W at DEF1141 ("Lucas touched Diamond on her chest").[3]

On May 1, 2020, Ms. Diamond reported, via a third-party PREA notice, that, along with the March 10, 2020 Assault, she had "endured preventable sexual assault in GDC custody at the hands of other incarcerated people on multiple occasions," Pl.'s Ex. 25 at 3, and that following her October 2019 placement in GDCP, "she was *promptly* subjected to repeated sexual assaults." *Id.* at 2 (emphasis added). On May 27, 2020, Defendant Atchison acknowledged in an email to Defendants L. Smith and Ford and others that the May 1, 2020 third-party PREA letter "lists several allegations," but determined that Defendants would investigate only one. Pl.'s Ex. 95 at DEF581. On June 5, 2020, Ms. Diamond communicated with Defendants by email reporting that she "has faced multiple sexual assaults." Pl.'s Ex. 263.

---

[2] As Ms. Diamond claimed, a camera was visible that would have captured the assault. Pl.'s Ex. 91B at DEF1128. On March 16, 2020, Defendants reported that the incident was "Not Videotaped." *Id.* In fact, a video was not requested until March 30, 2020, at which point Agent Johnson was informed that "there was an issue" with that camera. Pl.'s Ex. 85A at DEF542.

[3] On June 30, 2020, Agent Johnson interviewed Lt. Stewart. Pl.'s Ex. 85A at DEF546. According to the report of the interview, Lt. Stewart inexplicably changed her March 12, 2020 sworn statement. *Compare id. with* Pl.'s Ex. 233W at DEF1141. There is no indication that Agent Johnson inquired about the contradictory statements. Pl.'s Ex. 85A at DEF534.

Defendants opened investigations into three incidents involving sexual assault or abuse by GDC staff but did not contact either Ms. Diamond or the third-party reporters for details of the "multiple" sexual assaults "at the hands of other incarcerated people." Diamond Decl. ¶¶ 22, 27 (Nov. 19, 2021). Ms. Diamond provided specific details of those assaults at GDCP in legal filings, ECF 1 ¶¶ 70-72; ECF 36 ¶¶ 72-74, and at the Hearing. Hr'g Tr. 36:20-37:16, 39:3-9, 39:22-25, 40:1-6 (Diamond). The investigations into sexual assault by GDC staff members were closed as "Unsubstantiated." Pl's Ex. 85A at DEF565; Pl's Ex. 85B at DEF571.

**2.  Defendants' Knowledge and Responses to Sexual Assaults at CSP**

Since Ms. Diamond's arrival at CSP, beyond "security steps that are taken with respect to all offenders," Defendants' only safety measure has been housing her in a single person cell within N-Building, a dormitory Defendant Benton considers to be "the best and safest." *Id.* at 5; ECF 84-2 ¶¶ 3-9. Defendants did not alter Ms. Diamond's housing, or take any corrective measures, following any of the 10 reported sexual assaults within her cell and dorm. Diamond Decl. ¶¶ 1-18, 29-37 (Nov. 19, 2021).

<u>Video Evidence and Preservation Obligations</u>

There are "updated" video cameras in N-Building, ECF 84-2 ¶ 7, ██████████████████ ██████████████████████████████" Pl.'s Ex. 251 at 11. Absent a litigation hold, ██████████████ ████████████████████████████████ *Id.* On May 1, 2020, Defendants and their counsel received the first of eight preservation notices. Pl.'s Ex. 25 at 8 ("GDC must preserve all evidence . . . in anticipation of further litigation. *See* Fed. R. Civ. P. 37(e). This includes, but is not limited to . . . evidence related to Ms. Diamond's past sexual assaults, . . . including . . . surveillance video, and files or documents concerning any subsequent investigations."); *see also* Littrell Decl. ¶¶ 3-5 (Nov. 22, 2021) (Attaching May 1, 2020 Letter to correspondence sent May 20, June 3, July 2,

July 20, September 29, and October 23, 2020); *id*. at ¶¶ 6-7 (noting preservation requests sent June 3, July 2, and November 2, 2020, including counsel's statement that "we expect that you [GDC] will *continue* to preserve video footage from security cameras near Ms. Diamond's room") (emphasis added); *id*. at ¶ 8 (discussing ESI preservation obligations, including suspending automated deletion programming, in Rule 26(f) conference); *id*. at ¶ 9 (discussing preservation in letter sent February 11, 2021).

<u>Defendants Responses to Ms. Diamond's Reports of Sexual Assaults</u>

Court submissions and hearing testimony show that, prior to the Hearing, Ms. Diamond endured 11 incidents of sexual assault or abuse at CSP, set out as follows:

I)   *July 3, 2020 Assault.* An assailant sexually assaulted Ms. Diamond in her cell. Hr'g Tr. 58:7-59:2 (Diamond); ECF 59-1 ¶ 23. Blake Duckworth, an individual incarcerated with Ms. Diamond at the time, witnessed the assault and testified that the aggressor, who was not authorized to be in their dormitory, "had her pinned up against, like, where the bunk beds and the wall meet that forms a little corner. And he was ripping at her clothes." Hr'g Tr. 272:20-22 (Duckworth).

II)  *September 13, 2020 Assault.* Ms. Diamond awoke to find a man masturbating at the foot of her bed during the night. ECF 59-1 ¶ 25.

III) *September 18–20, 2020 Assaults.* Beginning on September 18, 2020, Ms. Diamond endured *four* sexual assaults over one weekend. Hr'g Tr. 64:10-66:3 (Diamond); ECF 59-1 ¶¶ 26-28.

IV)  *Early October 2020 Assault.* According to an eyewitness, Ms. Diamond was molested in her sleep sometime between October 2 and 6, 2020. Hr'g Tr. 62:10-63:6 (Diamond).

V)   *October 29, 2020 Assault.* On October 30, 2020, an incarcerated man admitted to molesting Ms. Diamond in her sleep. Hr'g Tr. 63:2-6, 67:13-68:3 (Diamond).

VI)  *March, 2021 Assaults.* On or about March 8, 2021, while in the TV room watching news about the January 6, 2021 assault on the Capitol, an incarcerated man sat next to Ms. Diamond, "whipped out his penis and began to masturbate while trying to grope" her. ECF 59-1 ¶ 30; Hr'g Tr. 73:1-74:8 (Diamond). The next day, the same man approached Ms. Diamond in her dormitory, "unhinged his pants, exposed his genitals, and lunged" at her. ECF 59-1 ¶ 31.

*July 3, 2020 Assault*

Hearing testimony confirmed that, after Duckworth witnessed and disrupted a sexual assault on July 3, 2020, he reported to Officer Manning "that he's got to start locking the door and not let that happen again." Hr'g Tr. 274:12-11 (Duckworth). On July 8, 2020, Ms. Diamond reported the July 3, 2020 Assault to her mental health counselor, Tamara Cantera, and agreed to discuss the assault in a future session when she was less emotional and could be joined by a legal advocate. Pl.'s Ex. 259 at DEF005317. Cantera noted that "Betterson stated that he would contact legal," that "the evaluation is now pending," and that the PREA evaluation would be rescheduled "once arrangements with legal are made." *Id.*

On July 20 and 31, 2020, Ms. Diamond provided additional details, including the date and location of the assault. Pl.'s Ex. 172 at *3 ("On July 3, 2020, . . . an incarcerated person from another dormitory[] was let into Ms. Diamond's dormitory by a GDC officer. . . . Ms. Diamond . . . turned to go back to her room. Her attacker followed and entered the room behind her. He grabbed her, covered her mouth, started touching her, and tried to remove her clothes."); Pl.'s Ex. 108H at DEF1062 ("On or about July 3, 2020 this guy who's name I don't want to say comes into the dorm. He went into my room and tried to pull down my pants and stick his penis inside of me. Thankfully, my friends in the dorm pulled him off of me").

Despite these details, on August 4, 2020, the July 3 Assault was marked "Unfounded," meaning that "[b]ased on factual evidence SART *proved* the allegation did not occur." Pl.'s Ex. 90N (emphasis added). No contrary factual or other evidence was considered or noted. *Id.* No evidence exists to show whether video of July 3, 2020 was requested or reviewed, and despite this assault occurring two months after receipt of the first preservation notice, no video was produced to show whether someone followed Ms. Diamond into her cell. *See* Hr'g Tr. 361:4-362:23

6

(Betterson) (admitting he did not check video footage of Ms. Diamond's cell on July 3); *id.* at 428:15-430:4 (Benton) (stating he believes he checked for video footage but "[t]here is none"); Littrell Decl. ¶¶ 10-12 (Nov. 22, 2021) (no video produced corresponding to any of the dates of alleged assaults responsive to discovery request for dates of alleged assaults or for "[a]ll audio and/or video recordings of Ashley Diamond from June 1, 2019 to present"). Despite the criminal nature of the allegation, it was not forwarded to OPS for investigation. Pl.'s Ex. 90N. Defendants failed to take any responsive or corrective steps to reduce Ms. Diamond's risk of suffering another sexual assault.

*September 18–20, 2020 Assaults*

On September 29, 2020, Ms. Diamond reported details of *four* incidents in which she was sodomized and raped between September 18 and 20, 2020, including dates, locations, and approximate times of day that the assaults occurred. Pl.'s Ex. 173. The day after Defendants received the detailed report, on September 30, 2020, Defendants opened—and closed—their PREA investigation. Pl.'s Ex. 108F; Pl.'s Ex. 107E at DEF906 ("After meeting with the SART team it is unclear if the alleged incident meets the threshold for PREA" and finding "the offenders claim of PREA is unfounded."). Defendant Benton concurred with the recommendation to mark Ms. Diamond's detailed allegations of four sexual assaults "Unfounded" the same day he received the reports, Pl.'s Ex. 91H at DEF963–64, without requesting, reviewing, or preserving recordings of any of these detailed and dated incidents. Hr'g Tr. 362:5-9 (Betterson) ("I don't have access to those cameras. If I requested, I could get access, but I don't readily have access to those cameras.").

Ms. Diamond wrote two Witness Statements concerning the September 18-20, 2020 Assaults. She first wrote that she would "[*p*]*refer* to [do] any and all PREA interviews with attorneys present." Pl.'s Ex. 233H at DEF912 (emphasis added). On October 8, 2020, Ms. Diamond submitted another Witness Statement, emphasizing that she "would like to pursue my

PREA investigation but can't get a response to the request for counsel to be present" and explaining the basis for her request as "fear [of] retaliation from those involved because of gang affiliations." Pl.'s Ex. 233I at DEF961. Ms. Diamond was not interviewed following her renewed request, nor was she informed whether she could have counsel present. Defendants never addressed her concerns about retaliation.

Defendants again failed to conduct any independent investigation. For example, PREA records reflect that an incarcerated man, T.N., was identified as having been "Involved," Pl.'s Ex. 91H at DEF920, yet he does not appear to have been interviewed. Despite having dates, times, and locations of the assaults, Defendants did not review or preserve recordings of the cameras ███████ ████████████████████████ as was the case with the July 3, 2020 Assault. *Id.* at DEF963; Hr'g Tr. 436:3-10 (Benton) (testifying that he cannot recall reviewing camera for September assaults). On December 7, 2020, Defendants simply closed any "investigation" and marked four more sexual assault reports as "Unfounded." Pl.'s Ex. 90G (defining "Unfounded" to mean "[b]ased on factual evidence SART proved the allegation did not occur"). *But see* Hr'g Tr. 437:3-5 (Benton) (admitting it was "never proven that th[e] incident[s] didn't occur"). Despite the criminal nature of the allegation, it was not forwarded to OPS for investigation. Pl.'s Ex. 90G. Defendants did not alter Ms. Diamond's housing, re-evaluate her for a safety transfer, or initiate additional surveillance or security measures.

### *Early October 2020 Assault*

On October 13, 2020, Ms. Diamond reported to Cantera that she had been molested in her cell overnight. Pl.'s Ex. 108E at DEF886. Ms. Diamond identified an eyewitness, E.T., *id.*, who, on October 15, 2020, provided the following Witness Statement: "At 11:15 pm about a week and ½ ago I went to check on [Diamond] when I open her door . . . I saw someone roben [sic] on her

butt. He to[ld] me to come get some too. I told him to get the hell out of [Diamond's] room or I was going to tell someone." Pl.'s Ex. 233B at DEF878. E.T. identified C.G. as the person he saw molesting Ms. Diamond. Pl.'s Ex. 107F at DEF864.

According to E.T.'s sworn statement, the assault occurred between October 2-6, 2020, *i.e.*, 7 to 10 days before his October 15, 2020 statement. Pl.'s Ex. 233B at DEF878. Evidence proves that C.G. was housed in N-Building during this time. Pl.'s Ex. 110 at DEF882 (showing C.G. moved from N-Building on October 9, 2020). PREA records, which incorrectly reported that the incident occurred on October 10, 2020, Pl.'s Ex. 108E at DEF886, were not updated after E.T.'s statement to reflect the correct date range of the assault. Pl.'s Ex. 107F.

Defendants did not request, review, or preserve recordings ████████████████ ███████████ for any dates between October 2 and October 10, 2020, instead deciding that the "INCIDENT [WAS] NOT VIDEOTAPED." Pl.'s Ex. 91I at DEF874; Pl.'s Ex. 111. Despite the failures to correctly date the incident and review any relevant video footage, Defendants falsely reported that a "thorough investigation was completed" and, because C.G. "was moved out of building N-B prior to the alleged incident date," the PREA investigation allegation was again closed as "Unfounded." Pl.'s Ex. 107F at DEF866. Benton concurred with the recommendation on October 16, 2020. Pl.'s Ex. 91I at DEF868. Defendants failed to take any responsive or corrective steps to reduce Ms. Diamond's risk of suffering another sexual assault.

### *October 29, 2020 Assault*

On October 30, 2020, E.T. admitted at a "dorm meeting" to also molesting Ms. Diamond in her cell overnight. Pl.'s Ex. 92U at DEF818. Ms. Diamond reported the incident on November 3, 2020, identifying E.T. and three witnesses to his confession. *Id.* Defendants appear to have interviewed only one of the three identified witnesses, C.C., who confirmed that E.T. admitted "he

had been going [in]to" Ms. Diamond's cell, exposing himself "and other things." Pl.'s Ex. 92S at DEF814. Again, Defendants did not request, review, or preserve the camera footage ███████ █████████████ from previous nights. Pl.'s Ex. 91K at DEF811-13. The failure to request video is particularly telling where Defendants reviewed and preserved hours of footage *the very next day* in order to support their allegation that Ms. Diamond had violated prison rules. Hr'g Tr. 346:21-24 (Betterson); Pl.'s Exs. 147-48. Defendants marked the October 29, 2020 Assault "Unsubstantiated," did not forward it to OPS, and did not discipline the aggressor, who confessed to two witnesses. Pl.'s Ex. 90C.

### *March 2021 Assaults*

The March 2021 Assaults which occurred while Ms. Diamond was watching T.V. were witnessed by others and reported to the "facilitators" responsible for managing Ms. Diamond's dormitory at CSP—who assured Ms. Diamond that they would "handle it." Hr'g Tr. 53:5-9, 73:1-74:8 (Diamond); ECF 59-1 ¶¶ 30-32. However, no investigation was ever opened or conducted. Instead, Ms. Diamond was retaliated against and threatened by her assailant. Defendants failed to take any responsive or corrective steps to reduce Ms. Diamond's risk of suffering another sexual assault. ECF 59-1 ¶ 32.

### Post-Hearing Assaults & Current Status

Since the Hearing, Ms. Diamond has been physically groped by men at least a dozen times and sexually assaulted twice more. Diamond Decl. ¶¶ 6-7, 11, 16-17 (Nov. 19, 2021). Ms. Diamond reported and fully participated in PREA investigations into these latest sexual assaults, the first of which occurred in her cell in late September 2021 between 5-7a.m. *Id.* at ¶¶ 11-13. A man entered her cell while Ms. Diamond was asleep, slipped into her bed, and began molesting her. *Id.* She screamed and was saved by N.B., a man in an adjacent cell. *Id.*

On September 30, 2021, at approximately 12:10 p.m., Ms. Diamond was returning

unescorted to her cell from a legal call when she was sexually assaulted by three or more men in the yard outside a locked, unattended gate. *Id*. at ¶¶ 14-16. The men passed her between them, groped her, grabbed her breasts and buttocks, and placed their hands all over her. *Id.* at ¶ 16; Pl.'s Exs. 270-71. The assault continued for at least 30 minutes until she managed to run away. Diamond Decl. ¶ 16 (Nov. 19, 2021). Later that day, after Ms. Diamond was sexually grabbed in the yard for a *second* time, she saw a GDC staff member, Ms. Wilson, and broke down in tears reporting that she had been assaulted that day. *Id*. at ¶ 17. Ms. Diamond then spoke with her mental health counselor, Mr. Pannazzo, who told her to report the sexual assault the next day, which she did. *Id.*; Pl.'s Exs. 270-71, 278.

Since the Hearing, Ms. Diamond has, at various times, reported assaults and/or pervasive sexual harassment to Daniel Fass, David Roth, Lasenna Rivers, Gerilyn Peppin, Brandi Moore, Wallesha Warren, Dominick Pannazzo, and Tia Fletcher. Diamond Decl. ¶¶ 17-19 (Nov. 19, 2021); Pl.'s Exs. 271-78. Ms. Diamond also provided a recorded interview with Investigator Furlow about both assaults and attempted to provide details about the pervasive sexual harassment. Diamond Decl. ¶¶ 24-27 (Nov. 19, 2021). Defendants failed to provide the video or audio recordings of Ms. Diamond's interview with Investigator Furlow, despite this Court's directive on October 29, 2021 "to contact Coastal and retrieve from them any documents concerning reports by Ms. Diamond of assaults, misconduct, whatever they may be, including the investigation into – the documents concerning the investigation into those assaults." Oct. 29, 2021 Status Conf. Tr. at 13:9-13; Littrell Decl. ¶¶ 10-12, 16-17 (Nov. 22, 2021). Ms. Diamond's sexual assault complaint was marked unfounded despite that she sat for an interview. Pl.'s Ex. 271, 278, 279 at DEF029519 (showing "Incident [was] forwarded for investigation").

Ms. Diamond has also faced difficulties while attempting to report incidents of sexual

abuse since the hearing due to, at various times, inoperable phones, inoperable PREA kiosks, unavailable PREA hotline, and lack of staff to take reports and grievances. Diamond Decl. ¶ 20 (Nov. 19, 2021). Ms. Diamond provided the names of witnesses, however; instead of interviewing her witnesses, Benton and CSP officials removed them from her dormitory, leaving her more vulnerable. *Id*. at ¶ 21. Ms. Diamond does not believe her witnesses have yet been interviewed, *id.*, and she has not been notified about any disposition of her reports.

The dormitory in which Ms. Diamond is housed, and CSP generally, have become increasingly more dangerous since the Hearing. *Id.* at ¶¶ 28-35. For example, in mid-July, two men were caught by a guard trying to crawl into Ms. Diamond's cell. *Id.* at ¶ 8. Also in July, a gang member who has threatened Ms. Diamond and is not authorized to be in her dormitory came to her cell window and threatened her. *Id.* at ¶ 9. Later the same day, she witnessed a stabbing in the same vicinity. *Id*. Ms. Diamond reported these incidents to Peppin and Fletcher. *Id*.

Ms. Diamond describes the environment at CSP as "in chaos" due in part to staffing shortages that have meant few officers on duty. Diamond Decl. ¶ 28 (Nov. 19, 2021). On or about November 1, 2021, a group of assailants with knives tried to enter her dormitory, trapping Ms. Diamond in the corridor after the door to N-B unit closed. *Id.* at ¶ 33. Ms. Diamond ran into N-A unit where an officer intercepted the assailants. *Id.* Ms. Diamond has witnessed numerous stabbings since the Hearing, prompting her to ask nursing staff to document her fear of being stabbed on her way to pill call. *Id.* at ¶¶ 31-34. In early November 2021, a gang member instructed three other gang members to attack Ms. Diamond. *Id.* at ¶ 18. At night, the officer booth is rarely manned and officers call in the count without entering the dormitory. *Id.* at ¶ 28. Oftentimes there is only one officer monitoring four dormitory buildings at a time, so inmates roam around her dormitory freely. *Id.* Because of the repeated sexual assaults she has endured and Defendants'

12

ongoing failure to protect her from sexual victimization, Ms. Diamond's PTSD symptoms are elevated, her mental health is further declining, and she has twice attempted suicide since the Hearing. *Id.* at ¶¶ 40-42.

### B.   Defendants' Inaction in Response to Ms. Diamond's Repeated and Uncontroverted Reports of Pervasive Sexual Harassment and Coercion

Ms. Diamond presented evidence showing she endures pervasive sexual harassment and coercion. *See*, *e.g.*, ECF 59-1 ¶ 18 (recounting that she is "propositioned, groped, rubbed up on, and taunted by male inmates who threatened to rape [her], among other sexual abuses"); *id.* ¶ 112; *see also* Hr'g Tr. 42:15-44:9, 60:21-61:22 (Diamond); *id.* at 268:17-270:13 (Duckworth). Men regularly expose themselves or masturbate in Ms. Diamond's presence, Hr'g Tr. 62:22-26, 73:11-15 (Diamond); ECF 59-1 ¶¶ 16, 25, 29-31, 113, and sexual harassment happens "almost daily," Hr'g Tr. 269:6-7 (Duckworth); ECF 59-1 ¶ 44. As examples, men "regularly" use "vulgar, crude words about what they were going to do to her. It just happened all the time . . . . [T]hey would say they wanted to fuck her or talk about getting their dick sucked" verbally and in writing, in her dormitory, *id.* at 269:7-21 (Duckworth), and outside of it, *id.* at 270:10-13 (Duckworth) ("it was a regular – very regular occurrence that when we were out there together, people would be cat-calling or saying derogatory things to her."); *see also* Pl.'s Ex. 259 at DEF005317 ("Diamond stated that multiple people had been sexually harassing her in the dorm."). Since the Hearing, the pervasive sexual threats, coercion, and harassment have continued. Diamond Decl. ¶¶ 1, 6-18, 29-38 (Nov. 19, 2021).

Ms. Diamond is forced to shower alongside men able to see into her shower. Hr'g Tr. 76:19-78:22 (Diamond); *id.* at 281:2-24 (Duckworth). Defendants refuse to allow Ms. Diamond to shower separately, contrary to PREA regulations, insisting a shower curtain is a "separate" facility. Pl.'s Ex. 129 at DEF1336; 28 C.F.R. § 115.42(f). Male officers repeatedly strip search Ms.

Diamond, Hr'g Tr. 78:23-79:13 (Diamond), and staff members constantly misgender her and worse, referring to her as "he" and "it," *id.* at 267:13-268:2 (Duckworth). Ms. Diamond has repeatedly complained of the pervasive and hostile sexual harassment, yet Defendants have taken little to *no* corrective action. Diamond Decl. ¶¶ 1-9, 14-17, 19, 21-22, 24-27 (Nov. 19, 2021).

## C. Evidence of Retaliation After Reporting Sexual Assaults

Evidence and testimony show that Ms. Diamond experienced retaliation after reporting and otherwise participating in PREA investigations. For example, after she discussed the March 10, 2020 assault, confidentiality was breached and she was encouraged by other inmates and staff not to say anything. Pl.'s Ex. 258 at DEF004667; Pl.'s Ex. 85A at DEF534 ("she expressed serving her time safely . . . without being bullied or harassed due [to] a PREA report"); Hr'g Tr. 45:18-46:17 (Diamond). When Ms. Diamond provided Defendant Smith with threatening letters and reported an assault, she was threatened with lockdown and loss of privileges. Hr'g Tr. 38:11-16, 40:7-12 (Diamond). After her attorneys reported the May 9-10, 2020 Assaults, Ms. Diamond was removed from her orderly duties, and had personal items confiscated. Hr'g Tr. 41:2-17, 49:16-50:7 (Diamond). Deputy Warden Betterson called her a "cancer to the prison" after she began filing PREA reports. Pl.'s Ex. 260. An aggressor and gang member, C.G., also approached and intimidated her. Pl.'s Ex. 261 at DEF006888.[4]

Based on retaliation and fear, Ms. Diamond eventually requested counsel during PREA interviews as a safety measure because: a) she "believed their presence would create an atmosphere where I would feel free to talk comfortably"; b) "in order to have a trusted advocate as a witness";

---

[4] Defendants also issued Ms. Diamond an avalanche of DRs following PREA reports and, without any basis, designated her a "Security Threat Individual" (STI) and a member of a "Security Threat Group" (STG), as well as a "Sexual Aggressor," Pl.'s Ex. 133, a dangerous charge proven demonstrably false at the Hearing. Any suggestion that the designations occurred only after Ms. Diamond was charged with sexual activity on October 31, 2020 is belied by the evidence showing that the changes were made as early as September 17, 2020. Pl.'s Ex. 91E at DEF724; Pl.'s Ex. 91C at DEF1111; Pl.'s Ex. 91F at DEF702.

and c) "in order to ensure that my words would not be misconstrued or inaccurately reflected in the PREA documents." Diamond Decl. ¶ 23 (Nov. 19, 2021).

## ARGUMENT

### I.    Ms. Diamond Has Demonstrated Her Entitlement to a Preliminary Injunction Based on Defendants' Deliberate Indifference.

In order to support the grant of a preliminary injunction, Ms. Diamond must establish: (1) a substantial likelihood of success on the merits of the underlying case, (2) she will suffer irreparable harm in the absence of an injunction, (3) the harm suffered in the absence of an injunction would exceed the harm suffered by Defendants if the injunction issued, and (4) an injunction would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002) (citation omitted). "To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor. Instead, it must determine whether the evidence establishes . . . a substantial likelihood of success on the merits." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (citation omitted). Ms. Diamond is entitled to a preliminary injunction because she is substantially likely to succeed on her Eighth Amendment failure-to-protect claim. As set forth below, Ms. Diamond is being incarcerated under conditions posing a substantial risk of serious harm, and Defendants had subjective knowledge of that risk yet have responded in an objectively unreasonable manner causing harm. *See Farmer v. Brennan*, 511 U.S. 825, 834-37, 839, 842-45, 847 (1994) (setting forth deliberate indifference standard); *Diamond v. Owens* ("*Diamond I*"), 131 F. Supp. 3d 1346, 1376 (M.D. Ga. 2015) (same).

### A.    Defendants Have Continuously Known that Ms. Diamond Faces a Substantial Risk of Sexual Victimization in GDC Custody

Under the two-part analysis governing Eighth Amendment challenges to conditions of confinement, the "objective component" requires an incarcerated person to prove that the condition

she complains of are sufficiently serious. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). Sexual abuse satisfies this prong. *Farmer*, 511 U.S. at 833–34; *Thomas v. District of Columbia*, 887 F. Supp. 1, 4 (D.D.C. 1995) ("Unsolicited sexual touching, harassment, and coercion are 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" (citing *Farmer*, 511 U.S. at 834); *Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 877 F. Supp. 634, 665 (D.D.C. 1994), *vacated and modified in part on other grounds*, 899 F. Supp. 659 (D.D.C. 1995), *vacated in part*, 93 F.3d 910 (D.C. Cir. 1996) (sexual harassment can be "so malicious that it violates contemporary standards of decency").

The second prong, the subjective component, requires only "'subjective knowledge of a risk of serious harm'—not subjective intent to harm." *Riddick v. United States*, 832 F. App'x 607, 613 (11th Cir. 2020) (internal citations omitted). A plaintiff can establish a substantial risk of harm by showing they belong to an "identifiable group of prisoners who are frequently singled out for violent attack by other inmates," that defendants were "exposed to information concerning the risk," or that the "risk was obvious." *Farmer*, 511 U.S. at 842-43 (citations omitted); *Diamond I*, 131 F. Supp. 3d at 1377 (considering "defendant's knowledge about the vulnerability of certain types of inmates to risk of harm"). The record evidence shows that, at all times relevant to this lawsuit, Defendants knew that Ms. Diamond faced a substantial risk of serious harm in GDC custody in the form of sexual victimization.

First, Defendants knew that Ms. Diamond is a transgender woman with a history of sexual assaults in GDC custody who faced a heightened risk of sexual assault as early as October 29, 2019. *See* Pl.'s Ex. 72 (noting transgender status and victimization history); Pl.'s Ex. 73 at DEF488-89 (noting history of "[b]eing assaulted in prison," and ongoing "housing and safety concerns"); Pl.'s Ex. 134A at DEF1420-27 (showing sexual victim classification at GDCP and

CSP); *id.* at DEF1428-32 (showing sexual victim classification from 2013 to 2015); Pl.'s Ex. 219 ¶ 26 ("Diamond was classified as a PREA victim on the following dates: October 30, 2019, February 21, 2020, June 11, 2020, September 4, 2020, and September 8, 2020."); Hr'g Tr. 32:3-7 (Diamond); *id.* at 399:8-400:1 (Benton); *id.* at 513:17-19, 518:15-20 (Atchison).

Second, Ms. Diamond directly reported ongoing threats to her safety, including through PREA notices and grievances. *See* Hr'g Tr. 67:5-12 (Diamond); *id.* at 399:8-400:1, 426:14-22, 434:1-7 (Benton); *id.* at 526:6-13, 528:8-11 (Atchison); *id.* at 555:20-24 (Holt); ECF 101 ("Cantera Dep. Tr.") 39:14-15 (admitting staff meetings about allegations); ECF 102 ("Fletcher Dep. Tr.") 24:18–25 (confirming that Ms. Diamond divulged safety concerns); Pl.'s Ex. 219 ¶¶ 20-21 ("I am aware of offender Ashley Diamond's assertions that she has been subjected repeatedly to sexual abuse, sexual harassment, or sexual assault at Coastal State Prison. . . . Specifically, as relates to PREA complaints, I am aware of 13 reports where offender Diamond is the alleged victim . . . ."); Pl.'s Ex. 115 (grievance requesting "[t]ransfer to a female facility that can accommodate health and safety needs"). Between May 1, 2020, and November 1, 2020, Defendants also received seven notices of Ms. Diamond's heightened risk of sexual assault and reports of ongoing sexual assaults. Pl.'s Ex. 25 at DEF54 ("Ms. Diamond has been repeatedly sexually assaulted by staff and other incarcerated people [and] is at an increased risk of sexual assault in her current housing.'"); Pl.'s Ex. 81 (same); Pl.'s Ex. 80 (same); Pl.'s Ex. 171 (same); Pl.'s Ex. 172 (same); Pl.'s Ex. 173 (same); Pl.'s Ex. 174 at *2–3 (reporting another sexual assault and providing "yet another notice to GDC of the continued threats to Ms. Diamond's safety").

Defendants also knew that Ms. Diamond faced a heightened risk of sexual assault as a transgender woman because the risk was obvious. As Duckworth, who was incarcerated with Ms. Diamond, explained: Ms. Diamond is "[a] very pretty, attractive woman. . . . [I]t's pretty easy to

tell she's obviously been on estrogen for a while, and she's got soft, womanly skin, and her voice is a woman, that she's got breasts and – you name it, she's very much a woman." Hr'g Tr. 266:16-23 (Duckworth).

Ms. Diamond's detailed PREA reports alleging inmate-on-inmate assault have never been controverted by Defendants. *Supra* at 5-10. Indeed, Cantera, responsible for conducting a mental health evaluation responsive to PREA allegations, found Ms. Diamond's numerous complaints of sexual assault credible: "I do not recall any incident where she was untruthful. . . . She seemed genuine when I spoke to her. Her emotions and her affect matched what she was saying. Yeah, I don't recall any untruths or anything." Cantera Dep. Tr. 55:13–17.

Ms. Diamond's medical providers independently determined and communicated to Defendants that her current housing was unsafe and repeatedly lobbied for Defendants to process her for a safety transfer. Pl.'s Ex. 277 ("Given amount of reported incidents, as previously reported, [] in GP of Coastal appears unsafe for her"); ECF 103 ("Fass Dep. Tr.") 23:3-6 ("[I]n Ashley Diamond's case, I believe when she got here, our first thought was, boy, you know, she's going to have some problems with safety."); Pl.'s Ex. 257 (indicating that Ms. Diamond's victimization risk persisted and her mental health worsened based on placement at CSP); Pl.'s Ex. 255 (recommending "transfer to a facility that can reduce victimization risk"); Pl.'s Ex. 256 (recommending "facility change for safety/victimization risk"); ECF 110-61 ("Cantera Dep. Ex. 13") at DEF425 (recommending "placement in safe housing"); Pl.'s Ex. 262 (stating "we are also requesting a change in prisons for her safety"); Pl.'s Ex. 253 ("Please transfer this inmate for security reasons"); Pl.'s Ex. 64A at DEF302 ("Recommend housing transfer . . . for security reasons"); *see also* Pl.'s Ex. 268 at DEF008136 (noting that facility transfer was also warranted because CSP was not willing to meet Ms. Diamond's healthcare needs).

Against this backdrop, Ms. Diamond easily satisfies the initial prongs of her Eighth Amendment claim because she has shown "the full gamut of facts *Farmer* contemplated to show subjective awareness." *Diamond I*, 131 F. Supp. 3d at 1379; *see also Tay v. Dennison*, 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020) (holding plaintiff's transgender status, her "other lawsuits, her grievances and PREA complaints" were sufficient to satisfy standard); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 696 (S.D. Tex. 2016) (where transgender plaintiff reported a series of abuses and assaults, "[t]here is no question that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm"); *Doe v. Wash. State Dep't of Corrs.*, No. 4:21-CV-5059-TOR, 2021 WL 2453099, at *5 (E.D. Wash. May 17, 2021), *appeal filed*, No. 21-35453 (9th Cir. June 14, 2021) ("Here, Plaintiffs are transgender individuals and are, therefore, at an increased risk of abuse while incarcerated.").

**B.    Defendants' Responses to Ms. Diamond's Risk of Sexual Assault and Her Sexual Abuse Allegations Were Objectively Unreasonable.**

Ms. Diamond also satisfies the objective prong of deliberate indifference because Defendants "'knew of ways to reduce the harm but knowingly declined to act' or . . . 'knew of ways to reduce the harm but recklessly declined to act.'" *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 620 (11th Cir. 2007) (emphasis added) (citing *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995)).

**1.    Defendants Failed to Take Reasonable Steps to Protect Ms. Diamond Despite Notice that GDCP and CSP Were Not Safe.**

Despite receiving early and repeated warnings about Ms. Diamond's heightened risk of sexual assault, Defendants failed to take reasonable steps to protect her. For instance, even though Ms. Diamond informed Defendant Atchison that her risk of sexual assault was especially acute at close security prisons, Hr'g Tr. 520:14-17 (Atchison), and that her health and safety preference was a female facility placement, Pl.'s Ex. 1A; Hr'g Tr. 31:4-19 (Diamond); *id.* at 505:11-15, 518:8-

23 (Atchison), Defendants assigned Ms. Diamond a long-term placement at GDCP, a close security prison outside of her security classification, including housing her in a double cell where she was immediately raped by her cellmate. Hr'g Tr. 36:7-8, 20-37:16 (Diamond). Defendant Ford placed Ms. Diamond in a dorm without cameras, Pl.'s Ex. 251 at 16-17, and took no actions to mitigate her heightened risk of sexual assault. *Id.* at 14.

When Ms. Diamond notified GDCP's PREA Compliance Manager, Defendant Smith, of some of these early assaults and presented copies of threatening letters she received, she was threatened with "lockdown" and loss of privileges. *Supra* at 14. Other than moving her into a single cell, Defendants took no measures to protect Ms. Diamond while at GDCP, despite the death threats and sexually graphic content in the letters she provided, and she continued to suffer additional sexual abuse and assaults. *Supra* at 2-4. In between sexual assaults, Ms. Diamond endured unyielding sexual abuse in the form of groping and touching: "It was always something. . . . I've always been touched or . . . [p]atted on the derriere, grabbed on the bosom, grabbed and hugged." Hr'g Tr. 42:19-43:1 (Diamond).

Ms. Diamond fared no better after her transfer to CSP on June 4, 2020. The *only* action Defendant Benton has taken specific to Ms. Diamond to protect her from sexual victimization since her arrival at CSP was to provide her with a single person cell within N-Building, a dormitory he considers to be "the best and safest building." Pl.'s Ex. 214 ¶¶ 3-9. Yet, Ms. Diamond has been sexually assaulted nearly a dozen times by men in N-Building—each in incidents occurring after Defendants received but ignored urgent requests to remedy Ms. Diamond's unsafe conditions or approve her for a safety transfer. *Supra* at 18-19.

### 2.  Defendants Cannot Rely on Their Failures to Substantiate Assaults in Order to Justify Their Failure to Ensure Ms. Diamond's Safety.

A prison official "deliberately disregards a known risk of serious harm when he or she

fails to investigate an inmate's complaints." *Dudley v. Singleton*, 508 F. Supp. 3d 1118, 1137 (N.D. Ala. 2020); *see also Goebert v. Lee Cnty.*, 510 F.3d 1312, 1328 (11th Cir. 2007) ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness."). Deliberate indifference also can be shown where prison officials "knew of alternative means that would have brought that risk to within constitutional norms," but failed to act. *LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993). The evidence shows both circumstances here.

First, Defendants' responses to Ms. Diamond's PREA complaints alleging inmate assaults were cursory at best, regardless of whether she directly reported incidents to GDC staff or participated in PREA interviews. In all cases, Ms. Diamond's PREA reports were summarily dismissed, all but one deemed "Unfounded" despite no contrary evidence. *Supra* at 2–10. Defendants' failures to take any independent investigative steps—notwithstanding receipt of third-party PREA reports that detailed when, where and how Ms. Diamond was assaulted—cannot be justified nor reconciled with the Eighth Amendment duty to protect. *See, e.g.*, *Rodriguez*, 508 F.3d at 619 (specific assailant identification not a prerequisite to an Eighth Amendment claim). Indeed, it contradicts GDC's own policies which mandate that investigations proceed regardless of whether a victim participates. Hr'g Tr. 521:22-522:17 (Atchison) (admitting GDC's duty to investigate attaches with or without optional victim interviews).

Even the most shocking assaults, such as four rapes in three days, were not investigated. Details of these assaults were provided to Defendants within 10 days, identifying dates, locations, and approximate times of the day. Pl.'s Ex. 173. Yet, no video recordings were requested, reviewed or preserved and all four allegations of sexual assault were dismissed as "Unfounded"—*on the same day the cases were opened*. Pl.'s Ex. 107E; *see also* Hr'g Tr. 434:3-434:15, 436:3-436:12

(Benton) (not aware if reviewed camera for September assaults). Similarly, the July 3, 2020 Assault—detailed in a third-party PREA report on July 20, 2020 and the first-hand account of Ms. Diamond on July 30, 2020—did not merit a review of video. Hr'g Tr. 361:4–362:23 (Betterson) (unsure whether he reviewed camera footage for July assault). Nor did Defendants bother to review video recordings of two allegations of overnight molestations in October, even with corroborating witness testimony. *Supra* at 8-10.

Any suggestion that the recordings did not exist is belied by the fact that Defendants requested, reviewed and preserved the video recordings of ████████████████████ ███ to support *their* unfounded PREA allegations *against* her on October 31, 2020, while refusing to do so to investigate a PREA allegation *by* her on October 30, 2020. Hr'g Tr. 455:10-20 (Benton). A "SART Investigation Checklist" appears to require designating whether potential video is recovered, downloaded, documented, and stored for every PREA report. Pl's Ex. 269. The only such checklist produced in relation to any of the reported sexual assaults listed herein is as to Early October, 2020 Assault and claims "no video," despite that the eyewitness provided a 10 day window for which video was not recovered, downloaded or documented. Pl's Ex. 111.

Defendants were required to preserve recordings of Ms. Diamond's cell on the dates of reported sexual assaults pursuant to express litigation preservation duties communicated on May 1, 2020, and on nine subsequent dates. *Supra* at 4-5. *See Stanfill v. Talton*, 851 F. Supp. 2d 1346, 1361 (M.D. Ga. 2012) (Treadwell, J.) (A party's obligation to preserve evidence begins when litigation is "pending or reasonably foreseeable." (quoting *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009)); Pl.'s Ex. 25; Pl.'s Ex. 266 (GDC acknowledging on July 10, 2020 "threats of litigation" in this case). Indeed, Defendant Benton admits a handheld camera was used daily to record Ms. Diamond. Pl.'s Ex. 265 ("[Ms. Diamond] must be escorted to and from

pill call by a supervisor daily. Be sure to use a camera and log all movement in the building's logbook."). Yet, on October 18, 2021, Defendants claimed that "all existing recordings have been collected and produced" responsive to discovery requests for all "video recordings of Ashley Diamond from June 1, 2019 to present" and of all recordings on the dates of alleged sexual assaults, Pl.'s Ex. 251 at 9, while *only* producing video of disputed allegations of rule violations by Ms. Diamond and, inexplicably, of March 26-29, 2021. Littrell Decl. ¶¶ 10-12, 15-16 (November 22, 2021). Failure to preserve crucial evidence directly relevant to Plaintiff's claims, contrary to an express obligation to preserve, is tantamount to willful destruction of evidence and subject to an adverse inference. *See*, *e.g.*, *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005) (finding "failure to preserve" evidence "resulted in extreme prejudice" and "a clear dereliction of duty").

Second, Defendants and their counsel refused to contact Ms. Diamond's lawyers—the authors of the third-party PREA reports—to seek additional information, even though third-party reporting is expressly permitted under PREA and GDC Policy, and Ms. Diamond's lawyers repeatedly requested an opportunity to discuss the allegations. 28 C.F.R. §§ 115.51, 115.54 (mandating a procedure for anonymous and third-party PREA reports); Pl.'s Ex. 131 at DEF1383-84 (same); Hr'g Tr. 424:25-425:3, 435:7-436:2, 437:6-9, 438:15-19, 440:12-19 (Benton). Defendants could not identify any policies that specifically prohibited such contact and, contrary to Defendant Atchison's testimony at the Hearing, GDC Policy expressly states that PREA investigators "*must* follow-up with *any persons identified as having knowledge* of the incident before the investigation is closed." Pl.'s Ex. 267 at DEF028267 (emphasis added).[5]

---

[5] Although Atchison testified at the Hearing that third-party reporters cannot be contacted by the agency where information is purportedly missing, she was unable to identify any policy prohibiting such communications when probed thereafter. Hr'g Tr. 523:4-14 (Atchison).

Defendants also ceased all inquiries into Ms. Diamond's sexual assault allegations and dismissed her PREA complaints after Ms. Diamond *requested* that her counsel be present during PREA interviews with GDC to mitigate her safety and retaliation concerns. Pl.'s Ex. 233I at DEF960 (explaining that her request was based on "the sensitive nature of the allegations" and "fear of retaliation," including from assailants who were gang-affiliated); *see also* Pl.'s Ex. 92K at DEF734 (requesting permission for counsel to attend her interviews because she "did not feel safe enough"); Diamond Decl. ¶ 23 (Nov. 19, 2021) ("I believed their presence would create an atmosphere where I would feel free to talk comfortably, in order to have a trusted advocate as a witness, and in order to ensure that my words would not be misconstrued or inaccurately reflected in the PREA documents"). Yet, Plaintiff had a reasonable and good faith basis to request that a legal advocate join the interviews. Indeed, at least one court in the Eleventh Circuit believes such a right exists. *Jacoby v. PREA Coordinator*, No. 5:17-cv-00053-MHH-TMP, 2017 WL 2962858, at *10 (Apr. 4, 2017), *report and recommendation adopted*, 2017 WL 2957825 (N.D. Ala. July 11, 2017) (acknowledging that inmates with retained counsel have "the right to have counsel present during [a] PREA interview"). In addition, the PREA regulations expressly allow inmates to request the presence of an outside advocate in "investigatory interviews" to provide emotional and other support. 28 C.F.R § 115.21(e) ("As requested by the victim, the victim advocate, qualified agency staff member, or qualified community-based organization staff member shall accompany and support the victim through the forensic medical examination process and investigatory interviews and shall provide emotional support[.].").

Significantly, Defendants never informed Ms. Diamond that her request to be interviewed in the presence of her counsel was being denied, nor advised her of the consequences of nonparticipation, so she could make an informed decision about next steps. Cantera Dep. Tr.

44:15-23, 46:21-24; Pl.'s Ex. 108H at DEF1062; Hr'g Tr. 337:18-21 (Betterson); 525:20-24 (Atchinson). Pl.'s Ex. 233I at DEF960 ("I would like to pursue my PREA investigation but can't get a response to the request for counsel to be present."). Instead, Ms. Diamond was told by staff that arrangements were being made to *allow* her attorneys to participate. Cantera Dep. Tr. 47:2-5 ("Q: Did you inform Ms. Diamond that declining to share details without counsel present would end a PREA investigation? A: No, I did not. I told her the opposite."); Hr'g Tr. 76:1-76:13 (Diamond) ("I thought all these investigations were still ongoing. I had no idea until the other day that all those investigations were canceled and that nothing was going to come of it . . . I just figured they'd look at the camera. I thought, 'Well, they have the video, they have the dates, they have the times, surely they will just look at the cameras.'"). Regardless of whether Defendants were obligated to grant the request, their decisions to summarily dismiss her PREA claims without notice based on the request was *not* reasonable.

Defendants' claim that Ms. Diamond "refused to participate, to be interviewed, and to provide information in [the PREA] process" *is also demonstrably false*. ECF 84 at 9. Ms. Diamond has participated in half a dozen PREA interviews at GDCP and CSP. *See, e.g.*, Pl.'s Ex. 257 (noting participation in August 5, 2020 PREA interview and stating Ms. Diamond "[e]xplain[ed] incident, response, and fear of having similar [incident] occur again"); Pl.'s Ex. 64J (describing participation in June 12, 2020 PREA interview); Pl.'s Ex. 64C at DEF423 (noting participation in October 13, 2020 PREA interview and "recommend[ing] placement in safe housing"); Pl.'s Ex. 254 (noting participation in February 24, 2021 PREA interview); Pl.'s Ex. 64B at DEF307 (same); Pl.'s Ex. 252 at DEF256 (noting participation in March 31, 2021 PREA interview); Pl.'s Ex. 64G (noting participation in July 24, 2020 PREA interview); Pl.'s Ex. 264 (noting participation in PREA interview and identification of witnesses).

Defendants' actions and inactions described above—their refusal to allow Ms. Diamond to have counsel present while failing to advise her that her request would result in dismissal; refusal to discuss the allegations with those who reported them; failure to review, document or preserve recordings that would have proven or disproven the allegations; and failure to conduct any independent investigation despite the level of detail provided—were not objectively reasonable and are evidence of deliberate indifference. *See Hale*, 50 F.3d. at 1584 (asking whether prison officials "disregard[ed] 'alternative means' or interim measures for reducing the risk of violence" (citation omitted)); *LaMarca*, 995 F.2d at 1536 (same).

### 3. Defendants' Refusal to Seriously Consider Transferring Ms. Diamond to a Female Facility for Her Safety, Contrary to PREA and GDC Policies and Based on Impermissible Considerations, is Unreasonable.

Defendants admit that PREA and GDC policies require prison officials to meaningfully consider housing transgender women in women's prisons where safety require. *See* 28 C.F.R. § 115.42(c) (prison officials must decide whether to house transgender people in male or female facilities on a "case-by-case basis" with a focus on their "health and safety,"); Pl.'s Ex. 129 at DEF1336 (requiring safety reassessments following reports "that bear[] upon their sexual safety," and at least twice yearly); Hr'g Tr. 560:21-25 (Holt); *id.* at 538:13-17 (Atchison). More than a dozen sexual assaults later and Ms. Diamond has yet to be re-evaluated for such a transfer.

Defendants' refusal to consider Ms. Diamond for a safety transfer in over two years is objectively unreasonable. *See Tay*, 457 F. Supp. 3d at 685, 690 (concluding that decision to house transgender plaintiff with a history of sexual harassment, assaults, and rapes in men's prisons may be tantamount to confining her in a cell with a cobra and ordering defendants to "develop an individualized case management plan for Plaintiff that takes into consideration Plaintiff's need for safety"); *Stover v. Corrs. Corp. of Am.*, No. 12-cv-00393-EJL, 2015 WL 874288, at *9 (D. Idaho Feb. 27, 2015) (housing a transgender woman with male prisoners stated a claim for deliberate

indifference to "an obvious risk of sexual assault"); *Becker v. Sherman*, No. 16-cv-0828 AWI MJS (PC), 2017 WL 6316836, at \*5 (Dec. 11, 2017), *report and recommendation adopted*, 2018 WL 623617 (E.D. Cal. Jan. 30, 2018) (where transgender inmate reported harassment and assaults in male prison, the risk of ongoing harm was not "hypothetical"); *see also De Veloz v. Miami-Dade Cnty.*, 756 F. App'x 869, 877 (11th Cir. 2018) (finding it "abundantly clear" that "placing a female in the general population of a male detention facility created an extreme condition and posed an unreasonable risk of serious harm").[6] Prisons across the country now house transgender women in women's facilities.[7]

Defendants' refusal to give serious consideration to transferring Ms. Diamond to a female facility to protect her from sexual assault cannot be squared with the Eighth Amendment or the "evolving standards of decency" encapsulated by PREA. *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal citation omitted); *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015) (noting

---

[6] Although the plaintiff in *De Veloz* was not transgender, its holding is equally applicable because exposing a woman to an "outrageous risk that she will be harassed, assaulted, raped, or even murdered" in prison does not become constitutionally permissible simply because the woman is transgender. *De Veloz*, 756 F. App'x at 877.

[7] Among the jurisdictions housing transgender women in women's facilities where safety requires are California, Connecticut, the District of Columbia, New York City, New Jersey, and Washington. *See, e.g.*, Jonathan McDougle, *California to House Transgender Inmates Based on Gender Identity*, CBS NEWS (Oct. 7, 2020), https://www.cbsnews.com/news/california-transgender-prison-inmates-gender-identity-housing/; Dale Chappell, *Connecticut Passes Law to Protect Women, Transgender Prisoners*, PRISON LEGAL NEWS (Jan. 8, 2019), https://www.prisonlegalnews.org/news/2019/jan/8/connecticut-passes-law-protect-women-transgender-prisoners/; Brooks Holton, *New Jersey's Trans Inmates To Be Housed by Gender Identity, Not Assigned Sex*, PHILLY VOICE (July 2, 2021), https://www.phillyvoice.com/new-jersey-prisons-transgender-inmates-brutality-lawsuit-settlement/; Madina Toure, *New York City Announces Plan to House Inmates According to Gender Identity*, OBSERVER (Apr. 16, 2018), https://observer.com/2018/04/new-york-inmates-gender-identity-housing/; *Doe*, 2021 WL 2453099, at \*1-\*2, \*5 (acknowledging transgender women housed in women's prisons in suit protecting disclosure of identities). *And see* Noelle Crombie, *Oregon grants transgender inmate's request to move to women's prison*, THE OREGONIAN/OREGONLIVE (Jan. 23, 2018, updated Jan. 30, 2019), https://www.oregonlive.com/pacific-northwest-news/2018/01/oregon_grants_transgender_inma.html; Janelle Griffith, *Transgender inmate who alleged abuse is transferred to female prison*, NBC NEWS (Dec. 27, 2018), https://www.nbcnews.com/news/us-news/transgender-inmate-who-alleged-abuse-transferred-female-prison-n952486 (Illinois).

that PREA and similar enactments are the "clearest and most reliable objective evidence of contemporary values.") (citing *Atkins v. Virginia*, 536 U.S. 304, 312 (2002)). As the Department of Justice explained in its Statement of Interest, prison officials can violate the Eighth Amendment when they fail "to take steps to mitigate [transgender inmates'] risk of sexual victimization, up to and including placement in a facility that matches their gender identity." ECF 65 at 9. Here, the violence and threats that Ms. Diamond faces are systemic, not a threat from a particular individual—stemming from her particular circumstances as a transgender woman who has lived her adult life as a woman; has been on hormones for 25 years, ECF 52 ¶ 1; is hormonally reassigned female, ECF 58 ¶ 66; has a long history of being sexually victimized in men's prisons, *supra* at 17-18, but who is nonetheless housed in a men's prison.

Numerous GDC personnel have admitted that Ms. Diamond's risk of sexual victimization would be non-existent if she were transferred to a female GDC facility. Fass Dep. Tr. 24:13-14 ("No, I would not have the same sort of victimization concerns at a female facility."). Yet, Defendants have steadfastly refused to give meaningful consideration to Ms. Diamond's safety-based placement request, and Ms. Diamond has been told by various Defendants that GDC isn't "there yet," and that it "probably wasn't going to happen." Hr'g Tr. 30:15-19 (Diamond); *cf.* Hr'g Tr. 441:23-25 (Benton); *id.* at 548:19-549:1 (Atchison) (admitting she has never recommended placing Ms. Diamond, or any other transgender woman, in a female facility), even though GDC policy expressly provides for such placements. Pl.'s Ex. 129. Defendants simply continue their discriminatory practice of housing Ms. Diamond exclusively in male prisons.

Defendants' attempt to rely on self-serving discipline violations as justification for failing to give serious, or documented, consideration of a safety transfer is belied by the facts. First, there is no record evidence showing that they reconsidered their placement decision in the two years

since Ms. Diamond re-entered GDC custody, contrary to PREA and GDC policies. Second, Defendants have furnished no constitutionally permissible explanation for why Ms. Diamond was denied placement in a female facility between October 29, 2019 and October 31, 2020, following repeated requests, 11 reported sexual assaults, and no disciplinary charges. Hr'g Tr. 543:17-544:20 (Atchison) (admitting genital status was the basis for the initial determination and lack of awareness of "any other considerations" that prevented Ms. Diamond from transfer to a female facility prior to October 31, 2020). Indeed, the only explanation that appears in GDC records is that her transgender status was viewed as a disqualifying factor. Pl.'s Ex. 1B at DEF2; Pl.'s Ex. 2 (showing placement decision based on impermissible factors).

### C. Contrary to Defendants' Argument, a Deliberate Indifference Finding Neither Requires That a Victim Participate in PREA Interviews Nor That Prison Officials Substantiate Assault Allegations.

Defendants argue that Ms. Diamond has not shown a substantial likelihood of success on her Eighth Amendment claims only because "there has not been one substantiated allegation of assault." ECF 77 at 9. This argument is contrary to law. Plaintiff does not need to prove past assaults or attacks occurred to prevail on an Eighth Amendment claim because the duty to protect does not require "a tragic event" to ripen. *Farmer,* 511 U.S. at 845 (citing *Helling*, 509 U.S. at 33). Nor are plaintiffs required to "furnish any specifics as to *who* was posing the alleged threats" to prevail on an Eighth Amendment claim. *Rodriguez*, 508 F.3d at 619 (stating such arguments are "without merit" due to *Farmer*); *accord Farmer*, 511 U.S. at 843, 849 n.10 (plaintiffs do not need to identify a particular threat from a particular prisoner to succeed on an Eighth Amendment claim). A plaintiff's willingness to relive past assaults or identify attackers has no direct bearing on a deliberate indifference finding. *Id.* at 845 ("[A plaintiff] does not have to await the consummation of threatened injury to obtain preventive relief." (citations omitted)).

Defendants' attempt to penalize Ms. Diamond for her legitimate concerns about

participating in PREA interviews following *some* of her reports is particularly unavailing here, where her apprehensions about the safety of the PREA interview process were occasioned by Defendants' actions in, for example, failing to conduct any independent review before going directly to the perpetrator, or to safeguard the confidentiality and integrity of the PREA process. *Supra* at 14-15. Identifying assailants by name in the prison context and being labeled a snitch frequently amounts to a death sentence, particularly where those assailants are gang members. *Johnson v. Lindor*, No. 20-81032-CV-MIDDLEBROOKS, 2021 WL 3025509, at *3 (S.D. Fla. June 10, 2021), *appeal filed*, No. 21-12377 (11th Cir. July 14, 2021) ("Courts have recognized that those in custody who are labeled a 'snitch' or a sex offender are at a significant risk of being harmed by others, and that correctional officers can violate the Eighth Amendment by showing deliberate indifference to that risk."); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984). Indeed, as an Atlanta Journal Constitution investigation reveals, Ms. Diamond's fear of gang-affiliated retaliation and corresponding distrust that Defendants would protect her is legitimate:

> At a time when the Georgia Department of Corrections is under scrutiny from the U.S. Department of Justice, the circumstances surrounding McClinton's death provide yet another stark portrait of inadequate staffing, policies and oversight. Interviews and documents reviewed by The Atlanta Journal-Constitution suggest that prison officials knew McClinton was subject to gang retaliation yet left him exposed to it anyway.[8]

Yet, Defendants simply ignored every request to address Ms. Diamond's safety concerns which would have allowed her to more fully participate in the PREA process.

A requirement that a victim of sexual assault in prison identify gang-affiliated perpetrators

---

[8] Danny Robbins, *Young inmate's stabbing death points to state prison system failures*, THE ATLANTA J.-CONST. (Nov. 19, 2021), https://www.ajc.com/news/young-inmates-murder-points-to-state-prison-system-failures/XTNT4YFFFNCX5LSKXZWEJDOGUU/ ("Prisoner-on-prisoner violence has been identified as a focus of the DOJ investigation. The inquiry, officially launched in September and ongoing, follows spiking murder and suicide rates in Georgia prisons.").

and that prison officials substantiate the assault before the duty to protect attaches, as Defendants argue here, would subject victims to an unconscionable and unconstitutional Hobson's choice: forfeit your protection from sexual assault or forfeit your physical safety. *Farmer*, 511 U.S. at 843 (for Eighth Amendment purposes, "it does not matter whether the risk comes from a single source or multiple sources" nor does it matter "whether a prisoner faces an excessive risk of attack for reasons personal to [her] or because all prisoners in [her] situation face such a risk."); *see also Howard v. Waide*, 534 F.3d 1227, 1237 (10th Cir. 2008) (reversing summary judgment against incarcerated victim of sexual assault based on district court's reliance on fact that notice of assault was "insufficiently detailed").

### D. Defendants' Persistent Inaction Concerning Ms. Diamond's Health and Safety Provides an Additional Basis for a Deliberate Indifference Finding

Ms. Diamond's substantial risk of harm from sexual abuse persists to this day. Ms. Diamond continues to face recurrent threats at CSP because of Defendants' persistent inaction, including continued sexual harassment and coercion. Diamond Decl. ¶¶ 1-18, 25, 27, 29, 39 (Nov. 19, 2021). Since the Hearing, Ms. Diamond has been sexually assaulted in broad daylight and passed around by a group of incarcerated men; she has continued to endure unyielding sexual harassment and groping from men across the prison; and she has woken up to find a man climbing into her bed. *Id.* at ¶¶ 11-17. Ms. Diamond reported these assaults to staff, *id.* at ¶¶ 9, 17, 19, identified several eyewitnesses, *id.* at ¶ 21, and has participated in PREA interviews despite her ongoing retaliation concerns, *id.*, at ¶¶ 24-26, but no action has been taken. *Id.* at ¶ 27. Ms. Diamond is also facing escalating threats of violence from inmates who perceive her as a snitch, including threats from gang members in her dormitory. *Id.* at ¶¶ 4, 10, 18, 39.

Despite the Court's admonition that the parties work together to resolve disputes, Defendants have refused to identify alternate housing placements for Ms. Diamond or develop a

safety plan with respect to her housing to this day. Littrell Decl. ¶ 18 (Nov. 22, 2021). Defendants have stopped providing Ms. Diamond security escorts to pill call or meals, despite the admitted need to do so. Pl.'s Ex. 265 (Ms. Diamond "must be escorted to and from pill call by a supervisor daily."). Diamond Decl. ¶¶ 7, 14-17, 30-31, 34-35 (Nov. 19, 2021). As a result, Ms. Diamond is unable to regularly access meals, medically necessary healthcare, or programming, and has resorted to relying on protection from other inmates. *Id.* at ¶¶ 30-31, 34-35, 42.

Defendants' persistent refusal to contemplate further actions to protect Ms. Diamond cannot be reconciled with the Eighth Amendment, which looks to prison officials' "attitudes and conduct at the time suit is brought *and persisting thereafter*." *Farmer*, 511 U.S. at 845 (emphasis added). Defendants' refusal to reduce Ms. Diamond's risk of harm following the Hearing, despite the ability to modify placement decisions to react and respond to new information, Hr'g Tr. 560:21-25 (Holt), constitutes further evidence of deliberate indifference. *Rodriguez*, 508 F.3d at 620-23 (failing to process inmate for safety transfer could constitute deliberate indifference).

## II. Defendants Caused Ms. Diamond's Injury.

Here, as in *Rodriguez*, the record evidence now shows that Defendants caused her injuries where each of the Defendants (1) "had the means substantially to improve" her safety, (2) "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and (3) had "other means available to him which he nevertheless disregarded." 508 F.3d at 622 (citing *LaMarca*, 995 F.2d at 1539). For instance, Defendants Atchison, Benton, Holt and Toole did not make any attempts to review or preserve video footage that could corroborate Ms. Diamond's sexual assault claims, nor did they respond to her concerns about the PREA interview process to facilitate her participation. *Supra* at 4-10.

Defendant Benton summarily closed investigations into Ms. Diamond's PREA complaints and failed to take any corrective action to aid in her protection. Hr'g Tr. 438:15-439:1 (Benton).

Defendants Atchison and Holt refused to reconsider the decision to house Ms. Diamond at CSP even after receipt of grievances requesting a safety transfer and numerous reports explaining that Ms. Diamond's placement was demonstrably unsafe. Pl.'s Ex. 115. Finally, because Defendants refuse to change course, Ms. Diamond continues to suffer unrelenting sexual harassment and additional assaults, and remains in severe peril. *Supra* at 10-14.

## III.   Preliminary Relief Is Needed to Avert Imminent Harm

An injunction is also needed to avert Ms. Diamond's *risk* of imminent harm from sexual abuse and severe psychological harm. A preliminary injunction is appropriate "to prevent a substantial risk of serious injury from ripening into actual harm." *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017) (quoting *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010)). Ms. Diamond does not need to show that she has been repeatedly raped or that she has been raped yet again to be entitled to injunctive relief. *See Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."). Imminent future injury may be inferred from a "history of past misconduct." *Hoffer*, 290 F. Supp. 3d at 1304. An injunction is also needed to avert Ms. Diamond's *risk* of imminent harm from sexual abuse and severe psychological harm.

Here, the evidence is uncontroverted that Ms. Diamond has experienced sexual assaults, sexual harassment, and severe psychological harm. The substantial risk to Ms. Diamond has not subsided; she continues to live in constant fear for her safety based on Defendants' inaction. *Supra* at 10-14. Yet, despite all the evidence and testimony showing her current safety risks, Ms. Diamond remains in the same cell, subject to repeated sexual harassment, sexual abuse, and threats to her physical safety. *Id.* The substantial risk to Ms. Diamond has never subsided and she continues to live in constant fear for her safety based on Defendants' inaction.

Preliminary relief is also needed based on the imminent threats to Ms. Diamond's mental

and emotional well-being. The repeated abuse and attacks Ms. Diamond has experienced within GDC have had catastrophic effects on Ms. Diamond such that, in addition to worsening Post-Traumatic Stress Disorder, she is now suffering from suicidal ideation and has repeatedly tried to take her own life. Diamond Decl. ¶¶ 40-41 (Nov. 19, 2021); Pl.'s Ex. 69B (noting worsening suicidality brought about by "stressful dorm environment with concerns for safety" and "recent physical [and] sexual abuse" in prison); Pl.'s Ex. 69C at DEF463-65 (noting recent suicide attempt in response to incidents of sexual abuse in custody). Ms. Diamond's GDC psychologist, Dr. Daniel Fass, testified that Ms. Diamond "has been in such a state of acute distress for so long," Fass Dep. Tr. 28:25–29:4, and that, because of her repeated sexual assaults, "it's been a constant crisis intervention," Fass Dep. Tr. 29:23. Fass further testified that Ms. Diamond's placement in a men's facility has adversely affected her mental health. Fass Dep. Tr. 29:13–15 ("[C]ertainly the overarching factor is that she's a transgender female in a male prison").

As of the Hearing, Ms. Diamond was "imminently suicidal," Fass Dep. Tr. 39:15-20, suffering anxiety and depression, *id.* at 37:15-19, "increased panic, hypervigilance, nightmares," Cantera Dep. Tr. 32:8-15, and engaged in auto-castration. Fass Dep. Tr. 37:22-25; *see also* Hr'g Tr. 19:6-11 (Diamond). Cantera testified that these symptoms were common for a victim of sexual abuse. Cantera Dep. Tr. 32:16-18. No contrary evidence exists that these symptoms have abated since the Hearing; indeed, Ms. Diamond reports escalating symptoms and several suicide attempts. Diamond Decl. ¶¶ 40-41.

Ms. Diamond's mental health condition led CSP's mental health staff to repeatedly recommend that Ms. Diamond be transferred to safe housing. Fass Dep. 33:4-12 ("[W]e got to the point where for a while she was, you know, chronically endorsing suicidal ideation . . . She was reporting frequent victimization. And, you know, at that point I just didn't feel like she was going

to be safe at our facility."); Cantera Dep. Tr. 32:19-24, 78:4-5, 78:10 (stating that she recommended safe housing after sexual abuse and that she thinks Ms. Diamond would be safer in a women's facility); Cantera Dep. Ex. 13 at DEF423 (noting increase in trauma and recommending safe housing placement); Ex. 277 (reiterating safety transfer recommendation).

## IV.    The Public Interest and the Balance of Equities Support an Injunction

The public interest in protecting the constitutional rights of incarcerated people and the balance of equities also weigh in favor of injunction. *See Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002) ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated[.] "); *Hoffer*, 290 F. Supp. 3d at 1304 (quoting *Laube*, 234 F. Supp. 2d at 1252) ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants."). Ms. Diamond, as a woman in a men's facility, has been subjected to an "outrageous risk that she will be harassed, assaulted, raped, or even murdered." *De Veloz*, 756 F. App'x at 877. Such a risk outweighs any financial or administrative burden that Defendants would bear in meeting their constitutional obligation to keep Ms. Diamond safe.

## CONCLUSION

Ms. Diamond's motion for preliminary injunction should be granted.

Dated: November 23, 2021                                Respectfully submitted,

/s/ A. Chinyere Ezie
A. Chinyere Ezie*                              Elizabeth Littrell, Ga. Bar No. 454949
Center for Constitutional Rights               Southern Poverty Law Center
666 Broadway, 7th Floor                        P.O. Box 1287
New York, NY 10012                             Decatur, GA 30031
Phone/Fax: (212) 614-6467                      Phone: (404) 221-5876
Email: cezie@ccrjustice.org                    Fax: (404) 221-5857
                                               Email: beth.littrell@splcenter.org

Scott D. McCoy[*]
Southern Poverty Law Center
P.O. Box 10788
Tallahassee, FL 32302
Phone: (334) 224-4309
Email: scott.mccoy@splcenter.org

Maya G. Rajaratnam[*]
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
Phone: (334) 956-8307
Fax: (334) 956-8481
Email: maya.rajaratnam@splcenter.org

*Counsel for Plaintiff Ashley Diamond*

[*] *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 23, 2021, the foregoing document and all attachments

were served on all counsel of record through the Court's CM/ECF system.

/s/ A. Chinyere Ezie
A. Chinyere Ezie[*]
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Phone/Fax: (212) 614-6467
Email: cezie@ccrjustice.org

Dated: November 23, 2021          *Counsel for Plaintiff Ashley Diamond*