# Exhibit A

## PLAINTIFF'S DESIGNATIONS

### June 30, 2022 Deposition of Will Ausborn

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| 7:8-7:13 | DR. WILL F. AUSBORN, having been duly sworn by the Notary, testified as follows: EXAMINATION BY MS. URIBE: Q. Good morning, Dr. Ausborn. A. Good morning. |
| 12:19-13:13 | Dr. Ausborn, you're a psychologist? A. Yes. Q. And what is your educational background? A. I hold a doctoral degree in psychology. My specialty is, or I specialized during that time in forensic psychology. I also have a master's degree in psychology, master's degree in criminal justice administration, and I'm board certified with -- in telepsychology. Q. And what educational institutions did you attend? A. Argosy University was my doctoral degree. I've attended also and graduated from Albany University and Troy University. Q. And where did you do your residency? Where did you do your residency? A. Georgia Regional Hospital in Atlanta on the forensic unit. |
| 14:4-14:7 | Q. Where are you currently employed, Dr. Ausborn? A. I have a private practice and I also work with Centurion. |
| 14:21-14:24 | Q. And for what -- what job titles do you hold -- what is your job title as an employee of Centurion? A. Telepsychologist. |
| 22:21-23:13 | So, Dr. Ausborn, are you familiar with the condition of gender dysphoria? A. Yes. Q. And what is gender dysphoria, to the best of your knowledge? A. It is depression or distress that |

1

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | results from incongruence between a person's gender identity and their sex at birth.<br>Q. And what is the source of your definition, Dr. Ausborn?<br>A. APA has published materials on treatment and involvement of clinicians with persons with gender dysphoria. I've also read materials from WPATH also.<br>Q. And could you just clarify what APA is?<br>A. The American Psychological Association. |
| 23:18-24:14 | Q. No problem. And Dr. Ausborn, do you agree that gender dysphoria is a serious medical condition?<br>A. I think -- yes. Yes, I would.<br>Q. And do you agree that patients' gender dysphoria treatment needs can't be ignored?<br>A. Yes, I would agree with that.<br>Q. And do you agree that gender dysphoria can lead to severe symptoms when not properly treated?<br>A. The symptoms could worsen, yes.<br>Q. Would you consider anxiety a symptom of gender dysphoria?<br>A. Typically with mood disorders, we might find individuals suffering with distress that perhaps is categorized as anxiety. So from a symptom standpoint, I guess the answer to that question would be yes.<br>Q. And other gender dysphoria symptoms could include depression, correct?<br>A. Yes. |
| 24:25-25:10 | Q. And what other types of -- what other symptoms are associated with gender dysphoria, Dr. Ausborn?<br>A. Well, since it falls in the category of a mood disturbance, then of course we see typical signs and symptoms that we would see with other depressive diagnoses. So, of course general sadness, worry, sleep disturbance, appetite changes. We see |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
|  | restlessness, maybe even frustration, negative thinking, racing thoughts, just to name a few. |
| 25:14-25:20 | Q. When untreated, what other types of symptoms could be linked to gender dysphoria? A. If the condition happens to worsen, as it would with anyone suffering a depression, there could be onset of self-destruction, self-destructive behaviors, or even suicidal ideations. |
| 26:17-26:23 | Q. Prior to working at GDC, have you ever treated patients with gender dysphoria? A. No. Q. But have you treated patients with gender dysphoria as a psychologist with GDC? A. Offenders that are incarcerated, yes. |
| 28:9-28:12 | Q. And to your knowledge can GDC mental health providers request a consultation with outside mental health experts? A. I'm not aware of that. |
| 37:14-38:1 | Q. Okay. And so you stated to me previously, Dr. Ausborn, that you are familiar with the WPATH treatment -- WPATH standards for treatment of gender dysphoria, correct? A. I've read the standards a couple of times. I couldn't quote word for word what the literature states about it, but I'm familiar with some of the standards. Q. And so based on your familiarity with the standards, would you agree that the WPATH standards are supposed to guide treatment of gender dysphoria inside prison? A. Yes, I've been advised of that. |
| 41:4-41:14 | Q. And so, Dr. Ausborn, when you make a recommendation for -- when you make recommendations for a patient that you're seeing within GDC, do you expect those recommendations to be followed? A. Yes. Yes, I would expect them to be followed and of course with the understanding that sometimes that doesn't happen, but that's the reason why we have the benefit of discussions in team meetings, to look at barriers to care and treatment. |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| 42:12-42:19 | Are you aware of any GDC inmates who have received medicated hair removal or have been referred for hair removal procedures? A. No, I'm not aware of that. Q. Are you aware of any GDC inmates who have used the medically -- a medically prescribed hair removal cream like Vaniqa? A. I'm not aware of any. |
| 42:20-42:25 | Q. Do you agree that medical treatment for gender dysphoria must be individualized to meet an inmate's medical -- an inmate's psychological needs? A. Yes, I think it should be individualized, of course. |
| 43:6-43:10 | Q. Do you agree that a variety of different recommendations could be used to psychologically treat an inmate's gender dysphoria? A. Yes. |
| 43:16-43:20 | Q. And are you aware that when transgender people with gender dysphoria don't receive adequate treatment, they can exhibit dysphoria symptoms? A. That's possible. |
| 45:15-45:19 | Q. In your practice, would the persistence of certain symptoms prompt you to try a different avenue or different recommendations? A. Yes. |
| 46:12-47:5 | Do you know who Ashley Diamond is? A. Yes. Q. How do you know her? A. I had some psychotherapy sessions with her during this current incarceration. Q. Are you aware that Ms. Diamond is a transgender woman? A. Yes. Q. Are you aware that she has a diagnosis of gender dysphoria? A. Yes. Q. And are you aware that she also has a diagnosis for a post-traumatic stress disorder? A. Yes. |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | Q. And how do you know that?<br>A. I reviewed the record just before treating her and saw the diagnostic recommendations in her record. |
| 47:8-47:16 | What do you mean when you refer to the record?<br>A. Clinical record, mental health treatment record, while incarcerated.<br>Q. And what type of documents are included in that mental health record?<br>A. Evaluations, progress notes, which would include psychological, psychiatric consultations, and counselor notes. |
| 48:7-48:9 | Q. So at one point you had visits with Ms. Diamond?<br>A. Yes, I did. |
| 48:16-48:18 | Q. No problem. And when did you have those visits?<br>A. In 2020 beginning in August. |
| 48:25-49:3 | Q. Okay. And so did you provide in-person mental health services or telepsych mental health services to Ashley Diamond?<br>A. It was all virtual. |
| 49:8-49:13 | Q. And were you given a reason as to why you were being directed to provide mental health services to Ashley?<br>A. I was told, which I documented in my notes, to assist with her involvement in some cognitive focus treatment. |
| 49:19-49:22 | MS. URIBE: I'd like to mark for identification Plaintiff's Exhibit 1, Bates number is DEF -- produced in discovery as DEF_0367. |
| 50:2-50:3 | (Plaintiff's Exhibit 1 marked for identification.) |
| 50:8-50:16 | Q. Dr. Ausborn, do you recognize this document?<br>A. Yes, I do.<br>Q. And what is it?<br>A. It's a mental health progress note that I completed.<br>Q. Do you see here that the date is listed as August 13, 2020?<br>A. Yes. |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| 50:19-51:3 | Q. Is this your signature on the bottom of the document? A. Yes. Q. And so is this a true and correct copy of the notes you generated on August 13th, 2020? A. Yes. Q. Was this your -- was this your first telepsych visit with Ashley? A. Yes, it was. |
| 51:7-51:22 | Do you see here where it says Ashley -- that chief complaint section? A. Yes. Q. It says, "I am struggling with dysphoria"? A. Yes. Q. Could you tell us a bit about that note and why you noted that? A. Well, I typically state exactly what a patient or an offender would state to that question. Usually in the beginning of my sessions I'll usually ask how they're doing. And having done that with her at this first visit, that's what she said, she's struggling with dysphoria, and I observed some sadness and worry in her presentation. |
| 51:23-53:14 | Q. And throughout the course of all of your visits, did you regularly record notes about Ashley? A. I saw her on four occasions and I produced four notes. Q. And so is it your ordinary practice to generate a mental health record and notes when you see a patient within GDC? A. Yes. Q. And when you generate these notes, do you generate them close in time to when you meet with the patients? A. Yes. There are some periods of time -- the note will always be completed the day that I saw them. I make it a point to either write the note as I'm seeing them or immediately thereafter. I don't spend the entire session writing, because I don't think |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
|  | that gives me a good interaction, and it doesn't help me to build rapport if I'm looking down writing while they're talking. So, in this case I wrote the note right after our visit. Q. And do you take these notes regardless of if it's in-person or it's a telepsych visit? A. I'm sorry, did you say take the note? Q. Right. Do you write these notes regardless of how you met with the patient? A. Yes, that's correct. Q. And what happens to these notes after you generate them? A. They're filed in the patient's record. I usually will send the note in to our coordinator, who will upload the note in our cloud system and send a copy to the facility to be contained in the record. Q. So these notes are updated as a part of the patient record in the normal course of business for GDC? A. That's my understanding. |
| 53:23-56:1 | Q. Back to this document. Could you -- I'm going to attempt to read the notes, and I will just ask for you to correct me if I'm wrong. A. Okay. Q. But in the section of the document where it says description of the session, it says, "Initial therapy session with offender at request of Dr. Rhone." A. Yes. Q. "Mental Health Director." A. Yes. Q. "To assist with facilitation of" -- A. Of cognitive. Q. -- "cognitive treatment addressing related mood concerns"? A. Yes. Q. And who is Dr. Rhone? A. Dr. Rhone at that time was the |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
|  | Mental Health Director.<br>Q. And was Dr. Rhone the Mental<br>Health Director at GDC or at Centurion?<br>A. I believe that was GDC, I believe.<br>I can't be certain, but I believe it's GDC.<br>Q. Okay. And Dr. Ausborn, what does<br>gender-related mood concerns mean, exactly?<br>A. Concerns -- distress and/or<br>concerns that were perhaps the result of gender<br>issues. Yes.<br>Q. Do those mood concerns correlate<br>to the diagnosis of gender dysphoria?<br>A. In this particular case it<br>probably did.<br>Q. And do you know why Dr. Rhone<br>requested for you to meet with Ashley Diamond?<br>A. No. Other than what I was told,<br>to begin treatment that focused on cognitive<br>elements. That's what I was told.<br>Q. Okay.<br>MS. URIBE: If you could please<br>scroll down a bit on the page.<br>Q. Dr. Ausborn, could you clarify for<br>us what the notes for Section III, "Clinical<br>plan for subsequent sessions" reads?<br>A. Yes. Let's see, so I'll begin<br>just above that. Her presentation was<br>"Initially guarded, more comfortable with the<br>passage of time. Emotional controls less than<br>automatic, and require effort." And then I<br>noted, "Will continue therapy sessions, build<br>stronger rapport, address safety concerns,<br>consult with the mental health team regarding<br>level and appropriateness of care." |
| 56:2-56:9 | Q. So, Dr. Ausborn, what safety<br>concerns can you recall were brought up to you<br>in this session?<br>A. Well, just to clarify, my first<br>visit was just collecting a lot of information<br>about her and about her history. And of course<br>if you note under the suicidal ideation, she<br>stated to me, she reported a castration attempt. |
| 56:13-56:22 | I did note that, you know, there<br>were mood-related, mood concerns and she was |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | someone who felt as though there was limited support, and that's been part of her history starting at an early age. And because there were -- well, safety in this particular sense I was using it to illustrate keeping her safe from either injury that would be self-imposed or those that would be perceived by her resulting from within her surroundings. |
| 57:11-57:15 | When you refer to her surroundings, are you referring to the fact that Ashley Diamond is a trans woman in a men's prison? A. Yes, for the most part, yes. |
| 62:11-62:12 | (Plaintiff's Exhibit 3 marked for identification.) |
| 62:15-62:20 | Q. Dr. Ausborn, do you recognize this document? A. Yes. Q. What is it? A. It's my progress note from 8/20/20. |
| 62:23-63:22 | Q. Is that your signature at the bottom of the document? A. Yes. Q. And is this a true and correct copy of the notes you generated on August 20th, 2020? A. Yes. Q. So, Dr. Ausborn, could you read for us the notes you took under Section II, Assessment, and tell us why you took those notes. A. Section II, I noted the symptoms are unchanged. Diagnosis, major depressive disorder, post-traumatic stress disorder, gender dysphoria, and that the diagnosis was unchanged. And I noted in the comments, "Clarification of depressive symptoms. Offender less defensive, improved controls." Q. Could you clarify for us, Dr. Ausborn, what are depressive symptoms? What type of symptoms are considered depressive symptoms? A. Well, sadness, sleep difficulties, |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | loss of appetite, frustration, irritability, negative thinking, worry and/or self-criticism. |
| 64:17-65:15 | Q. Okay. Dr. Ausborn, can you read for us under Section III where it says "Clinical plan for subsequent sessions" what you noted? A. Yes. "Prior to next session, follow up with mental health treatment team concerning facility reassignment; review symptom pattern, discuss involvement in daily activities." Q. And what did you mean, Dr. Ausborn, by considering -- concerning a facility reassignment? A. Well, there had been discussions about the level change, and I don't think it had been clarified. So, it was my assumption that in thinking about a level change, that would also necessitate movement to another facility, because I don't think Coastal had Level III offenders. So I felt as though that was something that just needed to be clarified, and the best way to do so was through use of the team process for discussion, and let's get a consensus about it and if it's something that needs to happen, it should happen. |
| 65:18-65:23 | I'd like to mark as Plaintiff Exhibit 4, I believe, a document produced in discovery labeled Bates number DEF_0361. THE TECHNICIAN: Please stand by. (Plaintiff's Exhibit 4 marked for identification.) |
| 66:6-66:11 | Q. Dr. Ausborn, do you recognize this document? A. Yes. Q. What is it? A. It's a mental health progress note that I completed on 8/27/20. |
| 66:14-66:20 | Q. Is this your signature at the bottom of the document? A. Yes, it is. Q. So is this a true and correct copy of the notes that you produced on August 27th, |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | 2020?<br>A. Yes. |
| 66:21-67:16 | Q. Dr. Ausborn, could you read for us your notes under Section III where it says "Clinical plan for subsequent sessions," please?<br>A. Yes.<br>"In consult with psychiatry, 1, level change recommended (Level 3); 2, with modification in medication regime, with monitoring; 3, increase communication with family; 4, facility reassignment also recommended to increase social support and feelings of belongingness; 5, offender also in need of feminine personal items (bra, panties, makeup) to help elevate mood, decrease feelings of isolation."<br>Q. So, go to recommendation 4. What type of facility reassignment were you recommending?<br>A. It was -- the thought of her being a Level III was still on the table, and I think from the team discussion there was some consensus about that taking place. |
| 69:10-70:2 | Q. Could you read for us again what the last recommendation is in your clinical plan notes.<br>A. Number 5?<br>Q. Yes, please.<br>A. "Offender also in need of feminine personal items (bra, panties, makeup) to help elevate mood, decrease feelings of isolation."<br>Q. Why did you make that recommendation, Dr. Ausborn?<br>A. She appeared distressed about that, about not having those things, and I felt if given such, it would help her to feel better and alleviate some of the mood symptoms.<br>Q. Those mood symptoms -- would you consider those mood symptoms to be connected to her gender dysphoria?<br>A. Yes. |
| 70:16-70:21 | Q. Did you communicate your recommendations with anyone else other than through these forms? |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
|  | A. When we had team meetings I used my notes to further the discussion with the other members about my recommendations. |
| 71:11-71:21 | Q. What happened after the treatment team discussed your recommendations? A. That I can't answer. It was my hope that the things we discussed would be applied, but there was no mechanism in place to actually allow us an opportunity to know what was going to be applied or not. We would just continue meeting, and during that time receive the updates about whether or not any additions, additional items, personal items or changes in her level were ever made. |
| 72:8-72:10 | MS. URIBE: I would like to mark a document produced in discovery as Exhibit 5, Bates number 005773. |
| 73:4-73:20 | Q. Do you recognize any of the recipients of this email? A. A few of them. Q. Which ones? A. I recognize Dr. Fass. Q. And who is Dr. Fass? A. He's a colleague, a psychologist at Coastal. Clinical director, I believe. Q. So the email states that the -- the subject is "Level III Offender Diamond, Ashley" with a GDC number and it says, "The aforementioned offender has been made a Level III by Dr. Fass, Dr. Roth and the treatment team at Coastal SP." Were you part of that treatment team? A. Yes, I think I was. |
| 76:3-76:22 | Q. Okay. Could you share with us, what was the conversation that you all had in the treatment team meetings? A. Well, we discussed level, the level change, the recommendation of such, quality of care, her level of functioning, distress, and some of the other recommendations that I've made about some of the personal items. And we also talked about how she was doing overall. |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | Q. Do you recall why the decision was made not to elevate Ashley to a Level III mental health level?<br>A. I was not told that reason for such.<br>Q. Were you told -- were you ever informed as to who made the decision to not follow the recommendation to increase her mental health level to III?<br>A. No, I wasn't informed about that. |
| 79:19-79:24 | MS. URIBE: I'd like to mark as exhibit -- as Plaintiff's Exhibit 7 a document produced in discovery, Bates number is DEF_0350.<br>THE TECHNICIAN: Please stand by.<br>(Plaintiff's Exhibit 7 marked for identification.) |
| 80:4-80:9 | Q. Dr. Ausborn, do you recognize this document?<br>A. I do.<br>Q. What is it?<br>A. It's a mental health progress note that I completed on 9/10/20. |
| 80:12-81:9 | Q. Is this your signature at the bottom of this document?<br>A. Yes, it is.<br>Q. And is this a true and accurate copy of the progress note you generated on September 10, 2020?<br>A. Yes.<br>Q. Dr. Ausborn, could you read for us the notes that you made for the section that is labeled "Description of session"?<br>A. Yes. "Fourth session with offender. Agenda included review of depression" -- " review symptoms of depression; 2, review recent events transfer/return; 3, elicit thoughts related to sadness. Multiple symptoms of depression. Increases related to transfer to GDCP and return," quote, " everything happened so quickly. I was hopeful about getting help, only to be returned," end quote. " Offender described details, acknowledged commitment to transfer and perception of help. |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | Now feeling victimized," quote, "victimized all over," end quote. |
| 81:11-81:20 | Q. Yes. Can you please read the section labeled "Clinical Interventions (during this session)" ? A. "Several PREAs filed. Provided empathic listening, collaboration, while probing with questions related to symptoms. Instructed offender on use of relaxation to reduce tension and anxiety. Assisted with prioritization of goals. Identified automatic thoughts and engage in reality testing." |
| 82:2-82:11 | Q. Prior to this visit, had you been made aware that Ashley had any concerns about her physical safety? A. I think in one of my earlier notes, I think I eluded to the fact that she felt her privacy had been violated and someone left a note on her bunk that was provocative. I'm not really sure which note it was, but during that exchange she had expressed some concerns about safety and privacy. |
| 83:4-84:6 | Q. Dr. Ausborn, could you read for us the section labeled -- Section III, "Clinical plan for subsequent sessions"? A. Yes. Let's see. Trying to see where that begins. So... "Improvements can be facilitated by addressing following needs: 1, acquisition of personal items (bra, panties, makeup) to aid in female expression; 2, continuation of timely hormone treatments; 3, continuation of psychiatric consults; 4, meet with GP counselor to review parole eligibility requirements, i.e. classes; and 5, mental health counselor or designee should meet with offender to review treatment plan and other support services, such as emergency care" Q. Based on your notes, you recommended that she receive feminine personal items multiple times, correct? A. Yes. Q. Can you -- did not having those items -- do you know whether not having those |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | items exacerbated her gender dysphoria symptoms?<br>A. It's very likely that it did.<br>That's one of the reasons I continued to report<br>it, because I thought it had relations to her<br>symptoms and her presentation as a feminine<br>identity. |
| 84:7-84:10 | Q. Given your observations and<br>Ashley's symptoms, do you have an opinion on how<br>quickly those items should have been provided to<br>her? |
| 84:14-85:4 | A. I don't know how quickly, but I<br>felt as though it could have been addressed at<br>the point that I initially noted it.<br>Q. And what did -- did you note any<br>of her symptoms as directly caused by the lack<br>of access to these items?<br>A. Well, she didn't feel very<br>feminine by virtue of not having those, and even<br>from my first visit with her where I was<br>exploring her past, there were traumas in her<br>life and esteem issues that led to<br>disconnections or disconnectedness in relations,<br>and much of her identity evolved around just the<br>experience of feeling like a female. And so the<br>absence of those things probably did have an<br>impact on her overall functioning. |
| 86:22-87:11 | Q. In this note specifically when you<br>made a recommendation for personal items, did<br>you have any concerns about what would happen if<br>recommendations were not followed?<br>A. Well, I felt as though there would<br>likely be the probability that she would<br>continue to have expressions that would suggest<br>a level of uncomfortability with her identity<br>because she didn't feel feminine. And so each<br>visit that we had when those things were brought<br>up, when I'd bring them up and ask if she was<br>ever given those and she wasn't, I felt<br>comfortable enough to restate it in the note,<br>that she had not received it and that this is,<br>again, a recommendation for it to happen. |
| 91:1-91:21 | Q. Do you recall how many team<br>meetings you had where you discussed Ashley<br>Diamond? |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| | A. I think it probably was somewhere in the neighborhood of two in the time that I had met with her. Q. And do you recall what was discussed at either of those meetings? A. Typically the same things, care, quality and type, her symptom presentation, her stressors, her reaction to her stressors, her needs and how best to achieve them. Q. Do you recall what her -- what those stressors discussed were? A. Her being incarcerated was probably the biggest one, and her reaction to such. Her lack of feminine expression and the difficulties that she was having in experiences with other offenders, particularly when the note was left on her bunk that was provocative. I think that had a big impact, you know, on her. |
| 105:3-105:14 | Q. Dr. Ausborn, during your visits with Ashley, did she ever share any concerns with you about her physical safety at Coastal? A. I think when -- I think I expressed that in one of the notes, and I go back to the, quote unquote, privacy violation that she referenced. She was concerned about that because she felt someone had access to her cell, enough to where they could write a provocative note and leave it on her bed. So, I think she had some feelings of safety stemming from that. |
| 109:1-109:12 | Q. All right, Dr. Ausborn. So, when did you stop having visits with Ashley Diamond? A. After the 9/10 visit. Q. And when were you informed that those visits would end? A. I think just prior to seeing her. Q. And who informed you about that? A. I can't recall who the person was. Q. At the end of your visits, had Ashley's gender dysphoria symptoms been fully resolved? A. No. |

| Page and Line Range | Direct Examination Testimony (Ausborn) |
|---|---|
| 110:21-110:23 | Q. Do you know why your visits with Ashley Diamond ended?<br>A. No. No, I don't. |

### May 10, 2021 Deposition of Tamara Cantera

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| 9:16-9:20 | TAMARA CANTERA<br>was thereupon called as a witness herein, and after having first been duly sworn or affirmed to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows: |
| 14:18-14:22 | Q. What was your position at Coastal State Prison?<br>A. I was a mental health counselor and I was the mental health PREA coordinator.<br>Q. Were you a member of the sexual abuse response team?<br>A. I was. |
| 14:23-15:5 | Q. What were your responsibilities at Coastal State Prison?<br>A. I carried a caseload ranging from 50 to, when we were low, at times over 100. I provided a mental health counseling to a wide range of clients. I was responsible for responding to the mental health aspect of PREA. And during the SART team meetings, I advocated mental health. |
| 15:22-15:24 | Q. Who did you report to while you were at Coastal?<br>A. I reported to the clinical director Dr. Fass, Tia Fletcher, and the deputy warden of care and treatment. |
| 16:3-16:11 | Q. Did you discuss your mental health evaluations with anyone?<br>A. With the SART team, yes. And by discuss, I mean I would say during the mental health evaluation, one of the first questions -- one of the questions on the first page is to ask the nature of the incident. Basically kind of what happened, but we don't write down the name of the alleged aggressor. So part of my job would be to describe what the incident was and -- |
| 16:14-16:22 | Q. You said you don't write down the name of the alleged aggressor in your initial evaluation?<br>A. Correct. That is not part of the mental health sexual assault evaluation. You do not list the aggressor's name. |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
|  | Q. Who reviews your sexual assault evaluation? A. That would be Dr. Fass, after I complete them and write the note for a sexual assault evaluation, the PREA victim is then seen by Dr. Fass. |
| 16:23-16:23 | Q. Then what happens? |
| 17:1-18:5 | So when a PREA complaint is made, they can make it verbally, there are multiple ways, email, write a note. An initial notification is sent by whichever SART team member is first notified about the PREA. That is sent to -- an email to all the members of the SART team. Within 24 hours an initial -- the mental health PREA evaluation is completed and then they are scheduled to see Dr. Fass, who only works two days a week. So it would be kind of a gap before Dr. Fass sees them. Witness statements are collected, because I did the mental health evaluation quickly, which I usually collected the victim's mental health witness statement. The security officer who is part of the SART team would then go and get the witness statements from any witnesses listed, the alleged aggressor. The SART team then meets, discusses the incident, comes to a decision. And then there is another piece of paper that is written at the end which -- I'm sorry, I can't remember the exact name of that sheet of paper. Everything is entered into a packet, any evidence is collected. The SART team makes a decision and then I would enter that into the Scribe computer system that we have. Then the victim would be informed by the deputy warden of care and treatment about the SART team's decision. If there was any sexual assault, that would be sent to the OPS investigator. And if there was a recent sexual assault, we would call the SING [sic] nurse. |
| 19:25-20:7 | Q. Who is Ashely Diamond? A. Ashely Diamond was or is a transgendered inmate that was -- I'm not positive where she is current -- was housed at Coastal State Prison during part of my time there. She self-identifies as female and she was not on my caseload. She was on the caseload of Gerilyn Pepin. But I saw her frequently for suicidal ideations and for PREAs. |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| 21:10-21:14 | Q. When did you first meet Ms. Diamond?<br>A. I met her very soon after she came because I believe according to the notes I attached, she was suicidal and I think I filled out a suicide risk assessment instrument shortly after she got there. |
| 22:12-22:15 | Q. During the month that you were talking to Ms. Diamond, did she express any concerns about her placement at Coastal State Prison?<br>A. Yes, she did. |
| 23:11-24:25 | Q. Can you describe what mental health level 2 versus mental health level 3 means?<br>A. Sure. Mental health level 2 is what we saw at Coastal, that is someone that is usually seen about once a month unless they have an emergency or group situation, who is fairly stable. And we see people with all diagnoses and they're able to stay at our prison.<br>Level 3 is where they need a higher level of care in a facility that will have an SLU, supportive living unit or crisis living unit. They are seen much more frequently and are less stable.<br>Q. You said initially Dr. Fass didn't think it was necessary, but that intervention changed; is that right?<br>A. Yes, ma'am.<br>Q. When did that change?<br>A. I don't know if I recall the exact time. It was several months after Ms. Diamond had been there. I believe it was the self-harm that had escalated and that prompted him to make the decision that she would be safer elsewhere.<br>Q. What self-harm were you aware of that led to that decision?<br>A. There was one incident where I saw her over a weekend when I was on call and I noted she had blood, a couple spots of blood on her shirt. When I initially asked her about it, she said it was a hangnail which I accepted because there was a cut on her finger. She later told me she had cut. And I was also informed by Dr. Fass and Ms. Fletcher that she was binding her genitalia and that that was from what I heard in treatment team meetings. I didn't look at her medical record or speak to medical about it. But from what I heard, that it was causing her problems |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | and she was to have see a urologist. She was also frequently verbalizing thoughts of suicide. Q. Is it your understanding that the binding had started to worsen over the month that she was at Coastal? A. Yes, that was my impression. |
| 25:5-25:9 | Q. What about other thoughts of self-harm? A. Yes, I do remember her verbalizing, saying that -- this is not a quote, but saying things about not wanting to live and discussing that it would be along the lines of "it would be easier if I just ended it." |
| 25:14-26:23 | Q. Did Ms. Diamond express any other concerns about her placement at Coastal State Prison? A. Yes. She was concerned about the PREAs and that she did not feel safe. Q. What is your understanding of her safety concerns at Coastal? A. I'm hope I'm going to get this question correct. I do not recall the exact number of PRAEs she filed. But there were several which, and they range from assault and harass -- they were both assault and harassment against staff and other offenders and she just didn't feel like she was in a safe environment, and I think that was part of why she wanted a level 3 because she wouldn't have been housed in a -- she was housed in an open building. It's basically like a giant building where the walls are lined with cells. She had her own because I went in it once to do a PREA. She had her own. The doors are open during the day and she felt that that was unsafe where people could just walk in there and get to her. Q. Were you aware of any history on physical assault or sexual assault in prison? A. Yes, she discussed that. She discusses with me and there was one I don't remember the date or who the aggressor was. In the notes that I got, it was missing a few pages, which I don't know if they just didn't copy correctly. But there was one that she told me about that happened at her previous facility that I did complete the mental health sexual evaluation and I sent it to that prison which is the standard policy to send it there and informed their deputy warden of care and treatment, as well as mine so they could follow-up |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
|  | on it and I entered it into the Scribe system so that the state could track it. |
| 27:3-27:6 | Q. Did Ms. Diamond share any other concerns about being placed at Coastal State Prison? <br> A. Not that I'm aware of. It was mostly her safety and that she thought they were retaliating against her. |
| 27:15-28:9 | Q. Did Ms. Diamond discuss the reasons for her suicidal thoughts? <br> A. Yes. <br> Q. What were those reasons? <br> A. She talked about prior childhood abuse. She spoke about prior assaults, prior harassments, gender dysphoria, and depression. <br> Q. Did she express any concern about being placed in a men's facility? <br> A. Yes, she did. <br> Q. What were those concerns? <br> A. She was concerned that she identified in -- as a woman and had lived as a woman for most of her life or most of her adult life and was having to live as a man and being surrounded by men which made her feel unsafe and she wasn't able to live how she expressed herself or how she felt. <br> Q. Do you know if Ms. Diamond requested placement in a female facility? <br> A. Yes, she did. |
| 28:13-29:3 | Q. Can you tell me a little bit about the PREA reports that Ms. Diamond submitted for sexual harassment? <br> A. Yes. Most of them were against staff. I believe there was one that was against an offender. There was one incident involving the deputy warden of care and treatment. So during that incident, he was not part of the SART team. We went around him because he was an alleged aggressor. <br> I don't remember every detail because that page was missing from the notes I received. I believe he came to her door and was yelling at her and making derogatory comments. There was another incident, or at least two where staff made derogatory comments about her self-identity and just towards her in general. I believe there were inmates that made, you know, inappropriate sexual comments. |
| 29:4-29:18 | Q. How would you describe Ms. Diamond's gender identity? <br> A. She's a woman. |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
|  | Q. Did she present as a woman?<br>A. Yes, she did.<br>Q. How so?<br>A. She had breasts. Usually, even though she wasn't supplied with cosmetics, she was able to kind of craft them a little bit with like -- I know she made nail polish of crayons somehow and colored pencils which was kind of amazing and could make lip gloss like McGyver used to makeup. She had to keep her hair short, which was a big problem for her. She usually had her, you know, her clothes tucked in and kind of -- she just tried her best to express herself as feminine while she was there. |
| 29:19-30:7 | Q. Did GDC staff refer to Ms. Diamond as a woman?<br>A. Some did, some did not.<br>Q. So those that did not, how did they refer to Ms. Diamond?<br>A. They used the pronoun he, him and they would say male.<br>Q. Did you ever hear anyone refer to Ms. Diamond as it?<br>A. Yes.<br>Q. How often?<br>A. I can't name the exact number of times, but five or six probably.<br>Q. Have you ever heard Ms. Diamond referred to as he/she?<br>A. Yes.<br>Q. How often?<br>A. Just a few times. |
| 30:11-30:21 | Q. Can you tell me about Ms. Diamond's reports of sexual assaults at Coastal State Prison?<br>A. Yes. I believe there were three that I can recall. There was one where she woke with someone on top of her attempting to sexually assault her. There was another where there was inappropriate touching. There was one against staff where she was strip searched by a male officer. That's the only ones I can remember.<br>Q. You conducted mental health evaluations for these PREA complaints?<br>A. I did. |
| 32:8-32:24 | Q. During these mental health evaluations, what symptoms did Ms. Diamond exhibit or did you note in your documents?<br>A. From what I remember from this morning when I looked at them and last night, she had increased anxiety, increased panic, hypervigilance, nightmares, basically |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | PTSD and trauma symptoms, feeling on edge, and I think her depression was increased. Q. Are these symptoms in line with someone who has been subject to sexual abuse? A. Yes, they are. Q. Did you ever recommend that Ms. Diamond be placed in safe housing? A. I did. Q. What was that recommendation based on? A. Her fear, her panic, and her statements of not feeling safe. |
| 37:4-37:15 | Q. Do you know how many times you recommended safe housing for Ms. Diamond? A. I don't, but probably with most of the PRAEs I completed. Q. Did you ever recommend that Ms. Diamond be moved from her alleged aggressor? A. Yes. That would happen with every PREA. That is part of the PREA policy. That's one of the first steps is to move them away from the alleged aggressor. Q. To your knowledge, was Ms. Diamond ever moved from her cell at Coastal State Prison? A. No, she was not, not to my knowledge. |
| 37:15-37:15 | A. No, she was not, not to my knowledge. |
| 39:4-39:13 | Q. Did you see any PREA notices regarding conditions at Coastal State Prison? A. I think there was one, yes. I think there was one talking about harassment and being around aggressors I think is what it says. Q. Did you see that PREA notice? A. I did. Q. Did other members of the SART team see that PREA notice? A. Yes. |
| 42:9-42:19 | A. I don't recall if this was one she was reporting at a previous institution or at Coastal because I did almost, I'd say 95 percent of the mental health PREA evaluations for everyone at Coastal. So they kind of run together. This one was -- if this occurred at Coastal, the date it occurred will be listed on the front page. Then we can check and make sure that it happened while she was at Coastal. This would have occurred in her dorm room |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | where another offender -- one of the ones where she woke up with him on top of her. |
| 45:9-45:22 | Q. Would you say that her mental health state effected her ability to discuss the details? A. Yes. Q. Did Ms. Diamond ever talk about a lack of trust in the system? A. Yes. Q. What did she say? A. She basically said that. She did not trust the system and -- I mean, these are not direct quotes. That people would say one thing and another thing would happen and that she didn't trust that she would be protected or the PRAEs would go anywhere. Q. Did she tell you what her basis was for that belief? A. Prior experience. |
| 46:4-46:11 | Q. You said that Deputy Warden Betterson said that they were making arrangements for Ms. Diamond's lawyers to be present; is that right? A. Yes. Q. Would it have been difficult to have a lawyer present by phone? A. Not to my knowledge. It seems that we could just put them on speakerphone. I had a speakerphone capability |
| 47:2-47:5 | Did you inform Ms. Diamond that declining to share details without counsel present would end a PREA investigation? A. No, I did not. I told her the opposite. |
| 51:8-52:19 | MARKED FOR IDENTIFICATION: DEPOSITION EXHIBIT 2 10:15 a.m. THE TECH: This is Alex, the tech, speaking. Exhibit 2 should be available in that same folder. You may have to refresh that window. MR. CHALMERS: I have it now. Thank you. BY MS. RAJARATNAM: Q. Ms. Cantera, can you see the document? A. I can. Q. Do you recognize this document? A. I do. I wrote it. Q. What is it? A. This the investigative summary from a PREA. Actually apparently three PREA allegations that were kind of combined into one for Ms. Diamond. This is the last |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | piece that is done after the SART investigation is completed.<br>Q. And do you say that you wrote this document?<br>A. I did.<br>Q. What was the outcome of the investigation?<br>A. There was no outcome really. I'm not positive if this in the one that I'm thinking of because I would need my whole mental health file. If this is the one where she was unable to provide information, I was directed to close this.<br>Q. Can you say that again? I don't hear you.<br>A. This was an incident where Ms. Diamond was unable to finish the interview or provide any information and I was directed by the deputy warden of care and treatment to close this investigation.<br>Q. This is deputy warden of care and treatment Carl Betterson?<br>A. Yes.<br>Q. What was the date of the alleged incident, alleged incidents?<br>A. September 18th, 19th, and 20th. |
| 54:23-55:1 | Q. From that document, there's no investigation into any video footage?<br>A. No. It would have said video footage if there was investigation into that. |
| 55:8-55:19 | Q. Do you find Ms. Diamond -- do you find Ms. Diamond to be credible?<br>A. Do you mean professionally or my personal opinion or both?<br>Q. Both.<br>A. Okay. I do not recall any incident where she was untruthful, not that I can remember. She seemed genuine when I spoke to her. Her emotions and her affect matched what she was saying. Yeah, I don't recall any untruths or anything.<br>Q. Is that your professional or your personal opinion?<br>A. Both. She seemed very sincere when I spoke to her. |
| 59:12-59:24 | Q. When Ms. Diamond got to Coastal State Prison, was she labeled a PREA victim?<br>A. Yes.<br>Q. Why was she labeled a PREA victim?<br>A. We do a victim and aggressor classification screening when every offender arrives to prison. There are several factors that can make you a victim. It's |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | because of her prior victimization.<br>Q. What are those factors?<br>A. The factors that made her a victim? The biggest one was all you need to be is a prior victim of PREA, and you were a PREA victim. You are labeled as a victim or potential victim. |
| 60:9-60:12 | Q. Do you know what the factors were for Ms. Diamond specifically?<br>A. That she was a victim of sexual assault while in a facility. That would immediately make it. |
| 61:14-62:9 | non-violent. Okay. I'm good.<br>Q. You can take down that exhibit. Do you now remember what factors weighed in favor of Ms. Diamond being classified as a PREA victim?<br>A. Yes. The non-violence, she didn't feel safe. I forgot about that one. That they feel vulnerable, that was a big question. Those all go towards alleged victim. The only thing that will make you a PREA victim is if you have been a prior victim, to my knowledge.<br>Q. Just to be clear again, Ms. Diamond, she didn't have -- you weren't aware of any history of sexually aggressive behavior?<br>A. Not that I remember, uh-huh.<br>Q. Did she have any history of sexual assault?<br>A. Being a victim or the aggressor?<br>Q. Of being the aggressor.<br>A. Not that I remember.<br>Q. Were you aware of any prior convictions for violent offenses of Ms. Diamond?<br>A. No, no. |
| 67:10-68:5 | Q. To your knowledge, was Ms. Diamond ever moved to level 3?<br>A. Yes, she was.<br>Q. When was she moved to a level 3?<br>A. I don't remember the date. I believe it was spring or summer. We made the decision in our treatment team and then there were some other providers on a phone, on two phones. Osborn and Rohn, I think. Other psychiatrists, psychologists and Dr. Roth. We all spoke and the decision was made to make her level 3. She was sent and came back after a few days.<br>Q. Where she was sent?<br>A. I don't remember. |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
|  | Q. You said she came back to Coastal State Prison after a few days?<br>A. Yes.<br>Q. Why did she come back?<br>A. I was told that the decision by the treatment team was overridden by GDC administration.<br>Q. Who told you that?<br>A. Dr. Fass and Ms. Fletcher. |
| 76:24-77:7 | Q. Ms. Cantera, I just have a few more questions. When you left GDC in October of 2020, what was the state of Ms. Diamond's mental health?<br>A. I don't remember if she was suicide precautions or not. I remember her still expressing, not constantly, but she would every now and then express passive SI. She was anxious, displaying signs of PTSD, like trauma symptoms, like depression, nightmares, anxiety, hypervigilance and was just anxious and depressed. |
| 77:18-77:23 | Q. Were you aware if Ms. Diamond was binding her genitals at that time?<br>A. I was.<br>Q. Was she still binding at that time?<br>A. I believe she was, yes. I don't remember a timeline for it, but I don't remember it stopping at any point. |
| 78:2-78:3 | Q. You said earlier that Ms. Diamond is a woman?<br>A. Yes, that's how she self-identifies, yes. |
| 79:5-79:17 | Q. You mentioned earlier that you were a mental health counselor at Coastal State Prison, but you were not Ms. Diamond's regular assigned counselor it; is that correct?<br>A. That's correct.<br>Q. And Ms. Pepin was the assigned counselor to Ms. Diamond?<br>A. Correct.<br>Q. But you did mention that you interacted with Ms. Diamond as a SART member and then also in your involvement with the PREA investigations or PREA inquiries. Did I hear that right?<br>A. Yes. |
| 83:7-83:17 | Q. Okay. You mentioned at one point in discussing either SART investigations or PREA investigations that occasionally or if it's a sexual assault it can be sent to OPS for investigation?<br>A. Correct.<br>Q. Are you aware of any of Ms. Diamond's allegations that |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | were sent from Coastal State Prison that were sent to OPS for investigation?<br>A. I didn't send them. That would have been Deputy Warden Betterson. But anyone that involved a sexual abuse should have been sent to OPS. |
| 85:2-85:13 | Q. You were asked about Ms. Diamond's allegations or reports of sexual assault and there were three that you mentioned that you could recall. One, she woke up with someone on top of her; another there was inappropriate touching; and another involved a report that a staff member strip searched her, a male officer?<br>A. Correct.<br>Q. Those are the three sexual assault reports from Ms. Diamond at Coastal State Prison that you recall; is that right?<br>A. Correct. |
| 86:25-87:8 | Q. You indicated previously that in the course of your PREA work relating to Ms. Diamond or your SART team work relating to her that you on occasion made recommendations for safe housing. Do you recall that?<br>A. Yes.<br>Q. Did you make a recommendation that Ms. Diamond be placed in a women's facility?<br>A. No, I never wrote that down, no. I never said that because I knew it wouldn't happen. |
| 95:7-95:12 | Q. Are you aware of any mental health staff other than yourself who recommended that Ms. Diamond be transferred to a women's facility?<br>A. Yes.<br>Q. Who is that?<br>A. Ms. Pepin. |
| 96:2-96:7 | Q. The recommendation for safe housing that you would indicate from time to time in your PREA or SART reviews those were based on Ms. Diamond's reports to you of incidents she said occurred; is that correct?<br>A. It was the report of incidents and her current mental health state. |
| 103:21-104:9 | Q. Ms. Cantera, what I have marked as Defendants' Exhibit 4 has three pages all together, so when you get access, just take a quick look through those.<br>A. I'm reading them now.<br>Q. Okay. So this is a similar set of progress notes. You recognize them as your own? |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | A. I do. <br> Q. You recognize your signature at the bottom of each of three pages in Exhibit 4? <br> A. I do. <br> Q. Again, these were instances where you met with Ms. Diamond to discuss a PREA incident or a PREA report; is that correct? <br> A. Correct. |
| 104:21-105:2 | Q. So the 7/31 time, from this document that would be the third time that you went to talk with her, Ms. Diamond provided information then? <br> A. Correct, she did. <br> Q. What was the information that she provided? <br> A. It would have been details about an PREA that occurred on 7/3. I would have to see the PREA report to know. |
| 107:4-107:5 | Q. Do we have Exhibit 5 up for you yet? <br> A. Yes. |
| 107:10-107:17 | Q. Is that your signature on the bottom? <br> A. Yes. <br> Q. This is dated July 8, 2020? <br> A. Mm-hmm, correct. <br> Q. What is it that Ms. Diamond reported to you at this time? <br> A. That she was being it looks like hitting on or sexually harassed in her dorm. |
| 111:18-113:5 | MR. CHALMERS: Can we take a look at Defendants' Exhibit 7, please? <br> MARKED FOR IDENTIFICATION: <br> DEFENDANTS' EXHIBIT 7 <br> 12:19 p.m. <br> A. Okay. <br> BY MR. CHALMERS: <br> Q. Have you had a chance to look at Exhibit 7? <br> A. I have. <br> Q. It is a five-page document. Do you recognize it as a document that you created? <br> A. Yes. <br> Q. Okay. You mentioned earlier that in doing interviews related to SART investigations that you would document your work, there would be several pages and there would be a confidential page on top. Is this what you were referring to? <br> A. Yes, this is it. <br> Q. The first this one, Defendants' Exhibit 7, has a |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | handwritten date near the top which indicates the inmate was involved with a sexual allegation on 10/10/20. Do I read that right?<br>A. Yes.<br>Q. This one relates to something Ms. Diamond said occurred on October 10, 2020?<br>A. Correct.<br>Q. What she alleged you have to go a few pages into the document.<br>A. Mm-hmm.<br>Q. Is it correct she alleged she was told by another offender that an alleged aggressor was observed rubbing the buttocks of the alleged victim in alleged victim's room?<br>A. While she was sleeping, yes.<br>Q. That's what Ms. Diamond reported to you?<br>A. Yes.<br>Q. And then you documented the report on this form?<br>A. Correct. |
| 113:13-113:16 | Q. On the last page you wrote under plan, "Follow-Up with psychologist and then also recommend placement in safe housing." Do you see that?<br>A. I do. |
| 113:25-114:5 | Q. Would you do that in virtually all cases?<br>A. Not in all of them, no.<br>Q. But it would be a common response when an offender reports to you sexual incidents of this kind?<br>A. It was common when they reported that they felt unsafe. |
| 120:6-120:15 | Q. Ms. Cantera, let me know when you have had a chance to go through Exhibit 11, which is a five-page document.<br>A. Okay.<br>Q. Exhibit 11 is your report, correct? Defendants' Exhibit 11 is your report?<br>A. It is.<br>Q. Is it one that you created report an allegation of sexual -- a sexual allegation occurring on the date of July 3, 2020?<br>A. Correct. |
| 121:1-121:10 | Q. As far as what information was ultimately shared and what you documented, that's on the page DEF 458?<br>A. Okay.<br>Q. So Ms. Diamond reported alleged aggressor came into room, her room from another dorm. And without |

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | speaking attempted to pull her pants down and force his penis inside of her buttocks alleged victim stated after fighting some others from her dorm entered and pulled away the alleged aggressor who then left? A. Correct. |
| 125:6-125:25 | Q. Are you aware of any risk of retaliation from other incarcerated people from those filing PREA reports? A. Yes. Q. Is that a common concern for potential PREA victims? A. Yes, it can be common about not wanting to identify someone. Q. Are you aware of the risk of gang retaliation if one identifies a PREA aggressor? A. If the aggressor is a gang member, yes. Q. Did Ms. Diamond express concern about retaliation to you about her PREA reports? A. Yes. Q. What were those concerns? A. She was concerned to name people because she said it would make her feel unsafe. Q. What do you mean by unsafe? A. I can't recall exact conversations because it was a while ago. I remember her saying along the lines of not feeling comfortable with the aggressor knowing she identified them. |
| 126:1-126:9 | Q. Did she express any fear of physical violence? A. Yes. Q. Physical violence in retaliation for reporting a PREA incident? A. I don't know if it was in retaliation, but I know that she did express it was part of her feeling unsafe. Q. Unsafe to identify a PREA aggressor? A. Yes, and unsafe in her house. I don't know if it was because of retaliation or not. |
| 126:10-126:20 | Q. Okay. You earlier said that you didn't recommend placement in a female facility for Ms. Diamond because you knew it wouldn't happen; is that right? A. Yes. Q. Why did you know it wouldn't happen? A. Dr. Fass told me that that would not happen. Q. What specifically did he say? A. I think we just had a non-on-the-record conversation about what would be good for her and he said that |

31

| Page and Line Range | Direct Examination Testimony (Cantera) |
|---|---|
| | won't happen. Something along those lines that that wasn't really an option. |
| 126:21-127:9 | Q. Wasn't an option because he wouldn't recommend it? A. No, not that I understood. It just wasn't an option -- because she because on the floor and she was identified as -- even though I saw her as transgender and I was going to help her and other forms identified her as male. We had a discussion that at this time we don't place people just where they identify, if that makes second. Q. Dr. Fass said that? A. Yes. Q. When he said we, was he referring to GDC officials? A. That's not his exact quote. It was basically GDC places people based on their sex, not their gender identity. |

**May 11, 2021 Deposition of Daniel Fass**

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| 6:16-6:22 | DANIEL F. FASS, Ph.D., having been remotely sworn by the Court Reporter, testified as follows: THE REPORTER: Please state your full name for the record. THE WITNESS: My name is Daniel Field Fass. |
| 8:25-9:6 | Q. You understand that you are under oath today, right? A. Yes, I do. Q. Is there any reason that you would not be able to give complete and honest answers to my questions today? A. No, there's not. |
| 15:6-15:13 | Q. Is the Georgia Department of Corrections your actual employer? A. No, I'm sorry. I work for -- I've been a contractor through -- for the Department of Corrections for the last seven or so years. At first I worked for MHM and then they merged with Centurion; I believe that's probably been about two years. |

| Page and Line Range | Direct Examination Testimony (Fass) |
| --- | --- |
| 17:11-17:25 | I was about to ask you what your job title is with MHM?<br>A. Clinical director.<br>Q. Clinical director of the state, of the facility?<br>A. Clinical director of the mental health at Coastal State Prison and Emanuel Womens Facility.<br>Q. What are your responsibilities as clinical director?<br>A. Supervision, quality improvement, making treatment teams or organizing treatment teams, making more difficult clinical supervision -- or making more difficult clinical decisions, crisis intervention. |
| 18:7-18:14 | Q. Do you know Ashley Diamond?<br>A. I do.<br>Q. Who is Ashley Diamond?<br>A. Ashley Diamond is an inmate at Coastal State Prison. I believe she came to us in June of 2020.<br>Q. Is she your patient?<br>A. She is. |
| 18:15-19:8 | Q. What are Ms. Diamond's mental health diagnoses?<br>A. Gender dysphoria, major depressive disorder, post-traumatic stress disorder. I believe that's it.<br>Q. So you mentioned gender dysphoria. That means Ashley Diamond is transgender, correct?<br>A. Correct.<br>Q. How did you become aware of Ms. Diamond's gender dysphoria diagnosis?<br>A. Well, I heard previous -- I think I've known about the case that she previously had before, so I had heard who Ashley Diamond was previous to her coming to our facility, but as she came to our facility she already carried a diagnosis of gender dysphoria and her chart had already indicated that she was a transgender female. |
| 19:9-20:3 | Q. So you were aware that Ms. Diamond had gender dysphoria before she got to Coastal? |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
|  | A. Yes, ma'am.<br>Q. What about her PTSD diagnosis?<br>A. Yes, ma'am. It was already there.<br>She had been previously assessed at the<br>diagnostic and classification prison before she<br>transferred to Coastal.<br>Q. Do you know what caused her PTSD?<br>A. Yeah. I believe it's related to<br>multiple sexual assaults.<br>Q. Where did the sexual assaults<br>occur?<br>A. Mostly while incarcerated.<br>Previously, in a previous incarceration, and<br>then she's also had some reported assaults<br>during this incarceration as well.<br>Q. And those are all at men's<br>facilities; is that correct?<br>A. Yes, ma'am. |
| 22:14-23:1 | What role do you play, do you play<br>in Ms. Diamond's gender dysphoria care?<br>A. At an individual facility that<br>close to when we get somebody with gender<br>dysphoria, we will try to advocate for different<br>privileges that would be unique to a transgender<br>offender like in Ms. Diamond's -- first of all,<br>our number one priority would be to provide some<br>sort of mental health treatment.<br>But then after that we've mostly<br>been in an advocate role, just because people<br>with gender dysphoria aren't going to do as well<br>being treated like a male inmate. |
| 23:2-23:19 | Q. Can you tell me more about that.<br>A. Yeah. Well, in Ashley Diamond's<br>case, I believe when she got here we, our first<br>thought was, boy, you know, she's going to have<br>some problems with safety. So we advocated to<br>get her her own cell in one of the safer dorms<br>that we had. We advocated to get her some<br>female clothing. And I believe she was already<br>on hormones when she came in but if not, we<br>would be the ones who would then alert medical<br>to put in an endocrinology consult to put the<br>diagnosis down in a medical chart if it wasn't<br>already there. |

| Page and Line Range | Direct Examination Testimony (Fass) |
| --- | --- |
| | Q. So to be clear, your concern about the transgender inmate at Coastal is related to the fact that she's a transgender woman in a male facility? A. Yes, yes, absolutely. |
| 23:22-23:24 | So that's because she would be in danger from assault by the male inmates? A. Yes. |
| 24:11-24:14 | Q. Is that a concern that you would have if Ms. Diamond was in a women's facility? A. No, I would not have the same sort of victimization concerns at a female facility. |
| 24:24-25:7 | we talked about Emanuel. But system-wide in GDC, are you aware of any transgender women who are being housed in women's facilities for GDC? A. I'm not. Q. Do you know if GDC authorizes transgender women to be placed in women's facilities? A. I do not think they do but I don't know the -- I don't know specifics. |
| 28:8-29:23 | Q. And so you said that normally that would be provided by someone else, but that in Ms. Diamond's case you've become involved; is that right? A. No, so the actual therapy portion of it, like providing this sort of therapeutic module, has been done by one of my counselors, but because Ms. Diamond has been on suicide precautions for so long, and what that does, suicide precautions, we see her twice a week. That's the SOP. And I can't -- I don't have enough counselors or enough -- or my counselors don't have enough time to see someone that frequently for that long of a period of time, so I have become the go-to for making these therapeutic contacts once a week. And my focus has not necessarily been on gender dysphoria because she has been in such a state of acute distress for so long it really is, you know, checking in and assessing her dangerousness and providing some cathartic relief. Q. When you say dangerousness, is |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| | that dangerous to herself, dangerous to others? A. Right, dangerous to herself, not dangerousness to others. I just assess her suicidality when she comes in. Q. You said that she's been in a state of acute distress. Do you have a sense of what's causing that distress? A. Yeah. I mean, certainly the overarching factor is that she's a transgender female in a male prison, but with that, you know, she continuously has disagreements with security staff. She has this legal process going on. Her time for being in prison has been longer than she believed. So you have a lot of incidents pop up, almost weekly. And also, you know, there have been multiple allegations of sexual assault. So it's been a constant crisis intervention. |
| 31:3-32:3 | Q. Are there issues that you can think of where you have recommended something that GDC administration has failed to implement? A. Yeah. Well done. So, I can't give you the exact dates, but on two occasions I increased, or in conjunction with the treatment team we increased Ms. Diamond's level of care, mental health level of care from a 2, which is typically like an out-patient, someone who needs out-patient therapy once a month, to a 3, which would result in someone needing more frequent mental health treatment, like at least two times a month, seeing the psychiatrist more often, and being in what is supposed to be an easier living environment with people with -- with people who typically have difficulty living in general population, whether it be because they have a serious mental illness or an intellectual disability or they're high victimization risk, or combined. Q. So on two occasions you recommended that Ms. Diamond be raised from this Level 2 to Level 3, and did GDC implement that recommendation? A. No, they did not. |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| 32:22-33:19 | Q. But to be clear, despite all of that, the treatment team still thought that her levels should be increased to Level 3? A. Yes, ma'am. Q. Why did your opinion on that change? A. You know, I just -- I don't want to say I. You know, we got to the point where for a while she was, you know, chronically endorsing suicidal ideation. She had been out to our ACU or CSU, which is our crisis stabilization bed. She was reporting frequent victimization. And, you know, at that point I just didn't feel like she was going to be safe at our facility. And not just, you know, safe from assault, but safe from herself. In theory, when you make someone a Level 3 and you increase their level of care, you think that they're going to go to a facility and in that facility a supportive living unit where, just like it sounds, there's going to be less instances of victimization and more opportunity for mental health treatment. |
| 34:9-35:8 | Q. Sure. So, is it true that gender dysphoria symptoms include things like suicidality and depression, self-injury, those sorts of things? A. Sure. Q. And then is it a goal of gender dysphoria treatment to reduce the occurrence of symptoms like that? A. Yeah. Yes. Q. Okay. So, what happens if, in spite of treatment, those symptoms persist? What should happen? A. Well, it depends how severe the suicidal ideation is, but I think I know what you're getting at. You need to -- in my opinion, you need to alleviate the environment, and in this case, you know, when you're in a toxic environment -- and prison is a toxic environment for many people, not just people with gender dysphoria, but I think it's worse for -- I mean, |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| | I know it's worse for transgender inmates. The victimization risk is much higher. You know, I think you need to get them into the safest possible environment. |
| | Q. So, aside from the Level 3 recommendation, have you recommended that Ms. Diamond be transferred to a facility other than Coastal? A. Yes, ma'am. Whenever I -- you know, like I said -- let me backtrack just a little. I'm going to stay on the same topic but, you know, after our decision to increase her level of care, you know, after she came back and she was -- and she remained at our facility, I was kind of wary to make more attempts to transfer her because it is sort of traumatic to think that you're leaving and go to another facility and come right back. Whatever, when you go to another facility, obviously when you get there, you're strip searched. So I didn't want to make those recommendations to increase her level of care anymore after they had already been denied. But, yeah, after she would report a PREA, which is a sexual allegation, I would typically write on my notes that she needs a transfer for security purposes. Q. How many times did that happen? A. How many times did she report sexual allegations, or how many times did I write in my notes that she needed to be transferred for safety and security purposes? Q. The second one. How many times did she be transferred? A. In my progress notes, which should be attached to the PREA allegations and reviewed by the head of the Sexual Allegation Committee, I don't know, I bet you know, but I bet it is two or three times, at least. Q. So you mentioned that your progress notes get attached to the PREA report and reviewed by the head of the sexual allegations committee; is that right? |
| 35:9-37:2 | A. Yeah, that's what I believe |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| | happens. There's a packet that goes along with -- when someone reports a sexual allegation, there's a PREA packet. And my part in that would be to provide the follow-up. |
| 37:15-37:21 | Q. So since Ms. Diamond has arrived at Coastal, has she demonstrated anxiety? A. Yes, ma'am. Q. Depression? A. Yes, ma'am. Q. Suicidality? A. Yes. |
| 38:3-38:6 | I know you said earlier that Ms. Diamond has been on suicide precautions for seven months. Is that right? A. That's right. |
| 39:15-39:20 | Q. So you used the term "imminently suicidal" Has Ms. Diamond been qualified as imminently suicidal during her time at Coastal? A. Yes, I believe so. Well, I'm sure she has because I believe we sent her to an ACU or CSU. I just can't remember exactly when. |
| 44:19-45:7 | Q. What about making notes about Ms. Diamond's suicidality? A. Well, yeah, I typically -- like I think I went over before, when I see her, that's what I'm doing when I talk to her. I'm trying to see if she's future oriented, I'm trying to see if she's engaging in nonsuicidal self-injury. And so typically I'm writing notes; in my progress notes I'm commenting on her suicidality frequently. Q. What's the purpose of those notes? A. To document her care. To let other providers know how she has either behaved or progressed or worsened in the past. |
| 53:18-54:15 | Q. So you mentioned earlier that Ms. Diamond had been traumatized by the environment at Coastal. Is part of how she's been traumatized, in your understanding, the sexual assaults that she says have occurred? A. Yeah, that's been part of it. Q. Did Ms. Diamond discuss any of those sexual assaults with you? A. Yes, ma'am. Probably every one |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| | that's been reported as a PREA incident I've discussed with her.<br>Q. Have you ever had any reason to doubt she was telling you the truth when she discussed those with you?<br>A. No, I've not. I mean, I like to take people from their word. I don't think that they're -- I did not think that like she was building a case to transfer by reporting all of these incidents. In fact, I think if anything, they're probably underreported. Just knowing what goes on in a male prison, I imagine that she could report a lot more instances of just general harassment than she has. |
| 56:15-56:19 | So, to be clear, though, her risk of sexual victimization would go down if she were at a women's facility, of course, in your opinion?<br>A. Yes. |
| 56:24-57:2 | Is continued sexual victimization, would that contribute to and exacerbation Ms. Diamond's PTSD?<br>A. Makes it worse. |
| 61:9-61:11 | MS. CLEMONS: Alex, if you would pull up ECF 78 and mark it as Fass Exhibit 4. Specifically, Alex, it's 78-06. |
| 61:18-61:19 | (Exhibit Fass 4 marked for identification.) |
| 61:24-62:4 | Q. Dr. Fass, can you tell me what this is?<br>A. It's a grievance form written by Ms. Diamond.<br>Q. What's the date on that?<br>A. July 15th, 2020. |
| 62:8-62:13 | Q. The resolution requested by Ms. Diamond on this form is "transfer to a female facility that can accommodate health and safety needs." Did I read that correctly?<br>A. Um-hum. |
| 62:16-62:23 | Q. Was Ms. Diamond requesting transfer to a female facility in this grievance honored, Dr. Fass?<br>A. No.<br>Q. To your knowledge had any |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
| | transgender woman's request to be transferred to a female facility been honored by GDC? <br> A. Not to my knowledge. |
| 63:16-64:1 | Q. All right. I want to begin by going back to Ms. Diamond's arrival at Coastal State Prison. I believe you stated that it was in June of 2020; is that correct? <br> A. Yeah, I believe so. <br> Q. And you also stated that when Ms. Diamond arrived at Coastal, you believed that there could be problems with her safety and the potential for victimization because Ms. Diamond is a transgender inmate; is that correct? <br> A. Yes, sir. |
| 64:12-64:15 | Q. Okay. You said that you discussed your concerns regarding her safe housing with Warden Benton; is that right? <br> A. That's right. |
| 66:15-66:20 | Q. Do you know whether particularly violent inmates are likely to be housed in the faith and character dormitory? <br> A. Not usually. Some slip through, you know, sometimes more violent or more sexually impulsive inmates do get in N-building |
| 67:16-67:22 | So, I wouldn't feel right if I didn't put it in there that, you know, a larger population of sex offenders live in safe housing, whether it be N-building or some other form of safe housing, at all prisons because they are much more vulnerable. Other prisoners are more violent towards them. |
| 83:14-83:17 | Q. And then just briefly, I wanted to go through, Mr. Shapiro talked to you a lot about the N-dorm at Coastal. <br> A. Yeah. I -- go ahead. |
| 83:21-83:25 | Q. To be clear, you had requested safety transfers for Ms. Diamond out of that dorm; is that correct? <br> A. Right, right, to a different facility, not anywhere else at our facility. |
| 84:15-85:3 | Q. So the N-dorm, the current dorm where she is, has been her only permanent placement at Coastal? <br> A. Yes, ma'am. |

| Page and Line Range | Direct Examination Testimony (Fass) |
|---|---|
|  | Q. Okay. And the sexual assaults that we discussed that Ms. Diamond alleged the PREA reports happened at Coastal, all happened while she was in that dorm? <br> A. Yes. <br> Q. But Ms. Diamond is still in that dorm? <br> A. Yes. <br> Q. And still in that same cell? <br> A. Correct. |

**May 10, 2021 Deposition of Tia Fletcher**

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| 15:8-15:21 | Q. Ms. Fletcher, what is your educational background? <br> A. I have a master's in social work from Savannah State University. <br> Q. How long have you been in the social work field? <br> A. Since 2011, but I started at Coastal in 2016. <br> Q. Where do you currently work? <br> A. At Coastal State Prison in Garden City, Georgia. <br> Q. And you have been working at Coastal State Prison since 2016 you said? <br> A. Yes, ma'am. <br> Q. Who is your employer? <br> A. Currently my employer is Centurion. <br> Q. What is your job title at Coastal State Prison? <br> A. My current job title is mental health unit manager. |
| 15:22-16:8 | Q. What are your responsibilities? <br> A. So basically I ensure that everybody on the mental health -- every offender that receives mental health treatment from my department is treated fairly, that they have access to services that are needed, they receive their medication in a timely manner, the documentation considering like treatment team, documentation, treatment planning, monthly notes, all of those things are completed in a timely manner. If any of them require crisis stabilization services or a high level of care, that those services are arranged, insured and that they're delivered there. |
| 16:9-16:22 | Q. Do you have any other responsibilities beyond what you just described? |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
|  | A. I also am a member of -- I was previously a member of SART, but I was moved to SAIRT which is the incident review team for the SART incidents that take place at Coastal. I'm also the EAP coordinator and that's about it.<br>Q. How long were you on the SART team?<br>A. I have been on the SART team since 2016. I just came off probably in 2020 and moved to SAIRT.<br>Q. When in 2020 did you get moved off the SART team?<br>A. I don't know. Ms. Pepin, that is the counselor who took my place on the SART team. I don't know her exact start date, but it was around when she started. |
| 17:9-17:12 | Q. Who do you report to?<br>A. At the facility, I report to Deputy Warden Carl Betterson, but for the company Centurion I report to Yenez Knight. |
| 18:3-18:8 | Q. When did you first learn of Ashley Diamond?<br>A. I was notified that she was arriving on an intake day and -- by our warden. That was sometime in June, I believe, if I'm not mistaken or maybe slightly before. I was notified basically via my warden that she was transferring to our facility from Jackson. |
| 18:9-18:14 | Q. Was that the first time you had heard of Ashley Diamond?<br>A. Only because I had been -- I had been working in the prison. I had heard of her, but never any detailed information, just that she was a transgender that had been housed in GDC custody before. |
| 19:7-19:10 | Q. Are you aware that Ms. Diamond is a transgender woman?<br>A. Yes.<br>Q. And that she has a diagnosis for gender dysphoria?<br>A. Yes, I am. |
| 19:7-19:8 | Q. Are you aware that Ms. Diamond is a transgender woman?<br>A. Yes. |
| 22:17-22:22 | Q. Does looking at this document help you remember if Ms. Diamond shared any concerns about her safety?<br>A. The concerns she voiced weren't for Coastal. Reading it, it does refresh my memory. She didn't say concerning Coastal. It was more so of her departure from GDCP. |
| 23:3-23:14 | What concerns did Ms. Diamond voice about GDCP?<br>A. That she had been treated unfairly. That there were some concerns of certain processes I guess, if you |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | will, weren't conducted appropriately, but she did not elaborate. It wasn't until later that we learned of the processes that she felt were not being done correctly. At that time, like I said, intake was brief. We try to keep it as brief as possible. I didn't really want her to elaborate. I just kind of tried to keep it as clear and short as possible to get her in and out of the area. |
| 23:15-23:25 | Q. Did Ms. Diamond make you aware of any history of suicidality? <br> A. She did. On the form -- I guess you can see. She was vague. She didn't give us -- other than me putting several -- she didn't give me like any specific dates or events, but everything that she reported, I just wrote down. <br> Q. Did she inform you that she had attempted to hang herself in the past year? <br> A. Correct, which is why I noted it on the reception screen. |
| 24:1-24:10 | Q. Did she make you aware of any history of self-castration? <br> A. Yes, ma'am. <br> Q. What did she tell you about? <br> A. No mention of how recent or the magnitude of it, but just that she did at times bind and perform self-mutilation on herself. <br> Q. Self-mutilation. Did she also talk about binding? <br> A. She didn't clarify. Those are the two terms that she gave me when I asked the question. |
| 24:18-25:9 | Q. Ms. Fletcher, you said at intake Ms. Diamond talked about her safety concerns from GDCP, right? <br> A. Yes, ma'am. <br> Q. Did she eventually share these safety concerns about Coastal State Prison? <br> A. She did on several different occasions. I can't give specific dates and times. I just know that some of the concerns that she had were voiced with me. Yes, ma'am. <br> Q. You cut out. What did you say? <br> A. I can't give specific dates and times of those discussions. She did eventually discuss some safety concerns that she was experiencing while at Coastal. <br> Q. What were those safety concerns? <br> A. She alleged that she had been assaulted, that she was |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | being sexually harassed, that she was -- she felt like strip searches were done inappropriately for her. |
| 25:17-26:6 | Q. So when she was talking about harassment, did you specify whether it was staff or incarcerated people or both?<br>A. She identified both. I didn't mean to talk over you. She identified both. Yes, ma'am.<br>Q. Did she express how often she was experiencing harassment from staff?<br>A. No, not that I can recall.<br>Q. What about harassment from other incarcerated people?<br>A. She didn't speak to the frequency of it, not that I can recall, but I know that she did -- it was a normal conversation. It was something when she came in the department, if she wasn't disclosing it to her counselor, she would definitely stop by and notify me of it. |
| 26:7-26:22 | Q. How often did she interact with you?<br>A. Initially every offender sees a counselor once a month. Because I'm not technically a counselor, I'm the unit manager, offenders that are more concerning, they will stop in and speak with me. I don't -- I can't really say how often I have spoken with her, but I know it has been -- I don't want to say regularly to make it seem like it's a one-time thing. I don't know how to clarify that.<br>Q. Multiple times a week?<br>A. No, not that often. Once she was placed on suicide precautions, her contacts were increased, but prior to that, maybe the regular -- maybe about once a week if possible. It wasn't just my contact, though, so I would step in and check on her. She wasn't seeing me once a week. It was more so her counselor. |
| 26:23-27:18 | Q. Were you aware of any safety issues Ms. Diamond had around sexual assault?<br>A. Only those that she voiced concerning the PREA allegations that she made.<br>Q. What were those allegations?<br>A. There were some instances that she did not report, that she refused to report and then later did disclose. I can't remember each specific incident. But there were definitely some that stuck out because I was -- I actually -- you know, she explained to me what was going on. So I'll give you those specific |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | ones.<br>Q. Can you just tell me what stuck out?<br>A. I know one incident where she was alleging that there was an offender who was in her room watching her sleep and masturbating as well on her or at the side of her which ended up being a lot more serious because she complained that her door not locking was the main reason why that offender was able to enter without her permission and be in her room. That was something we actually discussed with security upon being notified. |
| 27:19-27:25 | Q. And what was the response from security?<br>A. That I don't know. They don't follow-up with us. I just know it was discussed with the Deputy Warden of Security at that time and the warden. I'm not sure if they put a work request in or not. I can't do that from my area. It has to be a departmental secretary, but they were notified. |
| 30:22-34:8 | Q. How did you communicate about Ms. Diamond's care among the mental health team?<br>A. A treatment team, which we have once a week.<br>Q. Did you say you have treatment team meetings?<br>A. Yes, ma'am, we communicated about her at treatment team meetings.<br>Q. Throughout these team meetings, was there ever any discussion about Ms. Diamond's mental health level classifications?<br>A. Yes, ma'am.<br>Q. What were those discussions?<br>A. So initially there was a discussion that due to her history that it was possible that she could require a higher level of care and it was at treatment team where we decided that her level would be raised to a level 3 initially. The first -- the initial time that she was made a level 3. That was modified to change back to a level 2. Then the second time we were asked to bring in two other consultants which was a previous psychiatrist that treated her and a psychologist that was familiar with her as well. And on that second treatment team, it was also decided that she would be a level 3 and she was -- which was modified as well.<br>Q. Just to back up, when Ms. Diamond first got to Coastal State Prison, what was her mental health classification?<br>A. Upon her arrival, her classification was a level 2. |

46

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | After reviewing and discussing some of the events that were transpiring at GDCP, we found out that she was housed with level 3 offenders, but was a level 2 as far as Scribe was concerned. So when she came here, I believe maybe that with her belief it was possible that she would return on that same sort of living environment. We didn't have level 3s at this facility. Level 2s are allowed to be housed in general population. Upon arrival, she was a level 2. <br> Q. You said at some point you made -- the mental health team made a recommendation that she be classified as level 3? <br> A. Correct. <br> Q. When did that happen? <br> A. Oh, I believe around about August 5 was the initial time. Which was, let's see, she arrived in June or July. It was about two months after. Around August 5 is when had we first made the determination that she needed to be -- she needed an increase in services due to her history, just some of them -- I think we had already had an incident where she reported feeling suicidal or reported self-injury. I believe I would have to look at the report. <br> There was a level of severity that prompted Dr. Fass to call an emergency treatment team meeting to kind of discuss it which it was decided that she would be a level 3 among the local treatment team. At that time it was just everyone that I named in the department. So just -- so not having Dr. Cleary or Dr. Osborn or Dr. Rhone involved, that was the local treatment team decision. <br> Q. So the first time you made that determination, what was that based on? <br> A. She had an episode of non-suicidal self-injury, if I'm not mistaken. Without having the CSU report with me, I wouldn't be able to tell you what exactly happened. I know it was an incident that caused us to have to prepare to send her to ACU or the CSU. <br> Q. Do you know why she was moved back to level 2? <br> A. We weren't told anything other than GDC leadership. <br> Q. Do you know who in GDC leadership? <br> A. No, ma'am, they didn't provide names at that time. <br> Q. So you said the second time two consultants came to evaluate Ms. Diamond? |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | A. Correct. So after that initial incident, Dr. Rhone, who is the clinical director for Centurion, she -- I don't want to say requested, but two other consultants were brought in, but both had previous treatment history with Ms. Diamond. They knew of her previous incidents of self-injury. They knew of her previous levels of care. So they were brought in to assist with the treatment team meeting.<br>Q. Around when was this?<br>A. September maybe. It was shortly after that, the August determination.<br>Q. And was Ms. Diamond moved to a level 3?<br>A. Briefly. She left this facility as a level 3 and returned that same day as a level 2.<br>Q. Do you know why she was returned as a level 2?<br>A. The only thing we were informed was GDC leadership. |
| 34:10-35:7 | Q. Around this time, how would you describe Ms. Diamond's mental health state?<br>A. So from what I remember. I recall her being emotional and frustrated at that point because we did -- because it happened at treatment team and it was a part of her treatment, we did inform her that she was being transferred out of level 3. We try to inform offenders not where they're going, but that they are leaving especially if we have to raise their level of care. Upon telling her, she did seem relieved that her level had been raised which is what she had been inquiring about.<br>The return, she just seemed really distraught. You could tell she had been crying, was extremely emotional because on the return, because I'm the unit manager, the warden asked me to go out to receive her to make sure -- I insured that she got back on the compound safely and that all the -- all the necessary paperwork was completed. I was the one who made initial contact with her on the nights that she was transferred back. You could just tell that she was tearful and beginning to be a lot more frustrated than normal, depressed, flat affect. |
| 35:23-36:4 | Q. Were you aware of any attempts of self-castration around this time when you were changing -- recommending that her mental health level be changed?<br>A. I believe she did disclose that, but not -- I wouldn't be able to speak to when. That was one of the |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | concerns that she did voice that she was attempting to self-castrate. |
| 36:5-36:23 | Q. So Ms. Diamond, the mental health treatment team recommended Ms. Diamond be placed at mental health level 3 a few months after Ms. Diamond arrived at Coastal State Prison, right?<br>A. Yes, ma'am.<br>Q. Is it fair to say that her mental health state was worsening over those months?<br>A. Clinically I wouldn't be able to say that because she had more in-depth conversations with the psychologist because he was the upper level provider. But I know that increasingly she became more tearful in her sessions, where initially when we would see her. I'm not going to say she was ever upbeat, but she held it together a lot better towards making of level 3 even in her return. You could see an obvious change that she was becoming more emotional. She was more -- just her entire presentation was starting to change. I don't really know how to best put it. There was a noticeable change. |
| 38:20-39:16 | Q. Did Ms. Diamond ever express to you suicidal thoughts?<br>A. Yes.<br>Q. When did she express those thoughts to you?<br>A. She -- at one point in time in my office she was actually down here seeing her counselor. She would often step over to my office just to kind of check in and let me know how she was doing at the time. That was one of the incidents where she did disclose that she just, you know, she felt like she was suicidal.<br>Q. When was that?<br>A. I don't have an exact date when that was.<br>Q. Do you remember the details of what suicidal thoughts she expressed?<br>A. As far as I can remember, there were never outward statements of like, I want to kill myself. It was more like she was tired or extremely frustrated, she just didn't know what to do. She felt like giving up. She never made actual statements to say, like, I'm going to kill myself or I want to hang myself, things like that. It was more talk of, you know, I'm just -- I'm so depressed. I'm so fed up. I'm frustrated. I just do not know what else to do. |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| 43:7-44:13 | Q. Do you see under serious suicide attempt or SID within past two years? It says, "Offender self-reports multiple incidents of binding." <br> A. Yes, ma'am. <br> Q. Were you aware of these multiple incidents of binding while Ms. Diamond was at Coastal State Prison? <br> A. She did make us aware. There were some incidents that were in question where it wasn't necessarily reported to us, it was reported to medical. Medical would come and notify us which would prompt us to have to complete the paperwork, as far as the binding was concerned. So eventually she did get to a point where she did come to us and actually start to disclose that. There were incidents where it was secondhand information. <br> Q. Looking at the risk factors, do you see significant intensity of duration of suicidal ideation? <br> A. Yes, ma'am. <br> Q. Can you tell me what you know about that? <br> A. For us it means how long -- generally we look at how long an offender has been on suicide precautions or duration of suicidal ideation. How many incidents of actual or attempted ACU or SCU admissions, placements in observation. So we look at all of those things to be able to determine how significant the risk is. And then she -- upon return from GDCP, she was placed on suicide precautions and she still continues to be on suicide precautions currently. She is a long-term -- she has a long-term profile for suicide precautions which speaks to the duration of suicidal ideation. It may not be current, but there is always a risk. |
| 44:14-45:6 | Q. Do you see under -- if you scroll down a little bit to current and recent within the past six months stressors, can you tell me about recent physical sexual abuse in prison? <br> A. Those were just speaking to the PREAs that she had reported and not reported, just what we knew of them or anything that she had reported at that time, not necessarily one incident in general. It was just speaking to the history of them, however many she had filed within that time frame. <br> Q. Based on this form, these recent physical sexual abuse in prison were putting Ms. Diamond at risk for |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | suicide; is that right?<br>A. I'm sorry. What was that, ma'am?<br>Q. The recent physical/sexual abuse in prison, is that a stressor that put Ms. Diamond at risk for suicide?<br>A. Yes, suicide and self-injury or mutilation, all of the above. |
| 45:3-45:6 | Q. The recent physical/sexual abuse in prison, is that a stressor that put Ms. Diamond at risk for suicide?<br>A. Yes, suicide and self-injury or mutilation, all of the above. |
| 46:1-46:6 | Q. Would you say that being placed in isolation or segregation puts Ms. Diamond at risk for suicide?<br>A. Yes, ma'am.<br>Q. What about a long-term lock down, would that put Ms. Diamond at risk for suicide?<br>A. Yes, ma'am. |
| 47:12-48:4 | Q. How often would you discuss Ms. Diamond with Warden Benton?<br>A. I'm going to say at least weekly, it could have possibly been more frequently, but I can't speak to how frequent. We had very regular conversations concerning her, her progress, how she is coming along. Things that mental health maybe needing to step in on like making sure she is attending her appointments or making sure she's compliant with medicine. Getting her to pill call because of how she has to -- because of her having to be escorted, you know, if there is an inability to escort her, then she misses out on her medicine, just kind of making sure we ensure continuity of care. Any security issues that she brings to me, I would address with him, any -- interactions that she wasn't comfortable with staff, she would kind of let me know, and I would speak to the warden. That's probably about it. |
| 48:5-48:16 | Q. Were those discussions with Deputy Warden of Care and Treatment Betterson there?<br>A. Not all the time, no, ma'am, no.<br>Q. How often do you speak with Deputy Warden Betterson about Ms. Diamond?<br>A. Not very often. If it's -- when we dealt with -- if it was a PREA concern, we would probably discuss her during that time. I didn't really discuss much with him. I more so went directly to the warden only because of the sensitivity of the nature. I knew that |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | most of it was imperative that I discuss it with him and let him decide how he dispersed the information. |
| 55:6-55:21 | Q. Have you ever heard any discussion about placing Ms. Diamond in a women's facility?<br>A. Only from her. I have never heard it via report like in discussions with the warden or anything like that. I have only been told that's what -- I have only been told that by her.<br>Q. Do you know why Ms. Diamond would like to be placed in a women's facility?<br>A. According to her, she just feels like she is more like a woman, a female offender, and especially with her being transgender she feels like she identifies more, she would be safer there as opposed to a male facility.<br>Q. Do you know if Ms. Diamond has ever been evaluated for placement in a women's facility?<br>A. I would say, no, not to my recollection. |
| 55:22-57:6 | Q. You also said that you spoke with Warden Benton about access to undergarments; is that right?<br>A. Yes, ma'am.<br>Q. Can you tell me about that?<br>A. So generally when transgenders leave from a facility and are transferred to a new one, their profiles don't change, so they're allowed to bring whatever garments they have at the old facility to their new facility. Somewhere in between her transport to Coastal and then her going out to a ACU CSU admission, she reported that she was lacking undergarments, so she may have only had one set of a bra and panty. I just kind of -- the counselor that was placed over the transgenders in general, you know, verbalized that she was having difficulty getting the items or that she had already submitted the request and it just hadn't been honored.<br>When I discussed it with the warden, I reminded him that generally you're not waiting for a new profile. When you come to your new facility, that profile stands from the old facility. There is no need to get approval from the regional director or anything like that because that profile was already there. They just needed to submit the request to the Deputy Warden of Administration and then he would in turn notify the warehouse which would pull those items |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | and hopefully distribute them to the offender.<br>Q. When did you have this discussion with Warden Benton?<br>A. I don't know specifically. I would definitely say --<br>one was dealing with a return from ACU SCU services.<br>I don't remember which one that was, so I couldn't<br>give you a specific date.<br>Q. Was it this year?<br>A. Not in 2021, no, ma'am. So 2020, if anything it would<br>have been that. |
| 71:9-71:11 | Q. When Ms. Diamond got to Coastal State Prison, was she<br>classified as a PREA victim?<br>A. Yes, ma'am. |
| 74:18-74:20 | Q. Fair to say October 8, 2020 Ms. Diamond was classified<br>as a PREA victim?<br>A. Yes, ma'am. |
| 95:7-97:7 | Looking at this email at the bottom of<br>page 4, what's the date for this email?<br>A. Friday, June 12, 2020.<br>Q. It looks like it's an email with Ms. Cantera?<br>A. Yes, I am. She sent it to me.<br>Q. Turn to page 5, at the first paragraph, do you see a<br>reference to Ms. Diamond requesting female items,<br>including a bra with padding to hide erect nipples and<br>a female package containing cosmetics?<br>A. Yes.<br>Q. What did you do with this request?<br>A. So it was to my understanding that the bras, they're<br>just a standard issue bra. I wasn't told if they had<br>padding or not. The female items, from what I was<br>explained is that because Diamond is at a male<br>institution, she would only be able to order items<br>that were on the male commissary. If the items that<br>she was requesting were typically female in nature,<br>number 1, that generally wouldn't happen because she's<br>in a male facility. Number 2, she would have to get<br>permission or that would come from somebody higher<br>than the warden to be able to make that call.<br>Because there was a certain GP counselor<br>assigned to handle the transgenders, I just spoke with<br>that counselor to let her know that she was still<br>requesting those items. That was also how we got on<br>the conversation of when an offender is transferred<br>here, they don't have to get approval to get those<br>items here. As long as they have the profile, it |

53

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | still remains. They should just be able to order a new set from our warehouse through the Deputy Warden of Administration.<br>Q. So who informed you that Ms. Diamond wouldn't get access to the female items because she's in a male facility?<br>A. Not necessarily that she wouldn't get access, but just that the only items that were accessible were because she was at a male facility were the ones that were offered on the commissary at this facility. That was Mr. Benton. I don't know what specific female items it was. I know the bra and panties. I don't remember what cosmetics she was speaking to. Or if it was, you know, a certain brand of soap. I don't know what specific she was asking for. So that's why he was -- he alluded to the fact that it wouldn't be a call that he would have to make because only female facilities have female commissary items and only male facilities have male commissary items.<br>Q. To be clear, this was a conversation with Warden Benton?<br>A. Yes. |
| | Q. Towards the top of page 4, it looks like you forwarded this email to Warden Benton; is that right?<br>A. Yes, ma'am.<br>Q. Okay. Turning to page 6, what is the date of this email?<br>A. June 15, 2020.<br>Q. Is this an email between you and Dr. Fass?<br>A. Yes.<br>Q. In the second paragraph, do you see what looks like a recommendation that she be allowed to have some female personal items including underwear?<br>A. Yes, ma'am.<br>Q. In those that is common in most states other than Georgia? |
| 97:8-97:22 | A. Yes. |
| | Q. Can you tell me what you know about Dr. Fass' recommendation in his email?<br>A. It was my understanding that she had panties and a bra. She wanted additional -- she wanted -- it had decreased down to one set, so she wanted an additional set. I believe in this email he was more so speaking |
| 97:23-99:12 | to the female cosmetic items which was a conversation |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | that they had and they discussed in depth which, you know, that request was not granted.<br>Q. Who was the request made to?<br>A. Mr. Benton.<br>Q. It was Mr. Benton who didn't grant that request?<br>A. Correct. He referred back to the issue with male facilities have male items, female facilities having female items, and that clearance would have to come from an authority higher than him.<br>Q. Do you know what -- who would be higher than Warden Benton?<br>A. I assume the regional director, Mr. Shepherd, or the facilities director, Mr. Toole. Mr. Shepherd is his direct supervisor. Mr. Toole is Mr. Shepard's direct supervisor. I assume it would be someone higher up and not those two. Either a higher-up official other than those two which would point to Mr. Holt or Mr. Ward.<br>Q. Just to clarify, Mr. Shepard is Dan Shepard?<br>A. Yes, ma'am.<br>Q. Mr. Toole is Robert Toole?<br>A. Yes, ma'am.<br>Q. Mr. Holt is Ahmed Holt?<br>A. Yes, ma'am.<br>Q. What's his position?<br>A. I believe he is the assistant commissioner. I'm not sure. I know Mr. Ward is the commissioner. I would have to look at the facilities ID board. I know he is not directly under Mr. Ward, second or third.<br>Q. So from this email it seems that this recommendation needed to be approved by the higher-ups at GDC; is that fair?<br>A. Yes, ma'am. |
| 104:6-105:7 | Q. Turning to the last page, what is this document?<br>A. This is an email on March 31, 2021 to myself from Dr. Fass concerning a PREA allegation that Offender Diamond filed about being spat on while she was showering in her dorm.<br>Q. Can you tell me any details you know about this PREA allegation?<br>A. So the PREA was -- the PREA was filed. And his recommendation, which is kind of -- showers are only allowed at certain points in time during the day for GDC. There is only so much flexibility that can be |

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | allowed. The recommendation was just verbalized to Mr. Betterson because Diamond is actually housed in a dorm that is for our evidence-based program. He has specific counselors who deal with that program and a specific chief counselor over that program. Any moves that happens in that dorm is supposed to go through them.<br>It was recommended to him that options be looked at for showering for her because of the allegation. This particular PREA has not been reviewed by SAIRT yet, if I'm not mistaken, unless it happened when I wasn't here. I don't know the outcome or the disposition of it as of yet because, like I said, it may have happened while I wasn't here. I don't know that they have had a meeting to discuss this particular incident. |
| 123:2-123:17 | Q. Regarding placement in segregation, are you aware of any prolonged placement of Ms. Diamond in segregation at Coastal State Prison?<br>A. For prolonged, I guess by security's standpoint is 30 days or longer. For mental health, prolonged is -- honestly, it could be five days depending on their mental status. For us, any, placement for Diamond honestly past three or four days at the max is prolonged because her mental status decompensates so quickly when she's in seg. The isolatory environment starting -- just her starting to withdraw again from interactions with staff.<br>Isolation segregation is such -- that building is so loud and it's dark. It's not conducive to her mental health, you know, a positive mental health environment for her. |
| 125:3-126:7 | Q. Okay. You were asked if you know if Ms. Diamond was ever evaluated for placement in a women's facility. Do you have any involvement in evaluating whether an offender should be placed in a men's facility or women's facility?<br>A. No. Typically that decision is supposed to happen with the statewide classification committee for transgenders. It typically happens at a higher level.<br>Q. Are you on that committee?<br>A. I'm not. Upon Ms. Diamond arriving here, she already understood that she had not -- she felt that she hadn't been classified correctly, but she also knew |

56

| Page and Line Range | Direct Examination Testimony (Fletcher) |
|---|---|
| | that she was not brought before a formal committee to discuss her justification as to why or present any reasoning as to why she wasn't considered for a female facility.<br>Q. Is that information Ms. Diamond passed on to you?<br>A. I knew about the statewide classification committee because of the SOPs for the job that we have to be aware of. She further discussed it upon -- not once she initially got here, but a little while into her incarceration she discussed that she hadn't spoken with anybody and wasn't allowed to present -- her doctors weren't allowed to present documentation, her lawyers weren't allowed to give any justification as to why she would be better suited for a female facility with the classification committee.<br>Q. Just to be clear, you weren't involved in that classification determination?<br>A. No, no, sir. |
| 138:21-139:8 | Q. Are you aware of her providers, Dr. Fass or Dr. Roth or Ms. Pepin or anyone on her mental health treatment team, ever making a recommendation that Ms. Diamond receive these specific items, the bra that's described here or a female package with cosmetics?<br>A. I can't speak to the bra with padding. I know the bra was requested. Like I said previously, the female package, because it was explained to us that because this was a male facility, you could only order items off the male commissary package. They wouldn't allow a female commissary package. That decision would not be able to be made by Mr. Benton. It would have to be someone of a higher position, a higher authority. |

## February 25, 2022 Deposition of Porshe Moody

| Page and Line Range | Direct Examination Testimony (Moody) |
|---|---|
| 5:1-5:3 | PORSHE MOODY,<br>having been duly sworn by the<br>Court Reporter, testified as follows: |
| 5:4-5:7 | THE REPORTER: Please state your<br>full name for the record.<br>THE WITNESS: My full name is<br>Porshe Lashea Moody. |

| Page and Line Range | Direct Examination Testimony (Moody) |
|---|---|
| 13:4-13:16 | Where are you currently employed, Ms. Moody?<br>A. I'm employed at a homeless shelter, so I do a lot of community work.<br>Q. How long have you been --<br>A. I'm sorry.<br>Q. Go ahead.<br>A. I'm sorry. Mainly, I've been here since May of 2021.<br>Q. And where did you work before that?<br>A. Before that I was employed at Coastal State Prison as a counselor there. |
| 14:11-14:16 | So, your time at Coastal, when did that begin?<br>A. That began in January of 2019.<br>Q. So did you work there continuously from January 2019 till May of 2021?<br>A. Yes, sir. |
| 15:4-15:19 | Q. So you worked for GDC then for, looks like a little over two years, January 2019 to May of 2021; is that right?<br>A. Yes. Yes, sir.<br>Q. What were your -- you mentioned you were a counselor; is that correct, at Coastal?<br>A. Yes, sir. I had held many responsibilities. I was also a part of the PREA team, which is the Prison Rape Elimination Act. I was a general counselor for any offender, so I did their intake when they first came in, their orientation, and then later in my last year of working there I became a release counselor, so I dealt with offenders that were getting released. |
| 19:11-19:17 | Q. Ms. Moody, are you familiar with Ashley Diamond?<br>A. I am.<br>Q. And who is Ashley Diamond?<br>A. Ashley Diamond was an offender that was assigned to my caseload when she first came to Coastal. |
| 26:9-26:12 | Q. Her sort of outward presentation; how would you describe that? |

| Page and Line Range | Direct Examination Testimony (Moody) |
|---|---|
| | A. As a woman. I mean, yeah, she identified as -- yeah. |
| 53:2-53:17 | Q. Did Ms. Diamond ever -- do you know how Ms. Diamond brought her PREA allegations to the attention of the facility? A. I know we had one a third party, but I'm not sure if she did the PREA allegations on a tablet or using the PREA that's located in the dorm. But I do know some were third party. Q. Did she ever communicate an allegation directly to you? A. Yes, in talking about the allegations that she had already reported, but she never initially reported any new PREAs to me, no. Q. But she talked to you about them? A. About her PREAs, like, you know I filed a PREA, in that context. |
| 53:24-54:7 | Q. And how would you respond? A. I responded in basically taking her suggestions as to what could help with this or, okay, well -- but there was never really any suggestions as to what any one person could do. It was always just by circumstance. For an example, there was one where she reported being in a shower and someone put a fan in the room and it blew her shower curtain back. |
| 54:8-55:2 | Q. You said a third -- you talked about a third-party PREA; is that right? A. Yes, sir. Q. What do you mean by that? A. Basically we got -- I want to say it was a letter stating that she reported a PREA, and those are considered third parties if it's coming from -- and I want to say it was from Southern Poverty of Law. Q. How did you see that? A. Every PREA, I would basically get an email, you know, with a PREA alert that a new PREA had came in. It didn't come directly to me. It was only forwarded to everyone that was on -- that was in the SART group. Q. Do you know who forwarded that to you? |

| Page and Line Range | Direct Examination Testimony (Moody) |
|---|---|
| | A. Sometimes it would be from the warden, Warden Benton, sometimes it would be from Betterson. |
| 82:3-82:6 | Q. Okay. Do you know Deputy Warden Betterson, whether he, in your experience at Coastal, whether he addressed PREAs seriously? A. I don't know. |
| 82:8-82:15 | Q. Do you have any reason in your experience to believe that he did not address the PREA process seriously? MR. FLEISHER: Objection. A. In hindsight, of course it's always 2020, I can see where there are some things that should have been done in response, but at the time, I'm not sure. |
| 86:13-87:3 | Q. A few minutes ago you were talking about PREAs and I think you said hindsight is 2020 but there were some things you think should have been done or could have been done. Could you elaborate on that? A. One of them meaning possibly organizing with her lawyer to discuss the PREAs that did occur. And I say that only because the point of a PREA is to make sure that it doesn't happen again, so if there were anything else that we could have implemented based on the scenario of it, to actually allow her to speak even, you know, with the lawyer present. Q. When you say her, again just for clarity, you're talking about Ms. Diamond? A. Ms. Diamond, yes, sir. |
| 87:4-87:16 | Q. And you talked a little bit about Ms. Diamond's dorm earlier. Do you know, was that dorm fully staffed with security staff? A. Yes. I do know that sometimes it would be one officer to a building. I'm not too familiar with the standards of security to say that there should have been two officers versus one but, yeah, there were definitely times where there was, you know, a shortage on an officer for that building. Q. There was a shortage of security officers? A. Yes, sir. |

| Page and Line Range | Direct Examination Testimony (Moody) |
|---|---|
| 87:24-88:6 | Q. To be clear, are you saying that sometimes there was only one officer in the building? A. Only one officer in the building; sometimes only one officer for two buildings, the one directly across from it. And I don't know if that was an odd time of the shift or just at certain times of the day. |

**February 24, 2022 Deposition of Gerilyn Pepin**

| Page and Line Range | Direct Examination Testimony (Pepin) |
|---|---|
| 24:13-24:16 | So you've been at Coastal since 2019? A. Yes. Q. Okay. And what is your title? A. My title is mental health counselor. |
| 25:1-25:21 | Q. Okay. So what are your responsibilities as a, you said mental health counselor? A. Yes. My responsibilities include seeing the offenders every six weeks. Also helping with crisis. If there's crisis that comes in or if there's offenders that need a crisis, we help with that. Also helping with suicide precautions, and that's part of the crisis. And also helping with our intakes. Every offender that comes into our prison, no matter if they're on mental health or not, we do -- we do intakes for them -- with them. There's many roles that we play. You know, we have to keep up with our documentation on a daily basis. And when it comes to -- there's another role that I help with is with our PREAs. I'm a PREA coordinator for mental health. And that includes, you know, taking the PREA assessment with the PREA offender or -- and also logging it in our system. Not in our system, in our logbook. And keeping the copies, putting the copies where they go. |
| 25:22-25:24 | Q. And PREA is the Prison Rape Elimination Act; is that right? A. Correct. |
| 25:25-26:16 | Q. Let me go back a little. You said one of your responsibilities is to help with the crisis. |

| Page and Line Range | Direct Examination Testimony (Pepin) |
|---|---|
| | Then you mentioned suicide. But are there other types of crisis? Could you explain a little more what that might involve?<br>A. Other types of crisis are if we're on call, okay, we're on call for, like, a week. We rotate our on-call duties. And during that, if a prisoner acts on suicide, we have to come into the prison. And then we call our psychologist and our psychiatrist. We do, like, a three-way calling with them, and they determine where they're going to go. They determine what their plan of treatment is going to be.<br>Q. Okay.<br>A. And they put the orders in. And then we just -- we do the paperwork for that. |
| 27:12-27:21 | And you mentioned being the PREA coordinator for mental health; is that right?<br>A. Correct.<br>Q. And can you talk a little more about what that involves?<br>A. That involves -- when we get notice that an offender is reporting a PREA, we get that notice from our deputy warden, care and treatment. Then we have to see that offender within 24 hours to do the mental health assessment from it. And I'm not the |
| 40:3-40:9 | Q. Do you know how -- do you have an idea of how often she's been on suicide precaution in the time that you've known her?<br>A. I don't know. I don't have -- I don't have the records to that one.<br>Q. Has it been more than once?<br>A. Oh, yes, it's been more than once. |
| 41:5-41:12 | Q. Okay. And I think you said before you understood her to be -- you understood -- understand Ms. Diamond to be a transgender woman; is that correct?<br>A. That's correct.<br>Q. And how did you know that?<br>A. Oh, excuse me. Well, by looking at her and she telling me that she was on hormones. Excuse me. |
| 41:15-41:20 | Q. Has Ms. Diamond ever expressed to you any concern about her placement, her dorm placement, her cell placement?<br>A. She has, but I've always told her that was |

| Page and Line Range | Direct Examination Testimony (Pepin) |
|---|---|
| | security's -- she was to go to security for that because we don't do that. |
| 42:13-42:15 | Q. Did she ever have -- express any concerns about being in a male facility? A. She did. |
| 42:16-42:20 | Q. What did she say? A. She -- you know, she just couldn't understand why she was in a male facility versus a female facility. And I couldn't give her any answer to that. |
| 43:1-43:3 | Q. Did you have any opinion about how her mental health might be affected by being in a male facility or a female facility? |
| 44:9-44:16 | A. You know, we had talked as a treatment team with her mental health status in a men's prison. And we -- we -- she did have many, many services from us, many services from us. More so -- I mean, you know, we tried to give our offenders services that they need. And she -- her mental health as far as being in a male prison versus, we did talk about that as a treatment team. |
| 44:17-44:25 | Q. And what did you say? A. I agreed with the treatment team that, first of all, she needed to be in a women's prison, but that wasn't my choice to move her to a women's prison. It was just that we decided as a treatment team and on our expertise from the psychiatrist, psychologist, and mine as her mental health counselor that she would do well in a women's prison. But on the other hand, in hindsight, she |
| 45:3-45:10 | Q. When you say you agreed with the treatment team, can you just identify again who that was? A. Yes, it was Dr. Fass, Dr. Roth. Dr. Fass the psychologist, Dr. Roth the psychiatrist, myself, Ms. Fletcher. When we discussed a particularly Diamond, we would -- it would just be Ms. Fletcher, myself, and the psychiatrist and the psychologist when we discussed her. |
| 54:11-54:17 | Q. Has Ms. Diamond expressed fear to you? A. Yes, she has. Q. And what has she expressed fear of? A. That she was fearful for her life. Q. Did she say why? |

| Page and Line Range | Direct Examination Testimony (Pepin) |
|---|---|
| | A. Because she felt that she was a woman in a male prison. |
| 55:3-55:5 | Q. So would it qualify as multiple times in your definition? A. Yes. |
| 57:13-57:23 | I want to talk a little about gender dysphoria. I know you said you don't make that diagnosis; correct? That's not within your licensure? A. Correct. Q. Are you familiar, though, with what gender dysphoria is? A. Not -- you know what? Not that much. I'm not familiar. I know that gender dysphoria is when they perceive to be another gender than what they actually are. |
| 58:4-58:6 | Q. Okay. Have you had experience working with people with gender dysphoria other than Ms. Diamond? A. Ms. Diamond is the only one. |
| 60:3-60:9 | Q. Are you familiar with any symptoms of gender dysphoria? A. The only symptoms that I'm familiar with are with the mental health symptoms. Depression, mood, you know, instability, those type of symptoms. Q. Have you seen those symptoms in Ms. Diamond? A. Yes. |
| 60:10-60:18 | Q. Are you familiar with gender-affirming care? A. No, I'm not. Q. Okay. Have you had any discussions with Ms. Diamond about her needs for certain treatment or things that could affirm her gender as a woman? A. That would be on the medical side. Q. So does that mean you haven't had those discussions? A. No, have not had those discussions with her. |
| 62:2-62:4 | Q. Do you know if Ms. Diamond was given access to things like female undergarments? A. I don't know if she was. I don't know. |
| 62:5-62:14 | Q. Did you ever talk to you about issues with that? A. She did. She talked to me about not being able to get those things. I would say I have no control over that. I can't get you those things. She needs to talk to the warden. |

| Page and Line Range | Direct Examination Testimony (Pepin) |
|---|---|
| | Q. Did you ever mention these issues to anyone else? A. I mentioned it to the warden, that she needed it. Not this warden but the previous warden. |
| 63:16-63:18 | A. The warden himself. Mr. Betten. Benton. Q. Benton? A. Yeah, Benton. |
| 63:24-64:2 | So Warden Benton, the head person, is the person who you brought Ms. Diamond's concerns to about things like undergarments? A. Yes. |
| 64:21-64:25 | Q. Do you remember that? And that -- am I correct you thought the treatment team was of the belief that Ms. Diamond could be placed in a female facility? A. Correct. |
| 70:12-70:16 | Can you tell me again what your role in the PREA process is? A. My role is really basically if Ms. Fletcher says to me, hey, we have a PREA, can you go down and meet the offender and do the assessment. |
| 70:17-70:25 | Q. Okay. A. So I do the assessment, I come back here. I -- I make all -- I give it to Dr. Fass for him to do his part. When he's finished, completed with his part, he will give it back to me. And then I will log it in our book and make the appropriate copies on where they need to go, and then give the original copy to Ms. Kaigler, the deputy warden, care and treatment. |
| 75:14-75:18 | Q. Okay. Are you aware of Ms. Diamond being sexually harassed? A. I am. Q. How are you aware of that? A. By her PREAs. |
| 112:20-113:4 | Q. Okay. Has Ms. Diamond ever expressed fear or apprehension about coming to see you, walking to see you? And by that, I mean the actual walk from the dormitory. A. The actual walk from the dormitory? Q. Yes. A. She has expressed that fear. I don't know how many times. But she has expressed it. I |

65

| Page and Line Range | Direct Examination Testimony (Pepin) |
|---|---|
| | wouldn't say every time, but she has expressed it a couple times. |

## February 11, 2021 Deposition of David Roth

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| 6:4-6:9 | DAVID S. R TH, M.D., having been remotely sworn by the Court Reporter, testified as follows: THE REPORTER: Your full name, please, for the record. THE WITNESS: David Samuel Roth. |
| 9:22-9:25 | Q. Okay. Is there any reason that you would not be able to give me complete honest answers to my questions today? A. Absolutely not. |
| 22:9-22:21 | Q. So, you mentioned that you currently work for the Georgia Department of Corrections. Are they your employer? A. Georgia Department of Corrections is not my employer. I am employed with Centurion/MHM, which is a private company that provides mental health services to the Department of Correction. They've had the contract to do so, per my understanding, for the past, I want to say around 15 or 20 years. It's been a long time. Well, before I arrived, so it must have been greater than 17 years, 19 years maybe they've had the contract. |
| 26:7-26:16 | Q. To be clear, what is your actual job title for MHM now? A. Now? Technically it's called lead psychiatrist at Coastal State Prison, which boils down to, I'm the main psychiatrist at this facility. There is another psychiatrist who does telepsych, I believe it's once a week. I'm here 40 hours a week, four ten-hour days a week, and I've been here for the last two, three years. |
| 28:11-29:3 | I did want to ask you, what are your current duties as lead psychiatrist at Coastal? |

66

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| | A. I routinely do evaluations on patients either being transferred from one facility to this facility. I do new evaluations for individuals that are just beginning mental health treatment. And for the most part after that, I do routine follow-up visits with those patients, particularly the ones that are on medications. I also attend to any crisis that may arise and I'm often involved in recommending what level of care and treatment an individual may need at a given point in time. I think that accounts for most of it, in addition to, of course, the treatment team and working with my staff closely. |
| 29:4-29:10 | Q. Who do you report to? A. I report to Ms. Fletcher, who is the mental health unit director, unit manager it's called. And on occasion, the clinical director is Dr. Fass. So, both of those individuals are in the hierarchy of who I would report to. |
| 30:3-30:24 | Q. Do you know Ashley Diamond? A. Yes, I do. Q. Who is she? A. She's a -- I know Ashley Diamond as a patient of mine. Q. What are Ms. Diamond's mental health diagnoses? A. I'm going to open the chart because I have actually... MS. CLEMONS: Actually, Alex, I'm going to ask you to go ahead and pull up DEF 296 and mark it as Roth Exhibit 2. (Exhibit Roth 2 marked for identification.) A. So, the first page I have here is -- you asked me about the diagnoses. On 1/26/21 I didn't make a major change in the diagnosis. It was mainly to put the gender dysphoria disorder as the principal diagnosis. So it's listed as such. And then the other diagnoses include post-traumatic stress disorder and unspecified personality disorder. |

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| 32:11-33:11 | Q. Why did you change Ms. Diamond's principal diagnosis to gender dysphoria? A. At a minimum, one, because that seemed to be the most pressing domain of symptomatic manifestations that she was experiencing, and certainly to support ongoing obtaining of hormone replacement therapy, as my prior experience, as I explained, was that with that diagnosis it would enable ongoing hormonal replacement therapy. Q. So you mentioned the symptoms that Ms. Diamond was showing of gender dysphoria. Can you tell me what those were? A. Basically the -- dysphoria is like a depression or, you know, it can be a lot of things, but depression-like symptoms. In her case it was fairly persistent, and hopelessness. I think those symptoms are actually listed there. Those symptoms that you see really relate to just that. The dysphoria depression secondary to the gender concerns and concomitant desire to live as a female and then, as noted, needs ongoing hormonal replacement therapy. So, that group of symptoms is what I'm referring to with regards to her gender dysphoria. |
| 40:23-41:2 | Q. To your understanding does being a transgender woman in a men's prison make those difficulties worse? A. It's an incredible challenge. I think so. |
| 41:15-41:24 | Q. So let's talk about -- I want to draw your attention back to the issue of sexual assault. Has Ashley ever -- are you aware of Ashley having been sexually assaulted in GDC custody? A. I'm aware of the PREAs that have been done, which is to say that that implies that she has, or at least has made reports that she has been sexually assaulted, either by an inmate or, in this case, an officer. |
| 43:11-43:17 | Q. Is it standard practice to include PREA reports in patients' mental health charts? A. I don't know what -- I don't know |

68

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| | that as a protocol. I just know that they are in the mental health record that is contained in the medical record, because I have copies of them. |
| 44:10-44:25 | Q. Okay. You mentioned two previous diagnoses sheets. What are the dates on those? A. There's one on 7/8/20. And on that one -- this is not the one I spoke of earlier. This one has different orders of the same or pretty much the same diagnosis, almost the same diagnosis. That was 7/8/20. The other one, 11/13/19 was the first one I encountered, and then there was that one I just mentioned. Q. Okay. A. And then there's mine, which is the most recent. Q. And that one is from January 26th of this year? A. Yes, yes. |
| 45:1-45:23 | MS. CLEMONS: Alex, if you'll refresh the documents in the exhibit folder, I just uploaded a file that is notes or diagnosis sheet. If you can go ahead and pull that up and label it as Roth Exhibit 3. THE TECHNICIAN: What is that new file labeled? MS. CLEMONS: July 8th, 2020 MH diagnosis. It's a PDF. THE TECHNICIAN: I see it. Thank you. One moment. (Exhibit Roth 3 marked for identification.) MS. CLEMONS: If you could just scroll down slowly. BY MS. CLEMONS: Q. Dr. Roth, if you could just look at this. A. Yes. Q. Generally review it. Is this the July 8th, 2020 diagnosis list that you're referring to? A. Yes, ma'am. |

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| 46:6-47:4 | Q. I want to draw your attention to the history of physical/psychological/sexual abuse. Do you see that?<br>A. Yes.<br>Q. There's a yes check mark there; is that correct?<br>A. Yes.<br>Q. But then there is no check mark in the &quot;clinically relevant&quot; box; is that right?<br>A. Yes.<br>MS. CLEMONS: Alex, if you could pull this down and put back up Exhibit 2.<br>Q. So, looking back at Exhibit 2, Dr. Roth, which is the updated diagnosis list that you did, if we look at that same line, history of physical, psychological and sexual abuse, yes is still checked; is that right?<br>A. Yes.<br>Q. But then &quot;clinically relevant&quot; is checked on this updated sheet. Is that correct?<br>A. Correct.<br>Q. Why was that change made?<br>A. Because it was felt to be pertinent, relevant, just like it says. |
| 47:8-47:19 | Q. Felt by whom to be clinically relevant?<br>A. Oh. Well, my name's on the paper and it looked -- I don't know if it's my check mark or not, but I'm comfortable with that because I've heard through Ashley of various episodes where she feels she was clinically abused -- excuse me, sexually abused.<br>Q. And you believe today, based on your understanding, that that is clinically relevant to her mental health treatment?<br>A. Yes, ma'am. |
| 74:12-75:1 | Q. Dr. Roth, what is the Acute Care Unit?<br>A. Acute Care Unit is a unit where individuals that are having a crisis of one sort or another, and that can be due to events that have happened or it could be due to a need for the medication to be adjusted because they're having break-through symptoms of one sort or |

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| | another, sufficient that they need to be seen daily.<br>In an ACU one is seen daily by a little mini team at that facility, including a physician or a nurse practitioner, a nurse and a mental health counselor, a minimum of those three daily, or virtually daily. |
| 76:16-77:5 | In fact, there was an incident on 12/28/20 where the concern level on my part, in addition to Dr. Fass, which such that we would -- I and Dr. Fass recommended a CSU -- ACU or a CSU, because I'm looking at my note. She was unable to contract at that time. So that is an instance of her having been referred to an ACU.<br>Q. What was it that led to your and Dr. Fass being so concerned?<br>A. Our mental health unit director reported that Ashley had been making increasing comments about self-injurious behavior, and so I wrote down, which usually involves innate binding and harming genitals. |
| 77:16-78:1 | But the plan, based on that information that I just read, was due to her history of self-harm and mutilation and recurring recent thoughts to resume that behavior.<br>Then I put I strongly recommend placement in CSU and noted that she was not contracting for her own safety. And then I also noted she get more frequency -- recommended increased frequency of contacts, 24/7 therapeutic environment for her safety. |
| 79:8-79:10 | Alex, if you would pull up the June 4th, 2020 psych eval notes documents. Mark it as Roth Exhibit 4. |
| 79:18-79:19 | (Exhibit Roth 4 marked for identification.) |
| 80:4-80:8 | Q. And is this the note that you wrote for Ms. Diamond when she came from GDC to Coastal in June of 2020?<br>A. Yes. I'm just trying to find mine in here. |

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| 80:11-81:11 | Q. I want to direct your attention, Dr. Roth, to the portion of this form that says, &quot;Current Mental Health Status,&quot; to the part that says: &quot;IM is making every effort to remain in population. She is chronically stressful, fearful and anxious and this setting activates triggers for PTSD. IM would be much more appropriately treated if housed in SLU as MH III where she will receive increased staff contact, feel safe and much less symptomatic.&quot; Do you see that? A. Yes, I do. Q. Is IM, is that Ashley Diamond in this instance? A. Yes. IM, I've since switched from IM, which stands for inmate. I refer to my folks as patients. I decided it's just -- it's more appropriate. Felt it was a more appropriate reference than inmates. Q. What is SLU, Dr. Roth? A. Supportive living unit. Individuals have single cells in there and it's a very, how would I describe, peaceful, relatively peaceful environment. Q. Does Coastal have an SLU? A. No, Coastal does not. |
| 81:24-82:14 | Q. Okay. And you say here that a transitional center would be more therapeutic than general population for Ms. Diamond; is that right? A. I'm reading my notes, which you have. Q. Yes, take your time. A. Absolutely. Says that a TC, you know, if she has that option in the near future, which I was lead to believe that would be much more therapeutic than being in general population is pretty much -- to us over here it's obvious. General population is just being put in with all the other inmates then in living in a dorm. So that would be, I think, absurd to do to her. |
| 82:19-82:24 | Q. Why is that? A. It would be dangerous for her. I |

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| | think she'd be preyed upon.<br>Q. Is that because she's a<br>transgender woman?<br>A. Yes. |
| 83:2-83:22 | Q. And then finally for this<br>document, for your recommendations it says if TC<br>is not readily available, MH Level 3 or<br>somewhere for IM's safety and increasing her<br>mental health services. Do you see that?<br>A. Um-hum, yes, I do. Right above it<br>it says discuss with treatment team regarding<br>increasing her level. To me this is the right<br>way to change levels, usually, is in conjunction<br>with getting other treaters involved in making<br>that decision.<br>So that's what that is, discuss<br>with treatment team regarding increasing to<br>Level 3 and then what you just said about the<br>TC. If it's not readily available, we need to<br>see that she's in an environment that is safe<br>for her.<br>Q. So was your recommendation that<br>Ms. Diamond be moved to a Level 3 facility or<br>transition center, was that adopted?<br>A. No. Neither occurred. |
| 116:21-117:9 | Q. Okay. Going back to Ms. Diamond's<br>history, you recall you were shown a document<br>where you were asked to record whether Ms.<br>Diamond had reported any history of sexual<br>abuse. Do you recall that?<br>A. Yes. I was looking over the<br>transfer note in particular. Absolutely that<br>was something that was mentioned about history<br>of physical, sexual abuse, in prison, not in<br>prison. You know, being raped.<br>So, yeah, she clearly, by history,<br>has been traumatized by physical and sexual<br>abuse. There's not a doubt in my mind about<br>that. |
| 118:12-119:13 | Q. Dr. Roth, when you were asked to<br>indicate on an inmate's medical form whether<br>there's a history of prior sexual assault or<br>sexual abuse, is what's reflected there --<br>strike that -- is that notation based on the |

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| | inmate's reported history, what the inmate tells you, or is that based on your personal knowledge of instances of sexual harassment or sexual abuse in the inmate's file? A. It could be based on the information that came to me from, her diagnostic evaluation and the docs over at the other facility, and/or anything she said. But it seemed to be a very clear history that had to do with physical and sexual abuse, traumatic, and that's where the PTSD comes in, based on those experiences. Q. In your treatment of Ms. Diamond, were these more historic experiences from childhood or adolescence? A. I couldn't characterize -- the answer is yes and no. Yes, I think things happened -- or I believe things happened during her formative years, but then also in her adult years. Because to be in a prison and having been raped, you're an adult, at least 18, so I think it's both. |
| 120:12-120:20 | Q. I want to ask you about the recommendation to transfer Ms. Diamond to a mental health Level 3 facility. Do you recall you were asked about specific differences between the level of care that inmates receive at mental health Level 2 facilities versus mental health Level 3 facilities? Do you recall that? A. Yes. |
| 121:16-122:2 | Q. I believe one of the other key differences you described was that inmates that are designated as mental health Level 3 are housed in a supportive living unit; is that right? A. Yes. Yes. Q. Now, because Coastal State Prison does not have a supportive living unit, an increase to mental health Level 3 for Ms. Diamond would require a transfer to a different facility; is that right? A. Technically to be a Level 3, yes. |

74

| Page and Line Range | Direct Examination Testimony (Roth) |
|---|---|
| 142:12-143:1 | Q. Is it your opinion that being transferred to a female facility would improve Ms. Diamond's safety?<br>A. You're asking me to kind of speculate. This is an opinion, right? You want an opinion?<br>Q. Based on your medical experience.<br>A. It's an interesting idea, but probably. I don't think she would be a danger to the women. I don't think that, but I'm not sure what the answer is going to evolve to be, but I do think it's something we all need to be thinking about as far as what steps should continue to be taken to properly treat, house and separate transgender folks. |
| 147:5-147:11 | Q. So, Dr. Roth, you testified that it was an interesting question about whether transgender women should be housed in female facilities. To your knowledge, does GDC currently assign transgender women to female facilities?<br>A. Not that I'm aware of, no. |